# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LTD., 515 King Street, Suite 300 Alexandria, VA 22314, <br><br> and <br><br> ADVANCE AMERICA, CASH ADVANCE CENTERS, INC., 135 North Church Street Spartanburg, SC 29306, <br><br><div align="center">Plaintiffs,</div><br><br><div align="center">v.</div><br><br> FEDERAL DEPOSIT INSURANCE CORPORATION, 550 17th Street, N.W. Washington, D.C. 20429, <br><br> BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, 20th Street and Constitution Avenue, N.W. Washington, D.C. 20551, <br><br> OFFICE OF THE COMPTROLLER OF THE CURRENCY, Constitution Center 400 7th Street, S.W., Suite 3E-218 Washington, D.C. 20219, <br><br> and <br><br> THOMAS J. CURRY, in his official capacity as the Comptroller of the Currency, Constitution Center 400 7th Street, S.W., Suite 3E-218 Washington, D.C. 20219, <br><br><div align="center">Defendants.</div> | Civil Action No. 14-953 |

## PROPOSED BRIEF OF THE STATE OF SOUTH CAROLINA AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS, COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LTD. AND <u>ADVANCE AMERICA, CASH ADVANCE CENTERS, INC.</u>

LEWIS S. WIENER
DC Bar No. 414479
SUTHERLAND ASBILL & BRENNAN LLP
700 Sixth Street NW, Suite 700
Washington, DC 20001
[Tel.] (202) 383-0140
[Fax] (202) 637-3593
Email: *lewis.wiener@sutherland.com*

SEAN D. JORDAN
DANICA L. MILIOS
ROBERT LEMUS
SUTHERLAND ASBILL & BRENNAN LLP
One American Center
600 Congress Ave., Suite 2000
Austin, Texas 78701
[Tel.] (512) 721-2679
[Fax] (512) 721-2656

ALAN WILSON
Attorney General

ROBERT D. COOK
Solicitor General
Email: *BCook@scag.gov*

J. EMORY SMITH, JR.
Deputy Solicitor General
Email: *Esmith@scag.gov*
Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
[Tel.] (803) 734-3680
[Fax] (803) 734-3677

COUNSEL FOR AMICUS CURIAE SOUTH CAROLINA

## TABLE OF CONTENTS

Index of Authorities ........................................................................................................ ii

Introduction ..................................................................................................................... 1

Statement of Interest ...................................................................................................... 2

Summary of the Argument .............................................................................................. 4

Argument ........................................................................................................................ 5

    I.     Operation Choke Point Exceeds the Powers of the Executive Branch ................... 5

         A.    Operation Choke Point Implicates *Youngstown*'s Guidance on the Limits of Executive Branch Authority ........................................................ 6

         B.    Under *Youngstown*'s Familiar Analysis of Executive Branch Power, the Administration's Authority Is at Its "Lowest Ebb" in Implementing Operation Choke Point ........................................................ 7

    II.    Operation Choke Point Impermissibly Infringes on State Sovereignty ................... 8

         A.    The Constitution Establishes a System of Dual Sovereignty Designed to Protect Against Official Tyranny ........................................... 8

         B.    The States Possess Sovereignty Concurrent with the Federal Government, Subject to the Limitations of the Supremacy Clause ............ 9

         C.    Operation Choke Point Is Not Executed in Accordance with the Supremacy Clause ................................................................................. 11

              1.    Operation Choke Point has not been subject to the bicameral process ....................................................................... 11

              2.    Operation Choke Point interferes with the States' inherent police power to regulate their state-chartered banks .................... 12

         D.    Operation Choke Point Violates State Sovereignty by Depriving Law Abiding Citizens of Due Process ..................................................... 13

Prayer ........................................................................................................................... 15

Certificate of Service ................................................................................................... 17

INDEX OF AUTHORITIES

**Cases**

*Alden v. Maine,*
    527 U.S. 706 (1999) ............................................................................................ 2, 10, 13

*Atascadero State Hosp. v. Scanlon,*
    473 U.S. 234 (1985) ................................................................................................. 4, 8-9

*BankWest, Inc. v. Baker,*
    411 F.3d 1289 (11th Cir. 2005), *vacated on grounds of mootness,*
    446 F.3d 1358 (11th Cir. 2006) .................................................................................. 7, 13

*Bond v. United States,*
    131 S.Ct. 2355 (2011) .............................................................................................. 10, 13

*Bond v. United States,*
    134 S.Ct. 2077 (2014) ................................................................................................... 12

*Coleman v. Thompson,*
    501 U.S. 722 (1991) ...................................................................................................... 13

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981) ........................................................................................................ 7

*Garcia v. San Antonio Metro. Transit Auth.,*
    469 U.S. 528 (1985) ...................................................................................................... 10

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ................................................................................................. 4, 8, 9

*Hamdan v. Rumsfeld,*
    548 U.S. 557 (2006) ........................................................................................................ 7

*Inv. Co. Inst. v. FDIC,*
    728 F.2d 518 (D.C. Cir. 1984) ................................................................................ 12-13

*Lewis v. BT Inv. Managers, Inc.,*
    447 U.S. 27 (1980) ........................................................................................................ 12

*Medellín v. Texas,*
    552 U.S. 491 (2008) .................................................................................................... 6, 7

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    132 S.Ct. 2566 (2012) ............................................................................................... 2, 12

*New York v. United States*,
      505 U.S. 144 (1992).................................................................... 9, 12, 13

*Printz v. United States*,
      521 U.S. 898 (1997)..........................................................................8-10

*United States v. Lopez*,
      514 U.S. 549 (1995)............................................................................ 12

*United States v. Morrison*,
      529 U.S. 598 (2000)............................................................................ 12

*Wyeth v. Levine*,
      555 U.S. 555 (2009).................................................................... 4, 8, 10

*Youngstown Sheet & Tube Co. v. Sawyer*,
      343 U.S. 579 (1952)..........................................................................5-8

## Statutes

U.S. CONST. art. I, § 8 ............................................................................... 9

U.S. CONST. art. II, § 3............................................................................ 5, 9

U.S. CONST. art. VI, cl. 2 .......................................................................... 9

U.S. CONST. amend. X .............................................................................. 10

## Other Authorities

160 Cong. Rec. H5192-08 (daily ed. June 10, 2014).................................. 14

3 J. Story, *Commentaries on the Constitution of the United States* § 1831 ................................. 10

Alan Zibel and Brent Kendall, *Probe Turns up Heat on Banks*,
      Wall St. J., Aug. 7, 2013 .................................................................... 14

Chuck Ross, *Store Owner Says Bank Accounts Closed Because He Sells Guns*,
      The Daily Caller, Aug. 6, 2014.......................................................... 14

Kelsey Harkness, *Bank Admits Choking Off 3 Legal Enterprises at Government Behest*,
      The Daily Signal, Aug. 26, 2014 ....................................................... 15

Kelsey Harkness, *Meet Four Business Owners Squeezed by Operation Choke Point*,
      The Daily Signal, Aug. 12, 2014 ....................................................... 14

Peter Schroeder, *Issa: Justice overreaching with 'Operation Choke Point'*
     The Hill, May 29, 2014.................................................................................................. 4

THE FEDERALIST No. 39 (James Madison) .................................................................................... 9

The State of South Carolina, as *amicus curiae*, by and through its undersigned counsel and pursuant to Rule 7, respectfully submits this proposed amicus brief in support of Plaintiffs' challenge to the legality of the executive administration's program called "Operation Choke Point." The State of South Carolina agrees with Plaintiffs that implementation of the program is beyond the power of the executive branch for reasons advanced by the Complaint. Absent from the Complaint or the briefing heretofore submitted to the Court, however, is any discussion of the issue that, from a State's perspective, Operation Choke Point impermissibly infringes on state sovereignty, and for that additional reason it should be held unconstitutional, Defendants' motion to dismiss should be denied, and the case should be permitted to proceed.

## INTRODUCTION

Operation Choke Point is an executive administration policy designed to "choke out" businesses that this administration considers "high risk" or otherwise objectionable, despite the fact that they are being operated in compliance with applicable law and are being regulated effectively and efficiently by the States. With no authorization from Congress, Defendants[1] have identified a list of such "high risk" businesses, and, under the guise of their authority to protect the safety and soundness of banks, are improperly pressuring banks—including state-chartered banks—to close the ordinary business accounts of, and terminate their banking relationships with, the targeted businesses. Am. Compl. at 21, ¶ 52. Defendants have threatened banks with adverse regulatory action such as increased scrutiny, prolonged examinations, and reduced examination ratings if they continue to allow the targeted businesses to maintain accounts in their

---

1. The executive branch agencies are the Federal Deposit Insurance Corporation ("FDIC"), the Board of Governors of the Federal Reserve System ("the Board"), the Office of the Comptroller of the Currency ("OCC"), and Thomas J. Curry, in his capacity as the Comptroller of the Currency. These entities and Mr. Curry will collectively be referred to as "Defendants."

banks.  *Id.* at 22, ¶ 55.  The policy's objective is to cut off funding to the targeted businesses, choking them out of existence.

The administration's dragnet is working.  Individual small-business-owning Americans, whose only "offense" is operating a legal, and in many cases regulated, business that happens to be disfavored by this administration, are finding themselves cut off from their banking partners, despite years of previous good relations and no complaints or issues related to their financial status.  Without a bank, a business cannot conduct basic operations, such as paying its bills or meeting its payroll.  In short, without access to a bank, a business cannot survive.  The executive administration is wielding its regulatory authority to effectively change the law, outlawing legal businesses that the States expressly allow to exist and that the States are properly regulating as part of their local economies.

The State of South Carolina respectfully submits this proposed amicus brief in support of Plaintiffs, Community Financial Services Association of America, Ltd. and Advance America, Cash Advance Centers, Inc. (collectively "Plaintiffs"), in their challenge to the legality of Operation Choke Point and to express its concern that Operation Choke Point is an overreach of federal executive authority and an affront to state sovereignty.

### STATEMENT OF INTEREST

The States are concurrent sovereigns in our federal system, whose "status as residuary sovereigns and joint participants in the governance of this Nation" is beyond question.  *Alden v. Maine*, 527 U.S. 706, 748 (1999) (citations omitted).  Also beyond question is the States' role as the primary protector of the public—a role historically facilitated through the "police power" of the State.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S.Ct. 2566, 2578 (2012).  South Carolina has a substantial interest in this litigation because Operation Choke Point is an overreach of executive administration power that improperly interferes in an area of traditional

state police power—the regulation of state-chartered banks.  As explained in the Complaint, Operation Choke Point uses banks, including state-chartered banks, through means unsanctioned by Congress, to shut down legal businesses that are regulated (as Congress intended) by the States.  By stepping between the States and their banks, and interfering in local bank operations, Operation Choke Point interferes with one of the most important, internal state relationships.

Further, Operation Choke Point violates the States' sovereignty by depriving their citizens and businesses of their livelihoods without due process.  Under this administration's policy, law abiding citizens and businesses are threatened with the loss of bank funding and banking relationships through no fault of their own, with no notice, opportunity to be heard, or recourse.  The ripple effect from Operation Choke Point goes beyond individual citizens and businesses to impact States' economies and other social structures in ways that cause disruption and interference with the States' well-established regulatory authority.

It is indeed ironic that Operation Choke Point originated with the United States Department of Justice, the cabinet agency whose fundamental purpose is to enforce the Constitution and laws of the United States and to preserve and protect the constitutional rights of Americans.  Operation Choke Point is the very antithesis of the rule of law, ignoring the legislative branch and denying the constitutional rights of our citizens.  As a result, hardworking "mom and pop" businesses, such as pawn brokers and small lenders, who have been accused of violating no law, are being strangled.  Operation Choke Point will undoubtedly adversely affect the economy and harm Main Street.

As Chairman of the House Oversight and Government Reform Committee has commented: "If the administration believes some businesses should be out of business, they should prosecute them before a judge and jury.  By forcibly conscripting banks to do their

bidding, the Justice Department has avoided any review and any check on their power."  Peter

Schroeder, *Issa: Justice Overreaching with 'Operation Choke Point'*, The Hill, May 29, 2014,

*available   at*  http://thehill.com/policy/finance/207601-issa-justice-overreaching-with-operation-

choke-point.

South Carolina asks the Court to rule Operation Choke Point unconstitutional and to

bring this illegal program to an end.

<div align="center">

### SUMMARY OF THE ARGUMENT

</div>

"In order 'to ensure the protection of our fundamental liberties,' the 'Constitution

establishes a system of dual sovereignty between the States and the Federal Government.'"

*Wyeth v. Levine*, 555 U.S. 555, 583 (2009) (Thomas, J., concurring) (quoting *Atascadero State*

*Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985); *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)).

The balance of power is shared among Congress, which is authorized to create laws pursuant to

its specifically enumerated powers, the executive branch, which is authorized to enforce the laws

as passed by Congress, and the States, where the residual powers not enumerated by the

Constitution remain.  While the federal government is empowered to exert its authority over the

States through the Supremacy Clause, it must do so according to the structural limitations of that

clause, *i.e.*, it must pass laws that are within the federal government's constitutional authority,

and it must do so through the bicameral and presentment procedures of the legislative process.

Operation Choke Point, as conceived and executed, runs afoul of the structural limits on

executive power vis-à-vis both Congress and the States.   The policy emanates not from

Congress, but only the executive administration.   It is an unconstitutional extension of the

executive administration's power in its own right by claiming prerogatives that the Framers

explicitly withheld from it.  Moreover, Operation Choke Point is imposed on the States with no

<div align="center">

4

</div>

attempt to comply with the Supremacy Clause's restrictions.  It was never subjected to the rigors of the bicameral process, and it trammels one of the most fundamental state powers—the traditional police power to regulate state banks.

Further, Operation Choke Point is imposed on the States' law abiding citizens, with the intent of eliminating their businesses, with no due process.  Indeed, as has been widely reported, small business owners are feeling the squeeze of Operation Choke Point, as their banks are terminating their accounts and other banking relationships for no reason, other than the executive administration's unauthorized pressure to do so.

Operation Choke Point thus undermines every purpose of our federalism.  It exceeds the constitutional authority of the executive branch, it intrudes upon the States as States, threatening their sovereignty in terms of the States' regulatory authority, and it threatens the fundamental liberties of the States' citizens.

For all of these reasons, Operation Choke Point is unconstitutional and the executive administration should be ordered to cease its implementation.

## ARGUMENT

## I.   OPERATION CHOKE POINT EXCEEDS THE POWERS OF THE EXECUTIVE BRANCH.

Operation Choke Point is an impermissible expansion of executive power that encroaches on both state sovereignty and the due-process rights of the citizenry.  As the Constitution makes clear, and the Supreme Court has confirmed, the executive branch has no authority to act in the public interest absent a grant of power from the Constitution or an act of Congress.  U.S. CONST. art. II, § 3; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).   Because Operation Choke Point is not supported by either the Constitution or an act of Congress, it should be enjoined from continuing to impugn the rights of law abiding citizens.

**A.      Operation Choke Point Implicates *Youngstown*'s Guidance on the Limits of Executive Branch Authority.**

The President has the power to execute the laws of the land, not make them.  *Medellín v. Texas*, 552 U.S. 491, 532 (2008).  And the Supreme Court has made clear that executive actions unsupported by constitutional authority are void.  *Youngstown*, 343 U.S. at 589.

In *Youngstown*, the Supreme Court considered the validity of President Truman's executive order requiring the Secretary of Commerce to seize certain steel mills, whose workers were attempting to strike, in order to keep the mills running to support the war effort in Korea.  *Id.* at 583.  The Court held that "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President."  *Id.* at 588.  In other words, the executive branch was not enforcing the will of Congress, but rather was engaged in unconstitutional and unsanctioned law making.  *Id.* at 588-89.

Justice Jackson's concurrence provided a three-pronged analysis of executive power vis-à-vis the Constitution and acts of Congress.  *Youngstown*, at 634-655 (Jackson, J., concurring).  Justice Jackson explained that there are three levels of executive authority:

1.      When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.

2.      When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain.

3.      When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.

*Id.* at 635-638.  In the third category, the President's actions can be sustained only if the executive action is "within his domain and beyond control by Congress."  *Id.* at 640.  Justice Jackson's analysis of executive power has been subsequently adopted by other Supreme Court decisions, and has become the benchmark for evaluating the limits of executive power.  *See Dames & Moore v. Regan*, 453 U.S. 654, 668-69 (1981); *Hamdan v. Rumsfeld*, 548 U.S. 557, 593 n.23 (2006), *id.* at 638-39 (Kennedy, J., concurring); and *Medellín*, 552 U.S. at 523-26.

      **B.**      **Under *Youngstown*'s Familiar Analysis of Executive Branch Power, the Administration's Authority Is at Its "Lowest Ebb" in Implementing Operation Choke Point.**

Applying Justice Jackson's *Youngstown* analysis, Operation Choke Point is the exercise of executive authority at its lowest ebb.  Because this exertion of executive authority is neither within the executive administration's domain, nor beyond the control of Congress, Operation Choke Point cannot be sustained.

To begin, Operation Choke Point is indisputably implemented by the executive branch in the absence of any specific congressional authorization.  Therefore, it cannot be justified under the first prong of the *Youngstown* analysis.  *See Youngstown*, 343 U.S. at 638.  Nor can Operation Choke Point be sustained under the second prong of *Youngstown* because Congress has not left the regulation of state banks an "open field."  *See id.* at 639.  Congress has debated and addressed state-bank regulation through a variety of proposed and enacted legislation, including the Federal Deposit Insurance Act ("FDIA").  And Congress has specifically opted not to preempt state regulation of state-chartered banks.  *BankWest, Inc. v. Baker*, 411 F.3d 1289, 1301 (11th Cir. 2005), *vacated on grounds of mootness*, 446 F.3d 1358 (11th Cir. 2006); *see infra* at II.C.2.

That leaves the third prong of *Youngstown*, the "lowest ebb." Under this prong, the executive branch must rely on an express constitutional grant *of its own* to justify executive action. But there is none: Operation Choke Point is not implemented pursuant to any of the executive branch's express constitutional powers. There is no public crisis requiring executive intervention, there is no foreign or domestic hostility, and there are no foreign relations at issue.

Through Operation Choke Point, the executive administration is engaging in covert law making, not law enforcement, in violation of its constitutional authority. As Justice Jackson recognized, the framers intentionally created a limited executive—using the "unlimited executive power" and "prerogative exercised by George III" as the contrast to what is and is *not* allowed under our federal system of government. *See Youngstown*, 343 U.S. at 641. Operation Choke Point extends the executive power beyond its constitutionally intended boundaries.

## II.   OPERATION CHOKE POINT IMPERMISSIBLY INFRINGES ON STATE SOVEREIGNTY.

In addition to expanding executive branch authority beyond its own constitutional limits, Operation Choke Point also violates our federal system of dual sovereignty. The policy intrudes on the States' proper role as primary protector of the public and threatens the liberty interests of the citizenry that the system is intended to protect. Because Operation Choke Point cannot be justified as a matter of executive power and because its implementation is an affront to States' sovereignty, the policy should be permanently enjoined.

### A.   The Constitution Establishes a System of Dual Sovereignty Designed to Protect Against Official Tyranny.

"It is incontestable that the Constitution established a system of 'dual sovereignty'" between the States and the Federal Government. *Printz v. United States*, 521 U.S. 898, 918 (1997) (quoting *Gregory*, 501 U.S. at 457; *Wyeth*, 555 U.S. at 583 (Thomas, J., concurring). The Framers devised the system to "ensure the protection of our fundamental liberties," *Atascadero*,

473 U.S. at 242 (internal quotations omitted), and to "reduce the risk of tyranny and abuse from either front," *Gregory*, 501 U.S. at 458.  The system is premised on the Framers' belief that a "decentralized government . . . will be more sensitive to the diverse needs of a heterogeneous society" and will increase "opportunity for citizen involvement in democratic processes." *Id.*

The separation of the States and the federal government "is one of the Constitution's structural protections of liberty." *Printz*, 521 U.S. at 921.  "It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority." *Id.* at 928.  By dividing "power among sovereigns and among branches of government . . . the Constitution protects us from our own best intentions . . . so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day." *Id.* at 933 (citing *New York v. United States*, 505 U.S. 144, 187 (1992)).

> **B.      The States Possess Sovereignty Concurrent with the Federal Government, Subject to the Limitations of the Supremacy Clause.**

The distribution of power between the federal government and the States is expressly delineated by the Constitution.  *Printz*, 521 U.S. at 919.  On the federal side of the balance, Congress is granted certain, discrete, enumerated powers, U.S. CONST. art. I, § 8, that, under the Supremacy Clause, are the "supreme Law of the Land," U.S. CONST. art. VI, cl. 2.  The Executive Branch is required to "take Care that the Laws be faithfully executed."  U.S. CONST. art. II, § 3.  On the other side of the balance, the States "retained a residuary and inviolable sovereignty" when they entered the Union.  *Printz*, 521 U.S. at 918-19 (citing THE FEDERALIST No. 39, at 245 (James Madison)).  This residual sovereignty is implicit in the federal government's enumerated powers, but it is explicit in the Tenth Amendment:  "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved

to the States respectively, or to the people." U.S. CONST. amend. X; *Printz*, 521 U.S. at 919; *Alden*, 527 U.S. at 713.

The delicate balance of power is maintained by the proper application of the Supremacy Clause. Specifically, the Supremacy Clause grants overriding effect to the laws of the United States, but only to the extent they are "made in Pursuance" of the Constitution. *Wyeth*, 555 U.S. at 585 (Thomas, J., concurring). That command, in turn, requires Congress—to the extent it desires to impose its will on the States—to (1) pass laws (2) that are within its discrete, enumerated powers through the bicameral process established by the Constitution. *Id.* at 586-87 (Thomas, J., concurring). That process is a crucial part of the Constitution's protections of State sovereignty and "ensures that laws that unduly burden the States will not be promulgated." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 556 (1985).

The protections afforded by the process are intentional and clear as "the Framers were acutely conscious that the bicameral requirement and the Presentment Clauses would serve essential constitutional functions, by allowing the passage of legislation only after it has proceeded through a step-by-step, deliberate and deliberative process." *Wyeth*, 555 U.S. at 586 (Thomas, J., concurring) (internal citations omitted). Thus "the federal balance is, in part, an end to itself, to ensure that States function as political entities in their own right." *Bond v. United States*, 131 S.Ct. 2355, 2364 (2011) (*Bond I*). When this intended balance is upset, "[a]ctions of the Federal Government 'which are not pursuant to its constitutional powers, but which are invasions of the residuary authorities of the smaller societies,' are not 'the supreme law of the land. They will be merely acts of usurpation, and will deserve to be treated as such.'" *Wyeth*, 555 U.S. at 586-87 (Thomas, J., concurring) (quoting 3 J. Story, *Commentaries on the Constitution of the United States* § 1831, at 694).

While the requirements that the federal government must (1) pass laws that are (2) within its powers for its laws to have preclusive effect under the Supremacy Clause may seem to state a self-evident constitutional truism, the absence of both these elements demonstrates why the executive administration's Operation Choke Point constitutes an unwarranted invasion of the States' sovereignty.  The policy both lacks congressional action and extends the reach of the federal government far beyond its constitutionally designated powers.

**C.     Operation Choke Point Is Not Executed in Accordance with the Supremacy Clause.**

**1.     Operation Choke Point has not been subject to the bicameral process.**

First, because Operation Choke Point does not arise from any act of Congress, it necessarily has not been subject to any of the protection or scrutiny that is intended by the bicameral process.  There has been no opportunity for debate or deliberation over the merits of the policy, and thus no opportunity for the States' representatives in Congress to voice the States' concerns with it.[2]

Rather, as discussed above, *supra* at I.B, Operation Choke Point was devised solely as an out-growth of the executive administration's policy goals to eliminate the targeted businesses from our nation's economy.  With no authorization or input from Congress, much less the sovereign States, Operation Choke Point identifies certain legal businesses, whose primary regulation Congress has left to the States, and targets them for devastating business interference. Bypassing Congress and ignoring the bicameral system, Operation Choke Point stifles those businesses by pressuring banks, including state-chartered banks, to not engage in any transactions with these businesses, including, among other things, simple checking accounts.

---

2. That process may yet occur, however.  Congressman Blaine Luetkemeyer, and fourteen co-sponsors, have introduced a bill in the House of Representatives entitled "End Operation Choke Point Act of 2014." H.R. 4986.  No action on the bill is currently reported.

Thus, Operation Choke Point threatens to shut down legal businesses, operating within laws and regulations imposed by the various States, simply because the administration disapproves of them.

### 2. Operation Choke Point interferes with the States' inherent police power to regulate their state-chartered banks.

Second, and putting aside the fact that the policy has no basis in an act of Congress, Operation Choke Point intrudes on one of the most fundamental of the States' residual powers— the general power of governing, also known as the States' police power. *Sebelius*, 132 S.Ct. at 2578. The Framers of "'the Constitution created a Federal Government of limited powers,' while reserving a generalized police power to the States." *United States v. Morrison*, 529 U.S. 598, 619 n.8 (2000) (quoting *New York*, 505 U.S. at 155). As pointedly explained by Justice Thomas, "[W]e *always* have rejected readings of . . . the scope of federal power that would permit Congress to exercise a police power." *United States v. Lopez*, 514 U.S. 549, 584 (1995) (Thomas, J., concurring) (emphasis in original). Indeed, "[t]he Federal Government has nothing approaching a police power." *Id.* at 584-85; *Sebelius*, 132 S.Ct at 2578 (cautioning against reading the federal government's powers as authorizing a police power); *Bond v. United States*, 134 S.Ct. 2077, 2086 (2014) (*Bond II*) (the federal government has no police power).

Perhaps one of the most important aspects of the States' police power is the inherent authority to regulate state-chartered entities, such as banks. "[S]ince the early days of our Republic, the States have chartered banks and have actively regulated their activities." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 38 (1980). As the Supreme Court noted over thirty years ago, "banking and related financial activities are of profound local concern. . . . [S]ound financial institutions and honest financial practices are essential to the health of any State's economy and to the well-being of its people." *Id.*; *see Inv. Co. Inst. v. FDIC*, 728 F.2d 518, 525 (D.C. Cir.

1984) (noting the "primary role Congress intended state agencies to play in the regulation of state banks"). Congress itself recognizes and accommodates the States' historical interest in regulating their state-chartered banks. Under the FDIA, the states are the "primary regulatory authority" over state banks. *BankWest*, 411 F.3d at 1301.

By pressuring state-chartered banks to end all business relationships with the targets of Operation Choke Point, Defendants interfere with the States' ability and responsibility to regulate their banks as they see fit, intruding on the States' inherent authority over their banks and undermining their status as sovereign entities. "When the Federal Government asserts authority over a State's most fundamental political processes, it strikes at the heart of the political accountability so essential to our liberty and republican form of government." *Alden*, 527 U.S. at 751. Operation Choke Point "blur[s] . . . the distinct responsibilities of the State and National Governments . . . displacing state decisions that go to the heart of representative government." *Id.* (internal citations omitted). Operation Choke Point is an unwarranted and unconstitutional invasion of States' sovereignty.

**D.    Operation Choke Point Violates State Sovereignty by Depriving Law Abiding Citizens of Due Process.**

Operation Choke Point upends the allocation of powers in our federal system, undermining the "integrity, dignity, and residual sovereignty of the States." *Bond I*, 131 S.Ct. at 2364. Yet, the States "are not the sole intended beneficiaries of federalism." *Id.* (citing *New York*, 505 U.S. at 181). The purpose of federalism is not just "setting the boundary between different institutions of government for their own integrity." *Id.* "'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'" *New York*, 505 U.S. at 181 (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting)).

Those intended liberties are cut short by Operation Choke Point.  By orchestrating the closure of, or imposing financial hardship on, the targeted businesses, Operation Choke Point directly interferes with the livelihoods of countless law abiding citizens without any process at all, much less that which is due.  The Justice Department has asserted that Operation Choke Point is "changing the structures within the financial system that allow all kinds of fraudulent merchants to operate [with the intent of] choking them off from the very air they need to survive."  Alan Zibel and Brent Kendall, *Probe Turns up Heat on Banks*, Wall St. J., Aug. 7, 2013, at http://online.wsj.com/news/articles/SB10001424127887323838204578654411043000772. The flaw with the Justice Department's stance is that Operation Choke Point does not target only "fraudulent merchants," but rather indiscriminately sweeps up lawful businesses as well without any showing of fraud.  As recognized by Congressman Roger Williams, Operation Choke Point forces "banks to cut ties with law abiding businesses like sporting goods stores, licensed gun dealers, and thousands of others, [leaving] these business owners [with] no recourse."  160 Cong. Rec. H5192-08 (daily ed. June 10, 2014) (statement of Rep. Williams).

For example, former police officer and Army veteran, Brian Brookman, received a letter from his bank closing his pawnshop's business account, with no warning or explanation.  *See* Kelsey Harkness, *Meet Four Business Owners Squeezed by Operation Choke Point*, The Daily Signal, Aug. 12, 2014 *available at* http://dailysignal.com/print/?post_id=153400.  So did Marc Cohen, owner of a sporting goods store, who sells guns.  *Id.*  Morris Williams, who owns Inman Gun and Pawn, received a termination letter from his bank, despite having what he says was an "excellent" relationship with the bank.  *See* Chuck Ross, *Store Owner Says Bank Accounts Closed Because He Sells Guns*, The Daily Caller, Aug. 6, 2014 *available at* http://dailycaller.com/2014/08/06/store-owner-says-bank-accounts-closed-because-he-sells-guns/.

And recently, in a move that could impact thousands of small businesses, SunTrust Bank announced that it plans to prophylactically cut ties with pawn shops and other legal businesses on the Operation Choke Point target list, citing "risk considerations."  *See* Kelsey Harkness, *Bank Admits Choking Off 3 Legal Enterprises at Government Behest*, The Daily Signal, Aug. 26, 2014 *available at* http://dailysignal.com/2014/08/26/suntrust-bank-chokes-3-legal-enterprises-government-behest/.

This sort of governmental interference with citizen's lives and businesses is exactly the sort of activity that prompted the Framers to create the federal structure.  If Congress or the States determine that the targeted businesses need different or additional regulation, they are empowered to put such regulations into law—through the legislative process that ensures that all sides are heard and considered in the debate, including the States' interests in governing its local businesses.  Operation Choke Point bypasses those protections and in doing so violates the due process of the States' citizenry and infringes on the States' sovereignty.

## PRAYER

The Court should deny Defendants' motions to dismiss, allow Plaintiffs' challenge to Operation Choke Point to proceed, and ultimately order Defendants to cease implementation of the policy.

Respectfully submitted,


/s/ Lewis S. Wiener
Lewis S. Wiener
DC Bar No. 414479
SUTHERLAND ASBILL & BRENNAN LLP
700 Sixth Street NW, Suite 700
Washington, DC 20001
[Tel.] (202) 383-0140
[Fax] (202) 637-3593
Email: *lewis.wiener@sutherland.com*

Sean D. Jordan
Danica L. Milios
Robert Lemus
SUTHERLAND ASBILL & BRENNAN LLP
One American Center
600 Congress Ave., Suite 2000
Austin, Texas 78701
[Tel.] (512) 721-2679
[Fax] (512) 721-2656


ALAN WILSON
Attorney General

ROBERT D. COOK
Solicitor General
Email: *BCook@scag.gov*

J. EMORY SMITH, JR.
Deputy Solicitor General
Email: *Esmith@scag.gov*
Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
[Tel.] (803) 734-3680
[Fax] (803) 734-3677

COUNSEL FOR SOUTH CAROLINA

### CERTIFICATE OF SERVICE

I certify that, on October 9, 2014, the foregoing document was filed via the Court's

CM/ECF Document Filing System.  The Court's Notice of Docket Activity constitutes service on

all registered CM/ECF filing users, including the following counsel of record:

Charles J. Cooper
David H. Thompson
Howard C. Nielson, Jr.
Harold S. Reeves
COOPER & KIRK, PLLC
1523 New Hampshire Avenue N.W.
Washington, D.C. 20036
[Tel.] (202) 220-9600
Email: *ccooper@cooperkirk.com*

Duncan Norman Stevens
FEDERAL DEPOSIT INSURANCE CORPORATION
Legal Division, Professional Liability Unit
3501 Fairfax Drive
Arlington, VA 22226-3500
[Tel.] (703) 562-2402
Email: *dstevens@fdic.gov*

Erik Bond
FEDERAL DEPOSIT INSURANCE CORPORATION
Corporate Litigation Unit
3501 Fairfax Drive, D-7074
Arlington, VA 22226
[Tel.] (703) 562-6461
Email: *erbond@fdic.gov*

Yvonne F. Mizusawa
FEDERAL RESERVE BOARD
20th & C Streets N.W., Room 1000F
Washington, DC 20551
[Tel.] (202) 452-3436
Email: *yvonne.f.mizusawa@frb.gov*

Peter Chadwell Koch
OFFICE OF THE COMPTROLLER OF THE CURRENCY
Litigation Division
400 7th Street S.W.
Washington, DC 20219
[Tel.] (202) 649-6313
Email: *peter.koch@occ.treas.gov*

Ivan B. Knauer
PEPPER HAMILTON, LLP
600 14th Street N.W., Suite 500
Washington, DC 20005-2004
[Tel.] (202) 220-1219
Email: *knaueri@pepperlaw.com*

/s/ Lewis S. Wiener
Lewis S. Wiener