**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMUNITY FINANCIAL SERVICES
ASSOCIATION OF AMERICA, LTD. *et al.*,

       Plaintiffs,

    v.                                                                  Civil Action No. 14-953 (GK)

FEDERAL DEPOSIT INSURANCE
CORPORATION, *et al.*,

       Defendants.


**BRIEF OF *AMICUS CURIAE* THIRD PARTY PAYMENT PROCESSORS ASSOCIATION IN**
**SUPPORT OF PLAINTIFFS' COMPLAINT FOR**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

**INTEREST OF AMICUS CURIAE**

The Third Party Payment Processors Association (the "TPPPA") has a strong and independent interest in this Court's decision on the Defendants' Motions to Dismiss Plaintiffs' Amended Complaint.  The TPPPA files this brief, *amicus curiae,* to inform the Court how banking regulators' discriminatory oversight of their own sensible guidance to banks on managing third-party risks has harmed consumers, banks, third party payment processors ("TPPPs"), and merchants, caused confusion and inefficiency within the financial services industry, and undermined the objectives of the guidance itself.  The TPPPA therefore also files this brief to urge the Court to deny the Defendants' Motions to Dismiss in order to afford Plaintiffs the opportunity to prove the allegations set forth in the Amended Complaint.

Plaintiffs' Amended Complaint alleges facts consistent with the experience of several TPPPA members and/or their customers, especially insofar as it describes the troubling disconnect between regulators' commonsense guidance to banks to manage third-party risks and regulators' moralistic efforts to abolish whole industries that the government disfavors in the guise of the bank examination process.  The TPPPA and its members have a strong interest in this Court requiring regulators to perform their mandate of examining banks to ensure their financial safety and soundness, and not to overreach that important function by using the examination process as pretext to make subjective judgments on lawfully operating industries.

Government regulation selectively aimed at lawful, yet unpopular, industries must be stopped.  Respectfully, the public interest demands that this Court deny the Defendants' Motions to Dismiss the Amended Complaint and convene a trial on the Plaintiffs' allegations.

## I.      BACKGROUND

The TPPPA is a national, not-for-profit organization.  Its basic mission is to help TPPPs and bank members operate efficiently and compliantly within the financial services industry.  TPPPs facilitate monetary transactions between consumers, merchants, and banks.  The TPPPA helps its members perform this important role in the economy principally by educating its members on industry rules and regulations, providing compliance tools and training, and advocating its members' interests within the payments industry, to members of Congress, to state government officials, and to government regulators.

For example, the TPPPA educates its members on current rules and regulations governing the payments industry.  It also trains its members and provides comprehensive tools to support members' compliance programs.  In sum, TPPPA members rely on the organization for the latest guidance and best practices to comply with laws, rules, and regulations governing their industry.

The TPPPA's membership is primarily comprised of payment processing companies, payroll processors, and banks.  TPPPs provide essential services to diverse industries, and they function as necessary intermediaries between merchants and banks in a complex payments system.  For example, a TPPP may receive from its merchant client a list of payments to be generated by the merchant to pay for goods or services received, and/or a list of payments to employees for payroll.  The TPPP will then submit a payment file with payments from all of its merchant clients to its bank.  These payment files include payments to be pulled from an account to pay for goods or services, and payments to be sent to an account for payroll or vendor payments.  The bank will then introduce the payments into the payments system and receives settlement for the payments.  The funds are then passed from the bank to the TPPP, who settles with the merchant.  Banks are obviously critical to the payment processing system.  In fact, electronic payment processing is not possible without them.

Between 2008 and 2014, the Federal Deposit Insurance Corporation ("FDIC") published a series of Finanical Institution Letters ("FILs"), articles, and bulletins that alerted banks to risks the FDIC perceived associated with TPPPs.  The FDIC instructed banks to implement risk-management protocols and closely monitor relationships with TPPPs that had merchant clients operating in certain "high risk" industries.  The FDIC's admonition to banks—inasmuch as it instructed banks to manage closely its relationships with TPPPs to help identify and address fraudsters abusing the payments system--was  prudent.  The protocols that the FDIC directed banks to implement had the potential to strengthen the financial services industry by helping to identify fraudulent and/or unscrupulous merchants and ensuring that banks did not facilitate unlawful transactions.

The TPPPA of course supports the FDIC's efforts to ensure the safety and soundness of the banking industry and its objective of ferreting out fraud in the payments system.  Unfortunately, FDIC examiners have overstepped this mandate.  Recently, rather than examining banks for safety and soundness and assessing the strength of their risk-management systems, some examiners have improperly used the examination process as a tool to threaten, intimidate, and coerce banks to end relationships with TPPPs and merchants in lawful, yet disfavored, industries.

## II.    DISCUSSION

As an initial matter, it is important to distinguish between the types of risk at issue here. In its FILs concerning third-party relationships, the FDIC cautioned banks that third-parties present the following risks to banks, among possible others: strategic, reputation, and compliance.  The FILs are silent, however, on the risk that TPPPs assume on behalf of banks.  Specifically, because TPPPs interface with their merchant clients directly and absorb all of the financial risk involved in processing the merchants' payments, banks facilitating the payments on behalf of the third-party processor incur no financial risk in connection with the transaction.  In this way, TPPPs remove risk from the payments system for banks.

The TPPPA nonetheless champions the FDIC's efforts directing banks to manage properly its relationships with third parties, because unfortunately there are bad actors that take advantage of consumers and the payments system. The FDIC's directive to banks to implement a risk-management protocol—involving due diligence standards and ongoing oversight—is sensible. The TPPPA, in fact, embraced and advanced the precept of risk management in the payments system.

The TPPPA developed the Compliance Management System (the "CMS") for both its payment and payroll processing and bank members. The CMS is comprised of more than fifteen policies tailored to help members exceed their regulatory obligations. For example, it contains policies that guide payment and payroll processors on implementing due diligence procedures, as well as policies and resources that help banks conduct due diligence and monitor their relationships with TPPPs. In sum, the CMS helps TPPPA members assess and mitigate risk by providing them with resources to conduct due diligence, underwrite, draft agreements, train merchants, review and monitor merchant relationships, and report suspicious activity.

The TPPPA has also established a support center for its members—staffed by certified experts in the field—to help them interpret and implement applicable rules and regulations. By developing and implementing the CMS and support center, the TPPPA has acknowledged the importance of managing the risks of consumer fraud in the payments systems and taken steps side-by-side with the FDIC and other regulators to monitor and mitigate these risks. The TPPPA took seriously the FDIC's admonition to the payments industry to manage third-party risks. Unfortunately, the FDIC did not.

In 2011, the FDIC published a non-exhaustive list of thirty merchant categories, highlighting them to banks as "high risk" and thus deserving of heightened scrutiny. The list included, without explanation or distinction, both lawful and illicit industries. For example, the list included:

payday loans, credit card schemes, coin dealers, debt consolidation scams, dating services, Ponzi schemes, firearm sales, racist materials, ammunition sales, pornography, drug paraphernalia, and fireworks sales.  *See* Federal Deposit Insurance Corporation, SUPERVISORY INSIGHTS, *Managing Risks in Third-Party Payment Processor Relationships* (Summer 2011).

Not long after the list came out—and obviously in connection with it—FDIC examiners started using the examination process to coerce and intimidate banks to end relationships with TPPPs that processed payments for merchants in the pornography industry.   FDIC examiners' targeted enforcement against the pornography industry was the advent of its improper practice of moralistic regulation over the banking industry.  Regulators did not target the pornography industry because there was evidence of consumer fraud relative to that industry.  The TPPPA is constrained  therefore to conclude that regulators targeted the industry because they thought pornography was not good for consumers.

Thereafter, FDIC examiners expanded the scope of disfavored industries that they pressured banks to disavow.  For example, the TPPPA has learned that examiners threatened banks by promising that the FDIC would "make [the bank]'s life a living hell" if it did not end specific relationships with processors and/or merchants in certain disfavored industries.  Additionally, examiners have told banks that they would be subjected to "the toughest examination that [the bank] ever had" unless they ended relationships with specific processors and/or merchants in disfavored industries.  Furthermore, examiners have threatened to lower banks' examination ratings unless they ended relationships with customers in disfavored industries.

Moreover, the TPPPA knows of at least one instance where a bank that processed payments for a short-term lender specifically asked the FDIC whether processing the payments for the lender was illegal.  The FDIC assured the bank that short-term lending was not illegal.  A short time

later, however, FDIC examiners began to conduct examinations at the bank every several months.  The regular examinations stopped when the banks ended their relationships with the short-term lenders.

Unsurprisingly, many banks have succumbed to the pressure exerted by the FDIC, ending relationships with customers in so-called "high risk" industries.  When banks close TPPP and merchant accounts in response to FDIC pressure, TPPPs and merchants are put to the difficult challenge of finding new banks to process their transactions.  The uncertainty of TPPPs' and merchants' relationships with banks has introduced instability in the payments system, and this instability affects consumers and puts them at risk.

When a processor is cut off from its banking relationship, real people get hurt.  TPPPs provide the opportunity for merchants that cannot qualify—usually due either to inexperience, technological constraints, and/or credit standing—to process payments through a bank directly.  For these merchants, TPPPs provide the technology, payments expertise, and absorb the credit risk to banks, allowing merchants to provide electronic payment options that consumers demand.

When a TPPP is cut off from its banking relationship, none of the TPPP's merchants' payments (nor their payroll) can be processed.  Without the electronic payment capabilities that TPPPs provide to them, merchants (most often small businesses) are unable to compete with larger competitors, and are precluded from the online marketplace.  When merchants are disadvantaged by lack of access to the electronic payments system, they shed jobs and/or go out of business.

In addition to "high-risk" merchants, many TPPPs have been unfairly and adversely affected by the FDIC's coercive examinations.  As an initial matter, most TPPPs—similar to the merchants they service—are small businesses themselves. When banks sever relationships with them, TPPPs often experience the same dire consequences as their merchant partners: scrambling to find new bank relationships, shedding jobs, and/or going out of business.  Second, and as previously explained,

TPPPs themselves pose no risk to consumers, and provide beneficial services to merchants and consumers. For example, TPPPs facilitate payroll services and provide payment processing for, among others, churches, medical clinics, karate studios, and daycare providers. TPPPs also help make it possible for consumers without credit cards to obtain non-traditional loans for emergencies like dental care, car repair, or veterinary care by providing payment processing services to non-traditional lenders. Notwithstanding the far-reaching, real-world impact of shunting TPPPs, many banks have discontinued their relationships with TPPPs nonetheless in response to regulatory pressure from government agencies.

In fact, banks have reported that government regulators are pressuring them to drop TPPP programs altogether. Banks that succumb to regulators' pressure impact countless merchants and customers with their acquiescence, and likewise cause significant financial harm to TPPPs and their customers. Additionally, banks have reported that FDIC examiners told them that they may maintain their TPPP program without reprisal, but only if the TPPPs stopped processing payments for merchants in "high risk" industries.

This direct and indirect pressure on banks harms TPPPs. For example, when a bank, in response to improper regulatory pressure, discontinues a legitimate relationship with a TPPP because the TPPP services a short-term lender, all of the TPPP's customers—including its church, medical clinic, karate studio, and daycare provider partners—unfairly bear the brunt of the bank's decision. In fact, when banks end relationships with payment processors, merchants, like daycare providers, can be left unable to process payroll or provide basic goods and services to their customers.

Processing payments for businesses in socially unpopular or politically disfavored industries that are otherwise lawful is not a legitimate basis for regulators to require banks to stop providing financial services to these businesses. Simply claiming that whole industries pose a

"reputation risk"—amorphously defined as "the risk arising from negative public opinion"—does not justify regulators applying pressure to payment processors, banks, and small businesses to avoid these industries.  Indeed, as recently recognized by U.S. Congressman Jeb Hensarling: "The introduction of subjective criteria like 'reputation risk' into prudential bank supervision can all too easily become a pretext for the advancement of political objectives, which can potentially subvert both safety and soundness and the rule of law."  Letter from Rep. Jeb Hensarling, Chairman, H. Comm. of Fin. Svs., to Janet Yellen, Chair, The Federal Reserve Sys. (May 22, 2014).

Furthermore, banks and TPPPs are in the untenable position of trying to apply the amorphous concept of "reputation risk" during the due diligence process.  Without providing a meaningful, workable explanation of "reputation risk," regulators nonetheless expect banks to consider it when implementing risk-management protocols.  The gap between regulators' expectation that TPPPs and banks consider reputation risks and the dearth of practical guidance that they provide on what "reputation risk" actually means strongly suggests that regulators have not clearly defined the term on purpose.  Specifically, by failing to provide a meaningful explanation of "reputation risk," regulators leave themselves free to call whatever unpopular merchant groups that they choose  "reputation risks" and discredit banks and TPPPs for maintaining business relationships with them.

The FDIC's duplicitous enforcement of third-party risk has not just harmed TPPPs and merchants, but has also introduced inefficiency and instability into the payments system.  The FDIC issued guidance for banks to manage third-party risks.  The FDIC made clear in its guidance that, so long as banks proactively managed their third-party risks, they were free to conduct business with so-called "high risk" customers.  For example, the FDIC acknowledged that "many payment processors effect legitimate payment transactions for a variety of reputable merchants[.]"  *See* Federal Deposit Insurance Corporation, SUPERVISORY INSIGHTS, *Managing Risks in Third-Party Payment Processor*

*Relationships* (Summer 2011).  FDIC guidance from 2013 stated: "Banks that have appropriate systems and controls will not be criticized for providing payment processing services to businesses operating in compliance with applicable law."  Federal Deposit Insurance Corporation, Bank Letter, FIL-43-2013, *FDIC Supervisory Approach to Payment Processing Relationships with Merchant Customers that Engage in Higher-Risk Activities* (Sept. 27, 2013).

Banks heeded the FDIC's guidance and implemented robust risk-management protocols. The TPPP industry also heeded the guidance.  For example, as previously discussed, the TPPPA developed and implemented the CMS to complement banks' risk-management systems, adding even more safeguards to the payments system in response the FDIC's directives.  Neither the TPPPA nor its members contend that they should be permitted to process payments for Ponzi schemers or on behalf of other fraudsters in any illicit activities.  The TPPPA and its members instead contend that they should be free to process payments on behalf of any lawful merchant.  Furthermore, the TPPPA embraces the FDIC's mandate to banks to take the commonsense steps of assessing and monitoring financial risks. The risk-focused guidance is not the problem; the industry-focused intimidation is.

Banks, TPPPs, and lawful merchants are hurt by fraud, and an effective and efficient payments system rejects it.  That is why the TPPPA and its partners in the payments system laud the Federal Trade Commission's ("FTC") recent success in winning injunctive relief in the United States District Court for the Western District of Missouri against a group of unscrupulous payday lenders who fraudulently bilked millions of dollars from unwitting account holders.  *See FTC v. CWB Servs., LLC*, No. 4:14-cv-00783-DW, slip op. (W.D. Mo. Sept. 9, 2014) (granting FTC's request for a temporary restraining order based on evidence of defendants' fraud on consumers).  Importantly, the FTC's success turned on its investigation and production of evidence against a specific group of bad actors.  The

payments system and consumers benefit from this kind of focused, evidence-based enforcement rather than regulators trying to choke out from the economy whole industries that it disfavors.

Here, the FDIC did not heed its own guidance.  Rather than examining banks with a focus on assessing whether they are adequately overseeing activities and transactions they process and appropriately managing and mitigating risks, examiners pressured and threatened banks to stop processing transactions for "high risk" customers.  Sometimes, examiners would arrive at a bank with lists of specific merchants to determine if the institution or one of its TPPP clients had a relationship with the merchants, and would thereafter exert pressure on the bank via the examination process until it ended the relationships.  It is troubling that regulators are using their examination authority to try to regulate out of business industries that the FDIC concedes are lawful, but nonetheless finds morally unacceptable.  It is also troubling that the FDIC—under the specter of its legitimate examination function—has usurped the rightful authority of banks to assess risks posed by their own customers and take steps to manage and mitigate the risk themselves.

This Court should require the FDIC to enforce its own guidance.  Specifically, the FDIC must permit banks and TPPPs to implement risk-management systems in good faith.  Regulators must be held accountable to do what they say: conduct examinations focused on "assessing whether banks are adequately overseeing activities . . . and managing and mitigating risks," FIL-43-2013, rather than on identifying "high risk" customers and intimidating banks to close their accounts.

Requiring the FDIC to enforce its own guidance will enhance regulation in the payments system.  By giving banks and TPPPs breathing room to implement and execute risk-management best practices, the payments industry itself will naturally identify non-compliant bad actors in the system.  Regulatory resources will thus be conserved and efficiently administered.  Additionally, the FDIC can refocus the safety and soundness examination function on its mandate.  Currently, examiners regularly

focus on identifying banks' "high risk" relationships, and ignore the adequacy of the banks' risk-management system.

Failing to require the FDIC to enforce its own guidance would invite the FDIC to continue its moralistic regulatory enforcement and perhaps expand it to other socially unpopular or politically disfavored groups. Whereas the government now disfavors industries including tobacco, firearms, fireworks, and online dating, it is difficult to anticipate what industries in the future the government may deem socially repugnant and try to "choke" out of the economy. Without this Court granting the relief sought, there is nothing to curtail the ever-changing list of disfavored industries.

The impropriety of the government applying pressure to banks to sever ties with lawful yet disfavored industries is highlighted by the irony of it simultaneously *encouraging* banks to provide services to marijuana-related businesses operating in certain states. *See* FinCEN, U.S. Dep't of the Treasury, Guidance: *BSA Expectations Regarding Marijuana-Related Businesses* (Feb. 14, 2014); *see also* U.S. Dep't of Justice, Memorandum from Deputy A.G. James M. Cole to All Assistant U.S. Attorneys, *Guidance Regarding Marijuana Enforcement* (Aug. 29, 2013); U.S. House of Representatives, Committee on Oversight and Government Reform, Staff Report: *The Department of Justice's "Operation Choke Point": Illegally Choking Off Legitimate Businesses?* (May 29, 2014). Respectfully, this Court must not permit the government to engage in such selective enforcement to advance a currently-popular political agenda. Rather, unlike the current regime, regulation—especially over the banking industry—must be consistent, transparent, and predictable.

Acknowledging this precept, on July 28, 2014, the FDIC issued FIL-41-2014, in which it retracted the list of merchant categories it had previously identified as "high risk." In it, the FDIC conceded: "the lists of examples of merchant categories have led to misunderstandings regarding the FDIC's supervisory approach to institutions' relationships with TPPPs, resulting in the misperception

that the listed examples of merchant categories were prohibited or discouraged. . . . Accordingly, as part of clarifying our guidance, the FDIC is removing the lists of examples of merchant categories from outstanding guidance and the article." *See* Federal Deposit Insurance Corporation, Bank Letter, FIL-41-2014, *FDIC Clarifying Supervisory Approach to Institutions Establishing Account Relationships with Third-Party Payment Processors* (July 28, 2014).

    This retraction is not enough.  First, regardless of whether regulators maintain a published list, a retraction without judicial intervention leaves regulators free to continue to carry out an agenda of threats and coercion, and banks will remain fearful of doing business with TPPPs and previously-designated "high risk" merchants.  Importantly, TPPPA members have reported being subjected to the same kinds of threats and intimidation from regulators after July 28, 2014 as before that date.  Furthermore, a retraction without judicial intervention leaves banks in the untenable position of being forced to guess what "high risk" industries regulators might next focus on.

    Additionally, banks find the retraction dubious in light of the fact that the FDIC held it up as a centerpiece of its guidance for more than three years.  Many banks perceived the retraction as an easy way to assuage growing concern over regulators' selective enforcement.  Accordingly, many banks remain reticent to have relationships with merchants in "high risk" areas and TPPPs that process their payments.  The impact of the list thus remains.

    Moreover, the retraction of the list does not undo the harm suffered by several TPPPs and lawful merchants who have had their bank accounts closed and relationships with banks severed unjustifiably.  The unthoughtful list of merchant categories was comprised of—without distinction— legitimate industries and various types of criminal enterprises, and the list remained in effect for more than three years.  The list may have tried to alert banks to the reputation risk of processing payments for certain "high risk" entities, but it succeeded in giving lawful industries an unfair reputation for being

illicit.  This unearned reputation is unsurprising based on the FDIC lumping together, for example, short-term lenders with Ponzi schemers.  TPPPA members of course have no interest in processing payments for Ponzi schemers.  Conversely, nothing should prevent TPPPA members from processing payments for lawful lenders.  Retracting its list does not absolve the FDIC of reputing illicitness to lawful businesses.

The TPPPA of course understands and supports the FDIC's efforts to encourage banks to assess and manage risk.  The TPPPA does not, however, support the current regulatory regime of coercing and intimidating banks to squeeze out certain lawful merchant categories.  The TPPPA urges this Court to deny the defendants' motions to dismiss and let this litigation proceed.  This decision will create breathing room for banks and TPPPs to continue to implement risk-management protocols and instill industry best practices that comply with and further the FDIC's guidance.  Permitting best practices to predominate the payments system will allow the industry to identify and eliminate fraudsters, while simultaneously permitting lawful and legitimate businesses to thrive.

## III.    CONCLUSION

For the aforementioned reasons, the TPPPA respectfully requests that this Court vindicate the important rights of the Plaintiffs in the above captioned civil action by granting them their requested relief.

Respectfully Submitted,

/s/ Ivan B. Knauer                                    /s/ Richard J. Zack
Ivan B. Knauer (DC No.460681)              Richard J. Zack(PA No. 77142)        Of Counsel
Matthew D. Foster (DC No. 503057)        Neuman Leverett                           Of Counsel
PEPPER HAMILTON LLP                        Christina O. Hud (PA No.311168)  Of Counsel
Hamilton Square                                    PEPPER HAMILTON LLP
600 Fourteenth Street, N.W.                     3000 Two Logan Square
Washington, D.C.  20005-2004                 Eighteenth & Arch Streets
Telephone 202.220.1200                          Philadelphia, PA  19103-2799
Facsimile  202.220.1665                          Telephone 215.981.4000
                                                            Facsimile  215 981 4750
and

                                                            Counsel for The Third Party Payment
DATE: October 2, 2014                          Processors Association.