**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, *et al.*, | ) ) ) | |
| Plaintiffs | ) ) | Civil Action No. 14-953-GK |
| v. | ) ) | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**BRIEF OF *AMICUS CURIAE* THE LIBRE INITIATIVE INSTITUTE IN SUPPORT OF
<u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................................ii

INTEREST OF AMICUS CURIAE ............................................................................. 1

I. CHOKE POINT'S INDISCRIMINATE TARGETING OF "DISFAVORED" BUSINESSES HARMS HISPANICS AND RACIAL AND ETHNIC MINORITIES. ..................................... 2

II. CHOKE POINT OFFENDS PRINCIPLES OF DUE PROCESS AND TRANSPARENCY... 7

   A.  The Administrative Procedure Act And Due Process Are Vital To Preventing Government Abuse Associated With Choke Point. ................................................................... 8

   B.  Agencies Have Stonewalled FOIA Requests Regarding Choke Point............................. 12

III. CHOKE POINT UNDERMINES FEDERALISM.................................................... 14

CONCLUSION.......................................................................................................... 16

# TABLE OF AUTHORITIES

**CASES**

*Am. Sch. of Magnetic Healing v. McAnnulty,* 187 U.S. 94 (1902) .................................................. 10

*Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485 (D.C. Cir. 1983).......... 10

*Atl. Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771 (D.C. Cir. 1984).................................. 10

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408 (D.C. Cir. 2011) ..................... 10

*Davis v. Passman*, 442 U.S. 228 (1979) ....................................................................................... 10

*U.S. Dep't of Energy v. Tenenbaum*, 900 F. Supp. 2d 572 (D. Md. 2012).................................. 10

*Hirsch v. McCulloch*, 303 F.2d 208 (D.C. Cir. 1962)................................................................. 10

*Honda Motor Co. v. Oberg*, 512 U.S. 415 (1994) ....................................................................... 10

*Leedom v. Kyne,* 358 U.S. 184 (1958) ......................................................................................... 10

*McGehee v. Cent. Intelligence Agency*, 697 F.2d 1095 (D.C. Cir. 1983)................................... 12

*Mittleman v. Postal Regulatory Commn,* 757 F.3d 300 (D.C. Cir. 2014) .................................. 10

*Nat'l Fed'n of Indep. Bus. v. Sibelius*, 132 S. Ct. 2566 (2012) ................................................. 15

*National Parks Conservation Ass'n v. Norton*, 324 F.3d 1229 (11th Cir. 2003) ........................ 10

*New York v. United States*, 505 U.S. 144 (1992).......................................................................... 15

*Nat'l Labor Relations Bd. v. Sears, Roebuck & Co*., 421 U.S. 132 (1975) ................................. 12

*Shelby Cnty. v. Holder*, 133 S. Ct. 2612 (2013).......................................................................... 15

*Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006) ................................................. 10

**STATUTES**

5 U.S.C. § 501, *et seq.*.................................................................................................................. 8

5 U.S.C. § 552...............................................................................................................12

12 U.S.C. § 1833............................................................................................................11

Cal. Health & Safety Code § 11362.5...........................................................................15

Colo. Const. art. XVIII, § 16 ........................................................................................15

Mo. Rev. Stat. § 407.1243 (2013)..................................................................................14

Virginia Travel Club Act, Va. Code Ann. § 59.1-445 (1994) .......................................14

**OTHER AUTHORITIES**

Adair Morse, *Payday Lenders: Heroes or Villains?*, 102 J. of Fin. Econ. (2011), *available at* http://faculty.haas.berkeley.edu/morse/research/papers/morsepayday_jfe2.pdf.........................4

Alicia Robb, Small Bus. Admin., SBA-HQ-11-0033, *Access to Capital among Young Firms, Minority-owned Firms, Women-owned Firms, and High-tech Firms* (2013), *available at* http://www.sba.gov/sites/default/files/ files/rs403tot(2).pdf........................................................4

Andrew Grossman, *Banks to Be Allowed to Do Business with Marijuana Dispensaries*, Wall St. J. (Feb. 14, 2014), *available at* http://online.wsj.com/news/articles/SB1000142405270230443 41045793831507820342 82...............................................................................................15

Barack Obama, President, Remarks by the President in Welcoming Senior Staff and Cabinet Secretaries to the White House (Jan. 21, 2009), *available at* http://www.whitehouse.gov/the-press-office/remarks-president-welcoming-senior-staff-and-cabinet-secretaries-white-house .. 7

Dan Browning, *New Minnesota Coin Law Targets Shady Dealers*, Star Tribune (July 29, 2013), http://www.startribune.com/local/217320721.html ...................................................14

DOJ, Attorney General's Manual on the Administrative Procedure Act (1947), *available at* http://www.law.fsu.edu/library/admin/1947i.html.......................................................8

End Operation Choke Point Act of 2014, H.R. 4986, 113th Cong. (2014) ..................11

Fed. Reserve Bank of N.Y., *Payday Holiday: How Households Fare after Payday Credit Banks* (2008), *available at* http://www.newyorkfed.org/research/staff_reports/sr309.pdf ..................3

FinCEN, U.S. Dep't of the Treasury, Guidance FIN-2014-G001, BSA Expectations Regarding Marijuana-Related Businesses (Feb. 14, 2014), *available at* http://www.fincen.gov/ statutes_regs/guidance/pdf/FIN-2014-G001.pdf ........................................................................ 15

Geoscape & U.S. Hispanic Chamber of Commerce, *Hispanic Businesses and Entrepreneurs Drive Growth in the New Economy*, 2d Annual Report (2014), *available at* http://www.geoscape.com/HBR/pdf/Geoscape_HispanicBusinessOwners_FINAL.pdf............ 4

International Premium Cigars & Pipe Retailers Association Email Advisory (Sept. 2014), *available at* http://us8.campaign-archive1.com/?u=fa8d5c4e7b013b78be3d7c412&id= 374d4b4ae3&e=[UNIQID] ...................................................................................................... 5

Jeffrey Babener, *MLM Laws in 50 States*, MLM Legal (2010), http://www.mlmlegal. com/statutes.html; David Klein, *Multilevel Marketing: How to Avoid Building the Pyramid*, Justia (May 6, 2013), http://verdict.justia.com/2013/05/06/multilevel-marketing ................... 14

Kelly Riddell, *'High Risk' Label from Feds Puts Gun Sellers in Banks' Crosshairs, Hurts Business*, Washington Times (May 18, 2014), http://www.washingtontimes.com/news/2014/ may/18/targeted-gun-sellers-say-high-risk-label-from-feds/?page=all...................................... 5

Kelsey Harkness, *Meet Four Business Owners Squeezed by Operation Choke Point*, Daily Signal (Aug. 12, 2014), http://dailysignal.com/2014/08/12/meet-four-business-owners-squeezed-by-operation-choke-point/ ........................................................................................................ 5

Letter from Cause of Action to Lara Rodriguez, FOIA Officer, Nat'l Credit Union Admin. (Sept. 15, 2014); Letter from Cause of Action to Chief FOIA Officer, CFPB (Sept. 15, 2014); Letter from Cause of Action to Ken Courter, Acting Chief, FOIA/PA Unit, DOJ, Criminal Div. (July 14, 2014); Letter from Cause of Action to Jeanne McLaughlin, FOIA Manager, FRS (July 14, 2014); Letter from Cause of Action to Carmen Mallon, Chief of Staff, DOJ, Office of Info. Policy (July 14, 2014); Letter from Cause of Action to Frank Vance, Disclosures Servs. Commc'ns Div., OCC (July 14, 2014) (all letters on file with Cause of Action).................... 12

Letter from Hon. Mike Crapo, Ranking Member, U.S. S. Comm. on Banking, Hous., & Urban Affairs, to Eric Holder, Att'y Gen., DOJ (Oct. 6, 2014), *available at* http://www.crapo. senate.gov/issues/banking/documents/RepublicanLettertoHolderDOJOperation ChokePoint10-06-14.pdf ........................................................................................................ 11

Letter from Margaret McCloskey Shanks, Deputy Sec'y of the Bd., Bd. of Governors, FRS, to Cause of Action, FOIA Request F-2014-0313 (Sept. 29, 2014) (on file with Cause of Action).............................................................................................. 13

iv

Letter from the U.S. H. Comm. on Oversight & Gov't Reform to Martin J. Gruenberg, Chairman, FDIC (June 9, 2014), *available at* http://oversight.house.gov/wpcontent/uploads/2014/06/ 2014-06-09-DEI-Jordan-to-Gruenberg-FDIC-Choke-Point-and-Reputational-Risk.pdf ......... 13

Mario H. Lopez, *Opinion: Disparate Impact of Regulation and President Obama's 'Operation Choke Point,'* Fox News Latino (May 19, 2014), http://latino.foxnews.com/latino/ opinion/ 2014/05/19/opinion-disparate-impact-regulation-and-president-obama-operation- chokepoint/ ...................................................................................................................... 3

Mark Bovens, *Public Accountability*, Oxford Handbook of Public Management (Ewan Ferlie, Laurence E. Lynn & Christopher Pollitt eds., 2007)............................................ 7

Memorandum from James M. Cole, Deputy Att'y Gen., DOJ, to all U.S. Att'ys, Guidance Regarding Marijuana Enforcement (Aug. 29, 2013).................................................... 15

Memorandum from Michael S. Blume, Dir., Consumer Protection Branch, to Stuart F. Delery, Ass't Att'y Gen., Civil Div. of DOJ, *Operation Choke Point: Six-Month Status Report* (Sept. 9, 2013), *in House Choke Point Report*, app. at HOGR-3PPP000333 .................................... 14

Patrick Lagreid, *Operation Choke Point Targets Tobacco Retailers*, HalfWheel (Sept. 26, 2014), http://halfwheel.com/operation-choke-point-targets-tobacco-retailers ...................................... 5

Pew Charitable Trusts, *State Payday Loan Regulation and Usage Rates* (July 11, 2012), *available at* http://www.pewtrusts.org/en/multimedia/data-visualizations/2014/~/media/ Data%20Visualizations/Interactives/2014/State%20Payday%20Loan%20Regulation%20and% 20Usage%20Rates/Report/State_Payday_Loan_Regulation_and_Usage_Rates.pdf ............... 14

Press Release, Cause of Action, *25 Groups Ask President to Withdraw or Clarify Memorandum Instructing Agencies to Consult with White House on Document Releases* (Sept. 29, 2014), *available at* http://causeofaction.org/ coalition-open-government-groups-confront-president- obama-policy-frustrates-transparency/....................................................................................... 12

Press Release, SunTrust Bank, SunTrust Statement on Certain Account Closures (Aug. 8, 2014), *available at* http://newsroom.suntrust.com/index.php?s=20295&item=123158 ....................... 6

Rohit Arora, *Underfunded Latinos Grab the American Dream*, CNBC.com (Sept. 30, 2014), http://www.cnbc.com/id/102042459............................................................................ 3

Susan Burhouse & Yazmin Osaki, 2011 FDIC National Survey of Unbanked and Underbanked Households at 4 (2012), *available at* https://www.fdic.gov/householdsurvey/ 2012_unbankedreport.pdf. ......................................................................................... 2

Staff of H. Comm. on Oversight & Gov't Reform, 113th Cong., *The Department of Justice's "Operation Choke Point": Illegally Choking off Legitimate Businesses?* (2014), *available at* http://oversight.house.gov/wp-content/uploads/ 2014/05/Staff-Report-Operation-Choke-Point1.pdf ............................................................................................................... 6

Terry L. Cooper, *Big Questions in Administrative Ethics*, 64 Pub. Admin. Rev. 395 (2004), *available at* http://academic.udayton.edu/richardghere/POL%20318/Cooper Terry L.pdf........ 7

*White House "Equities" in FOIA Requests*, causeofaction.org, http://causeofaction.org/our-work/white-house-equities-in-foia-requests/................................................................... 12

William Funk, *Transparency in Administrative Law – Three Examples as an Object Lesson*, 61 Admin. L. Rev. 171 (2009) ..................................................................................................... 8

**INTEREST OF AMICUS CURIAE**

The LIBRE Initiative Institute ("LIBRE"), founded in 2011, is a 501(c)(3) non-partisan and non-profit organization dedicated to raising public awareness and serving as a source of information on pressing economic issues, primarily to the U.S. Hispanic community.  LIBRE promotes the benefits of a constitutionally limited government, property rights, rule of law, sound money supply and free enterprise.  LIBRE believes that these principles lead to effective solutions that address the nation's fiscal challenges and improve the overall well-being of our communities.  The aim of LIBRE is to provide research and educational opportunities to U.S. Hispanics.[1]  Thus, LIBRE is uniquely qualified to help the Court understand the pernicious impact of the federal government's "Operation Choke Point" on U.S. Hispanics.

---

[1] *See* http://libreinstitute.org/about/.

In 2013, the Federal Deposit Insurance Corporation ("FDIC"), the Board of Governors of the Federal Reserve System ("FRS") and the Office of the Comptroller of the Currency ("OCC") (collectively, "Defendants"), together with the Department of Justice ("DOJ"), launched Operation Choke Point ("Choke Point") in a shroud of secrecy, targeting lawful, regulated but bureaucratically "disfavored," businesses under the guise of an assault on "fraud."  The Government has conducted Choke Point without transparency or accountability and without accounting for the collateral damage that it has done to those businesses' customers or to the communities that they serve.  For all of these reasons, and as set forth in greater detail below, LIBRE respectfully urges the Court to take into consideration the full impact of Choke Point in connection with the pending motions.

## I.    CHOKE POINT'S INDISCRIMINATE TARGETING OF "DISFAVORED" BUSINESSES HARMS HISPANICS AND OTHER RACIAL AND ETHNIC MINORITIES.

As a result of  Choke Point, many banks simply are ceasing to provide services to purportedly "high-risk" merchants, who may be forced to shut down as a result.  The effect of choking off the banks and, in turn, merchants – to date, an aspect of Choke Point that has been under-reported – is harm to those individuals who rely on these financial services and other targeted industries, including racial and ethnic minorities and the working poor.

For instance, according to FDIC, one in five U.S. households, or fifty-one million adults, are considered "underbanked" and often use check-cashers, payday lenders or pawn shops.[2]  In the U.S. Hispanic community, almost thirty percent are considered "underbanked."[3]  In fact, U.S.

---

[2] Susan Burhouse & Yazmin Osaki, 2011 FDIC National Survey of Unbanked and Underbanked Households at 4 (2012), *available at* https://www.fdic.gov/householdsurvey/ 2012_unbankedreport.pdf.
[3] *Id.* at 5.

Hispanics are among the most likely to use alternatives to traditional banking, according to the

FDIC survey.[4]

> Additionally, banks like Capital One have already closed the accounts of check-cashing companies. By going after these companies, hardworking Hispanics without a bank account may not have a place to cash their paychecks[.] . . . The administration's regulatory assault is not an assault on the short-term lending industry, but rather on any consumer who relies on having access to cash in cash flow emergencies, especially in underserved communities. For example, two-thirds of all Hispanics work in the service industry, and they will feel the brunt of these policies more than others. In addition, alternative lenders can cater to newer immigrants without substantial credit histories — a demographic that banks fail to serve.
> . . .
> [T]he truth is that these heavy-handed regulations will have a disparate impact on the country's minorities, many of which live in communities with limited access to traditional banks.
> . . .
> In addition to restricting financial options for blue-collar workers, lending regulation will also hurt small-business owners and entrepreneurs, an area where Hispanics have contributed greatly to the American economy. Hispanic entrepreneurs fortified the U.S. economy by an estimated $468 billion last year. This has been pivotal for the nation's economy, especially in the face of the economic recession.[5]

Numerous studies, including those conducted by FRS, indicate that use of alternative

financial services for those with limited options provides a variety of benefits and leaves users in

a far better position than if those services are choked off.  *See, e.g.*, Fed. Reserve Bank of N.Y.,

*Payday Holiday: How Households Fare after Payday Credit Banks* (2008), *available at*

http://www.newyorkfed.org/research/staff_reports/sr309.pdf ("Our findings will come as no

---

[4] *Id*. at 17; *see also* Rohit Arora, *Underfunded Latinos Grab the American Dream*, CNBC.com (Sept. 30, 2014), http://www.cnbc.com/id/102042459 ("Because of their lower credit scores and revenue, Latino entrepreneurs face greater scrutiny from banks. The impact of these financial realities is that Latinos often must turn to high-interest, non-bank lenders. These so-called alternative lenders include firms that provide payday loans and cash-advance companies. In some cases, these lenders charge interest rates as high as 30 percent to 40 percent.").

[5] Mario H. Lopez, *Opinion: Disparate Impact of Regulation and President Obama's 'Operation Choke Point,'* Fox News Latino (May 19, 2014), http://latino.foxnews.com/latino/opinion/2014/05/19/opinion-disparate-impact-regulation-and-president-obama-operation-chokepoint/.

surprise to observers who have noticed that payday credit, as expensive as it is, is still cheaper than a close substitute: bounced check "protection" sold by credit unions and banks[.]"); Adair Morse, *Payday Lenders: Heroes or Villains?*, 102 J. of Fin. Econ. 28-44 (2011), *available at* http://faculty.haas.berkeley.edu/morse/research/papers/morsepayday_jfe2.pdf ("The results indicate that payday lenders offer a positive service to individuals facing financial distress. Natural disasters increase foreclosures by 4.5 units per 1,000 homes in the year following the event, but payday lenders mitigate 1.0 to 1.3 units of this increase.").

And, of course, the consequences extend beyond the individual, impacting small businesses as well as the broader economy.  This is particularly problematic to U.S. Hispanics, who create businesses at more than twice the national rate[6] and are more likely to experience hurdles in accessing capital.

> Much of the recent research on the issue of discrimination in business lending uses data from various years of the Survey of Small Business Finances (SSBF). The main finding from this literature is that [minority business enterprises] experience higher loan denial probabilities and pay higher interest rates than White-owned businesses even after controlling for differences in creditworthiness, and other factors. Cavalluzzo and Wolken (2005) found that while greater personal wealth is associated with a lower probability of denial, even after controlling for personal wealth, there remained a large difference in denial rates across demographic groups. African Americans, Hispanics, and Asians were all more likely to be denied credit, compared with Whites, even after controlling for a number of owner and firm characteristics, including credit history, credit score, and wealth. They also found that Hispanics and African Americans were more likely to pay higher interest rates on the loans they obtained.[7]

---

[6] Geoscape & U.S. Hispanic Chamber of Commerce, *Hispanic Businesses and Entrepreneurs Drive Growth in the New Economy*, 2d Annual Report at 3 (2014), *available at* http://www.geoscape.com/HBR/pdf/Geoscape_HispanicBusinessOwners_FINAL.pdf.

[7] Alicia Robb, Small Bus. Admin., SBA-HQ-11-0033, *Access to Capital among Young Firms, Minority-owned Firms, Women-owned Firms, and High-tech Firms* 6-7 (2013), *available at* http://www.sba.gov/sites/default/files/ files/rs403tot(2).pdf.

4

Reports of small businesses effectively being shut down continue to emerge across the country.  For instance, an Arizona owner of a payment processing business suddenly saw his accounts closed by Chase Bank ("Chase") and Horizon Community Bank, effectively choking off the business.  A Chase risk management official told him the bank also sent notices to

> hundreds of companies in similar industries in obedience to directions from several federal agencies, including the Office of the Comptroller of the Currency at the Department of Treasury.[8]

A Nevada auto title and storefront cash loan business could not find a single local bank willing to open an account for it and was told the business was too "high risk."[9]  A Florida firearms supply store had its account closed.  Its bank wrote that

> [t]his letter in no way reflects derogatory reasons for such action on your behalf. But rather one of industry.  Unfortunately your company's line of business is not commensurate with the industries we work with.[10]

As recently as September 2014, the International Premium Cigar & Pipe Retailers Association warned its members that banks were closing accounts of tobacco retailers as a result of Choke Point.[11]

Further, despite the FDIC's assertion that the removal of specific categories of merchants identified as "high-risk" from its latest guidance renders these arguments moot (*see* FDIC Mem. in Supp. of Mot. to Dismiss at 22 (ECF No. 17-1)), banks continue to terminate their

---

[8] Kelsey Harkness, *Meet Four Business Owners Squeezed by Operation Choke Point*, Daily Signal (Aug. 12, 2014), http://dailysignal.com/2014/08/12/meet-four-business-owners-squeezed-by-operation-choke-point/.
[9] *Id.*
[10] Kelly Riddell, *'High Risk' Label from Feds Puts Gun Sellers in Banks' Crosshairs, Hurts Business*, Washington Times (May 18, 2014), http://www.washingtontimes.com/news/2014/may/18/targeted-gun-sellers-say-high-risk-label-from-feds/?page=all.
[11] International Premium Cigars & Pipe Retailers Association Email Advisory (Sept. 2014), *available at* http://us8.campaign-archive1.com/?u=fa8d5c4e7b013b78be3d7c412&id=374d4b4ae3&e=[UNIQID]; Patrick Lagreid, *Operation Choke Point Targets Tobacco Retailers*, HalfWheel (Sept. 26, 2014), http://halfwheel.com/operation-choke-point-targets-tobacco-retailers.

relationships with previously identified "high-risk" merchants based on Choke Point-related threats and fears of increased regulatory scrutiny.  For instance, on August 8, 2014, one week *after* the FDIC withdrew its list of high-risk merchants, SunTrust bank released a statement:

> We have decided to discontinue banking relationships with three types of businesses – specifically payday lenders, pawn shops and dedicated check-cashers – due to compliance requirements.[12]

These small businesses and individuals are among the most harmed by Choke Point, and also are among those most ignored by Defendants.  Indeed, the blanket characterization of these businesses as "high-risk" and "disfavored" has cut access to capital, a burden carried mostly by minority entrepreneurs and their communities.  Choke Point has effectively stripped consumers of their ability to weigh the merits of these businesses and choose for themselves whether the services are warranted.  Without this choice, many are left with no access to funds and instead are forced to turn to other means for capital.  In effect, the Government's actions are actually harming those that government is supposed to be protecting.[13]

---

[12] *See* Press Release, SunTrust Bank, SunTrust Statement on Certain Account Closures (Aug. 8, 2014), *available at* http://newsroom.suntrust.com/index.php?s=20295&item=123158.

[13] *See* Staff of H. Comm. on Oversight & Gov't Reform, 113th Cong., *The Department of Justice's "Operation Choke Point":  Illegally Choking off Legitimate Businesses?*, app. at HOGR-3PPP000335 (2014), *available at* http://oversight.house.gov/wp-content/uploads/ 2014/05/Staff-Report-Operation-Choke-Point1.pdf (hereinafter *House Choke Point Report*) ("Although we recognize the possibility that banks may have therefore decided to stop doing business with legitimate lenders, we do not believe that such decisions should alter our investigative plans.").

## II.    CHOKE POINT OFFENDS PRINCIPLES OF DUE PROCESS AND TRANSPARENCY.

"Let me say it as simply as I can: Transparency and the rule of law will be the touchstones of this presidency."  So intoned President Obama at the onset of his Administration.[14]  This message, however, has gotten lost.

Significantly, government transparency is "as close to being a universally advocated public value as one can find[,]"[15] and government's activities should be open and available for review.[16]  Indeed, a constitutional republic cannot stand "if those in power cannot be held accountable for their acts and omissions, for their decisions, their policies, and their expenditures."[17]  Yet, Defendants and DOJ, through the shadowy exercise of their overreaching police power, have manufactured the functional equivalent of a new regulatory regime through the use of "guidance," based on vague notions of "reputational risk" and prosecutorial intimidation.  They have done so with no accountability to the public, no opportunity for affected parties to have notice and comment or to defend their Constitutional rights, no cost benefit analysis to assess or account for the impact of this regime on the customers of the targeted businesses and no respect for due process.[18]

---

[14] Barack Obama, President, Remarks by the President in Welcoming Senior Staff and Cabinet Secretaries to the White House (Jan. 21, 2009), *available at* http://www.whitehouse.gov/the-press-office/remarks-president-welcoming-senior-staff-and-cabinet-secretaries-white-house.
[15] Terry L. Cooper, *Big Questions in Administrative Ethics*, 64 Pub. Admin. Rev. 395, 400 (2004).
[16] Mark Bovens, *Public Accountability*, Oxford Handbook of Public Management 182 (Ewan Ferlie, Laurence E. Lynn & Christopher Pollitt eds., 2007).
[17] *Id*.
[18] *See generally House Choke Point Report*.

**A.    The Administrative Procedure Act And Due Process Are Vital To Preventing Government Abuse Associated With Choke Point.**

The Administrative Procedure Act ("APA"), codified at 5 U.S.C. § 501, *et seq.*, was, among other things, a bipartisan effort to prevent federal agencies from using enforcement authorities to create shadow regulations.[19]  After the enormous expansion of the administrative state during the New Deal, federal bureaucrats began acting more like central planners, allowing experts to decide on the best course for the public in closed door sessions.[20]  The public only participated in agency deliberations if specifically permitted by statute.  Even then, statutes, with the exception of those mandating adjudicatory proceedings, allowed merely for hearings so "that the persons interested in the proposed rule should be permitted to express their views."[21]  As one commentator noted, "[t]here was no requirement that the rule adopted be based upon, or even take account of, those views."[22]

To check this hidden power, Congress passed the APA, opting for a transparent process allowing for the full participation of the public coupled with judicial oversight of agency decision-making.  The APA's general purposes are:

1. To require agencies to keep the public currently informed of their organization, procedures and rules.
2. To provide for public participation in the rule making process.
3. To prescribe uniform standards for the conduct of formal rule making and adjudicatory proceedings, *i.e.*, proceedings which are required by statute to be made on the record after opportunity for an agency hearing.
4. To restate the law of judicial review.[23]

---

[19] *See* Administrative Procedure Act of 1946, Pub. L. No. 79-404, 60 Stat. 237 (as amended).

[20] William Funk, *Transparency in Administrative Law – Three Examples as an Object Lesson*, 61 Admin. L. Rev. 171, 177-78 (2009).

[21] *Id*.

[22] *Id*.

[23] DOJ, Attorney General's Manual on the Administrative Procedure Act (1947), *available at* http://www.law.fsu.edu/library/admin/1947i.html (internal citations omitted).

This formulation provides the framework under which governmental regulatory efforts must be viewed. The spirit animating the APA, one of transparency and accountability, remains even if technically the strictures of the APA might not apply in a given situation.

Here, had Defendants followed the APA's threshold requirements for open and transparent regulations, the damage done to fundamental notions of fair play and due process would have been avoided, and the voices of U.S. Hispanics and other minority groups could have been heard in that: (1) the public served by the targeted businesses, and the businesses themselves, could fully and openly participate in the agencies' decision-making process; (2) the agencies would be required to justify their proposals and to weigh costs and benefits of various regulatory actions; (3) the standards for determining what constitutes appropriate risk for banks would be clearly defined and affected parties could act accordingly; and (4) the judicial reviewability of any agency determination would not be in doubt.

Yet, as outlined in Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motions to Dismiss the Amended Complaint (ECF No. 23), Defendants' activities, including formulating guidance documents and the "reputational risk" standard, were promulgated without notice and comment and without any administrative record. And, as Plaintiffs point out, Defendants' activities should (indeed, must) be reviewable under the APA.

But Defendants claim, without sound basis, that both the APA and constitutional due process do not apply here. *See, e.g.*, FRS Mem. in Supp. of Mot. to Dismiss at 28 (ECF No. 16); OCC Mem. in Supp. of Mot. to Dismiss at 28 (ECF No. 18-1); FDIC Mem. in Supp. of Mot. to Dismiss at 13 (ECF No. 17-1). In other words, Defendants want it both ways – parties cannot make use of the APA because no final agency action exists, but appeals based on constitutional or other due process grounds also are precluded as the "legislative activities" of

9

these agencies are not constrained by such concepts.  *See, e.g.*, FRS Mem. in Supp. of Mot. to Dismiss at 38.  Thus, according to Defendants, there are no meaningful constitutional limits on administrative agency power, as demonstrated by this case.

This cannot be so and, in fact, where, as here, administrative safeguards do not adequately substitute for judicial review to protect business entities' and individuals' due process rights, judicial review is a *sine qua non* for due process and the rule of law.  *See, e.g.*, *Honda Motor Co. v. Oberg*, 512 U.S. 415 (1994) (denial of judicial review of punitive damage awards found unconstitutional because the statute provided no adequate substitute procedure); *Hirsch v. McCulloch*, 303 F.2d 208, 213 (D.C. Cir. 1962) (due process requires that "findings and conclusions of the [administrative factfinder must be] . . . subject to judicial review").  Therefore, this Court should exercise jurisdiction over Plaintiffs' claims to protect their constitutional rights from bureaucratic abuse and to affirm that all federal agencies are subject to the rule of law.

Moreover, and contrary to Defendants' argument, the APA's "final agency action" requirement is inapplicable to constitutional claims.  *Nat'l Parks Conservation Ass'n. v. Norton*, 324 F.3d 1229, 1240-41 (11th Cir. 2003); *see also Davis v. Passman*, 442 U.S. 228, 242-43 (1979).  The same holds true for nonstatutory *ultra vires* claims.  *See, e.g.*, *Am. School of Magnetic Healing v. McAnnulty,* 187 U.S. 94 (1902); *Mittleman v. Postal Regulatory Comm'n,* 757 F.3d 300, 307-08 (D.C. Cir. 2014) (citing *Leedom v. Kyne,* 358 U.S. 184, 188 (1958)); *see also Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 187 (D.C. Cir. 2006); *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 413 (D.C. Cir. 2011); *Atl. Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771, 782 (D.C. Cir. 1984) ("[W]hen resort to the agency would in all likelihood be futile, the cause of overall efficiency will not be served by postponing judicial review, and the exhaustion requirement need not be applied."); *Athlone Indus., Inc. v. Consumer*

10

*Prod. Safety Comm'n*, 707 F.2d 1485,1487-88 (D.C. Cir. 1983) ("When the reasons supporting the [exhaustion] doctrine are found inapplicable, the doctrine should not be blindly applied."); *U.S. Dep't of Energy v. Tenenbaum*, 900 F. Supp. 2d 572, 601 (D. Md. 2012).

All of this is particularly vital here, where due process concerns are most intense. *See supra* Part I. Specifically, DOJ's use of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub. L. 101-73, 103 Stat. 183 (codified at various sections of 12 U.S.C.) ("FIRREA"), to issue subpoenas is virtually limitless. Such subpoenas are not subject to judicial authorization and apply to all records and witnesses the Attorney General "deems relevant or material" to a FIRREA investigation. 12 U.S.C. § 1833(a). As of the end of last year, DOJ already had issued more than fifty subpoenas to banks and payment processors. *See House Choke Point Report* at 2. It is this expansive power, along with the guidance announcements and other policies of the Defendants, that is driving Choke Point and that makes it so threatening to potential targets.[24]

In an attempt to curb DOJ's subpoena power, on June 26, 2014, Representative Blaine Luetkemeyer (R-MO) introduced the End Operation Choke Point Act of 2014, H.R. 4986, 113th Cong. (2014), which would require judicial authorization, based on a showing of "specific and articulable facts," prior to the issuance of a FIRREA subpoena. This bill remains with the House Committee on Financial Services. But legislative relief, though welcome, will not resolve all of the problems associated with Choke Point. Rather, Choke Point will remain an improper

---

[24] On October 6, 2014, members of the Senate Banking Committee wrote to Attorney General Holder raising further questions about Choke Point and DOJ's questionable use of FIRREA. *See* Letter from Hon. Mike Crapo, Ranking Member, U.S. S. Comm. on Banking, Hous., & Urban Affairs, to Eric Holder, Att'y Gen., DOJ (Oct. 6, 2014), *available at* http://www.crapo.senate.gov/issues/banking/documents/RepublicanLettertoHolderDOJOperationChokePoint10-06-14.pdf ("[DOJ] should promptly cease seeking to use subpoenas and legal actions to unfairly impose liability on parties not involved in fraud and to put out of business merchants engaged in legal and legitimate commerce that DOJ disfavors.").

exercise of unbounded administrative power and an over-reach of Defendants' authority in violation of due process and the rule of law until the courts stop the abuse.[25]

**B.      Agencies Have Stonewalled FOIA Requests Regarding Choke Point.**

The APA's principles of government transparency and public access also run through the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").  FOIA reflects a "strong congressional aversion to secret [agency] law . . . and represents an affirmative congressional purpose to require disclosure of documents which have 'the force and effect of law.'"  *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (internal citations omitted).  In fact, FOIA demonstrates that Congress believes "an informed electorate is vital to the proper operation of a democracy."  *McGehee v. Cent. Intelligence Agency*, 697 F.2d 1095, 1108 (D.C. Cir. 1983).

The agencies behind Choke Point, including defendants OCC and FRS, have received a number of FOIA requests.[26]  To date, not a single agency has produced any documents responsive to these requests.[27]  In fact, last week, the FRS refused to process one of those FOIA

---

[25] *See id.* ("[The Choke Point high-risk business] list appears to have been created with no public input, no compliance guidance or metrics for private entities to follow, and with disregard for the legality of a merchant's operation.  Further, the list has been used as a pretext by DOJ to limit essential banking services for industries out of favor by this administration.").

[26] Letter from *Cause of Action* to Lara Rodriguez, FOIA Officer, Nat'l Credit Union Admin. (Sept. 15, 2014); Letter from *Cause of Action* to Chief FOIA Officer, CFPB (Sept. 15, 2014); Letter from *Cause of Action* to Ken Courter, Acting Chief, FOIA/PA Unit, DOJ, Criminal Div. (July 14, 2014); Letter from *Cause of Action* to Jeanne McLaughlin, FOIA Manager, FRS (July 14, 2014); Letter from *Cause of Action* to Carmen Mallon, Chief of Staff, DOJ, Office of Info. Policy (July 14, 2014); Letter from *Cause of Action* to Frank Vance, Disclosures Servs. Commc'ns Div., OCC (July 14, 2014) (all letters on file with *Cause of Action*, a non-profit, non-partisan government accountability organization dedicated to uncovering and reducing government fraud, waste, and abuse (*see* http://www.causeofaction.org)).

[27] Perhaps these properly submitted requests are being delayed for a review of "White House equities."  *See White House "Equities" in FOIA Requests*, causeofaction.org, http://causeofaction.org/our-work/white-house-equities-in-foia-requests/; Press Release, Cause of Action, *25 Groups Ask President to Withdraw or Clarify Memorandum Instructing Agencies to*

requests.[28]  In so doing, the FRS raised objections (describing the request as vague and overbroad), treating the FOIA request in a manner akin to a request for the production of documents in a pending lawsuit, but with virtually no remedy of going to the court as permitted in discovery.  To the contrary, the FRS stated that the request "is not being accepted by the Board for processing[,]" requiring the FOIA requester to re-submit and start over in the queue of FOIA requests submitted to the FRS; all of this instead of simply reaching out to the requestor and working with it to determine the scope of the request.  Additionally, this rejection letter itself came well after and without regard to statutory deadlines and with no legitimate basis for a delay.

That the agencies are delaying FOIA responses is nothing new.  However, the manner in which they are responding – not producing any responsive documents (despite the obvious existence of documents, some of which have been produced in response to Congressional inquiries) and relying on procedural loopholes to frustrate the purpose of FOIA – is further evidence of bad faith.  This unusual opacity reasonably raises serious questions about the government's commitment to transparency and about Defendants' efforts to hide Choke Point-related records.[29]

---

*Consult with White House on Document Releases* (Sept. 29, 2014), *available at* http://causeofaction.org/coalition-open-government-groups-confront-president-obama-policy-frustrates-transparency/.

[28] Letter from Margaret McCloskey Shanks, Deputy Sec'y of the Bd., Bd. of Governors, FRS, to *Cause of Action*, FOIA Request F-2014-0313 (Sept. 29, 2014) (on file with *Cause of Action*).

[29] Even Congress has struggled to get transparency from FDIC.  *See* Letter from the U.S. H. Comm. on Oversight & Gov't Reform to Martin J. Gruenberg, Chairman, FDIC (June 9, 2014), *available at* http://oversight.house.gov/wp-content/uploads/2014/06/2014-06-09-DEI-Jordan-to-Gruenberg-FDIC-Choke-Point-and-Reputational-Risk.pdf ("Documents produced to the Committee by [DOJ] call into question the sincerity and truthfulness of [FDIC Acting General Counsel, Richard] Osterman's testimony [that Choke Point is not an FDIC program].  In fact, the FDIC has been intimately involved in Operation Choke Point since its inception.").

### III.    CHOKE POINT UNDERMINES FEDERALISM.

Many of the industries targeted by Choke Point are heavily regulated but legal businesses.  For instance, payday lending is legal in thirty-six states and subject to a variety of regulations.[30]  Multilevel marketing operations are regulated in every state.[31]  Coin dealing and travel clubs also are subject to state regulations.[32]  It is appropriate and fully within the power and competency of the states to determine the legality of such businesses and how to regulate them.

Indeed, absent some compelling rationale not evident here, federalism principles mandate that states are free to regulate as they see fit.  The long arm of the federal government should not reach into state affairs and tamper with this ability merely because of a determination by federal agencies and officials that certain industries are disfavored and best eliminated.[33]  As the Supreme Court recently noted, "facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed[,]" allowing "the independent power of the states to serve as a check on the power of the Federal Government."

---

[30] Pew Charitable Trusts, *State Payday Loan Regulation and Usage Rates* (2012), *available at* http://www.pewtrusts.org/en/multimedia/data-visualizations/2014/~/media/ Data%20Visualizations/Interactives/2014/State%20Payday%20Loan%20Regulation%20and%20 Usage%20Rates/Report/State_Payday_Loan_Regulation_and_Usage_Rates.pdf.

[31] *See* Jeffrey Babener, *MLM Laws in 50 States*, MLM Legal (2010), http://www.mlmlegal. com/statutes.html; David Klein, *Multilevel Marketing: How to Avoid Building the Pyramid*, Justia (May 6, 2013), http://verdict.justia.com/2013/05/06/multilevel-marketing.

[32] *See, e.g.*, Mo. Rev. Stat. § 407.1243 (2013) (requiring travel club registration); Virginia Travel Club Act, Va. Code Ann. § 59.1-445 (1994) (requiring travel club registration); Dan Browning, *New Minnesota Coin Law Targets Shady Dealers*, Star Tribune (July 29, 2013), http://www.startribune.com/local/217320721.html.

[33] *See, e.g.*, Memorandum from Michael S. Blume, Dir., Consumer Protection Branch, to Stuart F. Delery, Ass't Att'y Gen., Civil Div. of DOJ, *Operation Choke Point: Six-Month Status Report* (Sept. 9, 2013), *in House Choke Point Report*, app. at HOGR-3PPP000333 ("[M]any banks have decided to stop processing transactions in support of Internet payday lenders.  We consider this to be a significant accomplishment and positive change for consumers . . . . ").

*Nat'l Fed'n of Indep. Bus. v. Sibelius*, 132 S. Ct. 2566, 2578 (2012); *see also Shelby Cnty. v. Holder*, 133 S. Ct. 2612, 2623 (2013) ("States retain broad autonomy in structuring their governments and pursuing legislative objectives."); *New York v. United States*, 505 U.S. 144, 181 (1992) ("State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.") (internal quotation marks omitted).

In carrying out Choke Point, Defendants have abused their authority over elements of the banking industry to *de facto* pre-empt state law by regulating disfavored, but legal non-banking industries. In contrast, the approach taken by the federal government regarding the marijuana industry permits states to legalize a product long illegal under federal law.[34] In that context, instead of issuing "guidance" to discourage such activity or to pressure banks not to work with, or accept accounts from, marijuana businesses, the federal government issued guidelines clarifying how banks could accept accounts from the marijuana industry without running afoul of federal law.[35] Defendants' failure to do the same with Choke Point offends basic federalism principles and raises, at a minimum, prudential questions regarding the efficacy and efficiency of agency enforcement and policy decision-making.

---

[34] *See, e.g.*, Colo. Const. art. XVIII, § 16 (personal use and regulation of marijuana); Cal. Health & Safety Code § 11362.5 (use of marijuana for medical purposes).

[35] *See* FinCEN, U.S. Dep't of the Treasury, Guidance FIN-2014-G001, BSA Expectations Regarding Marijuana-Related Businesses (Feb. 14, 2014), *available at* http://www.fincen.gov/ statutes_regs/guidance/pdf/FIN-2014-G001.pdf; *see also* Memorandum from James M. Cole, Deputy Att'y Gen., DOJ, to all U.S. Att'ys, Guidance Regarding Marijuana Enforcement (Aug. 29, 2013); Andrew Grossman, *Banks to Be Allowed to Do Business with Marijuana Dispensaries*, Wall St. J. (Feb. 14, 2014), *available at* http://online.wsj.com/news/ articles/SB10001424052702304434104579383150782034282.

**CONCLUSION**

For the reasons discussed above, The LIBRE Initiative Institute respectfully requests that the Court consider the full and deleterious impact of Choke Point in denying the pending motions.

Dated:

Respectfully submitted,

_____

DANIEL Z. EPSTEIN
PRASHANT K. KHETAN
CAUSE OF ACTION
1919 Pennsylvania Ave., N.W., Ste. 650
Washington, D.C. 20006
(202) 499-4232

Counsel for *Amicus Curiae*
The LIBRE Initiative Institute

16