IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Community Financial Services Association of America, et al.<br><br>Plaintiffs,<br><br>v.<br><br>Federal Deposit Insurance Corporation, et al.<br><br>Defendants. | Case No.: 1:14-cv-00953-GK |

**BRIEF OF *AMICI CURIAE* AUBRY STONE, THE NATIONAL ORGANIZATION OF AFRICAN AMERICANS IN HOUSING, AND THE TEAMSTERS NATIONAL BLACK CAUCUS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Operation Choke Point is a concerted, shrouded effort by Defendants and other government agencies to prevent lawful business they have deemed undesirable from receiving banking services. These efforts impact not only the targeted industries, but also the consumers that rely on their services. *Amici* take the unusual step of submitting a brief at this early stage of the litigation to inform the Court of the impact of Operation Choke Point on the often underrepresented communities they serve.

*Amici* respectfully submit that the Court should deny the Defendants' motions to dismiss. The Court should allow the case to proceed to discovery so that the Defendants' claims that they have not caused banks to drop clients based on their participation in lawful activities may be tested.

**INTERESTS OF *AMICI CURIAE***

Aubry Stone is an active member and leader in the African American community: a civil rights leader, the president and CEO of the California Black Chamber of Commerce, and a director of the U.S. Black Chambers, Inc.

Mr. Stone also has served on the boards of the NAACP, Sacramento Black Chamber of Commerce, the Mayor's Economic Development Council, the District Attorney's Community Relations Board, and the State Fair Minority council. Through his involvement in these and other civic organizations, Mr. Stone has gained an in-depth understanding of the needs of minority business owners and individuals.

The National Organization of African Americans in Housing ("NOAAH") is a non-profit advocacy organization. Formed in 1998 by affordable housing advocates and managers and residents of public housing, and founded on the belief that its members could better advance the interests of people of color who either sought fair, affordable housing or managed it, NOAAH is a national network that advocates for fair housing for all Americans. NOAAH members include former HUD officials, executive directors of public housing authorities, state housing finance agencies, resident leadership, and private groups and business.

The Teamsters National Black Caucus ("TNBC") is an organization of black Teamster men and women who are united by their special concerns for rights and conditions of minority workers. Working within the framework of the International Brotherhood of Teamsters Constitution, TNBC seeks to address pressing issues confronting minority workers ranging from increased participation to outreach to the African-American community and other communities of color.

*Amici* respectfully submit that their shared expertise can assist the Court in understanding the impact of Operation Choke Point on the communities they serve.

**OPPOSITION TO OPERATION CHOKE POINT**

The Defendants' campaign against payday lenders and other law-abiding industries that they have deemed "high risk" is also a campaign against the communities that rely on the services of these industries and the small business owners that provide them. *Amici* write in support of Plaintiffs to inform the Court of the particularized, harmful impact of Operation Choke Point on consumers and small businesses, particularly those in low-income and minority communities.

**I.   Operation Choke Point Is Bad for Consumers in Low-Income and Minority Communities**

It is easy for those who have never used or even considered a payday loan to cast stones at the industry. But for millions of Americans it provides a vital service: allowing individuals and families—for whom other forms of credit may be unavailable or cost prohibitive—to make ends meet in difficult economic times. In a survey of recent customers of Community Financial Services Association ("CFSA") affiliated payday lenders, 49 percent reported that they took out the loan to pay for an unexpected expense; 28 percent used the loan to avoid paying a late fee; and 23 percent used the loan to avoid bouncing a check or overdrawing a bank account.[1] The consequences of these deficiencies are enormous. "Without access to credit, these small-scale personal emergencies can lead to bounced checks, late fees, utility suspension, repossession, and, in some cases, foreclosures, evictions and bankruptcies."[2]

---

[1]   Harris Interactive, *Payday Loans and the Borrower Experience* (2013) at 7, *available at* http://cfsaa.com/Portals/0/Harris_Interactive/CFSA_HarrisPoll_SurveyResults.pdf (hereinafter "Harris Poll").

[2]   Adair Morse, *Payday Lenders: Heroes or Villains?* 102 J. Fin. Econ. 1 at 28–44 (2011), *available at* http://faculty.haas.berkeley.edu/morse/research/papers/morsepayday_jfe2.pdf (hereinafter "Morse").

This is not a unique experience. The 2011 FDIC National Survey of Unbanked and Underbanked Households found that 8.2 percent of all U.S. households are "unbanked" (do not have a checking or savings account) and a further 20.1 percent are "underbanked" (have a checking or savings account, but also rely on non-bank alternative financial services providers).[3] For low-income and minority households, these numbers are dramatically higher:

|  | Unbanked | Underbanked |
| --- | --- | --- |
| Income less than $15,000 | 28.2% | 28.6% |
| Black | 21.4% | 33.9% |
| Hispanic | 20.1% | 28.6% |

By definition, the one-fifth of all U.S. households defined as underbanked use some form of non-bank financial services. Six percent of households used a non-bank credit product (such as payday lending) in the 12 months preceding the survey.[4]

The decision by these customers to turn to payday lenders is not an accident or mistake as paternalistic assumptions might lead one to believe. The typical borrower is employed, has at least a high-school education, and has an income of approximately $22,400, with family income of between $25,000 and $50,000.[5] According to an FDIC survey, "the main reason

---

[3]     Susan Burhouse & Yazmin Osaki, 2011 FDIC National Survey of Unbanked and Underbanked Households (2012) at 5, *available at* https://www.fdic.gov/householdsurvey/ (hereinafter "2011 FDIC Survey").

[4]     The FDIC survey distinguishes between alternative financial services transaction products and alternative financial services credit products. Transaction products include non-bank money orders, non-bank check cashing, and non-bank remittances. Credit products include payday loans, pawn shops, rent-to-own stores, and refund anticipation loans.

[5]     Consumer Financial Protection Bureau, *Payday Loans and Deposit Advances: A White Paper of Initial Data Findings* (2013) at 18, *available at* http://files.consumerfinance.gov/f/201304_cfpb_payday-dap-whitepaper.pdf (hereinafter "CFPB White Paper"); Gregory Elliehausen & Edward Lawrence, *Payday Advance Credit in America: An Analysis of Customer Demand* (2001) at 28–33, *available at*

(continued on the next page)

households use [alternative financial services] credit products is because they are easier or faster to obtain than bank credit."[6] A consumer's choice to use a payday loan over other services is also often based on cost, with 93 percent of CFSA lender customers reporting that they carefully weighed the risks and benefits before taking out a payday loan.[7] A common storefront payday loan fee of $15 per $100 would yield an APR of 391% on a typical 14-day loan. Although the APR that results from the fixed fee and short duration of the loan is high relative to products that offer longer repayment terms, it is less expensive than some alternatives products. For example, a 2004 study of Chicago-area banks calculated the effective APR for bounced check protection to be, on average, 2,424% for a $200, 14-day bounced check loan.[8] The human cost of utilities interruption, eviction, or the inability to pay for a child's after-school program cannot be reduced to APR.

Not only are these services useful, but consumers also tend to be satisfied with the payday loan services they receive. In a survey of CFSA affiliated lenders' recent customers, over 90 percent of respondents reported that their experience with both the terms and cost of the loan were better than or as expected. Ninety-five percent valued having the option to take out

---

(continued from the previous page)
http://cfsaa.com/Portals/0/analysis_customer_demand.pdf.
 According to a Consumer Financial Protection Bureau report, the median reported personal income of borrowers is $22,476. The mean reported income is $26,167. Twenty-five percent of borrowers reported income of $33,876 or more.

[6]  2011 FDIC Survey at 6.

[7]  Harris Poll at 4.

[8]  Donald Morgan & Michael Strain, Staff Report of Fed. Reserve Bank of N.Y., *Payday Holiday: How Households Fare after Payday Credit Bans* (*revised* 2008), *available at* http://www.newyorkfed.org/research/staff_reports/sr309.pdf (hereinafter "Reserve Bank Staff Report") (citing Tim Westrich & Malcolm Bush, *Banking on Bounced Checks* (2004)).
 The study calculated the charges at the seven largest Chicago-area banks for a customer who starts with a checking account balance of $0 and makes five $40 purchases over 14 days.

a payday loan; the same percentage of respondents agreed that payday loans can provide a safety net in the event of unexpected financial difficulties.[9] It is no wonder then that the Consumer Financial Protection Bureau ("CFPB")—the federal agency charged with overseeing payday lenders—recognizes that "demand exists for small dollar credit products" and, when structured appropriately, "[t]hese types of credit products can be helpful for consumers."[10]

*Amici* do not dispute that there are bad actors in the payday loan industry, as there are in every industry, and efforts to stomp out fraudsters and predators are laudable. The tools for such a targeted approach exist. The payday loan industry is subject to various federal laws, including the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and the CFPB has statutory oversight authority over payday lenders, *see* 12 U.S.C. § 5581. The industry is also heavily regulated by the states in which payday lending is permitted. Among other things, state laws limit loan size and fix allowable fees, *e.g.* Mich. Comp. Laws § 487.2153; set minimum repayment terms, *e.g.* Colo. Rev. Stat. 5-3.1-103; and restrict the number of loans or number of times a loan can be rolled over, *e.g.* Wash. Rev. Code § 31-45.010.

But Defendants are not using these finer tools. They are not prosecuting violations of law or working to curtail bad actors. Operation Choke Point's "intense focus" on and "primary target[ing]" of the "indisputably lawful" short-term lending industry as a whole,[11] leaves no room for nuance.

---

[9] Harris Poll at 3, 6.

[10] CFPB White Paper at 4.

[11] Staff of H. Comm. on Oversight & Gov't Reform, 113th Cong., *The Department of Justice's "Operation Choke Point": Illegally Choking Off Legitimate Businesses?* (2014) at 5, *available at* http://oversight.house.gov/wp-content/uploads/2014/05/Staff-Report-Operation-Choke-Point1.pdf.

Lumping together all payday lenders—and grouping payday lenders and other legitimate businesses with Ponzi schemers and publishers of racist material—cannot be justified by real or perceived threats to consumers from individual actors in the industry, just as the sale of lemon cars could not justify a wholesale effort to shutter the used car market.

Operation Choke Point also cannot be justified by agency officials' stated belief that the "elimination [of the payday loan industry] would be a 'significant accomplishment' for consumers."[12] This sentiment ignores—and certainly does nothing to alleviate—the harsh economic reality faced by millions of households. If Operation Choke Point is allowed to achieve this goal, consumers will be denied a valuable choice and, as a result, will be economically harmed. States that banned payday lending have seen *increased* bounced check rates, complaints against debt collectors, and Chapter 7 bankruptcies.[13] Another study found that "the existence of payday lending increases welfare for households who may face foreclosure or be driven into small property crime in times of financial distress."[14] There is nothing to suggest that these results would differ were Operation Choke Point allowed to achieve its goal of eliminating payday lending nationally.

## II. Operation Choke Point Harms Lawful Small Businesses

Small businesses are also collateral damage in the Defendants' war on payday lenders and other law-abiding industries. Payday loan providers are often members of the communities they serve—local businessmen and women working to meet the needs of their community. Like other businesses

---

[12]   *Id.* at 1.
[13]   Reserve Bank Staff Report at 21–22.
[14]   Morse, § 6.

targeted by Operation Choke Point, these lenders rely on banking services to survive. When these services are removed because their patronage is now deemed too "risky" (despite years-long ongoing relationships), the business owners are left scrambling. They are punished not for any fraudulent or illicit activity, but simply for their choice of profession.

Of course, it is not just the business owners that are hurt. The U.S. payday loan industry directly employs more than 50,000 individuals, who collectively earn approximately $2 billion in wages. Again, these individuals are often members of the community served by their employers. The ironic end result of Operation Choke Point's targeting of their employers, and thus their jobs, may be an increase in those facing unexpected financial hardship and in need of alternative financial services.

## CONCLUSION

Operation Choke Point's aim of eliminating the payday lending industry and other legal businesses harms consumers and small businesses. The impact on poor and minority communities is particularly sharp. *Amici* respectfully submit that the Defendants' motions to dismiss should be denied, and their claims that they have not participated in this attack should be tested.

October 10, 2014            Respectfully submitted,

                            TROUTMAN SANDERS LLP


                            By:  s/ Brandon Almond
                                 Brandon Almond (DC Bar No. 982170)
                                 401 9th Street NW, Suite 900
                                 Washington, DC 20004
                                 Tel: 202.274.2864
                                 Fax: 202.274.2994
                                 brandon.almond@troutmansanders.com

By:  s/ M. Addison Draper
    M. Addison Draper (DC Bar No. 1004480)
    5200 Bank of America Plaza
    600 Peachtree Street NE
    Atlanta, GA 30308
    Tel: 404.885.2719
    Fax: 404.885.3900
    addison.draper@troutmansanders.com

*Counsel for* Amici Curiae *Aubry Stone and the National Organization of African Americans in Housing*

MCINTYRE & LEMON, PLLC

By:  s/ Chrys D. Lemon
    Chrys D. Lemon (DC Bar No. 433371)
    1155 15th Street NW, Suite 1101
    Washington, DC 20005
    Tel: 202.659.3900
    Fax: 202.659.5763
    CDL@mcintyrelf.com

*Counsel for* Amicus Curiae *Teamsters National Black Caucus*