**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMUNITY FINANCIAL SERVICES ASSOCATION OF AMERICA, LTD., et al., )))) | |
| Plaintiffs, )) | |
| v. )) | Case No. 14-CV-953 (GK) |
| FEDERAL DEPOSIT INSURANCE CORPORATION, et al., ))) | |
| Defendants. )) | |

**MEMORANDUM OPINION**

In June 2014, Plaintiffs Community Financial Services Association of America, Ltd. ("CFSA") and Advance America, Cash Advance Centers, Inc. ("Advance America") filed a Complaint against Defendants the Federal Deposit Insurance Corporation ("the FDIC"), the Board of Governors of the Federal Reserve System ("the Board"), and the Office of the Comptroller of the Currency and Thomas J. Curry, in his official capacity as the Comptroller of the Currency ("the OCC"). Plaintiffs seek declaratory and injunctive relief to set aside certain informal guidance documents and other actions by the FDIC, the Board, and the OCC on the grounds that they exceed the agencies' statutory authority, are arbitrary and capricious, were promulgated without following the

1

procedures required by law, and deprive Plaintiffs of liberty interests without due process of law.

This matter is before the Court on Defendants' Motions to Dismiss for Lack of Jurisdiction and for Failure to State a Claim (collectively, "Motions to Dismiss") [Dkt. Nos. 16, 17, 18], Plaintiffs' Motion for Jurisdictional Discovery ("Motion for Discovery") [Dkt. No. 25], and Plaintiffs' Motion for Leave to File a Second Amended Complaint [Dkt. No. 56]. Upon consideration of the motions,[1] oppositions, replies, surreplies, notices of support, response, the entire record herein, and for the reasons stated below, the Motions to Dismiss are **granted in part and denied in part**, the Motion for Discovery is **denied**, and the Motion for Leave to File a Second Amended Complaint is **granted.**

I.   **Background**

A.   **Factual Overview**[2]

Plaintiff CFSA is a national trade organization that represents payday lenders and Plaintiff Advance America is a payday

---

[1] See Section I.B, Procedural Background, infra, for a detailed history of the relevant briefs and their shorthand citations.

[2] For purposes of ruling on a motion to dismiss, the factual allegations of the complaint must be presumed to be true and liberally construed in favor of the plaintiff. Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc., 525 F.3d 8, 15 (D.C. Cir. 2008); Shear v. Nat'l Rifle Ass'n of Am., 606 F.2d 1251, 1253 (D.C. Cir. 1979). Therefore, the facts set forth herein are taken from the First Amended Complaint. The Court is not required though, to accept "a legal conclusion couched as a factual allegation" or

lender and member of CFSA. SAC ¶¶ 14-16. Payday lenders are by and large licensed and regulated by the states, as well as some federal consumer protection laws. Board Mot. at 3. The Dodd-Frank Act gave the Consumer Financial Protection Bureau ("CFPB") authority to supervise payday lenders and promulgate regulations pertaining to payday lending. See SAC ¶¶ 39-41; Dodd-Frank Act Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5491(a). CFPB is not a party in this case.

Defendant FDIC is an independent agency and acts as the primary federal regulator for certain state-chartered banks. In that capacity, the FDIC prescribes standards to promote banks' safety and soundness, and may do so by regulation or guideline. The FDIC also examines banks, prepares examination reports, and brings enforcement actions. See FDIC Mot. at 2; FDIC, Who is the FDIC?, available at www.fdic.gov/about/learn/symbol.

Defendant OCC is an independent bureau within the U.S. Department of the Treasury that functions as the primary supervisor of federally chartered (national) banks and savings and loan associations. The OCC administers statutory provisions governing most aspects of the federal banking system and has broad authority to examine the safety and soundness of the banks it supervises.

---

inferences unsupported by the facts set forth in the complaint. Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006).

See OCC Mot. at 5; OCC, About the OCC, available at http://www.occ.gov/about.

Defendant Board of Governors of the Federal Reserve System is a federal agency authorized to regulate and examine bank holding companies and state-chartered banks that are members of the Federal Reserve System. State member banks that are regulated by the Board are also regulated by state banking agencies. See Board Mot. at 2-3.

Payday lenders utilize the services of banks as part of their business. For example, "[w]hen a prospective borrower applies for the loan . . . he or she typically provides a post-dated check or an electronic debit authorization for the value of the loan, plus a fee. The lender immediately advances the customer funds, then after a specified period of time, usually determined by the customer's next payday, the borrower returns to repay the loan and fee. But if the customer does not return, the terms of the transaction permit the lender to deposit the post-dated check or to execute the debit authorization. In order to have that security, the lender must have a deposit account with a bank and/or access to the Automated Clearing House (ACH) network." SAC ¶ 28; see also OCC Motion to Dismiss ("OCC Mot.") [Dkt. No. 18-1] at 1 ("a payday lender typically must submit checks provided by its borrowers through the payment system by causing the checks to be deposited at a bank.")

4

Plaintiffs allege that Defendants participated and continue to participate in a campaign initiated by the United States Department of Justice ("DOJ"), known as "Operation Choke Point," to force banks to terminate their business relationships with payday lenders. Operation Choke Point has recently been the subject of a House Committee Investigation and reports. See SAC ¶¶ 56-58; STAFF OF H. COMM. ON OVERSIGHT & GOV'T REFORM, 113TH CONG., REP. ON THE DEP'T OF JUSTICE'S "OPERATION CHOKE POINT": ILLEGALLY CHOKING OFF LEGITIMATE BUSINESSES? (Comm. Print 2014) ("Comm. Report"); STAFF OF H. COMM. ON OVERSIGHT AND GOV'T REFORM, 113TH CONG., FEDERAL DEPOSIT INSURANCE CORPORATION'S INVOLVEMENT IN "OPERATION CHOKE POINT" (Comm. Print 2014) ("Comm. FDIC Report").

Defendants allegedly forced banks to terminate relationships with Plaintiffs and Plaintiffs' members by first promulgating regulatory guidance regarding "reputation risk," and by later relying on the reputation risk guidance "as the fulcrum for a campaign of backroom regulatory pressure seeking to coerce banks to terminate longstanding, mutually beneficial relationships with all payday lenders." Pls.' Opp'n at 9.

**B.   Procedural Background**

On June 5, 2014, Plaintiffs filed their original Complaint against Defendants asserting violations of the APA and due process [Dkt. No. 1]. The First Amended Complaint was filed on July 30, 2014 ("FAC") [Dkt. No. 12]. On August 18, 2014, the Board filed

its Motion to Dismiss for Lack of Jurisdiction, or Alternatively for Failure to State a Claim [Dkt. No. 16] ("Board Mot."). The FDIC filed a similar Motion [Dkt. No. 17] ("FDIC Mot."), as did the OCC [Dkt. No. 18] ("OCC Mot."). On October 2, 2014, Plaintiffs filed their Opposition to Motions to Dismiss [Dkt. No. 23] ("Pls.' Opp'n").

The following day, Plaintiffs filed a Motion for Discovery [Dkt. No. 25] ("Discovery Mot."). On October 31, 2014, the Board filed its Reply in support of its Motion to Dismiss [Dkt. No. 41] ("Board Reply") and its Opposition to Plaintiffs' Motion for Discovery [Dkt. No. 42] ("Board Discovery Opp'n"); the FDIC filed its Reply [Dkt. No. 46] ("FDIC Reply") and Opposition [Dkt. No. 45] ("FDIC Discovery Opp'n"); and the OCC filed its Reply [Dkt. No. 44] ("OCC Reply") and Opposition [Dkt. No. 43] ("OCC Discovery Opp'n"). Plaintiffs filed their Reply in support of their Motion for Discovery [Dkt. No. 49] ("Pls.' Discovery Reply") on November 10, 2014. Plaintiffs also filed a Surreply to Defendants' Replies in Support of the Motions to Dismiss [Dkt. No. 50] ("Pls.' Surreply") the same day. In response, the FDIC filed a Surreply [Dkt. No. 51] ("FDIC Surreply") on November 14, 2014.

On October 23, 2014, prior to the filing of Defendants' Replies and Discovery Oppositions, Plaintiffs filed a Notice of Supplemental Support [Dkt. No. 35] ("Pls.' First Supp.") notifying the Court of a letter from an FDIC official to a depository

6

institution. On December 12, 2014, after briefing was complete on the Motions to Dismiss and the Motion for Discovery, Plaintiffs filed a Second Notice of Supplemental Support [Dkt. No. 52] ("Pls.' Second Supp.") to notify the Court of a U.S. House of Representatives Committee Report on the FDIC's involvement in Operation Choke Point. On December 23, 2014, the FDIC filed a Response to Plaintiffs' Second Supplemental Notice [Dkt. No. 53] ("FDIC Supp. Resp.").

## II.   Second Amended Complaint

After briefing was complete on the Motions to Dismiss and the Motion for Jurisdictional Discovery, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint on April 10, 2015 [Dkt. No. 56]. Defendants' only opposition to the Motion to Amend is that the proposed Second Amended Complaint is futile because it does not overcome the alleged deficiencies in the First Amended Complaint with regard to standing and/or failure to state a claim. Consequently, Defendants argue that the Motion to Amend should be denied as futile. See Opp'ns to Motion to Amend. Because this Court finds, infra, that Plaintiffs have standing and some claims survive the Motions to Dismiss, and are therefore not futile, Plaintiffs' Motion to Amend will be **granted**. For purposes of deciding the

Motions to Dismiss, the Court will rely on the Second Amended Complaint [Dkt. No. 56-1] ("SAC") in this Memorandum Opinion.

## III. Jurisdiction

### A.  Standard of Review Under Fed. R. Civ. P. 12(b)(1)

As courts of limited jurisdiction, federal courts possess only those powers specifically granted to them by Congress or directly by the United States Constitution. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). The plaintiff bears the burden of establishing by a preponderance of the evidence that the Court has subject matter jurisdiction to hear the case. See Shuler v. United States, 531 F.3d 930, 932 (D.C. Cir. 2008). In deciding whether to grant a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), the court must "accept all of the factual allegations in [the] complaint as true." Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 54 (D.C. Cir. 2005) (quoting United States v. Gaubert, 499 U.S. 315, 327 (1991)). The Court may also consider matters outside the pleadings, and may rest its decision on its own resolution of disputed facts. See Herbert v. Nat'l Acad. of Sci., 974 F.2d 192, 197 (D.C. Cir. 1992).

### B.  Standing

As a threshold matter, Defendants argue that Plaintiffs do not have standing. Article III of the Constitution limits the jurisdiction of federal courts to certain "Cases" and

"Controversies." See U.S. Const. art. 3, § 2. "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1146 (2013) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341, (2006)). "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." Id. (internal quotation marks and citation omitted).

"[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact . . . which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks, citations, and footnote omitted).

"A plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation." Osborn v. Visa Inc., No. 14-7004, 2015 WL 4619874, at *5 (D.C. Cir. Aug. 4, 2015) (citing Lujan, 504 U.S. at 561). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may

suffice, for on a motion to dismiss we 'presume that the general allegations embrace those specific facts which are necessary to support the claim.'" Lujan, 504 U.S. at 561 (quoting Lujan v. National Wildlife Federation, 497 U.S. 871, 889 (1990)).

Our Court of Appeals recently reiterated and emphasized the requirement that courts must "accept as true all material allegations of the complaint" at the pleadings stage. Osborn, 2015 WL 4619874, at *5 (internal citation omitted). In Osborn, the Court of Appeals found that the plaintiffs' alleged facts were "specific, plausible, and susceptible to proof at trial," and therefore they "pass[ed] muster for standing purposes at the pleadings stage." Id. at *6.

"When a plaintiff's asserted injury arises from the Government's regulation of a third party that is not before the court, it becomes 'substantially more difficult' to establish standing." Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting Lujan, 504 U.S. at 562). Where standing has been found on the basis of third-party conduct, "the record presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." Id. at 941. Therefore, while the Court accepts as true all material allegations made by Plaintiffs, Plaintiffs bear

a greater burden of what they must allege in order to show standing on the basis of third-party conduct.

In this case, the elements of causation and redressability "hinge on the independent choices of the regulated third party," namely the banks. Id. at 938. While it is Plaintiffs' burden to "adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury," Id. (quoting Lujan, 504 U.S. at 562) (emphasis added), at the motion to dismiss stage, Plaintiffs need only allege facts that are "specific, plausible, and susceptible to proof at trial." Osborn, 2015 WL 4619874 at *14.

### 1. Injury in Fact

Defendants do not dispute that Plaintiffs have suffered an injury in fact. CFSA's members, including Plaintiff Advance America, have lost beneficial banking relationships, causing them on short notice to lose business and expend resources to locate new banking partners. Pls.' Opp'n at 11. Many payday lenders have not been able to replace the terminated bank relationships. Id. Plaintiffs have also alleged that Defendants' actions have

deprived them of their ability to compete for banks' resources and have stigmatized them. Id. at 12-13.

In sum, it is clear that Plaintiffs have alleged facts sufficient to show an injury in fact at the pleadings stage.

### 2.  Causation

Defendants argue that Plaintiffs do not meet the causation prong of standing because their injuries are not "fairly traceable" to any acts by the Defendants, and that it was the independent decisions of the respective banks to terminate their relationships with Plaintiffs' members. See Board Mot. at 10-11; FDIC Mot. at 12, 15.

To show causation, Plaintiffs must show that the Defendants' actions were a "substantial factor motivating the decisions of the third parties that were the direct source of the [P]laintiff[s'] injuries." National Wrestling Coaches, 366 F.3d at 940-41. Thus the key issue is the degree of Defendants' alleged involvement or influence on the banks' decisions to terminate relationships with payday lenders.

Plaintiffs allege that the Defendants undertook a "two-stage regulatory campaign designed to cripple and ultimately eliminate the payday lending industry." Pls.' Opp'n at 9. The first stage involved Defendants issuing informal regulatory guidance regarding "reputation risk." Plaintiffs allege that the Defendant agencies expanded the definition of "reputation risk" beyond its

traditional understanding to include bad publicity due to the actions of third parties, even when the actions were unrelated to work done on behalf of the bank. SAC ¶ 5, 47-51.

Plaintiffs cite to several documents issued by the FDIC, as well as one by the OCC, as examples of the expansion of "reputation risk." See e.g., OCC, Third-Party Relationships: Risk Management Guidance, OCC Bulletin 2013-29 (Oct. 30, 2013); FDIC, Financial Institution Letter: Guidance for Managing Third-Party Risk, FIL-44-2008 (June 6, 2008); FDIC, Financial Institution Letter: Guidance on Payment Processor Relationships, FIL-127-2008 (Nov. 7, 2008); FDIC, Financial Institution Letter: Payment Processor Relationships, FIL-3-2012 (Jan. 31, 2012); FDIC, Managing Risks in Third-Party Payment Processor Relationships, 8 SUPERVISORY INSIGHTS (Summer 2011). The Supervisory Insights article included a list of merchant categories--including payday loans--"that have been associated with high-risk activity." Managing Risks in Third-Party Payment Processor Relationships, 8 SUPERVISORY INSIGHTS at 7; Pls. Second Supp., Ex. B at 157 (collectively, "Agency Documents").

The second stage, according to Plaintiffs' theory, is that Defendants relied on the expanded definition of "reputation risk," as outlined in the regulatory guidance, "as the fulcrum for a campaign of backroom regulatory pressure" to coerce banks into terminating relationships with payday lenders. Pls.' Opp'n at 9.

Defendants allegedly acted in concert with DOJ in Operation Choke Point and "used their prudential 'safety and soundness' regulatory authority" to pressure banks. SAC ¶ 5; see also SAC ¶¶ 56-60.

Plaintiffs further allege that, as part of Operation Choke Point, Defendants privately threatened banks with adverse regulatory action if they continued doing business with payday lenders. See id. In support of their theory, Plaintiffs cite to an internal DOJ memo titled "Operation Choke Point: Eight-Week Status Report," in which meetings with the FDIC and the possibility of the FDIC assigning agents to work on DOJ cases were discussed. Pls.' Opp'n at 25 (citing Memorandum from Michael S. Blume, Dir., DOJ Consumer Prot. Branch, to Stuart F. Delery, Principal Deputy Ass't Att'y Gen., DOJ Civil Div. at 6 (Apr. 17, 2013), in Comm. Report app. at HOGR-3PPP000048.

Plaintiffs also refer to a February 15, 2013 letter from FDIC Regional Director M. Anthony Lowe to an unidentified bank regarding that bank's involvement in payday lending. See Pls.' Supp. Support, Ex. A [Dkt. No. 35-1]. In the letter, Lowe states, "we have generally found that activities related to payday lending are unacceptable for an insured depository institution." Id. at 2. Lowe also states that members of the Region's Senior Management will be contacting the bank in the near future "to further discuss [its] concerns relative to the aforementioned [payday lender] relationship." Id. Similarly, Plaintiffs cite to an internal email

14

from Marguerite Sagatelian, Senior Counsel with the FDIC Consumer Enforcement Unit, stating that FDIC Legal was "looking into avenues by which the FDIC can potentially prevent [its] banks from facilitating payday lending." Pls. Second Supp., Ex. B at 118 [Dkt. No. 52-2].

Plaintiffs bolster their allegations by noting that the Federal Reserve Board of Governors is the prudential regulator for three banks that have already terminated relationships with Plaintiffs and their members, the OCC is the prudential regulator for seven banks that terminated relationships with Plaintiffs and their members, and that the FDIC is the prudential regulator for four banks that terminated relationships with Plaintiffs and their members. SAC ¶ 84.

Plaintiffs also point to a DOJ memo indicating that it had been in contact with "several state attorneys general, FTC, FDIC, the Federal Reserve Bank of Atlanta, and [they] hope to begin working with the OCC soon," in "an attempt to increase their knowledge and attention to the roles banks and payment processors play in facilitating fraud." Memorandum from Michael S. Blume, Dir., DOJ Consumer Prot. Branch, to Stuart F. Delery, Ass't Att'y Gen., DOJ Civil Division at 14 (Sept. 9, 2013), in Comm. Report app. at HOGR-3PPP000339.   Finally, Plaintiffs claim that Defendants undertook the actions they did with the express purpose

of pressuring banks to terminate relationships with payday lenders.

In sum, Plaintiffs have alleged sufficient facts, that, if proven true, could show that the Defendants' conduct was a "substantial factor motivating the decisions of third parties that were the direct source of [P]laintiff[s'] injuries." National Wrestling Coaches, 366 F.3d at 940-41. Because the "facts alleged by the Plaintiffs are specific, plausible, and susceptible to proof at trial, they pass muster for standing purposes at the pleadings stage." Osborn, 2015 WL 4619874 at *6.

### 3. Redressability

Next, Defendants argue that Plaintiffs lack standing because their injuries are not redressable by the Court. Redressability requires that Plaintiffs demonstrate "a substantial likelihood[3] that the requested relief will remedy the alleged injury in fact." Teton Historic Aviation Found. v. U.S. Dep't of Def., 785 F.3d 719, 724 (D.C. Cir. 2015) (quoting Vermont Agency of Natural Res.

---

[3] Plaintiffs argue that they need only allege that the relief requested would result in a "significant increase in the likelihood" that their banking relationships will be reinstated." Pls.' Opp'n at 19-20 (citing Utah v. Evans, 536 U.S. 452, 464 (2002)). Both phrasings are used in our Circuit and are essentially the same in practice. See, e.g., Town of Barnstable, Mass. v. Fed. Aviation. Admin., 659 F.3d 28, 31 (D.C. Cir. 2011) (stating "significant increase in the likelihood" and "substantial probability" are synonymous); Spectrum Five LLC v. Fed. Commc'ns Comm'n, 758 F.3d 254, 261 (D.C. Cir. 2014) (utilizing "significant increase in the likelihood" standard).

v. U.S. ex rel. Stevens, 529 U.S. 765, 771 (2000)). A "substantial likelihood" requires "more than a remote possibility . . . that [Plaintiffs'] situation might . . . improve were the court to afford relief," Warth v. Seldin, 422 U.S. 490, 491 (1975), but is not so demanding as to require Plaintiffs to "show to a certainty that a favorable decision will redress [their] injury." Teton, 785 F.3d at 726 (quoting Nat'l Wildlife Fed'n v. Hodel, 839 F.2d 694, 705 (D.C. Cir. 1988)).

Plaintiffs' prayer for relief includes: (1) declaring various Agency Documents to be unlawful, (2) declaring that Defendants significantly changed the definition of reputation risk without notice and comment rulemaking; (3) declaring that Defendants deprived Plaintiffs of liberty without due process of law; (4) enjoining Defendants, "as well as those acting in concert with them," from implementing the aforementioned Agency Documents, from relying on the revised definition of "reputation risk," and from applying informal pressure to banks to encourage them to terminate relationships with payday lenders; (5) enjoining Defendants, "as well as those acting in concert with them," from harming the reputations of Plaintiffs and from seeking to deprive them of access to financial services; and (6) other such relief as the Court deems just and proper. SAC ¶ 205.

Defendants focus their redressability arguments primarily on the invalidation of the Agency Documents, offering little

discussion about Plaintiffs' other requested relief. They also argue that 12 U.S.C. § 1818(i)(1) prevents this Court from providing any injunctive relief that interferes with "the issuance or enforcement of any notice or order." Board Mot. at 15-16; FDIC Mot. at 43-44; OCC Mot. at 18-19. The nature of any injunctive relief the Court is able to provide is extremely relevant to standing, as "Plaintiffs cannot establish standing by requesting relief that the Court lacks the authority to grant." Long Term Care Pharmacy All. v. Leavitt, 530 F. Supp. 2d 173, 185 (D.D.C. 2008).

Therefore, the Court will address the parties' redressability arguments regarding the invalidation of the Agency Documents and injunctive relief separately, and will then assess the "substantial likelihood" of redressability. Teton Historic Aviation Found., 785 F.3d at 724.

### i.   Invalidation of Agency Documents

Defendants argue that, even if the Court were to invalidate the Agency Documents that allegedly redefine reputation risk and enjoin Defendants' actions, it does not necessarily follow that the banks will re-establish relationships with the Plaintiffs. See FDIC Mot. at 16-20; OCC Mot. at 13-14; Board Mot. at 14.

Defendants explain that the Agency Documents do not require banks to sever relationships with any third parties, but only provide guidance on risk management. For that reason, Defendants

argue that the documents could not have been the impetus for the termination of the bank relationships, and invalidation of them will not necessarily be the catalyst for reinstatement of the bank relationships. See FDIC Mot. at 17; OCC Mot. at 14-15. The Board argues that this is particularly true for it, because Plaintiffs are not even seeking to invalidate any Board documents. See Board Mot. at 14.

Defendants argue further that invalidation of the Agency Documents would not provide prospective relief to Plaintiffs. Banks would still be required to abide by safety and soundness standards, and independently determine whether they can adequately manage risks. See OCC Mot. at 14-15; Board Mot. at 14.

Defendants also point out that the Agency Documents do permit banks to have relationships with payday lenders. Moreover, the FDIC notes that it recently promulgated two Financial Institution Letters ("FILs") explicitly stating that banks "that properly manage" relationships with customers engaged in higher-risk activities, and the associated risks, "are neither prohibited nor discouraged from providing" services to those customers. FDIC Mot. at 18-19 (quoting FIL-43-2013). Thus, the FDIC argues that invalidating the Agency Documents is unlikely to provide prospective relief, as there would be no change in the FDIC's official position, which already permits relationships with payday lenders. Id. at 19.

Although invalidation of the Agency Documents would not necessarily lead to restoration of banking relationships, it may certainly affect Defendants' ability to pressure banks in the future. Plaintiffs have argued that Defendants relied on the definition of "reputation risk" contained in the Agency Documents as the "fulcrum" of their campaign pressuring banks to terminate relationships with payday lenders. Pls.' Opp'n at 9. Under Plaintiffs' theory, it is likely that the invalidation of the Agency Documents could deprive Defendants of this "fulcrum." Plaintiffs are not required to "show to a certainty that a favorable decision will redress [their] injury." Teton Historic Aviation Found., 785 F.3d at 726 (internal citation omitted).

### ii.   Section 1818(i) and Injunctive Relief

Defendants argue that Section 1818 of the Federal Deposit Insurance Act ("FDI Act") divests the Court of jurisdiction to grant Plaintiffs most of the injunctive relief they seek. See Board Mot. at 15; OCC Mot. at 18-20; FDIC Mot. at 44-45; 12 U.S.C. § 1818(i)(1). Section 1818(i)(1) states that "no court shall have jurisdiction to affect by injunction or otherwise" any ongoing or future enforcement action by Defendants, or to "review, modify, suspend, terminate, or set aside" such actions. 12 U.S.C. § 1818(i)(1).

As an initial matter, Plaintiffs correctly point out that there is no enforcement action at issue here, nor are they asking

the Court to enjoin future enforcement actions. See Pls.' Opp'n at 25.

Defendants argue that any injunction the Court might enter is likely to interfere with or effectively enjoin future enforcement actions, and is therefore precluded by Section 1818(i)(1). See Board Mot. at 15-17; OCC Mot. at 20; FDIC Reply at 22-23. The FDIC further argues that the limitation imposed by Section 1818(i)(1) extends to supervisory actions as well, such as examination findings and notices of undercapitalized status. See FDIC Mot. at 44-45; FDIC Reply at 22-23.

While it is true that Section 1818(i)(1) precludes this Court's jurisdiction to issue an injunction that interferes with an enforcement action or an order under Sections 1818, 1831o, or 1831p-1, that does not preclude the Court's ability to grant any injunctive relief against Defendants. The exact contours of any injunctive relief this Court might grant would depend on the specific facts that are proven. Mere speculation that an injunction "might" interfere with "any notice or order" does not necessarily mean that the Court has no authority to grant Plaintiffs' claims for injunctive relief that do not cover Sections 1818, 1813o, or 1831p-1.

Moreover, all the cases cited by Defendants involve challenges to specific enforcement actions or orders. See, e.g., Board of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc., 502

U.S. 32, 39 (1991) (court lacked jurisdiction to enforce automatic stay in bankruptcy against agency enforcement proceeding); Ridder v. Office of Thrift Supervision, 146 F.3d 1035, 1039 (D.C. Cir. 1998) (no jurisdiction under 1818(i)(1) to enjoin provision in consent order); Groos Nat'l Bank v. Comptroller of the Currency, 573 F.2d 889, 895 (5th Cir. 1978) (court cannot issue declaratory judgment that would prevent agency from pursuing enforcement).

That is simply not the case here. Section 1818(i) does not necessarily prevent the Court from granting Plaintiffs' requests for injunctive relief.[4]

### iii. Likelihood of Redressability

Even if some injunctive relief might be available to Plaintiffs, the Court must also determine if injunctive relief and/or the invalidation of the Agency Documents will result in a "substantial likelihood" that Plaintiffs' injuries will be redressed.

Defendants point out that other reasons unrelated to the challenged Agency Documents and actions by Defendants may affect banks' individual decisions on whether to reinstate relationships with payday lenders. See Board Mot. at 15 (citing National

---

[4] The FDIC also argues that Plaintiffs' requested injunctions are overbroad and improper. FDIC Mot. at 45. While the FDIC may turn out to be correct, that alone does not, at this time, defeat jurisdiction to provide injunctive relief.

Wrestling Coaches, 366 F. 3d at 939); FDIC Mot. at 14.   Such factors include safety and soundness standards, bank capacity and systems to effectively manage risk, DOJ's continued activities under Operation Choke Point, etc. See OCC Mot. at 14; Board Mot. at 14. Due to these factors, Defendants contend, it is not clear that a decision by this Court would change the outcome of banks' decisions.

Plaintiffs believe that, because some banks regretted terminating payday lenders, "they presumably would reverse those decisions if the coercive regulatory influence was removed." Pls.' Opp'n at 20. Plaintiffs support this assumption with letters from banks indicating that the banks were "very sorry" to terminate the relationship, were "frustrated and disappointed" with the situation, and, in the case of one bank, expressing the "hope [that they could] find a way to work together again soon." Id. (citations omitted). These letters do suggest that some banks would likely consider re-establishing relationships.

Although they believe banks would resume relationships with them should the Court order relief, Plaintiffs argue that it is not necessary to show that even a single bank would restore service to payday lenders in order to establish redressability. Pls.' Opp'n at 19. Instead, Plaintiffs argue that, to the extent Defendants deprived them of "the ability to compete for banks' limited compliance and risk management resources on an equal footing," and

therefore Plaintiffs need only demonstrate that they are "able and ready" to compete for banking services should the Court provide relief. Pls.' Opp'n at 19 (citing Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla., 508 U.S. 656, 666 (1993).

City of Jacksonville, and the redressability standard Plaintiffs cite it for, do not support Plaintiffs' argument. City of Jacksonville involved a challenge to a minority business program that required 10% of the amount spent on city contracts be set aside for "Minority Business Enterprises." Id. at 659. The Supreme Court found that, in order to establish standing, the plaintiff did not need to show that it would have won the contracts, but rather only needed to demonstrate that the policy prevented it from competing for the contracts on an equal basis. Id. at 666. Unlike City of Jacksonville, this case does not involve any sort of set-aside or quota program. Nor was City of Jacksonville a third-party standing case, which is "substantially more difficult." Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992). Moreover, Plaintiffs do not even allege that bank relationships were terminated because Plaintiffs were at a competitive disadvantage due to Defendants' actions.

Plaintiffs argue that the injunctive relief they request would "restrain Defendants from inflicting additional injury by continuing to pressure banks to terminate [Plaintiffs'] accounts,"

thereby   providing   meaningful   prospective   relief   and
redressability. Pls.' Opp'n at 19 (emphasis omitted).

However,   Defendants   provide   little   in   the   way   of
counterargument as to why injunctive relief would not redress
Plaintiffs' injuries. The FDIC and OCC do not address the issue at
all, and instead rely wholly on their belief that injunctive relief
is not available because of Section 1818(i)(1). See FDIC Reply at
3-4; OCC Reply at 9-13. The Board responds that, even if the Court
enjoined Defendants from exerting regulatory pressure, it does not
necessarily follow that banks would restore any relationships and
"banks still could terminate these relationships" with payday
lenders for a multitude of lawful business reasons. See Board Reply
at 10-11 (emphasis in original).

While the Board is correct that banks could still terminate
payday lenders even if Plaintiffs received injunctive relief,
Plaintiffs are not required to show that banks could not, under
any   circumstances,   terminate   relationships   in   order   to   show
redressability. If Plaintiffs are able to prove that injunctive
relief would result in a substantial likelihood that banks will
restore   relationships   or   not   terminate   relationships   in   the
future, they have sufficiently established.

Assuming for now the truth of Plaintiffs' allegations that
Defendants expanded the definition of reputation risk and relied
on that expanded definition to pressure banks into terminating

relationships with payday lenders, it is reasonable to conclude that a Court order invalidating the guidance documents and enjoining Defendants would redress Plaintiffs' injuries. In the absence of such pressure, some banks may well choose to reestablish relationships with Plaintiffs. Finally, the absence of such pressure is also likely to prevent additional banks from terminating relationships with Plaintiffs in the future.

In sum, Plaintiffs have alleged facts sufficient to show that there is a "substantial likelihood" that a favorable ruling by this Court would redress their injuries.

**C.   Mootness**

The FDIC argues that the two guidance documents it has issued render Plaintiffs' case moot, FDIC Mot. at 22, because, to the extent the FDIC Agency Documents may have previously led banks to terminate relationships with payday lenders, the two more recent FILs they have issued expressly clarified that termination of relationships is not required.

The two new guidance documents, as noted previously, are FILs issued in September 2013 and July 2014. The FILs state that banks, with appropriate controls in place, may continue to do business with "merchant customers engaged in higher risk activities," and those who properly manage such relationships "are neither prohibited nor discouraged" from doing business with payday lenders (among others). FIL-43-2013 at 2; FIL-41-2014 at 2. The

July 2014 FIL also removed the list of high-risk merchant categories, due to "the misperception that the listed examples of merchant categories were prohibited or discouraged." FIL-41-2014 at 2. Therefore, the FDIC concludes, even if the FDIC Agency Documents did force banks to terminate their relationships with payday lenders, the two FILS negate any such action now.

The doctrine of mootness is premised upon the notion that "[a] federal court is constitutionally forbidden to render advisory opinions or 'to decide questions that cannot affect the rights of litigants in the case before them.' " Better Gov't Assoc. v. Dep't of State, 780 F.2d 86, 90-91 (D.C. Cir. 1986) (quoting North Carolina v. Rice, 404 U.S. 244, 246 (1971)). Plaintiffs state that under the two-pronged test established by the Supreme Court, Defendants bear the burden of showing that "(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Pls.' Opp'n. at 22 (quoting Reeve Aleutian Airways, Inc. v. United States, 889 F.2d 1139, 1142-43 (D.C. Cir. 1989)); see also County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979). This burden "is a heavy one." Reeve Aleutian Airways, 889 F.2d at 1143).

The FDIC has not met this heavy burden. The invalidation of the Agency Documents is only one facet of the relief Plaintiffs' seek - Plaintiffs' other alleged harms and requested relief are

not mooted by the FDIC's clarification of the Agency Documents. Furthermore, in addition to the allegation that the Agency Documents forced banks to terminate relationships with them, Plaintiffs also allege that the Agency Documents improperly redefine "reputation risk" and violate the APA. SAC ¶¶ 137, 169, 195. The September 2013 and July 2014 FILs do not change the definition of or even mention "reputation risk." See FIL-43-2013; FIL-41-2014; see also Pls.' Opp'n at 23. Nor do the FILs remedy the alleged APA violations of the previous FILs.

Therefore, while the September 2013 and July 2014 FILs may have addressed a portion of Plaintiffs' allegations, they have not resolved the entirety of Plaintiffs' claims. Therefore Plaintiffs' claims are not moot.

### D. **Plaintiffs' Motion for Jurisdictional Discovery**

In response to Defendants' contention that the Court has no jurisdiction, Plaintiffs have filed a Motion for Jurisdictional Discovery in order to further support their Complaint. Because the Court has found that it has jurisdiction, Plaintiffs' Motion for Jurisdictional discovery is moot and is therefore **denied.**

### E. **Prudential Standing**

Defendant FDIC argues that, even if Plaintiffs have Article III standing, Plaintiffs fail to meet prudential standing requirements because they are not within the zone of interests protected by the relevant statutes. FDIC Mot. at 20. The principle of prudential

standing "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987).

The FDIC states that the statutes giving it the authority to promulgate guidelines, as well as the FDIC Agency Documents, are focused on promoting the safety and soundness of banks, and that those interests are not implicated by Plaintiffs' claims. FDIC Mot. at 21.

Plaintiffs failed to respond to this argument in their Opposition, and the FDIC argues that Plaintiffs have therefore conceded this point. See Pls.' Opp'n; FDIC Reply at 5; see also Clifton Power Corp. v. Fed. Energy Reg. Comm'n, 88 F.3d 1258, 1267 (D.C. Cir. 1996) (taking as conceded a seemingly sound argument that was not opposed); Rosenblatt v. Fenty, 734 F. Supp. 2d 21, 22 (D.D.C. 2010) ("an argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded").

It was only after the FDIC stated that Plaintiffs had conceded this argument that Plaintiffs filed a Surreply addressing prudential standing. Plaintiffs counter that "inherent in all of Plaintiffs' arguments that are based upon the [FDI] Act . . . is

the proposition that Plaintiffs' injuries fall within the zone of interest protected by the [FDI] Act." Pls.' Surreply at 2-3.

However, the Supreme Court's recent decision in Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377 (2014), "makes plain the zone of interests test no longer falls under the prudential standing umbrella." Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n, 788 F.3d 312, 319 (D.C. Cir. 2015) (citing Lexmark, 134 S. Ct. at 1387 n. 4). Nor is the zone of interests test a jurisdictional requirement. Id. Instead, the Supreme Court ruled that the zone of interests test is now considered a merits issue, in which the "court asks whether the plaintiff 'has a cause of action under the statute.'" Id. (quoting Lexmark, 134 S. Ct. at 1387).

Given the clear holdings from the Supreme Court and our Court of Appeals' clear rulings that the zone of interests test is not related to jurisdiction or standing, the FDIC's argument that Plaintiffs lack prudential standing necessarily must be **denied**.

## IV.  Failure to State a Claim

### A.    Standard of Review Under Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." Bell Atlantic Corp. v.

Twombly, 550 U.S. 544, 570 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563.

Under the Twombly standard, a "court deciding a motion to dismiss must not make any judgment about the probability of the plaintiffs' success . . . [,] must assume all the allegations in the complaint are true (even if doubtful in fact) . . . [, and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc., 525 F.3d 8, 17 (D.C. Cir. 2008) (internal quotation marks and citations omitted). The court does not, however, accept as true "legal conclusions or inferences that are unsupported by the facts alleged." Ralls Corp. v. Comm. on Foreign Inv. in U.S., 758 F.3d 296, 315 (D.C. Cir. 2014) (citation omitted). Furthermore, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557) (alteration in Iqbal).

**B.   APA Claims**

Plaintiffs allege that Defendants violated the APA in a number of ways. The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions" that are, inter alia: "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right,

power,   privilege,   or   immunity"; "in   excess   of   statutory
jurisdiction, authority, or limitations"; or "without observance
of procedure required by law." 5 U.S.C. § 706(2).

Plaintiffs allege that Defendants: (1) promulgated binding
rules without providing notice and comment, as required by law,
see SAC, Counts 1, 5, and 9; (2) exceeded their authority conferred
by 12 U.S.C. § 1831p-1 to set standards for safety and soundness,
see SAC, Counts 2, 6, and 10; (3) acted arbitrarily and
capriciously, see SAC, Counts 3, 7, and 11; and (4) deprived them
of protected liberty interests without due process of law, see
SAC, Counts 4, 8, and 12.

### 1.        Final Agency Action Requirement

Before the Court can evaluate the merits of Plaintiffs' APA
claims, it must first determine whether Defendants' actions are
considered final agency actions. The APA authorizes judicial
review only of "[a]gency action made reviewable by statute and
final agency action for which there is no other adequate remedy in
a court." 5 U.S.C. § 704. Plaintiffs have cited no provision of
the FDI Act authorizing judicial review beyond that which is
provided for in the APA. Therefore, the alleged agency actions by
Defendants must be final agency actions in order to be judicially
reviewable.[5] Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8,

---

[5] An alternate way of viewing the final agency action question is
whether the action constitutes "a de facto rule or binding norm

13 (D.C. Cir. 2005); see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882 (1990) ("When . . . review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'") (citing 5 U.S.C. § 704).

"The Supreme Court has established a two-part test to determine when an agency action is reviewable as final." Nat'l Ass'n of Home Builders, 415 F.3d at 13. First, the action under review "must mark the 'consummation' of the agency's decisionmaking process--it must not be of a merely tentative or interlocutory nature." Id. (quoting Bennett v. Spear, 520 U.S. 154, 177-78 (1997)). Second, the action must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Id. (quoting Bennett, 520 U.S. at 178). Final agency action may be comprised of "a series of agency pronouncements rather than a single edict." Ciba-Geigy Corp. v. Envtl. Prot. Agency, 801 F.2d 430, 435 n. 7 (D.C. Cir. 1986).

Our Court of Appeals has also given guidance for evaluating whether legal consequences flow from an action. One line of analysis "considers the effects of an agency's action, inquiring

---

that could not properly be promulgated absent" the requirements of the APA. Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 452 F.3d 798, 806 (D.C. Cir. 2006). By demonstrating the latter, a party implicitly proves the former, "because the agency's adoption of a binding norm obviously would reflect final agency action." Id.

whether the agency has '(1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion.'" Id. (quoting CropLife Am. v. Envtl. Prot. Agency, 329 F.3d 876, 883 (D.C. Cir. 2003)). "The language used by an agency is an important consideration in such determinations." Id. "The second line of analysis looks to the agency's expressed intentions. This entails a consideration of three factors: (1) the agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." Id. at 806-07 (internal quotation marks and citation omitted).

### 2. Defendants' Actions Constitute Neither Final Agency Actions Nor Binding Norms

Plaintiffs point to two actions by each of the Defendants that they consider final agency actions: 1) the promulgation of the Agency Documents; and 2) coercive back-room communications and the creation of a de facto rule against providing financial services to all payday lenders. See SAC ¶¶ 116-22, 127, 148-54, 159, 180-184, 189. The FDIC and OCC argue that the Agency Documents do not constitute final agency action, see FDIC Mot. at 23-24; OCC Mot. at 21-29, while the Board notes that Plaintiffs do not even allege that any guidance documents issued by the Board violate the APA, see Board Mot. at 18. In addition, Defendants argue that the

communications Plaintiffs cite in support of their argument of a
de facto rule do not constitute final agency action. Board Mot. at
19; FDIC Mot. at 36-37.

As noted above, under Bennett, Defendants' actions cannot be
viewed as "final agency action" under § 704 of the APA unless they
"mark the consummation of the agency's decisionmaking process" and
either determine "rights or obligations" or result in "legal
consequences." Bennett, 520 U.S. at 178 (citations and internal
quotation marks omitted).

After setting forth the two-step Bennett analysis, Plaintiffs
inexplicably fail to discuss the first Bennett step and make no
argument as to how the Agency Documents or the alleged de facto
rules "mark the consummation of [Defendants'] decisionmaking
processes." See Pls.' Opp'n at 27-28. The closest Plaintiffs come
to addressing the first Bennett step is a passing reference
stating, without further explanation, that the Agency Documents
"purport to reflect the agencies' expertise, experience, and
reasoned reflection." Pls.' Opp'n at 29. Plaintiffs continue that
"[n]othing in the guidelines suggests that they are 'tentative,
open to further consideration, or conditional on future agency
action.'" Id. (quoting City of Dania Beach, Fla. v. F.A.A., 485
F.3d 1181, 1188 (D.C. Cir. 2007)).

Plaintiffs' statement sufficiently alleges that the Agency
Documents reflect the consummation of the agencies decision-making

35

process, rather than a tentative or interlocutory step in that process. Given that the documents were published and widely distributed by the FDIC and OCC, it is reasonable to view them as the consummation of the agencies' decision-making processes. Therefore, the Court finds that the first Bennett prong has been met with regard to the Agency Documents.

Plaintiffs have alleged that Defendants created a de facto rule--in other words, Defendants' alleged "coercive communications with banks," taken together, have effectively created a rule against providing financial services to payday lenders.

It is not readily apparent how the amorphous de facto rule against payday lenders alleged by Plaintiffs is the consummation of the Defendants' decision-making processes.[6] In the absence of any explanation by Plaintiffs, the Court concludes that the alleged de facto rule fails to meet the first step of the Bennett test. Having failed the first prong of the Bennett test, any alleged de facto rule created by Defendants is not a final agency action and therefore not subject to review under the APA.[7]

---

[6] Plaintiffs' allegation of a de facto rule is not to be confused with a legal conclusion that Defendants created a de facto rule sufficient for purposes of § 704.

[7] In the SAC, Plaintiffs also allege that Defendants coerced Early Warning Services ("EWS"), a credit reporting company, "directly and indirectly through its five parent banks" to set an effective Annual Percentage Rate cap of 36% and cease providing its services to payday lenders. SAC ¶ 112. EWS is not regulated by Defendants. Plaintiffs fail to allege in the SAC any facts that could support

Turning to the second prong of the <u>Bennett</u> test, Plaintiffs make several arguments regarding the legal consequences of the Agency Documents. Plaintiffs characterize them as "filled with obligatory language and threats of enforcement actions." Pls.' Opp'n at 31. Such characterizations are clearly unsupported by the facts on which Plaintiffs rely. Plaintiffs excerpt phrases from the Agency Documents such as "it is essential that," "it is imperative that," and "the FDIC expects," as examples of obligatory language. <u>Id.</u> Read in context, it is clear that the language does not create new legal obligations. Instead, the language is used with regard to banks' overall responsibility to manage risks and third-party risks[8] - obligations that existed prior to the Agency Documents. In addition, the documents consistently use non-mandatory language such as "should," rather than "shall" or "must." See e.g., FIL-127-2008; OCC Bulletin 2013-29; <u>see also Holistic Candlers & Consumers Ass'n v. F.D.A.</u>, 664 F.3d 940, 944 (D.C. Cir.

---

an argument that Defendants' alleged coercion was the consummation of the Defendants' decision-making processes.

[8] For example: "<u>The FDIC expects</u> a financial institution to adequately oversee all transactions and activities that it processes and to appropriately manage and mitigate operational risks, Bank Secrecy Act (BSA) compliance, fraud risks, and consumer protection risks, among others." FIL-3-2012 at 2 (emphasis added); "Financial institutions that do not adequately manage these relationships may be viewed as facilitating fraudulent or unlawful activity by a payment processor or merchant client. Therefore, <u>it is imperative</u> that financial institutions recognize and understand the businesses with which they are involved." FIL-127-2008 at 1 (emphasis added).

2012) (use of "should" and "may" make plain that "there has been no order compelling the appellants to do anything") (internal citation omitted).

Indeed, Plaintiffs actually acknowledge the advisory nature of the Agency Documents, stating that "[a]lthough the banks' failure to follow the agencies' informal guidance may not directly trigger civil liability, these guidance documents set a standard for risk management that may also be used indirectly in other civil enforcement actions," Pls.' Opp'n at 33, and alleging that some "letters encourage banks to cut off relations . . . if the risks are too great." Id. at 32 (emphasis added). Although the Agency Documents provide guidance on the FDIC and OCC's views regarding risk management, they do not impose any obligations or prohibitions on banks.   Guidance that "does not tell regulated parties what they must do or may not do in order to avoid liability" is merely a general statement of policy.   National Mining Ass'n., 2014 WL 3377245 *6 (July 11, 2014).

Furthermore, the Agency Documents expressly state that they are not obligatory and are meant only to serve as guidance. See e.g., FIL-44-2008 at 2 ("[t]he guidelines should not be considered a set of mandatory procedures"); OCC Bulletin 2013-29 at 1 ("[t]his bulletin provides guidance to national banks and federal savings associations"). While this alone does not totally insulate the documents from having legal consequences, the agency's

characterization of the documents is one of the relevant factors for consideration. <u>Ctr. for Auto Safety</u>, 452 F.3d at 806-07. Guidance documents must establish a "new substantive rule" before they can be characterized as final action under the APA. <u>Broadgate, Inc. v. USCIS</u>, 730 F. Supp. 2d 240, 245 (D.D.C. 2010).

The Court need not limit its analysis to the four corners of the Agency Documents. Our Circuit has "looked to post-guidance events to determine whether the agency has applied the guidance as if it were binding on regulated parties." <u>Nat'l Min. Ass'n v. McCarthy</u>, 758 F.3d 243, 253 (D.C. Cir. 2014).

Plaintiffs allege that Defendants engaged in a campaign of backroom pressure against banks and payday lenders, relying on the definition of "reputation risk" outlined in the Agency Documents. <u>See</u> Pls.' Opp'n at 29. Specifically, Plaintiffs argue that the use of "reputation risk" in many termination letters from banks indicates that the redefinition of "reputation risk" has been actively enforced. <u>Id.</u> However, these letters are from banks, not Defendants, and do not indicate any legal consequences or enforcement stemming from the Agency Documents or Defendants.

In a similar vein, Plaintiffs argue that DOJ's attachment of an FDIC guidance document to subpoenas is indicative of the legal effect of the guidance document. Pls.' Opp'n at 33. Plaintiffs cite to <u>Barrick Goldstrike Mines Inc.</u> for the proposition that an informal action stating an agency's position, along with the threat

of enforcement action, may constitute final agency action. <u>See</u> Pls.' Opp'n at 29-30 (citing <u>Barrick Goldstrike Mines Inc. v. Browner</u>, 215 F.3d 45, 48 (D.C. Cir. 2000).

While an enforcement action may be sufficient to show legal consequences, it is not <u>per se</u> indicative of final agency action. The enforcement action must still be evaluated within the <u>Bennett</u> rubric of "rights or obligations" or "legal consequences."

In <u>Barrick</u>, an enforcement letter from the guidance-issuing agency, relying on the guidance document as the basis for enforcement, caused the guidance document to have legal consequences. In this case however, none of the Defendants have issued any enforcement letters and <u>Barrick</u> is not relevant.

DOJ's use of an FDIC guidance document does not necessarily reflect the FDIC's views, nor do any legal consequences flow from the document itself; any legal consequences flow from the actions of DOJ. Plaintiffs point to no case law to support the contention that DOJ's use of the FDIC's document constitutes enforcement action--and therefore final agency action--by the FDIC.

Plaintiffs also allege that the guidelines provide the Defendant agencies with a justification for requiring a bank to submit a safety and soundness plan, which is "an initial step toward exercising their enforcement powers." Pls.' Opp'n at 32. Obviously, there is an important distinction between an initial step toward an enforcement action, and an actual enforcement

action. See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n, 324 F.3d 726, 731-32 (D.C. Cir. 2003) (no final agency action where agency issued preliminary determination of violation of law, but was required by statute to bring a formal action before it could make a legally binding determination). Plaintiffs are not alleging that the Agency Documents commit the FDIC or OCC to a particular course of action. It remains within the FDIC and OCC's discretion to determine whether an enforcement action is warranted.

For all the foregoing reasons, the Court concludes that the Agency Documents are not final agency actions for purposes of § 704 review because they do not determine any rights or obligations. Consequently, they are not subject to judicial review under the APA and all of Plaintiffs claims under the APA fail to state a claim. Therefore, Defendants' Motions to Dismiss shall be **granted** with regard to Counts 1, 2, 3, 5, 6, 7, 9, 10, and 11, as well as the portions of Counts 4, 8, and 12 that plead violations of the APA.

### C.   **Violation of Fifth Amendment Due Process**

In Counts 4, 8, and 12 of the Second Amended Complaint, Plaintiffs allege that Defendants stigmatized them, deprived them of their bank accounts, and threatened their ability to engage in their chosen line of business, all without notice and opportunity to be heard, in violation of their procedural due process rights

under the Fifth Amendment to the United States Constitution. See
SAC ¶¶ 141-47, 173-79, 198-204; U.S. Const. amend. V.

The Fifth Amendment's due process clause protects the
individual citizen from the arbitrary exercise of power by the
government. Mathews v. Eldridge, 424 U.S. 319, 332 (1976). For a
plaintiff to establish a procedural due process claim, it must
show that (1) it has a protected interest, (2) the government
deprived it of this interest, and (3) the deprivation occurred
without proper procedural protections. See Indus. Safety Equip.
Ass'n, Inc. v. Envtl. Prot. Agency, 837 F.2d 1115, 1122 (D.C. Cir.
1988).

### 1.    Applicability of Due Process Protections

Defendants argue that the Supreme Court has held that due
process protections are not applicable to legislative activities
of an administrative agency that are generalized in nature and
affect a large number of parties. See Board Mot. at 28-29 (citing
Natural Res. Def. Council, Inc. v. Envtl. Prot. Agency, 859 F.2d
156, 194 (D.C. Cir. 1988); Bi-Metallic Inv. Co. v. State Bd. Of
Equalization Colorado, 239 U.S. 441 (1915)); OCC Mt. at 37-38. In
Bi-Metallic, the Supreme Court held that no hearing was
constitutionally required prior to a decision by Colorado to
increase the valuation of taxable property. Bi-Metallic Inv. Co.,
239 U.S. at 445-46.

However, the Supreme Court has recognized a distinction in administrative law "between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." United States v. Florida E. Coast Ry. Co., 410 U.S. 224, 245 (1973). Adjudicative proceedings require more individualized process than rule-making decisions. See id. at 244-45.

Plaintiffs' allegations fall somewhere in between the Court's two opposing poles.  Plaintiffs first allege that Defendants' promulgated guidelines, which are akin to "policy-type rules or standards." Plaintiffs also allege that Defendants engaged in coercive backroom communications aimed at payday lenders and targeted specific payday lenders. See Pls.' Opp'n at 43 n. 17. Plaintiffs allege that Defendants took these actions for the direct purpose of putting them out of business, which is more akin to an informal adjudication.

The FDIC also argues that the Due Process Clause does not apply to the indirect adverse effects of government action. See FDIC Mot. at 43 (citing O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 789 (1980)). While the O'Bannon court distinguished "between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and action that is directed against a third party and affects the citizen

only indirectly or incidentally," this case fits into neither category. O'Bannon, 447 U.S. at 788. Though Defendants' alleged actions were directed at the banks, Plaintiffs argue that they were the intended targets – that Defendants undertook the actions with the express purpose of affecting Plaintiffs. Taking Plaintiffs' allegations as true, the impact was neither "indirect" nor "incidental," and therefore O'Bannon is inapplicable.

Defendants' actions, as alleged by Plaintiffs, are not legislative in nature and are more analogous to an adjudication of payday lenders right to do business. Nor are the effects of Defendants' alleged actions indirect or incidental. Therefore, the Court concludes that Plaintiffs have sufficiently stated a claim for which due process protections apply.

### 2.    Interests Protected by Due Process

Turning to the merits of Plaintiffs' alleged due process claim, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999) (U.S. Const. amend. 14). In order to have a life, liberty, or property interest, a party must have more than an abstract need or desire – the party must have "a legitimate claim of entitlement to it." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). Interests afforded due process protection are not created by the Constitution, but are defined by

existing "rules or understandings that secure certain benefits and that support claims of entitlement to these benefits." Id.

Plaintiffs allege that the stigma resulting from Defendants' actions have affected two of their protected interests: 1) an interest in their bank accounts; and 2) an interest in their ability to engage in their chosen line of business. Pls.' Opp'n at 42-43.

While a company may have a "liberty interest in avoiding the damage to its reputation and business" caused by stigma, Reeve Aleutian Airways, Inc. v. United States, 982 F.2d 594, 598 (D.C. Cir. 1993), the Supreme Court has held that stigma alone is insufficient to implicate due process interests, see Gen. Elec. Co. v. Jackson, 610 F.3d 110, 121 (D.C. Cir. 2010) (citing Paul v. Davis, 424 U.S. 693, 708 (1976). In addition to stigma or reputational harm, the plaintiff must be able to show "that (1) the government has deprived them of some benefit to which they have a legal right, e.g., the right to be considered for government contracts in common with all other persons; or (2) the government-imposed stigma is so severe that it broadly precludes plaintiffs from pursuing a chosen trade or business." Id. at 121 (internal quotation marks and citations omitted).

Plaintiffs have alleged that the stigma promulgated by Defendants has resulted in lost banking relationships, and that the continued loss of banking relationships may preclude them from

pursuing their chosen line of business. Pls. Opp'n at 42-43. This is sufficient to constitute a "tangible change in status" and implicate a protected liberty interest. O'Donnell v. Barry, 148 F.3d 1126, 1141 (D.C. Cir. 1998).

Plaintiffs also argue that the stigma deprived them of their right to a bank account. Plaintiffs cite to National Council of Resistance of Iran v. Department of State ("NCRI") for the proposition that our Court of Appeals has previously held that a colorable allegation of a property interest in a bank account is sufficient to support a due process claim. See Pls.' Opp'n at 42-43 (citing NCRI, 251 F.3d 192, 204 (D.C. Cir. 2001)).

It is important to distinguish between the right to have a bank account, and the right to the contents of one's bank account. In NCRI, it was not only the bank account alone, but also the funds that it contained. NCRI, 251 F.3d at 204. The issue here is not that Plaintiffs have been denied access to their funds, but that they have been denied an account at all.

In Wisconsin v. Constantineau, the Supreme Court held that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." See 400 U.S. 433, 437 (1971). The Supreme Court elaborated its Constantineau holding in Paul v. Davis, stating that when an individual is "deprived . . . of a right previously held under state law" as a result of

stigmatization, due process is required. <u>Paul v. Davis</u>, 424 U.S. 693, 708 (1976). The deprivation at issue in <u>Constantineau</u> was "the right to purchase or obtain liquor in common with the rest of the citizenry." <u>Id.</u>

Plaintiffs have alleged a similar deprivation here – "the previously held right to . . . hold bank accounts. <u>NCRI</u>, 251 F.3d at 204. "Many people . . . would consider [this] right[] more important than the right to purchase liquor." <u>Id.</u> The loss of a bank account as a result of stigma is sufficient to implicate a right to due process.

In sum, Plaintiffs have sufficiently alleged that their liberty interests are implicated by Defendants' alleged actions and that the alleged stigma has deprived them of their rights to bank accounts and their chosen line of business, so as to state a claim for violation of constitutional due process.

## V.   Conclusion

For all of the foregoing reasons, Defendants' Motions for Lack of Jurisdiction, or Alternatively for Failure to State a Claim are **granted in part and denied in part**. Plaintiffs' Motion for Jurisdictional Discovery is **denied,** and Plaintiffs' Motion for

Leave to File a Second Amended Complaint is **granted.** An Order shall accompany this Memorandum Opinion.


September 25, 2015                         *Gladys Kessler*

                                          Gladys Kessler
                                          United States District Judge

**Copies via ECF to all counsel of record**