**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LTD., 515 King Street, Suite 300 Alexandria, VA 22314, and ADVANCE AMERICA, CASH ADVANCE CENTERS, INC., 135 North Church Street Spartanburg, SC 29306, Plaintiffs, v. FEDERAL DEPOSIT INSURANCE CORPORATION, 550 17th Street, N.W. Washington, D.C. 20429, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, 20th Street and Constitution Avenue, N.W. Washington, D.C. 20551, OFFICE OF THE COMPTROLLER OF THE CURRENCY, Constitution Center 400 7th Street, S.W., Suite 3E-218 Washington, D.C. 20219, and THOMAS J. CURRY, in his official capacity as the Comptroller of the Currency, Constitution Center 400 7th Street, S.W., Suite 3E-218 Washington, D.C. 20219, Defendants. | Civil Action No. 14-953 |

**SECOND AMENDED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Community Financial Services Association of America, Ltd. ("CFSA") and Advance America, Cash Advance Centers, Inc. ("Advance America"), by and through the undersigned attorneys, file this Second Amended Complaint against Defendants the Federal Deposit Insurance Corporation ("FDIC"); the Board of Governors of the Federal Reserve System ("the Board"); and the Office of the Comptroller of the Currency, and Thomas J. Curry, in his official capacity as the Comptroller of the Currency (collectively "OCC"). Plaintiffs seek declaratory and injunctive relief to set aside certain informal guidance documents and other unlawful regulatory actions by FDIC, the Board, and OCC on the grounds that they exceed the agencies' statutory authority, are arbitrary and capricious, were promulgated without observance of the procedures required by law, and deprive Plaintiffs of liberty interests without due process of law. Plaintiffs also seek declaratory and injunctive relief to prevent the Defendant agencies from abusing their regulatory authority over financial institutions to enforce a *de facto* boycott by financial institutions of CFSA's member businesses. Plaintiffs hereby allege as follows:

**INTRODUCTION AND SUMMARY OF THE ACTION**

1.      Founded in 1999, Plaintiff CFSA is a national trade association for community lenders. Its forty-two corporate members serve millions of consumers in more than thirty states by offering a range of financial services, including short-term, small-dollar unsecured loans commonly known as payday loans. Plaintiff Advance America is a member of CFSA.

2.      For millions of individuals across the country, payday lenders provide convenient access to small-dollar credit to address short-term financial needs. As former FDIC Chairman William Isaac has noted, for millions of borrowers, "these loans are less expensive than a series of overdrafts. They are less painful than the consequences of defaulting on an auto loan or a

mortgage . . . [or] having the electricity and heat turned off only later to pay for having them turned on again." William Isaac, *Payday Crackdown Creates More Problems than It Solves*, AMERICAN BANKER, Feb. 18, 2014. Congress has acknowledged the need for short-term credit products, prohibiting federal regulators from imposing rate limitations on short-term loans. The Dodd-Frank Wall Street Reform and Consumer Protection Act ("the Dodd-Frank Act"), § 1027, Pub. L. 111-203, 124 Stat. 1376 (2010), *codified at* 12 U.S.C. § 5517(o).

3.      CFSA and its members are committed to responsible lending practices. In order to become a member of CFSA, a financial services firm must comply with both state and federal law and abide by a code of industry "best practices" developed by CFSA to ensure that consumers are treated ethically and responsibly. CFSA also supports and advocates legislation and regulation that serves consumers by ensuring their access to short-term credit while also providing consumer protections.

4.      Although CFSA and its members are part of a lawful and legitimate industry that serves the critical short-term credit needs of millions of American consumers, the Defendant regulatory agencies, with active support from the Department of Justice ("DOJ"), are engaged in a concerted campaign to drive them out of business by exerting back-room pressure on banks and other regulated financial institutions to terminate their relationships with payday lenders. Known as "Operation Choke Point," Defendants' campaign targets a variety of lawful businesses that are disfavored by Defendants, such as firearms and tobacco sales, coin dealers, and dating services, but it is aimed primarily at the payday loan industry. As a recent report by the House Committee on Oversight and Government Reform concluded, "internal memoranda on Operation Choke Point clearly demonstrate that the Department's primary target is the short-term lending industry—an indisputably lawful financial service." STAFF OF H. COMM. ON OVERSIGHT & GOV'T

3

REFORM, 113TH CONG., REP. ON THE DEP'T OF JUSTICE'S 'OPERATION CHOKE POINT': ILLEGALLY CHOKING OFF LEGITIMATE BUSINESSES? 5 (Comm. Print 2014) [hereinafter COMM. REP. ON OPERATION CHOKE POINT].

5.      To achieve their goal of eliminating the payday loan industry, the Defendant agencies have used their prudential "safety and soundness" regulatory authority over depository institutions to directly coerce those institutions and to pressure consumer credit reporting agencies to sever their long-standing and mutually beneficial banking relationships with members of CFSA and other payday lenders. Internal agency documents reveal that Defendants' campaign against the payday lending industry (and other lawful but disfavored industries) is motivated by illicit bias and animus. The ostensible basis of the campaign, however, is that providing financial services to such industries exposes the banks to "reputation risk." According to informal "guidance documents" provided to the regulated institutions, "reputation risk" arises from "negative public opinion" about the bank's customer, and "any negative publicity involving the [bank's customer] . . . could result in reputation risk." FDIC, Financial Institution Letter: Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008).

6.      The Defendant agencies have not provided banks with any objective criteria, in their informal guidance documents or anywhere else, for measuring "negative public opinion" about a bank's customers or for otherwise determining when a particular customer, or an entire category of customers, is sufficiently unpopular to present an unacceptable "reputation risk" to the bank's safety and soundness. Nor does Defendants' guidance on reputation risk distinguish between bank customers engaged in fraudulent or otherwise unlawful businesses or practices and customers engaged in lawful businesses and committed to ethical business practices. As the Chairman of the House Committee on Financial Services observed in a May 22, 2014 letter to

Defendants, "[t]he introduction of subjective criteria like 'reputation risk' into prudential bank supervision can all too easily become a pretext for the advancement of political objectives, which can potentially subvert both safety and soundness and the rule of law." Letter from Rep. Jeb Hensarling, Chairman, H. Comm. on Fin. Servs., to Janet Yellen, Chair, The Federal Reserve System (May 22, 2014).

7.      Internal agency documents reveal that the Defendant agencies have employed a variety of back-room pressure tactics against regulated financial institutions, including warning them that continuing their relationships with payday lenders will result in harsh and prolonged examinations, reduced examination ratings, and/or other punitive measures. *See, e.g.*, Letter from M. Anthony Lowe, Regional Director, FDIC Chicago Regional Office to a depository institution subject to FDIC's supervisory authority (Feb. 15, 2013) (*available at* http://goo.gl/ZISdO4).

8.      Defendants' campaign has been targeted at the payday lending industry as a whole, indiscriminately seeking to choke off the banking services not only of unscrupulous payday lenders engaged in fraudulent or otherwise unlawful practices, but also of payday lenders that, like Advance America and other CFSA members, scrupulously abide by all state and federal laws and regulations applicable to their business and, moreover, regulate themselves according to a code of rigorous, self-imposed best practices. *See, e.g.*, *id.* (informing regulated bank that FDIC has "generally found that activities related to payday lending are unacceptable for an insured depository institution"); Email from Marguerite Sagatelian to two unnamed FDIC employees re "Payday Lending" (Mar. 8, 2013) (FDICHOGR00005179) (available at oversight.house.gov/wp-content/uploads/2014/12/Appendix-1.pdf) (noting that FDIC was conducting "research into what avenues are available to the FDIC to take action against banks that facilitate payday

5

lending" and that employees were "going to explore the BSA/Know Your Customer requirements to see if that would provide the FDIC with the means to get at payday lending").

9.    Numerous banks have yielded to Defendant's coercive regulatory pressure. As of the filing of this complaint, over 80 banking institutions have terminated their business relationships with CFSA members and other law-abiding payday lenders.

10.    The Defendant agencies' campaign against the payday lending industry has been carefully designed and waged to avoid the public and judicial accountability inherent in the Administrative Procedure Act's requirement that federal regulatory agencies follow notice and comment rule-making procedures before imposing binding legal norms on regulated entities. The Court of Appeals for the D.C. Circuit has aptly commented on a pattern of agency behavior like that at issue here:

> The phenomenon we see in this case is familiar. Congress passes a broadly worded statute. The agency follows with regulations containing broad language, open-ended phrases, ambiguous standards and the like. Then as years pass, the agency issues circulars or guidance or memoranda, explaining, interpreting, defining and often expanding the commands in the regulations. One guidance document may yield another and then another and so on. Several words in a regulation may spawn hundreds of pages of text as the agency offers more and more detail regarding what its regulations demand of regulated entities. Law is made, without notice and comment, without public participation, and without publication in the Federal Register or the Code of Federal Regulations. . . . An agency operating in this way gains a large advantage. It can issue or amend its real rules, i.e., its interpretative rules and policy statements, quickly and inexpensively without following any statutorily prescribed procedures. The agency may also think there is another advantage—immunizing its lawmaking from judicial review.

*Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C. Cir. 2000) (citations and internal quotation marks omitted). But as the D.C. Circuit made clear, when "an agency's . . . pronouncements . . . , as a practical matter, have a binding effect," they are subject to judicial review. *Id.*

11.     Vested with broadly-worded statutory authority to promulgate standards to ensure the "safety and soundness" of financial institutions subject to their prudential oversight, the Defendant agencies promulgated similarly broad legislative rules requiring banks to adopt "appropriate" and "adequate" operational and managerial controls. They have elaborated on these vague regulatory requirements with a raft of informal guidance documents establishing a novel and even more subjective and pliable regulatory standard—"reputation risk"—issued without any notice, without any input from interested parties, and without the support of an administrative record. And they have relied, pretextually, on this vague standard to attempt to eliminate a lawful industry that they disfavor, threatening financial institutions with a range of adverse regulatory consequences, including punitive examinations and downgraded ratings, if they continue providing banking services to payday lenders. The Defendant agencies' actions in promulgating a binding norm were taken without observance of the procedures required by law. Their actions are, furthermore, arbitrary and capricious, exceed Defendants' statutory authority, and deprive Plaintiffs of liberty interests without due process of law. These actions therefore must be set aside and permanently enjoined.

## JURISDICTION AND VENUE

12.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and the Due Process Clause of the Fifth Amendment to the United States Constitution. The Court has subject-matter jurisdiction over these claims under 28 U.S.C. § 1331. The Court is authorized to issue the nonmonetary relief sought with respect to these claims pursuant to 5 U.S.C. §§ 702, 705, and 706.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(A) and (B), because this is an action against officers and agencies of the United States, and all of the Defendant

agencies reside in this judicial district; Comptroller Curry performs his official duties in this judicial district; and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

**PARTIES**

14.     Plaintiff CFSA is a national membership organization for businesses offering small-dollar, short-term loans and other financial products and services. CFSA's primary purpose is to work to promote laws and regulations that balance strong consumer protections while preserving access to short-term credit for millions of Americans. CFSA's members have payday advance stores located in over thirty states. CFSA has established and maintains a code of industry best practices ("CFSA Best Practices") with which CFSA members must comply. Despite complying with all state and federal laws and following CFSA Best Practices, numerous CFSA members have lost their business relationships with banks and are struggling to establish new ones as a result of the agency actions complained of herein. CFSA is a Maryland non-stock corporation headquartered in Alexandria, Virginia. Its principal place of business is 515 King Street, Suite 300, Alexandria, VA 22314.

15.     Plaintiff CFSA has expended substantial financial and human resources attempting to protect its members from the effects of Operation Choke Point, resources that could have been devoted to other activities. CFSA's activities have included negotiating with banks to encourage them to continue to do business with CFSA members and providing guidance to member companies who are threatened with or have experienced a loss of banking services. CFSA's membership participation and revenue have diminished as a result of Operation Choke Point, with some members leaving the association altogether and others dropping to lower membership tiers with lower dues. In addition, several sponsors withdrew or lessened their

support of CFSA over the last year, also because of the impacts of Operation Choke Point. As detailed below, Operation Choke Point has likewise substantially injured CFSA's members by causing many financial institutions to terminate banking relationships that are essential to CFSA's members' businesses.

16.     Plaintiff Advance America is a provider of payday loans and various other consumer financial products and is a member of CFSA. It operates more than 2,400 stores in 29 states. It is a Delaware corporation headquartered in Spartanburg, South Carolina. Its principal place of business is 135 North Church Street, Spartanburg, South Carolina 29306.

17.     The Defendant agencies' actions described herein have caused substantial injury to Advance America. At the time of filing of this action, six banks and one payment processor have terminated their business dealings with Advance America as a direct result of the agency actions imposing burdensome requirements and grave uncertainties on banks that do business with payday lenders. These agency actions have also impaired Advance America's ability to establish new business relationships with banks and have thrown its future operations into a state of uncertainty. In fact, Advance America has attempted to establish new banking relationships with a plethora of different banks and, upon information and belief, has been refused by a number of those banks as a result of Operation Choke Point. Advance America has expended substantial financial and human resources as a result. For example, it has spent substantial sums to implement alternative cash management practices in markets where it no longer has access to a local bank.

18.     The loss of banking relationships imposes significant costs and burdens on other CFSA members. For example, one CFSA member has lost four significant banking relationships (and several smaller ones). Despite incurring the cost of hiring a dedicated employee to set up

9

new banking relationships, the lender has thus far been unsuccessful and currently relies on costly armored cars to transport money. Another CFSA member, after expending substantial labor costs searching for a new banking partner after KeyBank terminated all of its accounts, was able to transition half of its business to another bank, but its service charges doubled. The same member was also forced to find a new merchant card processor, resulting in an additional $300,000 in service charges each year. When they lose banking services, members lose the value of deposit tickets and endorsement stamps they use in branch locations and must pay for information technology support to switch their services to another network. Many have also experienced a loss of liquidity and a credit shortage.

19.     Until the agency actions described herein are set aside and enjoined, CFSA members will continue to be deprived of access to banking services that are essential to their business of providing short-term credit to underserved communities.

20.     Defendant FDIC is, and was at all relevant times, a banking agency of the United States government subject to the APA. *See* 5 U.S.C. § 551(1). FDIC is located at 550 17th Street, N.W., Washington, D.C. 20429.

21.     Defendant Board is, and was at all relevant times, a banking agency of the United States government subject to the APA. *See* 5 U.S.C. § 551(1). The Board is located at 20th Street and Constitution Avenue, N.W., Washington, D.C. 20551.

22.     Defendant OCC is, and was at all relevant times, a banking agency of the United States government, housed within the Department of the Treasury, and subject to the APA. *See* 5 U.S.C. § 551(1). OCC is located at Constitution Center, 400 7th Street, S.W., Suite 3E-218, Washington, D.C. 20024.

23.     Defendant Thomas J. Curry is the Comptroller of the Currency. As chief officer of the OCC, he exercises or delegates all the powers of the OCC, subject to oversight by the Secretary of the Treasury. His official address is Constitution Center, 400 7th Street, S.W., Suite 3E-218, Washington, D.C. 20024. He is being sued in his official capacity.

**FACTUAL ALLEGATIONS**

**The Payday Loan Industry**

24.     A payday loan is an advance on the borrower's paycheck or other source of income. Payday loans provide short-term credit to over nineteen million American households, especially those that are underbanked, by bridging unexpected financial needs between income installments. Payday loans are more readily available than more traditional forms of credit and less costly than the informal credit systems on which many consumers must rely in the absence of payday advances, such as overdraft protection, bounced checks, and late bill payment fees. Simply put, a payday loan is a convenient and reasonably-priced vehicle for short-term financial needs.

25.     Recognizing the importance of payday loans to millions of consumers and the potential consequences of their misuse, most states—often consulting with plaintiffs—have passed consumer protection laws to ensure that loans are offered and consumed responsibly. These laws may cap the amount of the loan or its fees, limit the number of times a consumer may renew a loan, and/or require certain disclosures. Every CFSA member must hold a license and comply with the laws in every state in which they maintain a storefront location and in every state in which their online customers reside. The Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, also applies to payday loans, requiring full disclosure of the costs and terms of the loans in order

to ensure that consumers have the information they need to make responsible borrowing decisions.

26.    In addition to complying with applicable state and federal laws, CFSA members are required to abide by CFSA Best Practices. These best practices require lenders to make additional disclosures to customers, to advise them on the intended use of payday loans, and to give customers the right to rescind the transaction at no cost before the end of the next business day. The CFSA Best Practices also prohibit certain lawful practices, such as certain types of collection procedures, in an effort to better serve consumers. And to the extent permitted by state law, the CFSA Best Practices require lenders to offer extended repayment plans, at no additional cost, to any customer who is not able to repay his or her loan when it comes due.

27.    Many payday lenders offer other financial services in addition to payday lending, including bill payment, check cashing, installment loans, and prepaid debit cards. Like payday advances, these lines of business serve critical needs in underserved communities.

28.    Payday lenders rely on banking services to operate. When a prospective borrower applies for the loan—at a storefront location, or online—he or she typically provides a post-dated check or an electronic debit authorization for the value of the loan, plus a fee. The lender immediately advances the customer funds, then after a specified period of time, usually determined by the customer's next payday, the borrower returns to repay the loan and fee. But if the customer does not return, the terms of the transaction permit the lender to deposit the post-dated check or to execute the debit authorization. In order to have that security, the lender must have a deposit account with a bank and/or access to the Automated Clearing House (ACH) network.

29.    Payday lenders also rely on banks to provide a range of other services, including but not limited to lines of credit, treasury services (accounts payable and receivable), and merchant services (credit and debit transactions).

## Federal Regulation of Lending Practices

30.    Both depository and nondepository financial institutions are subject to supervision and regulation by federal agencies when they engage in lending activities. Regulatory oversight serves two distinct purposes: to protect consumers and to ensure the safety and soundness of insured institutions and the stability of financial markets.

31.    These areas of responsibility are divided among an assortment of federal agencies, including Defendants FDIC, the Board, and OCC, as well as the Consumer Financial Protection Bureau ("CFPB"), which is an independent bureau within the Federal Reserve System.

32.    The Federal Deposit Insurance Act (FDIA), 12 U.S.C. § 1811 *et seq.*, vests the three Defendant agencies with power to set standards for the "safety and soundness" of insured depository institutions. The agencies are required to establish—by regulation or guideline— "standards relating to (A) internal controls, information systems, and internal audit systems . . . ; (B) loan documentation; (C) credit underwriting; (D) interest rate exposure; (E) asset growth; and (F) compensation, fees, and benefits" and "such other operational and managerial standards as the agency determines to be appropriate." 12 U.S.C. § 1831p-1(a). Violations of these standards can trigger various "safety and soundness" enforcement powers, which may even culminate in the agencies taking over the banks. *Id.* §§ 1831o(f)(2), 1831p-1(e)(1).

33.    Each of the Defendant agencies is responsible for prescribing standards for and monitoring the compliance of depository institutions subject to their prudential supervision, as set out in 12 U.S.C. § 1813(q).

34.     The authority conferred by 12 U.S.C. § 1831p-1 is not plenary, but is informed and limited by customary practices in the area of banking regulation. If this statutory regulatory authority were not so limited, it would constitute a standardless, and therefore unconstitutional, delegation of legislative power to an executive agency.

35.     After giving notice and opportunity to comment, the Defendant agencies published in the Federal Register and the Code of Federal Regulations highly general interagency guidelines requiring banks to establish operational and managerial standards that are "appropriate" and "adequate" "to the size of the institution and the nature and scope of its activities." *See* 12 C.F.R. Pt. 364 App. A.

36.     The interagency guidelines pertaining to internal controls and information systems provide, among other things, that the "institution should have internal controls and information systems that are appropriate to the size of the institution and the nature, scope and risk of its activities and that provide for . . . (2) effective risk management." 12 C.F.R. 30.6 App.A II.A. The interagency guidelines require only that controls and practices be adopted by which risks are to be assessed and managed.

37.     The Defendant agencies have provided additional detail on "safe and sound" banking practices over the years, sometimes through notice and comment rule making, *see, e.g.*, FDIC, Notice of Proposed Guidance on Deposit Advance Products, 78 Fed. Reg. 25,268-01 (Apr. 30, 2013), but more often by issuing informal guidance documents without notice and comment, *see, e.g.*, FDIC, Financial Institution Letter: Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008).

38.     Bank examiners from the Defendant agencies rate the financial institutions using the Uniform Financial Institutions Rating System, adopted by the Federal Financial Institutions

Examination Council. Pursuant to the rating system, examiners evaluate six factors: the adequacy of capital, the quality of assets, the capability of management, the quality and level of earnings, the adequacy of liquidity, and the sensitivity to market risk. Examiners must rely on an *objective* rubric to determine the financial institution's score for each factor.

39.     In 2010, the Dodd-Frank Act established the CFPB and charged it with "regulat[ing] the offering and provision of consumer financial products or services under the Federal consumer financial laws." The Dodd-Frank Act § 1011(a), *codified at* 12 U.S.C. § 5491(a).

40.     The Dodd-Frank Act transferred the Defendant agencies' consumer protection functions to CFPB. *See* 12 U.S.C. § 5581(b)(1)-(2), (4). Although Defendants continue to perform certain backup functions, *see id.* §§ 5515(c), 5581(c), they no longer possess plenary consumer protection powers.

41.     CFPB's regulatory and enforcement authority extends to nondepository institutions offering financial products, including payday lenders, 12 U.S.C. § 5514, and to depository institutions with more than $10 billion in assets, *id.* § 5515(a). The Dodd-Frank Act expressly prohibits CFPB from imposing rate limitations on short-term loans. *Id.* § 5517(o).

42.     The Dodd-Frank Act explicitly withheld the authority to set a maximum interest rate in the case of payday lenders. *See* 12 U.S.C. § 5517(o) ("No provision of this title shall be construed as conferring authority on the Bureau to establish a usury limit applicable to an extension of credit offered or made by a covered person to a consumer, unless explicitly authorized by law.").

43.     No federal statute authorizes the prudential bank regulators to set a national maximum interest rate and displace state usury laws. 12 U.S.C. § 85 ("Any association may take,

receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located . . ."); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 328 (1963) ("There is no federal control of the maximum, although all banks, state and national, are subject to state usury laws where applicable.").

## The Expanding Definition of Reputation Risk

44.     As part of their supervisory examinations, the Defendant agencies assess whether regulated depository institutions have systems and procedures in place to assess and to manage risk. The Defendant agencies have identified several such risks that a depository institution must manage. These include credit risk, market risk, liquidity risk, operational risk, and compliance risk. *See, e.g.*, Board of Governors of the Federal Reserve, Supervisory Letter: Risk-Focused Safety and Soundness Examinations and Inspections. SR 96-14 (May 24, 1996).

45.     Reputation risk is among these risks that a depository institution must manage. As understood in the banking industry and as previously defined by the Defendant agencies, "reputation risk" reflects "the potential that negative publicity regarding an institution's business practices, whether true or not, will cause a decline in the customer base, costly litigation, or revenue reductions." Board of Governors of the Federal Reserve, Supervisory Letter: Risk-Focused Safety and Soundness Examinations and Inspections. SR 96-14 (May 24, 1996). *See also* OCC, Risk Management Guidance: Third Party Relationships, OCC Bull. No. 2001-47 (Nov. 1, 2001) ("Reputation risk is the risk to earnings or capital arising from negative public opinion."); FDIC, Foreign-Based Third-Party Service Providers: Guidance on Managing Risks in These Outsourcing Relationships, FIL-52-2006 (June 21, 2006) ("Reputational risk is the risk that potential negative publicity about a financial institution's business practices will cause a

16

decline in the customer base, costly litigation, or the loss of revenue."). As previously defined by the Defendant agencies, reputation risk was exclusively the risk that a bank's business practices might cause harm to its reputation. Such reputational harm could be caused either because the bank's own business practices failed to serve its customers well or because the business practices of a third party provider, engaged by the bank and acting in the bank's name, failed to serve the bank's customers well. *See, e.g.*, OCC, Risk Management Guidance: Third Party Relationships, OCC Bull. No. 2001-47 (Nov. 1, 2001); FDIC, Foreign-Based Third-Party Service Providers: Guidance on Managing Risks in These Outsourcing Relationships, FIL-52-2006 (June 21, 2006).

46. Before the agency actions challenged here, the Defendant agencies did not, in either their promulgated rules or guidance documents, require that a bank assess the public reputation or popularity of a potential customer before agreeing to provide that customer with basic banking services; nor did the Defendant agencies ever require a bank to terminate an existing banking relationship on account of that customer's unpopularity with the public. To manage and mitigate reputation risk, banks were expected to adopt and adhere to professional and ethical business practices designed to meet their customers' needs, not to judge their customers' public reputations or popularity. *See, e.g.*, OCC Bulletin 2004-20, "Risk Management of New, Expanded, or Modified Bank Products" (May 10, 2004) (observing that reputation risk is heightened when a bank fails adequately to supervise third parties who provide services to its customers).

47. In 2008, the Defendant agencies began to expand the definition of reputation risk beyond this traditional understanding to reach the purported risks to a bank's reputation posed by bad publicity surrounding a third party provider, even when that publicity was entirely unrelated to the work that the provider performed in the name of the bank. Specifically, on June 6, 2008,

17

FDIC issued a Financial Institution Letter ("FIL") entitled "Guidance for Managing Third Party Risk." FDIC, Financial Institution Letter: Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008). This guidance document warns banks of safety and soundness concerns arising from "reputation risk" associated with third party relationships, including relationships with sub-prime lenders. After defining reputation risk as "the risk arising from negative public opinion," it further provides that "any negative publicity involving the third party, *whether or not the publicity is related to the institution's use of the third party*, could result in reputation risk." *Id.* (emphasis added). The FIL also warns banks to be on the lookout for third parties that maintain banking relationships with more than one financial institution, as this may be evidence of fraud. Although the letter states that it "should not be considered as a set of mandatory procedures," *id.*, it is not a mere invitation to voluntary compliance. It is being enforced as a binding legal norm, and it also represents the culmination of FDIC's decision-making process, attaching new legal consequences to the financial institution's decision to establish and maintain relationships with third parties. It is thus a final agency action.

48.     The Defendant agencies next expanded reputation risk to encompass the potential risk posed to a depository institution by its *customers'* public reputation or popularity. On November 7, 2008, FDIC issued a FIL entitled "Guidance on Payment Processor Relationships." FDIC, Financial Institution Letter: Guidance on Payment Processor Relationships, FIL-127-2008 (Nov. 7, 2008). This guidance document identified the reputation risks associated with providing banking services to particular customers. It also identified online payday lenders as among the merchants that "have displayed a higher incidence of unauthorized charges and associated returns or charge backs, which is often indicative of fraudulent activity." *Id.* It warned banks about merchants that experience a high rate of returned charges and checks (including returns

resulting from insufficient funds), and, as in the previous guidance letter, merchants that bank with more than one financial institution. *Id.* The FIL is a final agency action both because it is being enforced as a binding legal norm and because it represents the culmination of FDIC's decision-making process and creates new legal consequences of establishing and maintaining relationships with online payday lenders.

49.    In the summer of 2011, FDIC issued a Supervisory Insight article entitled "Managing Risks in Third-Party Payment Processor Relationships." The article warns banks of heightened risks, including reputation risks, associated with doing business with certain types of merchants, including online payday lenders. FDIC, *Managing Risks in Third-Party Payment Processor Relationships*, SUPERVISORY INSIGHTS, Summer 2011, at 3. The article offers a list of 30 merchant categories, including online payday lending and numerous other lawful businesses, that the agency deemed to involve "high-risk" activity. The Department of Justice has acknowledged, in response to legislative investigations of Operation Choke Point, that FDIC developed this list of "high-risk merchants" for purposes related to regulating the banking industry. Letter from Peter J. Kadzik, Ass't Att'y Gen., U.S. Dep't of Justice, Office of Legislative Affairs, to the Hon. Tim Johnson, Chairman, S. Comm. on Banking, Hous., & Urban Affairs at 4 (June 24, 2014). The article further urges banks to be wary of customers with high aggregate return rates and those that bank with more than one financial institution. *Id.* The article is a final agency action both because it is being enforced as a binding legal norm and because it represents the culmination of FDIC's decision-making process and creates new legal consequences of establishing and maintaining relationships with online payday lenders.

50.    On January 31, 2012, FDIC issued yet another FIL entitled "Guidance on Payment Processor Relationships," which updated the November 2008 FIL. FDIC, Financial

Institution Letter: Revised Guidance on Payment Processor Relationships, FIL-3-2012 (Jan. 31, 2012). This guidance document expanded the identification of risky industries to include not just online payday lenders, but all payday lenders. *Id.* Although it acknowledged that payday lenders may be legitimate customers, it encouraged banks to terminate banking relationships if the risk of maintaining them becomes too great. *Id.* Further, the guidance encourages financial institutions to structure their agreements with payday lenders and other supposedly risky industries to "permit immediate account closure [and] contract termination." *Id.* Like the other guidance documents, the FIL warned banks to look suspiciously on customers with high aggregate return rates and customers that bank at more than one depository institution. *Id.* The letter is a final agency action both because it is being enforced as a binding legal norm and because it represents the culmination of FDIC's decision-making process and creates new legal consequences of establishing and maintaining relationships with payday lenders.

51.     On October 30, 2013, OCC issued a Bulletin entitled "Risk Management Guidance: Third-Party Relationships." OCC, Risk Management Guidance: Third Party Relationships, OCC Bull. No. 2013-29 (Oct. 30, 2013). The Bulletin warns banks of reputation risks associated with providing financial services to business customers who, in turn, "do not meet the expectations of the bank's customers." *Id.* It urges banks to terminate relationships in the event that the risk becomes too great. *Id.* The bulletin is a final agency action both because it is being enforced as a binding legal norm and because it represents the culmination of FDIC's decisionmaking process and creates new legal consequences of establishing and maintaining relationships with payday lenders.

52.     In adopting the radically expanded interpretation of reputation risk that is announced in these informal guidance documents, the Defendant agencies have consistently chosen to proceed without providing the public with notice and an opportunity to comment.

53.     Further, these informal guidance documents provide no objective criteria for reliably ascertaining a bank customer's public reputation or popularity or for distinguishing between law-abiding, responsible bank customers and bank customers that engage in fraudulent or otherwise unlawful financial practices. Far from tailored guidance that would aid banks in targeting those customers who are engaged in fraudulent or otherwise unlawful practices, the Defendant agencies have created a vague and subjective standard that can be used to pressure banks to cut off relations with law-abiding customers engaged in lines of business that are disfavored by the Defendants.

54.     Indeed, as it has been redefined, "reputation risk" now comprises nothing more than the "risk" that arises when a bank does business with a law-abiding customer who regulators believe is (or, in their view, should be) unpopular. Defendants' guidance documents expressly distinguish "reputation risk" from "compliance risk," defining the latter as the risk to the bank of doing business with customers that engage in fraudulent, deceptive, or otherwise unlawful practices. *E.g.*, FDIC, Financial Institution Letter: Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008). The risk that a bank is doing business with a customer who is breaking the law is thus fully captured within the category of compliance risk. If the Defendant agencies new definition of reputation risk is to have any independent function in bank regulation, then, it must constitute the risk that arises from dealing with law-abiding customers who the regulators believe are (or, in their view, should be) unpopular.

55.     The opportunity for abuse that is inherent in such a subjective and pliant standard is patent. At the time that Operation Choke Point began, therefore, the Defendant agencies had already put in place the tools that they would need to implement the plan to choke off legitimate businesses from access to the banking system.

## Operation Choke Point

56.     The Defendant agencies, under the guise of protecting the safety and soundness of banks, are now waging a covert war against certain legitimate businesses that rely on banking services to function. What started as a set of diffuse sorties has now coalesced into a coordinated campaign, known as "Operation Choke Point," designed by the Defendant agencies and the DOJ to eliminate certain lawful businesses that they disfavor, by using their regulatory and enforcement authorities to quietly coerce banks to terminate their relationships with the disfavored businesses. As a 2014 report of the House of Representatives Committee on Oversight and Government Reform found, the objective of Operation Choke Point is "to 'choke out' companies the Administration considers a 'high risk' or otherwise objectionable, despite the fact that they are legal businesses." COMM. REP. ON OPERATION CHOKE POINT at 1. The Committee report also concluded that "internal memoranda on Operation Choke Point clearly demonstrate that the Department's primary target is the short-term lending industry—an indisputably lawful financial service." *Id.* at 5; *see, e.g.*, E-mail from Michael S. Blume, Director, Consumer Protection Branch of U.S. Dep't of Justice, to Maame Ewusi-Mensah Frimpong, Deputy Ass't Att'y Gen., Consumer Prot. Branch of U.S. Dep't of Justice (Aug. 6, 2013, 11:24 AM) ("[W]e have been starting to pay closer attention to banks and processors who deal with payday lenders."), *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP000307.

57.     As part of Operation Choke Point, the Defendant agencies have begun to require banks to terminate established relationships with customers who are engaged in perfectly legal lines of business. The Defendant agencies have done this based on a perceived "reputation risk" to the bank. This perceived risk, however, simply reflects the fact that the bank's customers are engaged in lines of business that, although legal, are nevertheless disfavored by the Defendants.

58.     The payday lending industry is the primary target of Operation Choke Point. From the inception of Operation Choke Point, the Defendant Agencies have been preoccupied with how "large nationwide banks are facilitating payday lending." Email from Surge Sen, Section Chief, Div. of Consumer & Depositor Prot., FDIC, to Marguerite Sagatelian, Senior Counsel, Consumer Enforcement Unit, Legal Div., FDIC (Mar. 8, 2013, 9:11 AM), FDICHOGR00006055, *quoted in* Appendix to STAFF OF H. COMM. ON OVERSIGHT & GOV'T REFORM, 113TH CONG., REP. ON FEDERAL DEPOSIT INSURANCE CORPORATION'S INVOLVEMENT IN "OPERATION CHOKE POINT" (Comm. Print 2014) (hereinafter "COMM. REP. ON FDIC INVOLVEMENT"). Agency officials have consistently sought out actions to "take . . . against banks that facilitate payday lending," Email from Marguerite Sagatelian, Senior Counsel, Consumer Enforcement Unit, FDIC, to two Counsel in Legal Div., FDIC (Mar. 8, 2013, 9:32 AM), FDICHOGR00006907, *quoted in* COMM. REP. ON FDIC INVOLVEMENT at 9, and looked for "a way to stop our banks from facilitating payday lending," Email from Marguerite Sagatelian, Senior Counsel, Consumer Enforcement Unit, FDIC to James L. Anderson, Ass't Gen. Counsel, Consumer Section, Consumer, Enforcement/Employment, Insurance, and Legislation Branch, FDIC (Feb. 22, 2013, 11:13 AM), FDICHOGR00006907, *quoted in* COMM. REP. ON FDIC INVOLVEMENT at 8.

59.     Relying on the foregoing informal guidance documents, FDIC, the Board, and OCC, acting through their examiners and other agents, have communicated privately to banks that they face adverse regulatory action, such as harsh and prolonged examinations and reduced examination ratings, if they continue to do business with payday lenders. In an August 2013 letter to DOJ and FDIC, over thirty members of Congress reported "that the DOJ and FDIC are intimidating some community banks and third party payment processors with threats of heightened regulatory scrutiny unless they cease doing business with online lenders." Letter from Rep. Blaine Luetkemeyer et al., House of Representatives, to Att'y Gen. Eric Holder, U.S. Dep't of Justice, and Chairman Martin J. Gruenberg, FDIC (Aug. 22, 2013). A 2014 report by the House Committee on Oversight and Government Reform agreed, finding that internal "[d]ocuments produced to the Committee demonstrate the accuracy of the Representative Luetkemeyer's interpretation . . . ." COMM. REP. ON OPERATION CHOKE POINT at 10.

60.     In one documented example that has come to light, FDIC Regional Director Anthony M. Lowe pressured a regulated bank to terminate banking services to a payday lender without offering any basis or grounds for suspecting that this lender might be engaged in unlawful activity. The FDIC informed the bank that "activities related to payday lending are unacceptable for an insured depository institution." Letter from M. Anthony Lowe, Regional Director, FDIC Chicago Regional Office to a depository institution subject to FDIC's supervisory authority (Feb. 15, 2013) (*available at* http://goo.gl/ZISdO4). In addition, the FDIC took the following actions solely because that bank provided services to a payday lender:

    a.  the FDIC conducted a Compliance and Risk Management visitation of the bank on December 17, 2012, *id.*;

b.  the FDIC held a conference call with the bank on February 5, 2013, in which Field

Supervisor Jim Meyer and Supervisory Examiners John George and Sean Blair

participated, *id.*;

c.  the FDIC wrote on February 15, 2013 to notify the bank of FDIC's general objections

to the payday lending business, *id.*; and

d.  the FDIC promised, in its February 15, 2013 letter, that "[m]embers of our Region's

Senior Management will contact you in the near term to schedule a meeting to further

discuss our concerns relative to the aforementioned relationship." *Id.*

Upon information and belief, the bank, after being subjected to this level of unrelenting federal

regulatory pressure, had no choice but to terminate its relationship with the payday lender.

61.    The Defendant agencies have also acted in concert with DOJ, which has used its

investigatory authority to reinforce the Defendant agencies' back-room pressure tactics. One

internal DOJ memo, circulated in early 2013, lists the banking regulators as part of the Operation

Choke Point team. Memorandum from Michael S. Blume, Dir., Consumer Prot. Branch of U.S.

Dep't of Justice, to Stuart F. Delery, Principal Deputy Ass't Att'y Gen., Civil Div. of U.S. Dep't

of Justice 1 (Feb. 8, 2013), *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-

3PPP000029. Another internal memo reports that, in the early stages of Operation Choke Point,

FDIC attorneys "contacted [DOJ] to share ideas about the laws relating to payday lending and

potential investigative approaches." Memorandum from Michael S. Blume, Dir., Consumer Prot.

Branch of U.S. Dep't of Justice, to Stuart F. Delery, Principal Deputy Ass't Att'y Gen., Civil

Div. of U.S. Dep't of Justice 6 (Apr. 17, 2013), *in* COMM. REP. ON OPERATION CHOKE POINT app.

at HOGR-3PPP000048. The same memo records a meeting between the Department and FDIC's

Office of Inspector General to "develop[] a structure for further cooperation." *Id.* In September

25

2013, a DOJ memorandum mentioned future coordination with OCC, Memorandum from Michael S. Blume, Dir., Consumer Prot. Branch of U.S. Dep't of Justice, to Stuart F. Delery, Principal Deputy Ass't Att'y Gen., Civil Division of the U.S. Dep't of Justice 14 (Sept. 9, 2013), *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP000329 [hereinafter "Six-Month Status Report Mem."], and, later that month, representatives of DOJ, FDIC, and OCC made a joint presentation on Operation Choke Point to the Federal Financial Institutions Examination Council, listing payday loans and several other lawful industries alongside criminal schemes as "high risk merchants/activities," Michael Bernardo, Chief, Cyber-fraud and Financial Crimes Section, FDIC et al., Third Party Payment Processors: Relationships Guidance, and Case Examples (Sept. 17, 2013), *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP000344. More than fifty subpoenas were served by DOJ on banks as part of Operation Choke Point, accompanied by copies of the Defendant agencies' guidance documents. *See, e.g.*, Memorandum from Michael S. Blume, Dir., Consumer Prot. Branch of U.S. Dep't of Justice, to Stuart F. Delery, Principal Deputy Ass't Att'y Gen., Civil Div. of U.S. Dep't of Justice 5 (May 14, 2013), *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP00064. And in a recent civil enforcement action, DOJ relied on FDIC's guidance documents to claim that the defendant bank "knew or should have known" about the fraud allegedly being perpetrated by its third-party payment processors and their payday lender merchants. *See* Compl. at ¶ 30, *United States v. Four Oaks Fincorp, Inc.*, No. 14-014 (E.D.N.C. Jan. 8, 2014); *see also* Joel M. Sweet, Trial Att'y, Consumer Prot. Branch of U.S. Dep't of Justice, United States of America v. Payment Processing Center 45, *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP000066 (identifying "[g]uidance to banks from FDIC, OCC and FinCEN" as "[i]mportant steps forward" in Operation Choke Point). As the House of Representatives Committee on

26

Government Oversight recently reported, this "close coordination" among Defendant agencies and DOJ "likely contribute[s] to the banks' understanding that the FDIC policy statements carr[y] with them the threat of a federal investigation." COMM. REP. ON OPERATION CHOKE POINT at 9.

62.     In addition to coercing the banks directly to terminate payday lenders, Defendants have also concurrently injured Plaintiffs' reputational interests. This harm has been inflicted both during backroom meetings with bank personnel and as part of the agency's public relations efforts. As a recent congressional report reveals, "the DCP's Deputy Director for Policy & Research insisted that Chairman Gruenberg's letters to Congress and talking points always mention pornography when discussing payday lending, in an effort to convey a 'good picture regarding the unsavory nature of the businesses at issue.' " COMM. REP. ON FDIC INVOLVEMENT at 10, quoting Email from a Counsel, Legal Div., FDIC, to Marguerite Sagatelian, Senior Counsel, Consumer Enforcement Unit, FDIC (Aug. 28, 2013, 9:32 AM), FDICHOGR00007424. The FDIC has insisted on repeatedly associating payday lending with pornography because it was felt "strongly that including payday lenders in the same circle as pornographers and on-line gambling businesses will ultimately help with the messaging on this issue." *Id.* at 11, quoting Email from a Counsel, Legal Div., FDIC, to Marguerite Sagatelian, Senior Counsel, Consumer Enforcement Unit, FDIC (Aug. 28, 2013 9:32 AM), FDICHOGR00007424.

63.     The above-described pattern of concerted activity by the Defendant agencies and DOJ was intended to and did result in the desired action on the part of regulated financial institutions, causing them to terminate or modify longstanding and mutually-beneficial banking relationships with CFSA's members, including Advance America, who have no further administrative recourse or other adequate remedy in court.

27

64.    Because the Defendant agencies chose to implement Operation Choke Point through informal guidance documents and back-room arm-twisting, Plaintiff CFSA's members and other law-abiding and responsible payday lenders have had no opportunity to propose objective regulatory standards or to protect themselves from such arbitrary and capricious regulatory and enforcement measures.

65.    For example, the Defendant agencies' guidance documents inform banks that high return rates are "often" evidence of fraudulent activity. *See, e.g.*, FDIC, Financial Institution Letter: Revised Guidance on Payment Processor Relationships, FIL-3-2012 (Jan. 31, 2012). Far from distinguishing among returns based on the *reason* for the return (*e.g.*, the payment was not authorized by payor), these documents affirmatively argue that other types of returns, such as insufficient funds returns, may also indicate fraud. This guidance thus ignores complexities in patterns of return rates and fails to acknowledge legitimate explanations for relatively high rates of certain types of returns, such as the merchant offering otherwise unavailable services to financially marginalized individuals, or for certain types of merchants, such as those who use banking services primarily in connection with collecting past due payments on loans. There is no public record evidence that, in preparing its guidance, the Defendant agencies considered empirical evidence of the connection between different types of returns and fraudulent activity.

66.    The same guidance documents also warn banks against doing business with merchant customers that use more than one financial institution to process payments. *See, e.g.*, FDIC, Financial Institution Letter: Revised Guidance on Payment Processor Relationships, FIL-3-2012 (Jan. 31, 2012). This guidance ignores the business reality—created by the Defendant agencies' advice that banks maintain flexible termination options in all contracts with merchant customers, *see id*.—that merchants such as payday lenders are at risk of losing critical banking

28

services with little to no notice. Responsible payday lenders that seek to ensure continuity of service for their customers by maintaining relationships with multiple financial institutions are lumped in together with payday lenders that establish relationships with multiple financial institutions in order to obscure fraudulent activities.

67.    Most importantly, the fulcrum for Operation Choke Point—reputation risk, redefined in a manner that is vague, manipulable, and wholly foreign to customary bank examination practices— "could ostensibly be invoked to compel a depository institution to sever a customer relationship with a small business operating in accordance with all applicable laws and regulations but whose industry is deemed 'reputationally risky' for no other reason than that it has been the subject of unflattering press coverage, or that certain Executive Branch agencies disapprove of its business model." Letter from Rep. Jeb Hensarling, Chairman, H. Comm. on Fin. Servs., to Janet Yellen, Chair, The Fed. Reserve Sys. (May 22, 2014). "The introduction of subjective criteria like 'reputation risk' into prudential bank supervision can all too easily become a pretext for the advancement of political objectives, which can potentially subvert both safety and soundness and the rule of law." *Id.*

68.    The Defendant agencies have confirmed that fear by making it clear that the target of Operation Choke Point is not just fraudulent or abusive payday lending schemes, but also law-abiding, responsible payday lenders like CFSA's members, who provide critically needed short-term credit to millions of American consumers. Yet even as the Defendant agencies have been targeting payday lenders for financial exile, they have been encouraging banks to provide services to marijuana dealers, whose activities are federal crimes. As a result of their participation in Operation Choke Point, the Defendant agencies have converted their statutory mandate to protect the safety and soundness of the American banking system into a pretext for

29

the advancement of political objectives. By so doing, they are both undermining the safety and soundness of the banks that they have been tasked to protect and subverting the rule of law.

**Operation Choke Point's Initial Results**

69.     Operation Choke Point has claimed casualties. As the House of Representatives Committee on Oversight and Government Reform recently reported, DOJ's aggressive use of subpoenas, "in conjunction with recent policy announcements by bank examiners, is compelling banks to terminate longstanding lending and depository relationships with a wide array of lawful businesses and individuals." COMM. REP. ON OPERATION CHOKE POINT at 7.

70.     Many of these banks have terminated their relationships with law-abiding, responsible payday lenders, and these payday lenders face increasing uncertainty in their remaining banking relationships and must compete for banking services elsewhere with a severe regulatory handicap.

71.     For example, Plaintiff Advance America has lost longstanding positive business relationships with at least ten banks as a result of Operation Choke Point. Hancock Bank and Whitney Bank informed Advance America of their intention to close its accounts on the ground that they were "unable to effectively manage [the lenders'] Account(s) on a level consistent with the heightened scrutiny required by [their] regulators . . . ." Fifth Third Bank wrote that it would stop doing business with payday lenders altogether on the ground that the entire industry is "outside of [its] risk tolerance." Synovus Bank and Umpqua Bank likewise terminated Advance America's accounts. Citizens Bank also informed Advance America that the bank would be closing its checking account on July 31, 2014. At least two of Advance America's banks expressed regret and explained that the service terminations were the result of pressure from their prudential regulator. Cadence Bank also terminated Advance America's accounts without

explanation. Advance America has not been able to find local banks to service certain stores that were affected by the terminations; many of the banks it contacted for that purpose had decided to exit the payday lending industry due to regulatory pressure.

72.    CFSA member Cash Tyme has also received termination notices for its accounts at three financial institutions. Two alluded to the regulatory environment. Fifth Third Bank informed Cash Tyme, as it had informed Advance America, that the payday loan industry was "outside [its] risk tolerance." Regions Bank informed Cash Tyme that it "ha[d] chosen to end relationships with certain types of customers deemed to be high risk." Cash Tyme has been unable to find substitute banks to service certain stores affected by the terminations, nor has it been able to find a bank that will provide ACH services.

73.    CFSA Member Speedy Cash, Inc. (Lending Bear), after a seventeen year banking relationship, has also received a termination notice from Bank of America. A bank officer told Speedy Cash, Inc. that Bank of America was "exiting the payday advance space," expressed regret at the decision, and led it to believe that the termination decision depended only on Speedy Cash Inc.'s classification as a payday lender. CFSA member Speedy Cash, Inc. recently received a notice from Bank of America that its small business accounts would soon be closed "based on the nature of [its] business and associated risks." Furthermore, two of its current banking partners now refuse to open new accounts for Speedy Cash, Inc.

74.    CFSA member Xpress Cash Management likewise received a termination notice from Fifth Third Bank that explained that the payday loan industry is "outside [its] risk tolerance."

75.    One CFSA member has lost direct or indirect business relationships with Associated Bank, Bank of America, Bank Independent, Capital One Bank, Fifth Third Bank,

First Financial Bank, FirstMerit Bank, J.P. Morgan Chase, and others. Of these, Associated Bank, Bank of America, Bank Independent, First Merit Bank, Fifth Third Bank, and J.P. Morgan cited regulatory pressure or risk concerns. This member was able to locate substitute bank relationships only in a few isolated cases; many of the banks it contacted did not even respond.

76.    Another CFSA member lost longstanding relationships with three banks: Bank of America, Bank of Kentucky, and Fifth Third Bank. Bank of America cited pressure from regulators. Bank of Kentucky explained that regulators had directed it to terminate its relationships with all payday lenders. Fifth Third Bank abruptly stopped opening new accounts and stated that it was conferring with regulators. This member later received the same termination notice from Fifth Third Bank as many other CFSA members.

77.    Another CFSA member has lost accounts at four banks—Bank of America, Capital One, Fifth Third Bank, and J.P. Morgan Chase—despite having maintained positive, mutually-beneficial relationships with each bank for over fifteen years. This member has been unable to establish relationships with new banks in the affected geographic areas. Many of the banks it has contacted have indicated that they are unwilling to do business with payday lenders.

78.    CFSA member, PH Financial Services has also seen banking relationships terminated as a result of Operation Choke Point. The company must now devote significant resources to address the problems raised by the denial of its access to basic banking services.

79.    Yet another CFSA member lost the services of KeyBank, without explanation.

80.    The banks described above are all subject to the Defendant agencies' prudential regulatory jurisdiction. FDIC is the prudential regulator for Bank of Kentucky, Hancock Bank, Synovus Bank, Umpqua Bank, Citizens Bank, and Whitney Bank. The Board is the prudential regulator for Bank Independent, Fifth Third, and Regions Bank. OCC is the prudential regulator

for Associated Bank, Bank Independent, Bank of America, Cadence Bank, Capital One, First

Financial Bank, FirstMerit Bank, KeyBank National Association, and J.P. Morgan Chase. Each

of these financial institutions is subject to the consumer protection supervision of the CFPB, with

the exception of Bank Independent, Cadence Bank, and First Financial Bank.

81.     The foregoing specific examples of banks that terminated their relationships with

CFSA members as a result of regulatory pressure are merely illustrative of the severely harmful

effects of Operation Choke Point on the payday loan industry. Numerous other CFSA members

have lost longstanding, positive banking relationships, despite their law-abiding and responsible

business practices, and absent relief from this Court, they are at risk of being put out of

business.[1]

82.     Many of these banks have made clear to they would not have terminated these

customer relationships but for the coercive regulatory pressure that Operation Choke Point has

brought to bear. Account representatives and relationship managers at these banks have told

CFSA members informally that these sudden, unexpected, and otherwise inexplicable

terminations were made at the behest of their regulators, who pressured the banks to stop doing

business with all payday lenders. As noted above, *see supra* at ¶ 71, at least two of Advance

America's banks expressed regret and explained that the service terminations were the result of

pressure from their prudential regulator. *See also supra* at ¶ 76 (Bank of Kentucky

communicated verbally to one CFSA member that it was ending its relationship "because bank

regulators had directed the bank to terminate its relationship with all payday lenders").

---

[1] Many of these members, and several whose experiences are described anonymously
above, declined to be identified for fear of regulatory retaliation.

83.     Another CFSA member was told that the bank would no longer do business with that member "because examiners had come into their bank … [and] did not want them to have anything to do with us."

84.     One bank, upon announcing that it had to terminate a payday lender's account relationship, informed that lender that "[w]e have appreciated your account relationships and the business which you have done with the bank," continuing that "we are not aware of any account activity in your accounts or your business relationship with us that would constitute any violation of any law, rule or regulation to which either of our organizations is subject." Nevertheless, the account had to be terminated because of "warnings of future adverse consequences to financial institutions who provide deposit and transaction services to payday lenders" from federal agencies, including Defendants, "and the lack of clear guidance on which our bank may reasonably rely in conjunction with providing such services, we must reluctantly discontinue such account services to all pay day lenders, which would include your accounts."

85.     These explanations that CFSA members have received from their banks comport with the findings of recent congressional investigations that have revealed Defendants' role in the termination of banks' relationships with payday lenders. The Chairman of the House Judiciary Committee reported, for example, that the Committee had obtained the following account of a meeting between a senior FDIC regulator and a banker contemplating serving a payday lending client: The official told the banker, "I don't like this product and I don't believe it has any place in our financial system . . . Your decision to move forward will result in an immediate, unplanned, audit of your entire bank." *Guilty until Proven Innocent? A Study of the Propriety & Legal Authority for the Justice Department's Operation Choke Point*: *Hearing*

34

*Before the H. Comm. on the Judiciary*, 113th Cong. 5 (2014) (statement of Chairman Bob Goodlatte), http://goo.gl/cWsWwo.

86.     Many banks have, moreover, either stated or, at least, suggested that they would restore those terminated relationships were that coercive regulatory pressure removed.

87.     One bank representative, for example, not only expressed incomprehension as to why the Bank was terminating a longstanding relationship with a payday lender but also, in March 2014, wrote to the payday lender: "Thank you again for being a great client and I hope we can find a way to work together again soon."

88.     In addition, several CFSA members, including Advance America, have lost business relationships with third-party payment processors and merchant card processors as a result of Operation Choke Point, which has also sought to coerce banks to cut ties with processor clients that do business with payday lenders.

89.     The pattern has continued through the summer of 2014 and shows no sign of relenting. CFSA continues to receive notifications from its member businesses that banks are terminating longstanding relationships. On July 18, 2014, for example, First Bank & Trust notified Express Check Advance that it will be terminating its business deposit account on July 31, 2014. No explanation was provided for this sudden termination. There is no sign that Operation Choke Point is slowing or that federal regulators have ceased to brand lawful and legitimate businesses as "high-risk" and target them for termination.

90.     The Defendant agencies and DOJ knew early on that their coordinated, coercive campaign of backroom pressure tactics was succeeding in prompting banks "to exit or severely curtail" business with *all* payday lenders, and that "banks may have therefore decided to stop doing business with legitimate lenders." Six-Month Status Report Mem. at 10.

35

91.     Because payday lenders cannot survive without access to banking services, Operation Choke Point has begun to have its intended and necessary effect. As one internal DOJ memorandum noted, "a large Internet payday lender decided recently to exit the business due to difficulties securing a bank or payment processor relationship." Memorandum from Michael S. Blume, Dir., Consumer Prot. Branch of U.S. Dep't of Justice, to Stuart F. Delery, Principal Deputy Ass't Att'y Gen., Civil Div. of U.S. Dep't of Justice 2 (July 8, 2013), *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP000166. The regulators celebrated "this type of positive conduct." Six-Month Status Report Mem. at 6, 10.

92.     The objective of the agency actions complained of herein was and is to put the payday loan industry out of business by misusing the statutory authority over the banks to "get at payday lending." Email from Marguerite Sagatelian, Senior Counsel, Consumer Enforcement Unit, FDIC, to Counsel in Legal Div., FDIC (Mar. 8, 2013 9:32 AM), FDICHOGR00006907, *quoted in* COMM. REP. ON FDIC INVOLVEMENT at 9.

### Operation Choke Point Continues

93.     Confronted with the overwhelming evidence of unlawful agency activity that congressional investigations uncovered, FDIC Chairman Martin Gruenberg and Vice Chairman Tom Hoenig recently reportedly have acknowledged wrongdoing within their Agency. Although Defendant FDIC claims that it put a stop to its campaign against payday lenders on July 28, 2014 when it issued a Financial Institution Letter disavowing the list of high-risk industries that had served as a key tool for coercing banks to terminate unpopular lines of business, the targeting of CFSA members continues apace.

94.     The campaign that Defendants FDIC, OCC, and the Board have been conducting specifically against payday lenders has shown no signs of letting up since the release of FIL-41-

2014 on July 28, 2014. The strong-arming and backroom coercion continues to produce account terminations. Renewed pressure has been applied to those banks that had resisted terminating all of their targeted customers. Banks that the Defendant Agencies had not earlier sought to coerce are now feeling the pressure to drop payday lenders for the first time. In sum, there are no signs that the campaign of regulatory coercion has ended; to the contrary, Operation Choke Point has only intensified and broadened the scope of its targets in the months since the initial complaint in this suit was filed.

95.     On August 20, 2014, one bank in the Midwest announced that it would be closing the account of a CFSA member in October 2014. This bank, which is regulated by the FDIC, had not previously terminated any CFSA members. The bank explained its decision by stating that

> due to recent initiatives of the U.S. Department of Justice and warnings of future adverse consequences to financial institutions who provide deposit and transaction services to payday lenders from Consumer Financial Protection Bureau and bank regulatory agencies under the Dodd-Frank Act and its implementing regulations and the lack of clear guidance on which our bank may reasonably rely in conjunction with providing such services, we must reluctantly discontinue such account services to all payday lenders, which would include your accounts.

Declaration of Dennis Shaul ¶ 11 (Oct. 2, 2014), Doc. 23-9.

96.     On September 2, 2014, Wells Fargo announced that it would be closing the bank accounts of Emergi-Cash. Three years earlier, Wells Fargo had actively solicited Emergi-Cash's business and had even persuaded Emergi-Cash to transfer its accounts at another bank to Wells Fargo. Emergi-Cash, moreover, had never used Wells Fargo for ACH transactions; Emergi-Cash had only depository accounts with Wells Fargo. The working relationship between Wells Fargo's bankers and Emergi-Cash personnel had been excellent. Emergi-Cash was never given any reason to believe that Wells Fargo believed that it posed any risk whatsoever to the reputation or to the safety and soundness of the bank. In spite of this long-standing and untroubled

relationship, Wells Fargo terminated Emergi-Cash without providing any advance warning or notice.

97.    On August 25, 2014, Bank of America closed the eight bank accounts of Speedy Cash, a CFSA member. The bank had announced on June 30, 2014, that it planned to close those accounts because of "the nature of [Speedy Cash's] business and associated risk." Although bank representatives were deeply disappointed with the decision to end this longstanding relationship and affirmed that the decision had nothing to do with the way Speedy Cash itself conducted its business, the decision could not be reversed even after the issuance of FIL-41-2014.

98.    On October 2, 2014, U.S. Bank, which is regulated by OCC, informed CFSA member DollarSmart that it was closing its accounts. DollarSmart had devoted substantial time and effort to establishing this relationship with U.S. Bank after another account had been closed because of Operation Choke Point's campaign. U.S. Bank gave DollarSmart notice that it would close these accounts on October 28, 2014, giving DollarSmart only 26 days in which to find a new bank and save its business. U.S. Bank later extended this deadline to November 30, 2014. Even with this extension, however, DollarSmart was unable to find an alternative source of financial services and, as a result, was forced to exit the payday lending and check cashing businesses by entering into a distressed sale. After the sale, U.S. Bank agreed to keep DollarSmart's accounts open, provided that DollarSmart surrendered its payday lending licenses and agreed that no Money Service Business activity would be processed through its accounts after November 30, 2014. Operation Choke Point has deprived this business of its ability to continue in its chosen line of commerce and has left some of its workers and its owners unemployed.

99.     A whistleblower letter sent to Representative Blaine Luetkemeyer in December of 2014 made clear that the illegality that is Operation Choke Point continues and that the two year campaign of subjecting banks that serve payday lenders and other disfavored industries to coercive examinations continues unabated:

> I am an employee of the Federal Deposit Insurance Corporation (FDIC). I was proud of my job and the FDIC's mission before Operation Choke Point. During the past two years, however, we have been told to examine banks much more harshly, if they deal with a class of customers prohibited by Choke Point.

Rep. Blaine Luetkemeyer, "Blaine's Bulletin: Operation Choke Point" (Feb. 13, 2015) (available at http://goo.gl/HXmorg).

100.    On February 25, 2015, South State Bank notified Advance America that it would be closing the company's five accounts. The FDIC is the prudential regulator of South State Bank. Although Jay Reagan, the City Executive Senior Vice President at South State, offered no explanation for the decision, this termination notice followed close upon a regulatory examination of the bank's ACH services.

101.    On March 10, 2015, International Bank of Commerce notified Advance America that it would be closing the company's accounts. The FDIC is the prudential regulator of International Bank of Commerce. As a result of these account closures, 72 facilities in Texas and Oklahoma have been cut off from access to basic banking services. The decision was reportedly made by the bank's compliance department and was handed down to bank employees without explanation. Advance America received no notice or warning that the bank was contemplating such a move. Indeed, the decision came as a surprise even to the account representatives at the bank who expressed to Advance America that they too were caught off guard by the decision and had received no explanation for the decision from the bank's upper management.

102.    The disavowal by FDIC of FIL-41-2014 has done nothing to narrow the scope of Operation Choke Point. While their focus remains fixed on the payday lenders, Defendant Agencies are reportedly continuing to pressure and to coerce banks to terminate relationships with the other industries that Operation Choke Point has labeled "high risk." Operation Choke Point has not ended. Its assault on legitimate businesses not only continues, but has expanded and intensified.

<b><u>Operation Choke Point Has Expanded</u></b>

103.    Far from putting an end to their campaign of regulatory intimidation and coercion, Defendant Agencies have expanded the range of their unlawful tactics. It was recently revealed that Defendants have been coercing a consumer reporting company to stop providing key data to the payday lending industry. By so doing, they have extended the reach of Operation Choke Point and cut off law-abiding payday lenders from data they use to do business. They accomplished this, upon information and belief, either indirectly, by leveraging their power over banks subject to their jurisdiction, or directly.

104.    Early Warning Services ("EWS") is a Delaware limited liability company that is headquartered in Scottsdale, AZ. EWS is owned by five national banks: Bank of America Corp., BB&T Corp., Capital One National Bank, JPMorgan Chase, and Wells Fargo. Defendant OCC is the prudential regulator of Capital One, JP Morgan Chase, and Bank of America. Defendant FDIC is the prudential regulatory of Wells Fargo and BB&T. According to the most recent filings available from the State of Arizona, five of six EWS management committee members are employees of one of these five banks.

105.    EWS is a consumer reporting company. It collects consumer bank account data from both its parent banks and from hundreds of other financial institutions, and then packages

and sells this data to credit reporting agencies that, in turn, provide businesses with nearly up-to-the-minute financial profiles of potential borrowers. Businesses use these reports to decide whether to offer credit, insurance, rental leases, or employment. These reports help lenders manage credit risks and detect and prevent fraudulent transactions.

106.    Because of its relationship with the nation's banks, EWS is the only service that is able to provide nearly real time consumer financial information. The reports that other companies generate are markedly inferior because they lack access to real time information. For example, one of these other providers that is used by Plaintiff Advance America offers information only on a consumer's banking history, not their current account status.

107.    Reports based upon EWS data were provided to payday lenders by credit reporting services that repackaged and presented that data in formats specifically tailored for use in assessing payday loan applications. Prior to February 2015, several companies had used EWS data to provide credit reporting services to payday lenders.  Advance America and other CFSA members contracted with these companies to obtain access to EWS data.

108.    CFSA members and other payday lenders used this information to manage risk, to ensure that they were not facilitating fraud, and to aid them in complying with certain contractual and regulatory requirements. As a former FDIC director recently explained, EWS data allowed lenders both to "weed out first-party fraud" and to protect the consumer:

> When lenders can verify that the identity of the customer matches his or her bank account, they are able to quickly weed out first-party fraud — that is, loan applications by individuals or groups that have no intent to repay. That means lenders are able to improve fraud scoring, which in turn leads to lower default rates and ultimately means better pricing for borrowers. Having access to this valuable data is especially important for the more innovative players in the space, which are using advanced analytics and modeling to determine pricing.

William M. Isaac, *Operation Choke Point Won't Go Away Quietly*, AMERICAN BANKER, Feb. 19, 2015, http://goo.gl/sfdzf5.

109.    Access to this data could also reduce return rates, a goal that is shared by payday lenders, the ACH trade association, federal regulators, and consumers alike.  A "return" occurs whenever a request for payment that has been submitted to a bank for payment is denied and returned unpaid. A return may result if the request contains an incorrect account number or other erroneous information, of if the underlying account has been closed or has insufficient funds. Advance America had planned to use EWS data, for example, to determine the current status of consumer accounts, i.e., whether an account was open, had been closed for cause, was overdrawn, or was otherwise an account likely to result in a return. EWS credit reports also provided "an important protective measure for customers who face expensive insufficient funds fees, bounced check fees or overdraft charges if the lender makes a payment attempt on the account." Isaac, *Operation Choke Point Won't Go Away Quietly*. Quite simply, the better the information a payday lender has about its customers, the smaller the number of errors and the lower the cost of credit becomes to payday lenders and consumers of payday loans alike.

110.    On January 21, 2015, Bloomberg News reported that Operation Choke Point had expanded its arsenal of unlawful tactics to include coercing EWS to cut off payday lenders from access to consumer credit information. Zeke Faux, *Banks Stop Selling Account Data to Payday Lenders Amid Pressure*, BLOOMBERG NEWS, Jan. 21, 2015, http://goo.gl/zFhHLv. This report detailed how EWS had been directed to cease providing consumer credit information to services that repackaged and resold that information to payday lenders.

111.    As a result of this regulatory coercion, EWS has been cutting off payday lenders' access to its services "one by one":

"We've been discontinuing service one by one," Kyle Thomas, chief of marketing and sales at Scottsdale, Arizona-based Early Warning, said in a telephone interview. "The way we're going through it reflects both the wishes of our data contributors as well as various regulators."

Faux, *Banks Stop Selling Account Data to Payday Lenders*.

112.    Upon information and belief, Defendant Agencies coerced EWS directly and indirectly through its five parent banks. In response to this pressure, EWS adopted "minimum vetting guidelines" that require the agencies to which it provides data to review the websites of all companies with which they do business in order "to understand and document high rates and/or fees charged that would result in an APR of >36%." "If unable to determine APR," the guidelines provide, then the "entity is not eligible."  Likewise, "[i]f any APR (varied by state, type of loan, etc.) exceeds 36%, [then the] entity is not eligible" to receive EWS data. This standard, adopted after the company was subject to regulatory coercion, directly resulted in the cutting off of service to all payday lenders.

113.    Advance America lost access to EWS data completely in February 2015 when EWS terminated a credit reporting service that had provided Advance America with access to its data.  Prior to that date, EWS had informed this credit reporting service that EWS had decided, due to regulatory pressure, to stop providing information that would ultimately be used by those who charged more than a 36% Annual Percentage Rate on their loans. This standard, adopted after the company was subject to regulatory coercion by Defendant Agencies, directly resulted in the cutting off of service to all payday lenders. The purpose and effect of the government pressuring EWS to adopt a 36% interest-rate limit for use of its services is to target the payday lending industry and to establish a de facto interest-rate cap of 36% in this context.

114.    As a result of these terminations, Advance America and other CFSA members have lost access to the comprehensive data on customer's banking accounts needed to avoid not

only debiting accounts that have been closed by customers seeking to avoid repaying outstanding loans, but also to correct erroneous account numbers and other administrative errors.

115. The Defendant Agencies' unlawful campaign against payday lending not only continues unchecked, therefore, but has been expanding its range of tactics.

## CLAIMS FOR RELIEF

## COUNT I

## FDIC Promulgated Binding Rules
## Without Observing the Procedures Required by Law

116. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

117. The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

118. Before it may promulgate a binding rule, FDIC must provide public notice in accordance with law and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c).

119. FDIC failed to provide any sort of notice and opportunity to comment in advance of promulgating the rules relating to reputation risk contained in the following guidance documents:

(a)     Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008);

(b)     Payment Processor Relationships, FIL-127-2008 (Nov. 7, 2008);

(c)     Supervisory Insight: Managing Risks in Third-Party Payment Processor Relationships (Summer 2011); and

(d)     Payment Processor Relationships, FIL-3-2012 (Jan. 31, 2012).

44

120     None of the rules relating to reputation risk contained in these documents is subject to a statutory exception to notice and comment rule-making requirements. As set forth above, they do not merely announce "interpretative rules and statements of policy"; they have been and are being enforced by FDIC to create new legal obligations for banks wishing to do business with the entities described in the guidance documents, including payday lenders. *See* 5 U.S.C. § 553(d)(2). No statement of "good cause" for avoiding notice and comment was published alongside the rules, *see id.* § 553(d)(3), and no such good cause exists.

121     FDIC also has failed to engage in notice and comment rule making to develop specific safety and soundness rules concerning banks' relationships with the payday lending industry and that distinguish between law-abiding, responsible payday lenders and payday lenders that engage in fraudulent or other wrongful practices. Instead, it has, through its informal, coercive communications with banks, created a *de facto* rule against providing financial services to all payday lenders, which has led banks to terminate business relationships with CFSA members and other law-abiding, responsible payday lenders.

122     FDIC therefore acted "without observance of procedures required by law," and its actions should be set aside and permanently enjoined.

## COUNT II

### FDIC's Conduct Exceeded Its Statutory Authority

123     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

124     The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

45

125     FDIC's authority to set standards for safety and soundness of depository institutions subject to its prudential regulatory jurisdiction is provided by statute. *See* 12 U.S.C. § 1831p-1.

126     The authority conferred by 12 U.S.C. § 1831p-1 is not plenary, but is informed and limited by customary practices and understandings in the area of banking and banking regulation. If the statute were not so limited, it would constitute an unconstitutional delegation of unbounded legislative power to an executive agency.

127     In its informal guidance documents and its coercive back-room communications with banks, FDIC has exercised an unlimited power to control banks' operations and management based on a novel, vague, and subjective understanding of reputation risk. By unmooring "safety and soundness" regulation from actual risk-taking or wrong-doing by the bank or its merchant customers, FDIC is claiming and exercising sweeping and boundless discretion to deploy its regulatory powers to deny banking services to lawful industries based on its own subjective judgments about which industries are (or, in its view, should be) unpopular with the public. This novel reputation risk standard is unknown to customary banking and banking regulation, and it is not constrained by articulable, objective criteria. It also transgresses Congress's careful partition of safety and soundness and consumer protection authority.

128     FDIC has also exceeded its statutory authority by seeking to set and enforce regulatory standards to govern when a credit reporting company may provide credit reports to payday lenders. FDIC has statutory authority to establish regulations to ensure the safety and soundness of regulated banks, but it has no authority to issue regulations governing credit reporting companies. By seeking to set standards for credit reporting companies and to supervise that industry, FDIC has exceeded it statutory authority.

129    The FDIA likewise confers no authority upon FDIC to designate an interest rate as "high" or otherwise cap the interest rates that may be charged by payday lenders to customers other than active-duty military personnel and their families. By attempting to set a 36% APR cap on these interest rates, FDIC has acted in excess of its statutory authority.

130    FDIC has exceeded its statutory authority by seeking to coerce a credit reporting company to terminate its business and customer relationships with payday lenders and with those specialized credit reporting companies that provide consumer credit reports directly to payday lenders. While the FDIC has statutory authority under the FDIA to supervise those banks that are subject to its supervisory authority, it has no statutory authority to supervise credit reporting agencies or payday lenders directly. By exerting and exercising such supervisory authority, therefore, FDIC has exceeded its statutory authority.

131    No provision of law purports to bestow on FDIC such boundless authority, nor could any such law do so constitutionally. By claiming and exercising it, FDIC has therefore acted in excess of its statutory authority, and its actions must therefore be set aside and permanently enjoined.

## COUNT III

### FDIC's Conduct Was Arbitrary and Capricious

132    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

133    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if it is not the product of reasoned decisionmaking. This means, among other things, that an agency

47

must provide an adequate evidentiary basis for its action and consider all important aspects of the problem before it.

134     FDIC has acted by regulatory fiat to effectively prohibit or severely restrict economic activity that is entirely legal under federal and state law. Although purporting to target fraudulent behavior, FDIC has arbitrarily and capriciously decided to level the entire payday lending industry.

135     FDIC's informal guidance to banks under its supervision—the fulcrum for the backroom pressure it applies to the banks—identifies various "warning signs" for which banks should be on the lookout in their dealings with merchant customers. Yet its descriptions of these "warning signs" capture the payday loan industry as a whole and do not provide banks with any objective criteria for distinguishing between law-abiding, responsible lenders and payday lenders that engage in fraudulent or other wrongful practices. Nor does FDIC's guidance reflect any consideration of the legitimate justifications for the behaviors that are deemed "warning signs."

136     FDIC has thus inflicted on all payday lenders the stigma of illegitimacy. It has done so through both written guidance and oral communications made to regulated institutions during the course of bank examinations. It has inflicted this stigma both on individual payday lenders and on all payday lenders collectively. It has thus tarred all payday lenders with the same brush, regardless of whether they are engaged in fraudulent or abusive behavior or are acting responsibly in compliance with all applicable laws. By so doing, FDIC has acted in an arbitrary and capricious manner.

137     FDIC's reliance on its expanded definition of "reputation risk" is likewise arbitrary and capricious. This new and standardless definition—tailored to suit the sweeping aims of Operation Choke Point and adopted not only without notice and an opportunity for

comment, but also without statutory authority—permits FDIC to sit in judgment over any and all activities in which a bank customer might have engaged or merely be believed to have engaged. Indeed, it permits FDIC to pass judgment on businesses and individuals for any reason whatsoever.

138    This assertion of unbridled power would not only extend FDIC's activities far beyond its own statutorily defined jurisdiction and area of expertise, but would empower FDIC to use standards and procedures unauthorized by, and often contrary to the agency's own regulations. FDIC's assertion of unlimited, unlawful, and unrestricted power is, on its face, arbitrary, capricious, and an abuse of discretion.

139    The FDIC's coercion of credit reporting companies to terminate relationships with payday lenders constitutes another instance of how this assertion of unbridled power has led to arbitrary and capricious agency action. The prudential regulators have stressed the importance of financial service companies knowing their customers in order to manage and to mitigate the risk that they might inadvertently facilitate fraudulent activity. FDIC, by requiring credit reporting companies to deny consumer information to payday lenders, now seeks to ensure that payday lenders cannot know their customers. Such irrational and self-contradictory regulation constitutes arbitrary and capricious agency action.

140    For all of these reasons, FDIC's actions should be set aside and permanently enjoined.

### COUNT IV

**FDIC's Conduct Violated Plaintiffs' Due Process Rights**

141    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

142     The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). In addition, this court has authority under 28 U.S.C. § 1331 and its traditional powers of equity to declare invalid and enjoin agency action that violates the Constitution.

143     FDIC has inflicted reputational harm upon CFSA's members and other law-abiding responsible payday lenders by stigmatizing them as, among other things, "illegitimate", "fraudulent", and "high risk."

144     The stigma that FDIC has imposed upon CFSA's members and other law-abiding, responsible payday lenders threatens to preclude them from pursuing their lawful, chosen line of business. Indeed, to choke off these businesses from the financial services that they must have in order to pursue their chosen line of business is the precise purpose of the FDIC's actions, a purpose openly declared in the very name that the government has chosen for its unlawful enterprise: Operation Choke Point.

145     Further, by attacking the reputations of payday lenders, FDIC has effectively coerced certain financial institutions to cease providing bank accounts and other essential financial services to CFSA members and other law-abiding, responsible payday lenders. FDIC has thus deprived these lenders of tangible benefits and interests that they had previously possessed.

146     FDIC has never provided CFSA and its member institutions either with notice of its intention to blacklist them as unacceptably high-risk merchants or with any opportunity to be heard and to defend their good names.

147     FDIC thus deprived CFSA's members of protected liberty interests without due process of law and therefore acted contrary to constitutional right. Its actions must therefore be set aside and permanently enjoined.

**COUNT V**

**OCC Promulgated Binding Rules**
**Without Observing the Procedures Required by Law**

148     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

149     The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

150     Before it may promulgate a binding rule, OCC must provide public notice in accordance with law and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c).

151     OCC failed to provide any sort of public notice and opportunity to comment in advance of promulgating the rules relating to reputation risk contained in the following guidance document: Risk Management Guidance: Third-Party Relationships, OCC Bulletin 2013-29 (Oct. 30, 2013).

152     The rules relating to reputation risk contained in this document is not subject to a statutory exception to the APA's notice and comment rule-making requirements. They do not merely announce "interpretative rules and statements of policy"; instead they have been and are being enforced by OCC to create significant new legal obligations for banks wishing to do business with the entities described in the guidance document, including payday lenders. *See* 5

U.S.C. § 553(d)(2). No statement of "good cause" for avoiding notice and comment was published alongside the rules, *see id.* § 553(d)(3), and no such good cause exists.

153    OCC also has failed to engage in notice and comment rule making to develop specific safety and soundness rules concerning banks' relationships with the payday lending industry and that distinguish between law-abiding, responsible payday lenders and payday lenders that engage in fraudulent or other wrongful practices. Instead, it has, through its informal, coercive communications with banks, created a *de facto* rule against providing financial services to all payday lenders, which has led banks to terminate business relationships with CFSA members and other law-abiding, responsible payday lenders.

154    OCC therefore acted "without observance of procedures required by law," and its actions should be set aside and permanently enjoined.

## COUNT VI

### OCC's Conduct Exceeded Its Statutory Authority

155    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

156    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

157    OCC's authority to set standards for safety and soundness of depository institutions subject to its prudential regulatory jurisdiction is provided by statute. *See* 12 U.S.C. § 1831p-1.

158    The authority conferred by 12 U.S.C. § 1831p-1 is not plenary, but is informed and limited by customary practices and understandings in the area of banking and banking

regulation. If the statute were not so limited, it would constitute an unconstitutional delegation of unbounded legislative power to an executive agency.

159    In its informal guidance document and its coercive back-room communications with banks, OCC has exercised an unlimited power to control banks' operations and management based on a novel, vague, and subjective understanding of reputation risk. By unmooring "safety and soundness" regulation from actual risk-taking or wrong-doing by the bank or its merchant customers, OCC is claiming and exercising sweeping and boundless discretion to deploy its regulatory powers to deny banking services to lawful industries based on its own subjective judgments about which industries are (or, in its view, should be) unpopular with the public. This novel reputation risk standard is unknown to customary banking and banking regulation, and it is not constrained by articulable, objective criteria. It also transgresses Congress's careful partition of safety and soundness and consumer protection authority.

160    OCC has also exceeded its statutory authority by seeking to set and enforce regulatory standards to govern when a credit reporting company may provide credit reports to payday lenders. OCC has statutory authority to establish regulations to ensure the safety and soundness of regulated banks, but it has no authority to issue regulations governing credit reporting companies. By seeking to set standards for credit reporting companies and to supervise that industry, OCC has exceeded its statutory authority.

161    Federal law likewise confers no authority upon OCC to designate an interest rate as "high" or otherwise cap the interest rates that may be charged by payday lenders to customers other than active-duty military personnel and their families. By attempting to set a 36% APR cap on these interest rates, OCC has acted in excess of its statutory authority.

162	OCC has exceeded its statutory authority by seeking to coerce a credit reporting company to terminate its business and customer relationships with payday lenders and with those specialized credit reporting companies that provide consumer credit reports directly to payday lenders. While OCC has the statutory authority under the FDIA to supervise those banks that are subject to its supervisory authority, it has no statutory authority to supervise credit reporting agencies or payday lenders directly. By exerting and exercising such supervisory authority, therefore, OCC has exceeded its statutory authority.

163	No provision of law purports to bestow on OCC such boundless authority, nor could any such law do so constitutionally. By claiming and exercising it, OCC has therefore acted in excess of its statutory authority, and its actions must therefore be set aside and permanently enjoined.

## COUNT VII

### OCC's Conduct Was Arbitrary and Capricious

164	Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

165	The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if it is not the product of reasoned decisionmaking. As stated above, this means that an agency must provide an adequate evidentiary basis for its action and consider all important aspects of the problem before it.

166	OCC has acted by regulatory fiat to effectively prohibit or severely restrict economic activity that is entirely legal under federal and state law. Although purporting to target

54

fraudulent behavior, OCC has arbitrarily and capriciously decided to level the entire payday industry.

167    OCC's informal guidance to banks under its supervision—the fulcrum for the backroom pressure it applies to the banks—identifies various "warning signs" for which banks should be on the lookout in their dealings with merchant customers. Yet its descriptions of these "warning signs" capture the payday loan industry as a whole and do not provide banks with any objective criteria for distinguishing between law-abiding, responsible lenders and payday lenders that engage in fraudulent or other wrongful practices. Nor does OCC's guidance reflect any consideration of the legitimate justifications for the behaviors that are deemed "warning signs."

168    OCC has thus inflicted on all payday lenders the stigma of illegitimacy. It has done so through both written guidance and oral communications made to regulated institutions during the course of bank examinations. It has inflicted this stigma both on individual payday lenders and on all payday lenders collectively. It has thus tarred all payday lenders with the same brush, regardless of whether they are engaged in fraudulent or abusive behavior or are acting responsibly in compliance with all applicable laws. By so doing, OCC has acted in an arbitrary and capricious manner.

169    OCC's reliance on its expanded definition of "reputation risk" is likewise arbitrary and capricious. This new and standardless definition—tailored to suit the sweeping aims of Operation Choke Point and adopted not only without notice and an opportunity for comment, but also without statutory authority—permits OCC to sit in judgment over any and all activities in which a bank customer might have engaged or merely be believed to have engaged. Indeed, it permits OCC to pass judgment on businesses and individuals for any reason whatsoever.

55

170    This assertion of unbridled power would not only extend OCC's activities far beyond its own statutorily defined jurisdiction and area of expertise, but would empower OCC to use standards and procedures unauthorized by, and often contrary to the agency's own regulations. OCC's assertion of unlimited, unlawful, and unrestricted power is, on its face, arbitrary, capricious, and an abuse of discretion.

171    The OCC's coercion of credit reporting companies to terminate relationships with payday lenders constitutes another instance of how this assertion of unbridled power has led to arbitrary and capricious agency action. The prudential regulators have stressed the importance of financial service companies knowing their customers in order to manage and to mitigate the risk that they might inadvertently facilitate fraudulent activity. OCC, by requiring credit reporting companies to deny consumer information to payday lenders, now seeks to ensure that payday lenders cannot know their customers. Such irrational and self-contradictory regulation constitutes arbitrary and capricious agency action.

172    For all of these reasons, OCC's actions should be set aside and permanently enjoined.

## COUNT VIII

### OCC's Conduct Violated Plaintiffs' Due Process Rights

173    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

174    The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). In addition, this court has authority under 28 U.S.C. § 1331 and its traditional powers of equity to declare invalid and enjoin agency action that violates the Constitution.

56

175    OCC has inflicted reputational harm upon CFSA's members and other law-abiding responsible payday lenders by stigmatizing them as, among other things, "illegitimate," "fraudulent," and "high risk."

176    The stigma that OCC has imposed upon CFSA's members and other law-abiding, responsible payday lenders threatens to preclude them from pursuing their lawful, chosen line of business. Indeed, to choke off these businesses from the financial services that they must have in order to pursue their chosen line of business is the precise purpose of the OCC's actions, a purpose openly declared in the very name that the government has chosen for its unlawful enterprise: Operation Choke Point.

177    Further, by attacking the reputations of payday lenders, OCC has effectively coerced certain financial institutions to cease providing bank accounts and other essential financial services to CFSA members and other law-abiding, responsible payday lenders. OCC has thus deprived these lenders of tangible benefits and interests they had previously possessed.

178    OCC has never provided CFSA and its member institutions either with notice of its intention to blacklist them as unacceptably high-risk merchants or with any opportunity to be heard and to defend their good names.

179    OCC thus deprived CFSA's members of protected liberty interests without due process of law and therefore acted contrary to constitutional right. Its actions must therefore be set aside and permanently enjoined.

## COUNT IX

### The Board Promulgated Binding Rules
### Without Observing the Procedures Required by Law

180    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

181     The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

182     Before it may promulgate a binding rule, the Board must provide public notice in accordance with law and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c).

183     The Board has failed to engage in notice and comment rule making to develop safety and soundness rules concerning banks' relationships with the payday lending industry and that distinguish between law-abiding, responsible payday lenders and payday lenders that engage in fraudulent or other wrongful practices. Instead, it has, through its informal, coercive communications with banks, created a *de facto* rule against providing financial services to all payday lenders, which has led banks to terminate business relationships with CFSA members and other law-abiding, responsible payday lenders.

184     The Board has therefore acted "without observance of procedures required by law," and its actions should be set aside and permanently enjoined.

## COUNT X

### The Board's Conduct Exceeded Its Statutory Authority

185     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

186     The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

187    The Board's authority to set standards for safety and soundness of depository institutions subject to its prudential regulatory jurisdiction is strictly limited by statute. *See* 12 U.S.C. § 1831p-1.

188    The authority conferred by 12 U.S.C. § 1831p-1 is not plenary, but is informed and limited by customary practices and understandings in the area of banking and banking regulation. If the statute were not so limited, it would constitute an unconstitutional delegation of unbounded legislative power to an executive agency.

189    In its coercive back-room communications with banks, the Board has exercised an unlimited power to control banks' operations and management based on a novel, vague, and subjective understanding of reputation risk. By unmooring "safety and soundness" regulation from actual risk-taking or wrong-doing by the bank or its merchant customers, the Board is claiming and exercising sweeping and boundless discretion to deploy its regulatory powers to deny banking services to lawful industries based on its own subjective judgments about which industries are (or, in its view, should be) unpopular with the public. This novel reputation risk standard is unknown to customary banking and banking regulation, and it is not constrained by articulable, objective criteria. It also transgresses Congress's careful partition of safety and soundness and consumer protection authority.

190    No provision of law purports to bestow on the Board such boundless authority, nor could any such law do so constitutionally. By claiming and exercising it, the Board has therefore acted in excess of its statutory authority, and its actions must therefore be set aside and permanently enjoined.

59

## COUNT XI

### The Board's Conduct Was Arbitrary and Capricious

191    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

192    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if it is not the product of reasoned decisionmaking. This means, among other things, that an agency must provide an adequate evidentiary basis for its action and consider all important aspects of the problem before it.

193    The Board has acted by regulatory fiat to effectively prohibit or severely restrict economic activity that is entirely legal under federal and state law. Although purporting to target fraudulent behavior, the Board has arbitrarily and capriciously decided to level the entire payday industry.

194    The Board has thus inflicted on all payday lenders the stigma of illegitimacy. It has done so through both written guidance and oral communications made to regulated institutions during the course of bank examinations. It has inflicted this stigma both on individual payday lenders and on all payday lenders collectively. It has thus tarred all payday lenders with the same brush, regardless of whether they are engaged in fraudulent or abusive behavior or are acting responsibly in compliance with all applicable laws. By so doing, the Board has acted in an arbitrary and capricious manner.

195    The Board's reliance on its expanded definition of "reputation risk" is likewise arbitrary and capricious. This new and standardless definition—tailored to suit the sweeping aims of Operation Choke Point and adopted not only without notice and an opportunity for

60

comment, but also without statutory authority—permits the Board to sit in judgment over any and all activities in which a bank customer might have engaged or merely be believed to have engaged. Indeed, it permits the Board to pass judgment on businesses and individuals for any reason whatsoever.

196     This assertion of unbridled power would not only extend the Board's activities far beyond its own statutorily-defined jurisdiction and area of expertise, but would also empower the Board to use standards and procedures unauthorized by, and often contrary to the agency's own regulations. The Board's assertion of unlimited, unlawful, and unrestricted power is, on its face, arbitrary, capricious, and an abuse of discretion.

197     For all of these reasons, the Board's actions should be set aside and permanently enjoined.

## COUNT XII

### The Board's Conduct Violated Plaintiffs' Due Process Rights

198     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

199     The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). In addition, this court has authority under 28 U.S.C. § 1331 and its traditional powers of equity to declare invalid and enjoin agency action that violates the Constitution.

200     The Board has inflicted reputational harm upon CFSA's members and other law-abiding responsible payday lenders by stigmatizing them as, among other things, "illegitimate," "fraudulent," and "high risk."

61

201   The stigma that the Board has imposed upon CFSA's members and other law-abiding, responsible payday lenders threatens to preclude them from pursuing their lawful, chosen line of business. Indeed, to choke off these businesses from the financial services that they must have in order to pursue their chosen line of business is the precise purpose of the Board's actions, a purpose openly declared in the very name that the government has chosen for its unlawful enterprise: Operation Choke Point.

202   Further, by attacking the reputations of payday lenders, the Board has effectively coerced certain financial institutions to cease providing bank accounts and other essential financial services to CFSA members and other law-abiding, responsible payday lenders. The Board has thus deprived these lenders of tangible benefits and interests that they had previously possessed.

203   The Board has never provided CFSA and its member institutions either with notice of its intention to blacklist them as unacceptably high-risk merchants or with any opportunity to be heard and to defend their good names.

204   The Board failed to provide CFSA's members with due process of law and thus acted contrary to constitutional right. Its actions must therefore be set aside and permanently enjoined.

## PRAYER FOR RELIEF

205   WHEREFORE, Plaintiffs pray for an order and judgment:

a.   Declaring that the following agency actions are not in accordance with procedures required by law within the meaning of 5 U.S.C. § 706(2)(D):

(i)   Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008);

  (ii)  Payment Processor Relationships, FIL-127-2008 (Nov. 7, 2008);

  (iii)  Supervisory Insight: Managing Risks in Third-Party Payment

Processor Relationships (Summer 2011);

  (iv)  Payment Processor Relationships, FIL-3-2012 (Jan. 31, 2012); and

  (v)  Risk Management Guidance: Third-Party Relationships, OCC

Bulletin 2013-29 (Oct. 30, 2013).

 b.  Declaring that the following agency actions exceed FDIC's, OCC's, and the Board's respective authority under 12 U.S.C. § 1831p-1 within the meaning of 5 U.S.C. § 706(2)(C):

  (i)  Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008);

  (ii)  Payment Processor Relationships, FIL-127-2008 (Nov. 7, 2008);

  (iii)  Supervisory Insight: Managing Risks in Third-Party Payment

Processor Relationships (Summer 2011);

  (iv)  Payment Processor Relationships, FIL-3-2012 (Jan. 31, 2012); and

  (v)  Risk Management Guidance: Third-Party Relationships, OCC

Bulletin 2013-29 (Oct. 30, 2013).

 c.  Declaring that the following agency actions were arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A):

  (i)  Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008);

  (ii)  Payment Processor Relationships, FIL-127-2008 (Nov. 7, 2008);

(iii)     Supervisory Insight: Managing Risks in Third-Party Payment

Processor Relationships (Summer 2011);

(iv)     Payment Processor Relationships, FIL-3-2012 (Jan. 31, 2012); and

(v)     Risk Management Guidance: Third-Party Relationships, OCC

Bulletin 2013-29 (Oct. 30, 2013).

d.     Declaring that the Defendant agencies significantly changed the definition of reputation risk without the use of notice and comment rulemaking required by 5 U.S.C. § 706(2)(D).

e.     Declaring that the agencies have deprived plaintiffs of liberty without due process of law in violation of the Fifth Amendment to the U.S. Constitution and 5 U.S.C. 706(2)(B).

f.     Enjoining FDIC, OCC, the Board, and each agency's officers, employees, and agents, as well as those acting in concert with them, from implementing, applying, or taking any action whatsoever pursuant to the above agency actions; from relying on the novel and revised definition of reputation risk that they have adopted without notice and comment rulemaking; and from applying informal pressure to banks to encourage them to terminate business relationships with payday lenders.

g.     Enjoining FDIC, OCC, the Board and each agency's officers, employees, and agents, as well as those acting in concert with them, from harming the reputations of plaintiffs; from seeking to deprive plaintiffs of their access to financial services; and from seeking to deprive plaintiffs of their ability to pursue their chosen line of lawful business without due process of law.

64

h. Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

i. Granting such other and further relief as this Court deems just and proper.

Date: April 10, 2015                          Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper (Bar No. 248070)
ccooper@cooperkirk.com
David H. Thompson (Bar No. 450503)
Howard C. Nielson, Jr. (Bar No. 473018)
Harold S. Reeves (Bar No. 459022)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

65