UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                              )
COMMUNITY FINANCIAL SERVICES  )
ASSOCATION OF AMERICA, LTD.,  )
et al.,                       )
                              )
        Plaintiffs,           )
                              )
             v.               )    Case No. 14-CV-953 (GK)
                              )
FEDERAL DEPOSIT INSURANCE     )
CORPORATION, et al.,          )
                              )
        Defendants.           )
                              )
```

<u>MEMORANDUM OPINION</u>

Plaintiffs, Community Financial Services Association of America, Ltd. ("CFSA") and Advance America, Cash Advance Centers, Inc. ("Advance America"), allege that the Defendants, the Federal Deposit Insurance Corporation ("the FDIC"), the Board of Governors of the Federal Reserve System, and the Office of the Comptroller of the Currency and Thomas J. Curry, in his official capacity as the Comptroller of the Currency ("the OCC"), have violated the due process rights of CFSA's members. Plaintiffs seek declaratory and injunctive relief to prevent these alleged violations from continuing.

This matter is before the Court on Defendants' Corrected Motion to Dismiss for Lack of Associational or Organizational Standing or, in the Alternative, for Judgment on the Pleadings

("Motion to Dismiss"), in which Defendants seek dismissal of CFSA as a party to this case.   [Dkt. No. 75].   Upon consideration of the Motion, Opposition, Reply, and the entire record herein, the Motion to Dismiss is **granted**.[1]

## I.    Background
### A. Factual Background

The basic facts of this case were fully discussed in the Court's prior Memorandum Opinion on Defendants' Motions to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Failure to State a Claim.   CFSA v. FDIC, 132 F. Supp. 3d 98, 105-107 (D.D.C. 2015).   Consequently, an abbreviated discussion of the facts follows.

Plaintiffs are CFSA, an association of payday lenders, and Advance America, a payday lender and member of CFSA.   Id., 132 F. Supp. 3d at 105.   Defendants are agencies of the United States Government that have been delegated regulatory authority over various parts of the United States banking system.   Id. at 106.

Plaintiffs allege that Defendants participated and continue to participate in a campaign to force banks to terminate their business relationships with payday lenders, known as "Operation Choke Point" and initiated by the United States Department of Justice.   Id. at 106-107.   Defendants allegedly forced banks that

---

[1] See Section I.B, Procedural Background, infra, for a detailed history of the relevant briefs.

they supervise to terminate relationships with CFSA's members, "by first promulgating regulatory guidance regarding reputation risk,' and by later relying on the reputation risk guidance 'as the fulcrum for a campaign of backroom regulatory pressure seeking to coerce banks to terminate longstanding, mutually beneficial relationships with all payday lenders.'" Id.

### B. Procedural Background

On June 5, 2014, Plaintiffs filed their original Complaint, [Dkt. No. 1], which they amended on July 30, 2014, [Dkt. No. 12], alleging that Defendants had violated the Administrative Procedure Act ("APA") and CFSA's members' right to procedural due process under the Fifth Amendment to the United States Constitution. CFSA, 132 F. Supp. 3d at 107.   Defendants then filed Motions to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Failure to State a Claim, [Dkt. Nos. 16, 17, & 18].   Id.

On September 25, 2015, the Court issued a Memorandum Opinion ("Memorandum Opinion"), granting in part and denying in part Defendants' Motions.   CFSA, 132 F. Supp. 3d 98.   The Court held that Plaintiffs had failed to state a claim under the APA, and dismissed all claims brought pursuant to it.   However, Plaintiffs could continue litigating their due process claims, see id., under the theory that the stigma caused by Operation Choke Point deprived them of a protected interest in liberty or property.   Id. at 123-

3

24 (citing <u>Paul v. Davis</u>, 424 US 693, 708 (1976) & <u>Gen. Elec. Co.</u> <u>v. Jackson</u>, 610 F.3d 110, 121 (D.C. Cir. 2010)).

Plaintiffs then filed a Second Amended Complaint ("SAC"), alleging facts and claims essentially indistinguishable from those contained in their earlier complaints.[2] [Dkt. No. 64]. Each Defendant filed an Answer to the Second Amended Complaint. [Dkt. Nos. 65, 66, & 67].

On October 29, 2015, Defendants filed a Motion to Dismiss Plaintiff CFSA for Lack of Associational and Organizational Standing or, in the Alternative, a Motion for Judgment on the Pleadings, [Dkt. No. 73], which they corrected on November 6, 2015. [Dkt. No. 75]. Defendants seek dismissal only of Plaintiff CFSA for lack of standing, and do not challenge the standing or seek dismissal of Plaintiff Advance America. Plaintiffs filed an Opposition on November 12, 2015, [Dkt. No. 76] and Defendants filed their Reply on November 19, 2015. [Dkt. No. 77].

---

[2] Despite the Court's dismissal of Plaintiffs' APA claims, Plaintiffs again included them in their Second Amended Complaint. <u>See</u> SAC ¶¶ 116-197 (Counts I-III, V-VII, IX-XI all brought pursuant to the APA). As those claims were dismissed, they are no longer before the Court and are not the subject of this motion. Only Plaintiffs' due process claims, claims IV, VIII, and XII, are properly before the Court.

## II.   Standard of Review
### A. Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1)

As courts of limited jurisdiction, federal courts possess only those powers specifically granted to them by Congress or directly by the United States Constitution. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). The plaintiff bears the burden of establishing by a preponderance of the evidence that the Court has subject matter jurisdiction to hear the case. See Shuler v. United States, 531 F.3d 930, 932 (D.C. Cir. 2008). In deciding whether to grant a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), the court must "accept all of the factual allegations in [the] complaint as true." Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 54 (D.C. Cir. 2005) (quoting United States v. Gaubert, 499 U.S. 315, 327 (1991)).

Nonetheless, "[t]he plaintiff's factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001). The Court may also consider matters outside the pleadings, and may rest its decision on its own resolution of disputed facts. See Herbert v. Nat'l Acad. of Sci., 974 F.2d 192, 197 (D.C. Cir. 1992).

### B. Motion for Judgment on the Pleadings Under Fed. R. Civ. P. 12(c)

"After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Under Rule 12(c), the court must accept the nonmovant's allegations as true and should view the facts in the light most favorable to the nonmovant." Bowman v. District of Columbia, 562 F. Supp. 2d 30, 32 (D.D.C. 2008) (internal citations and quotation marks omitted). As with a motion to dismiss for lack of subject-matter jurisdiction, "the court may consider the motion based on the complaint standing alone or, where necessary, on the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Id. at 32-33 (internal citations and quotation marks omitted).

"The court should grant a motion for judgment on the pleadings if the movant is entitled to judgment as a matter of law." Id. at 32.

### III. Analysis

Defendants challenge the standing of Plaintiff CFSA, arguing that it no longer has Article III standing following this Court's dismissal of the Plaintiffs' APA claims. Mot. to Dismiss at 1. Defendants argue that CFSA cannot establish that it has standing to pursue any of the due process claims that remain. Mot. to

6

Dismiss at 1-2.   Specifically, Defendants contend that CFSA lacks associational standing, organizational standing, or third party standing.[3]   Id.

CFSA counters that it satisfies the requirements for all three types of standing.  Furthermore, CFSA argues that Defendants waived these arguments by failing to raise them in their original Motions to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Failure to State a Claim.

### A. CFSA Lacks Standing
#### i. CFSA Must Establish that It Has Article III Standing

Article III of the Constitution limits the jurisdiction of federal courts to certain "Cases" and "Controversies." See U.S. Const. art. III, § 2.  "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  Clapper v. Amnesty Int'l USA, 133 S.Ct. 1138, 1146, (2013) (internal citations omitted).  "One element of the case-or-controversy requirement is that plaintiffs must

---

[3] In ruling on Defendants' first Motion to Dismiss, this Court held that the Plaintiffs collectively had standing to raise these due process claims.  CFSA, 132 F. Supp. 3d at 108-115. However, in doing so, the Court did not expressly distinguish between CFSA's and Advance America's respective standing to raise these claims, nor did the parties themselves raise the issue. See id. and [Dkt. Nos. 16, 17, 18, 23, 41, 44 & 46].

establish that they have standing to sue." Id. (internal quotation marks and citation omitted).

"[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact . . . which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, (1992) (internal quotation marks, citations, and footnotes omitted).

### ii. CFSA Lacks Associational Standing

Under the theory of associational standing, an organization may sue as a representative of its members even if it lacks standing to sue in its own right. See Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343 (1977). Three elements are required to establish associational standing: 1) at least one of the organization's members has standing to sue in her own right; 2) the interests the organization seeks to protect in its lawsuit are germane to the organization's purpose; and 3) "neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." Id., at 343;
Air Transp. Ass'n v. Reno, 80 F.3d 477, 483 (D.C. Cir. 1996).

The Court has already ruled that CFSA's members have standing
to pursue the due process claims remaining in this lawsuit. CFSA,
132 F. Supp. 3d at 108-15. Furthermore, it is self-evident that
the interest CFSA seeks to protect--the continued viability of
payday lending--is germane to its organizational purpose, advocacy
on behalf of payday lenders. Thus, to establish associational
standing under Hunt, CFSA need only show that participation of its
members in this lawsuit is not required. As discussed below, it
fails to do so.

> a. **CFSA's claims that its members' due process
> rights have been violated cannot be litigated
> without the participation of its members**

To satisfy the third prong of Hunt CFSA must show that
"neither the claim asserted nor the relief requested requires the
participation of individual members in the lawsuit." 432 U.S. at
343. Accordingly, Plaintiffs' claims are the starting point for
determining whether member participation is required.

Plaintiffs allege that Operation Choke Point violates the due
process rights of CFSA's members. See SAC ¶¶ 141-47, 173-79, 198-
204 (Claims IV, VIII, XII). These due process claims are brought
under the so-called "stigma-plus rule." General Elec. Co. v.
Jackson, 610 F.3d at 121 (citing Paul v. Davis, 424 U.S. at 708).

9

Under the stigma-plus rule a due process violation exists where the plaintiff can show, "in addition to reputational harm, that (1) the government has deprived them of some benefit to which they have a legal right . . . or (2) the government-imposed stigma is so severe that it 'broadly precludes' plaintiffs from pursuing 'a chosen trade or business.'" Id. (quoting Paul v. Davis, 424 U.S. at 708).

In its Memorandum Opinion the Court held that Plaintiffs could succeed under the first prong of the stigma-plus test by showing that Operation Choke Point deprived CFSA's members of a right to hold a bank account. CFSA, 132 F. Supp. 3d at 123-24 (citing National Council of Resistance of Iran v. Department of State, 251 F.3d 192, 204 (D.C. Cir. 2001); Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971)). Alternatively, the Court held that Plaintiffs could succeed under the second-prong by showing that "the continued loss of banking relationships," caused by Operation Choke Point, "may preclude them from pursuing their chosen line of business." Id.

It is quite evident that significant participation by CFSA's members is required under either theory. Central to both of CFSA's theories of the case is that its members have lost banking relationships as a result of Operation Choke Point. Thus, to prove its claims CFSA must provide evidence that: 1) Operation Choke

Point stigmatized CFSA's members; 2) that CFSA's members lost banking relationships; and 3) that the loss of those banking relationships was caused by the stigma generated by Operation Choke Point.

Even if it is possible that Plaintiffs could show that Operation Choke Point had stigmatized CFSA's members without significant member participation,[4] that alone would be insufficient to prove their claims.  See General Electric, 610 F.3d at 121 ("stigma alone is insufficient to invoke due process protections").

Instead, to show that they had actually lost banking relationships and those losses were caused by Operation Choke Point would require significant and extensive participation by CFSA's members.  First, member-specific evidence is necessary to show that CFSA's members have, in fact, lost banking relationships. For example, members would have to present individualized "documentation regarding the allegedly lost accounts, including the deposit agreements."  Mot. to Dismiss at 16.

Second, in order to establish that it was the stigma generated by Operation Choke Point that caused those losses, rather than

---

[4] For example, Plaintiffs could attempt to show that Operation Choke Point had stigmatized the entire payday lending industry relying primarily on evidence of the words and actions of Defendants.

some other cause, individual banks would almost certainly be required to provide evidence regarding their reasons for terminating banking relationships with CFSA's members.  This might include communications between the banks and CFSA's members, see id., along with the evidence of the banks' own reasoning, such as internal memoranda or emails.   Both require CFSA's members to introduce individualized evidence of their lost banking relationships.

Furthermore, establishing that CFSA's members can no longer pursue their chosen line of business will also almost certainly require individualized evidence of their respective business activity before and after Operation Choke Point, along with evidence as to the myriad factors relevant to the success or failure of their business.[5]  Mot. to Dismiss at 7.

It is impossible to see how any of this could be accomplished without significant member participation.   See Friends for American Free Enterprise Ass'n v. Wal-Mart Stores, Inc., 284 F.3d 575, 577 (5th Cir. 2002) (association's claims regarding defendants' interference in bilateral relationships between

---

[5] Defendants also point out that testing Plaintiffs' claims may require "documentation of each member's finances over the past several years . . . interrogatories about any other lost relationships or business opportunities that could have affected [members'] financial prospects, and notice depositions to adduce each member's present ability to do business."  Mot. to Dismiss at 15-16.

12

association members and third parties not involved in the lawsuit are too fact-specific to be resolved without individual member participation).[6]

### b. CFSA's request for injunctive, rather than monetary, relief is insufficient to establish that member participation is not required

In spite of this, Plaintiffs argue that because they seek injunctive relief, rather than monetary damages, member participation is not required. Opp'n at 11-12. For this proposition Plaintiffs cite United Food and Commercial Works Union Local 751 v. Brown Group, Inc., in which the Court noted that in

---

[6] Indeed, the facts of Friends for American Free Enterprise seem directly on point. In that case an association of "manufacturers' representatives" sued Sam's Club for tortious interference. The manufacturers' representatives were quintessential middlemen, selling the goods produced by the manufacturers to third parties, such as Sam's Club. The representatives' contracts with the manufacturers had exclusivity clauses that prevented the manufacturers from selling their products directly to others. Sam's Club decided it would no longer purchase goods from the representatives, but would instead purchase them directly from the manufacturers. An association of manufacturers' representatives then sued on their behalf, in part to keep the members' identities secret. 284 F.3d at 576.

The court held that the association lacked associational standing because member participation was required to prove the underlying claims. Just as here, the associational plaintiff claimed that the defendant, Sam's Club, was exerting pressure on a third party not before the court, the manufacturers, in order to get the third party to terminate a bilateral relationship with the association's members, the manufacturers' representatives. The court held that resolution of the tortious interference claims required member participation because the defendant would need to be able to obtain information regarding the business relationship between the association's members and the third-party manufacturers. Id. at 576-77.

all prior cases where the Court had found that associational standing existed, plaintiffs had only sought injunctive relief. 517 U.S. 544, 554 (1996) ("Brown Group").

The logical fallacy inherent in Plaintiffs' argument is evident on its face. The fact that all cases in which associational standing has been found to exist involved a request for injunctive relief, does not mean that associational standing exists in all cases where an association seeks injunctive relief.

Indeed, such a rule is plainly precluded by the Court's holding in Hunt, which requires the Court to look not only at the type of relief requested but also at the nature of "the claim asserted" to determine whether member participation is required, a requirement repeatedly confirmed since Hunt was decided. Hunt, 433 U.S. at 343; see also Rent Stabilization Ass'n v. Dinkins, 5 F.3d 591, 596 (2d Cir. 1993) ("the relief sought is only half of the story. . .we must also examine the claims asserted to determine whether they require individual participation."); Friends for American Free Enterprise, 284 F.3d at 577 (no associational standing even though plaintiffs only sought injunctive relief); Kansas Health Care Ass'n v. Kansas Dep't of Social and Rehab. Servs., 958 F.2d 1018, 1022 (10th Cir. 1992) (no associational standing even though plaintiffs only sought injunctive relief).

14

Thus, the mere fact that Plaintiffs seek injunctive rather than monetary relief does not mean that member participation is not required in <u>this</u> lawsuit.

### c. This defect cannot be cured through sampling

Plaintiffs argue that this defect can be overcome by sampling --i.e. by taking evidence from a representative sample of CFSA's members - without violating <u>Hunt's</u> third prong. Opp'n at 17 (arguing that "courts have repeatedly upheld associational standing where, as here, 'an association plaintiff can prove its case with a sampling of evidence from its members'" (quoting <u>Association of American Physicians & Surgeons, Inc. v. Texas Medical Bd.</u>, 627 F.3d 547, 551-552 (5th Cir. 2010))).

Plaintiffs are correct that numerous courts have held that the third prong of <u>Hunt</u> may be satisfied even though some minimal degree of member participation is necessary. <u>See e.g.</u> <u>Hospital Council v. Pittsburg</u>, 949 F.2d 83, 89 (3d Cir. 1991); <u>Retired Chicago Police Ass'n v. City of Chicago</u>, 7 F.3d 584 (7th Cir. 1993); <u>see also</u> <u>Association of American Physicians & Surgeons, Inc.</u>, 627 F.3d at 551-52 (providing an overview of various Circuits' approaches to allowing sampling). Those courts have held that a representative sample of members could provide evidence without violating <u>Hunt's</u> third prong. <u>See</u> <u>Association of American Physicians & Surgeons, Inc.</u>, 627 F.3d at 551-52.

There does not appear to be any bright-line rule regarding at
what point sampling violates Hunt's third prong.  See id. at 552
(differences in various Circuits' approaches "are more of degree
than kind").  Instead, it is a discretionary inquiry as to whether
it would be more efficient to allow sampling, rather than require
each member to bring a claim individually.  See Alliance for Open
Society International v. U.S. Agency for International
Development, 651 F.3d 218, 229 (2d Cir. 2011).  A number of factors
are relevant to this inquiry.

Typically, sampling is appropriate where only "minimal
participation from individual members" is required to prove the
claim.  Id. (internal quotation marks and citations omitted).
Thus, sampling is appropriate in a case where a "discrete pattern
of conduct . . . [is] alleged to have applied equally against a
large number of association members," such that "once proved as to
some, the violations would be proved as to all."  Id.

A related factor is whether the claims present "pure questions
of law" or, instead, are "fact-specific."  See Friends for American
Free Enterprise Ass'n, 284 F.3d at 577.  Thus, Courts have
repeatedly held that the third prong of Hunt is not violated where
the claim involves a question of law.[7]  Id.; Playboy Enterprises,

_____

[7] Another parallel is the difference between facial and as-applied
challenges.  Facial challenges do not ordinarily require
individual member participation but as-applied challenges

16

Inc. v. Public Service Com'n of Puerto Rico, 906 F.2d 25, 35 (1st Cir. 1990) (member participation is not required where the case involves a "question of law which is not particular to each member of the Association"); Bano v. Union Carbide Corp., 361 F.3d 696, 714 (2d Cir. 2004) (member participation is not required where "organization seeks a purely legal ruling"); but see Retired Chicago Police Ass'n v. Chicago, 7 F.3d 584, 601 (third prong of Hunt satisfied even though claims "were not premised on pure questions of law"). In contrast, Courts have concluded that member participation is required - and thus the third prong of Hunt is violated – where a fact-specific inquiry is necessary to establish a violation. Friends for American Free Enterprise Ass'n, 284 F.3d at 577.

Finally, courts have concluded that sampling does not violate Hunt's prohibition on member participation where the sample evidence focuses on the conduct of the defendant to establish a

---

ordinarily do. See Kansas Health Care Ass'n, 958 F.2d at 1022 (individual participation not required where violation can be adduced solely by looking at terms of agency policy or practice (discussing AMISUB (PSL), Inc. v. Colorado Dep't of Social Servs., 879 F.2d 789 (10th Cir. 1989)) but individual participation is required where violation cannot be determined from reviewing policies "on their face"); Bano v. Union Carbide Corp, 361 F.3d 696, 714 (2d Cir. 2004)(member participation required in "as-applied" challenge (discussing Rent Stabilization Ass'n, 5 F.3d at 596)); Free Speech Coalition, Inc. v. Attorney General, 787 F.3d 142, 153-54 (3d Cir.) (as-applied challenge under First Amendment requires member participation to establish violation), rev'd on other grounds by 825 F.3d 149 (3d Cir. 2016).

violation of law, rather than on the extent of plaintiff's injuries. Pennsylvania Psychiatric Soc. v. Green Spring Health Services, Inc., 280 F.3d 278, 286 (3d Cir 2002) (limited member participation does not defeat standing where sample evidence is about "methods" employed by Defendants and used to prove "systemic" conduct by Defendants); Alliance for Open Society, 651 F.3d at 229 (finding associational standing where "it is the conduct of Defendants . . . that will be the primary subject of inquiry"); Retired Chicago Policy Ass'n v. Chicago, 7 F.3d 584, 602-03 (7th Cir.) (limited member participation does not defeat associational standing where sample evidence focuses on whether defendants engaged in alleged conduct).

Even Hospital Council of Western Pennsylvania v. Pittsburgh, 949 F.2d 83 (3d Cir. 1991), the case on which Plaintiffs rely so heavily, is understood to allow for limited member participation where the sample evidence was used to prove the conduct of the defendant. See Retired Chicago Policy Ass'n, 7 F.3d at 603 ("In that case, at issue was whether the defendant governmental entities had pursued the policy of which the plaintiffs complained; the court believed that issue could be answered through the evidence submitted by, among others, some of the parties.").

The Court concludes that sampling is inappropriate in this case, as all of the relevant factors suggest that no efficiencies

18

will be gained by allowing CFSA to litigate this matter, rather than having individual members litigate their own claims.

First, Plaintiffs' stigma-plus claims do not involve pure questions of law, but instead, are highly fact-sensitive. Whether any individual member has suffered a loss of banking relationships and whether that loss was caused by Operation Choke Point turns on unique facts that are specific to that member, such as what reasons the individual bank gives for terminating the relationship.

Second, this is not a case where sample evidence can be limited to the conduct of the Defendants. As the Court has already explained, the Defendants' conduct is only one of the elements in establishing a due process violation under the stigma-plus test.

Indeed, CFSA's own pleadings confirm that individual participation is required in this case. See SAC ¶ 14 ("*numerous* CFSA members have lost their business relationships with banks" (emphasis added)). By stating that not all of its members have lost banking relationship CFSA has clearly demonstrated that Operation Choke Point did not have a uniform effect on CFSA's members. Therefore, this is not a case where sample evidence can establish violations that "once proved as to some [members] . . . would be proved as to all." See Association of American Physicians & Surgeons, Inc., 627 F.3d at 552.

Finally, the Court believes that sampling is likely to be inappropriate where an organization's membership is as small as CFSA's.  Where an organization contains only 41 members, as CFSA does, a statistically significant sample size includes virtually all members.  Indeed, any smaller sub-sample of members raises the risk of choosing an unrepresentative sample, either through inadvertence or cherry-picking by the plaintiff.  Thus, a sample of sufficient size to be representative will not be significantly more efficient than bringing the case individually, and any smaller sample is likely to be unrepresentative and misleading.

Consequently, all of the relevant factors suggest that it will be no more efficient to have CFSA litigate this case than to have members pursue their claims individually.  Association of American Physicians & Surgeons, Inc., 627 F.3d at 552-53 (third prong of Hunt is concerned with "whether an association or its individual members are better positioned to present a case" and judicial efficiency).  Therefore, as CFSA's claims so clearly "require[] the participation of individual members in the lawsuit," the Court concludes that CFSA lacks associational standing.  See Hunt, 432 U.S. at 343.

### iii. CFSA Lacks Organizational Standing

Additionally, rather than suing on behalf of its members, an organization may sue on its own behalf to protect against alleged

violations of its own interests.  Nat'l Treasury Employees Union

v. United States, 101 F.3d 1423, 1427-28. (D.C. Cir. 1996) (citing

Havens Realty Corp. v. Coleman, 455 U.S. 363, 378, (1982)).  To do

so, the organization must satisfy each of the traditional three

prongs of the standing inquiry - injury in fact, causation, and

redressability.  Id. at 1427.  However, the alleged injury cannot

simply be an injury to its members' interests.  Instead, it must

be a "concrete and demonstrable injury to [the organization's]

activities."  Id.

CFSA alleges two distinct injuries which it argues satisfy

the first prong of injury in fact.  First, CFSA alleges that it is

receiving fewer dues payments from members as a result of Operation

Choke Point.  Opp'n at 28, n.8.  Second, CFSA alleges that, as a

result of Operation Choke Point, it has had to divert significant

resources from its traditional activities to assist members who

have been adversely affected.  Opp'n at 27.

> ### a. CFSA's allegations that it has lost membership dues are too speculative to establish causation or redressability

The parties dispute whether Plaintiffs' loss of membership

dues, caused by the Defendants' actions, constitutes a cognizable

injury in fact.  See Opp'n at 28; Mot. to Dismiss at 19-20.  Each

party musters a number of cases seeking to show that it is correct.[8]
Yet, neither cites to a decision of this Circuit's Court of Appeals
that conclusively resolves the issue.

Even if the Court were to assume that a loss of membership
dues was a cognizable injury in fact, it is evident that Plaintiffs
cannot show that this injury was caused by Operation Choke Point
or that an order from this Court would redress it.

"When a plaintiff's asserted injury arises from the
Government's regulation of a third party that is not before the
court, it becomes substantially more difficult to establish
standing. Because the necessary elements of causation and
redressability in such a case hinge on the independent choices of
the regulated third party, it becomes the burden of the plaintiff
to adduce facts showing that those choices have been or will be
made in such manner as to produce causation and permit

---

[8] Opp'n at 28 n.8 (citing Taxation with Representation of
Washington v.Regan, 676 F.2d 715, 722-23 (D.C. Cir. 1982), rev'd
on other grounds, 461 U.S. 540 (1983); Construction Indus. Ass'n
of Sonoma Cnty. v. City of Petaluma, 522 F.2d 897, 903 (9th Cir.
1975); National Treasury Emps. Union v. IRS, 2006 WL 416161, at *2
(D.D.C. Feb. 22, 2006); NAACP v. Acusport Corp., 210 F.R.D. 446,
457 (E.D.N.Y. 2002); Tiano v. County of Santa Clara, 1994 WL
618467, at *6 (N.D. Cal. Oct. 19, 1994) Richards v. New York State
Dep't of Corr. Servs., 572 F. Supp. 1168, 1179 (S.D.N.Y. 1983));
Mot. to Dismiss at 19 (asserting that loss of dues is a
"derivative" harm and therefore non-cognizable as an Article III
injury (citing Petro-Chem Processing, Inc. v. EPA, 866 F.2d 433,
435 n.2 (D.C. Cir. 1989); Bensman v. United States Forest Serv.,
408 F.3d 945, 948 n.2 (7th Cir. 2005); Delta Air Lines, Inc. v.
Export-Import Bank, 85 F. Supp. 3d 250, 262 (D.D.C. 2015)).

redressability of injury. In other words, mere unadorned
speculation as to the existence of a relationship between the
challenged government action and the third-party conduct will not
suffice to invoke the federal judicial power." National Wrestling
Coaches Assn' v. Dept. of Education, 366 F.3d 930, 938 (D.C. Cir.
2004); see also Clapper v. Amnesty Intern. USA, 133 S. Ct. 1138,
1150 (2013) (expressing a "reluctan[ce] to endorse standing
theories that require guesswork as to how independent
decisionmakers will exercise their judgment.").

Previously, this Court held in its Memorandum Opinion that
Plaintiffs' allegations were sufficient to establish standing.
CFSA, 132 F. Supp. 3d at 111-15. The Court held that Plaintiffs'
allegations established causation, by alleging that Defendants'
actions had caused third-party banks, who are not parties to this
litigation, to terminate their business relationships with CFSA's
members. Id. The Court also found that a decision in Plaintiffs'
favor could redress this injury by enabling Plaintiffs to once
again access the banking system, even if their original banks did
not restore the terminated banking relationships. Id.

Plaintiffs now ask that the Court go even further and find
that the increased costs CFSA's members suffered because of the
alleged loss of banking relationships in turn caused those members
to either withdraw from CFSA or to reduce their membership level

23

within the association, resulting in lower dues.  See Opp'n at 28-
29, n.8.  Plaintiffs' argument fails because they cannot show
either causation or redressability.

First, CFSA has failed to allege any facts tending to show a
causal relationship between Operation Choke Point and its
decreased membership revenue.  CFSA names multiple members who
allegedly have lost banking relationships as a result of Operation
Choke Point, but fails to name a single member who has reduced its
dues payments as a result of such losses.  See SAC. Similarly,
CFSA has submitted numerous declarations from members who allege
that they have lost banking relationships as a result of Operation
Choke Point, but not one alleges that Operation Choke Point caused
it to reduce its dues payments to CFSA.  See various declarations
[Dkt. Nos. 23-1, 23-2, 23-3, 23-4, 23-5, 23-6, 23-8].

Indeed, it appears just as plausible that CFSA's members,
faced with the allegedly existential threat of Operation Choke
Point, would maintain or increase their contributions to CFSA
because CFSA's very mission is to defend them from harmful
regulatory actions.  Absent any tangible evidence, it is "mere
unadorned speculation" to infer a causal link between Operation
Choke Point and the alleged reduction in members' dues payments.
See National Wrestling Coaches Ass'n, 366 F.3d at 838; Food and
Water Watch v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (a court

need not "accept inferences that are unsupported by facts set out in the complaint" (internal citations and quotation marks omitted)).

Unable to show that Operation Choke Point has caused a reduction in membership dues, it is essentially impossible for CFSA to establish redressability. Furthermore, even if CFSA could establish causation, it is entirely unclear that a court order, ending Operation Choke Point, would cause CFSA's members to return to paying their previous level of dues. Indeed, just as with Plaintiff's arguments regarding causation, the Court can imagine an equally plausible scenario in which the Court orders a termination of Operation Choke Point and CFSA's members decline to resume their prior dues payments because the danger has passed. [9]

---

[9] This absence of causation and redressability distinguishes the present case from many of those that Plaintiffs cite for the proposition that a loss of membership dues constitutes an Article III injury.  See Opp'n at 28, n.8 (citing National Treasury Employees Union v. IRS, 2006 WL 416161, *2 (D.D.C. Feb. 22, 2006) ("NTEU"); Construction Industry Ass'n of Sonoma v. Petaluma, 522 F.3d 897, 903-04 (9th Cir. 1975)).

For example, in NTEU the Plaintiff union challenged the firing of union members and the court found standing on the basis of a loss of union dues.  2006 WL 416161 at *2.  The court held that the loss was necessarily caused by the firing of union members and was redressable because if the members were reinstated they would be required to begin paying dues once again.  Id.

Similarly, in Petaluma the Plaintiff Construction association challenged a regulation capping the number of dwellings that could be built annually and the court found standing on the basis of a

The Court is mindful of the Supreme Court's and the Circuit Court of Appeals' repeated admonitions not to speculate as to how third parties might respond to a court order in order to manufacture standing. See Food and Water Watch, 808 F.3d at 931 ("when considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)"); National Wrestling Coaches Ass'n, 366 F.3d at 838; Clapper, 133 S. Ct. at 1150.  In this case, it is entirely speculative as to whether the alleged reduced membership dues were caused by Operation Choke Point or could be redressed by an order of this Court.  Therefore, CFSA cannot establish organizational standing on the basis of that alleged injury.

### b. CFSA's alleged reprogramming of organizational resources in response to Operation Choke Point is not a cognizable Article III injury

CFSA also alleges that it has standing because Operation Choke Point frustrates CFSA's mission and CFSA has had to expend resources to combat that harm.  Opp'n at 25-27 (citing National

_____

loss of membership dues.  Petaluma, 522 F.3d at 903-04.  Because membership dues were a fixed percentage of revenues, the cap on building activity necessarily caused a reduction in dues and lifting the cap would necessarily redress that harm.  Id.

Treasury Emps. Union v. United States, 101 F.3d 1423, 1430 (D.C. Cir. 1996)).

In assessing an organization's standing it is insufficient to show that the organization's "mission has been compromised" by the challenged action.    Food and Water Watch, 808 F.3d at 919. Instead, it must show the challenged action has "impeded" the organization's own activities.    Id.   In other words, a showing of injury requires "more than simply a setback to the organization's abstract social interests." Nat'l Ass'n of Home Builders v. EPA, 667 F.3d 6, 11 (D.C. Cir. 2011).

This requires a "two-part inquiry—'we ask, first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm.'" Food and Water Watch, 808 F.3d at 919 (quoting PETA v. USDA, 797 F.3d 1087, 1093 (D.C. Cir. 2015)).   "To allege an injury to its interest, an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services in order to establish injury in fact. An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an inhibition of the organization's daily operations."   Id. (internal quotations and citations omitted).

"[A]n organization's use of resources for . . . advocacy is not sufficient to give rise to an Article III injury." See Food & Water Watch, 808 F.3d at 920.  "Furthermore, an organization does not suffer an injury in fact where it expends resources to educate its members and others unless doing so subjects the organization to operational costs beyond those normally expended." Id. at 920 (internal citations and quotations omitted).

The harms asserted by CFSA are not cognizable Article III injuries.  First, CFSA notes that its mission is to advocate on behalf of payday lenders in the legislative and regulatory arena, while Operation Choke Point is allegedly designed to put an end to payday lending, the very activity CFSA advocates on behalf of. Opp'n at 27.  CFSA contends that if that is not a direct conflict with its mission, then nothing ever would be.  Id.  While CFSA tries to characterize this as a unique organizational harm, it is nothing more than a "generalized grievance about the conduct of the Government." Food and Water Watch, 808 F.3d at 926.  Reduced to its essence, CFSA believes that payday lending is good and, necessarily, that this effort to allegedly eliminate payday lending is bad.  That is not an Article III injury.  Id.

Additionally, CFSA alleges that it has been forced to divert resources from its traditional lobbying activities and instead spend its resources advising its members on how to respond to

Operation Choke Point and negotiating with the banks on behalf of members. Id. Essentially, CFSA argues that it has been forced to curtail its traditional issue advocacy and engage in a new type of advocacy to respond to the threat posed by Operation Choke Point.

Yet, the Court of Appeals has repeatedly rejected the argument that impairment of an organization's ability to engage in issue-advocacy is a cognizable injury. See Center for Law and Educ. V. Dep't of Educ., 396 F.3d 1152, 1161-62 (D.C. Cir. 2005) (impairment of organization's ability to engage in "pure issue-advocacy" is not cognizable injury for standing purposes); National Taxpayers Union, Inc. v. U.S., 68 F.3d 1428, 1433; PETA, 797 F.3d at 1093-94. The courts have reasoned that an organization's interest in lobbying on behalf of its members is ordinarily indistinguishable from and identical to its abstract interest in having "a social goal furthered." National Taxpayers Union, Inc. v. U.S., 68 F.3d 1428, 1433. Harms to such a generalized interest are insufficiently concrete to rise to the level of a cognizable Article III injury.[10] Id.; PETA, 797 F.3d at 1094.

---

[10] Indeed, in some instances, government actions that hinder the policy objectives of an organization may *help*, rather than harm, the organization as an institution, by energizing its members or by giving it new opportunities to carry out its mission. See Elec. Privacy Info. Ctr. v. Dep't of Educ., 48 F. Supp. 3d 1, 23 (D.D.C. 2014) ("Here, the Final Rule has not impeded EPIC's programmatic concerns and activities, but fueled them. And the expenditures that EPIC has made in response to the Final Rule have not kept it from pursuing its true purpose as an organization but have

Consequently, CFSA has failed to establish that it has organizational standing.

### iv. CFSA lacks Third Party (*Jus Tetrii*) Standing

Defendants argue that even if Plaintiffs can establish organizational standing they still fail to satisfy the requirements of third party standing, also known as *jus tetrii* standing. CFSA asserts that it has satisfied the requirements for third party standing.

The doctrine of third party standing is a prudential limitation on the ability of third parties to challenge actions that injure others who are not before the court. Lepelletier v. FDIC, 164 F.3d 37, 43 (D.C. Cir. 1999). It reflects the principle that, ordinarily, "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." Powers v. Ohio, 499 U.S. 400, 410 (1991).

A party seeking to clear the prudential hurdle of third party standing must first establish that it has Article III standing. See Sands v. NLRB, 825 F.3d 778, 784 (D.C. Cir. 2016) ("[plaintiff]

---

contributed to its pursuit of its purpose."); Nat'l Consumers League v. Gen. Mills, Inc., 680 F. Supp. 2d 132, 136 (D.D.C.2010) ("Challenging conduct like General Mills' alleged mislabeling is the very purpose of consumer advocacy organizations. As such, General Mills' alleged conduct does not hamper NCL's advocacy effort; if anything it gives NCL an opportunity to carry out its mission.").

must show that he has standing under Article III, and that he satisfies third party, or *jus tertii*, standing requirements."). Assuming she has done so, there are three factors that must be considered in "determining whether an individual may assert the rights of others: (1) 'the litigant must have suffered an injury in fact, thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute,' (2) 'the litigant must have a close relation to the third party,' and (3) 'there must exist some *hindrance* to the third party's ability to protect his or her own interests.'" Lepelletier, 164 F.3d at 43 (quoting Powers, 499 U.S. at 411) (emphasis added).

As the foregoing analysis makes clear, CFSA lacks Article III standing, and therefore, it does CFSA no good to establish third party standing. Furthermore, even if CFSA could establish Article III standing, CFSA's alleged hindrance to its members is insufficient to find that it has third party standing.

As the Court has already concluded, many if not all of CFSA's members would be required to participate in this lawsuit and to disclose information regarding their banking relationships. Thus, CFSA's members will be forced to disclose their identities and business practices in order to prove the claims in this lawsuit and the claimed hindrance will exist regardless of whether CFSA litigates these claims on behalf of its members or whether the

31

members are forced to bring them individually. Indeed, one of CFSA's members, Advance America, is already a party to this lawsuit, suggesting that this fear is not a hindrance to member participation at all. See Hodak v. Peters, 535 F.3d 899, 905 (8th Cir. 2008).

Additionally, CFSA fails to cite a single case holding that fear of future regulatory activity alone constitutes a cognizable hindrance.[11] As third-party standing is an exception to the rule that litigants must bring their own claims, it is looked on with disfavor, Kowalski v. Tesmer, 543 U.S. 125, 130 (2004), and the Court will not extend this exception.

Thus, the Court concludes that CFSA cannot meet the test for third party standing.

### v. Therefore CFSA cannot establish standing under any theory

In sum, the Court concludes that CFSA lacks either associational standing or organizational standing. Furthermore, the Court concludes that even if CFSA had organizational standing,

---

[11] Plaintiffs rely on Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 798 (1984). That case makes clear that fear is a hindrance unique to the context of a facial challenge under the First Amendment to a criminal statute. Id.

The other case on which Plaintiffs rely did not hold that fear alone constitutes a hindrance. See Pennsylvania Psychiatric Soc., Inc., 280 F.3d at 290 (concluding that fear "coupled with [the third parties'] potential incapacity to pursue legal remedies" constituted a hindrance).

it cannot satisfy the prudential requirements of third party standing, and therefore should not be allowed to litigate the due process claims of its members.   These conclusions rest on the standard of review for a motion to dismiss, pursuant to Rule 12(b)(1), or a motion for judgment on the pleadings, pursuant to Rule 12(c).

### B. Defendants Did not Waive their Standing Arguments

Finally, Plaintiffs argue that even if CFSA cannot satisfy either the third prong of the Hunt test for associational standing or the third prong of the test for third party standing, Defendants waived these arguments by failing to raise them in their original Motions to Dismiss.  Opp'n at 9-11, 29.  Plaintiffs argue that these prongs are merely prudential limits on standing, and therefore, that they do not survive the Supreme Court's decision in Lexmark International, Inc. v Static Control Components, Inc., 134 S. Ct. 1377 (2014).  Opp'n at 9-11, 29.

In Lexmark the Court held that the "zone of interests" test is not a standing requirement imposed by Article III and is therefore non-jurisdictional.  134 S. Ct. at 1386-88.   In doing so, the Court suggested that the entire doctrine of prudential standing may be illegitimate, noting that it "is in some tension with . . . the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging."

Id. at 1386 (quoting Sprint Communications, Inc. v. Jacobs, 134 S.Ct. 584, 591 (2013) (internal quotation marks omitted)); see also 15 Moore's Federal Practice 3d § 101.50 (describing Lexmark as "herald[ing] the demise of the prudential strand of standing").

Plaintiffs are correct that the tests for both associational and third party standing contain prudential elements. See Brown Group, 517 U.S. at 555 ("the associational standing test's third prong is a prudential one"); Kowalski, 543 U.S. at 129-30 (describing third party standing doctrine as prudential and not derived from limits of constitutional standing). Plaintiffs argue that in light of Lexmark, such prudential limits on standing are no longer jurisdictional. Opp'n at 9-11, 29. Plaintiffs contend that such non-jurisdictional arguments can be waived, and that Defendants did in fact waive them in this case, by failing to raise their associational standing and organizational standing arguments in their first set of Motions to Dismiss. Id.

Plaintiffs are also correct that Lexmark casts doubt on the vitality of prudential standing doctrines. See 15 Moore's Federal Practice 3d § 101.50; Sheet Metal, Air, Rail, and Transportation Workers Local Union 20 v. Van's Industrial Inc., 2015 WL 8180287 (N.D. In. December 7, 2015) (reviewing decisions in the Sixth, Seventh, Eleventh Circuits, all stating that Lexmark has cast doubt on the vitality of prudential standing).

However, just because a doctrine was labelled as a form of prudential standing prior to Lexmark, does not mean that it is necessarily non-jurisdictional after Lexmark.   For example, in Lexmark the Court held that while the prohibition on suits raising "generalized grievances" had previously been treated as a form of prudential standing, it is actually a form of constitutional standing.   Lexmark, 134 S. Ct. at 1387, n.3.

Most importantly, the Court in Lexmark expressly reserved the question of whether third-party standing is a form of prudential standing or is instead a form of constitutional standing.   Id.; see also United States v. TDC Management Corporation, Inc., 827 F.3d 1127, 1133 (D.C. Cir. 2016) (declining to decide whether, after Lexmark, the limitations on third-party standing are prudential).   And the Court of Appeals for the D.C. Circuit continues to treat associational standing as jurisdictional after Lexmark.[12]   See Sierra Club v. FERC, 827 F.3d 69, 65 (D.C. Cir. 2016).   Thus, the fact that both associational and third party standing have been labelled prudential in the past, does not establish what will happen in the future, post-Lexmark.

---

[12] This alone would seem to foreclose Plaintiffs' argument with regard to associational standing.  However, in Sierra Club, it was "unchallenged and clear" that plaintiffs had satisfied the third prong of the Hunt associational standing test.  Therefore, the question of whether the third prong of Hunt is prudential was not before the Court of Appeals.  827 F.3d at 65.

Fortunately, the Court need not enter this thicket. Implicit in Plaintiffs' contention that these defenses are non-jurisdictional and therefore waivable, is the assumption that Defendants could have and should have raised them in their Motions to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for *Failure to State a Claim* (emphasis added).

However, Rule 12(h)(2) unambiguously provides that an argument that is not raised in an initial Rule 12(b)(6) motion is not waived prior to the conclusion of the case. See Fed. R. Civ. P. 12(h)(2) (explaining that Rule 12(b)(6) arguments may be raised as late as trial). Indeed, Rule 12(h)(2) expressly provides that any defense that could be brought under Rule 12(b)(6) can later be raised in a Rule 12(c) motion for judgment on the pleadings. Defendants' present motion is just that – a Motion to Dismiss for Lack of Associational or Organizational Standing, or in the Alternative, *A Motion for Judgment on the Pleadings*. [Dkt. No. 75] (emphasis added).

Thus, Plaintiffs find themselves in a Catch-22 of their own making. Either the absence of associational and third party standing is jurisdictional, and therefore not waivable, or it is non-jurisdictional and therefore preserved according to Rule 12(h)(2). Either way, Plaintiffs' argument that Defendants have waived their arguments regarding CFSA's lack of associational and

third party standing are without merit.  See <u>Washington Alliance</u>

<u>of Technology Works v. Dep't of Homeland Sec.</u>, 156 F. Supp. 3d

123, n.1 (D.D.C. 2015) (holding that, after <u>Lexmark</u>, failure to

raise in a motion to dismiss what was formerly considered a

prudential standing argument does not waive the issue, may be

decided on the merits at summary judgment), <u>vacated as moot</u> 650

Fed. Appx. 13 (D.C. Cir. 2016).

## IV.   Conclusion

For the foregoing reasons, Defendants Motion to Dismiss is

**granted** and Plaintiff CFSA is **dismissed.**

December 19, 2016                *Gladys Kessler*

                                 Gladys Kessler
                                 United States District Judge

37