**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ADVANCE AMERICA, CASH ADVANCE
CENTERS, INC.,
135 North Church Street
Spartanburg, SC 29306,

CHECK INTO CASH, INC.,
201 Keith St., SW, Suite 80
Cleveland, TN 37311,

NCP FINANCE LIMITED PARTNERSHIP,
205 Sugar Camp Circle
Dayton, OH 45409,

NCP FINANCE OHIO, LLC,
205 Sugar Camp Circle
Dayton, OH 45409,

NORTHSTATE CHECK EXCHANGE,
2555 Bechelli Lane,
Redding, CA 96002,

PH FINANCIAL SERVICES, LLC,
1855 Bowles Avenue
Fenton, MO 63026,

and

RICHARD NAUMANN,
P.O. Box 1229
Murphys, CA A95247,

      Plaintiffs,

   v.

FEDERAL DEPOSIT INSURANCE
CORPORATION,
550 17th Street, N.W.
Washington, D.C. 20429,

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

Civil Action No. 14-953

20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551,

OFFICE OF THE COMPTROLLER OF THE
CURRENCY,
Constitution Center
400 7th Street, S.W., Suite 3E-218
Washington, D.C. 20219,

and

THOMAS J. CURRY, in his official capacity
as the Comptroller of the Currency,
Constitution Center
400 7th Street, S.W., Suite 3E-218
Washington, D.C. 20219,

                              Defendants.

## THIRD AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Advance America, Cash Advance Centers, Inc. ("Advance America"), Check

Into Cash, Inc. ("Check Into Cash"), NCP Finance Limited Partnership and NCP Finance Ohio,

LLC (collectively, "NCP Finance"), Northstate Check Exchange, PH Financial Services, LLC

("PH Financial Services") and Richard Naumann, by and through the undersigned attorneys, file

this Third Amended Complaint against Defendants the Federal Deposit Insurance Corporation

("FDIC"); the Board of Governors of the Federal Reserve System ("the Board"); and the Office

of the Comptroller of the Currency, and Thomas J. Curry, in his official capacity as the

Comptroller of the Currency (collectively "OCC"). Plaintiffs seek declaratory and injunctive

relief to remedy the Defendants' deprivation of Plaintiffs' due process rights in violation of the

Fifth Amendment to the U.S. Constitution Plaintiffs hereby allege as follows:

## INTRODUCTION AND SUMMARY OF THE ACTION

1.     For millions of individuals across the country, payday lenders provide convenient access to small-dollar credit to address short-term financial needs. As former FDIC Chairman William Isaac has noted, for millions of borrowers, "these loans are less expensive than a series of overdrafts. They are less painful than the consequences of defaulting on an auto loan or a mortgage . . . [or] having the electricity and heat turned off only later to pay for having them turned on again." William Isaac, *Payday Crackdown Creates More Problems than It Solves*, AMERICAN BANKER, Feb. 18, 2014. Congress has acknowledged the need for short-term credit products, prohibiting federal regulators from imposing rate limitations on short-term loans. The Dodd-Frank Wall Street Reform and Consumer Protection Act ("the Dodd-Frank Act"), § 1027, Pub. L. 111-203, 124 Stat. 1376 (2010), *codified at* 12 U.S.C. § 5517(o).

2.     Plaintiffs are committed to responsible lending practices. Each of the Plaintiffs that has an active payday lending business is a member of the Community Financial Services Association of America, Ltd. ("CFSA"). In order to become a member of CFSA, a financial services firm must comply with both state and federal law and abide by a code of industry "best practices" developed by CFSA to ensure that consumers are treated ethically and responsibly. CFSA also supports and advocates legislation and regulation that serves consumers by ensuring their access to short-term credit while also providing consumer protections.

3.     Although Plaintiffs are part of a lawful and legitimate industry that serves the critical short-term credit needs of millions of American consumers, the Defendant regulatory agencies, with active support from the Department of Justice ("DOJ"), are engaged in a concerted campaign to drive them out of business by exerting back-room pressure on banks and other regulated financial institutions to terminate their relationships with payday lenders. Known as "Operation Choke Point," Defendants' campaign targets a variety of lawful businesses that are

3

disfavored by Defendants, such as firearms and tobacco sales, coin dealers, and dating services, but it is aimed primarily at the payday loan industry. As a recent report by the House Committee on Oversight and Government Reform concluded, "internal memoranda on Operation Choke Point clearly demonstrate that the Department's primary target is the short-term lending industry—an indisputably lawful financial service." STAFF OF H. COMM. ON OVERSIGHT & GOV'T REFORM, 113TH CONG., REP. ON THE DEP'T OF JUSTICE'S 'OPERATION CHOKE POINT': ILLEGALLY CHOKING OFF LEGITIMATE BUSINESSES? 5 (Comm. Print 2014) [hereinafter COMM. REP. ON OPERATION CHOKE POINT].

4.     To achieve their goal of eliminating the payday loan industry, the Defendant agencies have used their prudential "safety and soundness" regulatory authority over depository institutions to directly coerce those institutions and to pressure consumer credit reporting agencies to sever their long-standing and mutually beneficial banking relationships with Plaintiffs and other payday lenders. Internal agency documents reveal that Defendants' campaign against the payday lending industry (and other lawful but disfavored industries) is motivated by illicit bias and animus. The ostensible basis of the campaign, however, is that providing financial services to such industries exposes the banks to "reputation risk." According to informal "guidance documents" provided to the regulated institutions, "reputation risk" arises from "negative public opinion" about the bank's customer, and "any negative publicity involving the [bank's customer] . . . could result in reputation risk." FDIC, Financial Institution Letter: Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008).

5.     The Defendant agencies have not provided banks with any objective criteria, in their informal guidance documents or anywhere else, for measuring "negative public opinion" about a bank's customers or for otherwise determining when a particular customer, or an entire

category of customers, is sufficiently unpopular to present an unacceptable "reputation risk" to the bank's safety and soundness. Nor does Defendants' guidance on reputation risk distinguish between bank customers engaged in fraudulent or otherwise unlawful businesses or practices and customers engaged in lawful businesses and committed to ethical business practices. As the Chairman of the House Committee on Financial Services observed in a May 22, 2014 letter to Defendants, "[t]he introduction of subjective criteria like 'reputation risk' into prudential bank supervision can all too easily become a pretext for the advancement of political objectives, which can potentially subvert both safety and soundness and the rule of law." Letter from Rep. Jeb Hensarling, Chairman, H. Comm. on Fin. Servs., to Janet Yellen, Chair, The Federal Reserve System (May 22, 2014).

6.      Internal agency documents reveal that the Defendant agencies have employed a variety of back-room pressure tactics against regulated financial institutions, including warning them that continuing their relationships with payday lenders will result in harsh and prolonged examinations, reduced examination ratings, and/or other punitive measures. *See, e.g.*, Letter from M. Anthony Lowe, Regional Director, FDIC Chicago Regional Office to a depository institution subject to FDIC's supervisory authority (Feb. 15, 2013) (*available at* http://goo.gl/ZISdO4).

7.      Defendants' campaign has been targeted at the payday lending industry as a whole, indiscriminately seeking to choke off the banking services not only of unscrupulous payday lenders engaged in fraudulent or otherwise unlawful practices, but also of payday lenders that, like Plaintiffs, scrupulously abide by all state and federal laws and regulations applicable to their business and, moreover, regulate themselves according to a code of rigorous, self-imposed best practices. *See, e.g.*, *id.* (informing regulated bank that FDIC has "generally found that activities related to payday lending are unacceptable for an insured depository institution");

Email from Marguerite Sagatelian to two unnamed FDIC employees re "Payday Lending" (Mar. 8, 2013) (FDICHOGR00005179) (available at oversight.house.gov/ wp-content/uploads/2014/12/Appendix-1.pdf) (noting that FDIC was conducting "research into what avenues are available to the FDIC to take action against banks that facilitate payday lending" and that employees were "going to explore the BSA/Know Your Customer requirements to see if that would provide the FDIC with the means to get at payday lending").

8.      Numerous banks have yielded to Defendant's coercive regulatory pressure. As of the filing of this complaint, over 80 banking institutions have terminated their business relationships with Plaintiffs and other law-abiding payday lenders. Vested with broadly-worded statutory authority to promulgate standards to ensure the "safety and soundness" of financial institutions subject to their prudential oversight, the Defendant agencies promulgated broad rules requiring banks to adopt "appropriate" and "adequate" operational and managerial controls. They have elaborated on these vague regulatory requirements with a raft of informal guidance documents establishing a novel and even more subjective and pliable regulatory standard— "reputation risk"—issued without any notice, without any input from interested parties, and without the support of an administrative record. And they have relied, pretextually, on this vague standard to attempt to eliminate a lawful industry that they disfavor, threatening financial institutions with a range of adverse regulatory consequences, including punitive examinations and downgraded ratings, if they continue providing banking services to payday lenders. The Defendant agencies' actions deprive Plaintiffs of liberty interests without due process of law. These actions therefore must be set aside and permanently enjoined.

## JURISDICTION AND VENUE

9.      This action arises under the Due Process Clause of the Fifth Amendment to the

United States Constitution. The Court has subject-matter jurisdiction over these claims under 28

U.S.C. § 1331. The Court is authorized to issue the nonmonetary relief sought with respect to

these claims pursuant to the waiver of sovereign immunity provided by 5 U.S.C. § 702.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(A) and (B), because

this is an action against officers and agencies of the United States, and all of the Defendant

agencies reside in this judicial district; Comptroller Curry performs his official duties in this

judicial district; and a substantial part of the events or omissions giving rise to this action

occurred in this judicial district.

## PARTIES

11.     Plaintiff Advance America is a provider of payday loans and various other

consumer financial products and is a member of CFSA. It operates more than 2,300 stores in 29

states. It is a Delaware corporation headquartered in Spartanburg, South Carolina. Its principal

place of business is 135 North Church Street, Spartanburg, South Carolina 29306.

12.     Plaintiff Check Into Cash operates over 1,000 branch locations in 30 states. Check

Into Cash provides payday advances, in-store cash advances, title loans, check cashing services,

and Western Union® at these locations. Check Into Cash is a member of CFSA. Check Into Cash

is a Delaware Corporation headquartered in Bradley County, Tennessee. Its principal place of

business is 201 Keith St., SW, Suite 80, Cleveland, TN 37311.

13.     Plaintiff NCP Finance serves as a lender offering short-term, small-dollar loans

that are arranged for consumers by the country's largest credit services organizations, including

ACE Cash Express and Advance America. NCP is a member of CFSA. NCP Finance Limited

Partnership is an Ohio limited partnership. NCP Finance Ohio, LLC, is an Ohio limited liability company. Their principal place of business is 205 Sugar Camp Circle, Dayton, OH 45409.

14.     Plaintiff Northstate Check Exchange is a money service business located in Redding, CA. Northstate has been providing financial services to the local community since its founding in 1989. Northstate is a general partnership with its principal place of business located at 2555 Bechelli Lane, Redding, CA 96002.

15.     Plaintiff PH Financial Services is a family owned and operated business that offers payday loans and other alternative credit services at 51 branch locations throughout the United States. PH Financial Serivces is a member of CFSA. It is a Missouri corporation, with its principal place of business located at 1855 Bowles Avenue, Fenton, MO 63026.

16.     Plaintiff Richard Naumann was the sole owner and operator of Calaveras Cash. Calaveras Cash provided short-term small-dollar loans and check cashing services. Calaveras Cash was located at 253 S. Main Street, Angels Camp, CA 95222.

17.     The Defendant agencies' actions described herein have caused substantial injury to Plaintiffs. At the time of the filing of this Third Amended Complaint, Plaintiffs have experienced at least 36 instances of account closures as a direct result of the agency actions imposing burdensome requirements and grave uncertainties on banks that do business with payday lenders. Among the banks that have terminated banking relationships with Plaintiffs are: Bank of America, Bank Independent, BBVA Compass Bank, Cadence Bank, Capital One Bank, Chemical Bank, Citizens Bank, Fifth Third Bank, First Bank and Trust, First Citizens Bank, FirstMerit Bank, First Tennessee, Hancock and Whitney Banks, IBC Bank, J.P. Morgan Chase, MainSource Bank, PNC, RBS Citizens Bank, Shore Bank, South State Bank, Synovus Bank, Tri Counties Bank, Umpqua Bank, U.S. Bank, Wells Fargo, and Your Community Bank.

18.     These agency actions have also impaired Plaintiffs' ability to open and hold new

bank accounts and to establish new business relationships with banks and have thrown their

future operations into a state of uncertainty. In the case of Richard Naumann, the Defendant

Agencies' actions have already forced the closure of that Plaintiff's business. Plaintiffs have

attempted to establish new banking relationships with a plethora of different banks and, upon

information and belief, have been refused by a number of those banks as a result of Operation

Choke Point. Plaintiffs have expended substantial financial and human resources as a result. For

example, Advance America has spent substantial sums to implement alternative cash

management practices in markets where it no longer has access to a local bank. The other

Plaintiffs have incurred comparable expenses as they have sought to locate banks that remain

willing to serve payday lenders.

19.     Until the agency actions described herein are set aside and enjoined, Plaintiffs

will continue to be deprived of access to banking services that are essential to their business of

providing short-term credit to underserved communities.

20.     Defendant FDIC is, and was at all relevant times, a banking agency of the United

States government subject to the APA. *See* 5 U.S.C. § 551(1). FDIC is located at 550 17th Street,

N.W., Washington, D.C. 20429.

21.     Defendant Board is, and was at all relevant times, a banking agency of the United

States government subject to the APA. *See* 5 U.S.C. § 551(1). The Board is located at 20th Street

and Constitution Avenue, N.W., Washington, D.C. 20551.

22.     Defendant OCC is, and was at all relevant times, a banking agency of the United

States government, housed within the Department of the Treasury, and subject to the APA. *See* 5

U.S.C. § 551(1). OCC is located at Constitution Center, 400 7th Street, S.W., Suite 3E-218,

Washington, D.C. 20024.

23.     Defendant Thomas J. Curry is the Comptroller of the Currency. As chief officer

of the OCC, he exercises or delegates all the powers of the OCC, subject to oversight by the

Secretary of the Treasury. His official address is Constitution Center, 400 7th Street, S.W., Suite

3E-218, Washington, D.C. 20024. He is being sued in his official capacity.

## FACTUAL ALLEGATIONS

### The Payday Loan Industry

24.     A payday loan is an advance on the borrower's paycheck or other source of

income. Payday loans provide short-term credit to over nineteen million American households,

especially those that are underbanked, by bridging unexpected financial needs between income

installments. Payday loans are more readily available than more traditional forms of credit and

less costly than the informal credit systems on which many consumers must rely in the absence

of payday advances, such as overdraft protection, bounced checks, and late bill payment fees.

Simply put, a payday loan is a convenient and reasonably-priced vehicle for short-term financial

needs.

25.     Recognizing the importance of payday loans to millions of consumers and the

potential consequences of their misuse, most states—often consulting with plaintiffs and their

trade association—have passed consumer protection laws to ensure that loans are offered and

consumed responsibly. These laws may cap the amount of the loan or its fees, limit the number

of times a consumer may renew a loan, and/or require certain disclosures. As CFSA members,

Plaintiffs must hold a license and comply with the laws in every state in which they maintain a

storefront location and in every state in which their online customers reside. The Truth in

Lending Act, 15 U.S.C. § 1601 *et seq.*, also applies to payday loans, requiring full disclosure of the costs and terms of the loans in order to ensure that consumers have the information they need to make responsible borrowing decisions.

26.     In addition to complying with applicable state and federal laws, Plaintiffs Advance America, Check Into Cash, NCP Finance, Northstate, and PH Financial, as CFSA members, are required to abide by CFSA Best Practices. These best practices require lenders to make additional disclosures to customers, to advise them on the intended use of payday loans, and to give customers the right to rescind the transaction at no cost before the end of the next business day. The CFSA Best Practices also prohibit certain lawful practices, such as certain types of collection procedures, in an effort to better serve consumers. And to the extent permitted by state law, the CFSA Best Practices require lenders to offer extended repayment plans, at no additional cost, to any customer who is not able to repay his or her loan when it comes due.

27.     Many payday lenders offer other financial services in addition to payday lending, including bill payment, check cashing, installment loans, and prepaid debit cards. Like payday advances, these lines of business serve critical needs in underserved communities.

28.     Payday lenders rely on banking services to operate. When a prospective borrower applies for the loan—at a storefront location, or online—he or she typically provides a post-dated check or an electronic debit authorization for the value of the loan, plus a fee. The lender immediately advances the customer funds, then after a specified period of time, usually determined by the customer's next payday, the borrower returns to repay the loan and fee. But if the customer does not return, the terms of the transaction permit the lender to deposit the post-dated check or to execute the debit authorization. In order to have that security, the lender must

have a deposit account with a bank and/or access to the Automated Clearing House (ACH) network.

29.     Payday lenders also rely on banks to provide a range of other services, including but not limited to lines of credit, treasury services (accounts payable and receivable), and merchant services (credit and debit transactions).

### Federal Regulation of Lending Practices

30.     Both depository and nondepository financial institutions are subject to supervision and regulation by federal agencies when they engage in lending activities. Regulatory oversight serves two distinct purposes: to protect consumers and to ensure the safety and soundness of insured institutions and the stability of financial markets.

31.     These areas of responsibility are divided among an assortment of federal agencies, including Defendants FDIC, the Board, and OCC, as well as the Consumer Financial Protection Bureau ("CFPB"), which is an independent bureau within the Federal Reserve System.

32.     The Federal Deposit Insurance Act (FDIA), 12 U.S.C. § 1811 *et seq.*, vests the three Defendant agencies with power to set standards for the "safety and soundness" of insured depository institutions. The agencies are required to establish—by regulation or guideline— "standards relating to (A) internal controls, information systems, and internal audit systems . . . ; (B) loan documentation; (C) credit underwriting; (D) interest rate exposure; (E) asset growth; and (F) compensation, fees, and benefits" and "such other operational and managerial standards as the agency determines to be appropriate." 12 U.S.C. § 1831p-1(a). Violations of these standards can trigger various "safety and soundness" enforcement powers, which may even culminate in the agencies taking over the banks. *Id.* §§ 1831o(f)(2), 1831p-1(e)(1).

33.     Each of the Defendant agencies is responsible for prescribing standards for and monitoring the compliance of depository institutions subject to their prudential supervision, as set out in 12 U.S.C. § 1813(q).

34.     The authority conferred by 12 U.S.C. § 1831p-1 is not plenary, but is informed and limited by customary practices in the area of banking regulation. If this statutory regulatory authority were not so limited, it would constitute a standardless, and therefore unconstitutional, delegation of legislative power to an executive agency.

35.     After giving notice and opportunity to comment, the Defendant agencies published in the Federal Register and the Code of Federal Regulations highly general interagency guidelines requiring banks to establish operational and managerial standards that are "appropriate" and "adequate" "to the size of the institution and the nature and scope of its activities." *See* 12 C.F.R. Pt. 364 App. A.

36.     The interagency guidelines pertaining to internal controls and information systems provide, among other things, that the "institution should have internal controls and information systems that are appropriate to the size of the institution and the nature, scope and risk of its activities and that provide for . . . (2) effective risk management." 12 C.F.R. 30.6 App.A II.A. The interagency guidelines require only that controls and practices be adopted by which risks are to be assessed and managed.

37.     The Defendant agencies have provided additional detail on "safe and sound" banking practices over the years, sometimes through notice and comment rule making, *see, e.g.*, FDIC, Notice of Proposed Guidance on Deposit Advance Products, 78 Fed. Reg. 25,268-01 (Apr. 30, 2013), but more often by issuing informal guidance documents without notice and

comment, *see, e.g.*, FDIC, Financial Institution Letter: Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008).

38.     Bank examiners from the Defendant agencies rate the financial institutions using the Uniform Financial Institutions Rating System, adopted by the Federal Financial Institutions Examination Council. Pursuant to the rating system, examiners evaluate six factors: the adequacy of capital, the quality of assets, the capability of management, the quality and level of earnings, the adequacy of liquidity, and the sensitivity to market risk. Examiners must rely on an *objective* rubric to determine the financial institution's score for each factor.

39.     In 2010, the Dodd-Frank Act established the CFPB and charged it with "regulat[ing] the offering and provision of consumer financial products or services under the Federal consumer financial laws." The Dodd-Frank Act § 1011(a), *codified at* 12 U.S.C. § 5491(a).

40.     The Dodd-Frank Act transferred the Defendant agencies' consumer protection functions to CFPB. *See* 12 U.S.C. § 5581(b)(1)-(2), (4). Although Defendants continue to perform certain backup functions, *see id.* §§ 5515(c), 5581(c), they no longer possess plenary consumer protection powers.

41.     CFPB's regulatory and enforcement authority extends to nondepository institutions offering financial products, including payday lenders, 12 U.S.C. § 5514, and to depository institutions with more than $10 billion in assets, *id.* § 5515(a). The Dodd-Frank Act expressly prohibits CFPB from imposing rate limitations on short-term loans. *Id.* § 5517(o).

42.     The Dodd-Frank Act explicitly withheld the authority to set a maximum interest rate in the case of payday lenders. *See* 12 U.S.C. § 5517(o) ("No provision of this title shall be construed as conferring authority on the Bureau to establish a usury limit applicable to an

extension of credit offered or made by a covered person to a consumer, unless explicitly authorized by law.").

43.     No federal statute authorizes the prudential bank regulators to set a national maximum interest rate and displace state usury laws. 12 U.S.C. § 85 ("Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located . . ."); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 328 (1963) ("There is no federal control of the maximum, although all banks, state and national, are subject to state usury laws where applicable.").

### The Expanding Definition of Reputation Risk

44.     As part of their supervisory examinations, the Defendant agencies assess whether regulated depository institutions have systems and procedures in place to assess and to manage risk. The Defendant agencies have identified several such risks that a depository institution must manage. These include credit risk, market risk, liquidity risk, operational risk, and compliance risk. *See, e.g.*, Board of Governors of the Federal Reserve, Supervisory Letter: Risk-Focused Safety and Soundness Examinations and Inspections. SR 96-14 (May 24, 1996).

45.     Reputation risk is among these risks that a depository institution must manage. As understood in the banking industry and as previously defined by the Defendant agencies, "reputation risk" reflects "the potential that negative publicity regarding an institution's business practices, whether true or not, will cause a decline in the customer base, costly litigation, or revenue reductions." Board of Governors of the Federal Reserve, Supervisory Letter: Risk-Focused Safety and Soundness Examinations and Inspections. SR 96-14 (May 24, 1996). *See also* OCC, Risk Management Guidance: Third Party Relationships, OCC Bull. No. 2001-47

(Nov. 1, 2001) ("Reputation risk is the risk to earnings or capital arising from negative public opinion."); FDIC, Foreign-Based Third-Party Service Providers: Guidance on Managing Risks in These Outsourcing Relationships, FIL-52-2006 (June 21, 2006) ("Reputational risk is the risk that potential negative publicity about a financial institution's business practices will cause a decline in the customer base, costly litigation, or the loss of revenue."). As previously defined by the Defendant agencies, reputation risk was exclusively the risk that a bank's business practices might cause harm to its reputation. Such reputational harm could be caused either because the bank's own business practices failed to serve its customers well or because the business practices of a third party provider, engaged by the bank and acting in the bank's name, failed to serve the bank's customers well. *See, e.g.*, OCC, Risk Management Guidance: Third Party Relationships, OCC Bull. No. 2001-47 (Nov. 1, 2001); FDIC, Foreign-Based Third-Party Service Providers: Guidance on Managing Risks in These Outsourcing Relationships, FIL-52-2006 (June 21, 2006).

46.     Before the agency actions challenged here, the Defendant agencies did not, in either their promulgated rules or guidance documents, require that a bank assess the public reputation or popularity of a potential customer before agreeing to provide that customer with basic banking services; nor did the Defendant agencies ever require a bank to terminate an existing banking relationship on account of that customer's unpopularity with the public. To manage and mitigate reputation risk, banks were expected to adopt and adhere to professional and ethical business practices designed to meet their customers' needs, not to judge their customers' public reputations or popularity. *See, e.g.*, OCC Bulletin 2004-20, "Risk Management of New, Expanded, or Modified Bank Products" (May 10, 2004) (observing that reputation risk is heightened when a bank fails adequately to supervise third parties who provide services to its customers).

16

47.     In 2008, the Defendant agencies began to expand the definition of reputation risk beyond this traditional understanding to reach the purported risks to a bank's reputation posed by bad publicity surrounding a third party provider, even when that publicity was entirely unrelated to the work that the provider performed in the name of the bank. Specifically, on June 6, 2008, FDIC issued a Financial Institution Letter ("FIL") entitled "Guidance for Managing Third Party Risk." FDIC, Financial Institution Letter: Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008). This guidance document warns banks of safety and soundness concerns arising from "reputation risk" associated with third party relationships, including relationships with sub-prime lenders. After defining reputation risk as "the risk arising from negative public opinion," it further provides that "any negative publicity involving the third party, *whether or not the publicity is related to the institution's use of the third party*, could result in reputation risk." *Id.* (emphasis added). The FIL also warns banks to be on the lookout for third parties that maintain banking relationships with more than one financial institution, as this may be evidence of fraud.

48.     The Defendant agencies next expanded reputation risk to encompass the potential risk posed to a depository institution by its *customers'* public reputation or popularity. On November 7, 2008, FDIC issued a FIL entitled "Guidance on Payment Processor Relationships." FDIC, Financial Institution Letter: Guidance on Payment Processor Relationships, FIL-127-2008 (Nov. 7, 2008). This guidance document identified the reputation risks associated with providing banking services to particular customers. It also identified online payday lenders as among the merchants that "have displayed a higher incidence of unauthorized charges and associated returns or charge backs, which is often indicative of fraudulent activity." *Id.* It warned banks about merchants that experience a high rate of returned charges and checks (including returns

resulting from insufficient funds), and, as in the previous guidance letter, merchants that bank

with more than one financial institution. *Id.*

49.    In the summer of 2011, FDIC issued a Supervisory Insight article entitled

"Managing Risks in Third-Party Payment Processor Relationships." The article warns banks of

heightened risks, including reputation risks, associated with doing business with certain types of

merchants, including online payday lenders. FDIC, *Managing Risks in Third-Party Payment*

*Processor Relationships*, Supervisory Insights, Summer 2011, at 3. The article offers a list of

30 merchant categories, including online payday lending and numerous other lawful businesses,

that the agency deemed to involve "high-risk" activity. The Department of Justice has

acknowledged, in response to legislative investigations of Operation Choke Point, that FDIC

developed this list of "high-risk merchants" for purposes related to regulating the banking

industry. Letter from Peter J. Kadzik, Ass't Att'y Gen., U.S. Dep't of Justice, Office of

Legislative Affairs, to the Hon. Tim Johnson, Chairman, S. Comm. on Banking, Hous., & Urban

Affairs at 4 (June 24, 2014). The article further urges banks to be wary of customers with high

aggregate return rates and those that bank with more than one financial institution. *Id.*

50.    On January 31, 2012, FDIC issued yet another FIL entitled "Guidance on

Payment Processor Relationships," which updated the November 2008 FIL. FDIC, Financial

Institution Letter: Revised Guidance on Payment Processor Relationships, FIL-3-2012 (Jan. 31,

2012). This guidance document expanded the identification of risky industries to include not just

online payday lenders, but all payday lenders. *Id.* Although it acknowledged that payday lenders

may be legitimate customers, it encouraged banks to terminate banking relationships if the risk

of maintaining them becomes too great. *Id.* Further, the guidance encourages financial

institutions to structure their agreements with payday lenders and other supposedly risky

industries to "permit immediate account closure [and] contract termination." *Id.* Like the other guidance documents, the FIL warned banks to look suspiciously on customers with high aggregate return rates and customers that bank at more than one depository institution. *Id.*

51.     On October 30, 2013, OCC issued a Bulletin entitled "Risk Management Guidance: Third-Party Relationships." OCC, Risk Management Guidance: Third Party Relationships, OCC Bull. No. 2013-29 (Oct. 30, 2013). The Bulletin warns banks of reputation risks associated with providing financial services to business customers who, in turn, "do not meet the expectations of the bank's customers." *Id.* It urges banks to terminate relationships in the event that the risk becomes too great. *Id.*

52.     In adopting the radically expanded interpretation of reputation risk that is announced in these informal guidance documents, the Defendant agencies have consistently chosen to proceed without providing the public with notice and an opportunity to comment.

53.     Further, these informal guidance documents provide no objective criteria for reliably ascertaining a bank customer's public reputation or popularity or for distinguishing between law-abiding, responsible bank customers and bank customers that engage in fraudulent or otherwise unlawful financial practices. Far from tailored guidance that would aid banks in targeting those customers who are engaged in fraudulent or otherwise unlawful practices, the Defendant agencies have created a vague and subjective standard that can be used to pressure banks to cut off relations with law-abiding customers engaged in lines of business that are disfavored by the Defendants.

54.     Indeed, as it has been redefined, "reputation risk" now comprises nothing more than the "risk" that arises when a bank does business with a law-abiding customer who regulators believe is (or, in their view, should be) unpopular. Defendants' guidance documents

expressly distinguish "reputation risk" from "compliance risk," defining the latter as the risk to the bank of doing business with customers that engage in fraudulent, deceptive, or otherwise unlawful practices. *E.g.*, FDIC, Financial Institution Letter: Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008). The risk that a bank is doing business with a customer who is breaking the law is thus fully captured within the category of compliance risk. If the Defendant agencies new definition of reputation risk is to have any independent function in bank regulation, then, it must constitute the risk that arises from dealing with law-abiding customers who the regulators believe are (or, in their view, should be) unpopular.

55.     The opportunity for abuse that is inherent in such a subjective and pliant standard is patent. At the time that Operation Choke Point began, therefore, the Defendant agencies had already put in place the tools that they would need to implement the plan to choke off legitimate businesses from access to the banking system.

## Operation Choke Point

56.     The Defendant agencies, under the guise of protecting the safety and soundness of banks, are now waging a covert war against certain legitimate businesses that rely on banking services to function. What started as a set of diffuse sorties has now coalesced into a coordinated campaign, known as "Operation Choke Point," designed by the Defendant agencies and the DOJ to eliminate certain lawful businesses that they disfavor, by using their regulatory and enforcement authorities to quietly coerce banks to terminate their relationships with the disfavored businesses. As a 2014 report of the House of Representatives Committee on Oversight and Government Reform found, the objective of Operation Choke Point is "to 'choke out' companies the Administration considers a 'high risk' or otherwise objectionable, despite the fact that they are legal businesses." COMM. REP. ON OPERATION CHOKE POINT at 1. The

Committee report also concluded that "internal memoranda on Operation Choke Point clearly demonstrate that the Department's primary target is the short-term lending industry—an indisputably lawful financial service." *Id.* at 5; *see, e.g.*, E-mail from Michael S. Blume, Director, Consumer Protection Branch of U.S. Dep't of Justice, to Maame Ewusi-Mensah Frimpong, Deputy Ass't Att'y Gen., Consumer Prot. Branch of U.S. Dep't of Justice (Aug. 6, 2013, 11:24 AM) ("[W]e have been starting to pay closer attention to banks and processors who deal with payday lenders."), *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP000307.

57.     As part of Operation Choke Point, the Defendant agencies have begun to require banks to terminate established relationships with customers who are engaged in perfectly legal lines of business. The Defendant agencies have done this based on a perceived "reputation risk" to the bank. This perceived risk, however, simply reflects the fact that the bank's customers are engaged in lines of business that, although legal, are nevertheless disfavored by the Defendants.

58.     The payday lending industry is the primary target of Operation Choke Point. From the inception of Operation Choke Point, the Defendant Agencies have been preoccupied with how "large nationwide banks are facilitating payday lending." Email from Surge Sen, Section Chief, Div. of Consumer & Depositor Prot., FDIC, to Marguerite Sagatelian, Senior Counsel, Consumer Enforcement Unit, Legal Div., FDIC (Mar. 8, 2013, 9:11 AM), FDICHOGR00006055, *quoted in* Appendix to STAFF OF H. COMM. ON OVERSIGHT & GOV'T REFORM, 113TH CONG., REP. ON FEDERAL DEPOSIT INSURANCE CORPORATION'S INVOLVEMENT IN "OPERATION CHOKE POINT" (Comm. Print 2014) (hereinafter "COMM. REP. ON FDIC INVOLVEMENT"). Agency officials have consistently sought out actions to "take . . . against banks that facilitate payday lending," Email from Marguerite Sagatelian, Senior Counsel, Consumer

Enforcement Unit, FDIC, to two Counsel in Legal Div., FDIC (Mar. 8, 2013, 9:32 AM),

FDICHOGR00006907, *quoted in* COMM. REP. ON FDIC INVOLVEMENT at 9, and looked for "a

way to stop our banks from facilitating payday lending," Email from Marguerite Sagatelian,

Senior Counsel, Consumer Enforcement Unit, FDIC to James L. Anderson, Ass't Gen. Counsel,

Consumer Section, Consumer, Enforcement/Employment, Insurance, and Legislation Branch,

FDIC (Feb. 22, 2013, 11:13 AM), FDICHOGR00006907, *quoted in* COMM. REP. ON FDIC

INVOLVEMENT at 8.

59.     Relying on the foregoing informal guidance documents, FDIC, the Board, and

OCC, acting through their examiners and other agents, have communicated privately to banks

that they face adverse regulatory action, such as harsh and prolonged examinations and reduced

examination ratings, if they continue to do business with payday lenders. In an August 2013

letter to DOJ and FDIC, over thirty members of Congress reported "that the DOJ and FDIC are

intimidating some community banks and third party payment processors with threats of

heightened regulatory scrutiny unless they cease doing business with online lenders." Letter from

Rep. Blaine Luetkemeyer et al., House of Representatives, to Att'y Gen. Eric Holder, U.S. Dep't

of Justice, and Chairman Martin J. Gruenberg, FDIC (Aug. 22, 2013). A 2014 report by the

House Committee on Oversight and Government Reform agreed, finding that internal

"[d]ocuments produced to the Committee demonstrate the accuracy of the Representative

Luetkemeyer's interpretation . . . ." COMM. REP. ON OPERATION CHOKE POINT at 10.

60.     In one documented example that has come to light, FDIC Regional Director

Anthony M. Lowe pressured a regulated bank to terminate banking services to a payday lender

without offering any basis or grounds for suspecting that this lender might be engaged in

unlawful activity. The FDIC informed the bank that "activities related to payday lending are

unacceptable for an insured depository institution." Letter from M. Anthony Lowe, Regional

Director, FDIC Chicago Regional Office to a depository institution subject to FDIC's supervisory

authority (Feb. 15, 2013) (*available at* http://goo.gl/ZISdO4). In addition, the FDIC took the

following actions solely because that bank provided services to a payday lender:

    a.   the FDIC conducted a Compliance and Risk Management visitation of the bank on

        December 17, 2012, *id.*;

    b.   the FDIC held a conference call with the bank on February 5, 2013, in which Field

        Supervisor Jim Meyer and Supervisory Examiners John George and Sean Blair

        participated, *id.*;

    c.   the FDIC wrote on February 15, 2013 to notify the bank of FDIC's general objections

        to the payday lending business, *id.*; and

    d.   the FDIC promised, in its February 15, 2013 letter, that "[m]embers of our Region's

        Senior Management will contact you in the near term to schedule a meeting to further

        discuss our concerns relative to the aforementioned relationship." *Id.*

Upon information and belief, the bank, after being subjected to this level of unrelenting federal

regulatory pressure, had no choice but to terminate its relationship with the payday lender.

       61.    The Defendant agencies have also acted in concert with DOJ, which has used its

investigatory authority to reinforce the Defendant agencies' back-room pressure tactics. One

internal DOJ memo, circulated in early 2013, lists the banking regulators as part of the Operation

Choke Point team. Memorandum from Michael S. Blume, Dir., Consumer Prot. Branch of U.S.

Dep't of Justice, to Stuart F. Delery, Principal Deputy Ass't Att'y Gen., Civil Div. of U.S. Dep't

of Justice 1 (Feb. 8, 2013), *in* Comm. Rep. on Operation Choke Point app. at HOGR-

3PPP000029. Another internal memo reports that, in the early stages of Operation Choke Point,

FDIC attorneys "contacted [DOJ] to share ideas about the laws relating to payday lending and potential investigative approaches." Memorandum from Michael S. Blume, Dir., Consumer Prot. Branch of U.S. Dep't of Justice, to Stuart F. Delery, Principal Deputy Ass't Att'y Gen., Civil Div. of U.S. Dep't of Justice 6 (Apr. 17, 2013), *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP000048. The same memo records a meeting between the Department and FDIC's Office of Inspector General to "develop[] a structure for further cooperation." *Id.* In September 2013, a DOJ memorandum mentioned future coordination with OCC, Memorandum from Michael S. Blume, Dir., Consumer Prot. Branch of U.S. Dep't of Justice, to Stuart F. Delery, Principal Deputy Ass't Att'y Gen., Civil Division of the U.S. Dep't of Justice 14 (Sept. 9, 2013), *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP000329 [hereinafter "Six-Month Status Report Mem."], and, later that month, representatives of DOJ, FDIC, and OCC made a joint presentation on Operation Choke Point to the Federal Financial Institutions Examination Council, listing payday loans and several other lawful industries alongside criminal schemes as "high risk merchants/activities," Michael Bernardo, Chief, Cyber-fraud and Financial Crimes Section, FDIC et al., Third Party Payment Processors: Relationships Guidance, and Case Examples (Sept. 17, 2013), *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP000344. More than fifty subpoenas were served by DOJ on banks as part of Operation Choke Point, accompanied by copies of the Defendant agencies' guidance documents. *See, e.g.*, Memorandum from Michael S. Blume, Dir., Consumer Prot. Branch of U.S. Dep't of Justice, to Stuart F. Delery, Principal Deputy Ass't Att'y Gen., Civil Div. of U.S. Dep't of Justice 5 (May 14, 2013), *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP00064. And in a recent civil enforcement action, DOJ relied on FDIC's guidance documents to claim that the defendant bank "knew or should have known" about the fraud allegedly being perpetrated by its

third-party payment processors and their payday lender merchants. *See* Compl. at ¶ 30, *United States v. Four Oaks Fincorp, Inc.*, No. 14-014 (E.D.N.C. Jan. 8, 2014); *see also* Joel M. Sweet, Trial Att'y, Consumer Prot. Branch of U.S. Dep't of Justice, United States of America v. Payment Processing Center 45, *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP000066 (identifying "[g]uidance to banks from FDIC, OCC and FinCEN" as "[i]mportant steps forward" in Operation Choke Point). As the House of Representatives Committee on Government Oversight recently reported, this "close coordination" among Defendant agencies and DOJ "likely contribute[s] to the banks' understanding that the FDIC policy statements carr[y] with them the threat of a federal investigation." COMM. REP. ON OPERATION CHOKE POINT at 9.

62.    In addition to coercing the banks directly to terminate payday lenders, Defendants have also concurrently injured Plaintiffs' reputational interests. This harm has been inflicted both during backroom meetings with bank personnel and as part of the agency's public relations efforts. As a recent congressional report reveals, "the DCP's Deputy Director for Policy & Research insisted that Chairman Gruenberg's letters to Congress and talking points always mention pornography when discussing payday lending, in an effort to convey a 'good picture regarding the unsavory nature of the businesses at issue.' " COMM. REP. ON FDIC INVOLVEMENT at 10, quoting Email from a Counsel, Legal Div., FDIC, to Marguerite Sagatelian, Senior Counsel, Consumer Enforcement Unit, FDIC (Aug. 28, 2013, 9:32 AM), FDICHOGR00007424. The FDIC has insisted on repeatedly associating payday lending with pornography because it was felt "strongly that including payday lenders in the same circle as pornographers and on-line gambling businesses will ultimately help with the messaging on this issue." *Id.* at 11, quoting

Email from a Counsel, Legal Div., FDIC, to Marguerite Sagatelian, Senior Counsel, Consumer

Enforcement Unit, FDIC (Aug. 28, 2013 9:32 AM), FDICHOGR00007424.

63.     The above-described pattern of concerted activity by the Defendant agencies and

DOJ was intended to and did result in the desired action on the part of regulated financial

institutions, causing them to terminate or modify longstanding and mutually-beneficial banking

relationships with CFSA's members, including Plaintiffs, who have no further administrative

recourse or other adequate remedy in court.

64.     Because the Defendant agencies chose to implement Operation Choke Point

through informal guidance documents and back-room arm-twisting, Plaintiffs and other law-

abiding and responsible payday lenders have had no opportunity to propose objective regulatory

standards or to protect themselves from such arbitrary and capricious regulatory and enforcement

measures.

65.     For example, the Defendant agencies' guidance documents inform banks that high

return rates are "often" evidence of fraudulent activity. *See, e.g.*, FDIC, Financial Institution

Letter: Revised Guidance on Payment Processor Relationships, FIL-3-2012 (Jan. 31, 2012). Far

from distinguishing among returns based on the *reason* for the return (*e.g.*, the payment was not

authorized by payor), these documents affirmatively argue that other types of returns, such as

insufficient funds returns, may also indicate fraud. This guidance thus ignores complexities in

patterns of return rates and fails to acknowledge legitimate explanations for relatively high rates

of certain types of returns, such as the merchant offering otherwise unavailable services to

financially marginalized individuals, or for certain types of merchants, such as those who use

banking services primarily in connection with collecting past due payments on loans.

66.     The same guidance documents also warn banks against doing business with merchant customers that use more than one financial institution to process payments. *See, e.g.*, FDIC, Financial Institution Letter: Revised Guidance on Payment Processor Relationships, FIL-3-2012 (Jan. 31, 2012). This guidance ignores the business reality—created by the Defendant agencies' advice that banks maintain flexible termination options in all contracts with merchant customers, *see id.*—that merchants such as payday lenders are at risk of losing critical banking services with little to no notice. Responsible payday lenders that seek to ensure continuity of service for their customers by maintaining relationships with multiple financial institutions are lumped in together with payday lenders that establish relationships with multiple financial institutions in order to obscure fraudulent activities.

67.     Most importantly, the fulcrum for Operation Choke Point—reputation risk, redefined in a manner that is vague, manipulable, and wholly foreign to customary bank examination practices— "could ostensibly be invoked to compel a depository institution to sever a customer relationship with a small business operating in accordance with all applicable laws and regulations but whose industry is deemed 'reputationally risky' for no other reason than that it has been the subject of unflattering press coverage, or that certain Executive Branch agencies disapprove of its business model." Letter from Rep. Jeb Hensarling, Chairman, H. Comm. on Fin. Servs., to Janet Yellen, Chair, The Fed. Reserve Sys. (May 22, 2014). "The introduction of subjective criteria like 'reputation risk' into prudential bank supervision can all too easily become a pretext for the advancement of political objectives, which can potentially subvert both safety and soundness and the rule of law." *Id.*

68.     The Defendant agencies have confirmed that fear by making it clear that the target of Operation Choke Point is not just fraudulent or abusive payday lending schemes, but also law-

abiding, responsible payday lenders like Plaintiffs, who provide critically needed short-term credit to millions of American consumers. Yet even as the Defendant agencies have been targeting payday lenders for financial exile, they have been encouraging banks to provide services to marijuana dealers, whose activities are federal crimes. As a result of their participation in Operation Choke Point, the Defendant agencies have converted their statutory mandate to protect the safety and soundness of the American banking system into a pretext for the advancement of political objectives. By so doing, they are both undermining the safety and soundness of the banks that they have been tasked to protect and subverting the rule of law.

### Operation Choke Point's Initial Results

69.    Operation Choke Point has claimed casualties. As the House of Representatives Committee on Oversight and Government Reform recently reported, DOJ's aggressive use of subpoenas, "in conjunction with recent policy announcements by bank examiners, is compelling banks to terminate longstanding lending and depository relationships with a wide array of lawful businesses and individuals." COMM. REP. ON OPERATION CHOKE POINT at 7.

70.    Many of these banks have terminated their relationships with law-abiding, responsible payday lenders, and these payday lenders face increasing uncertainty in their remaining banking relationships and must compete for banking services elsewhere with a severe regulatory handicap.

71.    For example, Plaintiff Advance America has lost at least 21 longstanding positive banking relationships since February 2013 as a result of Operation Choke Point. Advance America has experienced account closures at, among other institutions, Cadence Bank, Hancock and Whitney Banks, Umpqua Bank, Citizens Bank, Capital One Bank, RBS Citizens Bank, First Bank and Trust, Synovus Bank, Chemical Bank, Fifth Third Bank, South State Bank, First

Citizens Bank, IBC Bank, Shore Bank, U.S. Bank, FirstMerit Bank, First Tennessee, Your Community Bank, BBVA Compass Bank, and MainSource Bank. Hancock Bank and Whitney Bank informed Advance America of their intention to close its accounts on the ground that they were "unable to effectively manage [the lenders'] Account(s) on a level consistent with the heightened scrutiny required by [their] regulators . . . ." Fifth Third Bank wrote that it would stop doing business with payday lenders altogether on the ground that the entire industry is "outside of [its] risk tolerance." Synovus Bank and Umpqua Bank likewise terminated Advance America's accounts. Citizens Bank also informed Advance America that the bank would be closing its checking account on July 31, 2014. At least two of Advance America's banks expressed regret and explained that the service terminations were the result of pressure from their prudential regulator. Cadence Bank also terminated Advance America's accounts without explanation. Advance America has not been able to find local banks to service certain stores that were affected by the terminations; many of the banks it contacted for that purpose had decided to exit the payday lending industry due to regulatory pressure.

72.    From October 30, 2013 through December 7, 2016, Plaintiff Check Into Cash has lost banking relationships with Bank of America, JP Morgan Chase, Whitney National-Hancock Bank, Fifth Third Bank, Capital One Bank, U.S. Bank, and Main Source Bank of Indiana. One bank employee informed the CFO of Check Into Cash that (i) the decision to cease doing business with the payday industry was not the bank's decision and (ii) at the time the bank was instructed to exit the payday business it was also instructed to stop servicing companies in the firearms and student loan businesses. Another bank official, when asked whether the terminations of payday lenders were a direct result of Operation Choke Point, responded: "Well it was Chokepoint for us."

73.     Plaintiff NCP Finance has lost account relationships with Fifth Third Bank, PNC, and U.S. Bank. On March 18, 2014, Fifth Third Bank terminated its account relationship with NCP Finance, stating that the accounts were being closed because businesses in the payday lending industry are outside the bank's risk tolerance. NCP Finance had opened these accounts in June 2010; there had been no issues with these accounts, nor any indication from the bank of any problems associated therewith, at any time.

74.     On July 23, 2014, PNC Bank sent a letter to NCP Finance notifying the company that it would be closing its accounts as of August 18, 2014. NCP Finance had opened this deposit account in order to accommodate customers needing access to a local bank for cashing loan checks free of charge. There were never any issues raised related to the operation of this account, and PNC Bank never complained or expressed concerns about NCP's compliance with any requirements. NCP Finance contacted the bank to request an explanation, and it was informed that PNC's risk department had realized that NCP Finance was involved in the payday loan industry after a recent application for an additional account.

75.     On November 3, 2016, U.S. Bank notified NCP finance that it was closing all of NCP Finance's accounts as of January 31, 2017. NCP Finance had had a banking relationship with U.S. Bank since 2007. U.S. Bank was one of NCP Finance's primary ACH banks. NCP Finance had placed millions of dollars into a restricted deposit account to provide collateral to mitigate against any risk U.S. Bank might incur as a result of these ACH transactions. U.S. Bank had never expressed any concerns about the relationship or communicated any complaints to NCP Finance. U.S. Bank had encouraged NCP Finance to expand the relationship at an August 2016 meeting, the final meeting prior to the termination of the relationship. The bank offered no

explanation for ending this longstanding relationship other than to state that the decision had been made by senior bank executives and that no further explanation would be provided.

76.     NCP Finance has incurred substantial costs as a result of these bank terminations, including increased compliance, accounting, and operational costs. NCP Finance has also lost substantial sunk costs that had been devoted to winning approval for and setting up those account relationships.

77.     The survival of NCP Finance is in serious jeopardy unless the termination of its account relationships abates.

78.     Northstate Check Exchange has lost banking relationships with two banks. On April 22, 2015, Tri Counties Bank closed Northstate's accounts, informing Northstate that "it is the policy of the Bank to not bank or lend money to Pay Day Lenders." Although Northstate was able to transfer its accounts to Wells Fargo, on October 28, 2015, Wells Fargo also notified Northstate that it would be terminating its accounts. Northstate learned from its bankers that these account closures were the result of regulatory pressure. Northstate has now arrived at a point where its ability to continue providing payday loans is in serious jeopardy. Plaintiff PH Financial Services has seen its relationship with its ACH provider terminated as a result of Operation Choke Point. The company must now devote significant resources to address the problems raised by the denial of its access to basic banking services.

79.     After Umpqua Bank closed its accounts in September 2014, Calaveras Cash, the sole proprietorship that was owned and operated by Plaintiff Richard Naumann, was forced to close its doors. Calaveras Cash had banked with Umpqua Bank since opening for business in October 2009.  Calaveras Cash had had an excellent relationship with Umpqua, with no complaints or concerns ever being expressed by the bank regarding Calaveras Cash. In fact, the

local branch manager was in tears when she announced to Mr. Naumann that the bank had to terminate the relationship because of the pressure that the bank was receiving from federal regulators not to do business with payday lenders. Mr. Naumann sought to obtain an alternative banking relationship, but without success. The banks were, without exception, unwilling to do business with Calaveras Cash because of the pressure being exerted by Defendants. One banker explained to Mr. Naumann that opening an account for a payday lender would put their bank "in regulatory hell." Unable to find a bank, Mr. Naumann was forced to close his business in October of 2014. Were the regulatory coercion to cease and the banks resumed serving payday lender customers, Mr. Naumann would reopen his business.

80.     Defendant Agencies' campaign of regulatory coercion has not been limited to Plaintiffs, but has targeted the entire payday lending industry. One payday lender, Cash Tyme, has received termination notices for its accounts at three financial institutions. Two alluded to the regulatory environment. Fifth Third Bank informed Cash Tyme, as it had informed Advance America, that the payday loan industry was "outside [its] risk tolerance." Regions Bank informed Cash Tyme that it "ha[d] chosen to end relationships with certain types of customers deemed to be high risk." Cash Tyme has been unable to find substitute banks to service certain stores affected by the terminations, nor has it been able to find a bank that will provide ACH services.

81.     Another payday lender, Speedy Cash, Inc. (Lending Bear), after a seventeen year banking relationship, has also received a termination notice from Bank of America. A bank officer told Speedy Cash, Inc. that Bank of America was "exiting the payday advance space," expressed regret at the decision, and led it to believe that the termination decision depended only on Speedy Cash Inc.'s classification as a payday lender. Speedy Cash, Inc. recently received a notice from Bank of America that its small business accounts would soon be closed "based on

the nature of [its] business and associated risks." Furthermore, two of its current banking partners now refuse to open new accounts for Speedy Cash, Inc.

82.     Another payday lender, Xpress Cash Management, received a termination notice from Fifth Third Bank that explained that the payday loan industry is "outside [its] risk tolerance."

83.     Another payday lender lost direct or indirect business relationships with Associated Bank, Bank of America, Bank Independent, Capital One Bank, Fifth Third Bank, First Financial Bank, FirstMerit Bank, J.P. Morgan Chase, and others. Of these, Associated Bank, Bank of America, Bank Independent, First Merit Bank, Fifth Third Bank, and J.P. Morgan cited regulatory pressure or risk concerns. This lender was able to locate substitute bank relationships only in a few isolated cases; many of the banks it contacted did not even respond.

84.     Another payday lender lost longstanding relationships with three banks: Bank of America, Bank of Kentucky, and Fifth Third Bank. Bank of America cited pressure from regulators. Bank of Kentucky explained that regulators had directed it to terminate its relationships with all payday lenders. Fifth Third Bank abruptly stopped opening new accounts and stated that it was conferring with regulators. This lender later received the same termination notice from Fifth Third Bank as many other payday lenders.

85.     Another payday lender lost accounts at four banks—Bank of America, Capital One, Fifth Third Bank, and J.P. Morgan Chase—despite having maintained positive, mutually-beneficial relationships with each bank for over fifteen years. This lender has been unable to establish relationships with new banks in the affected geographic areas. Many of the banks it has contacted have indicated that they are unwilling to do business with payday lenders.

86.     Yet another payday lender lost the services of KeyBank, without explanation.

33

87.     The banks described above are all subject to the Defendant agencies' prudential regulatory jurisdiction. FDIC is the prudential regulator for Bank of Kentucky, Hancock Bank, Synovus Bank, Umpqua Bank, Citizens Bank, International Bank of Commerce, First Bank and Trust, First Citizens Bank, MainSource Bank, South State Bank, Tri Counties Bank, and Whitney Bank. The Board is the prudential regulator for Bank Independent, Compass Bank, Chemical Bank, Fifth Third Bank, and Regions Bank. OCC is the prudential regulator for Associated Bank, Bank Independent, Bank of America, Cadence Bank, Capital One, First Financial Bank, FirstMerit Bank, First Tennessee Bank, KeyBank, J.P. Morgan Chase, U.S. Bank, Wells Fargo Bank, N.A., and PNC Bank, N.A..

88.     The foregoing specific examples of banks that terminated their relationships with Plaintiffs and other payday lenders as a result of regulatory pressure are merely illustrative of the severely harmful effects of Operation Choke Point. Numerous other payday lenders have lost longstanding, positive banking relationships, despite their law-abiding and responsible business practices.

89.     Many of these banks have made clear to them they would not have terminated these customer relationships but for the coercive regulatory pressure that Operation Choke Point has brought to bear. Account representatives and relationship managers at these banks have told Plaintiffs informally that these sudden, unexpected, and otherwise inexplicable terminations were made at the behest of their regulators, who pressured the banks to stop doing business with all payday lenders. As noted above, *see supra* ¶ 71, at least two of Advance America's banks expressed regret and explained that the service terminations were the result of pressure from their prudential regulator.

90.     Plaintiff Richard Naumann was told by his banker that his accounts were being closed because of the pressure the bank was receiving from its federal regulators not to do business with payday lenders.

91.     The CFO of Check Into Cash was told by one banker that (i) the decision to cease doing business with the payday industry was not the bank's decision and (ii) at the time the bank was instructed to exit the payday business it was also instructed to stop servicing companies in the firearms and student loan businesses. Another banker informed Check Into Cash's CFO that their bank had closed the accounts of payday lenders because of Operation Choke Point.

92.     Another payday lender was told that the bank would no longer do business with that lender "because examiners had come into their bank … [and] did not want them to have anything to do with us."

93.     One bank, upon announcing that it had to terminate a payday lender's account relationship, informed that lender that "[w]e have appreciated your account relationships and the business which you have done with the bank," continuing that "we are not aware of any account activity in your accounts or your business relationship with us that would constitute any violation of any law, rule or regulation to which either of our organizations is subject." Nevertheless, the account had to be terminated because of "warnings of future adverse consequences to financial institutions who provide deposit and transaction services to payday lenders" from federal agencies, including Defendants, "and the lack of clear guidance on which our bank may reasonably rely in conjunction with providing such services, we must reluctantly discontinue such account services to all pay day lenders, which would include your accounts."

94.     These explanations that payday lenders have received from their banks comport with the findings of recent congressional investigations that have revealed Defendants' role in

the termination of banks' relationships with payday lenders. The Chairman of the House Judiciary Committee reported, for example, that the Committee had obtained the following account of a meeting between a senior FDIC regulator and a banker contemplating serving a payday lending client: The official told the banker, "I don't like this product and I don't believe it has any place in our financial system . . . Your decision to move forward will result in an immediate, unplanned, audit of your entire bank." *Guilty until Proven Innocent? A Study of the Propriety & Legal Authority for the Justice Department's Operation Choke Point*: *Hearing Before the H. Comm. on the Judiciary*, 113th Cong. 5 (2014) (statement of Chairman Bob Goodlatte), http://goo.gl/cWsWwo.

95.     Many banks have, moreover, either stated or, at least, suggested that they would restore those terminated relationships were that coercive regulatory pressure removed.

96.     One bank representative, for example, not only expressed incomprehension as to why the Bank was terminating a longstanding relationship with a payday lender but also, in March 2014, wrote to the payday lender: "Thank you again for being a great client and I hope we can find a way to work together again soon."

97.     In addition, several payday lenders, including Advance America and PH Financial Services, have lost business relationships with third-party payment processors and merchant card processors as a result of Operation Choke Point, which has also sought to coerce banks to cut ties with processor clients that do business with payday lenders.

98.     The Defendant agencies and DOJ knew early on that their coordinated, coercive campaign of backroom pressure tactics was succeeding in prompting banks "to exit or severely curtail" business with *all* payday lenders, and that "banks may have therefore decided to stop doing business with legitimate lenders." Six-Month Status Report Mem. at 10.

36

99.     Because payday lenders cannot survive without access to banking services, Operation Choke Point has begun to have its intended and necessary effect. As one internal DOJ memorandum noted, "a large Internet payday lender decided recently to exit the business due to difficulties securing a bank or payment processor relationship." Memorandum from Michael S. Blume, Dir., Consumer Prot. Branch of U.S. Dep't of Justice, to Stuart F. Delery, Principal Deputy Ass't Att'y Gen., Civil Div. of U.S. Dep't of Justice 2 (July 8, 2013), *in* COMM. REP. ON OPERATION CHOKE POINT app. at HOGR-3PPP000166. The regulators celebrated "this type of positive conduct." Six-Month Status Report Mem. at 6, 10.

100.    The objective of the agency actions complained of herein was and is to put the payday loan industry out of business by misusing the statutory authority over the banks to "get at payday lending." Email from Marguerite Sagatelian, Senior Counsel, Consumer Enforcement Unit, FDIC, to Counsel in Legal Div., FDIC (Mar. 8, 2013 9:32 AM), FDICHOGR00006907, *quoted in* COMM. REP. ON FDIC INVOLVEMENT at 9.

### **Operation Choke Point Continues**

101.    Confronted with the overwhelming evidence of unlawful agency activity that congressional investigations uncovered, FDIC Chairman Martin Gruenberg and Vice Chairman Tom Hoenig recently reportedly have acknowledged wrongdoing within their Agency. Although Defendant FDIC claims that it put a stop to its campaign against payday lenders on July 28, 2014 when it issued a Financial Institution Letter disavowing the list of high-risk industries that had served as a key tool for coercing banks to terminate unpopular lines of business, the targeting of Plaintiffs and other payday lenders continues apace.

102.    The campaign that Defendants FDIC, OCC, and the Board have been conducting specifically against payday lenders has shown no signs of letting up since the release of FIL-41-

2014 on July 28, 2014. The strong-arming and backroom coercion continues to produce account terminations. Renewed pressure has been applied to those banks that had resisted terminating all of their targeted customers. Banks that the Defendant Agencies had not earlier sought to coerce are now feeling the pressure to drop payday lenders for the first time. In sum, there are no signs that the campaign of regulatory coercion has ended; to the contrary, Operation Choke Point has only intensified and broadened the scope of its targets in the months since the initial complaint in this suit was filed.

103.    On August 20, 2014, one bank in the Midwest announced that it would be closing the account of a payday lender in October 2014. This bank, which is regulated by the FDIC, had not previously terminated any payday lenders known to the Plaintiffs. The bank explained its decision by stating that

> due to recent initiatives of the U.S. Department of Justice and warnings of future adverse consequences to financial institutions who provide deposit and transaction services to payday lenders from Consumer Financial Protection Bureau and bank regulatory agencies under the Dodd-Frank Act and its implementing regulations and the lack of clear guidance on which our bank may reasonably rely in conjunction with providing such services, we must reluctantly discontinue such account services to all payday lenders, which would include your accounts.

Declaration of Dennis Shaul ¶ 11 (Oct. 2, 2014), Doc. 23-9.

104.    On September 2, 2014, Wells Fargo announced that it would be closing the bank accounts of Emergi-Cash. Three years earlier, Wells Fargo had actively solicited Emergi-Cash's business and had even persuaded Emergi-Cash to transfer its accounts at another bank to Wells Fargo. Emergi-Cash, moreover, had never used Wells Fargo for ACH transactions; Emergi-Cash had only depository accounts with Wells Fargo. The working relationship between Wells Fargo's bankers and Emergi-Cash personnel had been excellent. Emergi-Cash was never given any reason to believe that Wells Fargo believed that it posed any risk whatsoever to the reputation or

to the safety and soundness of the bank. In spite of this long-standing and untroubled relationship, Wells Fargo terminated Emergi-Cash without providing any advance warning or notice.

105.    On August 25, 2014, Bank of America closed the eight bank accounts of Speedy Cash. The bank had announced on June 30, 2014, that it planned to close those accounts because of "the nature of [Speedy Cash's] business and associated risk." Although bank representatives were deeply disappointed with the decision to end this longstanding relationship and affirmed that the decision had nothing to do with the way Speedy Cash itself conducted its business, the decision could not be reversed even after the issuance of FIL-41-2014.

106.    On October 2, 2014, U.S. Bank, which is regulated by OCC, informed DollarSmart, that it was closing its accounts. DollarSmart had devoted substantial time and effort to establishing this relationship with U.S. Bank after another account had been closed because of Operation Choke Point's campaign. U.S. Bank gave DollarSmart notice that it would close these accounts on October 28, 2014, giving DollarSmart only 26 days in which to find a new bank and save its business. U.S. Bank later extended this deadline to November 30, 2014. Even with this extension, however, DollarSmart was unable to find an alternative source of financial services and, as a result, was forced to exit the payday lending and check cashing businesses by entering into a distressed sale. After the sale, U.S. Bank agreed to keep DollarSmart's accounts open, provided that DollarSmart surrendered its payday lending licenses and agreed that no Money Service Business activity would be processed through its accounts after November 30, 2014. Operation Choke Point has deprived this business of its ability to continue in its chosen line of commerce and has left some of its workers and its owners unemployed.

107.     A whistleblower letter sent to Representative Blaine Luetkemeyer in December of
2014 made clear that the illegality that is Operation Choke Point continues and that the two year
campaign of subjecting banks that serve payday lenders and other disfavored industries to
coercive examinations continues unabated:

> I am an employee of the Federal Deposit Insurance Corporation
> (FDIC). I was proud of my job and the FDIC's mission before
> Operation Choke Point. During the past two years, however, we
> have been told to examine banks much more harshly, if they deal
> with a class of customers prohibited by Choke Point.

Rep. Blaine Luetkemeyer, "Blaine's Bulletin: Operation Choke Point" (Feb. 13, 2015) (available
at http://goo.gl/HXmorg).

108.     On February 25, 2015, South State Bank notified Advance America that it would
be closing the company's five accounts. The FDIC is the prudential regulator of South State
Bank. Although Jay Reagan, the City Executive Senior Vice President at South State, offered no
explanation for the decision, this termination notice followed close upon a regulatory
examination of the bank's ACH services.

109.     On March 10, 2015, International Bank of Commerce notified Advance America
that it would be closing the company's accounts. The FDIC is the prudential regulator of
International Bank of Commerce. As a result of these account closures, 72 facilities in Texas and
Oklahoma have been cut off from access to basic banking services. The decision was reportedly
made by the bank's compliance department and was handed down to bank employees without
explanation. Advance America received no notice or warning that the bank was contemplating
such a move.  Indeed, the decision came as a surprise even to the account representatives at the
bank who expressed to Advance America that they too were caught off guard by the decision and
had received no explanation for the decision from the bank's upper management.

110.     The disavowal by FDIC of FIL-41-2014 has done nothing to narrow the scope of Operation Choke Point. While their focus remains fixed on the payday lenders, Defendant Agencies are reportedly continuing to pressure and to coerce banks to terminate relationships with the other industries that Operation Choke Point has labeled "high risk." Operation Choke Point has not ended. Its assault on legitimate businesses not only continues, but has expanded and intensified.

111.     The pattern of terminations has continued through the fall of 2016 and shows no sign of relenting. Plaintiffs continue to receive notifications from their banks that they will be terminating their longstanding banking relationships. For example, by letter dated October 21, 2016, FirstMerit Bank informed Advance America that it would exit their relationship with Advance America, explaining that "[w]e have decided to close your account because the business is in an industry in which we do not service, such as payday lenders." On October 31, 2016, Your Community Bank notified Advance America that it will be terminating its business deposit account within 30 days.  On November 1, 2016, U.S. Bank notified Advance America, both by phone and by overnight letter, that it would close a total of 43 accounts held by Advance America and its operating subsidiaries. These accounts are slated to be closed by January 31, 2017.  U.S. Bank had provided services for approximately 1262 Advance America locations. There is no sign that Operation Choke Point is slowing or that federal regulators have ceased to brand lawful and legitimate businesses as "high-risk" and target them for termination.

**Operation Choke Point Has Expanded**

112.     Far from putting an end to their campaign of regulatory intimidation and coercion, Defendant Agencies have expanded the range of their unlawful tactics. It was recently revealed that Defendants have been coercing a consumer reporting company to stop providing key data to

the payday lending industry. By so doing, they have extended the reach of Operation Choke Point and cut off law-abiding payday lenders from data they use to do business. They accomplished this, upon information and belief, either indirectly, by leveraging their power over banks subject to their jurisdiction, or directly.

113.   Early Warning Services ("EWS") is a Delaware limited liability company that is headquartered in Scottsdale, AZ. EWS is owned by five national banks: Bank of America Corp., BB&T Corp., Capital One National Bank, JPMorgan Chase, and Wells Fargo. Defendant OCC is the prudential regulator of Capital One, JP Morgan Chase, and Bank of America. Defendant FDIC is the prudential regulatory of Wells Fargo and BB&T. According to the most recent filings available from the State of Arizona, five of six EWS management committee members are employees of one of these five banks.

114.   EWS is a consumer reporting company. It collects consumer bank account data from both its parent banks and from hundreds of other financial institutions, and then packages and sells this data to credit reporting agencies that, in turn, provide businesses with nearly up-to-the-minute financial profiles of potential borrowers. Businesses use these reports to decide whether to offer credit, insurance, rental leases, or employment. These reports help lenders manage credit risks and detect and prevent fraudulent transactions.

115.   Because of its relationship with the nation's banks, EWS is the only service that is able to provide nearly real time consumer financial information. The reports that other companies generate are markedly inferior because they lack access to real time information. For example, one of these other providers that is used by Plaintiff Advance America offers information only on a consumer's banking history, not their current account status.

42

116.     Reports based upon EWS data were provided to payday lenders by credit reporting services that repackaged and presented that data in formats specifically tailored for use in assessing payday loan applications. Prior to February 2015, several companies had used EWS data to provide credit reporting services to payday lenders.  Advance America and other payday lenders contracted with these companies to obtain access to EWS data.

117.     Plaintiffs and other payday lenders used this information to manage risk, to ensure that they were not facilitating fraud, and to aid them in complying with certain contractual and regulatory requirements. As a former FDIC director recently explained, EWS data allowed lenders both to "weed out first-party fraud" and to protect the consumer:

> When lenders can verify that the identity of the customer matches his or her bank account, they are able to quickly weed out first-party fraud — that is, loan applications by individuals or groups that have no intent to repay. That means lenders are able to improve fraud scoring, which in turn leads to lower default rates and ultimately means better pricing for borrowers. Having access to this valuable data is especially important for the more innovative players in the space, which are using advanced analytics and modeling to determine pricing.

William M. Isaac, *Operation Choke Point Won't Go Away Quietly*, AMERICAN BANKER, Feb. 19, 2015, http://goo.gl/sfdzf5.

118.     Access to this data could also reduce return rates, a goal that is shared by payday lenders, the ACH trade association, federal regulators, and consumers alike.  A "return" occurs whenever a request for payment that has been submitted to a bank for payment is denied and returned unpaid. A return may result if the request contains an incorrect account number or other erroneous information, of if the underlying account has been closed or has insufficient funds. Advance America had planned to use EWS data, for example, to determine the current status of consumer accounts, i.e., whether an account was open, had been closed for cause, was overdrawn, or was otherwise an account likely to result in a return. EWS credit reports also

provided "an important protective measure for customers who face expensive insufficient funds fees, bounced check fees or overdraft charges if the lender makes a payment attempt on the account." Isaac, *Operation Choke Point Won't Go Away Quietly*. Quite simply, the better the information a payday lender has about its customers, the smaller the number of errors and the lower the cost of credit becomes to payday lenders and consumers of payday loans alike.

119.    On January 21, 2015, Bloomberg News reported that Operation Choke Point had expanded its arsenal of unlawful tactics to include coercing EWS to cut off payday lenders from access to consumer credit information. Zeke Faux, *Banks Stop Selling Account Data to Payday Lenders Amid Pressure*, BLOOMBERG NEWS, Jan. 21, 2015, http://goo.gl/zFhHLv. This report detailed how EWS had been directed to cease providing consumer credit information to services that repackaged and resold that information to payday lenders.

120.    As a result of this regulatory coercion, EWS has been cutting off payday lenders' access to its services "one by one":

> "We've been discontinuing service one by one," Kyle Thomas, chief of marketing and sales at Scottsdale, Arizona-based Early Warning, said in a telephone interview. "The way we're going through it reflects both the wishes of our data contributors as well as various regulators."

Faux, *Banks Stop Selling Account Data to Payday Lenders*.

121.    Upon information and belief, Defendant Agencies coerced EWS directly and indirectly through its five parent banks. In response to this pressure, EWS adopted "minimum vetting guidelines" that require the agencies to which it provides data to review the websites of all companies with which they do business in order "to understand and document high rates and/or fees charged that would result in an APR of >36%." "If unable to determine APR," the guidelines provide, then the "entity is not eligible."  Likewise, "[i]f any APR (varied by state, type of loan, etc.) exceeds 36%, [then the] entity is not eligible" to receive EWS data. This

standard, adopted after the company was subject to regulatory coercion, directly resulted in the cutting off of service to all payday lenders.

122.     Advance America lost access to EWS data completely in February 2015 when EWS terminated a credit reporting service that had provided Advance America with access to its data.  Prior to that date, EWS had informed this credit reporting service that EWS had decided, due to regulatory pressure, to stop providing information that would ultimately be used by those who charged more than a 36% Annual Percentage Rate on their loans. This standard, adopted after the company was subject to regulatory coercion by Defendant Agencies, directly resulted in the cutting off of service to all payday lenders. The purpose and effect of the government pressuring EWS to adopt a 36% interest-rate limit for use of its services is to target the payday lending industry and to establish a de facto interest-rate cap of 36% in this context.

123.     As a result of these terminations, Advance America and other payday lenders have lost access to the comprehensive data on customer's banking accounts needed to avoid not only debiting accounts that have been closed by customers seeking to avoid repaying outstanding loans, but also to correct erroneous account numbers and other administrative errors.

124.     The Defendant Agencies' unlawful campaign against payday lending not only continues unchecked, therefore, but has been expanding its range of tactics.

## CLAIMS FOR RELIEF

### COUNT I

### FDIC's Conduct Violated Plaintiffs' Due Process Rights

125.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

126.     This court has authority under 28 U.S.C. § 1331 and its traditional powers of equity to declare invalid and enjoin agency action that violates the Constitution.

127.     FDIC has inflicted reputational harm upon Plaintiffs by stigmatizing them as, among other things, "illegitimate", "fraudulent", and "high risk."

128.     The stigma that FDIC has imposed upon Plaintiffs threatens to preclude them from pursuing their lawful, chosen line of business. Indeed, to choke off Plaintiffs from the financial services that they must have in order to pursue their chosen line of business is the precise purpose of the FDIC's actions, a purpose openly declared in the very name that the government has chosen for its unlawful enterprise: Operation Choke Point.

129.     Further, by attacking the reputations of payday lenders, FDIC has effectively coerced certain financial institutions to cease providing bank accounts and other essential financial services to Plaintiffs. FDIC has thus deprived these lenders of tangible benefits and interests that they had previously possessed.

130.     FDIC has never provided Plaintiffs with notice of its intention to blacklist them as unacceptably high-risk merchants or with any opportunity to be heard and to defend their good names.

131.     FDIC thus deprived Plaintiffs of protected liberty interests without due process of law. Its actions must therefore be set aside and permanently enjoined.

## COUNT II

### OCC's Conduct Violated Plaintiffs' Due Process Rights

132.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

133.     This court has authority under 28 U.S.C. § 1331 and its traditional powers of equity to declare invalid and enjoin agency action that violates the Constitution.

134.     OCC has inflicted reputational harm upon Plaintiffs by stigmatizing them as, among other things, "illegitimate," "fraudulent," and "high risk."

135.    The stigma that OCC has imposed upon Plaintiffs threatens to preclude them from pursuing their lawful, chosen line of business. Indeed, to choke off Plaintiffs from the financial services that they must have in order to pursue their chosen line of business is the precise purpose of the OCC's actions, a purpose openly declared in the very name that the government has chosen for its unlawful enterprise: Operation Choke Point.

136.    Further, by attacking the reputations of payday lenders, OCC has effectively coerced certain financial institutions to cease providing bank accounts and other essential financial services to Plaintiffs. OCC has thus deprived these lenders of tangible benefits and interests they had previously possessed.

137.    OCC has never provided Plaintiffs with notice of its intention to blacklist them as unacceptably high-risk merchants or with any opportunity to be heard and to defend their good names.

138.    OCC thus deprived Plaintiffs of protected liberty interests without due process of law. Its actions must therefore be set aside and permanently enjoined.

## COUNT III

### The Board's Conduct Violated Plaintiffs' Due Process Rights

139.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

140.    This court has authority under 28 U.S.C. § 1331 and its traditional powers of equity to declare invalid and enjoin agency action that violates the Constitution.

141.    The Board has inflicted reputational harm upon Plaintiffs by stigmatizing them as, among other things, "illegitimate," "fraudulent," and "high risk."

142.    The stigma that the Board has imposed upon Plaintiffs threatens to preclude them from pursuing their lawful, chosen line of business. Indeed, to choke off Plaintiffs from the

financial services that they must have in order to pursue their chosen line of business is the precise purpose of the Board's actions, a purpose openly declared in the very name that the government has chosen for its unlawful enterprise: Operation Choke Point.

143.     Further, by attacking the reputations of payday lenders, the Board has effectively coerced certain financial institutions to cease providing bank accounts and other essential financial services to Plaintiffs. The Board has thus deprived these lenders of tangible benefits and interests that they had previously possessed.

144.     The Board has never provided Plaintiffs with notice of its intention to blacklist them as unacceptably high-risk merchants or with any opportunity to be heard and to defend their good names.

145.     The Board failed to provide Plaintiffs with due process of law. Its actions must therefore be set aside and permanently enjoined.

## PRAYER FOR RELIEF

146.     WHEREFORE, Plaintiffs pray for an order and judgment:

a.     Declaring that the agencies have deprived Plaintiffs of liberty without due process of law in violation of the Fifth Amendment to the U.S. Constitution and 5 U.S.C. 706(2)(B).

b.     Enjoining FDIC, OCC, the Board, and each agency's officers, employees, and agents, as well as those acting in concert with them, from  relying on the novel and revised definition of reputation risk that they have adopted without and from applying informal pressure to banks to force or encourage them to terminate business relationships with payday lenders in violation of the Fifth Amendment to the United States Constitution.

48

     c.     Enjoining FDIC, OCC, the Board and each agency's officers, employees, and agents, as well as those acting in concert with them, from harming the reputations of Plaintiffs; from seeking to deprive Plaintiffs of their access to financial services; and from seeking to deprive Plaintiffs of their ability to pursue their chosen line of lawful business without due process of law.

     d.     Enjoining FDIC, OCC, and the Board and each agency's officers, employees and agents, as well as those acting in concert with them, to provide Plaintiffs a hearing, appropriate to the nature of this case, with notice to Plaintiffs of the accusations against them and opportunity for them to be heard on those accusations;

     e.     Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

     f.     Granting such other and further relief as this Court deems just and proper.


Date:  February 7, 2017               Respectfully submitted,

                            s/ Charles J. Cooper
                            Charles J. Cooper (Bar No. 248070)
                            ccooper@cooperkirk.com
                            David H. Thompson (Bar No. 450503)
                            Peter A. Patterson (Bar No. 998668)
                            Nicole J. Moss (Bar No. 472424)
                            Harold S. Reeves (Bar No. 459022)
                            COOPER & KIRK, PLLC
                            1523 New Hampshire Avenue, N.W.
                            Washington, D.C. 20036
                            (202) 220-9600
                            (202) 220-9601 (fax)