UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                    :
ADVANCE AMERICA, CASH ADVANCE :
CENTERS, INC., et al.               :
                                    :
         Plaintiff,                 :
                                    :
    v.                              :  Civil Action No. 14-953 (GK)
                                    :          (Under Seal)
FDIC, et al.                        :
                                    :
         Defendant.                 :
                                    :
```

## MEMORANDUM OPINION

Plaintiffs, Advance America, Cash Advance Centers, Inc. ("Advance America"), Check Into Cash, Inc. ("Check Into Cash"), NCP Finance Limited Partnership and NCP Finance Ohio, LLC (collectively "NCP"), Northstate Check Exchange ("Northstate"), PH Financial Services, LLC ("PHFS"), and Richard Naumann, bring this action against the Federal Deposit Insurance Corporation ("the FDIC"), the Board of Governors of the Federal Reserve System, and both the Office of the Comptroller of the Currency and Thomas J. Curry, in his official capacity as the Comptroller of the Currency ("the OCC") (collectively "Federal Defendants"), alleging violations of their right to due process under the Fifth Amendment of the United States Constitution.

The matter is now before the Court on the Plaintiffs' Motions for Preliminary Injunction. [Dkt. Nos. 87 & 107]. Upon consideration of the Motions, Oppositions, Replies, and the entire

record herein, and for the reasons set forth below, the Motions shall be **denied.**

I.   **BACKGROUND**

The Court has related the background of this case in two previous opinions. Community Fin. Services Assoc. of America v. FDIC, 132 F. Supp. 3d 98 (D.D.C. 2015) ("CFSA I") and Community Fin. Services Assoc. of America v. FDIC, 2016 WL 7376847 (D.D.C. December 19, 2016) ("CFSA II"). The original plaintiffs in this case were CFSA, an association of payday lenders, and Advance America, a payday lender and member of CFSA. CFSA I, 132 F. Supp. 3d at 105. Federal Defendants are agencies of the United States Government that have been delegated regulatory authority over various parts of the United States banking system. Id. at 106.

CFSA and Advance America alleged that the Federal Defendants participated and continue to participate in a campaign, known as "Operation Choke Point" and initiated by the United States Department of Justice, to force banks to terminate their business relationships with payday lenders. Id. at 106-107. They allege that Operation Choke Point forced banks supervised by Federal Defendants to terminate relationships with payday lenders, "'by first promulgating regulatory guidance regarding reputation risk,' and by later relying on the reputation risk guidance 'as the

-2-

fulcrum for a campaign of backroom regulatory pressure seeking to coerce banks to terminate longstanding, mutually beneficial relationships with all payday lenders.'" Id.; see also Plaintiffs' Second Amended Complaint ¶¶ 4-11 [Dkt. No. 64].

After this Court's decision in CFSA I dismissing some of the claims brought by CFSA and Advance America, the Federal Defendants moved on October 29, 2015, to dismiss CFSA for lack of standing. Mot. to Dismiss [Dkt. No. 73]. While that Motion was pending, CFSA and Advance America filed a Motion for Preliminary Injunction on November 23, 2016. ("Advance America Mot.")[Dkt. No. 87]. On December 19, 2016, the Court granted the Federal Defendants' Motion to Dismiss CFSA, leaving Advance America as the only remaining plaintiff. See CFSA II, 2016 WL 7376847.

Subsequently, on January 11, 2011, Advance America filed a Motion to Amend its Complaint for a second time, in order to add additional plaintiffs, all of whom are current or former payday lenders allegedly affected by Operation Chokepoint. [Dkt. No. 102]. The Court granted the Motion, thereby adding the following additional plaintiffs: Check Into Cash, Inc., NCP Finance Limited Partnership, NCP Finance Ohio, LLC, Northstate Check Exchange, PH Financial Services, LLC, and Richard Naumann (collectively "New Plaintiffs"). [Dkt. No. 120]. These New Plaintiffs also filed a

Motion for Preliminary Injunction, essentially joining in all of the same arguments presented by Advance America. ("New Plaintiffs' Mot.")[Dkt. No. 107-1].

The proposed injunctions ask the Court to enjoin Federal Defendants "from: 1) harming Plaintiffs' reputations; 2) applying informal pressure to banks to encourage them to terminate business relationships with Plaintiffs because Plaintiffs are members of the payday lending industry; 3) seeking to deny Plaintiffs of access to financial services on account of their being members of the payday lending industry; and 4) seeking to deprive Plaintiffs of their ability to pursue their chosen line of lawful business." New Plaintiffs' Proposed Order [Dkt. No. 107-8]; see also Advance America's Proposed Order [Dkt. No. 87-5].

The Federal Defendants filed Oppositions to both Motions for Preliminary Injunction. Opp'n to Advance America's Mot. [Dkt. No. 90] & Opp'n to New Plaintiff's Mot. [Dkt. No. 125]. Advance America and the new Plaintiffs each filed a Reply.  Advance America's Reply [Dkt. No. 95] & New Plaintiffs' Reply [Dkt. No. 127].

## II.  Standard of Review

The Court may issue interim injunctive relief only when the movant demonstrates "[1] that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in

-4-

the absence of preliminary relief, [3] that the balance of equities tips in [his or her] favor, and [4] that an injunction is in the public interest." Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008).

It is particularly important that the movant demonstrate a likelihood of success on the merits. Cf. Benten v. Kessler, 505 U.S. 1084, 1085 (1992) (per curiam). Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." Am. Bankers Ass'n v. Nat'l Credit Union Admin., 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (internal citations and quotation marks omitted).

The other critical factor in the injunctive relief analysis is irreparable injury. A movant must "demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22 (citing Los Angeles v. Lyons, 461 U.S. 95, 103 (1983)). If the plaintiff demonstrates a likelihood of success on the merits and irreparable injury, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987).

"The four factors have typically been evaluated on a "'sliding scale.'" Davis v. PBGC, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009). Under this approach, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." Id. While there is some doubt as to whether the sliding scale approach is still appropriate after the Supreme Court's decision in Winter, it remains good law in this Circuit. See League of Women Voters v. Newby, 838 F.3d 1, 7 (D.C. Cir. 2016).

Because a preliminary injunction is an extraordinary remedy, courts should grant such relief sparingly. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). The Supreme Court has observed "that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Id. Therefore, although the trial court has the discretion to issue or deny a preliminary injunction, it is not a form of relief to be granted lightly. In addition, any injunction that the court issues must be carefully circumscribed and "tailored to remedy the harm shown." Nat'l Treasury Employees Union v. Yeutter, 918 F.2d 968, 977 (D.C. Cir. 1990).

## III. ANALYSIS

### A.   Likelihood of Success on the Merits

A movant may show a likelihood of success on the merits by demonstrating that it is "more likely than not" that she will prevail.  Sherley v. Sebelius, 644 F.3d 388, 398 (D.C. Cir. 2011). However, under the sliding scale approach, if the other preliminary injunction factors strongly favor the movant, the movant need only show the existence of a "serious legal question" on the merits. Id. at 398.

#### 1. Legal Requirements to Successfully Establish a Due Process Violation Under the Stigma-Plus Rule of Davis

In CFSA I, the Court expressly laid out the necessary elements of Plaintiffs' due process claims, brought under the so-called "stigma-plus rule" of Paul v. Davis. 132 F. Supp. 3d at 123 (citing Paul v. Davis, 424 U.S. 693, 708 (1976) and Gen. Elec. Co. v. Jackson, 610 F.3d 110, 121 (D.C. Cir. 2010)).  Under the stigma-plus rule there is a due process violation if the plaintiff can show, "in addition to reputational harm, that (1) the government has deprived them of some benefit to which they have a legal right . . . or (2) the government-imposed stigma is so severe that it 'broadly precludes' plaintiffs from pursuing 'a chosen trade or business.'"  Id. (quoting Paul v. Davis, 424 U.S. at 708).

As the Court will explain, Plaintiffs' submissions do not establish a likelihood of success on the merits - or even a "serious legal question" on the merits.  First, Plaintiffs have not demonstrated that they are likely to prove that they have or will suffer harms that rise to the level of a due process violation under either prong of Davis.  Second, they have failed to demonstrate that they are likely to prove the existence of a vast backroom pressure campaign by Federal Defendants that is causing the termination of their bank accounts and banking relationships.

### 2. Plaintiffs' Are Unable to Demonstrate that they Are Likely to Suffer the Level of Injury that Is Necessary to Succeed on the Merits Under Either Prong of Davis

Plaintiffs can succeed under the first prong of Davis by showing that Federal Defendants deprived Plaintiffs of their right to hold a bank account.  CFSA I, 132 F. Supp. 3d at 123-24 (citing National Council of Resistance of Iran v. Department of State, 251 F.3d 192, 204 (D.C. Cir. 2001) ("NCRI"), and Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971)).  In order to show the deprivation of that right, it is insufficient for Plaintiffs to show that they have merely had some bank accounts terminated. The loss of some discrete number of bank accounts does not constitute a "change in legal status."  Kartseva v. Department of State, 37 F.3d 1524, 1527-28 (D.C. Cir. 1994).  Thus, in order to demonstrate

-8-

a change in legal status, each Plaintiff must show that it has had so many bank accounts and banking relationships terminated it has effectively been cut off from the banking system.[1]

Plaintiffs do not contend that Federal Defendants have established a de jure, blanket prohibition on banks transacting with payday lenders. Instead, they allege that Federal Defendants have applied pressure to regulated banks to stop transacting with Plaintiffs, and so many of those banks have succumbed to that pressure that the result is a de facto ban that constitutes a change in legal status. See Third Amended Complaint ("TAC") ¶¶ 8, 18, 19 [Dkt. No. 124]. That is the theory on which the Court allowed them to proceed, and that is what they ultimately must prove to succeed under the first prong of Davis. See CFSA I, 132 F. Supp. 3d at 123.

Alternatively, Plaintiffs can succeed under the second-prong of Davis by showing that "the continued loss of banking relationships," caused by Operation Choke Point, "may preclude them from pursuing their chosen line of business." CFSA I, 132 F. Supp. 3d at 123-24 (citing NCRI, 251 F.3d 192 & Constantineau, 400

---

[1] For example, in NCRI, the plaintiffs were designated as terrorist organizations and this designation triggered a de jure prohibition on any bank transacting with them.   251 F.3d at 203-04.   This blanket prohibition constituted the requisite change in legal status.   Id.

U.S. 433).   To do so, Plaintiffs must show that Operation Choke Point "broadly precludes plaintiffs from pursuing" the payday lending business.   Id. at 123 (quoting Gen. Elec. Co., 610 F.3d at 121); see also Trifax Corp. v. District of Columbia, 314 F.3d 641, 644 (D.C. Cir. 2003) ("government stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of liberty in violation of the Due Process Clause.").   Plaintiffs can show broad preclusion from the payday lending business by proving that Federal Defendants' actions have or will "effectively put [them] out of business."   Trifax Corp., 314 F.3d at 644.

Plaintiffs' submissions to the Court do not establish that they have a raised a "serious legal question," let alone that they are likely to succeed, on either prong of Davis.   To date, they have not been cut off from the banking system or been put out of business, and their evidence that those harms will befall them in the future is speculative and conclusory.

### a. Plaintiffs' evidence of past injury fails to satisfy either prong of Davis

Plaintiffs' submissions show only that their relationships with some banks have been terminated, not that they have been effectively denied a right to hold a bank account or access the banking system.   Indeed, it appears at this time that virtually

all of the Plaintiffs continue to have access to the banking system.

For example, Advance America has indicated that it has received termination notices from 21 banks since 2013, but fails to tell the Court how many banks it continues to have accounts or business relationships with. See Declaration of Christian Rudolph ¶ 3 ("Rudolph Declaration") [Dkt. No. 87-4]. Similarly, the declarations submitted by virtually all of the New Plaintiffs indicate that they continue to have accounts and relationships with other banks, despite having experienced some terminations since 2013.[2] See e.g. Declaration of Christopher Henn ¶ 8 ("Henn

_____

[2] The sole exception appears to be Mr. Naumann. Plaintiffs are not seeking injunctive relief on his behalf because he is not actively seeking to establish a business relationship with any bank. See New Plaintiffs' Mot. at 2; Opp'n to New Plaintiff's Mot. at 1, n.8.

Furthermore, his evidence – even if credited by the Court - is of limited value to establish the necessity of injunctive relief for the other Plaintiffs. Mr. Naumann states that his business was serviced by only one bank, Umpqua Bank. Declaration of Richard Naumann [Dkt. No. 107-2]. The fact that this single bank terminated his account and that he was unable to find another bank in his county that would work with him does not necessarily mean that he was cut off from the entire banking system. And it provides little evidence that is relevant to the situations the other Plaintiffs – all of whom appear to have a large, national or multi-state footprint – find themselves in. That Mr. Naumann cannot find another bank in Calaveras County, California, does not suggest to the Court that other payday lenders are unable to find a single bank across the entire nation with which to establish a new business relationship.

-11-

Declaration") [Dkt. No. 107-4] (describing NCP's actions "transitioning" terminated accounts to two other banks with which it had preexisting relationships); Declaration of Glenn Bassett ¶¶ 2,3 ("Bassett Declaration") [Dkt. No. 107-5] (describing ability of Northstate to find new banks after receiving termination notices); First Declaration of Robert Zeitler Sr. ¶ 5 ("First Zeitler Declaration") [Dkt. No. 107-6] (describing PHFS' ability to find new bank in Los Angeles market following termination).

The Plaintiffs provide little information about how the number of terminated banking relationships compares to the number of relationships they continue to have. See e.g. Second Declaration of Robert Zeitler, Sr. ("Second Zeitler Declaration")[Dkt. No. 126-1] (describing PHFS being turned down by 30 banks since 2013, but failing to mention how many bank accounts it now holds or has been able to open); First Declaration of William Lane ¶ 5 ("First Lane Declaration") [Dkt. No. 107-3] (describing terminations by seven banks but failing to state how many accounts Check Into Cash continues to have). Without such information, the Court is unable to conclude that they have been "cut off" from the banking system. In sum, the fairest reading of Plaintiffs' submissions is that, presently, they do have a right to hold bank accounts and otherwise access the banking system.

-12-

Similarly, the Plaintiffs' submissions fail to demonstrate that the loss of banking accounts has precluded them from engaging in their chosen line of business. Despite their loss of bank accounts to date, all of the Plaintiffs, but one, remain in business.[3] They have done so, in part, by establishing new accounts with new banks, as their own submissions establish. Plaintiffs have not even submitted financial statements or analyses showing that these prior terminations have harmed their bottom line. Indeed, at oral argument the parties agreed that Advance America has been profitable in some years despite the termination of many of its bank accounts. See also Opp'n to Advance America's Mot. at 8-10. Plaintiffs remain in business and therefore cannot show that they have been broadly precluded from the payday lending industry.

Accordingly, they cannot demonstrate a likelihood of success on the merits based on the harms that they allege they have suffered to date.

---

[3] Again, the sole exception is Mr. Naumann. For the reasons stated in Footnote 2, the Court finds that what occurred to Mr. Naumann has little relevance to the claims of the Plaintiffs.

### b. **Plaintiffs' evidence of future injury is too speculative to satisfy either prong of Davis**

Plaintiffs also assert that their due process rights will be violated in the near future if Operation Choke Point continues unabated. Plaintiffs contend that an increasing number of banks are choosing not to service payday lenders and that this will quickly deprive payday lenders of the right to hold bank accounts and access the banking system, which in turn will put them out of business. Plaintiffs fail to support these allegations, and their arguments are ultimately far too speculative to carry their burden and justify a preliminary injunction.

Plaintiffs' assertions that they will soon be cut off from the banking system suffers from the same lack of context and evidentiary gaps as their assertions of past harm. Plaintiffs place significant emphasis on the apparent decision of U.S. Bank to cease providing banking services to payday lenders. See e.g. Rudolph Declaration ¶¶ 9-14; First Lane Declaration ¶ 5. At oral argument Advance America stated that it contacted 150 banks in response to U.S. Bank's termination notification, and that none would provide Advance America with a replacement account.

Yet, the fact that some discrete number of banks refuse to transact with Advance America tells us almost nothing about how many banks remain willing to transact with payday lenders. At first

-14-

blush, 150 may sound like a large number of banks, until one considers that the FDIC insures just shy of 6,000 banks.[4] Plaintiffs' submissions give the Court little sense of how many of these banks have stopped working with the payday lenders. What they do make clear is that, even after U.S. Bank's decision, there are some banks that are still willing to do business with payday lenders, including Plaintiffs. Rudolph Declaration (36% of storefronts unaffected); First Zeitler Declaration ¶ 5; Bassett Declaration ¶ 4.

Moreover, Plaintiffs' submissions show that many of them have experienced similar terminations in the past, but have still been able to find new banks willing to do business with them. See e.g. First Zeitler Declaration ¶ 5; Bassett Declaration ¶ 4. This undercuts Plaintiffs' assertions that they will be unable to replace the accounts that are about to be terminated. Ultimately, it is Plaintiffs' heavy burden to demonstrate that they are likely to be cut off from the banking system. They have failed to submit evidence that meets that burden.

Plaintiffs also claim that the impending termination of bank accounts and banking relationships threatens to broadly preclude

---

[4] The FDIC's website states that it insures 5,903 banks. FDIC, BankFind, https://research.fdic.gov/bankfind/ (last visited February 23, 2017).

-15-

them from continuing to operate in the payday industry.  See e.g. Rudolph Declaration ¶ 14 (impending termination of accounts with U.S. Banks poses "existential threat" to Advance America); Henn Declaration at ¶ 11 (NCP will have to "shutter its doors" if it loses all banking relationships); Bassett Declaration at ¶ 4 & First Zeitler Declaration at ¶ 5 (describing businesses as in "serious jeopardy").  Plaintiffs posit that they will be put out of business if they are entirely cut off from the banking system, and that argument seems plausible on its face.  However, Plaintiffs have failed to demonstrate that they are likely to be cut off from the banking system, and thus, cannot rely on that speculative allegation to establish that they are likely to be put out of business.

Therefore, the Court must look to Plaintiffs' other evidence - which shows they are likely to lose some bank accounts and relationships - to determine whether these terminations threaten to effectively put them out of business.  The fault with Plaintiffs' argument is that they have survived many such terminations in the past, consistently finding new banks to transact with.  See e.g. Bassett Declaration at ¶ 3 (explaining efforts to switch to new bank); First Zeitler Declaration ¶ 5 (explaining successful effort to establish new banking

relationships in the Los Angeles market). Plaintiffs fail to present evidence that they cannot do the same in the face of upcoming terminations. Moreover, Plaintiffs fail to demonstrate that, even if they are unable to replace the terminated banks, their businesses face an "existential threat." Rudolph Declaration ¶ 14.

The submissions and representations by Advance America demonstrate much of what is lacking. Advance America has been notified that its accounts with U.S. Bank will be terminated on March 31, 2017. These accounts service 1262 - or roughly 58% - of Advance America's storefronts. Rudolph Declaration at ¶ 10. Plaintiffs' counsel stated at the preliminary injunction hearing that the threatened termination by U.S. Bank was a "date with the guillotine" for Advance America's payday lending business.

Yet, Plaintiffs' own filings belie that conclusion. First, and quite notably, the declaration of Advance America's CFO states only that terminations will "impact" these locations, Rudolph Declaration at ¶ 6, not that termination of these accounts will necessarily lead to the closure of them all. That omission is telling, because the submissions of Advance America and the other Plaintiffs demonstrate that they have been often able to keep storefronts open even after banking services to those particular

-17-

locations have been terminated.  <u>See e.g.</u> Bassett Declaration ¶¶ 2,3; First Zeitler Declaration ¶6.  Thus, the Court is unable to conclude that closure of these storefronts is actually threatened or imminent.[5]

Second, Advance America appears to have been profitable during much of the period in which it was suffering bank account terminations.  At oral argument, all parties agreed that Advance America was profitable in 2013 and 2014 and that it would have been profitable in 2015 but for a one-time write off of good will. Advance America has not submitted evidence demonstrating why they were able to maintain profitability despite terminations in 2013

---

[5] Even if the Court concluded that these storefronts were likely to close, that would likely be insufficient to demonstrate that Advance America has been broadly precluded from the payday lending industry.  As the Federal Defendants correctly note, courts have held that even the loss of a sizable majority of a plaintiff's business is insufficient to establish broad preclusion.  Opp'n to Advance America's Mot. at 34, n. 35 (citing <u>inter alia</u> <u>Chicago United Industries, Ltd. v. City of Chicago</u>, 669 F.3d 847,851 (7th Cir. 2012) (decrease in revenues of 81% is mere "diminution" of business and insufficient to establish due process violation); <u>Bannum, Inc. v. Samuels</u>, 2016 WL 6459549, *1, *9 (D.D.C. Oct. 28, 2016) (plaintiff was not deprived of a liberty interest when it formerly operated 17 facilities but now had only six).

Here, less than 60% of Advance America's storefronts are threatened.  Without knowing how much of its business these storefronts account for, it is impossible to conclude that it faces the threat of going completely out of business.  Even assuming that these storefronts account for roughly 60% of its business, the loss of 60% of a business is simply too low to meet the level of a due process violation.

and 2014, or a causal linkage between prior terminations and the losses they suffered in 2015 and 2016.  Thus, the Court lacks any basis to extrapolate from the potential terminations in order to conclude that there is a serious threat to Advance America's business.

The very same problems plague the submissions of all the Plaintiffs.  They have introduced no evidence of their past financial performance, making it virtually impossible for the Court to understand the impact of past terminations on their businesses and to draw conclusions about the future impact of anticipated terminations.

Plaintiffs essentially ask the Court to accept at face value their declarations, which direly warn the Court that their businesses face an imminent threat.  These declarations are simply too conclusory and speculative to rely on.

### 3. Plaintiffs Evidence that Federal Defendants Made Stigmatizing Statements, which Caused the Termination of Bank Accounts, Is Unpersuasive

To succeed on the merits, Plaintiffs must ultimately prove that Federal Defendants made stigmatizing statements about them and that these stigmatizing statements caused banks to terminate their business relationships with Plaintiffs.  Plaintiffs contend that Federal Defendants have engaged in a wide-ranging "campaign

-19-

of backroom strong-arming," pressuring banks to terminate their relationships with payday lenders. Advance America Mot. at 2; see also TAC at ¶¶ 4-8. At this juncture, Plaintiffs have not demonstrated that they are likely to succeed in proving such a wide-ranging campaign existed and, accordingly, cannot demonstrate a causal link between bank terminations and Federal Defendants' conduct.[6]

Plaintiffs introduce little direct evidence of such a wide-ranging campaign. Instead, they have introduced only a few scattered statements in which Federal Defendants may have pressured a small number of banks to discontinue their relationships with specific payday lenders. See e.g. Letter from

---

[6] Federal Defendants argue that even if Plaintiffs could establish the existence of such a campaign, they would be unable to succeed on the merits of their due process claims. First, at the preliminary injunction hearing Federal Defendants argued that while Plaintiffs need to prove that Federal Defendants made stigmatic statements about them, statements that place "pressure" on banks are not statements that stigmatize Plaintiffs. Second, Plaintiffs argued that only statements that disparage individual payday lenders constitute stigmatic statements, and that statements about payday lenders as a class do not suffice for a due process claim.

The Court need not address these arguments. Plaintiffs have failed to establish that a campaign against them is likely to exist. Moreover, they have introduced little direct evidence of the statements that constitute this alleged campaign. The Court need not evaluate hypothetical statements to determine whether they would or would not constitute impermissible stigma.

M. Anthony Love ("Love Letter") [Dkt. No. 35-1] (letter from FDIC supervisor to unidentified bank expressing concerns that relationship with unidentified payday lender increased reputation risk); Declaration of Ed Lette [Dkt. No. 87-2] (stating that Business Bank of Texas was pressured to terminate relationship with Power Finance because it was a payday lender); First Lane Declaration & Second Declaration of William Lane ("Second Lane Declaration") [Dkt. No. 126-2] (stating that two anonymous banks told Plaintiff Check Into Cash that it was being terminated because of pressure from Federal Defendants).

Much of Plaintiffs' evidence is problematic. Some of it is hearsay - indeed anonymous double hearsay - which the Court considers unreliable and of little persuasive value. See FTC v. CCC Holdings, Inc., 2009 WL 10631282, *2 (D.D.C. Jan 30, 2009) (although hearsay is allowable in deciding a motion for a preliminary injunction, double hearsay evidence was not admitted because it lacked "sufficient indicia of reliability"). Moreover, even that evidence which is not cloaked in anonymity is directly contradicted by sworn statements from employees of Federal Defendants. See e.g. Declaration of NS Ward III [Dkt. No. 89-1] (sworn declaration of OCC employee stating that Business Bank of Texas was never pressured to terminate relationships with payday

-21-

lenders generally, or Power Finance, specifically, and thereby directly contradicting the Declaration of Ed Lette).

Indeed, with regard to the looming terminations that Plaintiffs are most concerned with, that of U.S. Bank, the Federal Defendants have submitted a sworn declaration from its lead regulator/examiner stating unequivocally that they never pressured U.S. Bank to terminate its relationship with payday lenders. Declaration of Serena Christenson [Dkt. No. 90-1].

The one piece of direct, uncontroverted evidence of a regulator seeming to pressure a bank to terminate a relationship with a payday lender suffers flaws of its own. First, it does not contain any impermissibly stigmatic statements; instead, it appears based on FDIC's permissible concerns regarding a particular payday lender's business practices. Rather than being evidence of a broader campaign against payday lenders, it appears to be evidence of a targeted enforcement action against a single scofflaw. See Love Letter.

Unable to muster direct evidence of the existence of this alleged pressure campaign, Plaintiffs point to other statements - such as agency guidance documents and internal agency emails - as

-22-

circumstantial evidence of such a campaign.[7]   The Court finds

these statements to be too few and too equivocal to persuasively

establish that such a campaign existed.

Plaintiffs also attempt to show that this campaign exists by

pointing to what they characterize as an "unprecedented wave of

bank terminations of relationships with payday lenders" beginning

in 2013.   New Plaintiffs' Reply at 14 (internal citations and

quotation marks omitted).   Plaintiffs' submissions identify the

many terminations they have experienced firsthand, and Plaintiffs'

expert, having reviewed these submissions and other evidence, has

concluded that this "wave" could only have been caused by a

pressure campaign orchestrated by Federal Defendants.   See Expert

of Report of Charles Calomiris ("Calomiris Report") [Dkt. No. 126-

3].

_____

[7] Many of these statements were non-public and made internally
within the relevant agency, and thus could not have caused any
stigma.   See Opp'n to Advance America's Mot. at 28-30. Other
statements equating payday lending to pornography and other
unsavory businesses, though public, are of marginal relevance to
Plaintiffs'  claims.      Under  Plaintiffs'  own  theory,  Federal
Defendants' pressure campaign took place in the "backroom."   Thus,
it was those backroom efforts to pressure banks into terminating
relationships with payday lenders, not these widely-disseminated
public statements, that caused the complained of terminations.
Thus, these statements are at best circumstantial evidence of a
backroom pressure campaign.

This reasoning suffers from a fundamental flaw, in that it fails to establish whether or not banks frequently terminated accounts with payday lenders prior to the alleged initiation of Operation Choke Point in 2013. Absent such a baseline, it is impossible to make any comparison and, therefore, impossible to conclude that terminations have increased and/or were caused by Federal Defendants. Accordingly, this evidence and Plaintiffs' experts' conclusion is of little if any value to establish the existence of the alleged campaign.

Federal Defendants' supervision of regulated banks occurs largely behind closed doors, and as Plaintiffs' own filings acknowledge, to the extent the alleged campaign against payday lenders exists, it is taking place in the "backroom." Plaintiffs have been unable to penetrate these doors and bring forward direct evidence of the campaign, instead relying on circumstantial evidence. The Court finds Plaintiffs' evidence to be insufficient and unpersuasive, and concludes that Plaintiffs' have failed to demonstrate that they are likely to prove that such a wide-ranging pressure campaign exists.

### 4. The Court's Decision in CFSA I Does not Demonstrate that Plaintiffs Are Likely to Succeed on the Merits

Finally, Plaintiffs' briefs seem to suggest that the Court already decided that they were likely to succeed on the merits in

-24-

CFSA I, where the Court denied the Federal Defendants' Motion to Dismiss Plaintiffs' due process claims. Advance America Mot. at 16-23. Plaintiffs ignore the different standards applied when resolving a Motion to Dismiss under Rule 12(b)(6) versus a Motion for Preliminary Injunction. Bruni v. City of Pittsburgh, 824 F.3d 353, 361 n.11 (3d Cir. 2016) (discussing difference in those two standards); Swanson Grp. Mfg. LLC v. Jewell, 2016 WL 3625554, *8 (D.D.C. June 28, 2016) (plaintiff who satisfied Rule 12(b)(6) nonetheless failed to show "likelihood of success").

In denying the Federal Defendants' Motion to Dismiss, the Court concluded only that it was "plausible" that the Federal Defendants were violating Plaintiffs' due process rights, which was all that was necessary under Rule 12(b)(6) to survive Federal Defendants' Motion. See CFSA I, 132 F. Supp. 3d at 117. This determination was based solely on the allegations in Plaintiff Advance America's Complaint. Id. at 124 ("Plaintiffs have sufficiently alleged that their liberty interests are implicated by Defendants' alleged actions and that the alleged stigma has deprived them of their rights to bank accounts and their chosen line of business." (emphasis added)). The Court was quite clear that in doing so it was "not mak[ing] any judgment about the

-25-

probability of the Plaintiffs' success" on the merits.   Id. at
117.

Since that time, Plaintiffs have come forward with little
additional, persuasive evidence in support of their claims.
Accordingly, they have failed to demonstrate they are likely to
succeed on the merits of their claims, or that there is a serious
legal question as to the merits of their claims.   Thus, they have
failed to meet their burden on the first prong of the preliminary
injunction analysis.

## B.   Risk of Irreparable Harm

A party moving for summary judgment must demonstrate two
things to establish that it will suffer irreparable harm.   "First,
the injury must be both certain and great; it must be actual and
not theoretical...the injury complained of [must be] of such
imminence that there is a clear and present need for equitable
relief to prevent irreparable harm. Second, the injury must be
beyond remediation."   Chaplaincy of Full Gospel Churches v.
England, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal citations
and quotation marks omitted).

Plaintiffs allege that they will be cut off from the banking
system and put out of business absent the issuance of a preliminary
injunction.   As the foregoing analysis makes clear, the Court finds

that Plaintiffs have failed to establish that either of these outcomes are likely to occur.

However, in conducting the irreparable harm analysis, the Court must assume that the "movant has demonstrated a likelihood that the non-movant's conduct violates the law." Chaplaincy of Full Gospel Churches, 454 F.3d at 303. Thus, the Court must assume that Federal Defendants have committed a due process violation and "examine[s] only whether that violation, if true, inflicts irremediable injury." Chaplaincy of Full Gospel Churches, 454 F.3d at 303.

In this case, being deprived of bank accounts or being put out of business are themselves necessary elements of the violation, and therefore the Court must accept them as true for purposes of the irreparable harm analysis.    In other words, even though Plaintiffs have failed to show that it is likely that they will be deprived of access to the banking system or that they will be put out of business, for purposes of the irreparable harm analysis the Court must assume that those outcomes will occur because they are elements of their due process claim.

Plaintiffs have alleged that they will suffer a violation of their right to due process.  The violation of such a personal constitutional right is per se irreparable.  Mills v. District of

Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (internal citations and quotation marks omitted))). "'Suits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself.' Thus, 'although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes.'" Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013) (quoting Davis v. District of Columbia, 158 F.3d 1342, 1346 (D.C. Cir. 1998)); see also 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, et al. Federal Practice and Procedure § 2948.1 (3d ed. 2016) ("Wright and Miller") ("When an alleged deprivation of a constitutional right is involved...most courts hold that no further showing of irreparable injury is necessary.").[8]

---

[8] That conclusion is bolstered when, as in this case, damages are unavailable as a remedy to deter future constitutional violations. See Chaplaincy of Full Gospel Churches v. England, 454 F.3d at 303; Opp'n to Advance America's Mot. at 13 & Advance America Mot. at 28-29 (suggesting that sovereign immunity would preclude claim for damages).

Federal Defendants' arguments to the contrary are unpersuasive. First, they argue that there is no per se rule that an allegation of a constitutional violation constitutes irreparable harm. Opp'n to Advance America's Mot. at 19. While one sentence within Chaplaincy of Full Gospel Churches is in accord with that position, 454 F.3d at 301, that sentence is at odds with other parts of the very same opinion, as well as other rulings of the D.C. Circuit, supra, and the great weight of precedent. See 11A Wright and Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2016).[9]

Second, Federal Defendants argue that because the Court has concluded that Plaintiffs are unlikely to succeed on the merits, Plaintiffs necessarily cannot show that they will be irreparably harmed. This argument has a certain internal logic - after all, if it is unlikely that Plaintiffs' bank accounts will actually be terminated or they will actually be put out of business, it is not clear how those alleged harms are anything other than "theoretical." See Chaplaincy of Full Gospel Churches, 454 F.3d

---

[9] And the only other case cited by the Federal Defendants expressly distinguishes itself from these precedents on the basis that the alleged constitutional violations were of the Appointments Clause and did not involve the "personal denial of a constitutional right." Live365, Inc. v. Copyright Royalty Bd., 698 F. Supp. 2d 25, 45 (D.D.C. 2010).

at 297 (injury "must be actual and not theoretical" to show
irreparable harm).

However, this argument misapprehends the nature of the
irreparable harm analysis.  In evaluating whether harm is
irreparable, the Court focuses on the nature of the harm, whether
- if the violation were to occur - it could be remedied by the
Court.  Thus, the Court assumes that the alleged violation of law
will occur, Id. at 303, and then determines whether the alleged
harm is both "actual" and "beyond remediation." Id. at 303.  But
where a party claims that their personal constitutional rights are
being violated, the violation of law and the alleged injury are
one in the same.  Thus, in assuming that the constitutional
violation will occur, the Court must also assume that the
deprivation of the constitutional right will occur. Id.

Moreover, it makes little sense at the irreparable harm stage
to ask yet again whether the injury will occur, because that
analysis has already been conducted in evaluating the likelihood
of success on the merits. Chaplaincy of Full Gospel Churches, 454
F.3d at 303 ("the extent to which the disputed government action
actually violates [a Constitutional right]...is addressed by
another prong of the preliminary injunction calculation, the
likelihood of the movant's success on the merits.").  To do

-30-

otherwise would conflate the irreparable harm analysis with the likelihood of success on the merits analysis and make the former redundant.[10]

As Plaintiffs have alleged that their own due process rights will be violated by Federal Defendants' actions, the Court finds that they have carried their burden on irreparable harm.[11]

### C.   Balance of the equities and the public interest

A party seeking a preliminary injunction must demonstrate both "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20.

---

[10] In addition, the approach suggested by Federal Defendants would eviscerate the sliding scale evaluation in cases involving personal constitutional rights. Davis v. PBGC, 571 F.3d at 1291-92. Under that approach, a movant need only show a "serious legal question" on the merits if the other factors strongly favor her. Sherley, 644 F.3d at 398. But under Federal Defendants' approach, a movant who can show a serious legal question - but not a likelihood of success - on the merits, would never be able to make a strong showing on irreparable harm. Thus, the sliding scale evaluation would be a dead letter in cases involving personal constitutional rights. This further highlights the defect in Federal Defendants' argument.

[11] Even if Federal Defendants were correct, that would simply bolster the Court's conclusion that a preliminary injunction is unwarranted.

These factors merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

Plaintiffs argue that this "combined inquiry itself 'largely merges with the likelihood of success on the merits' when the government is alleged to be violating the Constitution." Reply at 16 (quoting Republican Nat'l Comm. v. FEC, 172 F.3d 920, 1998 WL 794896, at *1 (D.C. Cir. 1998) (unpublished)). Given that the Court finds that Plaintiffs are unlikely to succeed on the merits, Plaintiffs do not appear entitled to a preliminary injunction, even under their own rules of engagement.

Moreover, the Federal Defendants correctly note that enjoining an agency's statutorily delegated enforcement authority is likely to harm the public interest, particularly where plaintiffs are unable to demonstrate a likelihood of success on the merits. See e.g. Hunter v. FERC, 527 F.Supp.2d 9, 18 (D.D.C. 2007); National Propane Gas Ass'n v. DHS, 534 F. Supp. 2d 16, 20 (D.D.C. 2008). That danger is particularly acute in the context of bank supervision, where Congress has significantly curtailed the jurisdiction of federal courts to hear challenges to bank regulators' enforcement actions. See 12 U.S.C. § 1818(i)(1); CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d

738, 741-42 (D.C. Cir. 1995).[12]  Federal Defendants persuasively describe how Plaintiffs' injunction, if granted, would inject this Court into their oversight and supervision of numerous banks throughout the country. Opp'n to Advance America's Mot. at 40-48.

Given Congress' determination that the public interest is better served when banking regulators' enforcement actions are insulated from judicial supervision – as embodied in Section 1818(i)(1) – the Court is especially hesitant to grant an injunction when Plaintiffs are unable to establish a likelihood of success on the merits.  Ultimately, it is Plaintiffs' burden to demonstrate that issuance of an injunction would be in the public interest and they have failed to do so.

IV.  CONCLUSION

Plaintiffs have failed to persuade the Court that granting a preliminary injunction is warranted.  In particular, Plaintiffs have failed to carry their burden and demonstrate either a likelihood of success on the merits or that issuance of a preliminary injunction would be in the public interest.

_____

[12] Though the Court previously held that Section 1818(i)(1) did not divest the court of jurisdiction to hear this case, it made clear in CFSA I that it was cognizant of the limitations imposed by that statutory provision and would tailor any relief to comply with it. See 132 F. Supp. 3d at 113.

Accordingly, their respective Motions for Preliminary Injunction

are **denied**.


February 23, 2017                        Gladys Kessler
                                         United States District Judge


**Copies to**: attorneys on record via ECF