# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ADVANCE AMERICA, CASH ADVANCE
CENTERS, INC., et al.,

                Plaintiffs,

    v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, et al.,

                Defendants.

Civil Action No. 14-953-TNM

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Date:   October 12, 2018

Charles J. Cooper (Bar No. 248070)
ccooper@cooperkirk.com
David H. Thompson (Bar No. 450503)
Peter A. Patterson (Bar No. 998668)
Nicole J. Moss (Bar No. 472424)
Harold S. Reeves (Bar No. 459022)
John D. Ohlendorf (Bar No. 1024544)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

I.      Payday Lending ...................................................................................................... 4

II.     The Origins of Operation Choke Point ................................................................. 5

III.    The Expanding Definition of Reputation Risk .................................................... 7

IV.     Operation Choke Point Continues ...................................................................... 12

V.      Operation Choke Point's Effects ........................................................................ 25

ARGUMENT ..................................................................................................................... 29

I.      Plaintiffs Advance America, Check Into Cash, and Northstate Have Standing
        To Sue Defendants For Violating their Due Process Rights................................ 30

II.     Defendants' Actions Amount to a Continuing Violation of the Due Process Clause. ...... 35

        A.      Defendants Have Violated Plaintiffs' Due Process Rights Under the
                Stigma-Plus Theory. ............................................................................... 36

        B.      Defendants Have Violated Plaintiffs' Due Process Rights Under the
                Reputation-Plus Theory. ......................................................................... 41

III.    Plaintiffs Are Entitled to an Appropriate Remedy............................................. 44

CONCLUSION .................................................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**                                                                                                **Page**

*Bartel v. Federal Aviation Admin.*, 617 F. Supp. 190 (D.D.C. 1985)............................................39

* *Bartel v. Federal Aviation Administration*, 725 F.2d 1403 (D.C. Cir. 1984)...................38, 39, 40

*Beck v. Test Masters Educ. Servs. Inc.*, 994 F. Supp. 2d 98 (D.D.C. 2014)................................45

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................................30

* *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972)................................3, 36, 41, 42

*Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886 (1961) ........................35

*Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338 (Fed. Cir. 2010)............................................45

* *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005).......................................................40, 41

*Fahey v. Mallonee*, 332 U.S. 245 (1947)............................................................................7

*Filebark v. DOT*, 555 F.3d 1009 (D.C. Cir. 2009) ...........................................................36

*Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31 (D.D.C. 2016)........................................45

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ..........................................................45

* *Humphries v. County of Los Angeles*, 554 F.3d 1170 (9th Cir. 2009)...................................41, 44

*Hurtado v. People of Cal.*, 110 U.S. 516 (1884) ...........................................................3, 4

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................................................30

* *Lyons v. Barrett*, 851 F.2d 406 (D.C. Cir. 1988) ......................................................42, 44

* *National Council of Resistance of Iran v. Department of State*,
   251 F.3d 192 (D.C. Cir. 2001)................................................................................38, 43

*Nken v. Holder*, 556 U.S. 418 (2009) .............................................................................45

*O'Donnell v. Barry*, 148 F.3d 1126 (D.C. Cir. 1998)...................................................42, 43

*Old Dominion Dairy Prods., Inc. v. Secretary of Defense*, 631 F.2d 953 (D.C. Cir. 1980)..........43

*Owen v. City of Independence, Mo.*, 445 U.S. 622 (1980) ...............................................43

*Paul v. Davis*, 424 U.S. 693 (1976) ...............................................................3, 37, 38, 42

*PDK Labs Inc. v. Reno*, 134 F. Supp. 2d 24 (D.D.C. 2001) .............................................40

* *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594 (D.C. Cir. 1993) ...................39, 40

*Scenic America, Inc. v. DOT*, 983 F. Supp. 2d 170 (D.D.C. 2013)......................................30

*Tozzi v. United States Dep't of Health & Human Servs.*, 271 F.3d 301 (D.C. Cir. 2001)............30

*Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003) ..................................35

*Utah v. Evans*, 536 U.S. 452 (2002) ..............................................................................35

* *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994) .........................................................40, 41

*West v. Lynch*, 845 F.3d 1228 (D.C. Cir. 2017)..............................................................30

* *Wisconsin v. Constantineau*, 400 U.S. 433 (1971) ....................................................3, 35, 36, 37, 44

**Constitutional and Statutory Provisions, Regulatory Materials, and Rules**

U.S. CONST. amend. V ....................................................................................................9

12 U.S.C.

§ 1831o(f)(2) ...........................................................................................................9

§ 1831p-1 .................................................................................................................7

§ 1831p-1(e)(1) .......................................................................................................9

12 C.F.R. Pt. 364, App. A .............................................................................................7

12 C.F.R. § II(A) ...........................................................................................................7

FED. R. CIV. P. 56 .........................................................................................................29

**Other**

FDIC, *Managing Risks in Third-Party Payment Processor Relationships*, SUPERVISORY INSIGHTS, Summer 2011 ....................................................................................................9

FDIC, Financial Institution Letter: Foreign-Based Third-Party Service Providers, FIL-52-2006 (June 21, 2006) ......................................................................................8

FDIC, Financial Institution Letter: Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008) ........................................................................................ 8

FDIC, Financial Institution Letter: Guidance on Payment Processor Relationships, FIL-127-2008 (Nov. 7, 2008) .................................................................................8, 9

FDIC, Financial Institution Letter: Payday Lending Programs, FIL-14-2005 (Mar. 1, 2005) ........5

FDIC, Financial Institution Letter: Revised Guidance on Payment Processor Relationships, FIL-3-2012 (Jan. 31, 2012) .......................................................................................10

FDIC, Financial Institution Letter: FDIC Supervisory Approach to Payment Processing Relationships With Merchant Customers That Engage in Higher-Risk Activities, FIL-43-2013 (Sept. 27, 2013) ...................................................................................10

FDIC, Financial Institution Letter: FDIC Clarifying Supervisory Approach to Institutions Establishing Account Relationships with Third-Party Payment Processors, FIL-41-2014 (July 28, 2014) ................................................................................11, 12

OCC, Risk Management Guidance: Third Party Relationships, OCC Bull. No. 2013-29 (Oct. 30, 2013) .........................................................................................................10

## INTRODUCTION

In late 2010 or early 2011, the Regional Directors of the FDIC—the officials in the field entrusted with supervising the "safety and soundness" of banks throughout the Nation—were summoned to Washington D.C. and received an important message direct from the "Sixth Floor" offices of the Chairman himself: "if a bank was found to be involved in payday lending," in any of the Regional Offices, "someone was going to be **fired**." SOF ¶ 18 (emphasis added). Accordingly, "if an institution in their region was facilitating payday lending, the Regional Director should require the institution to submit a plan for exiting the business." SOF ¶ 16. Payday lending—the chosen trade of the Plaintiffs in this case—is a lawful, legitimate business. Payday loans provide short-term credit to millions of American households, especially those that are underbanked, helping them to pay their bills between paychecks without relying on more costly forms of informal credit such as overdraft protection, bounced checks, and late-payment fees. But starting in 2011, payday lenders found themselves in the cross-hairs of a clandestine pressure campaign, carried out by the banking regulators at the FDIC and OCC through backroom meetings, threatening letters, and whispered threats, all in pursuit of a single-minded purpose: to cast payday lending as a "high-risk," "dirty business," and to "stop [supervised] banks from facilitating" the industry by all "available means." SOF ¶¶ 32, 73, 118, 157.

Like many other modern businesses, payday lenders rely upon banking services—in particular, access to the Automated Clearing House ("ACH") network and check-cashing services—to operate. As Defendants perceived, this vulnerability could be exploited: by cutting off the industry's access to the banking systems, they could "choke out" payday lending, without ever regulating it directly, merely by leveraging their existing supervisory authority over the banks. Accordingly, in an act as remarkable for its candor as its alarming implications for our democracy,

the Government itself dubbed the pressure campaign "Operation Choke Point."

Defendants pursued the campaign with both enthusiasm and tenacity. In the FDIC's Washington Office, senior officials compiled and disseminated lists of banks with payday-lender customers, brainstormed ideas for cutting off the industry's access to the banking system, and through both formal regulatory guidance and informal conversations created the general "expectation [that officials in the field should] discourage institutions from facilitating payday lending." SOF ¶ 97. And in the regional offices, the banking regulators used a variety of methods to "encourage" banks to end their relationships with payday lenders. In some cases, regional officials employed naked pressure tactics: directing banks to terminate specific accounts and threatening them with punitive, retaliatory consequences if they did not comply. The FDIC threatened some banking officials with **criminal prosecution** if they persisted in banking payday lenders. And when the banks inevitably yielded to this unbearable pressure, the FDIC then immediately demanded that the decision be portrayed as a voluntary action to whitewash the agency's backroom pressure tactics.

In other cases, Defendants pursued a more nuanced approach: instructing banks that payday lenders are "high risk" customers, and if financial institutions wish to do business with them, they must pay a price—in the form of costly, heightened due-diligence and enhanced monitoring and compliance practices. Indeed, the FDIC admits to this day that it imposes these extra costs on banks who elect to do business with payday lenders—adopting what amounts to an unauthorized regulatory surcharge on serving anyone in the payday lending industry. SOF ¶ 77.

The effects of Defendants' operation have been predictable, uniform, and severe. Plaintiffs have seen bank after bank end longstanding, beneficial relationships with them. In some cases these terminations have come without any explanation at all—although a few bank officers have

later explained that their hand was forced by their regulators, who instructed them to exit the entire industry. SOF ¶¶ 213–22. And in other cases, the banks have explained that they could no longer afford to keep payday lenders as customers because of "the heightened scrutiny required by our regulators." SOF ¶ 200. Since 2011, Plaintiffs have lost relationships with scores of banks, have been refused service by hundreds more, and have spent millions of dollars in banking fees and on workarounds such as armored car-services as a result of their restricted access to the banking system. From Defendants' perspective, Operation Choke Point has been a resounding success.

The Due Process Clause does not permit the Government to attack the law-abiding members of a lawful industry in this manner. The Constitution's guarantee of due process is a bulwark of the rule of law, and it "was designed to protect the citizen against all mere acts of power, whether flowing from the legislative or executive branches of the government." *Hurtado v. People of Cal.*, 110 U.S. 516, 527 (1884). The evidence amassed in discovery shows that Plaintiffs are entitled to judgment on either of two related due process theories.

First, under *Wisconsin v. Constantineau*, 400 U.S. 433 (1971), due process must be afforded before the Government can stigmatize individuals in a way that prevents them from exercising pre-existing liberty or property rights "in common with the rest of the citizenry." *Paul v. Davis*, 424 U.S. 693, 708 (1976). *Constantineau* involved the liberty to purchase alcohol; here, Defendants have restricted payday lenders' liberty to access the banking system—a liberty of far more consequence—by tarring them as illegitimate and "high risk" and by imposing an unauthorized regulatory surcharge on any bank bold enough to do business with them. Second, under *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972), due process must be afforded before the Government can make stigmatizing statements in connection with the extinguishment of a right or benefit. Here, Defendants have coerced banks across the nation into

extinguishing Plaintiffs' bank accounts—all against the backdrop of the stigmatizing charge that banking payday lenders is a "high-risk" proposition and that even *offering a payday lender a checking account* could tarnish a bank's reputation.

The Constitution will not brook these "mere acts of power," *Hurtado*, 110 U.S. at 527— not, at least, without a modicum of due process—and the Court must declare Defendants' pressure tactics unlawful and put a stop to them.

## FACTUAL BACKGROUND

### I.     Payday Lending

Payday loans—short-term loans that operate as an advance on the borrower's paycheck or other income—provide short-term credit to millions of American households. SOF ¶¶ 1, 2. This form of credit is especially important to minority and other vulnerable communities that are underbanked, because payday loans are more readily available than more traditional forms of credit and allow these underbanked individuals to bridge unexpected financial needs between income installments. SOF ¶¶ 2, 3. Payday loans are less costly than the informal credit systems on which many consumers must rely in the absence of payday advances, such as overdraft protection, bounced checks, and late bill payment fees. SOF ¶ 3. Simply put, a payday loan is a convenient and reasonably-priced vehicle for short-term financial needs.

Payday lenders rely on banking services to operate. SOF ¶ 4. Like any other business, most payday lenders depend on banks for basic financial services such as the provision of lines of credit and the management of the outflow and inflow of money from accounts payable and receivable. SOF ¶ 6. Critically, the basic payday lending business model also relies on banks to provide access to the Automated Clearing House ("ACH") network and check-cashing services. When a prospective borrower applies for a payday loan, he or she typically provides a post-dated check or an electronic debit authorization for the value of the loan, plus a fee. SOF ¶ 4. The lender

immediately advances the customer funds, and then, after a specified period of time, the borrower returns to repay the loan and fee. SOF ¶ 5. But if the customer does not return, the terms of the transaction permit the lender to deposit the post-dated check or to execute the debit authorization. In order to execute a debit authorization, the lender generally must have access to the ACH network, either directly or through a Third-Party Payment Processor ("TPPP")—an entity that uses banking services to process payments for customers of its own. SOF ¶ 5. While there are alternatives to ACH access—such as physically transporting cash to and from remote depository institutions via armored car—they all entail additional hassle for the customer or significantly higher transaction costs, and they have therefore proven not to be a viable method of operation over the long-term. SOF ¶¶ 233, 248.

The reliance of payday lending on access to banking services—and, especially, the ACH network—is a critically important fact in this case. For Defendants, perceiving that access to banking services was the oxygen necessary to the payday lending industry's survival, resolved to suffocate the industry by choking off this air supply.

## II.     The Origins of Operation Choke Point

Defendants have a longstanding animus against payday lending. In early 2005, for instance, the FDIC undertook a successful campaign to force banking institutions to stop directly offering payday loans. On March 1, 2005, the FDIC issued a Financial Institution Letter expressly identifying payday lending as "a high-risk activity," that raised a number of "concerns." FDIC, Financial Institution Letter: Payday Lending Programs, FIL-14-2005 at 2 (Mar. 1, 2005); SOF ¶ 9–10. "As a result of the guidance and related supervisory actions, the relatively few FDIC-supervised institutions that were making payday loans stopped doing so in 2006." SOF ¶ 11 (OIG Report at 12).

Having successfully stopped banks from entering the payday lending industry, Defendants

next shifted the regulatory crosshairs to the industry itself. According to records produced to Congress, for example, a 2012 meeting of the Financial Fraud Enforcement Task Force's Consumer Protection Working Group—which included representatives from the FDIC and OCC, as well as DOJ and the Board—proposed that the agencies "[p]lan and execute national operations targeting specific types of consumer fraud" including "payday lending" alongside such other clearly illegal activities as "identity theft," "business opportunity schemes," and "counterfeiting." SOF ¶ 12–13. While the banking regulators do not have regulatory jurisdiction over payday lenders directly, they recognized that their vast, discretionary authority over the Nation's financial institutions provided them with a convenient "means to get at payday lending" *indirectly* "(either by the bank's direct customer or through a third party payment processor)." SOF ¶ 60.

Defendants could leverage their authority over banks to "get at" the payday-lender *customers* of those banks because of two facts: First, as discussed above, the payday lending business model is critically reliant on access to banks to provide basic financial services and access to the ACH network. And second, because banks are subject to intensive federal regulation, they are particularly vulnerable to regulatory pressure—a fact not lost on the government officials involved in the emerging campaign against payday lending. For example, one official noted early on that "[b]anks are sensitive to the risk of civil/criminal liability and regulatory action," and the banking regulators could thus pressure them to "scrutinize immediately" their relationships with the payday lending industry merely by "sending a letter to a senior bank executive." SOF ¶ 15. The DOJ officials involved thus themselves dubbed the project "Operation Choke Point"—as it was designed to "choke out" payday lenders and other "high risk" businesses by constricting their

access to necessary banking and payments networks at the most vulnerable point. SOF ¶ 8. [1]

While DOJ formally named the operation only late in 2012, by that point the FDIC's efforts to cut payday lenders off from the banking system were already well underway. In late 2010 or early 2011, the FDIC's senior Washington officials convened a meeting of all Regional Directors (or their designees)—the heads of the FDIC's field offices, in charge of supervising financial institutions throughout the Nation. SOF ¶ 16. The Senior Deputy Director informed the Regional Directors that he had discussed payday lending with the "Sixth Floor"—shorthand for the FDIC's Chairman and senior leadership—and that the regional offices were to implement the following approach: "if an institution in their region was facilitating payday lending, the Regional Director should require the institution to submit a plan for exiting the business." SOF ¶ 16, 17. The message, according to one of the Regional Directors at the meeting, was unambiguous: "if a bank was found to be involved in payday lending, someone was going to be **fired**." SOF ¶ 18 (emphasis added).

## III.    The Expanding Definition of Reputation Risk

The legal fulcrum of Defendants' campaign against payday lenders has been an amorphous and expanding definition of "reputation risk." "Banking is one of the longest regulated and most closely supervised of public callings," *Fahey v. Mallone*, 332 U.S. 245, 250 (1947), and the FDIC and OCC have vast authority to ensure the "safety and soundness" of the banks they supervise, *see, e.g.*, 12 U.S.C. § 1831p-1. Pursuant to this authority, Defendants have published high-level "interagency guidelines establishing standards for safety and soundness," 12 C.F.R. Pt. 364, App. A, which require banks to maintain "internal controls . . . that provide for . . . [e]ffective risk assessment." *Id*. § II(A). The specifics of what this requirement entails are not defined in the

---

[1] While the name "Operation Choke Point" could be seen as limited specifically to the DOJ initiative, we use the term to refer to the broader campaign, which included Defendants. While the DOJ has since repudiated its share of the operation, the record evidence discussed below shows that Defendants' campaign endures.

guidelines, but rather have been the subject of an evolving set of guidance documents.

One category of risk that Defendants have identified is "reputation risk." Traditionally, reputation risk has been understood to reflect the potential that a bank's own practices could cause it to have a negative reputation in the community and that this impaired reputation could threaten the bank's safety and soundness. *See, e.g.*, FDIC, Financial Institution Letter: Foreign-Based Third-Party Service Providers, FIL-52-2006 at 2 (June 21, 2006); SOF ¶ 26. But starting in 2008, Defendants expanded the meaning of reputation risk to encompass not only the risks posed by a bank's own operations but also those posed by a bank's *customers*. And in 2011, as the first stages of Operation Choke Point were unfolding, Defendants moved to deploy the expanded concept of reputation risk against the payday lending industry. SOF ¶ 55.

The first step in this expansion occurred in 2008, in the context of third-party agents performing functions on the banks' behalf. Under the traditional conception of reputation risk, a third party's activities could affect a bank's reputation risk only when those activities were undertaken on behalf of the bank. In June 2008, however, the FDIC issued a guidance letter stating that "any negative publicity involving the third party, *whether or not the publicity is related to the institution's use of the third party*, could result in reputation risk." FDIC, Financial Institution Letter: Guidance for Managing Third Party Risk, FIL-44-2008 (June 6, 2008) (emphasis added); SOF ¶ 27. The expansion continued later that year with the release of a guidance document addressing banks' relationships with payment processors—entities that use banking services to process payments for their own customers. *See* FDIC, Financial Institution Letter: Guidance on Payment Processor Relationships, FIL-127-2008 (Nov. 7, 2008); SOF ¶ 28. That guidance directed banks to be attuned to "reputation . . . risks" posed by having payment processors as customers, and it directed them to perform extensive due diligence and monitoring activities of not only the

8

payment processors themselves but also the payment processors' customers. *Id.* at 1, 2.

The expansion of reputation risk to include the reputation of a bank's customers gave Defendants a powerful new regulatory tool. The banking regulators' power over the institutions they supervise is vast, highly discretionary, and largely unaccountable. Defendants often operate under a veil of secrecy pursuant to their claims of "bank examination privilege"; they have expansive authority to impose a variety of negative consequences on banks—including costly visitations and examinations; and the violation of the risk-management standards they implement can lead to dire consequences for banks, up to and including seizure of control by Defendants or placement in conservatorship or receivership. *See* 12 U.S.C. §§ 1831o(f)(2), 1831p-1(e)(1). By defining reputation risk to include the risk arising from the bank's customers—unrelated to any activity of the banks themselves—Defendants were able to leverage their power over banks to target any line of business that depends on access to the banking system to operate. And Defendants soon moved to wield that tool against payday lenders.

In the summer of 2011, the FDIC published a Supervisory Insights article entitled "Managing Risks in Third Party Payment Processor Relationships." FDIC, *Managing Risks in Third-Party Payment Processor Relationships*, SUPERVISORY INSIGHTS, Summer 2011. The article warned against the reputational risk posed to banks by providing services to certain "high risk" merchants—even going so far as to *list* "merchant categories that have been associated with high-risk activity," a list that included "PayDay Loans" along with activities such as "Drug Paraphernalia," "Escort Services," "On-line Gambling," "Ponzi Schemes," and "Racist Materials." *Id.* at 6, 7. The article made clear that banks servicing high risk customers through payment processors would incur additional regulatory compliance burdens, including being required to perform "ongoing monitoring of high-risk accounts." *Id.* at 9.

While banks subject to Defendants' scrutiny would be ill-advised to disregard the guidance contained in the Supervisory Insights journal, these articles are not viewed as having the same force as the "Financial Institution Letters" issued by the FDIC. Accordingly, beginning in 2012, Defendants moved to include these warnings in more formal guidance documents.

In a January 2012 Financial Institution Letter offering guidance on payment processor relationships, the FDIC reiterated its view that payday lenders "pose elevated risk" to banks and that servicing such entities would require banks to engage in increased compliance activities, again including payday lending in a list of "high-risk" activities. FDIC, Financial Institution Letter: Revised Guidance on Payment Processor Relationships, FIL-3-2012 at 1 & n.1 (Jan. 31, 2012); SOF ¶ 39. Although it acknowledged that payday lenders may be legitimate customers, it encouraged banks to terminate banking relationships if the risk of maintaining them becomes too great. *Id.*; *see also* FDIC, Financial Institution Letter: FDIC Supervisory Approach to Payment Processing Relationships With Merchant Customers That Engage in Higher-Risk Activities, FIL-43-2013 at 1 & n.3 (Sept. 27, 2013) (clarifying that previous guidance applied not just to banks serving payday lenders indirectly through payment processors but also to banks servicing payday lenders directly as customers); SOF ¶ 43. And in October of 2013 the OCC issued a Bulletin similarly warning banks of reputation risks associated with providing financial services to business customers who "do not meet the expectations of the bank's customers"—and urging banks to terminate relationships in the event that the risk becomes too great. OCC, Risk Management Guidance: Third Party Relationships, OCC Bull. No. 2013-29 (Oct. 30, 2013); SOF ¶ 44.

The effects of enumerating payday lenders in a list of disfavored, "high risk" industries were swift and far reaching. Banks across the Nation concluded "that providing banking services to merchants on the high-risk list was discouraged by the FDIC." SOF ¶ 49 (OIG Report at 19).

And that conclusion was directly fostered by the Government. For example, the list of "high risk" industries was "often directly incorporated into FDIC-mandated Memorandums of Understanding (MOUs) and Consent Orders as 'prohibited businesses.' " SOF ¶ 48 (House FDIC at Report 7). The list was also attached, by DOJ, to the back of numerous subpoenas served upon banks and payment processors during this period. SOF ¶ 46 (House FDIC at Report at 16).

Indeed, far from some unintended consequence of sloppy regulatory draftsmanship, the *very purpose and design* of Defendants in crafting their "high risk" list and including it prominently in regulatory guidance documents was to erect, effectively, a *blacklist* of disfavored industries that banks could not serve without severe consequences. The list was included in the January 2012 FIL on the instructions of Acting Chairman Martin Gruenberg himself. SOF ¶ 36. And FDIC senior officials were explicit, in internal email traffic discussing the FIL, that they were trying to send a "message" by the inclusion of the list. One senior FDIC official, for example, had proposed the extraordinary step of placing the high-risk list not only on the first page of the FIL but *on the cover*, in an effort to ensure that the list would "grab some attention" and to avoid the risk that "the reader may not get the message." SOF ¶ 37. And while an earlier draft of the list was hedged by cautionary language indicating that "some of these activities might be legitimate," FDIC officials deliberately stripped these qualifiers out of the final draft. SOF ¶ 38.

In July 2014—shortly after the filing of this lawsuit and the release of the Oversight Committee's initial staff report on Operation Choke Point—the FDIC issued a new FIL "clarifying" its prior guidance by removing the list of "high risk" merchant categories. FDIC, Financial Institution Letter: FDIC Clarifying Supervisory Approach to Institutions Establishing Account Relationships with Third-Party Payment Processors, FIL-41-2014 at 1 (July 28, 2014); SOF ¶ 50. But this clarification did not retract the assertion that payday lenders or other merchants

on the lists are high risk—indeed, the 2014 FIL reiterates that customers on the list have "been associated by the payments industry with higher-risk activity," and it continues to require heightened monitoring for supposedly "high risk" businesses like payday lending *Id.* Indeed, the FDIC takes the position that the removal of the "high risk" list did not effect any substantive change in agency policy whatsoever. SOF ¶¶ 33, 54, 78.

## IV.    Operation Choke Point Continues

With the Supervisory Insights article and 2012 FILs in place establishing the legal hook for their campaign against payday lenders, the rest of the campaign began to unfold. As one FDIC official explained, "[t]hose due diligence requirements definitely give us (the FDIC) grounds for asking banks to keep track of what [banks'] payday lender/TPPP account holders are doing and a failure of banks to perform that due diligence may be grounds for an enforcement action . . . in the right situations." SOF ¶ 63. Indeed, the official noted, "a bank's relationship to payday lending . . . or to the payday lender or TPPP might by itself give rise to a possible enforcement action, depending on the nature of the relationship." SOF ¶ 64.

In the FDIC's Washington Office—the nerve center of Defendant's policy-making apparatus—the Division of Consumer Protection ("DCP") took the lead in developing, coordinating, and directing the agency's efforts to stamp out payday lending. It was DCP (according to emails from Marguerite Sagatelian, an FDIC Senior Counsel) that played the primary role in brainstorming the "avenues . . . available to the FDIC to take action against banks that facilitate payday lending," and the various regulatory hooks that "would provide the FDIC with the means to get at payday lending (either by the bank's direct customer or through a third party payment processor)." SOF ¶ 60. And the internal emails from and between the DCP's senior leadership—Director of the DCP Mark Pearce, Deputy Director Jonathan Miller, and Associate Director Luke Brown—clearly illustrate their hostility to the payday lending industry as a whole.

For example, when the FDIC's Regional Director in Atlanta gloated to Director Pearce that he was "pleased we are getting the banks out of ach (payday, bad practices, etc.)," Pearce responded that he was glad they were "on the same page" and that "failure to be proactive on this will lead to enforcement agencies [sic] or reputational issues, which is not in [the] best interest of our institutions." SOF ¶¶ 71, 72. Deputy Director Miller similarly sent emails evincing antipathy to payday lenders. According to a 2013 email, Deputy Director Miller insisted that whenever the letters or talking points prepared for Acting Chairman Gruenberg discussed payday lending, they should also mention pornography, because associating the two gives "a good picture regarding the unsavory nature of the businesses at issue" and thus "help[ed] with the messaging on this issue." SOF ¶ 62. And a 2011 email from Brown captures his understanding of the then-emerging operation against payday lending. Miller forwarded to Pearce and Brown an inquiry from another official noting that "I'm being told that banks are being pressured to not serve [payday lenders] as customers," and asking whether the FDIC had "a policy to disassociate banks from customer relationships with payday lenders." SOF ¶ 56. Associate Director Brown responded that "because of legal considerations, the FDIC has never expressly stated publically that our supervised institutions are not permitted to do business with payday lenders but the payday lending guidance and our public posture makes clear that we view payday loans as extremely risky." SOF ¶ 57.

Much of Defendants' early work in the operation involved information gathering—collecting lists of banks that had customer relationships with payday lenders, either directly or through third-party payment processors. In 2011, for example, the Washington Office asked the Regional Offices for information on any banks that were engaged in payday lending or processing transactions for payday lenders. SOF ¶ 59. In 2013, Director Pearce obtained "a list of Payday lenders we have seen in ACH transactions." SOF ¶ 74. Pearce shared the list with another official

in the Washington Office, Robert Drozdowski, asking "how hard/time-consuming do you think it'd be for the FDIC to check the major [banks] we supervise to see if any of them are processing transactions with these payday lenders?" SOF ¶ 75. Drozdowski responded with several ideas for gathering the information, including updating FDIC guidance "to emphasize (once again) that payday lending presents significantly higher risks to consumers and that any bank originating payments on behalf of payday lenders directly or indirectly should utilize enhanced due diligence" and perhaps even requiring banks to "identify to examiners any payday lenders that they originate payments for." SOF ¶ 76.

The FDIC coordinated these actions with officials in other federal agencies, as well—including DOJ and the OCC. In November 2012, for instance, Michael Benardo, the Chief of the Cyber Fraud and Financial Crimes Section of the FDIC's Division of Risk Management Supervision emailed Michael Bresnick, one of the Department of Justice officials who was spearheading Operation Choke Point in that agency, to send him the information of "someone at the FDIC for you to talk to about Pay Day Lending"—Ardie Hollifield, a Senior Policy Analyst at the DCP. SOF ¶ 66. The DOJ gave the FDIC access to its internal database on Operation Choke Point. SOF ¶ 69. And in June 2013, a DOJ official involved in Operation Choke Point provided the FDIC with a list of 15 financial institutions who had been subpoenaed by the DOJ in connection with the Operation and who DOJ believed were supervised by the FDIC. SOF ¶ 70.

The FDIC and OCC engaged in similar coordination as their respective efforts developed. In April 2013, Thomas Curry, the Comptroller of the Currency, receive from a national bank supervised by OCC a list of payday lenders that had submitted ACH transactions to that bank, along with a list of the banks that originated the transactions on behalf of the lenders. SOF ¶ 186. Once the list was complete, Curry forwarded the list to several members of his senior staff, one of

whom also shared the list with Director Pearce in the FDIC. SOF ¶¶ 187, 188. Pearce then sent the list along to his staff and asked them to determine which banks were supervised by the FDIC and "[d]evelop options and recommendations on whether we should follow up and more importantly how we should follow up." SOF ¶ 85. By the end of March, 2013, FDIC staff responded with a memo identifying which banks were supervised by the FDIC and explaining what actions were being taken—from scheduling examinations into the TPPP activities to exploring whether to take more aggressive actions such as "a Section 5 violation, Consent Order, and CMP." SOF ¶ 86.

In both defendant agencies, the efforts to "get at" payday lending reached up to the highest levels. In September 2013, OCC officials delivered a briefing to Comptroller Curry concerning payday lending and Operation Choke Point. SOF ¶ 190. According to the slides from the briefing, the officials discussed how payday lenders crucially rely upon banks for a variety of services, including accessing the ACH network and the provision of deposit accounts, making banks "gatekeepers" for the ACH network. SOF ¶ 192. It described the "[r]eputation" risk of serving "High risk clients of processors/aggregators (e.g., Payday lenders, interent/online sales)," and how Operation Choke Point had included subpoenas to numerous Banks to scrutinize payment processors and their payday lender clients. SOF ¶¶ 192, 193. And it ended by recommending several steps OCC could take in relation to Operation Choke Point, including making ACH return information more accessible, updating and strengthening the OCC's "existing guidance," and "allocat[ing] additional examiner resources as appropriate." SOF ¶ 193.

Hostility to payday lending also reached the very top of the FDIC. Indeed, there was "a widely-held understanding that the highest levels of the FDIC disfavored these types of banking services." SOF ¶ 98 (OIG Report at 29). On February 24, 2013, for example, Acting Chairman Gruenberg emailed Pearce, Miller, and others a link to a New York Times article discussing the

role of banks in facilitating payday loans, noting "We should discuss." SOF ¶ 88. Pearce responded that "We've been focused on the back end of the relationship (e.g., risks of payment processors relationships with banks)" and that they could discuss the matter at a meeting the following day. SOF ¶ 89. A short time later, Acting Chairman Gruenberg then arranged a meeting with a senior official at a prominent bank at which they discussed the "potential roles that national banks play which may[ ]be facilitating either traditional storefront or online payday lenders," including "facilitating payday loans by extending corporate lines of credit to national payday lending chains" and "act[ing] as the payment processor" for payday lenders. SOF ¶¶ 91, 92. They also discussed "[t]he potential ways in which regulators might intervene" to prevent these forms of facilitation, including "safety and soundness or reputational risk approaches." SOF ¶ 91. Following the meeting, Pearce and other senior officials in the Washington Office followed up with the bank in a conference call "to discuss their approach to minimizing the number of fraudulent payday lenders debiting consumer accounts." SOF ¶ 94. Two days later, the bank announced policy changes related to the repayment of payday loans. SOF ¶ 95. Because of the identity of the bank in question, FDIC believed the changes in "its practices and its activities" would have a significant "impact in the global financial economy." SOF ¶ 96.

While the FDIC's Washington Office was heavily involved in coordinating the operation against payday lending and in establishing the "general expectation" that FDIC officials should "discourage institutions from facilitating payday lending," SOF ¶ 97 (OIG Report at 28), most of the heavy lifting was done by the agency's seven regional offices—the arms of the FDIC that have direct contact with supervised banks throughout the country. After the quarterly meeting in which the Regional Directors were instructed to "require [any] institution" found to be "facilitating payday lending" to "submit a plan for exiting the business," SOF ¶ 16, the Regional Directors and

16

their senior staff began to apply backroom pressure on banks throughout the Nation, adopting the policy of using, in the words of one Regional Director, all "available means, including verbal recommendations, to strongly encourage [supervised banks] to refrain from any activities that provide assistance to the business activities of pd lenders," SOF ¶ 157.

For example, Atlanta Regional Director Thomas Dujenski, whose jurisdiction covered several states including South Carolina, where Plaintiff Advance America is headquartered, was an enthusiastic and active participant in Operation Choke Point. Director Dujenski's emails are suffused with blatant hostility to payday lenders. In one email to Director Pearce, Dujenski emphasized that he was "sincerely passionate" about the fact that "I literally cannot stand pay day lending. They are abusive, fundamentally wrong, hurt people, and do not deserve to be in any way associated with banking." SOF ¶ 100. In an email sent on Thanksgiving Day 2012, Dujenski told Director Pearce that "I think you will be pleased" because a "bank with ach is getting out of payday ach," remarking: "now that is something to celebrate on Thanksgiving! :)" SOF ¶ 103. In March 2013 Dujenski forwarded an article related to payday lending to another official in the Atlanta Region, Troy Hoskovec, who responded that "I am glad to see some of the large banks taking a stand to assist in driving these payday lending entities out of banking. Now we will just need all the others to follow suit." SOF ¶ 107. Dujenski plainly shared the sentiment. The following day, he forwarded to his staff and senior regional leadership several other articles concerning payday lending that Hoskovec had shared with him, writing: "Pay day lenders bring reputational risk, compliance risk, legal risk, and risk management concerns ……nothing good for our banks." SOF ¶ 108. And a few days later Director Dujenski informed members of his staff that "[a]ny banks even remotely involved in payday [sic] should be promptly brought to my attention." SOF ¶ 104.

Dujenski's active participation in Operation Choke Point is illustrated by the actions he

and his subordinates took to pressure a bank in the Atlanta region to sever all of its relationships with payday lenders. On or around November 19, 2011, Ardie Hollifield in the FDIC's Washington Office learned from a contact at the Consumer Financial Protection Bureau that a bank in the Atlanta Region "appear[s] to have a relationship" with payday lenders. SOF ¶ 109. John Bowman, an official at the DCP, quickly organized a call with senior officials in the Atlanta Region to see whether the regional examiners could "gather details about the nature of this relationship" and the "reputation risks involved" during an examination of the bank that the regional officials happened to be conducting. SOF ¶ 110. Days later, the regional examiners had determined that the bank in question "does indeed process transactions for up to 20 payday lenders," and they raised the issue with the senior Regional leadership, including Director Dujenski and Deputy Regional Director Phyllis Patton. SOF ¶ 111. Patton responded that the relationships with payday lenders were "of serious concern" and would "like adversely impact the rating" of the bank, and Director Dujenski responded that was "look[ing] forward to hearing more." SOF ¶¶ 112, 113.

The following month, seven regional officials—including Director Dujenski and his senior leadership—met with the bank's Chairman to discuss its relationship with payday lenders and its plans to offer a prepaid debit card with "payday lending elements" in partnership with Plaintiff Check Into Cash. SOF ¶ 116. Although the bank chairman "stressed that" the bank was not "involved in payday lending," the regional officials "detailed their numerous concerns with the program," which they viewed as "facilitating payday lending activities." SOF ¶ 117. According to the chairman, Director Dujenski stated during the course of this meeting that the bank was getting involved in a "dirty business," and that he would refer any money-laundering issues to the Department of Justice, which could lead to personal criminal prosecution. SOF ¶¶ 118–19.

Later that same day, in the shadow of a threat of criminal prosecution, the bank informed

Deputy Director Patton that it had decided not to pursue the debit-card program. SOF ¶ 120. Not satisfied with preventing the bank from engaging in payday-lending-related activities directly, Ms. Patton then followed up with the Chairman by phone to see if he was also going "to sever the entire relationship" with the payday lenders in question. SOF ¶ 121. He assured her that the bank was meeting with the payday lenders "to let them know that the relationship is ending." SOF ¶ 122.

Director Dujenski's reactions to this development starkly illustrate the covert, illegitimate nature of Defendants' pressure campaign and their efforts to whitewash their illegal behavior. Upon first hearing that the bank was terminating its payday-lender clients, Director Dujenski replied that "i hope he relays it is the banks decision." SOF ¶ 123. Deputy Director Patton responded that "I made that clear" and that he "indicated it's a business decision made by bank management." SOF ¶ 124. Dujenski replied: "great." SOF ¶ 125. And when regional officials later learned that the Chairman had nonetheless communicated to the Bank's board that the FDIC had established a *de facto* policy against bank relationships with payday lenders, Deputy Director Patton reached out to him to "express[ ] concern" about that characterization and to reiterate "that the basis for our concerns was centered on what we perceived as a lack of awareness of regulatory (payday and third party oversight guidance) and S&S implications of the business." SOF ¶ 126. In response to the email informing him about these efforts to dissuade the Chairman from referring to a "de facto" FDIC policy discouraging payday lending, Director Dujenski replied with an email consisting of a single emoticon: "☺" SOF ¶ 127.

Days after the Bank's decision to terminate its relationships with payday lenders, the Bank Chairman emailed Dujenski and his leadership team to clarify that "I'm no fan of the institution of payday lending." SOF ¶ 128. Dujenski forwarded the message to Director Pearce in the Washington Office, noting: "Confidential: This guy no longer likes payday…..hmmm…..I think

we got our message across . . . ." SOF ¶ 129. Dujenski was extremely effective in getting his message across: during his tenure, he testified, every bank within his jurisdiction that had a relationship with payday lenders ultimately terminated those relationships. SOF ¶ 132.

Regulatory pressure tactics such as this were not limited to the Atlanta region. In 2013, for example, the Chicago Regional Office engaged in a months-long effort to get a bank to cease providing ACH payment processing for a payday lender customer. On January 15, 2013, the Director of the Chicago Region, Anthony Lowe, sent a memo to Director Pearce informing him that the Chicago Office had investigated the bank because of a high number of ACH returns, and they had determined that they stemmed from a relationship with a payday lender. SOF ¶ 136. Although a bank visitation had determined that the "volume of ACH returns are reasonable," Mr. Lowe nonetheless stated that "we will determine a supervisory strategy for the bank, including considerations for encouraging termination of the relationship with the payday lender." SOF ¶ 137.

Lowe used every tool at his disposal to pressure the bank into ending the relationship. Shortly after learning that the bank was "providing ACH processing for a payday lender," for example, Lowe "withdr[ew] [his] recommendation of [the] Bank's CEO, for membership on the [regional] Advisory Committee." SOF ¶ 139. Director Lowe next informed the bank's board of directors that it was "unacceptable" for the bank to continue serving payday lenders: "It is our view that payday loans are costly, and offer limited utility for consumers, as compared to traditional loan products. Furthermore, the . . . relationship carries a high degree of risk to the institution . . . Consequently, we have generally found that activities related to payday lending are unacceptable for an insured depository institution." SOF ¶ 140. The FDIC kept up the pressure on the bank for months until it finally capitulated and terminated the relationship. And as the FDIC field supervisor on the account expressly recognized, "In the end, we are getting them out of [ACH

processing for a payday lender] through moral persuasion and as you know from a legal perspective we don't have much of a position, if any." SOF ¶ 151 (OIG Report at 27).

The letter from the bank notifying the FDIC of its decision to terminate the relationship makes clear that the decision was not voluntary. The bank noted that it "*is not engaged in payday lending*" but rather in merely providing "traditional banking services" to payday lenders, which were "engaged only in lawful lending activities." SOF ¶ 142. It then reiterated that it was not "engaged in unfair or deceptive practices through our services to [the lender] and its customers," and it related that it had "retained the services of a well-known consultant" to conduct a "risk assessment" of the relationship, which had concluded that the relationship "pose[s] no significant risk to the financial institution, including financial, reputational and legal risk." SOF ¶ 143. While the bank believed a variety of options were available to even further mitigate any risk stemming from the relationship, it recognized that what FDIC really wanted was for it "to request that [the payday lender] terminate their banking relationship with [the] bank," and it accordingly asked "to schedule a time to discuss . . . the termination of our relationship" with the lender. SOF ¶ 144–45.

Clearly frustrated at being pressured to terminate the relationship, however, the bank posed a number of questions, including: which "FIL . . . addresses the ability of the FDIC to force an institution to dismiss a relationship when there have been no safety and soundness considerations identified other than potential reputational risks," and what the consequences would be "[a]ssuming all federal regulators are successful in their attempt to drive the payday lenders from the banking system." SOF ¶ 146. Lowe forwarded the letter to Director Pearce, who commented "interesting letter" and "am curious how you plan to respond to these questions." SOF ¶ 147.

Lowe engaged in similar pressure tactics again and again. In January 2013, for example, Lowe emailed his team about another bank found "processing for [a] Payday Lender," explaining

that "we will be pursuing a strategy to 'encourage' the bank to sever the relationship." SOF ¶ 170.
In another incident, Director Lowe, upon learning that a bank within his region was considering
purchasing a payday lender as a wholly-owned subsidiary, directed his staff to immediately send
"a brief letter to the bank requesting that prior to engaging in any business plan change involving
PD lending, they consult with us," further instructing them to "[t]hrow in some items about rep,
legal, et al risk from that type of program." SOF ¶ 162. At Lowe's direction, his Assistant Regional
Director sent a letter to the bank in question to "make the Board aware of the additional legal,
reputational, and consumer compliance risks associated with payday lending" and requesting "that
the bank inform our office in writing of any proposed change . . . pertaining to the acquisition of a
payday lending entity prior to engaging in this activity." SOF ¶ 163. Five days later, the bank wrote
to inform the Regional Office that it had "decided not to pursue a payday lending business in light
of additional legal reputational and consumer compliance risks associated with same." SOF ¶ 164

In the summer of 2013, Lowe again got word that examiners visiting a bank within the
region had "found them doing business with payday lenders" and that the FDIC regional officials
needed to decide what action to take: "enforcement action, exiting?" SOF ¶ 165. Lowe responded
suggesting "we consider drafting and sending an 'early warning' letter of our concerns regarding
the relationship with PD lenders." SOF ¶ 166. On September 3, Director Lowe sent a letter to the
bank's Board of Directors warning them that they had "failed to exercise an appropriate level of
oversight over the institution's third-party relationships," by failing to establish "controls to ensure
the Bank does not engage in transactions with payday lenders, illegal gambling businesses, or other
high risk entities," and concluding that "a progressive wind-down of the program is warranted."
SOF ¶ 167–68. On September 13, 2013, a regional examiner held a phone call with officials at the
bank and reiterated the FDIC's recommendation that the bank "Amend ACH policy to expressly

prohibit processing for payday lenders." SOF ¶ 169.

Lowe and Dujenski were not rogue Regional Directors acting alone. As shown above, their actions were encouraged by Director Pearce and the FDIC's top brass in Washington and in fact *required upon the pain of dismissal* by the Washington Office. Moreover, the record shows that there was close coordination throughout the entire campaign not only between the Washington office and the Regional Directors but between the Regional Directors in the field themselves. On January 18, 2013, for instance, Director Lowe emailed Director Dujenski about a "PD lender, for which a bank is conducting processing," in the Chicago Region. SOF ¶ 159. Lowe continued: "We should definitely continue to share and compare info as our cases develop." SOF ¶ 159. Similarly, when the Regional Director for the Kansas City Region, James LaPierre, requested other Regional Directors to forward "information regarding ongoing exams or visits where concerns with Third Party Payment Processors have been identified," Director Lowe sent a "High priority" request to his senior staff to collect "any correspondence, within the previous two years, that we have sent to banks regarding concerns specifically in regard to payday lending." SOF ¶ 160.

Nor was the intimidation campaign limited to the Washington, Atlanta, and Chicago Offices. The House Oversight Committee, for example, reported that a senior FDIC official in the Kansas City region threatened a bank considering serving a payday lender with severe regulatory consequences: "The official told the banker, 'I don't like this product, and I don't believe it has any place in our financial system. Your decision to move forward will result in an immediate unplanned audit of your entire bank.' " SOF ¶ 177. Similarly, an FDIC examiner in Washington State, when asked whether any banks within the region "are facilitating payday lending thru TPPP," responded that it was unlikely because "We scrutinize TPPP very closely." SOF ¶ 178. Indeed, when Regional Director Lowe later fell under criticism for his harsh tactics against payday

lenders, he received calls from officials in other regions expressing sympathy that Lowe was being subjected to criticism for simply following the FDIC's national policy. SOF ¶¶ 175–76.

OCC engaged in a similar pattern of enhanced scrutiny of bank relationships with payday lenders. In January 2014, for example, an email exchange between several different senior OCC officials described how OCC examiners had "told [a bank] for years they needed to really re-think the payday lenders," and had used "moral suasion" to "suggest[ ] strongly that they re-evaluate payday lending, at the very least considering the potential reputation risk." SOF ¶ 194. A 2014 Supervisory Letter from the OCC warned a bank that it needed "to enhance monitoring of Automatic Clearing House (ACH) returns . . . to enable accurate risk rating and suspicious activity identification for Payday Lenders and other high-risk customers." SOF ¶ 196. Similarly, a 2014 Supervisory Letter criticized a bank that later would terminate Advance America's account for failing to adequately monitor and scrutinize its relationships with money service businesses, singling out the bank's allegedly lax treatment of Advance America. SOF ¶ 195.

As this example illustrates, while Defendants sometimes engaged in brute pressure tactics, at other times they turned to more subtle tactics. A polite letter characterizing payday lenders as "high risk" and asking a bank to engage in "enhanced monitoring" of their accounts, for example, is seemingly innocuous. Indeed, the FDIC's Rule 30(b)(6) designee freely testified, during her deposition, that the FDIC continues to adhere to the policy of requiring banks who facilitate payment processing for payday lenders to engage in heightened due diligence and monitoring of those relationships. SOF ¶ 77. But the practical effect of requiring a bank to engage in costly, enhanced due diligence of a certain relationship is to *significantly raise the costs* of keeping the lender in question as a customer. SOF ¶ 79–82. The minutes from a meeting of a bank's Executive Committee in 2014 capture the way this mechanism works. The bank, the minutes note,

"process[ed] ACH transactions" for an Ohio-based payday lender that "appears to adhere to rules in place for payday lending operations." While the lender's "practices have been validated," and the bank noted it could "closely monitor any risk" it posed, "the consensus of the Committee is that the fees generated from the [lender's] account are not worth any risk to the reputation of the bank," "given the government's current position under 'Operation Choke Point'." SOF ¶ 179. The bank did "not want to appear as being involved in practices subject to criticism," in light of the "potential for regulatory scrutiny due to association with any type of payday lending." SOF ¶ 180. Accordingly, the Committee decided "to draft a letter to [the payday lender] advising them that although they are not engaged in any illegal or improper activities," the bank felt it was "prudent to discontinue our relationship with [them] and all pay day lenders." SOF ¶ 180.

A memo produced for Director Pearce in September 2013 provides a partial account of the fruits of the FDIC's campaign up to that date. SOF ¶ 181. It recounted nine banks where examiners had surfaced "concerns relative to payday and/or online lending" that had "resulted in . . . either an enforcement action or specific recommendations in a Report of Examination of Visitation." SOF ¶ 181. In three cases, the concerns led to a Section 8b action; in three other cases, the FDIC and the institution had entered a "memorandum of understanding" addressing the concern; and in many other cases, FDIC officials had been able to resolve the concerns through merely issuing verbal or informal written "recommendations" to the banks in question. SOF ¶¶ 182–84. In response, the memo noted, the banks repeatedly chose to end the relationships under scrutiny— one bank, for example, "terminated its loan and deposit relationship with the payday lender"; another "blacklisted known payday lenders" from future ACH transactions. SOF ¶ 185.

## V.     Operation Choke Point's Effects

Viewed from Defendants' perspective, Operation Choke Point has been a resounding success. Around the same time that the FDIC began labelling payday lenders as high-risk

customers and pressuring them not to service payday lenders, banks regulated by Defendants began terminating their payday lender customers, often *en masse*, and often with little warning and with little to no explanation. SOF ¶ 197. According to Professor Calomiris, "the recent wave of terminations of bank relationships with Payday Lenders has been dramatic and unprecedented;" and it threatens the continuing viability of the payday lending industry—including Plaintiffs Advance America, Northstate, and Check Into Cash. SOF ¶¶ 197, 236, 242, 248.

Most of the banks that terminated Plaintiffs' accounts did so abruptly, with no explanation at all. SOF ¶ 211. But as Professor Calomiris has explained, some of the bank officers have been more forthcoming in private, personal discussions—pointing to Defendants' campaign of backroom coercion as the cause of the terminations. To take just three examples:

- Officials at Bank of America verbally communicated to the payday lender Community Choice that the bank was ending their relationship because of "pressure from regulators regarding reputational risk." SOF ¶ 214.

- Bank of Kentucky verbally communicated to another payday lender that it was terminating its banking relationship because bank regulators had directed the bank to terminate its relationship with all payday lenders. SOF ¶ 215.

- The Executive Vice President of Synovus bank told Advance America, during a phone conversation, that the bank was terminating Plaintiff's account because it was exiting all Money Service businesses because of regulatory pressures relating to these industries, relating that in his thirty years as a banker he had never seen a regulatory environment like the one today. SOF ¶ 216.

Moreover, several bank officials—including at Bank of America and Synovus Bank, institutions that terminated relationships with Advance America—have expressed regret at being forced to end long-standing, positive relationships with payday lenders and have made it clear that they would reestablish these relationships if allowed to—actions hardly consistent with institutions that have made an independent business decision to cut ties with a customer. SOF ¶ 223.

Of course, not all banks have come forward in this way; but even sudden, unexplained terminations are evidence that something other than ordinary business considerations motivated

the decision to end the relationship. As Plaintiffs' expert witness explains, "When bankers decide to end business relationships for independent reasons that reflect a mismatch between a customer's business practices and the bank's relationship development or product delivery strategy, that does not tend to occur suddenly. The reasons are easy to understand. First, bankers wish to resolve problems with clients in ways that preserve valuable relationships, if that is possible. Second, when a banker comes to the conclusion that the bank is better off ending a relationship, after lengthy bank deliberations and discussions with clients, bankers have an incentive to end the relationship in a way that avoids adverse consequences for their reputations in the business community, which often produces further delays in the termination process." SOF ¶ 212.

Moreover, the banks that did offer *some* justification for terminating their payday clients, in the termination letter, often pointed generically to "heightened scrutiny" or increased monitoring or compliance costs—an explanation that fits perfectly with the more subtle types of regulatory coercion, discussed above, which have sought to stamp out payday lending not through brute force, but by raising the costs of doing business with payday lenders. Limiting ourselves, again, to only a handful of examples:

- In January 2013, Citizens First Bank terminated Advance America's account, stating that "[d]ue to the nature of your business, we are required by guidance from our primary federal regulatory agency to implement a due diligence and monitoring program," and that because of the "resources necessary to accomplish this, it has been decided to terminate our relationship with advance America." SOF ¶ 198.

- In February 2014, Hancock Bank/Whitney Bank sent a notification indicating that "[w]e are unable to effectively manage your Account(s) on a level consistent with the heightened scrutiny required by our regulators for money service businesses"— a category that includes payday lenders—"due to the transactional characteristics of your business." SOF ¶ 200.

- In August 2014 SunTrust issued a press release stating that it was discontinuing relationships with payday lenders "due to compliance requirements." SOF ¶ 204.

- In December 2016, counsel for Wesbanco Bank informed Advance America that its accounts were being terminated because the Bank had decided "to exit a business

line providing services to . . . payday lenders due to the costs required in monitoring such accounts." SOF ¶ 209.

This mass of terminations has had a dire effect on Plaintiffs' ability to remain in the payday lending business. For example, since February 2013, Plaintiff Advance America has received termination notices from at least 21 banks. SOF ¶ 225. This wave of terminations is unprecedented—never before in its history has Advance America experienced a pattern of terminations of this pace and scale. SOF ¶ 226. Critically, in November 2016 U.S. Bank notified Advance America that it was closing all 43 accounts Plaintiff held at the bank. SOF ¶ 230. U.S. Bank was Advance America's principal banking partner, providing services to 1,262 storefronts, as well as covering all of the company's payroll and ACH transactions. SOF ¶ 231. Advance America has yet to find a banking relationship sufficient to make up for its loss of its accounts at U.S. Bank. SOF ¶ 232. Indeed, since 2013, about 275 banks have refused Advance America's business because of their status as a payday lender. SOF ¶ 229.

The company has incurred substantial costs as a result of the banking relationships it has lost. For example, the company spent over $3 million on armored courier services in 2017—a 500% increase over what it spent in 2012. SOF ¶ 233. The company also experienced a 37% increase in ACH processing expenses and bank fees from 2016 to 2017 as a result of the latest round of terminations. SOF ¶ 234. All told, from 2012 to 2017, Advance America's banking-related expenses increased approximately $2.5 million per year—dramatically reducing the profitability of this line of business. SOF ¶ 235. Advance America has not yet been forced out of business, but its continued survival is in jeopardy. SOF ¶ 236. If Advance America were to lose its remaining banking relationships, for example, it might not be able to find further replacements. SOF ¶ 237.

Like Advance America, the other Plaintiffs also have suffered the effects of bank

terminations in recent years. Check Into Cash lost seven crucial banking relationships between October 2013 and December 2016, including Bank of America, Capital One Bank, and JP Morgan Chase. SOF ¶ 238. Over 300 of Check Into Cash's storefronts still lack banking relationships. SOF ¶ 241. During this period, Check Into Cash has had to close over 250 storefronts and eliminate over 400 employee positions, and its profits have declined, in part due to the increased costs imposed by Defendants' regulatory campaign. SOF ¶ 240.

The same is true for Plaintiff Northstate Check Exchange. Northstate's longtime banking partner, North Valley Bank, abruptly terminated the relationship in 2015, after being acquired by a larger regional bank. SOF ¶ 243. Northstate attempted to replace the relationship by opening an account at Wells Fargo, but only months later Wells Fargo, too, terminated Northstate's account. SOF ¶ 244. Northstate has been able to keep its payday lending operations in business by opening an investment account with another institution—but because of the policies of this account, Northstate cannot deposit customer's checks directly into the account, and instead it must convert each check into a money order. SOF ¶¶ 246–47. This workaround entails considerable additional expense, and it also makes the experience less convenient from the customer's perspective, reducing the attractiveness of Northstate's payday loans. SOF ¶ 248.

## ARGUMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [thus] the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The undisputed facts show beyond any genuine dispute that (I) Plaintiffs have standing to sue, (II) Defendants violated Plaintiffs' Due Process rights, and (III) Plaintiffs are entitled to declaratory and injunctive relief. Accordingly, the Court should enter judgment in our favor.

I.      **Plaintiffs Advance America, Check Into Cash, and Northstate Have Standing To Sue Defendants For Violating their Due Process Rights.**

"The Constitution limits [the] 'judicial Power' " of the federal courts "to 'Cases' and 'Controversies,' and there is no justiciable case or controversy unless the plaintiff has standing." *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017) (citations omitted). Under Article III, "the irreducible constitutional minimum of standing" requires three elements: (1) injury in fact, (2) causation, and (3) redressability *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Here, the undisputed facts in the record show that all three elements are met.

a.      There can be no question that all three Plaintiffs have suffered injury in fact. *First*, each of the Plaintiffs has lost numerous, specific bank accounts. SOF ¶ 225, 238, 243. *Second*, each of the Plaintiffs has faced—and continues to face—significant difficulty establishing *new* accounts to replace the terminated ones. SOF ¶¶ 229, 239, 245. And *third*, the loss of ready access to the banking system has caused and is causing each of the Plaintiffs serious financial harm, in the form of additional banking-related expenses and reduced profits. SOF ¶¶ 235, 240, 248.

b.      The undisputed facts also establish causation. While the traceability requirement is not satisfied "if the injury complained of is the result of the *independent* action of some third party not before the court," Article III "does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (quotation marks and brackets omitted). To show causation, a plaintiff need not establish "that a challenged government policy *compel[led]* a third party to act," *Scenic America, Inc. v. DOT*, 983 F. Supp. 2d 170, 180 (D.D.C. 2013), but merely that the "agency action is at least a substantial factor motivating the third parties' actions," *Tozzi v. United States Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001) (quotation marks omitted). Here, the record shows that Defendants' intimidation campaign was at the very least a substantial factor leading to Plaintiffs'

injuries. That is evident from the strong direct evidence of causation in the record, as well as from the overwhelming indirect evidence.

The record demonstrates that Defendants doggedly and repeatedly coerced banks across the Nation into terminating any relationships with payday lenders or their third-party payment processors. The evidence shows that this was a national campaign imposed by headquarters on all seven regional directors and targeting the entire payday lending industry, including plaintiffs. Atlanta Regional Director Dujenski and his staff, for example, pressured an Atlanta-area bank for weeks, in 2011, to terminate any relationships with payday lenders—warning the bank that payday lending was a "dirty business" and that involvement with the industry could lead to criminal prosecution, following up after the bank buckled under to ensure that they would "sever the entire relationship," and gloating, after the bank agreed, that the FDIC had gotten "our message across." SOF ¶¶ 118, 121, 129. In 2013, the Chicago Regional Office undertook a similar, extended pressure-campaign to coerce a bank within the region to cease providing ACH processing services payday lenders, using all "available means" to turn the screws on the bank, including sending a threatening letter effectively telling the bank that the relationships were "unacceptable." SOF ¶¶ 140, 157. And the bank's response shows beyond any doubt that the FDIC's pressure campaign was a "substantial factor" in its decision to end the relationship—protesting that it had concluded after a "risk assessment" that the customers posed "no significant risk to the financial institution" and that any risk could be adequately mitigated by enhanced monitoring and reporting, but that it would nonetheless agree to terminate the relationships. SOF ¶¶ 143, 145.

As our expert has noted, several bank officials—including officers of some of the banks that have terminated Plaintiffs' own accounts—have described their decisions as caused by the same types of pressure tactics. For instance, officials at Bank of America verbally communicated

to the payday lender Community Choice that the bank was ending their relationship because of "pressure from regulators regarding reputational risk." SOF ¶ 214. Around the same time, Bank of America also terminated its relationship with Plaintiff Check Into Cash. SOF ¶ 238. Bank of Kentucky verbally communicated to another payday lender that it was terminating its banking relationship because bank regulators had directed the bank to terminate its relationship with all payday lenders. SOF ¶ 215. And both Tri Counties Bank and Wells Fargo told Plaintiff Northstate, orally, that they were terminating its accounts because of regulatory pressure. SOF ¶ 220.

Moreover, regulatory action amounts to a "substantial factor" in a bank's decision to terminate an account not only when the regulators baldly *demand* the termination, as in the examples above, but also when they simply *raise the costs* to the bank of maintaining the relationship. The FDIC admits even now that its policy is to require banks to engage in heightened due diligence and monitoring of payment-processing relationships with payday lenders. SOF ¶ 77. As our expert has explained and Director Dujenski has admitted, imposing enhanced monitoring, recordkeeping, and compliance requirements in this way significantly increases the cost, to the bank, of the relationship. SOF ¶¶ 80 (First Calomiris Report), 79 (deposition testimony of Director Dujenski). And in the termination letters Plaintiffs received from their banking partners, the banks *repeatedly* explained their decision to end the relationship by pointing to precisely these increased costs that Defendants have imposed. SOF ¶¶ 198, 200, 204, 209; *see supra* pp. 27–28. Beyond Defendants' directives against banks doing business with payday lenders, Defendants also imposed such a regulatory surcharge on the accounts that the banks could no longer afford to maintain them—and those costs, standing alone, were indisputably a "substantial factor" in the ultimate termination decision. Defendants well understood the causal connection between the "high risk" label and increased banking costs, SOF ¶ 79, and therefore imposed these costs so that

terminations would ensue.

Defendants' causal role in the termination of Plaintiffs' bank accounts is also demonstrated by the mass of indirect evidence now contained in the record. It is clear from Defendants' actions and statements that they had the *purpose and intent* of creating a "de facto" policy against any bank facilitating payday lending by using all "available means, including verbal recommendations, to strongly encourage [supervised banks] to refrain from any activities that provide assistance to the business activities of pd lenders." SOF ¶¶ 127, 157. We know, for example, that senior FDIC officials stated that they "literally can not stand pay day lending," thought payday lenders brought "nothing good for our banks" and "do not deserve to be in any way associated with banking," and asked their staff to identify and bring to their attention "[a]ny banks even remotely involved in payday [lending]." SOF ¶¶ 100, 108, 104. We know that FDIC officials repeatedly told bank officials to "wind-down" relationships with payday lenders, "[a]mend [their] ACH policy to expressly prohibit processing for payday lenders," or otherwise terminate their payday-lender customers. SOF ¶¶ 168, 169. And we know that senior FDIC officials informed all of the FDIC's regional directors (or their designees), at a quarterly meeting of regional officials in Washington, that "if an institution in their region was facilitating payday lending, the Regional Director should require the institution to submit a plan for exiting the business" and that "if a bank was found to be involved in payday lending, someone was going to be fired." SOF ¶¶ 16, 18.

Defendants also plainly had the *means* and *opportunity* to pressure banks into terminating their payday-lender customers. At least 10 of the institutions that have terminated Plaintiffs' accounts since 2011 are supervised by Defendant FDIC (8 for Advance America, 2 for Check Into Cash, and 1 for Northstate, with one overlap), and 8 are supervised by both Defendant OCC and the FDIC, through the FDIC's authority over all members of the federal deposit insurance program

(5 for Advance America, 4 for Check Into Cash, and 1 for Northstate, with an overlap at two banks). The power these agencies hold over their supervised institutions is truly vast. They set the standards banks must apply when assessing the various risks posed by their operations and can impose consequences large and small—from punitive, time-consuming visitations to seizing control of the bank and placing it into conservatorship or receivership—with little to no administrative or judicial accountability. SOF ¶¶ 19–20.

Finally, the timing of the terminations further buttresses the conclusion that Defendants' actions are the root cause. Before 2011, Plaintiffs suffered only scattered bank terminations—Advance America, for example, lost only one or two accounts per year. SOF ¶ 226. After 2011, they have lost banking relationships *en masse*—around 30 combined, since 2013. Hundreds more banks have refused to bank them. Lightning does not strike over and over again in the same place at the same time. While this close temporal relationship is not alone dispositive, it strongly supports the direct evidence of Defendants' role in causing Plaintiffs' injury.

c. Because Defendants' campaign of regulatory coercion, the evidence shows, *caused* Plaintiffs' injuries, injunctive relief putting a stop to it would *redress* the injuries. As shown above, Defendants have moved to cut off Plaintiffs' access to the banking system in two related but distinct ways: in some cases by directly coercing banks to terminate their relationships with payday lenders, and in other cases by increasing the regulatory monitoring and compliance costs banks must endure if they maintain those relationships. As described below, *infra* part III, it is well within this Court's power to craft an injunction that would end both types of stigmatizing actions—by forbidding Defendants and their agents from directing or pressuring banks to terminate payday-lender relationships and by requiring them to publicly make clear that payday lending is not a "dirty business" and that a customer's status as a payday lender does not require the bank to engage

34

in enhanced monitoring or due diligence.

This relief would yield a "significant increase in the likelihood" that Plaintiffs' injuries would be redressed. *Utah v. Evans*, 536 U.S. 452, 464 (2002). By making clear that intimidation campaign has ended, this relief would almost certainly stem the tide of terminations and remove the stigma that has caused hundreds of banks to turn Plaintiffs away at the door. Moreover, since many banks indicated regret over terminating Plaintiffs' accounts, *see supra*, pp. 26, there is a significant likelihood that this relief would cause these banks to reconsider those decisions.

## II.  Defendants' Actions Amount to a Continuing Violation of the Due Process Clause.

The United States Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. While government defamation, standing alone, does not amount to a violation of the Due Process Clause, due process is implicated when the government (1) stigmatizes a person or entity, and (2) that stigmatization causes or is connected with an adverse impact on a background liberty or property right. Three related, but distinct, strands of cases fleshing out this inquiry have developed.

**First**, beginning with *Wisconsin v. Constantineau*, 400 U.S. 433 (1971), the courts have held that due process must be afforded before the Government can stigmatize a person in a way that alters their background legal rights or status. This "stigma-plus" theory is generally a *forward-looking* inquiry, asking whether stigmatizing actions or statements alter or extinguish a right, previously held, to engage in some activity. **Second**, where the liberty in question is the right "to follow a chosen trade or profession," *Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895–96 (1961), the D.C. Circuit has prescribed a different analysis: is the plaintiff "broadly precluded" from engaging in their chosen line of business. *See Trifax Corp. v. District of Columbia*, 314 F.3d 641, 645 (D.C. Cir. 2003). This "broad preclusion" inquiry is also essentially forward-looking. **Third**, a separate line of cases holds that due process must be provided where

the Government stigmatizes a plaintiff in the course of extinguishing its protected rights or benefits. This "reputation-plus" inquiry, arising from the Supreme Court's case in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972), is generally *backward-looking*.

Here, the record evidence shows that Defendants have violated Plaintiffs' due-process rights under two of these theories: the "stigma-plus" inquiry and the "reputation-plus" inquiry.[2]

A. **Defendants Have Violated Plaintiffs' Due Process Rights Under the Stigma-Plus Theory.**

The stigma-plus doctrine derives from in *Wisconsin v. Constantineau*, 400 U.S. 433 (1971). That case involved a Wisconsin statute allowing government officials to prohibit businesses from selling alcohol to certain persons through "postings" that labelled them as excessive drinkers. In *Constantineau*, the chief of police posted such notice about the plaintiff in retail liquor establishments in a particular town—effectively forcing her to drive to the next town to purchase alcohol. The Court held that the Wisconsin statute violated the Due Process Clause, because it allowed the government to label individuals as excessive drinkers and alter their background legal rights without providing them with any procedural protections. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," the

---

[2] While Plaintiffs' briefing—and the Court's opinions—have previously focused on the "broad preclusion" line of cases, Plaintiffs believe that the evidence amassed during discovery shows that the "stigma-plus" and "reputation-plus" inquiries are in fact better guides to the requirements of due process in this case. Plaintiffs respectfully request that the Court reconsider any of its previous rulings that, in its view, would foreclose the arguments presented here. *See Filebark v. DOT*, 555 F.3d 1009, 1013 (D.C. Cir. 2009) ("[I]nterlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment."). Plaintiffs do not concede that they fail to prevail under the "broad preclusion" theory, but for their summary judgment motion they focus on the other two theories.

Because the Court previously ordered us to remove from our Amended Complaint the allegations and claims related to the Administrative Procedure Act, Order at 2 (Feb. 3, 2017), Doc. 120, we do not press those claims in this brief. However, Plaintiffs believe that the decision dismissing the APA claims was in error and that we are entitled to summary judgment on those claims, and were the Court willing to reconsider that ruling, Plaintiffs stand ready to brief them.

Court explained, "notice and an opportunity to be heard are essential." *Id.* at 437.

The Court reaffirmed *Constantineau*'s central holding in *Paul v. Davis*, 424 U.S. 693 (1976). "Posting," the Court reasoned, "deprived the individual of a right previously held under state law . . . to purchase or obtain liquor in common with the rest of the citizenry. . . ." *Id.* at 708. In that way, "a right or status previously recognized by state law was distinctly altered or extinguished" and this "alteration of legal status . . . combined with the injury resulting from the defamation . . . justified the invocation of procedural safeguards." *Id.* at 708–09, 712.

The FDIC's and OCC's guerilla war against payday lenders violates the Due Process Clause under the very same reasoning. While *Constantineau* concerned a relatively minor burden on the right to purchase alcohol, here the background right at issue is the right to access the banking system in common with the rest of the citizenry. Just as the defendants in that case had acted to cut off the plaintiff's legal rights by "posting" her as a drunkard, here the record evidence shows that Defendants have repeatedly labelled all payday lenders—a class that unambiguously includes Plaintiffs—as "high risk" customers. SOF ¶¶ 35, 167, 193, 196. Indeed, the FDIC has freely conceded that it continues to tar plaintiffs' line of business with that label to this day. SOF ¶ 77. Under the regulatory regime Defendants have established, applying this label to an industry has consequences: it triggers a variety of costly, mandatory monitoring and compliance requirements that banks must implement if they really wish to have a "high risk" business as a customer. As the record evidence shows, this added regulatory sur-charge on payday-lender customers has caused many banks to conclude that the disfavored relationship is simply not worth the expense, and they have cut Plaintiffs loose—or turned them away at the door—*en masse*. SOF ¶¶ 197–211, 229, 239.

In this way, the "high risk" label is akin to the "excessive drinker" label in *Constantineau*. "Many people" would consider the right to "hold bank accounts" to be "more important than the

right to purchase liquor" at issue in *Constantineau*, and it therefore deserves at least as much procedural protection. *See National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 204 (D.C. Cir. 2001) ("*NCRI*"). But the procedural protection Defendants bestowed upon Plaintiffs before tarring their line of work as a "high risk," "dirty business" is precisely nil. SOF ¶¶ 35, 118. Plaintiffs were given no notice that Defendants were adopting a "de facto" policy of stigmatizing them as high-risk and pressuring banks to terminate their business. SOF ¶ 127. Nor were they given any opportunity to contest the label. No, Defendants' actions were taken behind closed doors—and FDIC officials in fact attempted to *cover their tracks*, pressuring banks to characterize their treatment of payday lenders as an independent business decision. SOF ¶ 123–25. Due process demands more and better of the Government than this.

To be sure, while the posting of the plaintiff as an "excessive drinker" in *Constantineau* prohibited her from purchasing alcohol in her hometown, the "high risk" label here does not necessarily flatly forbid a bank from letting a payday lender hold a bank account. But this distinction does not undermine Plaintiffs' claims, for due process protections are required before a pre-existing right is "distinctly altered *or* extinguished." *Paul*, 424 U.S. at 711 (emphasis added). Indeed, in *Constantineau* itself the burden on the plaintiff's right to purchase alcohol was relatively minor: because the application of the state law at issue in that case prohibited her only from purchasing alcohol in one particular town, the effect of the law was merely to make her drive to the next town to buy liquor. *Paul* thus described the right at issue in *Constantineau* as the right "to purchase or obtain liquor *in common with the rest of the citizenry*," not the right to purchase or obtain liquor *at all*. *Id.* at 708 (emphasis added).

The D.C. Circuit and this Court have applied the rule established in *Constantineau* and *Paul* in several cases, and those decisions strongly support Plaintiffs' claims here. In *Bartel v.*

*Federal Aviation Administration*, 725 F.2d 1403 (D.C. Cir. 1984), for instance, Bartel alleged that an official at the Federal Aviation Administration wrote a letter accusing him of wrongdoing during his previous employment with the agency and then sent the letter to a series of prospective employers that Bartel was interviewing with, including another office of the FAA. Because of the stigmatizing letter, one organization declined to hire Bartel, and the FAA office hired him "only in a temporary GS–12 position," rather than "at the GS–13 level" for which he otherwise qualified. *Id.* at 1415. The D.C. Circuit held that Bartel had successfully stated a due process claim because he had alleged that the government "besmirch[ed] Bartel's reputation" and, as a result, he "was not considered for FAA employment on a basis equal with others of equivalent skill and experience—*i.e.*, that he was wrongfully denied the 'right to be considered for government employment in common with all other persons.' " *Id.* at 1414–15 (brackets omitted) (quoting *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983)). On remand this Court (though it ultimately denied the claim on alternative grounds) agreed that Bartel's allegations that the government's actions had "defamed him and resulted in the denial of his right to consideration for re-employment at the GS–13 position on an equal basis with others of equivalent skill and experience . . . identified a cognizable liberty interest the denial of which would constitute a due process violation." *Bartel v. Federal Aviation Admin.*, 617 F. Supp. 190, 195 (D.D.C. 1985).

*Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594 (D.C. Cir. 1993), is in accord. There, Reeve Aleutian Airways alleged that the government had issued a performance report which "contained an extensive and specific summary of problems in Reeve's operation," and then had suspended all of its operations on the basis of the report. *Id.* at 596. The airline challenged this "stigmatizing suspension" under a stigma-plus theory, and the D.C. Circuit agreed that the Due Process Clause's procedural protections did indeed apply:

> We think it evident that [the government's] actions deprived Reeve of a significant liberty interest. [The] suspension imposed a sure stigma on Reeve; branding an airline unsafe creates a lasting blemish on a company's reputation, roughly the equivalent to Hawthorne's scarlet letter pinned across the heart of Hester Prynne. . . . [The] suspension of Reeve . . . did not amount to as severe a deprivation as the typical debarment ban on contracting for virtually all government work for a fixed period of time that we have met in prior cases. Realistically appraised, however, it had to work a significant deprivation of Reeve's constitutionally cognizable interest in avoiding the loss of government contracting opportunities based on stigmatizing charges.

*Id.* at 598 (quotation marks and citations omitted); *cf. PDK Labs Inc. v. Reno*, 134 F. Supp. 2d 24, 33 (D.D.C. 2001).

So too here. Just like the FAA's stigmatizing letter denied Bartel the right to be "considered for FAA employment on a basis equal with others of equivalent skill and experience," *Bartel*, 725 F.2d at 1415, as a result of being labelled "high risk" due to their connection to the payday lending industry, Plaintiffs have been wrongfully denied the right to be considered for bank accounts in common with other law-abiding entities. And just like the performance report in *Reeve Aleutian Airways*, the "high risk" label operates as a "scarlet letter," severely diminishing its "[banking] opportunities based on stigmatizing charges." 982 F.2d at 598.

Other circuits have applied the stigma-plus theory as well. A trio of cases from the Second, Ninth, and Seventh Circuits is especially instructive. All three cases involved the placement of individuals on state-wide registries of child abusers, and in each case the legal effect of that placement was to alter, but not necessarily to extinguish, certain rights. In *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994), child care providers in New York were required to consult the registry when making hiring decisions and, if they decided to hire someone on the registry, they were required to explain why in writing. Similarly, in *Dupuy v. Samuels*, 397 F.3d 493, 497 (7th Cir. 2005), individuals named in Illinois's registry were presumptively unsuitable for certain positions, and an employer who nonetheless wished to hire someone in the registry had to specially request

a waiver from the State. *Id.* at 497–98. In both cases, the courts concluded that "the requirement that puts burdens on employers wishing to hire individuals on the list results in a change of that individual's status significant enough to satisfy the 'plus' requirement of the 'stigma plus' test." *Valmonte*, 18 F.3d at 1002; *see also Dupuy*, 397 F.3d at 511.

In *Humphries v. County of Los Angeles*, 554 F.3d 1170 (9th Cir. 2009), *rev'd on other grounds*, 562 U.S. 29 (2010), similarly, agencies in California were required to consult the registry and to conduct an investigation of listed individuals before conferring rights and benefits such as a license to work in child care or receiving custody of a relative's child. The court held that the burdens imposed by this regime were sufficient to require due process protections: "A tangible burden exists in this context where a law effectively requires agencies to check a stigmatizing list and investigate any adverse information prior to conferring a legal right or benefit . . . . This requirement places a tangible burden on a legal right that satisfies the 'plus' test." *Id.* at 1188.

Here, Plaintiffs have similarly been stigmatized—by being labelled high risk—and the consequences of that label are to similarly burden their rights—here, their rights to access the banking system, which are burdened by the additional regulatory scrutiny brought to bear on banks servicing purportedly high-risk customers. Under the reasoning of *Valmonte*, *Dupuy*, and *Humphries*, the Government cannot stigmatize Plaintiffs and burden their background rights in this way without providing due process—a requirement that they have not even arguably met. Plaintiffs are thus entitled to judgment on their due process claim under the stigma-plus theory.

**B.** **Defendants Have Violated Plaintiffs' Due Process Rights Under the Reputation-Plus Theory.**

Plaintiffs have also shown a violation of due process under the "reputation plus" theory. This theory has its genesis in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972), decided in the year following the Court's decision in *Constantineau*. There, Roth, who had been a

non-tenured assistant professor in political science at a university in Wisconsin, was informed that he would not be rehired when his teaching contract expired. Roth argued that the decision violated his due process rights, but the Supreme Court rejected his claim. The Court did not hold that the lack of tenure or any other property right to continued employment necessarily foreclosed due process protection. Rather, the Court emphasized that the "State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community . . . . Had it done so, . . . due process would accord an opportunity to refute the charge before University officials." *Id.* at 573. As with *Constantineau*, the Court reiterated *Roth*'s reasoning in *Paul v. Davis*: "*Roth* recognized that governmental action defaming an individual in the course of declining to rehire him could entitle the person to notice and an opportunity to be heard as to the defamation." 424 U.S. at 709.

Following *Roth* and *Paul*, the D.C. Circuit has repeatedly recognized that "defamation in the course of the termination of employment is" actionable under the Due Process Clause. *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998) (quotation marks omitted). In *Lyons v. Barrett*, for example, Lyons was fired by the GPO after "charges that he had sexually harassed a female coworker." 851 F.2d 406, 407 (D.C. Cir. 1988). The D.C. Circuit held that Lyons had made out a reputation-plus claim:

> Combined with dismissal from a government job, . . . injury to reputation can rise to the level of a liberty deprivation. In the case at bar, appellant was discharged from his government position after an investigation into charges that he sexually harassed a fellow employee. It is clear that the circumstances of his termination had the potential to imperil his standings and associations in his community. We have no difficulty on this record finding that appellant had a protected liberty interest that was implicated in his dismissal.

*Id.* at 410 (quotation marks and citations omitted).

Plaintiffs have established all the elements of a reputation-plus claim. First, each of the Plaintiffs has had its relationship with at least one bank terminated. SOF ¶¶ 225, 238, 243. Because

these terminations were caused by and attributable to Defendants' actions, they are akin to the loss of government employment. *Cf. NCRI*, 251 F.3d at 204 (due process implicated where the government impaired the "right to . . . hold bank accounts"); *Old Dominion Dairy Prods., Inc. v. Secretary of Defense*, 631 F.2d 953, 964 (D.C. Cir. 1980) (extending reasoning of *Roth* to reach denial of government contracts, explaining that to "rule otherwise would drain *Roth* of meaning"). Furthermore, these terminations occurred against the backdrop of Defendants falsely claiming that the reputational risks incurred by having payday lenders as customers threaten the safety and soundness of banks. The stigmatizing nature of this high-risk label has been heightened by the association of law-abiding payday lending with Ponzi schemes, online gambling, and other unsavory—if not illegal—activities, *see* SOF ¶ 32, and it has been reinforced by Defendants in one-on-one communications with banks pressuring them to cease serving payday lenders, *see* SOF ¶¶ 118, 140, 195. Indeed, to this day the Defendant agencies have yet to unequivocally retract the allegation that payday lenders are reputationally risky customers for banks.

Like the stigma-plus theory, the reputation-plus theory does not require Plaintiffs to show that they have been cut off from the banking system entirely. Rather, Plaintiffs need to show that Defendants defamed them "in the course of the termination" of their accounts. *See O'Donnell*, 148 F.3d at 1140; *see also Owen v. City of Independence, Mo.*, 445 U.S. 622, 633 n.13 (1980). To be sure, Plaintiffs must show that Defendants' actions caused their banks to terminate them—that is what makes the loss of bank accounts in this case equivalent to the loss of government employment in *Roth* and other reputation-plus cases. But as discussed above, *supra* pp. 30–34, it is clear beyond any reasonable dispute that Defendants caused the terminations, from: (1) the direct evidence that Defendants implemented a national policy prohibiting banks from facilitating payday loans and pressuring banks into terminating their payday-lender customers; (2) the direct evidence showing

how Defendants have raised the cost of doing business with payday lenders for banks across the country by tarring the entire industry as "high risk;" and (3) the overwhelming indirect evidence establishing Defendants' hostility to payday lenders, their desire to cut them off from the banking system, the coercive power they wield over banks, and the close temporal relationship between their actions and Plaintiffs' loss of banking relationships. Accordingly, Plaintiffs are also entitled to judgment on their due process claim under the reputation-plus theory.

## III.    Plaintiffs Are Entitled to an Appropriate Remedy.

Courts have fashioned a variety of different remedies to redress stigma-plus and reputation-plus due-process claims. In some cases, the courts have granted "name-clearing" relief designed to remove the stigma the government has imposed on the plaintiff's reputation. *E.g.*, *Lyons*, 851 F.2d at 410–12. In other cases, the courts have required the government to provide due process before the challenged stigmatizing action is taken. *E.g.*, *Humphries*, 554 F.3d at 1201. And perhaps most on-point, in *Constantineau* the courts simply "enjoin[ed] [the] enforcement" of Wisconsin's unconstitutional law providing for the "posting" of suspected drunkards. 400 U.S. at 434.

Here, the Court should issue injunctive relief closing off both of the mechanisms through which Defendants have stigmatized Plaintiffs and harmed their background legal rights. The Court should end Defendants' campaign of direct coercion by enjoining them, and their employees and agents, from applying informal pressure on banks to terminate their relationships with payday lenders (both direct customer relationships or indirect relationships with third-party payment processors) or otherwise seeking to deprive Plaintiffs of their access to the banking system. And the Court should end Defendants' attempts to raise the cost of doing business with payday lenders by requiring them to issue a public clarification that payday lending *is not* a disfavored, "high risk" business, and that merely having a payday-lender (or a third-party that processes payments for payday lenders) as a customer *does not*, standing alone, necessitate any kind of heightened

monitoring or enhanced due diligence obligations.

Injunctive relief is warranted here. To obtain permanent injunctive relief, a plaintiff must show that "(1) it will suffer an irreparable injury in the absence of an injunction; (2) legal remedies are insufficient to compensate for that injury; (3) considering the balance of hardships between the parties, an equitable remedy is warranted; and (4) the injunction is in the public interest." *Beck v. Test Masters Educ. Servs. Inc.*, 994 F. Supp. 2d 98, 101 (D.D.C. 2014). As this Court has already held, Plaintiffs plainly face irreparable injury, since the D.C. Circuit has squarely held that an ongoing violation of due process amounts to irreparable harm. *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also* Opinion at 27–28 (Feb. 23, 2017), Doc. 134. Under the same reasoning, no damages remedy available at law would be a sufficient remedy. And the balance of the equities and the public interest—factors that "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—also favor injunctive relief, since "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653.

Finally, the Court should also issue a declaration making clear that Defendants' campaign violated Plaintiffs' right to due process. Declaratory relief is appropriate where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1345 (Fed. Cir. 2010). Here, a declaration that Defendants' actions are unlawful would do much to "terminate and afford relief from the uncertainty, insecurity, and controversy" between the parties over the legality of Defendants' campaign against payday lenders. *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs judgment as a matter of law.

Date:   October 12, 2018

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper (Bar No. 248070)
ccooper@cooperkirk.com
David H. Thompson (Bar No. 450503)
Peter A. Patterson (Bar No. 998668)
Nicole J. Moss (Bar No. 472424)
Harold S. Reeves (Bar No. 459022)
John D. Ohlendorf (Bar No. 1024544)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

*Attorneys for Plaintiffs*