**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ADVANCE AMERICA, CASH ADVANCE CENTERS, INC., et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 14-953-TNM |
| FEDERAL DEPOSIT INSURANCE CORPORATION, et al., | |
| Defendants. | |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to FED. R. CIV. P. 56(c), LCvR 7(h)(1), and paragraph 13(B) of the Standing Order for Cases Before Judge Trevor N. McFadden, Plaintiffs Advance America, Cash Advance Centers, Inc.; Check Into Cash, Inc.; and Northstate Check Exchange hereby submit this statement of material facts as to which there is no genuine dispute.

**I.      Payday Lending.**

1.      A payday loan is an advance on the borrower's paycheck or other source of income. Transcript of Glenn Bassett Deposition at 33:20–34:2 (Apr. 24, 2018) ("Bassett Depo.") (App.2–3).

2.      Payday loans provide short-term credit to millions of American households, especially those that are underbanked, by bridging unexpected financial needs between income installments. Expert Report of Charles W. Calomiris at 33 (Jan. 11, 2017), Doc. 107-7 ("First Calomiris Report") (App.51); William Isaac, *Payday Crackdown Creates More Problems than It Solves*, AMERICAN BANKER (Feb. 18, 2014) (App.68).

3.      Payday loans are more readily available than more traditional forms of credit and less costly than the informal credit systems on which many consumers must rely in the absence of payday advances, such as overdraft protection, bounced checks, and late bill payment fees. First Calomiris Report at 37 (App.55); Isaac, *supra* ¶ 2 (App.68).

4.      Payday lenders rely on banking services to operate. When a prospective borrower applies for the loan—at a storefront location, or online—he or she typically provides a post-dated check or an electronic debit authorization for the value of the loan, plus a fee. Second Declaration of Dennis Shaul ¶ 4 (Nov. 23, 2016), Doc. 87-3 ("Shaul Declaration") (App.72).

5.      The lender immediately advances the customer funds, then after a specified period of time, usually determined by the customer's next payday, the borrower returns to repay the loan and fee. But if the customer does not return, the terms of the transaction permit the lender to deposit the post-dated check or to execute the debit authorization. In order to have that security, the lender must have a deposit account with a bank and/or access to the Automated Clearing House (ACH) network, either directly or through a Third-Party Payment Processor ("TPPP"). Shaul Declaration ¶ 4 (App.72).

6.      Payday lenders also rely on banks to provide a range of other services, including but not limited to lines of credit and treasury services (accounts payable and receivable). *See, e.g.*, Bassett Depo. 61:15–21 (payroll) (App.4); *id.* at 65:6–10 (line of credit) (App.5); Transcript of Joachim Christian Rudolph Deposition at 46:2–15 (May 9, 2018) ("Rudolph Depo.") (treasury services) (App.77).

## II.     The Origins of Operation Choke Point.

7.      Over the last decade, the Federal Deposit Insurance Corporation ("FDIC") and Office of the Comptroller of the Currency ("OCC") have undertaken a campaign—in conjunction with other federal agencies such as the Department of Justice ("DOJ"), the Bureau of Consumer

Financial Protection, and the Federal Reserve Board (the "Board")—to encourage or, in some cases, coerce the banks they supervise to terminate their relationships with payday lenders, seeking to effectively cut the payday lending industry off from access to the modern financial system. STAFF OF H.R. COMM. ON OVERSIGHT & GOV'T REFORM, 113TH CONG., REP. ON THE DEP'T OF JUSTICE'S "OPERATION CHOKE POINT": ILLEGALLY CHOKING OFF LEGITIMATE BUSINESSES? 1 (2014) ("House DOJ Report") (App.84); STAFF OF H.R. COMM. ON OVERSIGHT & GOV'T REFORM, 113TH CONG., REP. ON FEDERAL DEPOSIT INSURANCE CORPORATION'S INVOLVEMENT IN "OPERATION CHOKE POINT" 1 (2014) ("House FDIC Report") (App.96); FDIC3310 (App.116); FDIC113672 (observing that CFPB had "noticed an apparent affiliation/relationship with one of our [, i.e., FDIC's,] institutions) (App.117); Transcript of Ardie Hollifield Deposition at 100:2–6 (May 4, 2018) (App.121); OCC-AA-1378 (App.123).

8.      The DOJ dubbed the project "Operation Choke Point" since, as described by an Oversight Committee staff report, it was designed "to 'choke out' companies the Administration considers a 'high risk' or otherwise objectionable, despite the fact that they are legal businesses" by "deny[ing] these merchants access to the banking and payments networks that every business needs to survive." House DOJ Report at 1 (App.84); Appendix to House DOJ Report at 3PPP17 ("DOJ Report Appx.") (App.125); *see also* FDIC67829 (describing "gatekeeper" role of banks) (App.130).

9.      Initially, Defendants targeted banks that were themselves involved in payday lending, whether directly or through arrangements with third parties. In March 2005, for example, the FDIC issued a Financial Institution Letter addressing payday lending programs that some banks had initiated. FDIC, Financial Institution Letter: Payday Lending Programs, FIL-14-2005 at 1 (Mar. 1, 2005) (App.131).

10.     The letter expressly identified payday lending as "a high-risk activity," and it identified a number of "concerns" it had about banks' payday lending programs. FDIC, Financial Institution Letter: Payday Lending Programs, FIL-14-2005 at 2 (Mar. 1, 2005) (App.132).

11.     "As a result of the guidance and related supervisory actions, the relatively few FDIC-supervised institutions that were making payday loans stopped doing so in 2006." Office of Inspector General, FDIC, The FDIC's Role in Operation Choke Point and Supervisory Approach to Institutions that Conducted Business with Merchants Associated with High-Risk Activities, Report. No. AUD-15-008 at 12 (2015) ("OIG Report") (App.159).

12.     Defendants next turned their attention to payday lenders that used banking services in connection with their business—whether indirectly through payment processors or directly through their own relationships with banks. According to records produced to Congress, for example, a meeting of the Financial Fraud Enforcement Task Force's Consumer Protection Working Group—which included representatives from the FDIC, OCC, as well as DOJ and the Board—proposed that the agencies examine "areas where consumers may be vulnerable to fraud," including "identity theft, third-party payment processors and other payment fraud, student-consumer fraud, cramming, business opportunity schemes, data privacy, payday lending, counterfeiting, and schemes targeting servicemembers and their families." DOJ Report Appx. at 3PPP1 (App.124).

13.     The Working Group recommended that the agencies "Enhance civil and criminal enforcement of consumer fraud" and "Plan and execute national operations targeting specific types of consumer fraud." *Id.* (emphases omitted) (App.124).

14.     "[A] number of FDIC officials," similarly, "had concerns about ACH payment processing for payday lenders," because "such services facilitate payday lending." OIG Report at

12 (App.159); *see also* FDIC13220 (App.190); FDIC65073 ("If we don't want banks facilitating pay day lending via ACH, why don't we just come out with a statement or FIL letter warning banks") (App.192).

15.     The officials involved in Operation Choke Point realized early on that payday lenders' reliance on access to the banking system made them vulnerable, because "[b]anks are sensitive to the risk of civil/criminal liability and regulatory action," and merely by "sending a letter to a senior bank executive inquiring [into] . . . its merchants' return rates," regulators could force banks to "scrutinize immediately its relationships with third-party payment processors." DOJ Report Appx. at 3PPP18–19 (App.126–27).

16.     Accordingly, in late 2010 or early 2011, the FDIC's senior Washington officials convened a meeting of all Regional Directors. The FDIC is divided into seven regions, each of which has a Director in charge of exercising the FDIC's supervisory authority over each bank in his or her region. At this meeting in which all of these Regional Directors (or their designees) were gathered, the Senior Deputy Director for the Division of Supervision and Consumer Protection informed them that "if an institution in their region was facilitating payday lending, the Regional Director should require the institution to submit a plan for exiting the business." OIG Report at 27 (App.174); FDIC110958 (App.194).

17.     These instructions, the Senior Deputy Director, conveyed, came from "the sixth floor"—the Chairman and senior leadership of the agency. Transcript of Marvin Anthony Lowe Deposition at 36:11–21 (Apr. 27, 2018) ("Lowe Depo.") (App.198).

18.     At the meeting, the Senior Deputy Director conveyed the following message: "if a bank was found to be involved in payday lending, someone was going to be fired." *Id.* at 36:16–18 (App.198).

**III.     Defendants Develop and Expand the Concept of "Reputation Risk."**

19.     The Federal Deposit Insurance Act (FDIA), 12 U.S.C. § 1811 *et seq.*, vests the Defendant agencies with power to set standards for the "safety and soundness" of insured depository institutions. The agencies are required to establish—by regulation or guideline— "standards relating to (A) internal controls, information systems, and internal audit systems . . . ; (B) loan documentation; (C) credit underwriting; (D) interest rate exposure; (E) asset growth; and (F) compensation, fees, and benefits" and "such other operational and managerial standards as the agency determines to be appropriate." 12 U.S.C. § 1831p-1(a).

20.     Violations of these standards can trigger various "safety and soundness" enforcement powers, which may even culminate in the agencies taking over the banks. *Id.* §§ 1831o(f)(2), 1831p-1(e)(1).

21.     Each of the Defendant agencies is responsible for prescribing standards for and monitoring the compliance of depository institutions subject to their prudential supervision, as set out in 12 U.S.C. § 1813(q).

22.     The primary federal supervisor of a domestic bank is determined based upon whether the bank operates under a federal or state charter, and, for state banks, upon whether the bank has chosen to join the federal reserve system. The FDIC and Federal Reserve Board share supervisory authority over state-chartered banks, with the Federal Reserve being the primary federal supervisor of those state-chartered banks that are members of the Federal Reserve System, 12 U.S.C. § 325, and the FDIC being the primary federal supervisor of those state-chartered banks that have chosen not to join the Federal Reserve System, 12 U.S.C. § 1820(b)(2). The OCC supervises all federally-chartered national banks, regardless whether they are members of the federal reserve system. 12 U.S.C. § 481. The FDIC also has secondary supervisory authority over

all banks primarily regulated by the OCC or Federal Reserve who participate in the federal deposit insurance program.

23.     Exercising their supervisory authorities, Defendants have published high-level "interagency guidelines establishing standards for safety and soundness," 12 C.F.R. Pt. 364, App. A, which "set out the safety and soundness standards that the agencies use to identify and address problems at insured depository institutions before capital becomes impaired," *id*. § I(vi).

24.     Among other things, the guidelines provide that a banking "institution should have internal controls and information systems that are appropriate to the size of the institution and the nature, scope and risk of its activities and that provide for . . . [e]ffective risk assessment." *Id*. § II(A).

25.     The Defendant agencies have identified several such risks that a depository institution must manage. These include credit risk, transaction risk, liquidity risk, strategic risk, and compliance risk. *See, e.g.*, OCC, Credit Derivatives: Guidelines for National Banks, OCC Bull. No. 1996-43 (Aug. 12, 1996) (App.207).

26.     One category of risk that Defendants have identified is "reputation risk." Traditionally, reputation risk has been understood to reflect the potential that a bank's own practices could cause it to have a negative reputation in the community and that this impaired reputation could threaten the bank's safety and soundness. *See, e.g.*, FDIC, Financial Institution Letter: Foreign-Based Third-Party Service Providers, FIL-52-2006 at 2 (June 21, 2006) ("Reputational risk is the risk that potential negative publicity about a financial institution's business practices will cause a decline in the customer base, costly litigation, or the loss of revenue.") (App.215).

27.     Recently, however, Defendants have expanded the meaning of reputation risk to encompass not only the risks posed by a bank's own operations but also those posed by a bank's *customers*. In June 2008, FDIC issued a guidance letter stating that "any negative publicity involving the third party, *whether or not the publicity is related to the institution's use of the third party*, could result in reputation risk." FDIC, Financial Institution Letter: Guidance for Managing Third-Party Risk, FIL-44-2008 at 3 (June 6, 2008) (emphasis added) (App.224).

28.     The expansion continued later that year with the release of a guidance document addressing banks' relationships with payment processors—entities that use banking services to process payments for their own customers. *See* FDIC, Financial Institution Letter: Guidance on Payment Processor Relationships, FIL-127-2008 (Nov. 7, 2008) (App.233).

29.     That guidance directed banks to be attuned to "reputation . . . risks" posed by having payment processors as customers, *id.* at 2 (App.235), and it directed them to perform extensive due diligence and monitoring activities of not only the payment processors themselves but also the payment processors' customers, *id.* at 3 (App.236).

30.     The expansion of reputation risk to include the reputation of a bank's customers gave Defendants a powerful new regulatory tool, and they soon moved to wield that tool against payday lenders. In the summer of 2011, the FDIC published a Supervisory Insights article entitled "Managing Risks in Third Party Payment Processor Relationships." FDIC, *Managing Risks in Third-Party Payment Processor Relationships*, SUPERVISORY INSIGHTS, Summer 2011 (App.238).

31.     According to the article, "[a]lthough many clients of payment processors are reputable merchants, an increasing number are not and should be considered 'high risk.' " FDIC, *Managing Risks in Third-Party Payment Processor Relationships*, SUPERVISORY INSIGHTS, Summer 2011, at 6 (App.243).

32.     The article went on to list "merchant categories that have been associated with high-risk activity," and the list included "PayDay Loans" along with activities such as "Drug Paraphernalia," "Escort Services," "On-line Gambling," "Ponzi Schemes," and "Racist Materials." *Id.* at 7 (App.244).

33.     The full list consisted of the following merchant categories: Ammunition Sales, Cable Box De-scramblers, Coin Dealers, Credit Card Schemes, Credit Repair Services, Dating Services, Debt Consolidation Scams, Drug Paraphernalia, Escort Services, Firearms Sales, Fireworks Sales, Get Rich Products, Government Grants, Home-Based Charities, Life-Time Guarantees, Life-Time Memberships, Lottery Sales, Mailing Lists/Personal Info, Money Transfer Networks, On-line Gambling, PayDay Loans, Pharmaceutical Sales, Ponzi Schemes, Pornography, Pyramid-Type Sales, Racist Materials, Surveillance Equipment, Telemarketing, Tobacco Sales, and Travel Clubs. *Id.* (App.244); *see also* FDIC77124 (App.250).

34.     The article made clear that banks servicing high risk customers through payment processors would incur additional regulatory compliance burdens, including being required to perform "ongoing monitoring of high-risk accounts . . . ." FDIC, *Managing Risks in Third-Party Payment Processor Relationships*, SUPERVISORY INSIGHTS, Summer 2011, at 9 (App.246).

35.     In a January 2012 Financial Institution Letter offering guidance on payment processor relationships, the FDIC reiterated its view that merchants offering payday loans "pose elevated risk" to banks and that servicing such entities would require banks to engage in increased compliance activities, again including payday lending in a list of "high-risk" activities such as "online gambling-related operations," "pornography," and "online tobacco or firearms sales." FDIC, Financial Institution Letter: Revised Guidance on Payment Processor Relationships, FIL-3-2012 at 1 & n.1 (Jan. 31, 2012) (App.253).

9

36.     A briefing with Acting Chairman Martin Gruenberg led to the inclusion of the list of high-risk businesses in the January 2012 Financial Institution Letter and its placement at the beginning of the document. Appendix to House FDIC Report at 2183–85 ("FDIC Report Appx.") (App.261–63).

37.     Indeed, in one draft of the FIL, senior FDIC staff had even proposed placing the footnote singling payday lending out as high risk *on the cover* of the FIL, in an effort to ensure that the list would "grab some attention" and to avoid the risk that "the reader may not get the message." *Id.* at 2173 (App.259).

38.     FDIC officials sought to ensure that banks would "get the message" in other ways, as well. While the list of high-risk industries in the December 2011 draft of the FIL ended with cautionary language indicating that "[t]he risks presented by each relationship must be measured according to its own facts and circumstances" since "some of these activities might be legitimate," FDIC Report Appx. at 2185 (App.263), by the final draft of the FIL the FDIC had stripped out these qualifiers, FDIC, Financial Institution Letter: Revised Guidance on Payment Processor Relationships, FIL-3-2012 at 1 n.1 (Jan. 31, 2012) (App.253).

39.     This guidance document identified risky industries to include payday lenders generally. *Id.* (App.253).

40.     Although it acknowledged that payday lenders may be legitimate customers, it encouraged banks to terminate banking relationships if the risk of maintaining them becomes too great. *Id.* (App.253).

41.     Further, the guidance encourages financial institutions to structure their agreements with payday lenders and other supposedly risky industries to permit "immediate account closure [and] contract termination." *Id.* at 1 (App.253).

42.     Like the other guidance documents, the FIL warned banks to look suspiciously on customers with high aggregate return rates and customers that bank at more than one depository institution. *Id.* (App.253).

43.     In a September 2013 Financial Institution Letter, the FDIC made clear that its guidance applied not just to banks serving payday lenders indirectly through payment processors but also to banks servicing payday lenders directly as customers: "The FDIC is issuing this letter to clarify its policy and supervisory approach related to facilitating payment processing services directly, or indirectly through a third party, for merchant customers engaged in higher-risk activities. Facilitating payment processing for merchant customers engaged in higher-risk activities can pose risks to financial institutions and requires due diligence and monitoring, as detailed in prior FDIC and interagency guidance and other information"—including the Summer 2011 Supervisory Insights article and the January 2012 Financial Institution Letter expressly listing payday lending as a high-risk activity. *See* FDIC, Financial Institution Letter: FDIC Supervisory Approach to Payment Processing Relationships With Merchant Customers That Engage in Higher-Risk Activities, FIL-43-2013 at 1 & n.3 (Sept. 27, 2013) (footnote omitted) (App.276).

44.     On October 30, 2013, OCC issued a Bulletin entitled "Risk Management Guidance: Third-Party Relationships." OCC, Risk Management Guidance: Third Party Relationships, OCC Bull. No. 2013-29 (Oct. 30, 2013) (App.278). The Bulletin warns banks of reputation risks associated with providing financial services to business customers who, in turn, "do not meet the expectations of the bank's customers." *Id.* at 11 (App.288).

45.     The Bulletin urges banks to terminate relationships in the event that the risk becomes too great. *Id.* (App.288).

46.     The list of "high risk" businesses was used as more than just non-binding guidance. For example, DOJ attached the list to the back of numerous subpoenas served upon banks and payment processors. House FDIC Report at 16 (App.111).

47.     FDIC also advised banks during examinations to "scrub" their "customer base for previously unidentified high risk relationships including payday lenders, casinos, pawn brokers, and Privately Owned ATM's." FDIC128348–49 (App.295–96).

48.     The list was also "often directly incorporated into FDIC-mandated Memorandums of Understanding (MOUs) and Consent Orders as 'prohibited businesses.' " House FDIC Report at 7 (App.102).

49.     Banks supervised by the FDIC got the message—executives at several institutions concluded "that providing banking services to merchants on the high-risk list was discouraged by the FDIC." OIG Report at 19 (App.166); *cf.* FDIC77138–43 ("According to media reports in January 2014, each of the banks known to have previously offered deposit advance loans [, i.e., bank-offered payday loans,] made the business decision not to continue extending this type of credit under the parameters set forth in the Guidance" issued by FDIC and OCC on November 21, 2013) (App.299–304); FDIC76939 (FDIC examiner responds to email from Pearce that banks have stopped offering "deposit advance" products that "[h]opefully it won't be long until our payday lenders are required to play fair as well") (App.307).

50.     In July 2014—shortly after the filing of this lawsuit and the release of the Oversight Committee's initial staff report on Operation Choke Point—the FDIC issued a Financial Institution Letter "clarifying" its prior guidance by removing the lists of "high risk" merchant categories from the 2011 Supervisory Insights article and the January 2012 Financial Institution Letter. FDIC, Financial Institution Letter: FDIC Clarifying Supervisory Approach to Institutions Establishing

Account Relationships with Third-Party Payment Processors, FIL-41-2014 at 1 (July 28, 2014) (App.309).

51.     The July 2014 letter did not, however, retract the assertion that payday lenders or other merchants on the lists are high risk. *Id.* (App.309).

52.     To the contrary, the letter reiterated that the listed merchant categories "had been associated by the payments industry with higher-risk activity." *Id.* (App.309).

53.     The July 2014 letter reiterated that servicing allegedly high-risk businesses such as payday lenders would continue to subject banks to increased regulatory compliance costs: "FDIC guidance indicates that insured institutions that engage in customer relationships with [third party payment processors] should assess their risk tolerance for this type of activity and develop an appropriate risk management framework, which includes policies and procedures that address due diligence, underwriting, and ongoing monitoring." *Id.* (App.309).

54.     According to the FDIC, the 2014 removal of the high-risk list did not effect any substantive change of policy. Transcript of Doreen R. Eberley 30(b)(6) Deposition at 78:9–12 (May 18, 2018) ("Eberley Depo.") (App.313).

## IV.    Defendants' Efforts to Discourage Banks from Providing Services to Payday Lenders.

55.     Antipathy to the payday lending industry reached the FDIC's senior leadership and was frequently revealed in FDIC senior officials' emails to one another. The hostility was on display, for instance, in an April 8, 2011 email from Jonathan Miller, the Deputy Director of the FDIC's Division of Depositor and Consumer Protection ("DCP"), to Mark Pearce—Director of the DCP—and Luke Brown—the DCP's Associate Director. Deputy-Director Miller forwarded a link pertaining to the membership of the Community Financial Services Association—a trade association for payday lenders and a former plaintiff in this lawsuit—commenting that "[t]his makes me mad. I don't suppose we can do anything about it?" FDIC52318 (App.315). Deputy

Director Miller further commented that "[w]e should show it to banks to prove the reputat'l risk argmnt." *Id.* (App.315).

56.     A few months later, Deputy-Director Miller forwarded to Director Pearce and Associate Director Brown an inquiry asking whether the FDIC has "a policy to disassociate banks from customer relationships with payday lenders" and whether banks were "being pressured to not serve them as customers." FDIC53568 (App.318).

57.     Mr. Brown responded that "because of legal considerations, the FDIC has never expressly stated publically that our supervised institutions are not permitted to do business with payday lenders but the payday lending guidance and our public posture makes clear that we view payday loans as extremely risky." FDIC53566 (App.316).

58.     When Mr. Miller inquired whether this hostility extended to "having a deposit rel'shp" with a payday lender, in addition to offering payday loans directly, Brown responded that "[w]e're doing more leg work on this," but that when such a relationship had been considered previously "the Chairman was unhappy about [that type of] arrangement." *Id.* (App.316); *see also* FDIC124559 (FDIC criticisms for bank that "had a big loan to a payday lender that I believe funded its lending operations") (App.319).

59.     Around the same time, the Washington Office asked the Regional Offices for information on any banks that were engaged in payday lending or processing transactions for payday lenders. Transcript of Thomas J. Dujenski Deposition at 62:12–16 (May 2, 2018) ("Dujenski Depo.") (App.323).

60.     In March of 2013, the Senior Counsel in the FDIC's Consumer Enforcement Unit, Marguerite Sagatelian, sent an email explaining that DCP was inquiring "where we stand regarding our research into what avenues are available to the FDIC to take action against banks that facilitate

payday lending." FDIC Report Appx. at 6042 (App.273). She recalled that "after we met with Mark" (presumably a reference to Director Pearce), they were going to explore whether "BSA/ Know Your Customer requirements . . . would provide the FDIC with the means to get at payday lending (either by the bank's direct customer or through a third party payment processor)." *Id.* (App.273).

61.     Later that day, Ms. Sagatelian explained that the agency was developing talking points for a meeting Acting Chairman Gruenberg was having with bankers "as to how banks facilitate payday lending and why the FDIC is concerned." *Id.* at 5178 (App.270).

62.     As a later email shows, Deputy Director Miller insisted that whenever the letters or talking points prepared for Acting Chairman Gruenberg discussed payday lending, they should also mention pornography, because associating the two gives "a good picture regarding the unsavory nature of the businesses at issue" and thus "help[ed] with the messaging on this issue." *Id.* at 7424 (App.275).

63.     Another email in the same chain provides a blueprint for how the FDIC could use the regulatory guidance it had issued to pressure banks to terminate payday lenders: "Those due diligence requirements definitely give us (the FDIC) grounds for asking banks to keep track of what [banks'] payday lender/[third party payment processor] account holders are doing and a failure of banks to perform that due diligence may be grounds for an enforcement action . . . in the right situations." *Id.* at 5178 (App.270).

64.     Indeed, the email noted, "a bank's relationship to payday lending (some engage in it directly) or to the payday lender or TPPP might by itself give rise to a possible enforcement action, depending on the nature of the relationship." *Id.* (App.270).

65.     As the efforts to target payday lending developed, officials at the FDIC worked closely with the Department of Justice. OIG Report at 15 (App.162).

66.     In November 2012, for instance, Michael Benardo, the Chief of the Cyber Fraud and Financial Crimes Section of the FDIC's Division of Risk Management Supervision emailed Michael Bresnick, one of the Department of Justice officials who was spearheading Operation Choke Point in that agency, to send him the information of "someone at the FDIC for you to talk to about Pay Day Lending"—Ardie Hollifield, a Senior Policy Analyst at the DCP. FDIC163099 (App.327).

67.     Later, in April 2013, Joel Sweet, another DOJ official heavily involved in the initiative, emailed senior FDIC officials including Benardo and Marguerite Sagatelian, along with officials at several other federal agencies including the FTC and the CFPB, with "a simple and elegant idea about how to protect consumers from predatory PD lenders," involving banning banks from "originating debit transactions against the bank accounts of non-customer borrowers." FDIC163081 (App.328).

68.     Similarly, in the summer of 2013 the FDIC created "an official file within the FDIC's Advanced Legal Information System" named "Operation Chokepoint," which allowed FDIC officials to collect documents received in response to the subpoenas DOJ was issuing. House FDIC Report at 16 (App.111).

69.     DOJ also allowed FDIC attorneys to access its own internal database of materials related to the operation. *Id.* (App.111).

70.     In June 2013, a DOJ official involved in Operation Choke Point provided the FDIC with a list of 15 financial institutions who had been subpoenaed by the DOJ in connection with the Operation and who DOJ believed were supervised by the FDIC. OIG Report at 16 (App.163).

71.     Other examples of animus against the payday lending industry involve Director Pearce. In a February 2013 email, the Director of FDIC's Atlanta region informed Pearce that he was "pleased we are getting the banks out of ach (payday, bad practices, etc.)." FDIC62684 (App.329).

72.     Pearce responded that he was glad they were "on the same page" and that "failure to be proactive on this will lead to enforcement agencies [sic] or reputational issues, which is not in [the] best interest of our institutions." FDIC62685 (App.330).

73.     Emails between members of FDIC's Legal Division further indicate that Director Pearce was "interest[ed] in trying to find a way to stop our banks from facilitating payday lending." House FDIC Report at 8 (App.103).

74.     On March 18, 2013, Pearce obtained "a list of Payday lenders we have seen in ACH transactions." FDIC64724 (App.332).

75.     Pearce shared the list with another official in the Washington Office, Robert Drozdowski, asking "[h]ow hard/time-consuming do you think it'd be for the FDIC to check the major [banks] we supervise to see if any of them are processing transactions with these payday lenders?" FDIC64723 (App.331); *see also* FDIC62141 (App.333); FDIC62143 (App.334).

76.     Drozdowski responded with several ideas for gathering the information, including updating FDIC guidance "to emphasize (once again) that payday lending presents significantly higher risks to consumers and that any bank originating payments on behalf of payday lenders directly or indirectly should utilize enhanced due diligence" and perhaps even "identify to examiners any payday lenders that they originate payments for." FDIC64723 (App.331).

77.     It continues to be the FDIC's policy to require banks facilitating payment processing for payday lenders to engage in heightened due diligence and monitoring. Eberley Depo. at 82:16–21 (App.314).

78.     Even after Congress had made clear its concerns, FDIC made no change in its position regarding both direct and indirect payday lending activities, but instead continued to review and scrutinize TPPP relationships for potential risks, as delineated in both outstanding FILs and the Supervisory Insight Journal. FDIC68700 (App.335).

79.     When regulators formally or informally require a bank to engage in enhanced due diligence and scrutiny of a type of customer or activity, that raises the cost, to the bank, of servicing that customer or activity. Dujenski Depo. at 34:5–17 (App.321).

80.      "[B]anks that are perceived as troublesome by their regulators are often subject to indirect costs relating to more extensive and costly auditing as regulators punish the failure to cooperate on one dimension (such as complying with guidance about Payday Lender relationships) with stricter discretionary enforcement on all other regulations." First Calomiris Report at 13 (App.31).

81.     In such circumstances, it may be "more cost effective for bankers simply to drop Payday Lenders from their client lists, accept the lost revenues from the loss of those relationships, and move on." *Id.* at 14 (App.32).

82.     Moreover, "[r]egulators also can raise prudential requirements for loan provisioning and for minimum capital ratios that banks must maintain as a consequence about concerns regarding 'reputation risk,' " which can "entail[ ] severe costs for banks." *Id.* at 10 (App.28).

83.     If the FDIC requests that a bank implement enhanced monitoring and controls but the bank refuses to do so, the FDIC will generally consider compelling the bank to comply with its requests through a formal enforcement action or through more informal requests such as a "memorandum of understanding." Dujenski Depo. at 36:1–22 (App.322); *see also* Eberley Depo. at 77:5–78:4 (App.312–13).

84.     In May 2013, Pearce obtained from a contact in the OCC another list of banks believed to be providing ACH services to payday lenders. FDIC65105–10 (App.336–44).

85.     Pearce sent the list to his staff and asked them to determine which banks were supervised by the FDIC and "[d]evelop options and recommendations on whether we should follow up and more importantly how we should follow up." FDIC65567, 71 (App.346, 350).

86.     At the end of the month, FDIC staff responded with a memo identifying which banks were supervised by the FDIC and explaining what actions were being taken—from scheduling examinations into the TPPP activities to exploring whether to take more aggressive actions such as "a Section 5 violation, Consent Order, and CMP." FDIC65566, 67, 71–72 (App.345, 346, 350–51).

87.     A memo to Director Pearce from senior staff in the Washington office, including Deputy Director Miller, confirmed the approach. "During 2013," the memo related, DCP "continued its major effort to better align the focus of compliance examinations on detecting, addressing, and preventing consumer harm" in part through what it described as "[i]ncreased monitoring of third-party risks centered on institutions engaged in processing ACH for merchants accepting transactions for higher risk activities such as online gambling, payday lending, and pornography." FDIC70350, 51 (App.357, 358).

88.     The scrutiny on payday lending reached the very top of the FDIC. On February 24, 2013, for example, Acting Chairman Gruenberg emailed Pearce, Deputy Director Miller, and others a link to a New York Times article discussing the role of banks in facilitating payday loans, noting "We should discuss." FDIC63042 (App.364).

89.     Pearce responded that "We've been focused on the back end of the relationship (e.g., risks of payment processors relationships with banks)" and that he would "provide more info tomorrow at priorities mtg." *Id.* (App.364)

90.     A short time later, Acting Chairman Gruenberg arranged a meeting with a senior official at a prominent bank to discuss payday lending. FDIC34208 (App.365).

91.     According to the draft talking points for Acting Chairman Gruenberg's meeting, they discussed the "potential roles that national banks play which may[ ]be facilitating either traditional storefront or online payday lenders" as well as "[t]he potential ways in which regulators might intervene" to prevent the facilitation. FDIC34209 (App.366).

92.     The potential roles included "facilitating payday loans by extending corporate lines of credit to national payday lending chains"—which could be subjected to regulatory control through "safety and soundness or reputational risk approaches"—as well as "act[ing] as the payment processor" for payday lenders—which the FDIC was beginning to scrutinize "either from a safety or soundness perspective or from a compliance perspective." FDIC34209–10 (App.366–67); *see also* FDIC34226–28 (App.368–70).

93.     After the meeting, Chairman Gruenberg emailed Director Pearce and Barbara A. Ryan that "[w]e should follow up on the discussion of bank services to payday lenders." FDIC63407 (App.371).

94.     Later in March 2013, Pearce and other senior officials in the Washington Office held a conference call with other officials from the bank "to discuss their approach to minimizing the number of fraudulent payday lenders debiting consumer accounts." FDIC63411 (App.372).

95.     The day after the call, on March 19, 2013, a senior officer at the bank emailed Pearce to inform him that there were "announcing our ACH/payday changes tomorrow (maybe as early as tonight)" "consistent with our discussion yesterday." FDIC63591 (App.374).

96.     Because of the identity of the bank in question, FDIC believed the changes in "its practices and its activities" would have a significant "impact in the global financial economy." Transcript of Mark Pearce Deposition at 148:18–149:4 (May 3, 2018) ("Pearce Depo.") (App.378).

97.     Based on the attitudes and conduct of Acting Chairman Gruenberg and other senior officials in the Washington Office towards payday lending, multiple Regional Directors in the field "believed that there was a general expectation from executives in Washington, D.C., to discourage institutions from facilitating payday lending." OIG Report at 28 (App.175).

98.     Indeed, there was "a widely-held understanding that the highest levels of the FDIC disfavored these types of banking services." *Id.* at 29 (App.176).

99.     The opinions of FDIC's leadership extended into the field, and the regulatory guidance FDIC had promulgated was used to apply backroom pressure to banks to terminate payday lenders. As the FDIC's own Inspector General found, FDIC officials had "a heightened level of concern for payday lending by financial institutions and related ACH processing," and these officials "used moral suasion to discourage [banks] from adopting payday lending products or providing ACH processing for payday lenders." *Id.* at 12 (App.159).

100.    This is particularly evident in the emails of Atlanta Regional Director Thomas Dujenski, whose jurisdiction covered several states including South Carolina, where Plaintiff

Advance America is headquartered. In one email to Director Pearce, for example, Director Dujenski emphasized that he was "sincerely passionate" about the fact that "I literally can not stand pay day lending. They are abusive, fundamentally wrong, hurt people, and do not deserve to be in any way associated with banking." FDIC62042 (App.380); *see also* FDIC62084 (App.381).

101.    Director Dujenski continued: "I really hope this bank we discussed truly gets out of this on their own as they are indicating….I hope my persuasion skills are still effective :)" *Id.* (App.380).

102.    Dujenski made a practice of reporting to Director Pearce "any bank that had payday lending relationships." Dujenski Depo. at 63:1–2 (App.324).

103.    In an email sent on Thanksgiving Day 2012, Dujenski told Director Pearce that "I think you will be pleased" because a "bank with ach is getting out of[ ] payday ach." Dujenski continued: "now that is something to celebrate on Thanksgiving! :)" FDIC62027 (App.382).

104.    A few days later, Director Dujenski informed members of his staff that "[a]ny banks even remotely involved in payday [sic] should be promptly brought to my attention." FDIC62138 (App.383).

105.    The senior regional staff responded by instructing all examiners and supervisors to "review your banks and determine if there is any indication of direct or indirect payday lending." FDIC62162 (App.384); *see also* FDIC62140 (App.385); FDIC62142 (App.386).

106.    A few weeks later, Dujenski forwarded his staff and senior leadership a story about a North Carolina bank that had stopped offering a payday loan product, remarking "Congrats to NC!" FDIC62550 (App.387).

107.    In another example, in March 2013, after Dujenski forwarded to Troy Hoskovec, another official in the Atlanta Region, an article related to payday lending, Hoskovec responded

"I am glad to see some of the large banks taking a stand to assist in driving these payday lending entities out of banking. Now we will just need all the others to follow suit." FDIC63609 (App.388).

108.    Dujenski plainly shared the sentiment. The following day, he forwarded to his staff and senior regional leadership several other articles concerning payday lending that Hoskovec had shared with him, writing: "Pay day lenders bring reputational risk, compliance risk, legal risk, and risk management concerns ......nothing good for our banks." FDIC63667 (App.389); *see also* FDIC62684 (Dujenski emails Pearce that he is "pleased we are getting the banks out of ach (payday, bad practices, etc.) (App.329). Another bank is gripping [sic] ... but we are doing good things for them!"); FDIC62685 (App.330).

109.    Another incident illustrates the close coordination between FDIC's Regional Offices, its Washington Office, and other agencies interested in targeting payday lending. On or around November 19, 2012, Ms. Hollifield learned from a contact at the Consumer Financial Protection Bureau that a bank in the Atlanta Region "appear[s] to have a relationship" with payday lenders. FDIC43111 (App.391).

110.    John Bowman, an official at the DCP, quickly organized a call with senior officials in the Atlanta Region to see whether the regional examiners could "gather details about the nature of this relationship" and the "reputation risks involved" during an examination of the bank that the regional officials happened to be conducting. *Id.* (App.391).

111.    Days later, the regional examiners had determined that the bank in question "does indeed process transactions for up to 20 payday lenders," and they raised the issue with the senior Regional leadership, including Director Dujenski and Deputy Regional Director Phyllis Patton. FDIC62105–06 (App.787–88).

112.     Ms. Patton responded that "it's definitely something of serious concern" and "this issue will likely adversely impact the rating…" FDIC62105 (App.787).

113.     Director Dujenski responded by stating that "I look forward to hearing more." *Id.* (App.787).

114.     Troy Hoskovec then replied directly to Dujenski alone: "This does not look good at all." *Id.* (App.787).

115.     Two days later, on December 5, 2012. Deputy Director Patton sent a follow-up email to the group, including Director Dujenski. The examiner had looked further into the bank's "arrangements with payday lenders," and he was in the process of "obtain[ing] additional information to determine if there are grounds sufficient to considering pursuing a Section 5 violation," including "copies of the Bank's due diligence for its customers, beginning with the payday lenders." FDIC62145 (App.393); *see also* FDIC81424 (App.397); FDIC43175–78 (App.400–03).

116.     The following month, seven regional officials—including Director Dujenski and his senior leadership—met with the bank's Chairman to discuss its relationship with payday lenders and its plans to offer a prepaid debit card with "payday lending elements" in partnership with Check Into Cash. FDIC44041–42 (App.404–05); FDIC43119–26 (App.407–14).

117.     Although the bank chairman "stressed that" the bank was not "involved in payday lending," the regional officials "detailed their numerous concerns with the program," which they viewed as "facilitating payday lending activities." FDIC44042–43 (App.405–06).

118.     According to the bank chairman, Director Dujenski stated during the course of this meeting that through the proposed debit-card program, the bank was getting involved in a "dirty business," and that he would refer any money-laundering issues to the Department of Justice.

Transcript of Bank Chairman Deposition at 37:5–14 (May 1, 2018) ("Bank Chairman Depo.") (App.416); *see also* BC227 (App.420).

119.    According to the bank chairman in question, Director Dujenski also asked him whether he was aware that bank directors could be subject to **criminal prosecution**. Bank Chairman Depo. at 37:15–19 (App.416).

120.    Later that same day, the bank informed Deputy Director Patton that it had decided not to pursue the debit-card program. FDIC44039 (App.424); *see also* FDIC44021 (App.425).

121.    Ms. Patton then followed up with the Chairman by phone to see if he was also going "to sever the entire relationship" with the payday lenders in question. FDIC44038 (App.423).

122.    The Chairman assured her that the bank's management was meeting with the payday lenders "to let them know that the relationship is ending." FDIC44039 (App.424); *see also* FDIC44021 (App.425).

123.    After Ms. Patton informed Director Dujenski about these developments, Director Dujenski replied that "i hope he relays it is the banks decision." FDIC44038 (App.423).

124.    Deputy Director Patton responded that "I made that clear" and that he "indicated it's a business decision made by bank management." *Id.* (App.423).

125.    Dujenski replied: "great." *Id.* (App.423).

126.    When regional officials learned that the Chairman had communicated to the Bank's board that the FDIC had established a de facto policy against bank relationships with payday lenders, Deputy Director Patton reached out to him to "express[ ] concern" about that characterization and to reiterate "that the basis for our concerns was centered on what we perceived as a lack of awareness of regulatory (payday and third party oversight guidance) and S&S implications of the business." FDIC62575 (App.426).

127.     In response to the email informing him about these efforts to dissuade the Chairman from referring to a "de facto" FDIC policy discouraging payday lending, Director Dujenski replied with an email consisting of a single emoticon: "☺" FDIC62582 (App.427); *see also* FDIC62556 (App.429).

128.     Days after the Bank's decision to terminate its relationships with payday lenders, the Bank Chairman emailed Dujenski and his leadership team that "I'm no fan of the institution of payday lending," though he had "come to care about the type of consumer that is often their customer," who was frequently ill-served by "traditional bank transaction account products." FDIC62553 (App.430).

129.     Dujenski then forwarded the Chairman's message to Director Pearce in the Washington Office, noting: "Confidential: This guy no longer likes payday…..hmmm…..I think we got our message across . . . ." FDIC62555 (App.428). "I am a firm believer in moral[ ] suasion (and mark, I think this is one strength we bring to the table)." *Id.* (App.428).

130.     Dujenski's efforts to target payday lending continued at least into 2014. In a March 6, 2014 email to a bank, for instance, one of his staff members wrote that the bank's plans to provide ACH access to a payday lender would "receive close regulatory scrutiny from the FDIC" because "[e]ven under the best circumstances, if this venture is undertaken with the proper controls and strategies to try to mitigate risks, since your institution will be linked to an organization providing payday services, your reputation could suffer." FDIC Report Appx. at 4249 (App.269).

131.     Accordingly, the official requested that the bank submit a letter to Regional Director Dujenski if they really did "plan[ ] to go forward with this venture." *Id.* (App.269).

132.     During Director Dujenski's tenure, every single bank within the region that had relationships with payday lenders, to his knowledge, ultimately terminated those relationships. Dujenski Depo. at 133:19–134:3 (App.325–25).

133.     Director Dujenski manifested his hostility to payday lending in more informal ways, as well. For example, when he was forwarded a bank's application to appoint as CEO a former director a shareholder of Advance America, he responded "A pay day….this is a big deal." FDIC55751 (App.432); *see also* FDIC55739–41 (App.435–37).

134.     Later that evening, he followed up by stating that "[w]e need to chat about a director from a payday operation — this has appearance issues for sure." FDIC55760 (App.438).

135.     Regulatory pressure tactics such as this were not limited to the Atlanta region. In 2013, for example, the Chicago Regional Office engaged in an effort to get a bank to terminate a payday lender customer that had been using the bank to facilitate ACH payment processing. *See* OIG Report at 25 (App.172).

136.     On January 15, 2013, the Director of the Chicago Region, Anthony Lowe, sent a memo to Director Pearce informing him that the Chicago Office had investigated the bank because of a high number of ACH returns, and they had determined that they stemmed from a relationship with a payday lender. FDIC62441 (App.444).

137.     Although a bank visitation had determined that the "volume of ACH returns are reasonable," Mr. Lowe nonetheless stated that "we will determine a supervisory strategy for the bank, including considerations for encouraging a termination of the relationship with the payday lender." *Id.* (App.444); *see also* FDIC62667 (App.446); FDIC62670 (App.449); FDIC62674 (App.453).

138.    On January 18, 2013, Mr. Lowe wrote to his staff that "we will be pursuing a strategy to 'encourage' the bank to sever the relationship . . ." FDIC62479 (App.459).

139.    Lowe used every tool at his disposal to discourage the relationship. Shortly after learning that the bank was "providing ACH processing for a payday lender," for example, Lowe "withdr[ew] [his] recommendation of [the] Bank's CEO, for membership on the [regional] Advisory Committee." FDIC124505 (App.461); *see also* FDIC61915–18 (App.466–69).

140.    Director Lowe next informed the bank's board of directors that it was "unacceptable" for the bank to continue serving payday lenders: "It is our view that payday loans are costly, and offer limited utility for consumers, as compared to traditional loan products. Furthermore, the . . . relationship carries a high degree of risk to the institution . . . Consequently, we have generally found that activities related to payday lending are unacceptable for an insured depository institution." FDIC79013–14 (App.470–71); *see also* FDIC64330–31 (App.472–73).

141.    When a few weeks passed without a response from the bank, Lowe emailed a staff member that "We need to get some indication of the bank's intentions, and/or move forward on arranging a meeting." FDIC64330 (App.472).

142.    The FDIC pressured the bank for months until it finally capitulated and terminated the relationship. In notifying the FDIC of its decision, the bank noted that it "*is not engaged in payday lending*" but rather in merely providing "traditional banking services" to payday lenders, which were "engaged only in lawful lending activities." FDIC67052 (App.474).

143.    The bank reiterated that it was not "engaged in unfair or deceptive practices through our services to [the lender] and its customers," and it related that it had "retained the services of a well-known consultant" to conduct a "risk assessment" of the relationship, which had concluded

that the relationship "pose[s] no significant risk to the financial institution, including financial, reputational and legal risk." FDIC67053 (App.475).

144.    While the bank believed a variety of options were available to even further mitigate any risk stemming from the relationship, it recognized that what FDIC really wanted was for it "to request that [the payday lender] terminate their banking relationship with [the] bank." FDIC67054 (App.476).

145.    It accordingly asked "to schedule a time to discuss . . . the termination of our relationship" with the lender. FDIC67055 (App.477).

146.    Clearly frustrated at being pressured to terminate the relationship, however, the bank posed a number of questions for Director Lowe, including which "FIL . . . addresses the ability of the FDIC to force an institution to dismiss a relationship when there have been no safety and soundness considerations identified other than potential reputational risks," and what would happen to the payday lending industry "[a]ssuming all federal regulators are successful in their attempt to drive the payday lenders from the banking system." FDIC67055 (App.477).

147.    Lowe forwarded the letter to Director Pearce, who commented "interesting letter" and "am curious how you plan to respond to these questions." FDIC67087 (App.479).

148.    Indeed, Lowe informed Pearce of his "Concerns related to the institution's involvement with a third party that facilitated payday lending" and his efforts to convince the bank "to exit the relationship" in each of his monthly status reports between February and August of 2013. OIG Report at 25 (App.172).

149.    Yet Pearce never expressed any concerns, during this period, to Director Lowe regarding his approach to payday lenders. Pearce Depo. at 100:16–22 (App.377).

150.    Indeed, "[n]o one at the FDIC informed [Director Lowe]" that his tactics relating to payday lending were "inconsistent with FDIC policy or guidance until after Operation Choke Point was publicized in the media." OIG Report at 27 (App.174).

151.    The FDIC field supervisor on the account expressly recognized that, "In the end, we are getting them out of [ACH processing for a payday lender] through moral persuasion and as you know from a legal perspective we don't have much of a position, if any." OIG Report at 27 (App.174).

152.    Lowe continued to keep Director Pearce appraised of the situation throughout the summer. In an August 2013 memo, he related that regional officials had relayed "[t]he FDIC's concerns regarding the bank's involvement in payday lending related activities and the supervisory expectation to exit the [payday lending] relationship," and that in June the bank had "confirmed exit of [the] relationship." FDIC67929 (App.485).

153.    Lowe understood the FDIC's senior leadership to be deeply concerned about supervised banks facilitating payday lending activities. Lowe Depo. at 27:8–11, 35:8–16 (App.196, 197).

154.    Indeed, Director Pearce did not like banks providing TPPP services to payday lenders, and his preferred policy was to encourage banks to terminate any relationships that facilitated payday lending. *Id.* at 57:17–20, 59:8–15 (App.199, 200).

155.    In another example, the Chicago Office worked to discourage a bank within the region from entering even a deposit and lending relationship with a payday lender. In August 2013, regional staff emailed Lowe that a bank was contemplating entering "a depository and lending relationship with [a] payday lender," though the bank would not "be involved in any payment processing." FDIC119430–31 (App.489–90).

156.    Lowe's subordinate inquired what steps they should take, noting that "I didn't think we wanted our banks involved in this type [of] activity." FDIC119430 (App.489).

157.    Lowe responded: "Our position has been to use available means, including verbal recommendations, to strongly encourage [supervised banks] to refrain from any activities that provide assistance to the business activities of pd lenders. Let's discuss." FDIC119432 (App.491).

158.    A few days later, Lowe wrote to another regional official asking for her to look through agency records for "any mention therein that the bank is involved, directly or indirectly, in payday lending," since he was "concerned that this bank may have been involved in certain activities which have been heavily criticized elsewhere in the Region." FDIC119467 (App.493).

159.    These incidents are not isolated examples of a few overzealous individuals acting alone; instead, there was close coordination throughout the entire campaign. On January 18, 2013, for instance, Director Lowe emailed Director Dujenski about a "PD lender, for which a bank is conducting processing," in the Chicago Region. FDIC62474 (App.494). Lowe continued: "We should definitely continue to share and compare info as our cases develop." *Id.* (App.494).

160.    Similarly, when the Regional Director for the Kansas City Region, James LaPierre, requested other Regional Directors to forward "information regarding ongoing exams or visits where concerns with Third Party Payment Processors have been identified," Director Lowe sent a "High priority" request to his Assistant Regional Directors to collect "any correspondence, within the previous two years, that we have sent to banks regarding concerns specifically in regard to payday lending." FDIC119607–08 (emphasis omitted) (App.495–96).

161.    During this period, the FDIC as a whole took the position that activities related to payday lending were simply unacceptable for banks under FDIC supervision. Lowe Depo. at 68:22–69:6 (App.201–02).

162.    In another incident, Director Lowe, upon learning that a bank within his region was considering purchasing a payday lender as a wholly-owned subsidiary, directed his staff to immediately send "a brief letter to the bank requesting that prior to engaging in any business plan change involving PD lending, they consult with us," further instructing them to "[t]hrow in some items about rep, legal, et al risk from that type of program." FDIC52994 (App.497).

163.    At Lowe's direction, his Assistant Regional Director sent a letter to the bank in question to "make the Board aware of the additional legal, reputational, and consumer compliance risks associated with payday lending" and requesting "that the bank inform our office in writing of any proposed change . . . pertaining to the acquisition of a payday lending entity prior to engaging in this activity." FDIC53293 (App.499).

164.    Five days later, the bank wrote to inform the Regional Office that it had "decided not to pursue a payday lending business in light of additional legal, reputational and consumer compliance risks associated with same." FDIC 110884 (App.500).

165.    In the summer of 2013, Lowe again got word that examiners visiting a bank within the region had "found them doing business with payday lenders," that the "bank was not aware of these payday lender relationships," and that the FDIC regional officials needed to decide what action to take: "enforcement action, exiting?" FDIC67498 (App.503).

166.    Lowe responded suggesting "we consider drafting and sending an 'early warning' letter of our concerns regarding the relationship with PD lenders." FDIC67497 (App.502).

167.    On September 3, Director Lowe sent a letter to the bank's Board of Directors warning them that they had "failed to exercise an appropriate level of oversight over the institution's third-party relationships," by failing "to identify higher risk customers" and to

establish "controls to ensure the Bank does not engage in transactions with payday lenders, illegal gambling businesses, or other high risk entities." FDIC69914 (App.504).

168.     "In [the] aggregate," Lowe concluded, "a progressive wind-down of the program is warranted." FDIC69915 (App.505).

169.     On September 13, 2013, a regional examiner held a phone call with officials at the bank and reiterated the FDIC's recommendation that the bank "Amend ACH policy to expressly prohibit processing for payday lenders." FDIC120133 (App.507).

170.     Director Lowe and his team were clear about their intentions and the purpose of their campaign. In January 2013, for example, Lowe emailed his team about another bank found "processing for [a] Payday Lender," to instruct them that "Our examiners should Give attention to the payday lender (type of loans, charges and fees, targeted customers, etc). As we will be pursuing a strategy to 'encourage' the bank to sever the relationship, we should have the basic info regarding the utility of the product offered." FDIC62475 (App.511).

171.     At some point, after the congressional inquiries into Operation Choke Point and the initiation of this litigation, Director Lowe was criticized by some in the FDIC for exhibiting hostility towards payday lending. For example, the OIG Report criticized some of Lowe's communications regarding payday lending as "reflect[ing] poor judgment." OIG Report at 30 (App.177).

172.     Similarly, in March 2014, Lowe wrote Director Pearce defending his judgment related to the payday lending issue. Lowe defended his actions, noting that while he had used "strong" language, it was "not completely dissimilar from comments the Chairman included in a letter to a consumer group a few months earlier." FDIC122529 (App.512).

173.     Moreover, Lowe noted, throughout the entire period he "had multiple discussions with the [Washington office]," and kept senior FDIC officials, including Director Pearce, informed through "several memos" and personal meetings. FDIC122529 (App.512).

174.     Until Operation Choke Point fell under congressional scrutiny, Lowe was never criticized by anyone in the FDIC for his interactions with banks facilitating payday lending. Lowe Depo. at 85:10–14 (App.203).

175.     And even after Lowe began to take criticism from the FDIC's senior leadership, in response to increased congressional scrutiny, many officials from other regions called to express their sympathy that Lowe was being subjected to criticism for conduct that was in fact widespread in the FDIC. *Id.* at 110:14–111:15 (App.205–06).

176.     These officials from around the country clearly understood that Regional Director Lowe was simply following the FDIC's national policy. Indeed, Lowe believes he was scapegoated for actions that merely implemented the policy pursued by the FDIC as a whole. *Id.* at 91:9–14 (App.204).

177.     Other regions were involved as well. The House Oversight Committee, for example, reported that a senior FDIC official in the Kansas City region threatened a bank considering serving a payday lender with severe regulatory consequences: "The official told the banker, 'I don't like this product, and I don't believe it has any place in our financial system. Your decision to move forward will result in an immediate unplanned audit of your entire bank.' " House FDIC Report at 14 (App.109).

178.     Similarly, an FDIC examiner in Washington State, when asked whether any banks within the region "are facilitating payday lending thru TPPP," responded that it was unlikely

because "We scrutinize TPPP very closely." FDIC67442 (App.514); *see also* FDIC67446 (App.515).

179.    The minutes from a meeting of a bank's Executive Committee in 2014 capture the way Defendants' regulatory pressure factors into banks' decision-making process. The bank, the minutes note, "process[ed] ACH transactions" for a payday lender that "appears to adhere to rules in place for payday lending operations." While the lender's "practices have been validated," and the bank noted it could "closely monitor any risk" it posed, "the consensus of the Committee is that the fees generated from the [lender's] account are not worth any risk to the reputation of the bank," "given the government's current position under 'Operation Choke Point'." FDIC128625 (App.519).

180.    The bank did "not want to appear as being involved in practices subject to criticism," in light of the "potential for regulatory scrutiny due to association with any type of payday lending." Accordingly, the Committee decided "to draft a letter to [the payday lender] advising them that although they are not engaged in any illegal or improper activities," the bank felt it was "prudent to discontinue our relationship with [them] and all pay day lenders." FDIC128625 (App.519).

181.    A memo produced for Director Pearce in September 2013 provides a good, at least partial account of the fruits of the FDIC's campaign up to that date. FDIC69237, 69239–40. The memo recounted nine banks where examiners had surfaced "concerns relative to payday and/or online lending" that had "resulted in . . . either an enforcement action or specific recommendations in a Report of Examination or Visitation." FDIC69239 (App.522).

182.    In three cases, the concerns led to a Section 8b action. FDIC69239–40 (App.522–23).

183.    In three cases, the concerns led the FDIC to enter a "memorandum of understanding" with the bank. *Id.* (App.522–23).

184.    In many other cases, FDIC officials had been able to resolve the concerns through merely issuing verbal or informal written "recommendations" to the banks in question. *Id.* (App.522–23).

185.    In response, the memo noted, the banks repeatedly chose to end the relationships under scrutiny—one bank, for example, "terminated its loan and deposit relationship with the payday lender"; another "blacklisted known payday lenders" from future ACH transactions. *Id.* (App.522–23).

186.    OCC officials coordinated with the FDIC beginning in the early stages of the campaign. In April 2013, for example, Thomas Curry, the Comptroller of the Currency, received from a national bank supervised by OCC a list of payday lenders that had submitted ACH transactions to that bank, along with a list of the banks that originated the transactions on behalf of the lenders. OCC-AA-1378 (App.122); OCC-AA-7081 (App.524).

187.    On April 15, Mr. Curry forwarded the list with several members of his senior staff, including the Deputy Comptroller for Compliance Policy, Grovetta Gardineer. OCC-AA-1378 (App.122).

188.    The next month, Deputy Comptroller Gardineer sent the list to Director Pearce. FDIC65105–06, 65108–10 (App.336–37, 342–44).

189.    In examining banks, OCC raised questions about banks continuing to provide banking services to payday lenders. For example, one national bank that had decided to prohibit Private Bank customers whose source of wealth is generated from payday lending was asked

whether its "[know-your-customer] Standards [shouldn't] reflect this prohibition?" OCC-AA-7131 (App.526); OCC-AA-7121 (App.529); OCC-AA-7093 (App.536).

190.    In September 2013, OCC officials delivered a briefing to Comptroller Curry concerning payday lending. Transcript of Kathleen Oldenborg Deposition at 120:14 (May 3, 2018) (App.543).

191.    According to the slides used during the briefing, the officials discussed the various "[a]ctivities [b]anks [p]rovide," to payday lenders, including by having "Payroll, Supply Chain, and Merchant [payments] processing," and "Access to [the] ACH network." OCC-AA-1259 (App.548).

192.    The briefing also discussed how banks act "as the 'gatekeepers' for the [ACH] Network," and how Operation Choke Point was "aimed at Third Party Payment Processors and their Merchant clients" including "payday lenders," and had resulted in subpoenas issued to "approximately 40 banks for data relative to their ACH transaction[s]." OCC-AA-1257, 1265 (App.546, 554).

193.    The briefing noted the "[k]ey [r]isks" posed by ACH activities, including the "[r]eputation" risk of serving "High risk clients of processors/aggregators (e.g., Payday lenders, interent/online sales)," and it recommended that OCC take several steps, including making ACH return information more accessible, updating and strengthening the OCC's "existing guidance," and "allocat[ing] additional examiner resources as appropriate." OCC-AA-1264, 1269 (App.553, 558).

194.    OCC's scrutiny of payday lending continued into the next year. In January 2014, for example, an email exchange between several different senior OCC officials, including Director Oldenborg, described how OCC examiners had "told [a bank] for years they needed to really re-

think the payday lenders," and had used "moral suasion" to "suggest[ ] strongly that they re-evaluate payday lending, at the very least considering the potential reputation risk." OCC-AA-1052 (App.560).

195.    In a 2014 Supervisory Letter, the OCC criticized a bank that later would terminate Advance America's account for failing to adequately monitor and scrutinize its relationships with money service businesses, singling out the bank's allegedly lax treatment of Advance America. OCC-AA-23–25, 26 (App.565–67, 568); *see also* OCC-AA-3786 (recording that"[a]ccount closure was initiated" after Advance America was identified as an MSB) (App.582).

196.    Similarly, a 2014 Supervisory Letter from the OCC warned a bank that it needed "to enhance monitoring of Automated Clearing House (ACH) returns . . . to enable accurate risk rating and suspicious activity identification for Payday Lenders and other high-risk customers." OCC-AA-4423 (App.586).

**V.    The Effect on the Banks Supervised by Defendants.**

197.    Around the same time that the FDIC began labelling payday lenders as high-risk customers and pressuring them not to service payday lenders, banks regulated by Defendants began terminating their payday lender customers, often en masse, and often with little warning and with little to no explanation. "[T]he recent wave of terminations of bank relationships with Payday Lenders has been dramatic and unprecedented." First Calomiris Report at 15; Third Declaration of Christian Rudolph ¶ 4 (Jan. 23, 2017), Doc. 112-8 ("Third Rudolph Declaration") (App.593).

198.    While most banks did not explicitly refer to direct regulatory coercion in their termination letters, many offered reasons that are consistent with the cause of the termination being Defendants' regulatory activities. In January 2013, for example, Citizens First Bank terminated Advance America's account, explaining that "[d]ue to the nature of your business, we are required by guidance from our primary federal regulatory agency to implement a due diligence and

monitoring program," and that because of the "resources necessary to accomplish this, it has been decided to terminate our relationship with advance America." Exhibit H to Fifth Declaration of Christian Rudolph (Oct. 11, 2018) ("Fifth Rudolph Declaration") (App.622).

199.    In August 2013, Bank of Kentucky terminated its relationship with Community Choice Financial. Declaration of Michael Durbin ¶ 5 (Oct. 2, 2014), Doc. 23-3 (App.696).

200.    In February 2014, Hancock Bank/Whitney Bank sent a notification indicating that "[w]e are unable to effectively manage your Account(s) on a level consistent with the heightened scrutiny required by our regulators for money service businesses"—a category that includes payday lenders—"due to the transactional characteristics of your business." Exhibit N to Fifth Rudolph Declaration (App.643).

201.    In June 2014, Chemical Bank informed Plaintiff Advance America that it would be closing an account "due to the overall risks associated with Money Services Business transactions." Exhibit E to Fifth Rudolph Declaration (App.616).

202.    In June 2014, Capital One Bank informed Advance America that it was terminating its accounts because it had "made the decision to exit the business of providing commercial banking services to payday lenders and related businesses." Exhibit C to Fifth Rudolph Declaration (App.609).

203.    In June 2014, Bank of America notified a payday lender that it was closing its account "based on the nature of your business and associated risks." Declaration of Brian K. Lynn Ex. A (Oct. 2, 2014), Doc. 23-7 ("Lynn Declaration") (App.698).

204.    In August 2014 SunTrust issued a press release stating that it was discontinuing relationships with payday lenders "due to compliance requirements." Press Release, SunTrust, SunTrust Statement on Certain Account Closures (Aug. 8, 2014), https://goo.gl/Tyytrv.

205.    In April 2015, Tri Counties Bank terminated Northstate's account, stating that "it is the policy of the Bank to not bank or lend money to Pay Day Lenders." Declaration of Glenn Bassett Ex. A (Jan. 11, 2017), Doc. 107-5 ("Bassett Declaration") (App.702).

206.    In October 2016, FirstMerit Bank terminated Advance America's account because, according to the termination letter, "the business is in an industry in which [sic] we do not service, such as payday lenders." Exhibit L to Fifth Rudolph Declaration (App.631).

207.    In December 2016, Great Western Bank informed Advance America that it was "unable to continue serving your banking needs" because it was "not comfortable with our ability to manage the risk associated with the . . . account." Exhibit M to Fifth Rudolph Declaration (App.641).

208.    In December 2016, MainSource Bank closed Advance America's accounts, explaining in a termination letter that it had "made the strategic decision to discontinue deposit account and banking services to businesses identified as money service businesses." Exhibit R to Fifth Rudolph Declaration (App.654).

209.    In December 2016, counsel for Wesbanco Bank informed Advance America that its accounts were being terminated because the Bank had decided "to exit a business line providing services to . . . payday lenders due to the costs required in monitoring such accounts." Exhibit DD to Fifth Rudolph Declaration (App.683).

210.    In April 2018, Highlands Union Bank closed Advance America's checking account because, according to the termination letter, the bank had "made the business decision, due to Compliance requirements, that we cannot maintain services for non-bank financial institution businesses." Exhibit GG to Fifth Rudolph Declaration (App.692).

211.    Many other banks terminated their relationships with payday lenders abruptly, with no explanation at all. *See* Exhibit B to Fifth Rudolph Declaration (Cadence Bank) (App.607); Exhibit D to Fifth Rudolph Declaration (Chase) (App.613); Exhibit G to Fifth Rudolph Declaration (Citizens Bank) (App.620); Exhibit I to Fifth Rudolph Declaration (BBVA Compass) (App.624); Exhibit K to Fifth Rudolph Declaration (First Bank and Trust) (App.628); Exhibit O to Fifth Rudolph Declaration (Huntington National Bank) (App.645); Exhibit Q to Fifth Rudolph Declaration (IBC Bank) (App.650); Exhibit T to Fifth Rudolph Declaration (Old National Bank) (App.658); Exhibit V to Fifth Rudolph Declaration (South State Bank) (App.662); Exhibit W Fifth Rudolph Declaration (Synovus) (App.664); Exhibit F to Fifth Rudolph Declaration (Citizens Bank) (App.618); Exhibit AA to Fifth Rudolph Declaration (UMB) (App.677); Exhibit BB to Fifth Rudolph Declaration (Umpqua Bank) (App.679); Exhibit EE to Fifth Rudolph Declaration (U.S. Bank) (App.686); Exhibit HH to Fifth Rudolph Declaration (Evangeline Bank and Trust Co.) (App.694).

212.    Even these sudden, unexplained terminations are evidence that something other than ordinary business considerations was motivating the decision to end the banking relationship. "When bankers decide to end business relationships for independent reasons that reflect a mismatch between a customer's business practices and the bank's relationship development or product delivery strategy, that does not tend to occur suddenly. The reasons are easy to understand. First, bankers wish to resolve problems with clients in ways that preserve valuable relationships, if that is possible. Second, when a banker comes to the conclusion that the bank is better off ending a relationship, after lengthy bank deliberations and discussions with clients, bankers have an incentive to end the relationship in a way that avoids adverse consequences for their reputations in the business community, which often produces further delays in the termination process." Expert

Report of Charles W. Calomiris at 22–23 (June 1, 2018) ("Second Calomiris Report") (App.729–30).

213.    While banks typically did not expressly blame their regulators in written communications with payday lenders, as our Expert has noted, some bankers were more forthcoming in personal discussions. Check Assist, a third-party payment processor that terminated its relationship with several payday lenders managed by PH Financial, informed PH Financial that examiners of the bank that it used—Bank of Kentucky—had informed the bank that they did not want it to have anything to do with the payday lenders. *See* First Calomiris Report at 21 (App.39); Declaration of Robert K. Zeitler, Sr. ¶ 10 (Oct. 2, 2014), Doc. 23-6 (App.749); Fourth Declaration of Robert K. Zeitler, Sr. ¶ 11 (Apr. 7, 2017), Doc. 153-4 (App.752).

214.    Officials at Bank of America verbally communicated to the payday lender Community Choice, in November 2013, that the bank was ending their relationship because of "pressure from regulators regarding reputational risk." First Calomiris Report at 22 (App.40); Durbin Declaration ¶ 6, Doc. 23-3 ("Durbin Declaration") (App.696).

215.    Bank of Kentucky verbally communicated to another payday lender that it was terminating its banking relationship because bank regulators had directed the bank to terminate its relationship with all payday lenders. First Calomiris Report at 22 (App.40); Durbin Declaration ¶ 5 (App.696).

216.    The Executive Vice President of Synovus bank told Advance America, during a phone conversation, that the bank was terminating Plaintiff's account because it was exiting all Money Service businesses because of regulatory pressures relating to these industries, relating that in his thirty years as a banker he had never seen a regulatory environment like the one today.

Declaration of Christian Rudolph ¶ 6 (Oct. 2, 2014), Doc. 23-1 ("First Rudolph Declaration") (App.756).

217.    Richard Naumann was told by the local branch manager at Umpqua Bank that Umpqua was terminating its relationship with his payday lending company because of the pressure the bank was receiving from its federal regulators not to do business with payday lenders. First Calomiris Report at 21 (App.39); Declaration of Richard Naumann ¶ 3 (Jan. 11, 2017), Doc. 107-2 ("Naumann Declaration") (App.759).

218.    Another banker told him that to try to do business with a payday lender would put the bank in regulatory hell. First Calomiris Report at 21 (App.39); Naumann Declaration ¶ 3 (App.759).

219.    The Executive Vice President of Fifth Third Bank orally informed Advance America that it was terminating its account and exiting the entire money services industry not because of anything Advance America had done, but because there was a "third person" in the room making the decision. First Rudolph Declaration ¶ 8 (App.756–57).

220.    Based on conversations with bank managers, the Managing Partner of Plaintiff Northstate Check Exchange understood that both Tri Counties Bank and Wells Fargo Bank terminated relationships with Northstate because of the regulatory pressure placed on them that made continuing to do business with payday lenders untenable. First Calomiris Report at 22 (App.40); Bassett Declaration ¶ 3 (App.703).

221.    A bank official told the Chief Financial Officer of Plaintiff Check Into Cash that the bank was "instructed" to cease doing business with payday lenders. Declaration of William S. Lane ¶ 6 (Jan. 11, 2017), Doc. 107-3 ("Lane Declaration") (App.764).

222.   An official with another bank told him that the bank's decision to stop doing business with payday lenders was due to "Chokepoint." *Id.* ¶ 7 (App.764).

223.   Moreover, several bank officials—including at Bank of America and Synovus Bank, institutions that terminated relationships with Plaintiff Advance America—have expressed regret at being forced to end long-standing, positive relationships with payday lenders and have made it clear that they would reestablish these relationships if allowed to. *See* Lynn Declaration ¶ 5 ("Representatives at our local branches [of Bank of America] were frustrated and disappointed with this decision to end our longstanding relationship.") (App.699); Declaration of Mark McDonald ¶¶ 11–12, 14 (Oct. 2, 2014), Doc. 23-5 (expressing regret that relationship had ended and hope that relationship would later be allowed to resume) (App.767–68); Declaration of Jose Gonzalez ¶ 3 (Oct. 2, 2014), Doc. 23-2 (Executive Vice President of Synovus Bank stated "that he had supported maintaining the Advance America relationship") (App.770).

## VI.   The Impact on Plaintiffs and Other Payday Lenders.

224.   Because payday lenders need access to the banking system to survive, the bank terminations that they have suffered have taken a toll on their businesses.

225.   For example, since February 2013, Plaintiff Advance America has received termination notices from at least 21 banks. Third Rudolph Declaration ¶ 3 (App.592–93).

226.   This wave of termination is unprecedented. Advance America lost banking relationships on an intermittent bases before 2013—for example, it experienced a single termination each in the years 2007, 2008, and 2009, and three terminations in 2010. *Id.* ¶ 4 (App.593). But never before has it experience terminations on this scope and scale. *Id.* (App.593).

227.   The terminations have intensified in pace and scope recently. In October and November 2016 alone, Advance America received termination notices from five banks, affecting accounts serving 1,380 storefronts. *Id.* ¶ 5 (App.593).

44

228.    Also in November and December of 2016 alone, approximately 150 additional banks refused to enter a banking relationship with the company. *Id.* ¶ 6 (App.593–94).

229.    Since 2013, about 275 banks have refused Advance America's business because of their status as a payday lender. *Id.* (App.593–94).

230.    Critically, in November 2016 U.S. Bank notified Advance America that it was closing all 43 accounts Plaintiff held at the bank. Declaration of Christian Rudolph ¶ 9 (Nov. 23, 2016), Doc. 87-4 (App.773).

231.    U.S. Bank was Advance America's principal banking partner, providing services to 1,262 storefronts, as well as covering all of the company's payroll and ACH transactions. *Id.* ¶ 10 (App.773).

232.    Advance America has yet to find a banking relationship sufficient to make up for its loss of its accounts at U.S. Bank. *Id.* ¶ 14 (App.774); Rudolph Depo. at 279:6–7 (App.80).

233.    The company has incurred substantial costs as a result of the banking relationships it has lost. For example, the company spent over $3 million on armored courier services in 2017, Fifth Rudolph Declaration ¶ 2 (App.596)—a 500% increase over what it spent in 2012. Third Rudolph Declaration ¶ 8 (App.594).

234.    The company also experienced a 37% increase in ACH processing expenses and bank fees from 2016 to 2017. Fifth Rudolph Declaration ¶ 3 (App.596).

235.    All told, from 2012 to 2017, Advance America's banking-related expenses increased approximately $2.5 million per year. Rudolph Depo. at 290:20–291:2 (App.81–82).

236.    Advance America has not yet been forced out of business, but its continued survival is in jeopardy. Third Rudolph Declaration ¶ 11 (App.595); Rudolph Depo. at 278:6–7 (App.79).

237.    If Advance America were to lose its remaining banking relationships, for example, it might not be able to find further replacements. Rudolph Depo. at 273:3–5 (App.78).

238.    Like Advance America, the other Plaintiffs also have suffered the effects of bank terminations in recent years. Check Into Cash, for instance, lost seven crucial banking relationships between October 2013 and December 2016, including Bank of America (October 2013), Capital One Bank (March 2014), and JP Morgan Chase (November 2013). *See* Lane Declaration ¶ 5 (App.764).

239.    Check Into Cash also had difficulty establishing new banking relationships in this period to replace the terminated accounts, and multiple banks refused its business, including Regents Bank, BB&T, and SunTrust Bank. Transcript of William S. Lane 30(b)(6) Deposition at 256:3–261:21 (May 1, 2018) ("Lane Depo.") (App.777–82).

240.    During this period, Check Into Cash has had close to over 250 storefronts and eliminate over 400 employee positions, and its profits have declined, in part due to the increased costs imposed by Defendants' regulatory campaign. Third Declaration of William S. Lane ¶¶ 3, 5, 7 (Apr. 7, 2017), Doc. 153-3 ("Third Lane Declaration") (App.785–86).

241.    Over 300 of Check Into Cash's storefronts still lack banking relationships. Lane Depo. at 266:16–18 (App.783).

242.    If its access to the banking system is cut off, Check Into Cash "would be forced out of business entirely." Third Lane Declaration ¶ 6 (App.786).

243.    The same is true for Northstate Check Exchange. Northstate's longtime banking partner, North Valley Bank, abruptly terminated the relationship in 2015, after being acquired by a larger regional bank. Bassett Declaration ¶ 2 (App.702–03).

244.    Northstate attempted to replace the relationship by opening an account at Wells Fargo, but only months later Wells Fargo, too, terminated Northstate's account. *Id.* ¶ 3 (App.703).

245.    After losing its existing relationships, Northstate contacted twelve separate banks seeking to open new accounts, but all of them refused its business. Bassett Depo. at 205:15–212:11 (App.9–16).

246.    Northstate has been able to keep its payday lending operations in business only by opening an Investment Account with Edward Jones. Bassett Declaration ¶ 4 (App.703).

247.    Because of the policies of this account, Northstate cannot deposit customer's checks directly into the account; instead, it must convert each check into a money order. Basset Depo. at 193:20–194:40 (App.6–7).

248.    This workaround entails considerable additional expense, and it also makes the experience less convenient from the customer's perspective, reducing the attractiveness of Northstate's payday loans. *Id.* at 195:15–17, 234:3–12 (App.8, 17).

249.    Other payday lenders have suffered similar patterns of terminations. Richard Naumann, for example, owned and operated Calaveras Cash, a payday lender located in Calaveras County, California. Calaveras Cash began banking with Umpqua Bank before the store opened for business, and Mr. Naumann had an excellent relationship with the bank for several years. Naumann Declaration ¶¶ 2–3 (App.758–59).

250.    Then, in 2014, the bank suddenly terminated its accounts with Calaveras Cash. *Id.* ¶ 4 (App.759).

251.    Unable to find another bank to service the business, Mr. Naumann was forced to shut it down shortly thereafter. *Id.* (App.759).

Date:   October 12, 2018                    Respectfully submitted,

                                            /s/ Charles J. Cooper
                                            Charles J. Cooper (Bar No. 248070)
                                            ccooper@cooperkirk.com
                                            David H. Thompson (Bar No. 450503)
                                            Peter A. Patterson (Bar No. 998668)
                                            Nicole J. Moss (Bar No. 472424)
                                            Harold S. Reeves (Bar No. 459022)
                                            John D. Ohlendorf (Bar No. 1024544)
                                            COOPER & KIRK, PLLC
                                            1523 New Hampshire Avenue, N.W.
                                            Washington, D.C. 20036
                                            (202) 220-9600
                                            (202) 220-9601 (fax)

                                            *Attorneys for Plaintiffs*