UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
ADVANCE AMERICA, CASH ADVANCE                       )
CENTERS INC., et al.,                               )
                                                    )
        Plaintiffs,                                 )        CIVIL ACTION
                                                    )
        v.                                          )
                                                    )        Case No. 14-953 (TNM)
FEDERAL DEPOSIT INSURANCE                           )
CORPORATION, et al.,                                )
                                                    )
        Defendants.                                 )
_____)

**MEMORANDUM IN SUPPORT OF FEDERAL DEPOSIT INSURANCE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT
ON COUNT I OF THE THIRD AMENDED COMPLAINT**

**TABLE OF CONTENTS**

BACKGROUND ...................................................................................................2

    A.   Factual Background..................................................................................2

        1.    The Payday Lending Industry.................................................2

        2.    Supervisory Guidance Regarding Banks' Customer Relationships.............3

        3.    FDIC Interest In Banks' Relationships with Payday Lenders ....................5

            a.   Due Diligence and Monitoring Requirements ...........................5

            b.   FDIC Concerns about Banks Facilitating Illegal Activity.........7

            c.   The FDIC Clarified its Policy in 2013 ....................................10

        4.    Plaintiffs' Payday Lending Businesses ....................................10

            a.   Advance America........................................................................10

            b.   Check Into Cash .........................................................................12

            c.   Northstate ...................................................................................13

    B.   Procedural History..................................................................................15

        1.    Initial Pleadings .......................................................................15

        2.    Preliminary Injunction Proceedings.........................................16

        3.    Additional Dispositive Motions................................................17

ARGUMENT.....................................................................................................18

I.      SUMMARY JUDGMENT STANDARD ....................................................18

II.    PLAINTIFFS LACK STANDING TO SUE...............................................19

    A.   Plaintiffs Cannot Show Causation..........................................................19

    B.   Plaintiffs Cannot Show Redressability....................................................23

    C.   Northstate Cannot Show Injury in Fact...................................................24

III.   THERE WAS NO DUE PROCESS VIOLATION HERE. ........................................... 24

    A.   Plaintiffs Have Not Been Deprived of a Liberty Interest. ......................................... 25

        1.   Plaintiffs Have Not Lost a Government Position or Private Business Opportunities or Otherwise Suffered a Change in Legal Status. ............... 26

            a.   Plaintiffs Cannot Prevail on a "Reputation-Plus" Claim Because They Have Not Lost Government Employment or Contracts. ................................................................................. 26

            b.   Plaintiffs Cannot Prevail on a "Stigma-Plus" Claim Because They Have Suffered No Broad Preclusion of Any Kind. ........ 27

            c.   Loss of a Single Account is Not a Liberty Interest Deprivation. ........................................................................... 31

            d.   Plaintiffs Have Not Identified Any "Official Action." ............ 32

        2.   The FDIC Has Not Stigmatized Plaintiffs. ................................................. 33

        3.   There is No Evidence of Reputational Harm. ............................................. 35

    B.   Plaintiffs Cannot Show Causation. .............................................................................. 36

    C.   Plaintiffs Identify No Individualized Interest. ............................................................ 41

IV.   PLAINTIFFS' REQUESTED INJUNCTION IS INAPPROPRIATE. ...................... 42

V.   THE FDIC TOOK ACTION TO ENSURE THAT BANKS WERE NOT IMPLICATED IN ILLEGAL AND UNETHICAL CONDUCT. ........................................... 43

CONCLUSION ..................................................................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*ABA, Inc. v. District of Columbia,*
  40 F. Supp. 3d 153 (D.D.C. 2014) ........................................................................... 29

*\*Abdelfattah v. DHS,*
  787 F.3d 524 (D.C. Cir. 2015) ................................................................................. 30

*Advanced Mgmt. Tech., Inc. v. FAA,*
  211 F.3d 633 (D.C. Cir. 2000) ................................................................................. 28

*Aguirre v. SEC,*
  671 F. Supp. 2d 113 (D.D.C. 2009) ......................................................................... 33

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ........................................................................................... 18, 19

*\*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015) ..................................................................... 20, 24, 42

*Asbill v. Housing Auth.,*
  726 F.2d 1499 (10th Cir. 1984) ............................................................................... 36

*Association of Private Sector Colleges & Univs. v. Duncan,*
  681 F.3d 427 (D.C. Cir. 2012) ................................................................................. 20

*Bank of Jackson Cty. v. Cherry,*
  980 F.2d 1354 (11th Cir. 1992) ............................................................................... 29

*Bannum, Inc. v. Samuels,*
  221 F. Supp. 3d 74 (D.D.C. 2016) ........................................................................... 29

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,*
  239 U.S. 441 (1915) ................................................................................................. 41

*Black v. District of Columbia,*
  134 F. Supp. 3d 255 (D.D.C. 2005) ......................................................................... 27

*Bloomberg L.P. v. CFTC,*
  949 F. Supp. 2d 91 (D.D.C. 2013) ........................................................................... 22

*Brown v. District of Columbia,*
  888 F. Supp. 2d 28 (D.D.C. 2012) ........................................................................... 36

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................ 19

*Chicago United Industries, Ltd. v. City of Chicago*,
    669 F.3d 847 (7th Cir. 2012) ................................................................................ 29

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................................................ 42

*Codd v. Velger*,
    429 U.S. 624 (1977) ........................................................................................ 33, 35

*Cook v. Babbitt*,
    819 F. Supp. 1(D.D.C. 1993) ............................................................................... 19

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) .............................................................................................. 25

*Crooks v. Mabus*,
    845 F.3d 412 (D.C. Cir. 2016) ............................................................................. 32

*Dearth v. Holder*,
    641 F.3d 499 (D.C. Cir. 2011) ............................................................................. 42

*Decatur Liquors, Inc. v. District of Columbia*,
    478 F.3d 360 (D.C. Cir. 2007) ............................................................................. 41

*Doe v. Cheney*,
    885 F.2d 898 (D.C. Cir. 1989) ............................................................................. 33

*\*Doe v. Rogers*,
    139 F. Supp. 3d 120 (D.D.C. 2015) ................................................................ 27, 28

*Evangelou v. District of Columbia*,
    63 F. Supp. 3d 96 (D.D.C. 2014) ......................................................................... 33

*Fair Employment Council v. BMC Mkttg. Corp.*,
    28 F.3d 1268 (D.C. Cir. 1994) ............................................................................. 42

*Fla. Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) ............................................................................... 22

*Freedom Republicans, Inc. v. FEC*,
    13 F.3d 412 (D.C. Cir. 1994) .......................................................................... 22, 23

*Fulani v. Brady*,
935 F.2d 1324 (D.C. Cir. 1991) ........................................................................ 20

*General Electric Co. v. Jackson*,
595 F. Supp. 2d 8 (D.D.C. 2009) ...................................................................... 30

*General Electric Co. v. Jackson*,
610 F.3d 110 (D.C. Cir. 2010) .......................................................................... 28

*Gettman v. DEA*,
290 F.3d 430 (D.C. Cir. 2002) .......................................................................... 22

*Greer v. Paulson*,
505 F.3d 1306 (D.C. Cir. 2007) ........................................................................ 21

*Grocery Mfrs. Ass'n v. EPA*,
693 F.3d 169 (D.C. Cir. 2012) .......................................................................... 22

\*Groos Nat'l Bank v. Comptroller of Currency*,
573 F.2d 889 (5th Cir. 1978) .............................................................. 4, 28, 32

*Industrial Safety Equipment Association v. EPA*,
837 F.2d 1115 (D.C. Cir. 1988) ........................................................................ 28

*Kaempe v. Myers*,
367 F.3d 958 (D.C. Cir. 2004) .......................................................................... 18

\*Kartseva v. Department of State*,
37 F.3d 1524 (D.C. Cir. 1994) ................................................................... 32, 33

*Khan v. Gallitano*,
180 F.3d 829 (7th Cir. 1999) ............................................................................ 25

*Lighton v. University of Utah*,
209 F.3d 1213 (10th Cir. 2000) ........................................................................ 30

*Long Term Care Pharmacy Alliance v. Leavitt*,
530 F. Supp. 2d 173 (D.D.C. 2008) .................................................................. 22

*Loumiet v. United States*,
255 F. Supp. 3d 75 (D.D.C. 2017) .................................................................... 29

*Lucas v. District of Columbia*,
214 F. Supp. 3d 1 (D.D.C. 2016) ...................................................................... 31

*Lujan v. Defenders of Wildlife,
   504 U.S. 555 (1992) .................................................................... 20, 23, 24

Madsen v. Women's Health Ctr., Inc.,
   512 U.S. 753 (1994) .................................................................... 42

Massachusetts Credit Unions Share Ins. Corp. v. NCUA,
   693 F. Supp. 1225 (D.D.C. 1988) ............................................... 23

Mazaleski v. Treusdell,
   562 F.2d 701 (D.C. Cir. 1977) .................................................... 34

McCormick v. District of Columbia,
   752 F.3d 980 (D.C. Cir. 2014) .................................................... 25

McGinnis v. District of Columbia,
   65 F. Supp. 3d 203 (D.D.C. 2014) .............................................. 37, 40

Mervin v. FTC,
   591 F.2d 821 (D.C. Cir. 1978) .................................................... 29

Moore v. Agency for Int'l Dev.,
   80 F.3d 546 (D.C. Cir. 1996) ...................................................... 26

Moore v. Williamsburg Regional Hospital,
   560 F.3d 166 (4th Cir. 2009) ...................................................... 25

*Mosrie v. Barry,
   718 F.2d 1151 (D.C. Cir. 1983) .................................................. passim

National Council of Resistance v. Department of State,
   251 F.3d 192 (D.C. Cir. 2001) .................................................... 32

National Maritime Union v. Dole,
   1987 WL 10495, *5 (D.D.C. Apr. 27, 1987) ............................... 23

National Wrestling Coaches Ass'n v. Department of Educ.,
   366 F.3d 930 (D.C. Cir. 2004) .................................................... 20, 21, 22, 37

*O'Donnell v. Barry,
   148 F.3d 1126 (D.C. Cir. 1998) .................................................. passim

Ohio Head Start Ass'n v. HHS,
   873 F. Supp. 2d 335 (D.D.C. 2012) ............................................ 30, 36

*Old Dominion Dairy Prods., Inc. v. Secretary of Defense,*
    631 F.2d 953 (D.C. Cir. 1980) ............................................................... 29

*Osborn v. Visa Inc.,*
    797 F.3d 1057 (D.C. Cir. 2015) ............................................................. 19

*Paul v. Davis,*
    424 U.S. 693 (1976) ...................................................... 16, 25, 27

*Payne v. District of Columbia,*
    773 F. Supp. 2d 89 (D.D.C. 2011) ........................................................ 33

*Perez v. City of Roseville,*
    882 F.2d 843 (9th Cir. 2018) ............................................................... 27

*Peter B. v. CIA,*
    620 F. Supp. 2d 58 (D.D.C. 2009) ........................................................ 27

*Pickus v. United States Bd. of Parole,*
    543 F.2d 240 (D.C. Cir. 1976) ............................................................. 41

*Reporters Committee for Freedom of the Press v. AT&T Co.,*
    593 F.2d 1030 (D.C. Cir. 1978) ............................................................. 42

*Shirvinski v. U.S. Coast Guard,*
    673 F.3d 308 (4th Cir. 2012) ............................................................... 25

*Siegert v. Gilley,*
    500 U.S. 226 (1990) ................................................................ 26, 33

*Simon v. Eastern Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ............................................................................ 21

*St. John's United Church of Christ v. FAA,*
    520 F.3d 460 (D.C. Cir. 2008) ............................................................. 23

*Taylor v. RTC,*
    56 F.3d 1497 (D.C. Cir. 1995) ...................................................... 35, 37

*Town of Babylon v. FHFA,*
    699 F.3d 221 (2d Cir. 2012) ............................................................... 24

*Townsend v. Vallas,*
    256 F.3d 661 (7th Cir. 2001) ............................................................... 37

*Toxco Inc. v. Chu*,
    724 F. Supp. 2d 16 (D.D.C. 2010) ............................................................. 30, 36

*Trifax Corp. v. District of Columbia*,
    314 F.3d 641 (D.C. Cir. 2003) ..................................................................... 28

*U.S. Fidelity & Guar. Co. v. Planters Bank & Trust Co.*,
    77 F.3d 863 (5th Cir. 1996) .......................................................................... 19

*United States v. Florida East Coast Ry.*,
    410 U.S. 224 (1973) ...................................................................................... 41

*Vineyard Investments, L.L.C. v. City Of Madison, Miss*,
    440 F. App'x 310 (5th Cir. 2011) ................................................................. 25

*Williams v. Lew*,
    819 F.3d 466 (D.C. Cir. 2016) ................................................................. 24, 42

## STATUTES

12 U.S.C. § 1813 .................................................................................................... 4

12 U.S.C. § 1817 .................................................................................................... 3

12 U.S.C. § 1818 .................................................................................................... 4

12 U.S.C. § 1819 .................................................................................................... 3

12 U.S.C. § 1820 ............................................................................................... 3, 4

12 U.S.C. § 1831p-1 ............................................................................................... 4

31 U.S.C. § 5318 .................................................................................................... 4

## REGULATIONS

12 C.F.R. § 326.8 .................................................................................................. 4

12 C.F.R. § 353.3 .................................................................................................. 4

31 C.F.R. § 1020.220 ............................................................................................. 4

ix

## RULES

Fed. R. Civ. P. 54(b) ................................................................................................................ 31

Fed. R. Civ. P. 56..................................................................................................................... 18

Fed. R. Evid. 702 ..................................................................................................................... 23

This is a lawsuit by three payday lenders, Advance America, Cash Advance Centers, Inc. ("AA"), Check Into Cash, Inc. ("CIC") and Northstate Check Exchange ("Northstate") (collectively "Plaintiffs"), against two federal agencies, the Federal Deposit Insurance Corporation ("FDIC") and the Office of the Comptroller of the Currency ("OCC") (collectively "Defendants"). Plaintiffs allege in Count I of the Third Amended Complaint, the only remaining FDIC Count, that the FDIC violated Plaintiffs' due process rights under the Fifth Amendment by making stigmatizing statements that caused banks to terminate their relationships with Plaintiffs. That claim is baseless as a matter of fact and law.

First, Plaintiffs lack standing to sue. There is *no* evidence that Plaintiffs have lost a *single* account as a result of the FDIC's acts, and indeed the available evidence shows that banks terminated Plaintiffs' accounts for their own business reasons. As the FDIC did not cause those terminations in the first place, no order directed at the FDIC could cause banks to restore the relationships. Thus, Plaintiffs cannot show causation or redressability, and they lack standing.

Second, there has been no Fifth Amendment due process violation here. Plaintiffs claim that Defendants have deprived them of a liberty interest by conducting a "campaign" to bar them from the banking system and drive them out of business, but Plaintiffs' own documents show that, after more than five years of the supposed "campaign," Plaintiffs have access to the banking system (AA and CIC have nearly ■ bank accounts *each*), and their businesses remain profitable. The termination of an individual bank account is not a liberty interest deprivation, as this Court has correctly held, and would not be even if the FDIC caused the termination, which it did not. There is no evidence that Plaintiffs have been stigmatized, and statements or actions directed at the payday lending industry *en masse*, even if shown, do not implicate the due process rights of an individual lender. Nor did the FDIC undertake a "campaign" against payday lenders;

1

rather, the FDIC was concerned that banks had neglected their duty to monitor their customer relationships and had facilitated or failed to prevent certain lenders' illegal acts as a result. For that reason, the FDIC cautioned banks that the Bank Secrecy Act requires appropriate safeguards to manage the risks of customer relationships. The FDIC did not, and does not, prohibit banks from maintaining relationships with payday lenders or any other industries.

Finally, Plaintiffs would not be entitled to an injunction even if they could show the deprivation of a liberty interest, as they are not facing the type of ongoing or imminent harm required to obtain such relief. Because there is no genuine issue of material fact and the FDIC is entitled to judgment as a matter of law, the Court should enter summary judgment for the FDIC on Count I of the Third Amended Complaint.

## BACKGROUND

### A.     Factual Background

#### 1.     The Payday Lending Industry

Payday lending refers to small-dollar, short-term, high-interest loans, usually to low-income borrowers. Statement of Undisputed Material Facts ("SOF") ¶¶ 1, 5-8. The loans are generally repayable on the borrower's next payday, and lenders charge fees, typically in the amount of $15 per $100 borrowed for storefront lenders. *Id.* ¶¶ 3, 5-6. The loans are secured either with postdated checks that the lender can deposit if the borrower does not repay in cash, or with authorizations to debit the borrower's bank account through the Automated Clearing House (ACH) system. *Id.* ¶¶ 4, 9. If the loans are not repaid on the due date, they are often "rolled over" to a new term (such as 14 days) with an additional fee charged; lenders often encourage rollovers. *Id.* ¶¶ 15-20. Losses on payday loans are significant: a two-year study found that only 50 percent of loan principal was ultimately repaid, and loss rates are even higher for online loans. *Id.* ¶¶ 31-33. Borrower credit checks are minimal, and the industry is highly dependent on fees

from repeat borrowers; a study found that 90 percent of payday lending revenue comes from borrowers with seven or more loans. *Id.* ¶¶ 11-13, 33. Payday lenders often make repeated attempts to debit borrowers' accounts (driving up fees), leading to significant levels of electronic transactions returned as unauthorized or for insufficient funds; the payments industry views high levels of returns as indicative of potentially fraudulent activity. *Id.* ¶¶ 21-22, 507.

The industry's total loan volume in 2015 was $39.5 billion, down from $46 billion in 2013 and $50 billion in 2007. *Id.* ¶¶ 23-24. Online lending volume grew by more than 50 percent in that time frame. *Id.* ¶¶ 27-28. Many brick and mortar stores have closed as the industry moves online. *Id.* ¶¶ 25-30.

Payday lenders are licensed on the state level, though they are only legal in 35 states. *Id.* ¶¶ 2, 10. Online lenders often claim to be exempt from federal and state regulation and disclosure requirements, and regulators have often found online lenders doing business in states where payday lending is prohibited. *Id.* ¶¶ 10, 13-14, 60, 460, 577, 587-88, 592, 597, 605, 616. Both Congress and the Consumer Financial Protection Bureau (CFPB) have restricted payday lending in the recent past, and since 2008, ten states that formerly permitted payday lending have either banned or sharply limited it. *Id.* ¶¶ 36-43, 49-53. Certain municipalities have followed suit. *Id.* ¶ 54. In 2017, the CFPB found widespread abuses by payday lenders, including deceptive practices and over-debiting of borrowers' accounts. *Id.* ¶¶ 44-48. The National Automated Clearing House Association (NACHA) has responded to concerns about payday lenders' abuse of that system by restricting use of the ACH network for debiting borrowers' accounts, and fining or suspending merchants with excessive amounts of returned transactions. *Id.* ¶¶ 55-57.

### 2.   Supervisory Guidance Regarding Banks' Customer Relationships

Under the Federal Deposit Insurance Act (FDI Act), the FDIC acts as the primary federal regulator for certain state-chartered banks. 12 U.S.C. §§ 1817(a), 1819, 1820(b). In that capacity,

it examines banks and prepares examination reports, and brings enforcement actions against institutions and affiliated parties that violate laws or regulations or engage in unsafe and unsound practices. *Id.* §§ 1818(b-e), 1820(b). The FDIC prescribes standards to promote the banks' safety and soundness, and may do so by "regulation or guideline." *Id.* § 1831p-1(d)(1).

In its capacity as a federal regulator of financial institutions, the FDIC issues guidance to banks regarding their customer relationships. In particular, the FDIC has advised banks about their obligation to monitor their customers (and their proxy customers) under section 326 of the Bank Secrecy Act, 31 U.S.C. § 5318(*l*) ("BSA"), which requires banks to establish and maintain a Customer Identification Program ("CIP") for verifying the identities of accountholders. SOF ¶ 409. Federal law recognizes that banks have discretion in choosing their customers, *see Groos Nat'l Bank v. Comptroller of Currency*, 573 F.2d 889, 897 (5th Cir. 1978), and federal statutes and regulations recognize that discretion and require banks to exercise it to detect illegal activity. SOF ¶¶ 420-43, 488.[1] In general, banks are expected to monitor their customer relationships and conduct due diligence to ensure that they are aware of all risks posed by their customers and that those customers are conducting their businesses lawfully. *Id.* ¶¶ 414-19, 431, 435-39.

The FDIC has promulgated regulations and issued guidance regarding banks' CIP responsibilities, *see* 12 C.F.R. § 326.8; SOF ¶¶ 410-13, along with guidance regarding banks'

---

[1] *See, e.g.*, 12 U.S.C. §§ 1813(v), 1818(b) (banks may neither engage in a violation of law nor facilitate such a violation by any other party); 31 U.S.C. § 5318(g) (banks must report actual or suspected violations of law by bank customers); *id.* § 5318(i) (banks must exercise due diligence in monitoring accounts for money laundering activity); *id.* § 5318(*l*) (banks must establish procedures for verifying that customers do not have terrorist ties); 12 C.F.R. § 353.3(c) (banks are expected to monitor customer activity to detect customers' illegal acts); 31 C.F.R. § 1020.220 (banks must implement CIPs to assess the "relevant risks" posed by new customers); *see also* SOF ¶ 411 (FDIC guidance, providing that banks must "develop procedures to account for all relevant risks" when opening accounts).

obligations to monitor their customers' activities and manage the risks arising from third-party relationships. In particular, the FDIC has issued Financial Institution Letters ("FILs") on several occasions, along with an article in the journal *Supervisory Insights*, advising banks of the risks of those relationships, particularly with payment processors whose clients include certain industries (including but not limited to payday lenders), and recommending certain procedures to fulfill the bank's due diligence and monitoring obligations. SOF ¶¶ 449, 492-542. These materials explain the various risks that a bank's involvement with customers may pose, including the legal risks to a bank from its customers' fraudulent or illegal conduct, as well as strategic risk, reputation risk, operational risk, transaction risk, credit risk, and compliance risk. *Id.* ¶¶ 502, 509, 518, 542. The materials also identify warning signs for potentially fraudulent or criminal activity, including complaints about inappropriate use of personal information and misleading claims, high return rates (indicative of unauthorized transactions), and excessive reliance on fee income. *Id.* ¶¶ 35, 519, 542. Failure to control risk from third-party relationships, the FDIC has warned, could lead to enforcement actions, and indeed the FDIC has pursued such enforcement actions. *Id.* ¶ 503, 540, 624. The FILs and article cite examples of industries that may pose risks to banks because of the elevated incidence of fraudulent and illegal activities in those industries, drawing on similar lists prepared by the payments industry. *Id.* ¶¶ 511-14, 520-29, 534-42. The FDIC acknowledged, however, that many transactions processed on behalf of those industries are legitimate, *id.* ¶¶ 507, 516, 533, 539, and the FDIC did not use its list of high-risk industries to target financial institutions that had relationships with those industries. *Id.* ¶¶ 528-29, 538.

**3.      FDIC Interest in Banks' Relationships with Payday Lenders**

a.      Due Diligence and Monitoring Requirements

The FDIC neither prohibits banks from doing business with particular categories of customers such as payday lenders nor requires banks to maintain any relationships, and does not

discourage particular relationships unless they involve illegal activity. *Id.* ¶¶ 485-86, 490, 546-59, 568. Banks may decide to forgo a customer relationship with a payday lender because of, *inter alia*, compliance costs, inability to manage the relationship, actual or expected liabilities, concerns about the lender's violations of laws, regulations, and industry rules (including fraud and money laundering, deceptive practices that violate consumer protection laws, and NACHA restrictions), or consumer complaints. *Id.* ¶¶ 35, 62-105.

Payday lenders' relationships with banks are sometimes direct and sometimes established through third-party payment processors (TPPPs) who process transactions at banks on behalf of a variety of merchant clients. *Id.* ¶ 432. TPPPs may present varied risk profiles, including BSA risks, depending on their merchant base; banks entering into relationships with TPPPs must understand that merchant base, and review the TPPPs' processes for conducting due diligence and monitoring their merchant clients. *Id.* ¶¶ 432-39. Examiners reviewing banks' TPPP relationships focus on the banks' monitoring and risk assessment procedures. *Id.* ¶¶ 472-74.

Banks, not the FDIC, are responsible for conducting risk assessments on their third-party relationships. *Id.* ¶¶ 426-31, 473. Consistent with the FDIC's policies on third-party relationships generally, banks that maintain relationships with payday lenders (directly or through TPPPs) are expected to have safeguards (often resource-intensive) in place to verify the payday lender's identity and understand how the lender will use its bank account. *Id.* ¶¶ 455-59. These are the same safeguards that banks are expected to have for any customer to detect criminal violations and other suspicious activity, but the need for those safeguards for payday lenders is particularly acute in light of their high transaction volumes, high rates of returned transactions, minimal customer verifications, and complex interstate and private (i.e., NACHA) regulatory regime. *Id.* ¶¶ 450-60, 466-69. Other risks to banks include credit risk (in the event that the losses on

payday loans exhaust a lender's cash reserves), strategic risk (if the bank does not create adequate procedures), and reputation risk (if, for example, the bank mismanages the relationship and fails to detect and prevent illegal activity), though a payday lender relationship does not, in itself, pose reputation risk to a bank. *Id.* ¶¶ 461-65. Online lenders pose a particular concern because they often claim to be exempt from state law. *Id.* ¶¶ 10, 13, 60, 468. Those concerns led the FDIC (and private actors as well) to include payday lenders on lists of industries that may pose risks to banks, discussed above. *Id.* ¶¶ 81-84, 511-14, 520-29, 534-42. State regulators had raised concerns about these practices with the FDIC. *Id.* ¶¶ 570, 573.

The Federal Financial Institutions Examinations Council (FFIEC) has published a manual on the BSA recognizing that nonbank financial institutions ("NBFIs") are higher-risk customers for BSA compliance purposes; providing banking services to higher-risk customers may pose BSA risks to banks that do not conduct the appropriate due diligence or institute the appropriate controls. *Id.* ¶¶ 424-25, 440-48. At one time, the manual specifically identified online payday lenders as NBFIs. *Id.* ¶ 446. FDIC examiners are guided by the FFIEC's BSA manual in their assessment of BSA risks, and must assess banks' (1) procedures for evaluating NBFIs' risks and (2) controls for mitigating BSA risk. *Id.* ¶¶ 470-91. The manual also identifies cash-intensive businesses, TPPPs, and ACH transactions as posing higher BSA risks to banks requiring special attention from examiners, and recommends procedures to assess banks' due diligence and monitoring for those customers as well. *Id.* ¶ 441. If an NBFI is conducting ACH transactions, the bank must monitor that activity to ensure that it complies with applicable laws. *Id.* ¶ 460.

b.      FDIC Concerns about Banks Facilitating Illegal Activity

Despite the foregoing legal requirements and guidance, some banks have not adequately addressed their due diligence obligations. In 2012 and 2013, the FDIC researched illegal payday

lending activities and reviewed the payment processing records of specific banks (*not* the banks that terminated Plaintiffs' accounts) to determine whether the banks were facilitating fraudulent or illegal activities. SOF ¶¶ 569-74, 577-623. In several instances, the FDIC entered into consent orders with banks to improve the banks' payment processing practices. *Id.* ¶ 624.

The FDIC's concerns about banks facilitating fraudulent and illegal activities by payday lenders were, and are, well founded. On many occasions in recent years, banks have provided ACH access to lenders who used the system to originate loans in states where payday lending is prohibited, or loans that violate the pertinent states' payday lending laws. *Id.* ¶¶ 577, 587-88, 597, 608, 616. In other cases, the banks were not aware that their customers were conducting payday lending activities. *Id.* ¶¶ 578, 590. In some of those instances, the lenders and their affiliates were later convicted of multiple criminal offenses, including fraud and money laundering, and the banks were implicated in those offenses. *Id.* ¶¶ 612, 620. These banks often conducted inadequate or no due diligence on these customers even though the return rates for the customers exceeded the industry thresholds; they also frequently ignored any red flags they encountered in their screening. *Id.* ¶¶ 580, 589, 594, 599, 605, 609-10, 613.



The FDIC took supervisory actions against banks that had inadequate controls for processing payments for payday lenders involved in unlawful or suspect activity (not the banks that terminated Plaintiffs' accounts), but the lenders often simply went to other banks that were similarly unprepared to monitor the associated risks. *Id.* ¶¶ 591, 595, 601, 607, 615, 617, 621-22.

Recent years have also seen high-profile criminal convictions of payday lenders, and significant consequences for banks. One major lender, Scott Tucker, was sentenced to 16 years in prison and fined $1.2 billion for fraud, money laundering, and other violations in his $3.5 billion payday lending scheme, in which he charged borrowers as much as 1,000 percent interest. *Id.* ¶ 58. Others received lengthy prison sentences for RICO violations and other offenses in schemes that affected hundreds of thousands of borrowers. *Id.*; *see also id.* ¶ 59 (FTC and CFPB actions against lenders who made tens of millions of dollars in unauthorized withdrawals from customer accounts). Notably, the bank that Tucker used to carry out his violations, U.S. Bank, was charged with multiple felonies for violating the BSA and fined more than $600 million. *Id.* ¶ 258. U.S. Bank's experience shows that banks choosing to do business with payday lenders

incur risks, including legal and reputational risks, and must be prepared to manage those risks.

c.      The FDIC Clarified its Policy in 2013

It became apparent in 2013 that there was confusion about the FDIC's policy on banks

doing business with payday lenders, and that the list of higher-risk industries had contributed to

that confusion. *Id.* ¶¶ 544-45, 568. For that reason, the FDIC clarified in September 2013 that

banks are permitted to maintain relationships with payday lenders provided the banks manage

the risks properly. *Id.* ¶¶ 546-51. In July 2014, the FDIC withdrew the lists of industries that may

pose risks to banks, and in January 2015, it reiterated its policy that banks should take a risk-

based approach to individual customers rather than declining to provide services to entire

categories of customers. *Id.* ¶¶ 552-59. The FDIC also instituted a requirement that, if an

examiner intends to recommend that a bank terminate a customer relationship, the

recommendation must be in writing and approved by the appropriate FDIC Regional Director

and reported to the FDIC's Board of Directors. *Id.* ¶¶ 560-64. FDIC management has conducted

extensive training on this requirement for its examination staff, and has emphasized the above

policies in many meetings with bankers and other outside groups. *Id.* ¶¶ 565-67.

**4.      Plaintiffs' Payday Lending Businesses**

Plaintiffs AA, CIC, and Northstate all operate businesses (all or primarily storefront-

based) that offer payday lending, among other financial services, and have done so for many

years. *Id.* ¶¶ 107-08, 283-84, 368.  CIC and Northstate maintain money service business

("MSB") registrations with the Financial Crimes Enforcement Network (MSBs are a subset of

NBFIs); AA maintains a registration for some of its subsidiaries. *Id.* ¶¶ 109, 285, 369, 444.

a.      Advance America

AA is owned by a Mexican company, Grupo Elektra, ████████████████████

███████████. SOF ¶¶ 110-13. AA earned approximately ████████████ in 2017,

███████████████████████████████████████████████

███████████████████████████████████████████████.

*Id.* ¶¶ 126-27. As of the end of 2017, AA had ████ stores in ██ states, having closed numerous unprofitable stores. *Id.* ¶¶ 132-33. AA currently has approximately ███ bank accounts at approximately ███ separate banks in ██ states, many of them at FDIC-supervised banks, and concedes that it has no basis to expect any of those banks to close its accounts. *Id.* ¶¶ 274, 279, 282. It has recently expanded its relationships at several of those banks. *Id.* ¶¶ 277, 280-81. AA alleges that as a result of account closures, it has incurred additional costs of $2.5 million per year in banking fees, armored car expenses, and debit card transaction fees. *Id.* ¶ 134. In March 2017, shortly after representing to the Court that the company had a "date with the guillotine," AA purchased a new corporate jet for at least $4.5 million. *Id.* ¶¶ 139-42. The purchase was financed by Enterprise Bank. *Id.* ¶ 141.

Between 2007 and 2018, 73 banks terminated relationships with AA. *Id.* ¶ 143-44. Many of the banks did not give reasons for the terminations. AA's internal documents state either "Closed due to MSB" or a close variant of that, or "unknown," as the basis for the bulk of the terminations. *Id.* ¶¶ 148-273. According to AA, only four of those 73 banks mentioned regulators at all; one stated that the regulators required a "due diligence and monitoring program" and the bank was terminating the relationship "[d]ue to the resources necessary to accomplish this." *Id.* ¶ 175. Another alluded to the "heightened scrutiny required by our regulators for money service businesses," *id.* ¶ 336, and a third vaguely alluded to "regulatory pressures" and a "tough regulatory environment" without specifying whether it was referring to compliance requirements or other regulatory actions. *Id.* ¶ 203. None of the banks mentioned the FDIC. *Id.* ¶ 146.

Several of the banks that terminated relationships with AA did so for one important

reason: because of AA's Mexican ownership, and the banks' obligation to monitor and report international currency transactions. *Id.* ¶¶ 92-105. At least four major banks terminated AA's accounts in late 2012 and early 2013, after Grupo Elektra acquired AA, and another, Capital One, cited the foreign ownership concern when it terminated the relationship in early 2014. *Id.* ¶¶ 94-95. Other smaller banks also cited the same concern. *Id.* ¶ 96. AA's CEO acknowledged that the foreign ownership concern is real and the post-acquisition terminations did not have "anything to do with . . . Operation Chokepoint," as the same banks that had terminated relationships with AA "continue to bank [its] competitors." *Id.* ¶¶ 98-99.

b.   <u>Check Into Cash</u>



CIC earned approximately ███████████████ in 2017, ███████ ███████████████████████. *Id.* ¶¶ 289, 299. ███████████ ████████████████████████████████████ ████████████ *Id.* ████████████████████ ████████████████████████████████████ *Id.* ¶¶ 286-300. ███████████████████████ ████████████████████████████ ██████████████████████████████████ *Id.* ¶ 302. ██████████████████████ *Id.* ¶¶ 288, 300. ████ ███████████████████████ *Id.* ¶ 301.

CIC currently has approximately ███ account relationships at approximately ███ banks, and as with AA, many are at FDIC-supervised banks. *Id.* ¶¶ 357, 367. It expanded its relationship with ████████ in 2017. *Id.* ¶ 361. CIC does not expect any of those banks to terminate its accounts. *Id.* ¶ 362. ████████████████████████████████████

████████████████████████████████████████████████ *Id.* ¶ 306.

Between 2008 and 2018, 21 banks terminated relationships with CIC. *Id.* ¶ 308. Many of the banks did not give reasons for the terminations. Only six of those 21 banks mentioned regulators at all, according to CIC, and three of them expressly referred to regulatory compliance requirements, not regulatory pressure or statements by regulators. *Id.* ¶¶ 315, 319, 325, 330, 336, 339. Three others mentioned regulators, but in two cases (Bank of America and JPMorgan Chase Bank), the bank representatives indicated that the regulatory concerns dealt with the banks' mortgage and student loan portfolios. *Id.* ¶¶ 325, 330. In another instance, the bank relationship manager allegedly stated to a CIC representative that the bank was "under pressure from regulators to exit banking the payday industry," but did not state what form the "pressure" took or the reasons for it, or identify any specific regulators. *Id.* ¶ 339. CIC wrote to Bank of America, JPMorgan Chase, and Fifth Third following the terminations to seek reconsideration, acknowledging each time that lawsuits or "negative press" arising from the activities of illegal payday lenders "may have contributed to the termination decision," and did not mention regulators in any of those letters. *Id.* ¶¶ 327, 332, 340. None of the banks mentioned the FDIC or any specific regulators as a cause of the account closures. *Id.* ¶¶ 309-10.

c.    <u>Northstate</u>



Northstate earned ████████████████ in 2012 and ████████████

████ in 2012, but those figures ████████████████████████, in 2014,

before any Northstate accounts were closed. *Id.* ¶¶ 370-71. ████████████████

████████████████████████████████████████████████

████████████████████████████████ *Id.* ¶ 374. Northstate had

at least one bank account for its payday lending business through December 2015. *Id.* ¶¶ 372,

392. [REDACTED]

[REDACTED] *Id.* ¶¶ 375-76. [REDACTED]

[REDACTED] *Id.* ¶ 408.

Prior to November 2014, Northstate had had a longstanding relationship with North Valley Bank, but that bank was acquired by Tri Counties Bank in 2014, and in April 2015 Tri Counties advised Northstate that it was terminating the relationship, stating, "it is the policy of the Bank to not bank or lend money to Pay Day lenders." *Id.* ¶¶ 383-84. Tri Counties did not mention any regulatory involvement in its decision. *Id.* ¶¶ 390-91. After further discussions, Tri Counties elected to keep most of Northstate's accounts open and closed only the account used for payday lending activity. *Id.* ¶¶ 387, 402. Northstate then moved its payday lending business to a Wells Fargo account, but that bank closed the account, saying that the termination was a "business decision," after Northstate failed to provide the bank certain compliance-related information. *Id.* ¶¶ 392-99. Northstate unsuccessfully approached thirteen banks to request accounts for payday lending activity, and none of those banks mentioned the FDIC as the basis for the decision. *Id.* ¶¶ 404-07.

Since late 2015, Northstate has used Edward Jones, an investment firm, for its payday lending business, meaning that Northstate's customers are required to buy back their checks, rather than simply authorizing Northstate to deposit them. *Id.* ¶¶ 400, 403. No customers have told Northstate that they are discontinuing their business with Northstate as a result. *Id.* ¶ 382. Using Edward Jones cost Northstate approximately $2,300 in one-time expenses and costs approximately $3,000 in annual expenses, [REDACTED]

[REDACTED]. *Id.* ¶ 379. Northstate has not identified any specific financial impact of the closed bank accounts. *Id.* ¶ 380.

### B.   Procedural History

1.   Initial Pleadings

AA, along with the now-dismissed plaintiff Community Financial Services Association ("CFSA"), a payday lenders' trade association, filed the initial Complaint against Defendants[2] in June 2014, and filed an Amended Complaint in July 2014. The Amended Complaint claimed that AA had lost banking relationships as a result of a "campaign" by Defendants beginning in 2013 that pressured banks not to do business with payday lenders, referring to the alleged "campaign" as "Operation Choke Point." DE 112 ¶¶ 4, 56. AA alleged that it had thereby been deprived of a liberty interest. *Id.* ¶ 112. CFSA and AA filed a Second Amended Complaint in April 2015, adding more allegations about lost banking relationships. DE 56-1 ¶¶ 95-98, 100-01.

Defendants moved to dismiss in August 2014, contending, *inter alia*, that CFSA and AA did not have standing because they had not shown that Defendants had caused harms redressable by this Court, and also failed to state a due process claim. DE 16, 17, 18. On September 25, 2015, the Court granted the motion to dismiss in part, dismissing nine of the twelve claims in the Second Amended Complaint, but held that CFSA and AA had stated a due process claim to the extent they were specifically targeted in Defendants' statements.  DE 63 at 12-26, 42-47. The Court found that CFSA and AA did have standing, but noted that they would bear a heavier burden in showing standing after the pleadings stage. *Id.* at 9, 11. Defendants subsequently moved to dismiss CFSA's claims for lack of associational standing, and the Court granted that motion on December 19, 2016, holding that this case turns on individualized proof that made it inappropriate for a trade association to litigate on its members' behalf. DE 97 at 10.

---

[2] The Federal Reserve Board of Governors was originally named as a Defendant, but was voluntarily dismissed on September 24, 2018. Docket Entry (DE) 196.

On January 11, 2017, AA moved for leave to file a Third Amended Complaint that added new Plaintiffs CIC and Northstate (and others later dismissed or voluntarily withdrawn). DE 102. The Court granted that motion on February 3, 2017. DE 120.

2.      Preliminary Injunction Proceedings

Meanwhile, AA moved for a preliminary injunction on November 23, 2016, and CIC and Northstate filed their own preliminary injunction motion on January 11, 2017. DE 87, 107. Those motions argued that Plaintiffs were likely to suffer irreparable harm absent an injunction because they faced the loss of banking services and business relationships. DE 87 at 24-28. At a hearing, Plaintiffs' counsel claimed that AA had a "date with the guillotine" absent an injunction. DE 146 at 11. Defendants opposed those motions, DE 90, 125, and the Court denied them on February 23, 2017, finding that Plaintiffs were unlikely to prevail on the merits. DE 134.

Specifically, the Court held that Plaintiffs had not shown that they had "effectively been cut off from the banking system"; at most, they had shown the loss of some, but not all, bank accounts, and that was not enough to evidence a change in legal status under *Paul v. Davis*, 424 U.S. 693 (1976). DE 134 at 9, 11-12. Nor had Plaintiffs shown that they had been precluded from their chosen trade, as all of them were continuing to do business as payday lenders. *Id.* at 13. The Court likewise found no reason to believe that Plaintiffs would lose access to the banking system, or lose the ability to do business as payday lenders, in the future. *Id.* at 14-18. It was significant, the Court held, that Plaintiffs had survived the terminations of their bank accounts in the past; Plaintiffs offered no evidence "that they cannot do the same in the face of upcoming terminations," or that their businesses faced a threat in the event that their lost banking relationships were not replaced. *Id.* at 16-17.

The Court also found no evidence that Defendants had made stigmatizing statements that caused banks to terminate their relationships with Plaintiffs. Plaintiffs had not shown that

16

Defendants were engaged in a "campaign" against payday lenders; rather, they identified only "a few scattered statements" that may or may not indicate pressure on banks not to do business with payday lenders. *Id.* at 20-21. (The Court acknowledged Defendants' arguments that such pressure is irrelevant if it does not take the form of stigmatizing statements, and that statements that do not single out specific payday lenders cannot be stigmatizing, but declined to address those arguments. *Id.* at 20 n.6.) And even those scattered statements rested on anonymous hearsay, were contradicted by Defendants' sworn statements, and did not reflect anything stigmatizing. *Id.* at 21-22. Plaintiffs' reliance on nonpublic statements was likewise unavailing. *Id.* at 22-23 & n.7. Finally, the Court held that Plaintiffs' assertions about a "wave" of terminations lacked the necessary context, as Plaintiffs had not offered any data to compare recent losses of accounts to losses during periods prior to the alleged "campaign." *Id.* at 23-24. The Court went on to conclude that a preliminary injunction was not warranted. *Id.* at 33.

### 3.     Additional Dispositive Motions

In the meantime, Defendants moved for summary judgment as to AA and moved to dismiss the newly-added Plaintiffs' claims, arguing that none of the Plaintiffs had identified a "change in status" necessary to prove a due process violation  and that publicly available information showed that AA and CIC had not suffered any loss of business. DE 101, 138.

The Court granted the motion to dismiss in part, dismissing one of the new Plaintiffs, and noted that "Defendants muster a litany of undisputed evidence demonstrating that [AA and CIC] continue to access the banking system and remain quite profitable." DE 165 at 12. Nevertheless, the Court denied the summary judgment motion, finding that Plaintiffs might be "cut off from the banking system or broadly precluded from the payday lending industry *in the future*," and granted Plaintiffs a further opportunity to prove as much by conducting discovery. Similarly, as to the motion to dismiss, the Court agreed that Plaintiffs had not alleged "that they have already

17

been effectively cut off from the banking system or broadly precluded from the payday lending industry," but found that Plaintiffs had alleged "that these harms *will* occur in the future" should they lose more bank accounts. *Id.* at 8-9. The Court also acknowledged that any "pressure" by Defendants on banks not to do business with Plaintiffs is irrelevant to the stigma analysis, as are purely internal statements (*i.e.*, within the Defendant agencies) and statements about the "payday lending industry as a whole," but found that Plaintiffs had alleged sufficient non-internal "statements that can be labeled stigmatizing" to "make it plausible that Federal Defendants stigmatized" Plaintiffs, though the allegations were "just barely" sufficient. *Id.* at 9-10.

Discovery is now closed. Plaintiffs sought no discovery from banks, except for a single subpoena directed at the chairman of a bank that terminated a prepaid card relationship with a joint venture where CIC was a member.[3]

## ARGUMENT

### I.      SUMMARY JUDGMENT STANDARD

Summary judgment may be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). A dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "To survive a motion for summary judgment, the party bearing the burden of proof at trial . . . must provide evidence showing that there is a triable issue as to each element essential to that party's claim." *Kaempe v. Myers*, 367 F.3d 958, 966 (D.C. Cir. 2004). "Only

---

[3] ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████

disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment. Factual disputes that are irrelevant or

unnecessary" are not material. *Anderson*, 477 U.S. at 248. It is sufficient for a movant to "point[]

out to the district court that there is an absence of evidence to support the nonmoving party's

case"; the movant is not required to prove the absence of a genuine issue of fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325 (1986). Special rules govern summary judgment motions when, as

here, the plaintiffs seek only equitable relief: in those circumstances, the court need not draw all

inferences in favor of the nonmovant. It can draw inferences from undisputed facts on all matters

other than witness credibility. *See U.S. Fidelity & Guar. Co. v. Planters Bank & Trust Co.*, 77

F.3d 863, 865 n.1 (5th Cir. 1996); *Cook v. Babbitt*, 819 F. Supp. 1, 11 n.11 (D.D.C. 1993).

## II.     PLAINTIFFS LACK STANDING TO SUE.

The Court previously ruled that AA had sufficiently alleged standing to survive a motion

to dismiss, but emphasized that the standing issue was subject to later reevaluation. DE 63 at 9,

11 ("'A plaintiff's burden to demonstrate standing grows heavier at each stage of the

litigation.'") (quoting *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015)). None of the

Plaintiffs can show that the FDIC caused them any injury or that their injuries are redressable in

this suit, and Northstate has sustained no injury in fact.

### A.     Plaintiffs Cannot Show Causation.

The FDIC is entitled to summary judgment because Plaintiffs cannot show that the FDIC

caused the termination of any of their bank accounts. When a plaintiff sues the government for

injury arising out of the government's regulation of a third party, it is "substantially more

difficult" to establish standing because proof of causation and redressability hinge on the

independent choices of that third party. *National Wrestling Coaches Ass'n v. Department of*

*Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004).[4] Thus, only "occasionally" is standing shown "in cases challenging government action on the basis of third party conduct." *Id.* at 940. Such a plaintiff must show either that the agency "permit[ted] or authorize[d] third-party conduct that would otherwise be illegal," or that the government's conduct was a "substantial factor" in causing that third-party conduct. *Id.* at 940-41.[5] Plaintiffs have never claimed that the termination of Plaintiffs' banking relationships would have been illegal absent FDIC authorization, and they can point to no evidence that FDIC conduct was a "substantial factor" in those terminations.

At the summary judgment stage, when a showing of causation or redressability "depends on the unfettered choices made by independent actors not before the courts . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made" in a way that directly reflects the government's influence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). "[M]ere allegations" are not sufficient to survive summary judgment. *Id.* at 561. The Court has recognized that the causation question in this case is "the degree of Defendants' . . . involvement or influence on the banks' decisions to terminate relationships" with Plaintiffs, DE 63 at 12, and cited *Lujan* in cautioning Plaintiffs that, in later phases of the case, they would be required to adduce evidence of the banks' reasons for terminating those

---

[4] *See also Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (plaintiff's "reliance on the anticipated action of unrelated third parties makes it considerably harder to show the causation required to support standing"); *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 457-58 (D.C. Cir. 2012) (where agency statements "neither require nor forbid any action on the part of" plaintiff, and plaintiff is not "the object of the government action or inaction," standing "is ordinarily substantially more difficult to establish"); *Fulani v. Brady*, 935 F.2d 1324, 1330 (D.C. Cir. 1991) ("[T]his Court has denied standing where the plaintiff seeks to change the defendant's behavior only as a means to alter the conduct of a third party, not before the court, who is the direct source of the plaintiff's injury.") (citations omitted).

[5] *See also Lujan*, 504 U.S. at 562 ("When ... a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed.") (emphasis in original) (citations omitted).

relationships. *Id.* at 11. The Court later reiterated that point, noting that, "to prove [their] claims [Plaintiffs] must provide [individualized] evidence that . . . the loss of [their] banking relationships was caused by the stigma generated by Operation Choke Point." DE 97 at 10-11.

Plaintiffs ignored those warnings and made no attempt to obtain *any* evidence from terminating banks on this point during discovery, let alone the "formidable evidence" required by the pertinent cases. *Wrestling Coaches*, 366 F.3d at 942-43. Plaintiffs are left with hearsay evidence that is not admissible on summary judgment, *see, e.g.*, *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007), and even if it were admissible, it would not show that the FDIC has caused Plaintiffs any injury. Neither of the banks that terminated Northstate's accounts cited the regulators. SOF ¶¶ 383-96. Likewise, the vast majority of the banks that terminated AA's and CIC's accounts did not cite any regulatory considerations at all; 69 of the 73 AA terminations and 15 of the 21 CIC terminations were carried out with no explanation, or for reasons unrelated to the regulators. *See supra* at 11-13. The few banks that mentioned regulatory issues mostly appeared to be referring to compliance burdens or regulatory initiatives that had nothing to do with the FDIC, *see* SOF ¶¶ 175, 203, 211, 315, 319, 325, 330, 336, 339, 390, and none of those banks mentioned the FDIC, let alone stigmatizing statements by the FDIC, as a causal factor. Plaintiffs have previously speculated that the FDIC was responsible for the terminations that the banks declined to explain, but speculation is not sufficient. *See, e.g.*, *Wrestling Coaches*, 366 F.3d at 938 ("'[M]ere unadorned speculation as to the existence of a relationship between the challenged government action and the third-party conduct will not suffice to invoke the federal judicial power.'") (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976)).

It is significant, moreover, that the record contains numerous other reasons for banks' terminations of Plaintiffs' accounts. In *Wrestling Coaches*, the D.C. Circuit deemed it significant

that the documents before the court cited "several other factors" as contributing to the third

parties' decisions, 366 F.3d at 943, and here, Plaintiffs have acknowledged that banks may

terminate payday lenders' accounts for numerous reasons unrelated to regulatory acts. SOF ¶¶

62, 64-65, 85-92. Indeed, banks frequently terminated Plaintiffs' accounts before the "campaign"

supposedly began in 2013. *Id.* ¶¶ 150-70, 311-16. Termination reasons included, *inter alia*,

insufficient resources to manage the relationship, AA's foreign ownership, and the risks and

compliance burdens associated with processing payments for payday lenders and/or MSBs. The

plaintiffs' speculation that one particular cause was responsible for the third parties' decisions

was not sufficient to survive the *pleading* stage in *Wrestling Coaches*, and it is certainly not

enough to avoid summary judgment here.[6]

Plaintiffs likewise cannot point to any future injury that the FDIC will cause them—

indeed, they cannot identify any future injury at all. Plaintiffs have admitted that they have no

reason to believe that any of the banks (or equivalents) now offering them account services will

terminate those accounts in the future. SOF ¶¶ 279, 362, 401. Plaintiffs therefore cannot satisfy

the causation requirement, and summary judgment for the FDIC is appropriate.[7]

---

[6] *See also Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 176 (D.C. Cir. 2012) (rejecting causation theory based on third-party acts as "speculative at best"); *Gettman v. DEA*, 290 F.3d 430, 434-35 (D.C. Cir. 2002) (causation not satisfied by "sheer speculation and conjecture"); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) (on summary judgment, "the presence and number of third-party links in this causal chain independently corroborate that appellants' claim of causation is entirely speculative and insufficient for standing") (citations omitted).

[7] *See also Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 419 (D.C. Cir. 1994) (injury arose from third-party decisions and was "not fairly traceable to any encouragement on the part of the government"); *Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 120-21 (D.D.C. 2013) (challenge to regulation setting futures' minimum liquidation times as likely to discourage trading with plaintiffs was speculative, as traders can impose their own time requirements); *Long Term Care Pharmacy Alliance v. Leavitt*, 530 F. Supp. 2d 173, 181 (D.D.C. 2008) (no standing where "plaintiffs have failed to provide sufficient facts to support their contention that the [third-party

Finally, Plaintiffs have furnished expert reports purporting to opine on causation, but those opinions fail the basic tests of helpfulness and reliability under Federal Rule of Evidence 702 because, *inter alia*, the expert offered no opinions on the causation issue presented here and failed to address the methodological concerns already raised by the Court. DE 190 at 6-8, 24-25; DE 195 at 3-9. Even if his opinions are admissible, they are entitled to no weight. DE 195 at 25.

**B.      Plaintiffs Cannot Show Redressability.**

Nor are Plaintiffs' alleged harms redressable in this suit. As set forth above, Plaintiffs cannot show that they suffered injuries attributable to the FDIC in the first place, and thus an injunction directed at the FDIC would not remedy those injuries. *See Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994) ("When plaintiffs' claim hinges on the failure of government to prevent another party's injurious behavior, the 'fairly traceable' and redressability inquiries appear to merge."); *see also St. John's United Church of Christ v. FAA*, 520 F.3d 460, 463 (D.C. Cir. 2008) (plaintiff cannot satisfy redressability standard without showing that third party that directly caused plaintiff's injury would change its behavior).

Plaintiffs declined to take discovery from the banks, and thus they cannot prove that the relief they seek would cause banks to restore their relationships. This Court has already held that, absent such evidence, Plaintiffs cannot show redressability, *see* DE 63 at 23-24, and while Plaintiffs' allegations regarding the resumption of those relationships were deemed sufficient at the pleading stage, they are wholly insufficient now. DE 63 at 9, 11, 24; *Lujan*, 504 U.S. at 561;

---

conduct] is actually motivated by [agency action]"); *Massachusetts Credit Union Share Ins. Corp. v. NCUA*, 693 F. Supp. 1225, 1229 (D.D.C. 1988) (no standing where plaintiff did not specifically allege that it lost business relationships "as a consequence of" agency action); *National Maritime Union v. Dole*, 1987 WL 10495, *5 (D.D.C. Apr. 27, 1987) (agency action was "only one of a myriad number of factors" influencing third parties' conduct).

*see also Town of Babylon v. FHFA*, 699 F.3d 221, 229 (2d Cir. 2012) (plaintiff must show that "national banks regulated by the OCC would act differently" by "resuming their *status quo ante* lending practices" if relief were granted against the OCC).

    **C.    Northstate Cannot Show Injury in Fact.**

AA and CIC claim to have incurred (minimal) expenses as the result of losing bank accounts, and the FDIC does not dispute those expenses for these purposes, though it *does* dispute causation and redressability. Northstate, however, cannot even show an injury in fact.

Standing to seek injunctive relief requires a showing of an ongoing or impending injury, *see Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016), and that injury must be "concrete and particularized." *Lujan*, 504 U.S. at 560. Northstate cannot identify any current "concrete and particularized" harm because it conducts its payday lending business through an investment account at Edward Jones, ███████████████████████████████████████ ████████████████████. SOF ¶¶ 375-76, 379-80. And while Northstate asserts in vague terms that the Edward Jones account is less convenient for Northstate's customers (because Northstate must purchase money orders rather than deposit the customers' checks), no customer has declined to do business with Northstate for that reason. *Id.* ¶ 382.

Nor can Northstate show future injury. Anticipated harm must be "certainly impending" for a plaintiff to seek prospective relief, *see Arpaio*, 797 F.3d at 15, and Northstate acknowledged that it has no basis to expect that it will lose its account at Edward Jones. SOF ¶ 401. And as Edward Jones is not a bank regulated by Defendants, there is even less of a basis to expect Defendants to cause such a termination. Northstate therefore lacks standing.

**III.    THERE WAS NO DUE PROCESS VIOLATION HERE.**

Plaintiffs' due process claim has no merit. They have not suffered the deprivation of a liberty interest, as they continue to access the banking system and conduct profitable payday

lending businesses, and they cannot show that the FDIC caused them to lose *any* bank accounts or stigmatized them. Furthermore, procedural due process claims require actions that affected the plaintiffs individually, not classwide acts like legislation, rules, or regulatory guidance.

### A.      Plaintiffs Have Not Been Deprived of a Liberty Interest.

A threshold issue in any procedural due process claim is the existence of a protected liberty or property interest. *McCormick v. District of Columbia*, 752 F.3d 980, 987 (D.C. Cir. 2014). A liberty interest is implicated when a plaintiff suffers damage to its reputation "in the course of the termination of employment," or otherwise in connection with an "alteration of legal status." *Paul*, 424 U.S. at 708, 710. There are stringent requirements, consistent with the Supreme Court's warnings that "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998); *see also Paul*, 424 U.S. at 701 (the Fourteenth Amendment is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States.").[8] This requirement of an adverse governmental action beyond defamation "helps to limit the scope of permissible due process claims to a small set of truly serious claims, thus limiting the constitutionalization of tort law." *O'Donnell v.*

---

[8] *See also Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 312-14, 316-17 (4th Cir. 2012) (upholding dismissal of due process claim arising from defamatory government statements and recognizing that "allowing Shirvinski's constitutional claim to go forward would do exactly what the Supreme Court has warned us not to do: transform the Fifth Amendment's Due Process Clause into a 'font of tort law' in the field of government contracts" and "impermissibly constitutionalize state tort law"); *Vineyard Invs., L.L.C. v. City of Madison*, 440 F. App'x 310, 315 (5th Cir. 2011) ("Vineyard has demonstrated no federally protected right to be free from tortious interference with business opportunity."); *Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 180 (4th Cir. 2009) (rejecting tortious interference claim pled as due process claim, lest it transform the Constitution into the "font of tort law that the Supreme Court has consistently rejected."); *Khan v. Gallitano*, 180 F.3d 829, 835 (7th Cir. 1999) ("Khan has failed to show why the right to be free from tortious interference by state actors is a fundamental right . . . . [W]e will not create a redundant federal right that simply mirrors the available state-law tort.").

*Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). Plaintiffs can show neither a change in legal status nor stigma, and thus they cannot show the deprivation of a liberty interest.

> **1.      Plaintiffs Have Not Lost a Government Position or Private Business Opportunities or Otherwise Suffered a Change in Legal Status.**

A liberty interest in reputation is implicated in two scenarios:

**(1)** a "reputation-plus" claim arises when stigmatizing statements that "seriously damage [plaintiff's] standing and associations in the community" are made "in the course of the termination of [government] employment" or nonrenewal of a government contract, or

**(2)** a "stigma-plus" claim arises when a "continuing stigma or disability aris[es] from official action" that either formally excludes the plaintiff from his or her career or has an informal but broad preclusive effect.

*O'Donnell*, 148 F.3d at 1140. Plaintiffs have previously alleged both types of claims, *see* DE 153 at 13, and the FDIC is entitled to summary judgment on both theories.

> a.      Plaintiffs Cannot Prevail on a "Reputation-Plus" Claim Because
> They Have Not Lost Government Employment or Contracts.

A "reputation-plus" claim requires proof of governmental defamation *and* an adverse government employment or contracting action. *See O'Donnell*, 148 F.3d at 1140 (either a termination of employment or a demotion is necessary for a claim under the "reputation-plus" theory). Only defamations "in the course of" such an action give rise to a "reputation plus" claim. *Id.*[9] Plaintiffs have lost no government position or contract, and thus there could not have been any stigmatizing statements "in the course of" or "incident to" such a loss. *See Doe v.*

---

[9] *See also Siegert v. Gilley*, 500 U.S. 228, 233 (1990) (defamatory statements about an employee do not affect a liberty interest unless they are made "incident to" the termination of employment); *Moore v. Agency for Int'l Dev.*, 80 F.3d 546, 549 (D.C. Cir. 1996) (defamation must be "incident to [a] deprivation of some legal protection of the plaintiff") (citations omitted)

*Rogers*, 139 F. Supp. 3d 120, 159 (D.D.C. 2015) ("Dr. Doe was never employed by the

government, and the [statement] did not accompany Dr. Doe's termination of his employment

with the Hospital, so the essential elements of a reputation-plus cause of action are lacking.").

Furthermore, the reputation-plus test requires that adverse employment action be

"accompanied" by "official defamation," *see O'Donnell*, 148 F.3d at 1140, and cases applying

that requirement have made it clear that the government must *both* make the statement and carry

out the adverse employment action.[10] "Official defamation," even if it existed here—and it does

not—could not "accompany" the termination of a private relationship. Thus, Plaintiffs'

"reputation-plus" claim fails as a matter of law.

b.    Plaintiffs Cannot Prevail on a "Stigma-Plus" Claim Because They
      Have Suffered No Broad Preclusion of Any Kind.

Nor can Plaintiffs show the preclusive effect required for a "stigma-plus" claim. *Id.* at

1140. The Supreme Court held in *Paul* that reputational harm must be linked to an "alteration of

legal status" to affect a liberty interest. 424 U.S. at 710; *see also id.* at 710 (affected rights must

be "recognized and protected by . . . law"). A plaintiff advancing a "stigma-plus" reputational

harm claim must show either a formal exclusion (not alleged here) or an informal but "broad . . .

preclu[sion]" from the plaintiff's career. *O'Donnell*, 148 F.3d at 1141. Consistent with those

authorities, this Court has held that Plaintiffs cannot prevail on a "stigma-plus" claim absent an

effective loss of access to the banking system or inability to do business as a payday lender. DE

---

[10] *See, e.g.*, *Peter B. v. CIA*, 620 F. Supp. 2d 58, 70 (D.D.C. 2009) (plaintiff must show "the
government changed his status and accompanied such a change with defamation"; a statement is
"accompanying" if it is "offered as the official reason for the status change"); *Black v. District of
Columbia*, 134 F. Supp. 3d 255, 261 n.3 (D.D.C. 2005) (the "[g]overnment deprives an employee
of a protected liberty interest where it stigmatizes his good name in conjunction with an
accompanying loss of *government* employment") (citations omitted) (emphasis added); *cf. Perez
v. City of Roseville*, 882 F.3d 843, 859-60 (9th Cir. 2018) (nineteen-day gap between statement
and official action may satisfy "accompanying" standard, but sixteen-month gap would not).

134 at 8-9. Plaintiffs can show neither.[11]

Plaintiffs have not lost access to the banking system. AA currently has approximately ▮ accounts at approximately ▮ banks—substantially *more* banking relationships than it had before 2013—and CIC has approximately ▮ accounts at approximately ▮ banks, a net loss of only ▮ banking relationships. SOF ¶¶ 274-75, 358-60. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶¶ 278, 363. AA and CIC successfully replaced their terminated accounts with new accounts: no subsidiary of AA lacks access to a bank account, and no AA or CIC store has closed for lack of a bank account. *Id.* ¶¶ 135-38, 276, 364. Both AA and CIC have accounts at dozens of FDIC-supervised banks. *Id.* ¶¶ 282, 367. Northstate uses the equivalent of a bank account at Edward Jones, and at any rate Northstate cannot show that it has been excluded from the banking system because it has contacted only a few banks to inquire about opening accounts. *Id.* ¶¶ 400, 403. Plaintiffs' continued ability to access the banking system is fatal to their stigma-plus claim.[12]

---

[11] The FDIC has previously argued that no liberty interest would be implicated if banks simply chose not to do business with Plaintiffs, as banks are not required to do business with any particular customer. DE 90 at 25-26; DE 116 at 2-5; *see Groos*, 573 F.2d at 897 ("[P]ersons cannot claim a constitutionally protected right to do business with a particular bank. It is well established at common law that a bank may decline or terminate a deposit relationship."). Likewise, to whatever extent a decline in payday lending revenue arose from banks' decisions not to do business with Plaintiffs, such a decline would not implicate a liberty interest. DE 90 at 22-24; *see Rogers*, 139 F. Supp. 3d at 163 ("[W]hen a specified harm is predicated on voluntary [private] third-party behavior," it does not constitute a change of legal status for purposes of the liberty interest analysis) (citations omitted); *see also General Electric Co. v. Jackson*, 610 F.3d 110, 122 (D.C. Cir. 2010); *Indus. Safety Equip. Ass'n v. EPA*, 837 F.2d 1115, 1122 (D.C. Cir. 1988); *Mosrie v. Barry*, 718 F.2d 1151 (D.C. Cir. 1983). The FDIC does not waive those arguments, but the Court need not address them because Plaintiffs have not lost access to the banking system, or lost the ability to do business as payday lenders, at all.

[12] *Compare Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636 (D.C. Cir. 2000) (the "'all is forgiven' message implicit" in a government contract award "suggests the improbability of ... a [reputational] shadow" arising from past criticism by the contracting agency); *see also Trifax Corp. v. District of Columbia*, 314 F.3d 641, 645 (D.C. Cir. 2003) (award of new contract by the agency that had made the challenged statements supported the conclusion that there was no

Plaintiffs have not lost their payday lending businesses either. A plaintiff seeking to show exclusion from its chosen trade or business must show the loss of "virtually all" of that business. *Old Dominion Dairy Prods., Inc. v. Secretary of Defense*, 631 F.2d 953, 955-56, 963 (D.C. Cir. 1980). Even plaintiffs who lost the majority of their business have been found to fall short of that high standard; in *Trifax*, for example, the D.C. Circuit held that the loss of two out of three contracts is not sufficient to show the deprivation of a liberty interest.[13] Plaintiffs here do not come close to that "virtually all" threshold. ████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████, and the only financial impact of the terminated bank accounts AA has alleged is approximately $2.5 million in additional annual costs. SOF ¶¶ 114, 126, 134. Accepting that allegation as true for present purposes, AA's costs have risen by roughly ██% annually (████████████████████████████████████████████████). CIC, similarly, earned ██████████████████████ in 2017, █████████████████████████████ ██████████████████████████████████████████████████████

---

"broad preclusion" from contracting); *O'Donnell*, 148 F.3d at 1141 ("O'Donnell's new job demonstrates that the stigma he suffered cannot have been too disabling."); *Mervin v. FTC*, 591 F.2d 821, 828 (D.C. Cir. 1978) (agency action did not implicate a liberty interest simply because it "ma[de] the search for a new job difficult").

[13] *See also Chicago United Indus., Ltd. v. City of Chicago*, 669 F.3d 847, 851 (7th Cir. 2012) (loss of 81 percent of business not sufficient, as "diminution is not destruction, and diminution is all the company has shown"); *Bank of Jackson Cty. v. Cherry*, 980 F.2d 1354, 1359 (11th Cir. 1992) (loss of 20-25 percent of business "pales in comparison" to injuries found sufficient to affect liberty interest); *Loumiet v. United States*, 255 F. Supp. 3d 75, 97 (D.D.C. 2017) (no claim where plaintiff's law practice "largely evaporated" but "did not cease to exist") (citations omitted); *Bannum, Inc. v. Samuels*, 221 F. Supp. 3d 74, 78, 87 (D.D.C. 2016) (plaintiff was not deprived of a liberty interest when it formerly operated 17 facilities but now had only six); *ABA, Inc. v. District of Columbia*, 40 F. Supp. 3d 153, 167, 170 (D.D.C. 2014) (loss of more than 80 percent of income not sufficient, as "the right to due process is *not* implicated when a contractor is not completely cut off from doing business with the government").

2012. *Id.* ¶¶ 289, 299. As with AA, the only financial impact of the account terminations that

CIC alleges is approximately ███ % of its total expenses, and both continue to earn profits.

*Id.* ¶¶ 114-127, 286-300, 306. 

SOF ¶¶

370-78. Plaintiffs' modest declines in income and profits reflect the general decline of storefront

lenders' market share, along with other challenges facing the industry generally and Plaintiffs in

particular. SOF ¶¶ 23-29, 44-106, 129-33, 307. They have not been precluded from doing

business as payday lenders.

Moreover, the Court has previously found no evidence that Plaintiffs are likely to suffer

the asserted harms, DE 134 at 19, and discovery has only confirmed that Plaintiffs have no

reason to fear a future loss of access to the banking system or the payday lending industry. No

banks have told Plaintiffs that they intend to terminate their accounts, SOF ¶¶ 279, 362, and five

years of the alleged "campaign" have not cut off Plaintiffs' access to the banking system and the

industry.[14] Plaintiffs' voluntary dismissal of the Federal Reserve Board as a defendant tacitly

acknowledges what is already evident: there is no credible argument that Plaintiffs have been, or

---

[14] *Compare Abdelfattah v. DHS*, 787 F.3d 524, 538-39 (D.C. Cir. 2015) (fear of losing a job in the future not enough to support injunction); *Lighton v. University of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000) ("alleged loss of future employment" was "too speculative and intangible to constitute the deprivation of a liberty interest"); *General Electric Co. v. Jackson*, 595 F. Supp. 2d 8, 26 (D.D.C. 2009) (future "collateral consequences" of an allegedly stigmatizing statement only considered "when the consequences are inevitable"), *aff'd*, 610 F.3d 110 (D.C. Cir. 2010); *Ohio Head Start Ass'n v. HHS*, 873 F. Supp. 2d 335, 352 (D.D.C. 2012) ("speculation as to what might happen" as a result of allegedly stigmatizing conduct not enough to show affected liberty interest); *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 30-31 (D.D.C. 2010) ("uncorroborated and speculative assertions" about future deprivation not enough).

will be, prevented from accessing the banking system.[15] Accordingly, even if *all* of the financial

effects of bank account terminations were attributable to the FDIC—and, as discussed both

above and below, that is not the case—Plaintiffs' "stigma-plus" claim would still have no merit.

c.     <u>Loss of a Single Account Does Not Constitute a Liberty Interest
Deprivation.</u>

Plaintiffs have indicated, DE 194 at 13 n.3, that they intend to seek reconsideration of the

Court's holding that the loss of "*some* bank accounts" is not a liberty interest deprivation. DE

134 at 8 (emphasis in original). The Court previously rejected those arguments, holding that

"each Plaintiff must show that it has had so many bank accounts and banking relationships

terminated that it has effectively been cut off from the banking system." *Id.* at 9. Plaintiffs

subsequently returned to those arguments, claiming that "[i]t would suffice to establish this claim

. . . that New Plaintiffs have lost a single account," DE 153 at 22, and the Court rebuffed

Plaintiffs again. DE 165 at 12 n.3 ("The Court rejected this argument . . . . The termination of

some . . . bank accounts does not constitute a change in legal status necessary to give rise to a

due process violation."). Reconsideration of interlocutory orders under Rule 54(b) is warranted

for legal conclusions only where there is new binding authority or "clear error." *Lucas v. District

of Columbia*, 214 F. Supp. 3d 1, 5 (D.D.C. 2016). Neither applies here.

When a stigma-plus claim is founded on the deprivation of a legal right (rather than on

the loss of a career), the deprivation must be broad. In *Mosrie v. Barry*, 718 F.2d 1151 (D.C. Cir.

1983), the court held that, to show the loss of a legal right for these purposes, the plaintiff must

---

[15] Plaintiffs argued at one time that this case is about their purported exclusion from the *entire* banking system. *See, e.g.*, DE 76 at 14 (alleging "wholesale, indiscriminate campaign intended to deprive all payday lenders of access to the banking system"); DE 23 at 14 (alleging "wholesale expulsion of payday lenders from the banking system"). The premise for this lawsuit, in other words, has disappeared.

show that the government has either "formal[ly] depriv[ed]" it of that right or "so severely impaired [its] ability to take advantage of a legal right . . . that the government can be said to have '*foreclosed*' [the plaintiff's] ability to take advantage of it and thus *extinguished* the right." *Id.* at 1161 (emphasis added). Plaintiffs have not been "foreclosed" from holding bank accounts, as AA's and CIC's continued broad access to the system attests; Northstate has not shown an exclusion either. *See* SOF ¶¶ 404-06. The Court's holding on this point is consistent with the principle that banks have discretion in choosing their customers, and no one has a constitutional right to demand an account at a particular bank. *See, e.g.*, *Groos*, 573 F.2d at 897.[16]

The Court's holding also accords with the decisions holding that the loss of a single job does not deprive the employee of a liberty interest in his or her career. *See, e.g.*, *Crooks v. Mabus*, 845 F.3d 412, 421 (D.C. Cir. 2016) ("Discharge from a particular job is not the same as exclusion from one's chosen profession."); *Kartseva v. Department of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994) ("[I]f Kartseva has merely lost one position in her profession but is not foreclosed from reentering the field, she has not carried her burden . . . ."). Assuming *arguendo* that bank accounts are analogous to employment, the loss of one account is not a liberty interest deprivation. *See Mosrie*, 718 F.2d at 1162 ("Financial loss and loss of some employment opportunities do not . . . amount to an alteration of a legal right."). There was no error at all, let alone "clear error," in the Court's prior holdings on this point, and the Court should reject Plaintiffs' attempt at a third bite at this apple.

d.   Plaintiffs Have Not Identified Any "Official Action."

There is a separate reason why Plaintiffs' stigma-plus claim fails. Under that test,

---

[16] Plaintiffs have previously cited *National Council of Resistance v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001) on this point, but that case is distinguishable, as it involved a formal legal prohibition that prevented the plaintiff from holding *any* bank account. *Id.* at 196.

Plaintiffs must show a "continuing stigma or disability *arising from official action.*" *O'Donnell*, 148 F.3d at 1140 (emphasis added). Specifically, the harm must "occur[] in conjunction with, or flow[] from, some tangible change in status [such as] an adverse employment action." *Id.* at 1141. Typically, the "official action" for purposes of the stigma-plus analysis is either termination of employment, *id.*, or the disqualification of a plaintiff as a government contractor, *see Kartseva*, 37 F.3d at 1528. Plaintiffs have not identified any similar "official action" here, and thus they cannot prevail on a stigma-plus claim.[17]

## 2. The FDIC Has Not Stigmatized Plaintiffs.

Plaintiffs' liberty interest claim, under both the reputation-plus and stigma-plus tests, also fails because the FDIC inflicted no stigma on them. A statement is stigmatizing for purposes of reputation-plus if it damages the plaintiff's standing in the community, is publicly disclosed, and contains a false statement of fact singling out the plaintiff. *Codd v. Velger*, 429 U.S. 624, 627 (1977); *Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir. 1989); *see* DE 90 at 28-31; DE 152 at 15-18; DE 156 at 12-19. The FDIC made no such statements—the Court found no evidence of stigma at the preliminary injunction stage, DE 134 at 19-24, and Plaintiffs have identified nothing since then—and while a stigma-plus claim may rest on adverse action, such as termination of employment or a demotion, that by itself creates a stigma, the FDIC took no such action here. *O'Donnell*, 148 F.3d at 1140.[18]

---

[17] *See also Siegert*, 500 U.S. at 234 (diminished prospects must "flow[] from" status change, not reputational injury); *Aguirre v. SEC*, 671 F. Supp. 2d 113, 119 (D.D.C. 2009) ("[P]laintiff must establish that . . . a stigma flowed from or occurred in conjunction with [a status] change.").

[18] *Cf., e.g.*, *Evangelou v. District of Columbia*, 63 F. Supp. 3d 96, 103-04 (D.D.C. 2014) (plaintiff argued that termination "sends a signal to other law enforcement agencies that [certain] individuals . . . were terminated because they are unfit for service"); *Payne v. District of Columbia*, 773 F. Supp. 2d 89, 96 (D.D.C. 2011) (plaintiff argued that "his termination and the accompanying publicity have had the effect" of destroying his career)

Plaintiffs have claimed that the FDIC pressured banks to terminate Plaintiffs' accounts. The record does not support that claim, but even if it did, that would be irrelevant because stigma requires damaging *information* about the plaintiff, and evidence of pressure does not, as Defendants have explained elsewhere, constitute evidence of damaging information or stigma. DE 190-2 at 15; *see Mazaleski v. Treusdell*, 562 F.2d 701, 712 (D.C. Cir. 1977) (court looks to whether "the *information* [publicly] disclosed is of such a derogatory nature as to infringe a liberty interest of the employee") (emphasis added). Person A can pressure Person B not to do business with Person C without offering *any* information about Person C. Plaintiffs' "pressure" theory is more akin to a tortious interference claim, and the Due Process Clause does not encompass all tortious acts, as discussed above. *See also* DE 165 at 9 (pressure, by itself, is irrelevant). Thus, even if it were true that the FDIC caused banks to terminate Plaintiffs' accounts by exerting pressure on banks, Plaintiffs still could not prevail in this case.

There is a good reason for this. Banking regulators are charged with preserving the stability of the banking system. Ensuring that regulated banks do not facilitate illegal conduct is part and parcel of that task. SOF ¶¶ 470-71, 484, 633. Regulators cannot, and should not, be required to give entities committing illegal acts a hearing before instructing banks not to do business with them. Allowing banks' customers to intrude into the confidential relationships between banks and regulators would significantly impede the regulatory process.

Plaintiffs' "pressure" theory is inconsistent with the Due Process Clause for another reason. The purpose of the Clause in this context is to give a person affected by a stigmatizing governmental determination a name-clearing hearing. DE 101-1 at 4-5. Such a hearing affords an "opportunity to refute the charge. . . . If the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a

discharged employee which has some significant bearing on the employee's reputation." *Codd*, 429 U.S. at 627 (citations omitted). But "pressure" on a bank not to do business with payday lenders leaves nothing to "refute"; there is no "factual dispute," and no blot on the payday lender's "name" that a hearing could "clear." Absent some statement that a plaintiff believes to be "substantially false," due process protections do not apply. *Id.* at 627. Here, the FDIC made no false factual statements about any of the Plaintiffs, and a hearing would serve no purpose. "Pressure" allegations therefore do not give rise to due process protections.

### 3.    There is No Evidence of Reputational Harm.

Plaintiffs' failure to develop the factual record is fatal to any reputation-plus or stigma-plus claim for another reason: they cannot show reputational damage. There are no statements from banks in the record, and there is certainly no non-hearsay *testimony*, showing that the banks' opinions of Plaintiffs (or of payday lenders in general, assuming *arguendo* that such evidence is enough) deteriorated, much less that the FDIC was responsible for that nonexistent reputational harm or that Plaintiffs' accounts were terminated because of it.

When a plaintiff in an employment "stigma" case claims that damaging statements or actions have eliminated or sharply reduced his or her job opportunities, the bare fact of unemployment or reduced employment options is not enough; the plaintiff must show that the stigma is responsible. In *Taylor v. RTC*, 56 F.3d 1497 (D.C. Cir. 1995), the plaintiff was unable to find government contract work, and claimed that stigmatizing actions and statements by the RTC were responsible. *Id.* at 1506. The court found that insufficient because "all [plaintiff] proffered in this regard was a simple assertion that he has been unable to find employment in his chosen field, *a difficulty that if true might easily be explained in other ways . . . .*" *Id.* at 1507 (emphasis added). Here, again assuming *arguendo* that bank accounts are equivalent to jobs, the terminations "might easily be explained in other ways" than the result of stigma, and indeed the

banks' communications with Plaintiffs *did* explain them in other ways. *See infra* at 39. Similarly, in *O'Donnell*, summary judgment was proper where the plaintiff alleged that his demotion by one police department had hampered his job prospects in other jurisdictions; the court found that he had "presented no *concrete* evidence" that he would have obtained a better job elsewhere absent the demotion. 148 F.3d at 1141 (emphasis added). There is no "concrete evidence" of reputational harm here either, and Plaintiffs cannot prevail on a stigma claim.[19]

### B.      Plaintiffs Cannot Show Causation.

Plaintiffs have not been deprived of a liberty interest, as they have neither been stigmatized nor lost access to the banking system or the payday lending industry. Moreover, even if Plaintiffs could show stigma, and even if losing some bank accounts (largely if not entirely replaced with other accounts) were sufficient to implicate a liberty interest, Plaintiffs could not prevail because there is no evidence that the FDIC caused those account terminations.

When a plaintiff claims that it has been broadly precluded from its chosen business and thus suffered the deprivation of a liberty interest, it bears a heavy burden in proving that any lost opportunities are attributable to the defendants rather than to other factors. In *O'Donnell*, for instance, the court held the plaintiff was required to, but did not, show that "he would have done dramatically better on the job market in the absence of his demotion." 148 F.3d at 1141. In

---

[19] *See also Asbill v. Housing Auth.*, 726 F.2d 1499, 1503 (10th Cir. 1984) ("speculat[ion] that plaintiff's difficulties in finding employment" were attributable to stigmatizing statements not sufficient to state claim); *Brown v. District of Columbia*, 888 F. Supp. 2d 28, 33 (D.D.C. 2012) (claim that plaintiff lost teaching opportunities elsewhere because of tenure denial fails because "Plaintiff does not offer any evidence . . . that other law schools have refused or would refuse to hire her due to defendants' denial of tenure," and "speculative, unsubstantiated contentions" that her reputation was "tarnish[ed]" are not enough); *Ohio Head Start Ass'n*, 873 F. Supp. 2d at 351 (plaintiff did not identify "concrete and substantial" harm from allegedly stigmatizing act); *Toxco*, 724 F. Supp. 2d at 30-31 (plaintiff's speculation is insufficient where it "does not point to a single concrete manifestation of the reputational injury it is purportedly suffering").

*McGinnis v. District of Columbia*, 65 F. Supp. 3d 203 (D.D.C. 2014), similarly, the court noted that the government must have "placed a significant roadblock" in the plaintiff's career path. *Id.* at 215 (citations omitted).[20] That is consistent with the standing doctrine, where, as discussed above, when injury is alleged to arise from government regulation of a third party, it becomes substantially more difficult to establish standing.'" DE 63 at 10 (quoting *Wrestling Coaches*, 366 F.3d at 938) (internal citations omitted). A plaintiff alleging the inability to exercise a legal right bears a similar burden. *See Mosrie*, 718 F.2d at 1161 (plaintiffs must show that the government has "so severely impaired one's ability to take advantage of a legal right" that it has "foreclosed one's ability to take advantage of it and thus extinguished the right") (citations omitted).

Plaintiffs cannot discharge that burden here. There is no evidence in the record that *any* bank attributed its termination of Plaintiffs' accounts to the FDIC. SOF ¶¶ 145-46, 309-10, 390-94. A handful of banks (less than 10 in all) mentioned "regulators" generically, but most of that handful were clearly referring to unrelated regulatory initiatives or compliance obligations, and none of them mentioned any stigmatizing statements. *See supra* at 11, 13, 21.[21] One of Northstate's two terminating banks had been purchased by another bank that did not do business with payday lenders, and the other offered no explanation. SOF ¶¶ 383-99. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[20] *See also Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) ("[T]he employee's good name, reputation, honor or integrity must be called into question in a manner that makes it virtually impossible for the employee to find new employment in his chosen field."); *Taylor*, 56 F.3d at 1507 (government's acts "must substantially reduce the value of [the plaintiff's] human capital," such as by "render[ing] [his skills] largely unmarketable"); *AFGE v. Hawley*, 481 F. Supp. 2d 72, 98 (D.D.C. 2006) (stigma must "seriously hamper or foreclose opportunities").

[21] State regulators have taken aggressive action against payday lenders. SOF ¶¶ 60.

██████ *Id.* ¶¶ 359, 361. This sparse, equivocal evidence is not sufficient to show that the FDIC

"severely impaired" Plaintiffs' access to the banking system and thus "foreclosed" Plaintiffs

from holding bank accounts. *Mosrie*, 718 F.2d at 1171.

Even if these scattered mentions of regulators were sufficient to carry Plaintiffs'

burden—and, clearly, they are not—that evidence is inadmissible hearsay. Plaintiffs took no

steps during discovery to obtain admissible sworn declarations or deposition testimony from the

banks that terminated their deposit accounts. That failure is particularly striking because this

Court has previously made it clear that to prove their case, Plaintiffs would "almost certainly"

have to furnish "evidence regarding the banks' reasons for terminating banking relationships

with [Plaintiffs]," including both "communications between the banks and [Plaintiffs]" and

"evidence of the banks' own reasoning, such as internal memoranda or e-mails." DE 97 at 11-12.

The Court also advised Plaintiffs that "scattered statements" and other circumstantial evidence,

*see* DE 134 at 20, would not be enough to prove causation, denying Plaintiffs' preliminary

injunction motion because, *inter alia*, Plaintiffs' evidence was insufficient on the causation issue.

DE 134 at 19-24. Plaintiffs ignored the Court's warnings and served no requests for discovery on

the terminating banks. As Plaintiffs obtained no additional evidence on causation during

discovery, the causation record stands now where it stood at the preliminary injunction stage, and

the Court should conclude now, as it did then, that Plaintiffs cannot prevail on that issue.[22]

---

[22] Plaintiffs' failure to conduct discovery of the banks is all the more inexplicable because
Plaintiffs repeatedly represented to the Court that they would take such discovery. Indeed, in
response to the Court's preliminary injunction ruling, they claimed they needed that discovery to
fill the gaps the Court identified. *See* DE 154 at 2-3 ("[T]o demonstrate that Defendants' pressure
tactics do indeed threaten to 'entirely cut [Plaintiffs] off from the banking system,' [DE 134] at
16, Plaintiffs must be allowed to take discovery both of Defendants and third-party banks, to
assemble evidence of the true scope of Defendants' backroom campaign."). *See also* DE 127 at

Furthermore, assuming *arguendo* that these statements are admissible under some exception to the hearsay rule, they refute the argument Plaintiffs have made throughout this case that the only possible reason for such a termination is regulatory pressure. Many banks cited AA's foreign ownership as grounds for terminating accounts, and AA's CEO acknowledged that those terminations did not have "anything to do with . . . Operation Chokepoint," as those same banks "continue[d] to bank [AA's] competitors." SOF ¶¶ 92-105. Other reasons, actual or potential, for terminating Plaintiffs' accounts include MSB registration status (and the accompanying compliance burdens), high return rates, the lack of profitability in the accounts for the banks, consumer complaints, risks and compliance costs, or a merger with another bank that does not do business with payday lenders. *Id.* ¶¶ 35, 62-91. *No* banks mentioned "Choke Point" when terminating the accounts, and none mentioned the FDIC. *Id.* ¶¶ 145-47. The few references to regulators were ambiguous at best; some of those banks referenced regulatory initiatives unrelated to the FDIC. *Id.* ¶¶ 325, 330. Internal inquiries have confirmed that the FDIC-supervised banks did not close the accounts because of the FDIC. *Id.* ¶ 106.

The banks may also have terminated these accounts because of violations of law, actual or anticipated, by these specific Plaintiffs or by payday lenders generally. This concern is particularly salient given recent high-profile examples of crimes by payday lenders, including

---

12 ("New Plaintiffs are likely to discover additional evidence from the banks providing further confirmation that Defendants were responsible for the banks' decisions to terminate payday lenders."); DE 84-1 at 3 ("Plaintiffs also intend to take discovery into the banks' actual rationale for terminating payday lenders."); *id.* at 8 ("Plaintiffs will also conduct third-party discovery into some of the specific banks that terminated individual CFSA members."); DE 78 at 4 ("Plaintiffs will conduct third-party discovery of no more than six banks."); DE 68 at 6 ("Plaintiffs intend to seek discovery from . . . third parties including . . . supervised financial institutions"). Furthermore, Plaintiffs at one time sought jurisdictional discovery to prove causation, for standing purposes, and specifically represented to the Court that they would depose the banks. DE 25-1 at 9-10, 12-13; DE 25-2 at 5-9.

RICO violations, money laundering, wire fraud, and other crimes. At least one of those banks, U.S. Bank, pleaded guilty to multiple felonies and was fined more than $600 million. *Id.* ¶ 258.[23] Other examples of payday lenders breaking the law, and criminal consequences for banks, abound. *Id.* ¶¶ 58-61, 77-78. AA and CIC have their own histories of regulatory and NACHA violations and wrongful conduct, *see Id.* ¶¶ 65-76, and it is reasonable for a bank to view this history and conclude that a relationship with a payday lender is outside the bank's risk tolerance.

Finally, there is no evidence that the FDIC is likely to direct the termination of Plaintiffs' accounts in the future. The FDIC's current policy, instituted in early 2015, requires that, when an examiner intends to recommend that banks terminate a customer relationship, he or she must obtain the advance authorization of the Regional Director, and such recommendations cannot rest solely on the bank's reputational risk. *Id.* ¶¶ 560-63. There have been no such recommendations since the policy went into effect. *Id.* ¶ 564. Thus, there is no evidence to suggest that the FDIC will cause banks to terminate Plaintiffs' accounts in the future.

In short, Plaintiffs have not shown that the FDIC has caused or will cause them to lose *any* bank accounts, let alone pose a "significant roadblock" to Plaintiffs' access to the banking system or the payday lending industry. *McGinnis*, 65 F. Supp. 3d at 215. The record reflects no FDIC involvement in the account terminations, Plaintiffs took no steps to develop that record, and Plaintiffs have themselves acknowledged a plethora of reasons why banks might choose not

---

[23] While AA submitted a sworn declaration to the Court shortly after the U.S. Bank termination that the "only logical reason" for the termination was regulatory pressure, that same declarant stated in an internal e-mail just days before that he "would bet the investigation related to US Bank's relationship with Scott Tucker and its AML controls was the trigger to exit the entire payday lending industry." SOF ¶ 256. AA admitted that the declarant's sworn statement to this Court was not accurate. SOF ¶ 260. Northstate's representative made similar assertions, and Northstate later admitted that those were not accurate either. SOF ¶¶ 390-91. Future speculative assertions from Plaintiffs should accordingly be given little weight.

to do business with them. The sweeping assertions by Plaintiffs' expert about causation acknowledge none of these reasons, and his opinions therefore do not create a genuine issue of material fact. DE 190 at 9, 26-36. Summary judgment is therefore appropriate.

### C.   Plaintiffs Identify No Individualized Interest.

Plaintiffs' due process claim fails for a separate reason: generalized statements about the payday lending industry do not require due process. *See United States v. Florida East Coast Ry.*, 410 U.S. 224, 245 (1973); *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445-46 (1915) (due process protections attach to parties "exceptionally affected . . . upon individual grounds"); *see also Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007) (moratorium affecting "all 73 liquor stores" in one city ward is "the classic *Bi-Metallic* scenario"); *Pickus v. United States Bd. of Parole*, 543 F.2d 240, 245 (D.C. Cir. 1976) (due process protections do not apply absent "singling out of a particular person in the light of his circumstances"). Recognizing these authorities, the Court has previously permitted Plaintiffs' claims to proceed only to the extent Defendants "targeted specific payday lenders." DE 63 at 43.

Nothing in the record of this case shows that the FDIC targeted specific payday lenders. Every statement identified by Plaintiffs in their filings to date pertains to payday lenders generally, not any of the specific Plaintiffs in this case.[24] Such statements do not give rise to procedural due process protections for the obvious reason that the thousands of entities operating as payday lenders in this country cannot all be given notice and opportunity to respond when the FDIC makes a general statement about the industry. Because broad statements about payday

---

[24] Indeed, the theory of Plaintiffs' case is that Defendants have acted uniformly against *all* payday lenders and have *not* singled Plaintiffs out. *See, e.g.*, DE 124 at 7 (Third Amended Complaint, alleging that Defendants are "indiscriminately" excluding both law-abiding and fraudulent payday lenders from the banking system"; *id.* ¶ 66 ("Responsible payday lenders . . . are lumped in together with payday lenders that" commit fraud).

lenders are not a proper basis for a due process claim, the FDIC is entitled to summary judgment.

## IV. PLAINTIFFS' REQUESTED INJUNCTION IS INAPPROPRIATE.

Even if Plaintiffs could show the deprivation of a liberty interest—and they cannot—no injunctive relief is appropriate because Plaintiffs cannot show imminent irreparable harm.

As a general matter, "an injunction issues only if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law, and that there is a cognizable danger of recurrent violation." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 766 n.3 (1994) (citations omitted). An injunction against government misconduct must show an "imminent threat of harm" that would be "irreparable." *Reporters Committee for Freedom of the Press v. AT&T Co.*, 593 F.2d 1030, 1065 (D.C. Cir. 1978).[25]

Plaintiffs have not made any showing of imminent irreparable harm, as there is no reason to believe that Plaintiffs will lose access to the banking system or to the payday lending industry imminently or at any time in the future. Plaintiffs' "campaign" theory does not entitle Plaintiffs to injunctive relief in 2018 because their evidence consists entirely of communications in 2013 and earlier. Plaintiffs' own financials show that they have sustained little if any harm over the past five years from the "campaign," SOF ¶¶ 114-38, 286-306, 370-82, and if the "campaign" did not harm Plaintiffs from 2013 to 2017, there is no reason to believe that harm is "imminent"

---

[25] Likewise, a plaintiff has standing to seek injunctive relief only upon a showing of "injury or threat of injury" that is "real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983); *see also Williams*, 819 F.3d at 474 (claim that "turns entirely on hypothetical future injury . . . fails plausibly to allege a cognizable injury-in-fact"); *Arpaio*, 797 F.3d at 15, 19 (harm must be "certainly impending" to justify injunctive relief; no standing when future injury theory is based on "unsupported speculation"); *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) (standing to seek injunctive relief cannot rest on past injuries alone); *The Fair Employment Council v. BMC Mkt'g. Corp.*, 28 F.3d 1268, 1272-73 (D.C. Cir. 1994) (plaintiffs must allege likely "violations of their rights . . . in the reasonably near future").

in 2018. Moreover, the FDIC took steps beginning in 2013 to clarify its policies in this area, issuing multiple FILs and conducting training and outreach. *Id.* ¶¶ 544-67. Plaintiffs have acknowledged that they have no reason to believe they will lose their existing banking (or equivalent) relationships. *Id.* ¶¶ 279, 362, 401.

The dismissal of the Federal Reserve Board from this lawsuit, *see* DE 196, simply confirms that no injunctive relief is warranted. Presumably, Plaintiffs would not have stipulated to the dismissal if they believed they are currently unable, or likely to be unable in the future, to do business with the approximately 800 banks supervised by the Federal Reserve Board. *Id.* ¶ 639. If Plaintiffs have present and continuing unfettered access to those banks, they are not suffering the type of harm that warrants injunctive relief.

## V.   THE FDIC TOOK ACTION TO ENSURE THAT BANKS WERE NOT IMPLICATED IN ILLEGAL AND UNETHICAL CONDUCT.

Finally, while the Court need not address Plaintiffs' "campaign" claims to enter summary judgment in this case, the FDIC briefly responds to those claims.

According to FDIC policy, banks may maintain relationships with law-abiding customers, including payday lenders, provided the banks manage the risks of those relationships properly. *Id.* ¶¶ 485-86, 490, 546-59, 568. The FDIC first articulated that policy in 2008, and it has reiterated the policy many times since then. *Id.* ¶¶ 500-68. In the past, many banks have *not* properly managed the risks arising from these relationships. In 2011, 2012 and 2013, the FDIC was concerned that numerous banks were facilitating illegal or fraudulent conduct by failing to adequately monitor the activities of payday lenders and other customers, and it discussed those concerns with other agencies. *Id.* ¶¶ 569-70, 574. State regulators had expressed concerns as well. *Id.* ¶¶ 570, 573. Payday lender relationships are high-volume transactional accounts for banks, and the FDIC found that certain banks were not devoting sufficient resources to monitor

those accounts. *Id.* ¶¶ 570-72. Some banks were conducting no due diligence *at all*—they did not even realize that their customers were payday lenders in violation of the BSA's "Know Your Customer" requirements, *see id.* ¶¶ 578, 590—while other small banks allowed lenders to process tens of millions of dollars in transactions every month, making no attempt to monitor that activity. *Id.* ¶¶ 594, 599. The result: the customers used the banks to carry out illegal acts, such as conducting payday lending in states where that practice is prohibited, and the banks knew nothing about those violations until the FDIC took supervisory action. *See, e.g.*, *id.* ¶¶ 586-91. The FDIC was therefore concerned that some banks (not those that terminated Plaintiffs' accounts) were not taking sufficient steps to manage their third-party relationships, and it reviewed banks' records, and pursued supervisory action, in order to bring banks into compliance with the law. *Id.* ¶¶ 570-72. Indeed, the Court has recognized that raising these concerns does not indicate an improper "campaign." DE 134 at 22.

As for the lists of higher-risk industries, the FDIC appropriately created those lists based on materials used by the payments industry, based on concerns that industries on the list posed special risks to banks. SOF ¶¶ 512, 522. Some of them had high incidences of illegal conduct, others offered difficult compliance challenges owing to a variety of federal, state and local laws, others had significant consumer complaint rates, and others had excessive transaction return rates. *Id.* ¶¶ 523-27. All of those concerns apply to payday lenders. The lists were provided to help banks assess their relationships and the safeguards they had in place; the FDIC did not use them to target banks in examinations. *Id.* ¶¶ 528-29, 538. The FDIC ultimately withdrew the lists, based on its concern that banks were misperceiving the lists as indicating that relationships with the industries included on the lists were discouraged or prohibited. *Id.* ¶¶ 553-54.

What Plaintiffs have described as a "campaign" against payday lenders in general,

therefore, did not exist at the FDIC. The FDIC appropriately responded to individualized evidence that certain banks (not those that terminated Plaintiffs' accounts) were not monitoring their high-volume customer relationships sufficiently to prevent illegal and fraudulent activity, and in certain instances it took action to require banks to comply with the BSA. The FDIC took no broader action, and Plaintiffs have no evidence to the contrary; notably, AA and CIC each have *dozens* of accounts at FDIC-regulated banks. SOF ¶¶ 282, 367. At most, the FDIC's policies may not have been clear, and the FDIC took steps to clarify those policies in 2013, 2014, and 2015 when it stated that banks are neither prohibited nor discouraged from offering banking services to payday lenders, provided that the banks manage the associated risks properly, and withdrew the higher-risk lists. *Id.* ¶¶ 546-59. The FDIC subsequently required that any FDIC-directed termination of customer relationships be reported to the Regional Directors and the FDIC's Board of Directors (and there have been none), and conducted extensive examiner training and industry outreach to ensure that its policies were understood. *Id.* ¶¶ 560-67.[26]

Moreover, the continued robust health of the $40 billion payday lending industry, *see* S *Id.* ¶¶ 23-27, belies Plaintiffs' arguments. By Plaintiffs' own theory, if payday lenders were being denied access to the banking system *en masse*, their businesses would dry up. Evidently, no such denial of access is occurring. There is no FDIC "campaign" against payday lenders.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment for the FDIC on Count I of the Third Amended Complaint.

---

[26] As for Operation Choke Point, that was a Justice Department ("DOJ") initiative to address fraud in the banking system. The FDIC communicated with the DOJ to help it understand the system and ensure that its investigation would not interfere with bank regulation, and provided the DOJ information about certain banks, but did not otherwise play a part. SOF ¶¶ 625-39.

Respectfully submitted,

COLLEEN J. BOLES
Assistant General Counsel
BARBARA KATRON
Senior Counsel
_____/s/_____
DUNCAN N. STEVENS D.C. Bar No. 473550
ANDREW J. DOBER D.C. Bar No. 489638
Counsel
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive, D-7028
Arlington, VA 22226
dstevens@fdic.gov
(703) 562-2402 (phone)
(703) 562-2477 (fax)

JUSTIN V. SHUR (D.C. Bar No. 973855)
MoloLamken LLP
600 New Hampshire Ave. NW
Washington, DC 20037
jshur@mololamken.com
(202) 556-2000 (phone)
(202) 556-2001 (fax)

Attorneys for Federal Deposit Insurance Corporation

October 12, 2018