IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ADVANCE AMERICA, CASH ADVANCE CENTERS INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-953 (TNM) |
| | ) | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS OFFICE OF THE
COMPTROLLER OF THE CURRENCY AND JOSEPH OTTING'S
RENEWED MOTION FOR SUMMARY JUDGMENT
ON COUNT II OF THE THIRD AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 4

    A.    The Statutory, Regulatory, and Supervisory Scheme ...................................................... 4

        1.    Statutory and Regulatory Background ....................................................... 5

            a.   *The Federal Deposit Insurance Act* ............................................. 5

            b.   *The Bank Secrecy Act* ................................................................... 5

        2.    Supervision and Examination Process ....................................................... 6

            a.   *OCC Supervisory Activities* ......................................................... 6

            b.   *Bank Secrecy Act Examinations* .................................................. 7

        3.    Supervisory Actions .................................................................................... 9

    B.    Factual Background ....................................................................................................... 10

        1.    The OCC Did Not Participate in Operation Choke Point ........................ 11

        2.    The Comptroller's Briefing and Issuance of the OCC's Supervisory Tip ................. 12

    C.    Procedural History ........................................................................................................ 13

SUMMARY JUDGMENT STANDARD ................................................................................. 15

ARGUMENT .............................................................................................................................. 16

    I.    PLAINTIFFS LACK STANDING TO SUE ................................................................. 17

      A.    Plaintiffs Cannot Establish Causation ....................................................................... 17

      B.    Plaintiffs Cannot Establish Redressability ................................................................ 20

II.   PLAINTIFFS HAVE NOT BEEN DEPRIVED OF A LIBERTY INTEREST............. 21

   A.   Plaintiffs Have Not Been Cut Off from the Banking System or Broadly Precluded
        from the Payday Lending Business ........................................................................... 22

III.   PLAINTIFFS HAVE NOT ADDUCED FACTS SHOWING THAT THE OCC
       PRESSURED BANKS TO TERMINATE PLAINTIFFS' ACCOUNTS ..................... 23

   A.   Plaintiffs Cannot Identify Any Substantive Proof to Support Their Allegations
        Regarding OCC-Supervised Banks ........................................................................... 25

       1.   ████████████ ................................................................................................. 25

       2.   ████████████████ ........................................................................................ 29

       3.   ██████████████ ............................................................................................ 30

       4.   ████████████████████ ............................................................................ 32

       5.   ██████████████ ............................................................................................ 33

       6.   █████████████████ ...................................................................................... 34

       7.   ████████████████████ ............................................................................ 34

       8.   ████████████ ................................................................................................. 37

       9.   █████████████████ ...................................................................................... 37

CONCLUSION ........................................................................................................................... 38

# TABLE OF AUTHORITIES

Page(s)

Cases

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970) .................................................................................................... 16
*Allen v. Wright*,
  468 U.S. 737 (1984) .................................................................................................... 17
*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................. 15, 16
*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ..................................................................................... 18
*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
  681 F.3d 427 (D.C. Cir. 2012) ................................................................................... 18
*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564, 573 (1972) ............................................................................................ 22
*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
  239 U.S. 441 (1915) .................................................................................................... 24
*Branton v. FCC*,
  993 F.2d 906 (D.C. Cir. 1993) ................................................................................... 21
*Brown v. District of Columbia*,
  888 F. Supp. 2d 28 (D.D.C. 2012) ............................................................................. 23
*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................................................... 16
*Clapper v. Amnesty Int'l USA*,
  133 S. Ct. 1138 (2013) ................................................................................................ 18
*Ctr. For Law & Educ. v. Dep't of Educ.*,
  396 F.3d 1152, 1157 (D.C. Cir. 2005) ....................................................................... 21
*Decatur Liquors, Inc. v. District of Columbia*,
  478 F.3d 360 (D.C. Cir. 2007) ................................................................................... 24
*Desjardins v. Willard*,
  777 F.3d 43 (1st Cir. 2015) ........................................................................................ 24
*Doe v. Rogers*,
  139 F. Supp. 3d 120 (D.D.C. 2015) ........................................................................... 22
*Doe v. U.S. Dep't of Justice*,
  753 F.2d 1092 (D.C. Cir. 1985) ................................................................................. 24
*Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of Treasury*,
  498 F. Supp. 2d 150 (D.D.C. 2007) ........................................................................... 21
*Fla. Audubon Soc'y v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) ............................................................................... 19, 21
*Freedom Republicans, Inc. v. FEC*,
  13 F.3d 412 (D.C. Cir. 1994) .............................................................................. 19, 20
*Gen. Elec. Co. v. Jackson*,
  610 F.3d 110 (D.C. Cir. 2010) ..................................................................................... 3

*Greer v. Paulson*,
  505 F.3d 1306 (D.C. Cir. 2007) ............................................................ 18
*Grocery Mfrs. Ass'n v. EPA*,
  693 F.3d 169 (D.C. Cir. 2012) .............................................................. 19
*Groos Nat'l Bank v. Comptroller of the Currency*,
  573 F.2d 889 (5th Cir. 1978)................................................................. 7
*In re Providian Fin. Corp. Sec. Litig.*,
  222 F.R.D. 22 (D.D.C. 2004) ................................................................ 4
*In re Subpoena Served upon Comptroller of Currency*,
  967 F.2d 630 (D.C. Cir. 1992) .............................................................. 4
*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004) .............................................................. 16
*Long Term Care Pharmacy All. v. Leavitt*,
  530 F. Supp. 2d 173 (D.D.C. 2008) ..................................................... 20
*Lossia v. Flagstar Bancorp., Inc.*,
  895 F.3d 423 (6th Cir. 2018) ................................................................ 9
*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ....................................................................... 17, 21
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .............................................................................. 15
*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
  366 F.3d 930 (D.C. Cir. 2004) ....................................................... 18, 19
*Osborn v. Visa Inc.*,
  797 F.3d 1057 (D.C. Cir. 2015) ........................................................... 17
*O'Donnell v. Barry*,
  148 F.3d 1126 (D.C. Cir. 1998) ..................................................... 22, 23
*Paul v. Davis*,
  424 U.S. 693 (1976) ................................................................. 14, 18, 22
*Perry Capital LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) ............................................................. 18
*Pickus v. U.S. Bd. of Parole*,
  543 F.2d 240 (D.C. Cir. 1976) ............................................................. 24
*Renal Physicians Ass'n v. Dep't of Health
  & Human Services*, 489 F.3d 1267 (D.C. Cir. 2007) ...................... 20, 21
*Siegert v. Gilley*,
  500 U.S. 226 (1991) .............................................................................. 24
*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ......................................................................... 17, 19
*Sinclair v. Hawke*,
  314 F.3d 934 (8th Cir. 2003)................................................................. 4
*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................................... 20
*Steele v. Schafer*,
  535 F.3d 689 (D.C. Cir. 2008) ............................................................. 15
*Stewart v. Panetta*,
  826 F. Supp. 2d 176 (D.D.C. 2011) ..................................................... 23

*Taylor v. Resolution Tr. Corp.*,
   56 F.3d 1497, 1507 (D.C. Cir. 1995) (D.C. Cir. 1995) ..................................... 23
*Town of Babylon v. FHFA*,
   699 F.3d 221 (2d Cir. 2012) ................................................................................ 21
*URI Student Senate v. Town of Narragansett*,
   631 F.3d 1 (1st Cir. 2011) ................................................................................... 24
*Zeigler v. Potter*,
   555 F. Supp. 2d 126, (D.D.C. 2008) ................................................................... 23

Statutes

12 U.S.C. § 1 ................................................................................................................ 6
12 U.S.C. § 21 .............................................................................................................. 4
12 U.S.C. § 191 ............................................................................................................ 4
12 U.S.C. § 481 ............................................................................................................ 4
12 U.S.C. § 1461 .......................................................................................................... 4
12 U.S.C. § 1463 .......................................................................................................... 4
12 U.S.C. § 1464 .......................................................................................................... 4
12 U.S.C. § 1818(b) .................................................................................................. 6, 9
12 U.S.C. § 1818(b)(1) ................................................................................................ 9
12 U.S.C. §§ 1818(b)(6) .............................................................................................. 9
12 U.S.C. § 1818(c) ..................................................................................................... 9
12 U.S.C. § 1818(d) ..................................................................................................... 9
12 U.S.C. § 1818(e) ..................................................................................................... 9
12 U.S.C. § 1818(i) ...................................................................................................... 9
12 U.S.C. § 1818(h)(2) .............................................................................................. 10
12 U.S.C. § 1818(s) .................................................................................................. 5, 6
12 U.S.C. § 1818(s)(2) ................................................................................................. 8
12 U.S.C. § 1820(d) ..................................................................................................... 7
12 U.S.C. § 1829(b) ..................................................................................................... 5
12 U.S.C. § 1831p-1(a)-(c) ...................................................................................... 4-5
12 U.S.C. § 3301 .......................................................................................................... 8
31 U.S.C. §§ 5311-330 ................................................................................................ 5
31 U.S.C. § 5318(g) ..................................................................................................... 5
31 U.S.C. § 5318(*l*) .................................................................................................... 5

Rules

Fed. R. Civ. P. 30(b)(6) .............................................................................................. 31
Fed. R. Civ. P. 56(c) ................................................................................................... 15
Fed. R. Evid. 702 ........................................................................................................ 19

Regulations

12 C.F.R. Part 4, Subpart C ................................................................................ 11
12 C.F.R. § 4.37(c)............................................................................................. 11
12 C.F.R. § 21.11 ................................................................................................ 6
12 C.F.R. § 21.11(c)............................................................................................. 6
12 C.F.R. § 21.21 ................................................................................................. 6
12 C.F.R. § 21.21(d) ............................................................................................ 8
12 C.F.R. § 30, App. A ........................................................................................ 5

# INTRODUCTION

After more than four years of litigation, three payday lender Plaintiffs[1] each have a single remaining claim against two federal banking agencies, the Federal Deposit Insurance Corporation ("FDIC") and the Office of the Comptroller of the Currency ("OCC"), which are set out respectively in Counts I and II of Plaintiffs' Third Amended Complaint ("Complaint"). Docket Entry ("DE") 124. Reducing the Complaint to its essence, Plaintiffs allege that the OCC violated their *due process* rights under the Fifth Amendment, specifically their due process *liberty* interest to access the banking system and to pursue their chosen line of business, payday lending. *See* DE 124 at ¶¶ 135-36. Not so. As the primary federal banking regulator of national banks, the OCC's mandate is to ensure a *safe and sound* federal banking system. The OCC does not tell national banks who their customers should be. Those are business decisions that bank managers must make themselves.

Plaintiffs allege that the OCC carried out this unconstitutional deprivation by participating in a Department of Justice initiative known as Operation Choke Point, through which the OCC purportedly pressured banks under its supervision to drop payday lenders as customers. But the OCC did not participate in Operation Choke Point, prudently rejected offers to join it, and has repeatedly maintained that banks chose their own customers. Plaintiffs maintain that the OCC blocked Plaintiffs' access to the national banking system by making stigmatizing statements about them to the banks it supervises and by improperly invoking the concept of *reputation risk*, or risk to a business from negative public opinion directed at the institution.

---

[1] Advance America, Cash Advance Centers, Inc. ("Advance America"), Check Into Cash, Inc. ("Check Into Cash"), and Northstate Check Exchange's ("Northstate") (collectively, "Plaintiffs").

The OCC now moves for summary judgment on this claim because the facts adduced in discovery show that Plaintiffs' allegations are without factual support and are legally deficient. Plaintiffs cannot establish any of the three basic predicates to their due process claim: (1) that they have *standing* to sue the OCC, (2) that they have suffered a *change in legal status* constituting a due process injury, or (3) that the OCC made *stigmatizing* statements that caused or will cause OCC-supervised banks to end business relationships with them.

*First*, Plaintiffs lack standing to sue because there is no factual support (or triable issue of fact) for their allegations that the OCC participated in Operation Choke Point, made stigmatizing statements about Plaintiffs that caused any bank to terminate their accounts, or used reputation risk to improperly influence a national bank to drop Plaintiffs as customers. Where OCC-supervised banks did terminate accounts of any of the Plaintiffs, they did so for their own business reasons. There are no facts to support the claim that any of the OCC-supervised banks at issue in the litigation closed any Plaintiff account because of pressure from, or statements by, the OCC. Against these undisputed facts, Plaintiffs offer nothing but speculation, hearsay, and unreliable opinion testimony that the OCC and the FDIC have moved to exclude. *See* DE 193, 195. Without factual support for *any* of their allegations, Plaintiffs cannot demonstrate that the OCC caused banks to terminate their relationships with Plaintiffs or that any injunction directed against the OCC would result in banks restoring these relationships. Thus, Plaintiffs do not have standing to pursue their claim against the OCC.

*Second*, Plaintiffs have not been deprived of a liberty interest. The OCC has done nothing to damage Plaintiffs' reputations, and Plaintiffs have not suffered any resulting change in legal status. Instead, Plaintiffs' own documents show that they retain unfettered access to the banking system and face no foreseeable risk of any loss in the future. These documents also

demonstrate that Plaintiffs continue to pursue, and continue to thrive in, their chosen business of payday lending.  Thus, Plaintiffs have neither been "effectively cut off . . . from the banking system" nor "'broadly preclude[d] from pursuing' the payday lending business."  DE 134 at 8-9 (quoting *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010)).

*Third*, Plaintiffs cannot show that the OCC pressured any national bank under its supervision to terminate its business relationships with them.  The facts adduced in discovery support a contrary finding; namely that closures of Plaintiffs' bank accounts at any of the nine national banks supervised by the OCC were made for independent business reasons and without any pressure from, or stigmatizing statements by, the OCC.  Without any facts to rely on, Plaintiffs instead seek to paste together a seemingly plausible story from loose strands of testimony and snippets of documents focusing on the alleged misuse by OCC examiners of the Agency's reputation risk guidance.  Statement of Undisputed Material Facts ("SOF") ¶ 19. Plaintiffs have not established a factual connection between *any* action by the OCC and an account termination by one of the national banks identified in the Complaint.  No fact adduced in discovery demonstrates that any of these banks terminated business relationships with Plaintiffs because of OCC stigma, pressure, or misuse of reputation risk guidance.  In fact, at least two of these nine banks still bank one of the Plaintiffs.

In short, the OCC's supervisory approach to national banks does not prohibit them from doing business with any category of customer that may lawfully hold a bank account.  Instead, the OCC expects banks to monitor their business relationships and conduct due diligence to ensure they evaluate all the risks posed by their customers and confirm these customers conduct their businesses lawfully.  Where any of the nine national banks decided to cease offering banking services to payday lenders, these decisions were not the result of "backroom pressure,"

direct or otherwise, on the part of the OCC.  This case therefore presents no genuine issue of material fact, and the OCC is entitled to judgment as a matter of law.

## BACKGROUND

### A.  The Statutory, Regulatory, and Supervisory Scheme

The OCC is an independent bureau of the United States Department of the Treasury and functions as the primary supervisor of federally chartered (national) banks and Federal savings associations.  12 U.S.C. § 21 *et seq.*; 12 U.S.C. § 1461 *et seq.*  The OCC administers statutory provisions governing virtually every aspect of the federal banking system, from chartering a new institution to appointing a receiver for an insolvent bank.  12 U.S.C. §§ 21, 191, 1464.  The OCC has broad authority to "make a thorough examination of all the affairs of the bank[s]" it supervises.  12 U.S.C. § 481; *see also* 12 U.S.C. § 1463 (authorizing the Comptroller to provide for the examination and safe and sound operation of Federal savings associations).  "Bank safety and soundness supervision is an iterative process" between the regulators and the banks, and communication between both is essential to achieving this end.  *In re Subpoena Served upon Comptroller of Currency*, 967 F.2d 630, 633-34 (D.C. Cir. 1992); *see also In re Providian Fin. Corp. Sec. Litig.*, 222 F.R.D. 22, 25-26 (D.D.C. 2004).  "Through periodic examinations and intense regulation of unsound practices, the OCC actively engages with bank management to protect the interest of depositors and the general public in the solvency and soundness of national banks."  *Sinclair v. Hawke*, 314 F.3d 934, 941 (8th Cir. 2003).

### 1. Statutory and Regulatory Background

#### a. *The Federal Deposit Insurance Act*

The Federal Deposit Insurance Act ("FDI Act") requires that the OCC prescribe, by regulation or guideline, certain "standards for safety and soundness" regarding a bank's operation and management, its asset quality, earnings and stock valuation, and its compensation of its employees," and "such other operational and managerial standards as the agency determines to be appropriate." *See* 12 U.S.C. § 1831p-1(a)-(c). Under this authority, the OCC has prescribed guidelines establishing "safety and soundness" standards which, following notice and comment, were incorporated into the Code of Federal Regulations. *See* 12 C.F.R. § 30, App. A. Among these guidelines is a standard governing a bank's "internal controls and information systems," which provides that an institution should have such controls and systems that are "appropriate to the size of the institution and the nature, scope and risk of its activities" and that provide for, among other safety and soundness measures, "[e]ffective risk assessment." *See* 12 C.F.R. § 30, App. A.

#### b. *The Bank Secrecy Act*

The Bank Secrecy Act, 31 U.S.C. §§ 5311-330, ("BSA") forms the primary U.S. anti-money laundering law. The Act establishes requirements for record keeping and reporting by individuals, banks, and financial institutions ("BSA/AML requirements"). Congress has amended the BSA several times by, for example, imposing criminal liability on financial institutions that knowingly assist in the laundering of money or structure transactions to avoid reporting them. *See* 12 U.S.C. §§ 1818(s), 1829(b). Most recently, Congress amended the Act to include certain provisions of Title III of the USA PATRIOT Act. These amendments are designed to detect, deter, and disrupt terrorist financing networks. Section 326 of the BSA, for

instance, requires banks to establish and maintain a Customer Identification Program ("CIP") for verifying the identities of account holders and maintaining the verification records.  31 U.S.C. § 5318(*l*).

Pursuant to its authority under the Act, the OCC has promulgated regulations requiring OCC-supervised banks to have written, board-approved programs reasonably designed to assure and monitor compliance with the BSA.  12 C.F.R. § 21.21.  OCC regulations also implement another portion of the BSA, 31 U.S.C. § 5318(g), requiring a national bank to file a Suspicious Activity Report when its employees detect "known or suspected" violation of federal law or a suspicious transaction related to a money laundering activity or a violation of the BSA.  12 C.F.R. § 21.11.  The OCC's BSA/AML regulations direct a bank to report actual or suspected violations of law committed or attempted against the bank, as well as to maintain a BSA compliance program that monitors customer activity for indications that the bank may be facilitating a criminal violation.  12 C.F.R. § 21.11(c).[2]

### 2.  Supervision and Examination Process

#### a.  *OCC Supervisory Activities*

The OCC is responsible for supervising the federal banking system.  12 U.S.C. § 1. Pursuant to that responsibility, the OCC provides guidance on how it supervises national banks and Federal savings associations in the *Comptroller's Handbook*, a series of booklets describing various aspects of the supervisory process.  As described in the *Bank Supervision Process* booklet, the OCC uses a risk-based approach to supervision that focuses on evaluating risk,

---

[2] *See also* 12 U.S.C. §§ 1818(b) (stating that banks may neither engage in a violation of law nor facilitate such a violation by any other party); 1818(s) (requiring federal banking agencies to issue regulations "requiring depository institutions to establish and maintain procedures reasonably designed" to monitor compliance with the BSA).

identifying material and emerging concerns, and requiring banks to take timely corrective action.

SOF ¶ 20.  Specifically, the OCC focuses on eight different categories of risk that may affect a

bank's safety and soundness: credit risk, interest rate risk, liquidity risk, price risk, operational

risk, compliance risk, strategic risk, and reputation risk.[3]  SOF ¶ 24.  Under its risk-based

approach, the OCC allocates greater resources to areas of higher risk by, among other actions,

evaluating a bank's internal risk management system and determining whether that system

adequately identifies, measures, monitors, and controls risk.  SOF ¶ 20.

The OCC's supervisory activities fall into three groups: ongoing supervision, full-scope

examinations, and target examinations.  SOF ¶ 22.  Ongoing supervision involves the OCC's

continual assessment of its knowledge about, and the risks within, national banks.  SOF ¶ 25.

Information derived from ongoing supervisory activities informs the OCC's strategy in full-

scope and targeted examinations.  Full-scope, on-site examinations of all national banks must

occur every 12 or 18 months.  SOF ¶ 26; 12 U.S.C. § 1820(d).  Targeted examinations do not

fulfill all of the requirements of the full-scope examination, but may fulfill a portion of those

requirements.  SOF ¶ 27.

### b.  Bank Secrecy Act Examinations

The OCC's supervisory approach does not prohibit banks from doing business with any

category of customer.  *See, e.g.*, SOF ¶¶ 11, 28; *see also Groos Nat'l Bank v. Comptroller of the*

*Currency*, 573 F.2d 889, 897 (5th Cir. 1978) (recognizing that banks have discretion to choose

---

[3] In its filings with the Court, Plaintiffs have trumpeted the alleged misuse of reputation risk guidance as the means by which the OCC purportedly carried out a campaign to pressure banks into terminating business relationships with them.  As discussed in the Argument section, Plaintiffs misapply this supervisory concept to their account terminations.  Instead, these terminations most often centered on bank concerns about BSA/AML issues.  *See infra* Section III.

their customers). Instead, the OCC expects banks to monitor their customer relationships and conduct due diligence to ensure they evaluate all the risks posed by their customers. SOF ¶ 34; *see also* 12 C.F.R. § 21.21(d).

To that end, and as part of its examination activities, the OCC must review a bank's BSA/AML compliance programs during every supervisory cycle. 12 U.S.C. § 1818(s)(2). Serious BSA/AML deficiencies can potentially affect a bank's safety and soundness. SOF ¶ 33. Recognizing this, and consistent with its general supervisory approach, the OCC uses risk-based *transaction testing* to assess a bank's timely investigation and resolution of transactions potentially posing BSA-related risk. SOF ¶ 35. In conducting such testing, the OCC applies the methods and principles adapted by the Federal Financial Institutions Examinations Council ("FFIEC"), an interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions. 12 U.S.C. § 3301. These methods and principles have been published in the FFIEC's BSA/AML Manual ("FFIEC Manual"). SOF ¶¶ 36-45.

Consistent with the FFIEC Manual, bank examiners assess banks' procedures for evaluating risks posed by nonbank financial institutions ("NBFIs") and bank's controls for mitigating BSA risk. SOF ¶ 38. As relevant here, the FFIEC Manual designates payday lenders as among the NBFIs that are considered higher-risk customers for BSA compliance purposes. SOF ¶¶ 39-40. The FFIEC Manual further observes that providing banking services to higher-risk customers may pose BSA risks to a bank that does not conduct the appropriate due diligence or institute the appropriate controls. SOF ¶ 43. Similarly, the FFIEC Manual identifies cash-intensive businesses, third-party payment processors, and Automated Clearing House ("ACH")

transactions[4] as posing elevated BSA risks, and also recommends examination procedures that assess banks' due diligence and monitoring of customers that engage in these activities.  SOF ¶¶ 39, 41-45.  To that end, a bank must monitor the ACH activity of NBFIs conducting such transactions to ensure the activity complies with applicable laws.  SOF ¶¶ 37, 39, 43.  For example, large volumes of activity or high rates of return could suggest the presence of fraudulent or illegal activity.  *See* SOF ¶ 42-44.

### 3.  Supervisory Actions

Among the OCC's supervisory tools is the ability to bring enforcement actions against national banks and affiliated parties that violate laws or regulations or that engage in unsafe and unsound practices.  *See* 12 U.S.C. §§ 1818(b), (c), (d), (e), (i).  To communicate and address a bank's deficiencies, the OCC typically first informs a bank that it has examined a Matter Requiring Attention ("MRA") or has identified a violation of law or regulation ("violation").  SOF ¶ 29.  MRAs describe a deficient bank practice and how it deviates from sound governance, internal controls, risk management principles, or laws or regulations.  SOF ¶ 30.  Violations identify specific acts that deviate from, or fails to comply with, a statutory or regulatory requirement.  MRAs, violations, and other unsafe or unsound practices may serve as the basis for an enforcement action, particularly when a bank's deficiencies are severe and uncorrected.  SOF ¶ 48.  In such circumstances, the OCC may "issue and serve upon . . . such party a notice of

---

[4] "ACH transactions are electronic payments made from one bank account to another and involve one party providing their account number and routing number.  Common ACH transactions include online bill pay and an employee's direct deposit."  *Lossia v. Flagstar Bancorp., Inc.*, 895 F.3d 423, 426 (6th Cir. 2018).

charges constituting the alleged violation" and, after notice and hearing, determine whether the issuance of a permanent cease and desist order is warranted.  12 U.S.C. § 1818(b)(1), (6).[5]

The OCC may also use informal supervisory actions, such as board resolutions, memoranda of understanding, and formal agreements, to address weaknesses in a bank's controls before such weaknesses become serious.  SOF ¶ 50.  The OCC terms the mildest form of informal supervisory action as *moral suasion*, where OCC examiners engage in frank conversations with bank managers when problems are often first identified.  SOF ¶ 51.  When using moral suasion in the context of BSA/AML compliance, for example, OCC examiners may suggest that bank managers reevaluate offering services to higher risk customers in cases where a bank's risk management systems may not be sufficiently robust to properly manage such risks.  SOF ¶ 52.  When OCC examiners use moral suasion, bank management retains discretion as to whether the bank will follow such advice.  SOF ¶ 53.

## B.  Factual Background

The genesis of this litigation, somewhat ironically, does not originate from within the federal banking regulatory community.  "Operation Choke Point" was a United States Department of Justice ("DOJ") initiative aimed at combatting fraud by denying fraudulent enterprises access to the banking system.  The OCC was *not* a participant in Operation Choke Point.  As OCC officials have unequivocally stated on multiple occasions, "[t]he OCC is not now, nor has it ever been part of Operation [Choke Point].  That has been, is, and will continue to be the policy of this agency."  SOF ¶ 57.

---

[5] Judicial review of permanent orders is only available in the United States Court of Appeals. *See* 12 U.S.C. § 1818(h)(2)

### 1.  The OCC Did Not Participate in Operation Choke Point

The uncontested facts demonstrate that the OCC did not participate in Operation Choke Point.  The OCC first became aware of the DOJ initiative when, starting in July 2012, certain OCC staff attended meetings of the Financial Fraud Enforcement Task Force's Consumer Protection Working Group.  SOF ¶ 58.  But given the large number of attendees and the high level of the presentations, OCC participants never discussed investigatory goals, subjects, or strategies with their DOJ counterparts.  SOF ¶ 59.

OCC staff later learned more specific information about Operation Choke Point during a presentation delivered by two DOJ attorneys, ███████ and ████████████, at a June 2013 conference.  SOF ¶ 60.  Soon after, DOJ submitted several written requests to the OCC for confidential supervisory bank examination information.  SOF ¶ 61.  DOJ's letters did not mention Operation Choke Point, but noted that the requests related to an ongoing criminal investigation into certain banks' relationships with third-party payment processors.  SOF ¶ 62.  The requests were not unusual; when not prohibited by law, the OCC routinely provides other federal agencies, including DOJ, with bank examination reports and other non-public OCC information if these materials are requested by, and necessary for, those agencies to perform their official duties.  12 C.F.R. § 4.37(c).  Accordingly, the OCC's Enforcement and Compliance Division processed DOJ's requests under the agency's *Touhy* regulations, 12 C.F.R. Part 4, Subpart C, but did not otherwise provide DOJ with any additional confidential supervisory bank examination information.  SOF ¶¶ 64-65.

During this time, DOJ also issued subpoenas to a group of approximately 20 OCC-supervised banks.  SOF ¶ 66.  In August 2013, OCC employees tried to schedule a call with DOJ officials to discuss the subpoenas and the banks being investigated.  SOF ¶ 67.  The OCC

intended to use the call to gather information about the scope of DOJ's investigation into OCC-supervised banks, specifically, and Operation Choke Point, generally. *Id.* DOJ officials later requested that the call include a discussion of its outstanding requests for OCC bank examination information and its "ideas" about how the OCC could "more effectively address TPPP [Third Party Payment Provider] abuses and consumer fraud." SOF ¶ 68. This call never took place. SOF ¶ 69. Instead, OCC staff made a conscious decision to delay discussions with DOJ officials until the Agency could develop a position on Operation Choke Point. SOF ¶ 70. In the end, the OCC decided not to pursue these discussions and limited its communications with DOJ officials to logistical issues surrounding the requests for supervisory information and the subpoenas. *Id.*

## 2. The Comptroller's Briefing and Issuance of the OCC's Supervisory Tip

In response to news accounts of Operation Choke Point and other ACH-related issues, OCC staff prepared a PowerPoint slide presentation and briefing for then-Comptroller of the Currency Thomas Curry. SOF ¶ 71. The briefing, which OCC staff delivered in September 2013, was intended to provide the Comptroller with a "baseline understanding" of the ACH network and to inform him of "current challenges in the system," including federal and state enforcement activities in the payday lending space. *Id.* Operation Choke Point was among the topics discussed, specifically the DOJ-issued subpoenas to OCC-supervised banks. *Id.* After the meeting, the OCC issued an internal Supervisory Tip to its examiners about risks posed by the ACH system. SOF ¶ 73. The Supervisory Tip aimed to raise awareness of these risks and to remind examiners of existing OCC guidance on the detection of unusual activity in the ACH space. SOF ¶ 74. Significantly, the OCC did not issue any new guidance on the subject, deeming it unnecessary. *Id.* By instead focusing on existing guidance, the OCC sought to *avoid*

overzealous examination practices and, by consequence, did not further Operation Choke Point's goals. *Id.*

### C. Procedural History

On June 5, 2014, Plaintiff Advance America and now-dismissed plaintiff Community Financial Services Association ("CFSA"), a payday lender trade association, commenced this lawsuit.  In July 2014, Plaintiffs filed an Amended Complaint alleging, among other claims, that Advance America and other CFSA members had lost banking relationships, and thus had been deprived of a liberty due process interest, because of pressure exerted by the FDIC, the Board of Governors of the Federal Reserve (the "Board"), and the OCC (collectively, the "Federal Defendants").

Each of the Federal Defendants moved separately to dismiss the Amended Complaint in August 2014, arguing, *inter alia*, that Advance America and CFSA did not have standing and that neither had stated a due process claim.  On September 25, 2015, the Court granted Federal Defendants' motions to dismiss in part, dismissing nine of the twelve claims in the Amended Complaint.  The Court, however, held that Advance America and CFSA had stated a claim for denial of due process and had standing to pursue that claim.  DE 63 at 12-26, 42-47.  Plaintiffs filed a Second Amended Complaint in conformance with the Court's decision.  DE 64.  Federal Defendants then brought a renewed motion to dismiss CFSA for lack of associational standing to pursue the remaining due process claims on behalf of its members.  DE 73.  On December 19, 2016, the Court granted the Federal Defendants' motion, and dismissed CFSA as a party to the lawsuit.  DE 97 at 10.

Before granting Federal Defendants' motion to dismiss CFSA, Plaintiffs filed a Motion for Preliminary Injunction.  DE 87.  While that motion was pending, Plaintiffs moved to file a

Third Amended Complaint on January 11, 2017, adding new Plaintiffs Check Into Cash,

Northstate, and PH Financial Services, LLC as named parties ("New Plaintiffs").  DE 102.  The

Court granted Plaintiffs' request on February 3, 2017.  The New Plaintiffs similarly filed their

own motion for preliminary injunction.  DE 107.  The Court later denied both injunctions, based

in large part on the Court's conclusion that Plaintiffs were unlikely to succeed on the merits of

their claim.  DE 134.  Specifically, the Court held that Plaintiffs had not shown they had

"effectively been cut off from the banking system" and, consequently, had not produced

sufficient evidence of a change in legal status under *Paul v. Davis*, 424 U.S. 693 (1976).  DE 134

at 9, 11-12.  The Court also concluded that Plaintiffs had neither been precluded from the payday

lending industry—they still operated in it—nor shown they would likely be precluded from it in

the future.  *Id.* at 14-18.  According to the Court, Plaintiffs' ability to survive past account

terminations, coupled with the lack of any evidence suggesting they were unable to "do the same

in the face of upcoming terminations," counseled against issuance of a injunctive relief.

Similarly, the Court also found it unlikely that the Federal Defendants had made

stigmatizing statements that would have caused banks to terminate their relationships with

Plaintiffs.  The Court noted that Plaintiffs had identified only "a few scattered statements" that

shed little light on whether the Federal Defendants had pressured banks to forego business

relationships with payday lenders.  *Id.* at 20-21.[6]  The Court also recognized that these statements

rested on anonymous hearsay that had been contradicted by Federal Defendants' sworn

statements and, in any event, were not stigmatizing.  *Id.* at 21-22.

---

[6] The Court also acknowledged, but did not rely on, Federal Defendants' arguments that such pressure is irrelevant unless applied through stigmatizing statements, and that generalized statements about payday lenders as a class cannot be stigmatizing.  *Id.*

Following the Court's denial of Plaintiffs' request for a preliminary injunction, Federal Defendants filed a motion to dismiss the Third Amended Complaint as to the New Plaintiffs or, in the alternative, for Summary Judgment.  DE 138.  The Court denied Federal Defendants' motion to dismiss Check Into Cash and Northstate, but granted their motion to dismiss PH Financial, LLC.  DE 165 at 12.  In doing so, the Court based its ruling on the possibility that Plaintiffs could prove they would be "cut off from the banking system *in the future*." *Id.* at 8-9. The Court nevertheless acknowledged that Plaintiffs claims were "just barely plausible," *id.* at 8-9, and observed that the Federal Defendants had "muster[ed] a litany of undisputed evidence demonstrating that [Advance America and Check Into Cash] continue to access the banking system and remain quite profitable," *id.* at 12.

The litigation proceeded to discovery.  After discovery concluded, Plaintiffs voluntarily dismissed the Board from the case.  DE 196.  The OCC now moves for summary judgment on Count II of the Third Amended Complaint, the only remaining count against the OCC.  DE 124 at 46-47.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Once the moving party has met its burden, the non-movant must identify specific facts showing that a genuine issue exists for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Thus, the non-movant must "provide evidence showing that there is a triable issue as to each element essential to that party's claim." *Kaempe v. Myers*, 367 F.3d 958, 966 (D.C. Cir. 2004).

Although courts view the evidence in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970), "a complete failure of proof concerning an essential element of the non[-]moving party's case necessarily renders all other facts immaterial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Therefore, in responding to a motion for summary judgment, the party who bears the burden of proof on an issue at trial must make a "sufficient" showing on an essential element of his case to establish a genuine dispute; if the evidence is "merely colorable" or is "not significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.

## ARGUMENT

Plaintiffs base their due process claim on a misplaced view that the OCC took part in Operation Choke Point.  Relying on hearsay and conjecture, Plaintiffs allege that the OCC conspired with DOJ and other agencies to "pressure" banks into dropping Plaintiffs and other payday lenders as customers.  The undisputed material facts of the case prove otherwise: the OCC did not participate in DOJ's operation and did not pressure national banks to deny banking services to Plaintiffs or to any other payday lenders.  *See infra* Section III.  The decision not to join Operation Choke Point is consistent with the OCC's supervisory approach: the Agency does not prohibit national banks from doing business with particular categories of customers.  Irrespective of the OCC's unequivocal (and factually unrebutted) disavowal of Operation Choke Point, Plaintiffs' claim fails for any of three reasons.  First, Plaintiffs do not have standing to sue.  Second, Plaintiffs cannot show—as they must—that they have or will suffer harms rising to the level of a due process injury.  Third, Plaintiffs cannot prove that the OCC "made stigmatizing

statements about them and that these stigmatizing statements *caused* banks to terminate their business relationships with Plaintiffs." DE 134 at 19. For the reasons set forth below, the Court should grant summary judgment in favor of the OCC.

## I.     PLAINTIFFS LACK STANDING TO SUE

To prove Article III standing, Plaintiffs must establish an injury-in-fact that is "fairly trace[able]" to, or caused by, OCC actions and that is "likely" to be "redressed by a favorable decision." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41-43 (1976).[7] With discovery now complete, Plaintiffs still have no facts to support their claim that the OCC caused them injury or that their injuries are redressable. Thus, Plaintiffs' lack standing to sue and summary judgment is appropriate.[8]

### A.  Plaintiffs Cannot Establish Causation

Plaintiffs lack standing to sue because, as discussed below, they cannot show that the OCC caused banks to terminate any of their accounts or their business relationships. *See infra* Section III. Standing is "'substantially more difficult' to establish" when, as here, "the plaintiff is not himself the object of the government action or inaction he challenges." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). In these cases, plaintiffs bear the burden of offering "substantial evidence of a causal relationship between the government policy and the third-party conduct" that "leav[es] little doubt as to

---

[7] Although the Court previously ruled that Plaintiffs had sufficiently alleged standing to survive a motion to dismiss, it stressed that it would revisit the issue and that Plaintiffs' "burden to demonstrate standing grows heavier at each stage of the litigation." DE 63 at 9, 11 (quoting *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015)).

[8] The OCC agrees with, and incorporates by reference, the FDIC's argument that Plaintiff Northstate has not suffered an injury-in-fact and, therefore, does not have Article III standing. *See* FDIC Memorandum in Support of Motion for Summary Judgment, Section II(C).

causation." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004), *abrogated on other grounds by Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017).[9]  "[M]ere unadorned speculation as to the existence of a relationship between the challenged government action and the third-party conduct will not suffice to invoke the federal judicial power." *Id.*  Instead, plaintiffs must show either (1) that the government "permit[ted] or authorize[d] third-party conduct that would otherwise be illegal in the absence of . . . government action" or (2) that the government's conduct was a "substantial factor" in causing that third-party conduct. *Id.* at 940-41.  Plaintiffs have never claimed the former, and they cannot identify any facts supporting the latter.

The Court previously stated that the causation issue in this case "'hinge[s] on the independent choices of the regulated third party,' namely the banks." DE 63 at 11 (quoting *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 938).  Plaintiffs' standing therefore turns on their ability to establish "the degree of [the OCC's] . . . involvement or influence on the banks' decisions to terminate relationships" with Plaintiffs.  *Id.* at 12.  But Plaintiffs never sought any evidence from the banks on this point during discovery.  They instead choose to rely on a dubious expert report and hearsay statements that is inadmissible on summary judgment.  *See, e.g.*, *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007).  Even if these statements were admissible, they do not show that the OCC caused banks to terminate business relationships with Plaintiffs.  As

---

[9] *See also Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 (2013) (expressing a "reluctan[ce] to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment"); *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (noting that plaintiff's "reliance on the anticipated action of unrelated third parties makes it considerably harder to show the causation required to support standing"); *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 457-58 (D.C. Cir. 2012) (observing that where agency statements "neither require nor forbid any action on the part of" plaintiff, and plaintiff is not "the object of the government action or inaction," standing "is ordinarily substantially more difficult to establish").

discussed below, undisputed material facts reveal that OCC-supervised banks either ended

relationships with Plaintiffs for their own business reasons or, in some instances, maintain

*existing* relationships with them to this day.  *See infra* Section III; *see also Nat'l Wrestling*

*Coaches Ass'n*, 366 F.3d at 943 (finding it significant that materials before the court cited

"several other factors" as contributing to third parties' decisions).  Furthermore, Plaintiffs cannot

identify any stigmatizing statements made by the OCC to these banks about their companies.

SOF ¶¶ 85-147, 155-81, 192-201.  Instead, Plaintiffs' causation-related facts consist solely of

hearsay, speculation, and conjecture—a far cry from the "formidable evidence" of causation

required at the motion to dismiss stage, let alone at the merits stage.  *See Freedom Republicans,*

*Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994).[10]  As for future terminations, each of Plaintiffs'

corporate representatives admit that their companies have no reason to believe any OCC-

supervised banks named in the Complaint that currently offer account services to them will

terminate these services in the future.  SOF ¶¶ 113, 184, 188.

    In an attempt to fill this gaping factual deficiency, Plaintiffs turn to expert reports that

opine on the causation question.  These opinions are—at best—unhelpful and unreliable.  *See*

Fed. R. Evid. 702.  Plaintiffs' expert offered no opinions on the causation issue presented here—

namely, the OCC's role in influencing banks' termination decisions—and did not address

methodological concerns previously raised by the Court.  DE 190, 195.  Moreover, Plaintiffs'

expert does not cite any OCC document or testimony in his reports that support his opinion

---

[10] *See also Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 176 (D.C. Cir. 2012) (rejecting causation theory based on third-party acts as "speculative at best"); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) (holding, on summary judgment, that "the presence and number of third-party links in this causal chain independently corroborate that appellants' claim of causation is entirely 'speculative' and insufficient for standing" (quoting *Simon*, 426 U.S. at 43 n.23).

regarding the OCC's alleged role in these decisions.  DE 190 at 25-26.  Plaintiffs' expert did not

even speak with the banks in question about the motivation for their actions; instead, the

conclusions reached in these reports rely on pure speculation.  Plaintiffs cannot "fairly trace" any

past or potential injury to OCC actions and, therefore, cannot make the necessary causation

showing.[11]

### B.  Plaintiffs Cannot Establish Redressability

Plaintiffs also lack standing because their alleged injuries are not redressable in this suit.

Because Plaintiffs cannot tie their alleged injuries to the OCC, an injunction directed at the OCC

would not remedy these injuries.  *See Freedom Republicans*, 13 F.3d at 418 ("When plaintiffs'

claim hinges on the failure of government to prevent another party's injurious behavior, the

'fairly traceable' and redressability inquiries appear to merge.").  This Court expressly held that

Plaintiffs needed evidence from the banks to prove that the relief they seek would lead banks to

restore their banking relationships.  *See* DE 63 at 23-24.  Without this evidence, Plaintiffs cannot

prove that their requested relief "would serve . . . to eliminate any effects of" the alleged

misconduct.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998).

The D.C. Circuit's decision in *Renal Physicians Ass'n v. Department of Health & Human

Services* proves instructive.  489 F.3d 1267 (D.C. Cir. 2007).  In that case, the plaintiff submitted

an affidavit from one of its members who stated that the facility where he worked had reduced

his wages as a result of a new regulatory "safe-harbor" provision.  *Id.* at 1276.  Observing that

the affidavit addressed causation and not redressability, the D.C. Circuit rejected plaintiff's

standing because it had "not alleged any facts showing that an order invalidating" the regulation

---

[11] *See Long Term Care Pharmacy All. v. Leavitt*, 530 F. Supp. 2d 173, 181 (D.D.C. 2008)
(holding that there was no standing where "plaintiffs . . . failed to provide sufficient facts to
support their contention that the [third-party conduct] is actually motivated by [agency action]").

would "cause . . . facilities to increase" wages.  *Id.* at 1278.  The court also found it

"'speculative,' rather than 'likely,' that invalidating" the regulation would "somehow cause the[]

facilities to pay more."  *Id.* at 1277 (quoting *Ctr. For Law & Educ. v. Dep't of Educ.*, 396 F.3d

1152, 1157 (D.C. Cir. 2005)).

At bottom, Plaintiffs can offer only untested assertions, not proven facts, to support their

claims about banks' likely response to their requested injunction.  Nor do any of Plaintiffs'

declarations from their employees speak to the redressability issue.  *See Emergency Coal. to

Defend Educ. Travel v. U.S. Dep't of Treasury*, 498 F. Supp. 2d 150, 159 (D.D.C. 2007).

Plaintiffs' requested injunction may therefore "have no real consequence" because it depends on

"the putative cost-benefit analysis of [banks] over whom [the Court] has no jurisdiction and

about whom it has almost no information."  *See Branton v. FCC*, 993 F.2d 906, 912 (D.C. Cir.

1993).  Plaintiffs thus cannot prove redressability and, therefore, standing.  *Lujan*, 504 U.S. at

561.[12]

## II.     PLAINTIFFS HAVE NOT BEEN DEPRIVED OF A LIBERTY INTEREST

For reasons discussed in the FDIC's Memorandum in Support of its Motion for Summary

Judgment ("FDIC Memo"), Plaintiffs have not experienced a "change in legal status" and cannot

demonstrate a due process injury.  FDIC Memo Section III(A).  The FDIC and the OCC are

similarly situated on these points; if Plaintiffs cannot demonstrate a due process deprivation, then

their claims against both agencies must fail.  In the interest of efficiency, the OCC therefore

---

[12] *See also Fla. Audubon Soc'y*, 94 F.3d at 670 (noting difficulty of establishing standing where
it "depends on predicting the acts of even a single 'interest group' who is unrepresented in the
instant litigation, especially when that group . . . is actually composed of dozens of individual
actors, each of whom must react to other market or regulatory inputs"); *Town of Babylon v.
FHFA*, 699 F.3d 221, 229, 230 (2d Cir. 2012) (holding that plaintiff had to show that "national
banks regulated by the OCC would act differently" by "resuming their *status quo ante* lending
practices" if relief were granted against the OCC).

adopts and incorporates by reference all arguments and citations to authority in Section III(A) of

the Argument in the FDIC Memo, along with all statements of undisputed fact, exhibits, and

testimony cited thereto and incorporated therein.

### A.  Plaintiffs Have Not Been Cut Off from the Banking System or Broadly Precluded from the Payday Lending Business

To briefly summarize, Plaintiffs' assert that the OCC has deprived them of a

constitutionally protected liberty interest in their reputation without due process.  DE 124 at ¶¶

132-38.  Under D.C. Circuit law, plaintiffs can assert two types of reputation-based liberty due

process claims: a "reputation-plus" claim or a "stigma-plus" claim.  The former arises when

stigmatizing statements made "in the course of the termination of employment" or nonrenewal of

a government contract "seriously damage [a plaintiff's] standing and associations in the

community."  *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998) (quoting *Paul*, 424 U.S.

at 710, and *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)).  The latter applies

when a "continuing stigma or disability arising from official action" either formally excludes the

plaintiff from his or her "chosen trade or business" or informally, but broadly, precludes plaintiff

from that trade or business.  *Id.*

Plaintiffs, who have previously alleged both types of claims, DE 153 at 13, can prevail on

neither.  *See* DE 153 at 13.  First, Plaintiffs "reputation-plus" claim fails because they have not

lost any government position or contract and, therefore, cannot establish that the OCC made

stigmatizing statements "in the course of" or "incident to" such a loss.  *See Doe v. Rogers*, 139 F.

Supp. 3d 120, 159 (D.D.C. 2015).  Second, Plaintiffs' "stigma-plus" claim fails because they

have not lost access to the banking system and thus have not suffered an "alteration of legal

status."  *Paul*, 424 U.S. at 710.  Plaintiffs have neither been "effectively . . . cut off from the

banking system" nor "'broadly preclude[d] from pursuing' the payday lending business."

DE 134 at 8-9 (quoting *Gen. Elec. Co.*, 610 F.3d at 121).  They continue to access the banking

system and continue to bank with numerous OCC-supervised banks.  SOF ¶¶ 111-13, 150, 185,

185-86, 189.  Plaintiffs also have not lost "virtually all" their payday lending business.  FDIC

Memo Section III(A); *see also* SOF ¶¶ 78, 154, 192.  In any event, the record contains no facts

suggesting that the OCC was responsible for their alleged reputational harm.  Instead, Plaintiffs'

terminations "might easily be explained in other ways" than OCC-imposed stigma.  *Taylor v.*

*Resolution Tr. Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995); *see also infra* Section III.  Plaintiffs'

"speculative, unsubstantiated contentions" to the contrary are therefore insufficient.  *Brown v.*

*District of Columbia*, 888 F. Supp. 2d 28, 33 (D.D.C. 2012).[13]

## III.   PLAINTIFFS HAVE NOT ADDUCED FACTS SHOWING THAT THE OCC PRESSURED BANKS TO TERMINATE PLAINTIFFS' ACCOUNTS

Putting aside the OCC's disavowal of Operation Choke Point and its longstanding

position that banks choose their own customers, the Court should conclude that Plaintiffs' claim

still fails because they cannot identify any stigmatizing statements made by the OCC about *them*

that resulted in a deprivation of liberty without due process.  As with all "stigma-plus" due

process claims, "[a] showing of reputational harm alone cannot suffice to demonstrate that a

liberty interest has been infringed."  *O'Donnell*, 148 F.3d at 1141.  Plaintiffs must also "show

that the harm occurred in conjunction with, or flowed from, some tangible change in status."  *Id.*;

---

[13] In a recent filing, Plaintiffs state they will seek reconsideration of the Court's holding that the loss of "*some* bank accounts" does not deprive Plaintiffs of a liberty interest.  DE 194 at 13 n.3. Under Federal Rule of Civil Procedure 54(b), courts may only reconsider legal conclusions in interlocutory orders when the movant establishes either "an intervening change in the law" or "a clear error in the first order."  *Stewart v. Panetta*, 826 F. Supp. 2d 176, 177 (D.D.C. 2011) (quoting *Zeigler v. Potter*, 555 F. Supp. 2d 126, 129 (D.D.C. 2008)).  The OCC agrees with the FDIC that neither prong applies here.  FDIC Memo Section III(A)(1)(c).  As the Court has correctly—and repeatedly—recognized, "[t]he termination of some banking relationships or some bank accounts does not constitute a change in legal status necessary to give rise to a due process violation."  DE 165 at 12 n.3; *see also* DE 134 at 8-9.

see also *Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (noting that alleged defamatory statements must be "incident to" the claimed deprivation to be a constitutional violation).  In other words, Plaintiffs must prove that they suffered "some tangible change of status vis-à-vis" stigmatizing statements made by the OCC to banks under its supervision.  *See Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1108-09 (D.C. Cir. 1985).[14]

Plaintiffs cannot identify any such stigmatizing statements, let alone connect those statements to their account terminations.  This Court has explained that Plaintiffs "must ultimately prove that [the OCC] made stigmatizing statements *about them* and that these stigmatizing statements *caused* banks to terminate their business relationships with *Plaintiffs*."  DE 134 at 19 (first and third emphases added).  Plaintiffs, in other words, cannot rely on generalized statements made about the payday lending industry.[15]  Lacking such Plaintiff-specific facts, Plaintiffs' attempts to "demonstrate a causal link between bank terminations and [the OCC's] conduct" are must fail.  DE 134 at 19.

On closer inspection, the small number of individualized statements offered by Plaintiffs in their attempt to tie account closures to the OCC actually serve to reinforce the *lack* of any causal link.  Contrary to allegations of the existence of an industry-wide ban, Plaintiffs still

---

[14] *See also Desjardins v. Willard*, 777 F.3d 43, 45 (1st Cir. 2015) (noting that the harm underlying a due process stigmatization claim must be "'directly attributable' to, and derive[] from the same source as, the challenged action" (quoting *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 9-10 (1st Cir. 2011)).

[15] *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445-46 (1915) (holding that due process protections attach to parties "exceptionally affected . . . upon individual grounds"); *see also Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007) (concluding that moratorium affecting "all 73 liquor stores" in one city ward was "the classic *Bi-Metallic* scenario"); *Pickus v. U.S. Bd. of Parole*, 543 F.2d 240, 245 (D.C. Cir. 1976) (observing that due process protections do not apply short of the "singling out of a particular person in the light of his circumstances").

patronize OCC-supervised banks.  SOF ¶¶ 111-13, 150, 185, 185-86, 189.  And those banks that did end their business relationships with Plaintiffs did so for reasons unrelated to any alleged campaign by the OCC against payday lenders.  The undisputed facts instead show that these decisions were attributable to a number of different causes: ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ .  Therefore, Plaintiffs' due process claim against the OCC fails as a matter of law.

### A. Plaintiffs Cannot Identify Any Substantive Proof to Support Their Allegations Regarding OCC-Supervised Banks

*1.* ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████   ████████████████████████

████████████████████████████████ .  SOF ¶ 127.  The company's Chief Financial Officer, Christian Rudolph opined that the "only logical reason" for the termination was regulatory pressure.  DE 87-4 ¶ 13.

The Court did not accept Plaintiffs' argument and denied that motion on February 23, 2017, finding that Plaintiffs had not shown they were likely to prove that the OCC and other defendants were engaged in a wide-ranging campaign to pressure banks to terminate their relationships with payday lenders or to demonstrate a causal link between bank terminations and the defendants' conduct.  DE 134 at 20.  At most, Plaintiffs had produced "only a few scattered statements in which Federal Defendants may have pressured a small number of banks to discontinue their relationships with specific payday lenders." *Id.* ████████████████████████



*. See also* ████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████ .

Incredibly, when discovery commenced, Plaintiffs took *no* steps to obtain any evidence or testimony from ██████████ or its management that might contradict ██████████ testimony.  Instead, Plaintiffs' efforts with regard to ██████████ were limited to seeking document discovery from the OCC and deposing ██████████ as a fact witness in May 2018.  Far from uncovering evidence in support of Plaintiffs' allegations of pressure on ██████████ Plaintiffs' tacit submission regarding this point and decision not to pursue this line of inquiry only confirms the accuracy of ██████████ prior statements.  ██ testimony plainly refuted the existence of any effort by the OCC to pressure ██████████ to terminate Advance America's accounts.  When asked in ██ deposition what ██ meant when ██ said the OCC did not ██████████ ██████████, ██████████ testified that ██ and ██ team members "[d]idn't do anything at all" to direct or pressure ██████████ to terminate the bank accounts of Advance

America or any other payday lender: "[w]e do not direct banks to terminate . . . relationships with customers."  SOF ¶ 142.

███████████████ testimony is also consistent with the statements of Advance America's senior officers, who concluded that the termination of their account at ████████ was *not* due to OCC pressure.  Contradicting his declaration, Christian Rudolph stated in an internal email that he "would bet the investigation related to ████████ relationship with ████████ and its AML controls was the trigger to exit the entire payday lending industry."  SOF ¶ 128.  ████████ had previously disclosed that, following the indictment of ████████ a major payday lender with an extensive relationship with ████████ the bank was being investigated by the Department of Justice.  SOF ¶ 129.  ████████ incurred a ████████ fine as a result of its payday lender relationships, and responded to the investigation of its payday lending relationships by exiting the entire industry.  SOF ¶ 130, 132.  Specifically, ███████████████████████████████ ███████████████████████.  SOF ¶ 131.

Moreover, documents produced by Advance America essentially acknowledge that the bank's termination of the payday lender's account was attributable to the bank's own business reasons.  Advance America's internal documents provide the following reasons for the payday lender's account closure by ████████ "Closed due to MSB" and "Reviewed Account, felt relationship no longer desirable"  SOF ¶ 133.

As for Check Into Cash, facts adduced in discovery show that ████████ terminated its relationship with that Plaintiff on or about November 10, 2016.  SOF ¶ 177.  ████████ provided no basis for the termination.  SOF ¶ 178.  Nor has any ████████ representative told Check Into Cash that it closed the account at the direction of the OCC.  SOF ¶ 181.  Instead, ████

███████████ unrebutted testimony squarely rejects any contention that the OCC played a role in the Bank's decision.  *See* SOF ¶ 179.

Having chosen not to pursue discovery from the Bank, and confronted with ████ ███████████ rejection of their allegations of pressure, Plaintiffs appeared to explore a new theory of injury during their deposition of ███████████—that the OCC examination process itself worked to pressure the ████████ to terminate Advance America and Check Into Cash. During ████ deposition, Plaintiffs' counsel questioned ███████████ at length about an MRA that the OCC imposed on the Bank in ████ following an examination of the bank's payment systems.  SOF ¶ 135-37.  The MRA, however, identified deficiencies in the Bank's BSA/AML compliance function and required the bank to "enhance monitoring of Automated Clearing House returns, and implement the monitoring of remote deposit capture and remotely created check returns to enable accurate risk rating and suspicious activity identification for payday lenders and other high-risk customers."  SOF ¶ 136.  In ██████ the OCC and ██████████ entered into a Consent Order based on ██████████████████████████████ for BSA/AML compliance.  SOF ¶¶ 138-39.  Among other actions, the Consent Order—████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

███████████ SOF ¶ 139.  Significantly, neither the ██████ MRA nor the ██████ Consent Order make any reference to reputation risk, and ███████████ testified that she was not concerned with reputation risk associated with the services that ██████████ was providing to Advance America.  SOF ¶ 140-41.

2.   ██████████████████

Any claims by Advance America with respect to its account closures at ████████████ lack factual support.  Advance America's corporate representative testified that ████████████ never provided the company with a reason why it terminated the business relationship.  SOF ¶ 85.  He also could not recall any communications between Advance America and ████████ ████████ on the topic.  SOF ¶ 86.  Significantly, Advance America documents and testimony from its corporate representatives do not attribute the termination to pressure by the OCC.  Instead, Advance America attributes the termination to concerns about compliance costs arising from the company's ownership foreign ownership structure.  SOF ¶ 88.

Plaintiffs tried to create an inference of OCC pressure during ████████████████ deposition by focusing on a chart provided to the OCC by ████████████  SOF ¶ 92.  The chart listed lines of credit extended by the ████████████ to payday lenders.  *Id.*.  Advance America's name appeared on this chart.  *Id.*  ████████████ the EIC for ████████ and *not* ████████████████ had no personal knowledge about the chart or why the OCC possessed it.  SOF ¶ 93.  But as ████████████████ the former EIC of ████████████ states in ██ declaration submitted in support of this motion, the OCC did not direct, encourage, or pressure ████████████ to terminate its customer relationships with Plaintiffs or any other payday lenders.  *Id.*  Nor was the OCC's request for the information in the chart meant to influence ████ ████████████ involvement with payday lending businesses.  *Id.*  And crucially, this exchange *postdated* the bank's termination of its relationship with Advance America, countering any implication that the OCC's request for information somehow triggered the termination.  *See* SOF ¶¶ 85, 92.

29

There is a similar lack of factual support regarding Plaintiffs' treatment of the ████

██████ termination of its business relationship with Check Into Cash.  The bank's termination

letter to Check Into Cash did not provide a reason why it chose to end its relationship with Check

Into Cash.  SOF ¶ 158.  Check Into Cash, however, alluded to a possible reason in its response,

contemporaneously noting that the company "realize[d] that banks are being sued in California

for processing ACH's for unlicensed, arguably illegal, internet payday lenders."  SOF ¶ 162.

Check Into Cash further stated it was "sad that banks servicing these unlicensed companies may

have contributed to your decision to cease doing business" with it.  *Id.*

Neither letter suggests that the OCC influenced—let alone caused—██████████

decision to drop Advance America or Check Into Cash as a client.  Instead, Plaintiffs base their

allegations on hearsay statements supposedly made by a ██████████ employee indicating

that the bank terminated the relationship due to "regulatory pressures," specifically those arising

from an unidentified agreement it had with an unnamed regulator.  SOF ¶¶ 159-63.  This

representative had no involvement in the termination decision and did not explain how the

decision had been conveyed to him, if at all.  SOF ¶ 161-62.  Such hearsay "cannot be considered

in awarding or avoiding summary judgment."  *Ragsdale v. Holder*, 668 F. Supp. 2d 7, 16

(D.D.C. 2009).  But irrespective of its hearsay status, the statement sheds no light on whether the

OCC made stigmatizing statements to ██████████ or whether any such statement actually

caused the bank to end its relationship with Check Into Cash.  *See* SOF ¶¶ 160.2, 162.

> 3.   ██████████

██████████ did not provide a reason why it ended the bank's relationship with the

company in its account termination letter to Advance America.  SOF ¶ 94.  A later email from

the ███████ simply stated that the bank had made "a risk based decision based on [Advance America's] MSB status." *Id.*

In their examination of the OCC's Federal Rule of Civil Procedure 30(b)(6) designee, Plaintiffs focused on an examiner work paper from a 2014 examination of the bank that contains a screenshot from ████████ internal compliance management system.  The screenshot states that the bank closed Advance America's accounts "due to MSB activity."  SOF ¶¶ 96.  This work paper does not suggest that pressure from the OCC caused the bank to terminate the accounts.  The work paper also contains a chart providing the bank's response to an OCC examiner's question about the bank's customer identification processes.  SOF ¶ 97.  The question is entirely neutral, relates to BSA/AML—rather than reputational risk—concerns, and does not suggest any intent to pressure the bank.  SOF ¶ 98.

The OCC's witness also testified that there was no causal link between ██████████ decision to terminate its relationship with Advance America and the OCC's supervisory activities.  *See id.*  To the extent the OCC's transactional testing looked at Advance America during the ████████ exam—again, after ██████████ had already decided to terminate its relationship with the company—these questions would have addressed whether the bank was complying with its own BSA/AML policies, not to bring about a change to the bank's customer base: "We don't tell [banks] . . . what customers they should or should not bank."  *Id.*

This testimony is also fully consistent with the OCC's post-examination letter to ██████ ████ in which the OCC noted in an MRA that transaction testing had "uncovered a licensed MSB, Advance America, which was routinely identified [by the bank] as having MSB activity during transaction monitoring but was not on the bank's identified MSB list."  SOF ¶ 99.  ████

████████████████████████████████████████████████████████████

████████████████████████████.[16]  Again, the OCC's BSA/AML assessments in

both circumstances—the latter of which was public—focused on deficiencies in the bank's

compliance processes, not deficiencies in their customer base.  Thus, statements from OCC

examiners to ███████ about Advance America were not "stigmatizing," related to

reputation risk, or the cause of the bank's decision to end its relationship with the company.

  *4.*   ███████████████████

  Plaintiffs cannot connect their allegations of OCC "pressure" to ███████ decisions

to terminate its business relationships with Advance America and Check Into Cash.  Rather,

undisputed material facts show that ███████ ended these relationships for its own strategic

reasons—reasons wholly unrelated to any supposed OCC "pressure."  In a letter to Advance

America, ███████ explained that it "consistently review[s] business plans and initiatives

across the company to ensure that they are aligned with [its] strategic plans" and that the bank

"took a range of factors into consideration and determined that [payday lending] no longer fit[]

within the Bank's strategic priorities."  SOF ¶ 102.  Similar language appeared in a separate

letter to Check Into Cash.  SOF ¶ 164.  Neither of these letters suggests that regulatory

"pressure," generally, or OCC statements, specifically, motivated these decisions.

  In contrast, Plaintiffs' case on this point relies entirely on vague, second-hand hearsay

statements allegedly from a ███████ employee indicating that the bank ended its relationship

with Advance America because of "regulatory pressure" stemming from an OCC examination.

SOF ¶ 104.  But even if the Court were to admit this unreliable and inadmissible statement, it

---

[16] SOF ¶¶ 100-01.  The consent order required the bank, among other things, to conduct a
BSA/AML assessment that included █████████████████████████████
███████████████████████████  *Id.*

does not advance their case.  Plaintiffs cannot elaborate on what this employee meant by "regulatory pressure," how the OCC allegedly applied this pressure, or the role such pressure played in the bank's decisionmaking process.  More to the point, Advance America's own internal records debunk this hearsay source—████████ terminated its relationship with the company because Advance America was a wholly owned subsidiary of a Mexican company, Grupo Elektra.  SOF ¶ 103.

     *5.*   ████████

In account termination letters sent to both Advance America and Check Into Cash, ████████ simply state that the bank decided to end the relationships because their businesses were "in an industry in which [it] do[es] not service, such as payday lenders."  SOF ¶¶ 105, 166.  Consistent with this representation, these letters referenced—and Advance America's representative acknowledged—that at the time of the account terminations, ████████ had been acquired by ████████ which had a preexisting policy of not providing banking services to payday lenders.  SOF ¶ 107.

Representatives of Advance America and Check Into Cash both testified that ████████ did not provide either company with a different reason for its decisions, let alone one that suggests any reaction to pressure by the OCC to close these accounts.  SOF ¶ 106, 167.  Instead, the record fully supports a purely business reason for the account terminations.  An internal Advance America email states that one ████████ branch stopped providing services to an Advance America location because it had "issues" with the location's "volume."  SOF ¶ 108.  To that end, Advance America's representative conceded that a bank's inability to effectively and profitably manage a customer's account activity could motivate the bank to terminate its relationship with that customer.  SOF ¶ 110.

     *6.* ██████████████████████

Plaintiffs' inclusion of ████████████ in their pleadings highlights the absence of any regulatory agenda to exclude payday lenders as customers at national banks. ████████████ maintains existing relationships with both Advance America and Check Into Cash.  SOF ¶¶ 111-13, 186-88.  In fact, ████████████ recently *expanded* both relationships.  Since January 2017, Advance America has opened approximately twenty new accounts with the bank.  SOF ¶ 112.  Check Into Cash, meanwhile, ██████████████████████████████████████████ ██████████████████████████████████.  For these reasons, ████████████████████████ ███████████████████████████████ ███████████ ████████████████████████ ██████████████████████.  SOF ¶ 113, 188.  Thus, Plaintiffs' allegations regarding ██████████████████ are meritless.

     *7.* ██████████████████████

As with the other OCC-supervised banks they name in their pleadings, Plaintiffs cannot identify any facts supporting a conclusion that the OCC pressured ██████████████ into terminating their business relationships with the bank.  In its account termination letter to Check Into Cash, for example, ██████ did not provide a reason for why it decided to sever its business relationship with the company.  SOF ¶ 169.  But as it did when ██████████████ terminated its accounts, Check Into Cash suggested a possible reason in its response.  The company observed how "sad" it was that illegal loans made by other payday lenders "may have contributed to ██████████ decision to cease doing business" with it.  SOF ¶ 172.  These statements undermine Plaintiffs' arguments that the OCC influenced or caused ██████████████ to drop Check Into Cash as a client.  Plaintiffs try to fill this factual void with half-remembered statements of a ██████████████ employee suggesting that "pressure" from unidentified regulators about unnamed issues caused it to terminate Check

Into Cash's accounts.[17]  SOF ¶ 170-71, 175-76.  This hearsay should—again—"count for

nothing" and be discarded as speculative and inadmissible.  *See Gleken v. Democratic Cong.*

*Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).

      Turning to Advance America, the company's own internal discussions and presentations

belie any argument that ███████████ terminated its relationship with the company because of

OCC "pressure."  When ██████████ closed Advance America's accounts, it did not provide a

reason.  *See* SOF ¶ 114.  An internal Advance America PowerPoint presentation, however,

records that ████████████ harbored concerns about Advance America's foreign ownership

structure.  SOF ¶ 115.  The company held this view even after it initiated this lawsuit: Advance

America's President and CEO stated in a March 19, 2015, email that "the major banks which we

have lost [relationships] have claimed it is due to" similar concerns, "not anything to do with . . .

Operation Chokepoint."  SOF ¶ 117.

      In an attempt to create an issue and thereby bolster a weak case, Plaintiffs' discovery

efforts have focused on a meeting between former Comptroller of the Currency Thomas Curry,

███████████████████████████████, and ████████████████████

███████. SOF ¶ 119.  After the meeting, ██████████ provided the OCC with a chart summarizing

the amount of ACH debits initiated by other banks, acting on behalf of payday lenders, to ████████

████████ accounts that later resulted in overdrafts—and extra fees—for █████████ customers.

SOF ¶ 120.

      This exchange, while interesting, does not advance Plaintiffs' case.  For the purposes of

Plaintiffs' cause of action against the OCC, this chart not reflect the individualized proof of

---

[17] Further demonstrating these hearsay statements' unreliability, Check Into Cash states in
another letter that ███████████ also had concerns about various "[c]ompliance problems" at the
company.  SOF ¶ 173.

causation necessary to prevail on a "stigma-plus" due process claim, if it can be deemed to be

stigmatizing at all.  *See* DE 134 at 19.  Far from showing any effort by the OCC to coerce ████

████ into terminating its business relationships with Plaintiffs, the chart reflects ████████

own concern with other banks' failure to police their customers' use of the ACH system.  The

chart and attendant emails illustrate an OCC that is focused on different concerns: excessive

ACH debiting practices and bank-issued lending products.  SOF ¶ 121.  Also noteworthy is the

fact that ████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████. *Id.*

Similarly, other OCC communications with ████████ about payday lenders reflect

OCC concerns about the institution's compliance with the BSA and its adherence to an OCC

Consent Order.  Consent Order ██████████—which the OCC issued in ██████████ ██

██████████████—requires, among other things, that ██████████ conduct ██

██████████████████ that would include "████████████████████

██████████████████" SOF ¶ 122. ██████████████████

████████████████████████████████████████

██████████████ SOF ¶ 123.  Consistent with these terms, the OCC ██████████

████████████████████████████████████████████████

███████████████████████████████. *See* SOF

¶ 124.  Plaintiffs therefore cannot point to any materials demonstrating that the OCC "pressured"

██████████ into ending its relationships with Plaintiffs because of reputation risk-related

reasons.

8. ███████████████

Like other banks, ███████████ did not provide Advance America with a reason why it closed the company's accounts—and Advance America has never sought one.  SOF ¶ 125.  The company instead assumed that ███████████ terminated the relationship because of its status as a Money Service Business.  SOF ¶ 126.  Advance America made this assumption even though ███████████ October 14, 2014 account closure letter was the only correspondence between it and the company on the issue.  SOF ¶ 125.  The letter neither mentions Advance America's status as a Money Service Business nor identifies any statements from regulators about Advance America's business activities.  Similarly, Plaintiffs cannot identify any statements, stigmatizing or otherwise, made by the OCC to ███████████ about Advance America.  Without this individualized showing, Plaintiffs cannot meet their evidentiary burden.  Accordingly, ███████████'s termination of its business relationship with Advance America does not support its due process claim against the OCC.

9. ███████████████

Plaintiffs' allegations regarding ███████████ are meritless because Plaintiffs either remain customers of the bank or had their accounts terminated for reasons clearly unrelated to OCC "pressure."  First, Check Into Cash continues to enjoy a business relationship with ███████ ██████.  SOF ¶ 183.  The bank has not terminated any of Check Into Cash's accounts and has given no indication that it will in the future.  SOF ¶ 182-83.  In fact, Check Into Cash, has recently expanded its relationship with the bank.  SOF ¶ 185.

Second, ███████████ ████████████████████████████████████████████ ████████████████████████████████████████.  A Northstate representative acknowledged in a deposition that, although the representative had previously asserted that ███████

 closed the company's accounts because of "regulatory pressure," Northstate conducts less business relative to other larger payday lenders, that  stood to make less money off its accounts than the accounts of larger payday lenders, and that  still does business with larger payday lenders.  SOF ¶ 201-02.  Moreover, 



.  Although Northstate eventually provided an incomplete set of information to the bank, it did so a week after 's deadline.  SOF ¶ 200.

Finally, Advance America's representatives admit that  did not terminate their business relationship because of stigmatizing statements made by the OCC.  In conversations with the Advance America, —like many other banks—expressed concerns about Advance America's ownership structure, specifically the company's ownership by a Mexican company, Grupo Elektra.  SOF ¶ 145.  Again, these concerns revolved around BSA/AML issues, not Plaintiffs' reputations.  *See id.*  Plaintiffs therefore cannot identify any facts showing that OCC statements caused  to end its business relationships with them.

## CONCLUSION

For these reasons, the Court should enter summary judgment for the OCC on Count II of Plaintiffs' Third Amended Complaint.

Date:   October 12, 2018

Respectfully submitted,

BAO NGUYEN
Acting Chief Counsel
CHARLES M. STEELE
Deputy Chief Counsel
GREGORY F. TAYLOR
Director for Litigation
PETER C. KOCH
Assistant Director for Litigation
/s/ Michael K. Morelli
MICHAEL K. MORELLI
Attorney – Litigation Division
Office of the Comptroller of the Currency
400 7th Street SW
Washington DC 20219
Telephone: (202) 649-6209
Facsimile: (202) 649-5709
michael.morelli@occ.treas.gov

*Attorneys for the Office of the Comptroller of the Currency and for Joseph Otting in his official capacity as Comptroller of the Currency*