IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ADVANCE AMERICA, CASH ADVANCE CENTERS INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 14-953 (TNM) |
| FEDERAL DEPOSIT INSURANCE CORPORATION, et al., | ) ) ) | |
| Defendants. | ) ) | |
| ———————————————— | ) | |

**DEFENDANTS OFFICE OF THE COMPTROLLER OF THE CURRENCY AND
JOSEPH OTTING'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

# TABLE OF CONTENTS

**Payday Lending** ........................................................................................................... 1

    Payday Lending Practices .......................................................................................... 1

    Legislative, Regulatory, and Private Initiatives Regarding Payday Lending ........................... 1

    Legal Actions against Payday Lenders and Affiliated Entities ................................................. 1

    Reasons for Banks to Terminate Payday Lenders' Accounts .................................................. 1

**The OCC's Supervision and Examination Processes** ........................................................ 2

    OCC Supervisory Responsibilities ........................................................................................ 3

    OCC Supervisory Activities ................................................................................................. 5

    Bank Secrecy Act Examinations ........................................................................................... 7

    FFIEC Guidance ................................................................................................................ 8

**Operation Choke Point** ................................................................................................ 10

    OCC Awareness of Operation Choke Point ....................................................................... 11

**Advance America** ........................................................................................................ 13

    Advance America Financials ............................................................................................. 14

    Advance America Account Terminations by OCC-Supervised Banks ................................... 14

    Advance America's Existing Banking Relationships and Access to the Banking System ...... 25

**Check Into Cash** ......................................................................................................... 25

    Check Into Cash Financials .............................................................................................. 26

    Check Into Cash Account Terminations by OCC-Supervised Banks .................................... 26

    Check Into Cash's Existing Banking Relationships and Access to the Banking System ........ 30

**Northstate Check Exchange** ........................................................................................ 31

    Northstate Financials ...................................................................................................... 31

Northstate Account Terminations by OCC-Supervised Banks ................................................ 31

Northstate's Existing Banking Relationships and Access to the Banking System ................. 33

Pursuant to Local Rule 7(h)(1), Defendant Office of the Comptroller of the Currency ("OCC") submits that there is no genuine issue as to the material facts set forth below.

**Payday Lending**

Payday Lending Practices

1.      The OCC incorporates by reference paragraphs 1-35 of the Federal Deposit Insurance Corporation's ("FDIC") Statement of Undisputed Material Facts, filed October 12, 2018, and the testimony and exhibits cited in support of those statements of undisputed material fact.

Legislative, Regulatory, and Private Initiatives Regarding Payday Lending

2.      The OCC incorporates by reference paragraphs 36-57 of the FDIC's Statement of Undisputed Material Facts, filed October 12, 2018, and the testimony and exhibits cited in support of those statements of undisputed material fact.

Legal Actions against Payday Lenders and Affiliated Entities

3.      The OCC incorporates by reference paragraphs 58-61 of the FDIC's Statement of Undisputed Material Facts, filed October 12, 2018, and the testimony and exhibits cited in support of those statements of undisputed material fact.

Reasons for Banks to Terminate Payday Lenders' Accounts[1]

4.      The OCC incorporates by reference paragraphs 62-105 of the FDIC's Statement of Undisputed Material Facts, filed October 12, 2018, and the testimony and exhibits cited in support of those statements of undisputed material fact.

---

[1] The parties have stipulated to the authenticity of the documents produced in this matter, without waiving any other evidentiary objections.

5.      Advance America CEO J. Patrick O'Shaughnessy stated in a March 19, 2015 email that

"the major banks which we have lost [relationships] have claimed it is due to" similar

concerns, "not anything to do with . . . Operation Chokepoint." Ex. 1 at AA047327.

6.      Advance America's CEO believed that to be true, as the same banks that had terminated

relationships with Advance America "continue to bank [its] competitors." *Id.*

### The OCC's Supervision and Examination Processes

7.      The OCC is an independent bureau of the Treasury Department that functions as the

primary supervisor of federally chartered (national) banks and Federal savings

associations.  12 U.S.C. § 21 *et seq.*; 12 U.S.C. § 1461 *et seq.*

8.      Specifically, the OCC is charged with "assuring the safety and soundness of, and

compliance with laws and regulations, fair access to financial services, and fair treatment

of customers by, the institutions and other persons subject to its jurisdiction."  12 U.S.C.

§ 1.

9.      The OCC administers statutory provisions governing virtually every aspect of the federal

banking system, from chartering a new institution to appointing a receiver for an

insolvent bank.  12 U.S.C. §§ 21, 191, 1464.

10.     The OCC has broad authority to "make a thorough examination of all the affairs of the

bank[s]" it supervises.  12 U.S.C. § 481; *see also* 12 U.S.C. § 1463 (authorizing the

Comptroller to provide for the examination and safe and sound operation of Federal

savings associations).

11.     The OCC does not tell banks who their customers should be, provided that a bank

customer may lawfully hold a bank account under U.S. law.  Instead, the OCC requires

that a bank have risk management systems and procedures commensurate with the risks

that the bank assumes in its various lines of business and with respect to the categories of

customers, including higher risk customers, to whom it provides banking services.  In this

respect, the OCC does not have any practice, policy, or guidance prohibiting or

discouraging banks from offering banking services to payday lenders.  Ex. 93, Gardineer

Decl. ¶ 11.

OCC Supervisory Responsibilities

12.  The Federal Deposit Insurance Act ("FDI Act") requires that the OCC prescribe, by

regulation or guideline, certain "standards for safety and soundness" regarding a bank's

operation and management, its asset quality, earnings and stock valuation, and its

compensation of its employees," and "such other operational and managerial standards as

the agency determines to be appropriate."  *See* 12 U.S.C. § 1831p-1(a)-(c).

13.  The Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.* ("BSA"), meanwhile, forms the

primary U.S. anti-money laundering law and establishes requirements for record keeping

and reporting by individuals, banks, and financial institutions ("BSA/AML

requirements").

14.  Section 326 of the USA PATRIOT Act amended the BSA by requiring banks to establish

and maintain a Customer Identification Program ("CIP"), under which financial

institutions must implement reasonable procedures for: (1) verifying the identity of any

person seeking to open an account, to the extent reasonable and practicable; (2)

maintaining records of the information used to verify the person's identity, including

name, address, and other identifying information; and (3) determining whether the person

appears on any lists of known or suspected terrorists or terrorist organizations provided to

the financial institution by any government agency.  31 U.S.C. § 5318(*l*).

15.     To that end, and pursuant to its authority under the Act, the OCC has promulgated

        regulations requiring OCC-supervised institutions to have written, board-approved

        programs that are reasonably designed to assure and monitor compliance with the BSA.

        12 C.F.R. § 21.21.

16.     OCC regulations also implement another portion of the BSA, 31 U.S.C. § 5318(g),

        requiring all national banks and Federal savings associations to file a Suspicious Activity

        Report ("SAR") when its employees detect "known or suspected" violations of federal

        law or a suspicious transaction related to a money laundering activity or a violation of the

        BSA.  12 C.F.R. § 21.11.

17.     Specifically, OCC regulations require banks, bank holding companies, and their

        subsidiaries to file a SAR with respect to: criminal violations involving insider abuse in

        any amount; criminal violations aggregating $5,000 or more when a suspect can be

        identified; criminal violations aggregating $25,000 or more regardless of a potential

        suspect; transactions conducted or attempted by, at, or through the bank (or an affiliate)

        and aggregating $5,000 or more, if the bank or affiliate knows, suspects, or has reason to

        suspect that the transaction (i) may involve potential money laundering or other illegal

        activity, (ii) is designed to evade the BSA or its implementing regulations, or (iii) has no

        business or apparent lawful purpose or is not the type of transaction that the particular

        customer would normally be expected to engage in, and the bank knows of no reasonable

        explanation for the transaction after examining the available facts, including the

        background and possible purpose of the transaction.  *Id.*; *see also* 12 C.F.R. § 163.180.

18.     These BSA/AML requirements not only direct an institution to report actual or suspected

        violations of law committed or attempted against the bank, but also to maintain a BSA

compliance program that monitors customer activity for indications that the institution is facilitating a criminal violation.  12 C.F.R. § 21.11(c).

<u>OCC Supervisory Activities</u>

19.     Pursuant to its supervisory responsibilities, the OCC provides guidance on how it supervises national banks and Federal savings associations in the *Comptroller's Handbook*, a series of booklets describing various aspects of the supervisory process. Office of the Comptroller of the Currency, "Comptroller's Handbook" Webpage, *available at* https://occ.gov/publications/publications-by-type/comptrollers-handbook/index-comptrollers-handbook.html.

20.     As described in the *Bank Supervision Process* booklet, the OCC uses a risk-based supervisory approach that focuses on evaluating risk, identifying material and emerging concerns, and requiring banks to take timely corrective action.  The risk-based approach concentrates on systemic risks; the OCC allocates greater resources to areas of higher risk by evaluating a bank's internal risk management system and determining whether that system adequately identifies, measures, monitors, and controls risk. Ex. 2 at 28.

21.     In executing this approach, the OCC utilizes a Risk Assessment System ("RAS").  The RAS is a concise method of communicating and documenting conclusions regarding eight specific categories of risk that may have an impact on the safety and soundness of a financial institution: credit risk, interest rate risk, liquidity risk, price risk, operational risk, compliance risk, strategic risk, and reputation risk.  *Id.* at 24-27.

22.     The OCC's *Comptroller's Handbook* booklet, "Compliance Management Systems" ("CMS Booklet") is prepared for use by OCC examiners in connection with their examination and supervision of national banks, Federal savings associations, and Federal

branches and Federal agencies.  The CMS Booklet defines *risk* for supervisory purposes as "the potential that events will have an adverse effect on a bank's current or projected financial condition and resilience."  The primary risks associated with a bank's compliance management systems are compliance, operational, strategic, and reputation risks.  Ex. 3 at 5; Ex. 93, Gardineer Decl. ¶ 9].

23.   As defined in the *Compliance Management Systems* booklet, reputation risk is "the risk to earnings, capital, or enterprise value arising from negative public opinion.  This risk may impair the bank's competitiveness by affecting its ability to establish new relationships or services or continue servicing existing relationships."  The CMS Booklet also notes that "[i]nadequate policies and procedures, operational breakdowns, or other weaknesses in the bank's CMS can harm its reputation when these weaknesses result in violations of consumer protection-related laws or regulations, particularly when consumers are harmed."  Ex. 3 at 5; Ex. 93, Gardineer Decl. ¶ 10.

24.   The OCC's supervisory activities over national banks fall into three groups: ongoing supervision, full-scope examinations, and target examinations.  Ex. 2 at 14-15.

25.   Ongoing supervision is the OCC's process for assessing risks and reviewing core knowledge about a bank on an ongoing basis. Information derived from ongoing supervisory activities inform the OCC's periodic examination strategy in full-scope and targeted examination process.  *Id.* at 14-15.

26.   Full-scope, on-site examinations of all national banks must occur every 12 or 18 months, and survey a broad range of bank products, functions, and risks.  12 U.S.C. § 1820(d),

27.   Targeted examinations do not fulfill all of the requirements of the full-scope examination, but may fulfill a portion of those requirements.  Ex. 2 at 11, 14-15.

28.   The OCC's supervisory approach does not prohibit banks from doing business with any category of customer, provided the customer may lawfully hold a bank account under U.S. law.  Ex. 103, Schwartz Tr. 81:15-82:1; Ex. 93, Gardineer Decl. ¶ 11.

29.   The OCC uses a number of supervisory actions in its regulation of banks, including Matters Requiring Attention, violations of law or regulation, and enforcement actions. Ex. 2 at 44-49.

30.   The OCC uses Matters Requiring Attention, or MRAs, to communicate concerns about a bank's deficient practices.  MRAs describe a deficient bank practice and how it deviates from sound governance, internal controls, risk management principles, or laws or regulations.  Ex. 2 at 11, 44-46; Ex. 93, Gardineer Decl. ¶ 6.

31.   A violation of law or regulation is an act (or failure to act) that deviates from, or fails to comply with, a statutory or regulatory requirement.  Violations are often the result of deficient practices.  Ex. 2 at 46-47.

### Bank Secrecy Act Examinations

32.   The OCC examines banks for compliance with the Bank Secrecy Act during every supervisory cycle.  12 U.S.C. § 1818(s)(2); Ex. 2 at 15-17.

33.   Serious BSA/AML deficiencies can affect a bank's safety and soundness.  Ex. 101, Oldenborg Tr. at 75:12-13.

34.   The OCC expects banks to monitor their customer relationships and conduct due diligence to ensure that they are aware of all risks posed by their customers and that those customers are conducting their businesses lawfully.  Ex. 103, Schwarz Tr. 26:2-9, 81:6-14; Ex. 101, Oldenborg Tr. 26:20-27:4, 29:3-13; *see also* 12 C.F.R. 21.21(d).

35.    Recognizing this, and consistent with its general supervisory approach, the OCC uses

risk-based transaction testing to assess a bank's timely investigation and resolution of

transactions potentially posing BSA-related risk  Ex. 2 at 16-17.

## FFIEC Guidance

36.    The Federal Financial Institutions Examination Council ("FFIEC") is charged with

prescribing uniform standards for examinations of financial institutions, and its members

include the OCC.  12 U.S.C. § 3301.

37.    The FFIEC's manual on BSA examination procedures states that:

> The same risk management principles that the bank uses in traditional
> operational areas should be applied to assessing and managing BSA/AML
> risk.  A well-developed risk assessment assists in identifying the bank's
> BSA/AML risk profile.  Understanding the risk profile enables the bank to
> apply appropriate risk management processes to the BSA/AML
> compliance program to mitigate risk.  This risk assessment process
> enables management to better identify and mitigate gaps in the bank's
> controls.  The risk assessment should provide a comprehensive analysis of
> the BSA/AML risks in a concise and organized presentation, and should
> be shared and communicated with all business lines across the bank, board
> of directors, management, and appropriate staff; as such, it is a sound
> practice that the risk assessment be reduced to writing.

Ex. 4 at 18.

38.    The FFIEC manual identifies BSA risks associated with "nonbank financial institutions"

("NBFIs"), defined as "institutions other than banks that offer financial services," and

requires heightened due diligence for NBFIs.  *Id.* at 299.

39.    The FFIEC BSA Manual identifies cash-intensive businesses, TPPPs, and ACH

transactions as posing elevated BSA risks to banks requiring special attention from

examiners.  *Id.* at 217, 235, 322.

40.    MSBs and "[l]oan or finance companies" are specifically identified as NBFIs, and

payday lenders are NBFIs as well.  *Id.* at 299.

41. Risks associated with these businesses depend on, *inter alia*, the types of products and services offered, the level of activity, and the purpose of the account, though the evaluation of risk is always done on a case-by-case basis. *Id.* at 300.

42. The manual explains that each of those categories of customers may carry out money laundering and other criminal violations absent careful monitoring. *Id.* at 217, 235, 322.

43. The manual sets forth procedures for banks to evaluate NBFIs for risk factors and institute appropriate controls for mitigating BSA risk. *Id.* at 300-03.

44. The manual describes ways banks can mitigate the BSA risks associated with these customers and activities and recommends special examination procedures to assess banks' due diligence and monitoring procedures for these customers. *Id.* at 225, 239, 324.

45. A bank's due diligence for NBFIs should be commensurate with the level of risk. *Id.* at 299.

<u>OCC Supervisory Actions</u>

46. The OCC can bring enforcement actions against institutions and affiliated parties that violate laws or regulations or engage in unsafe and unsound practices. *See* 12 U.S.C. §§ 1818(b), (c), (d), (e), (i).

47. The OCC uses enforcement actions to require a bank's board and management to take timely actions to correct a bank's deficiencies. Ex. 2 at 47.

48. Concerns in MRAs, violations of law or regulation, and other unsafe or unsound practices may serve as the basis for an enforcement action, particularly when a bank's deficiencies are severe and uncorrected. Ex. 2 at 47; Ex. 93, Gardineer Decl. ¶ 6.

49.  In circumstances where an enforcement action is warranted, the OCC may "issue and

     serve upon . . . such party a notice of charges constituting the alleged violation" and, after

     notice and hearing, determine whether the issuance of a permanent cease and desist order

     is warranted.  12 U.S.C. § 1818(b)(1), (6).

50.  The OCC may also use informal supervisory actions, such as board resolutions,

     memoranda of understanding, and formal agreements, to address weaknesses in a bank's

     controls before such weaknesses become serious.  Ex. 2 at 47; Ex. 93, Gardineer Decl.

     ¶ 7.

51.  The mildest form of informal supervisory action is what the OCC calls *moral suasion*.  It

     occurs when OCC examiners engage in frank conversations with bank managers, often

     following an examination where problems are first noted.  Ex. 93, Gardineer Decl. ¶ 7.

52.  When using moral suasion in the context of BSA/AML compliance, OCC examiners may

     suggest that bank managers reevaluate offering services to higher risk customers in cases

     where a bank's risk management systems may not be sufficiently robust to properly

     manage such risks.  Ex. 93, Gardineer Decl. ¶ 7.

53.  When OCC examiners use moral suasion, it is always bank management's decision as to

     whether the bank will follow such advice.  Ex. 93, Gardineer Decl. ¶ 7.

### Operation Choke Point

54.  In November 2012, the Department of Justice's Civil Division began investigating

     financial institutions and third-party payment processors that had processed transactions

     on behalf of merchants engaged in fraudulent activities.  Ex. 5 at OCC-AA-00001542-53.

55.  The Justice Department was concerned that the banks in question had ignored warning

     signs of fraud.  *Id.*

56.   The Justice Department called this anti-fraud initiative Operation Choke Point.  *Id.*

OCC Awareness of Operation Choke Point

57. The OCC has repeatedly stated that it "is not now, nor has it ever been part of Operation

[Choke Point].  That has been, is, and will continue to be the policy of this agency."  Ex. 6,

*available at* https://www.consumerfinancemonitor.com/wp-

content/uploads/sites/14/2017/08/Noreika-August-2017-letter.pdf; *see also, e.g.*, Ex. 7,

*available at* https://occ.gov/news-issuances/congressional-testimony/2014/pub-test-2014-

101-oral.pdf; Ex. 8 at 1, *available at* https://www.occ.gov/news-

issuances/speeches/2017/pub-speech-2017-110.pdf; Ex. 9 at OCC-AA-00001026-1027.

58.   The OCC first became aware of the Department of Justice's ("DOJ") concerns with third-

party payment processors when, starting in July 2012, it began attending meetings of the

Financial Fraud Enforcement Task Force's Consumer Protection Working Group.  Ex. 10

at OCC-AA-00003753; Ex. 11 at OCC-AA-00003755.

59.   DOJ did not discuss its investigatory goals, subjects, or strategies during these meetings.

Ex. 12 at OCC-AA-00003659.

60.   In June 2013, two Justice Department attorneys made a presentation about Operation

Choke Point at a conference, which OCC staff attended.  Ex. 101, Oldenborg Tr. 18:18-

19:1.

61.   Soon after the June 2013 conference, DOJ submitted multiple written requests to the

OCC pursuant to 12 C.F.R. Part 4, Subpart C for confidential supervisory examination

information about several OCC-supervised banks.  Ex. 13 at OCC-AA-00007036.

62.    These written requests did not mention Operation Choke Point, but noted they were related to an investigation into bank relationships with third-party payment processors. Ex. 99, LaRoche Tr. 37:13-20.

63.    The OCC has an administrative process to handle such requests. *See* 12 C.F.R. Part 4, Subpart C.

64.    When not prohibited by law, the OCC routinely provides other federal agencies, including DOJ, with bank examination reports and other non-public OCC information if these materials are requested by, and necessary for, those agencies to perform their official duties. *Id.*

65.    The OCC's Enforcement and Compliance Division processed DOJ's requests, but did not otherwise provide DOJ with information beyond that in the requests. Ex. 99, LaRoche Tr. 23:11-15; 24:21-25:9.

66.    The Justice Department later issued approximately 20 subpoenas to OCC-supervised banks. Ex. 14 at OCC-AA-00006985.

67.    In August 2013, the OCC scheduled a conference call with the Justice Department to discuss the subpoenas and the scope of the Department's investigations. Ex. 15 at OCC-AA-00001349; Ex. 16 at OCC-AA-00006975; Ex. 101, Oldenborg Tr. 136:10-20.

68.    The Department requested that the call include a discussion of document requests made to the OCC and "ideas" about how the OCC could "more effectively address TPPP [Third Party Payment Processor] abuses and consumer fraud." Ex. 17 at OCC-AA-00006973.

69.    The conference call did not take place. Ex. 101, Oldenborg Tr. 138:15-17.

70.    The OCC made the decision to limit its communications with Department officials on this subject to logistical issues surrounding the requests for examination information and

the subpoenas.  Ex. 101, Oldenborg Tr. 139:7-10; Ex. 14 at OCC-AA-00006985; Ex. 18 at OCC-AA-00001344; Ex. 19 at OCC-AA-00007015; Ex. 20 at OCC-AA-00007028.

71.    Prompted by media reports of Operation Choke Point, OCC staff  prepared a PowerPoint slide and briefing for the former Comptroller of the Currency, Thomas Curry, in September 2013 to provide a "baseline understanding" of the ACH network and of "current challenges in the system," including federal and state enforcement activities in the payday lending space.  Ex. 101, Oldenborg Tr. 120:12-121:10; Ex. 21 at OCC-AA-00001255-1270.

72.    That presentation discussed Department of Justice-issued subpoenas to OCC-supervised banks.  Ex. 21 at OCC-AA-00001265.

73.    Following the presentation to Comptroller Curry, the OCC issued a supervisory tip to its examiners about the risks posed by the ACH system.  Ex. 101, Oldenborg Tr. 139:17-140:6.

74.    The supervisory tip was intended "to remind [OCC examiners] of existing guidance" regarding the detection of unusual activity in the payments space and to "avoid overzealous exam practices."  Ex. 22 at OCC-AA-00001034-1036.  The OCC did not deem any other guidance necessary.  *See* Ex. 101, Oldenborg Tr. 139:17-140:6.

### Advance America

75.    Advance America has been in operation since 1997.  Ex 102, Rudolph Tr. 52:2-3.

76.    Advance America offers storefront and online payday loans, along with title loans, installment loans, lines of credit and, other ancillary services.  *Id.*, Rudolph Tr. at 74:2-17.

77.     Some, though not all, of Advance America's subsidiaries are registered with the Financial

        Crimes Enforcement Network as money service businesses.  *Id.*, Rudolph Tr. 80:21-81:1-

        2.

Advance America Financials

78.     The OCC incorporates by reference paragraphs 110-42 of the FDIC's Statement of

        Undisputed Material Facts, filed October 12, 2018, and the testimony and exhibits cited

        in support of those statements of undisputed material fact.

Advance America Account Terminations by OCC-Supervised Banks[2]

79.     Since 2007, ▮ banks have terminated relationships with Advance America.  Ex. 23 at

        AA584123; Ex. 24 at AA258977.

80.     Count II of Plaintiffs' Third Amended Complaint is limited to terminations initiated by

        nine OCC-supervised banks.  *See* Docket Entry ("DE") 124.

81.     None of the terminating banks has told Advance America that the company's account

        was terminated at the direction of the OCC.  *See infra* SOF ¶¶ 85-147.

82.     None of the terminating banks has attributed the termination to stigmatizing statements

        by the OCC.  *See id.*

83.     Advance America created internal documents purporting to reflect the reasons for banks'

        decisions to terminate relationships with Advance America.  Ex. 23 at AA584123; Ex. 24

        at AA258977; *see also, e.g.*, Ex. 102, Rudolph Tr. 162:2-69:19.

---

[2] The documents setting forth banks' reasons for terminating their business relationships with each of the plaintiffs may contain, or consist entirely of, inadmissible hearsay.  The OCC offers these documents provisionally, as background material, without taking a position on whether they qualify for some hearsay exception, or whether those statements could ultimately be converted to an admissible form for use at trial.  *See Gleklen v. Democratic Congressional Campaign Comm.,* 199 F.3d 1365, 1369 (D.C. Cir. 2000) (summary judgment material "must be capable of being converted into admissible evidence.").

84.   Advance America created a similar document to respond to Defendants' interrogatories, and recognized its responsibility to make that document as accurate as possible.  Ex. 26 at A; Ex. 102, Rudolph Tr. 155:16-160:6, 169:15-19.

████████████████

85.   On or about December 7, 2012, ████████████ terminated its relationship with Advance America, providing no explanation for its termination of the relationship.  Ex. 100, Nelson Tr. 227:8-14; *see also* Ex. 25 at AA258976.

86.   Advance America's corporate designee could not recall any specific communications he had with ████████████ on the topic.  Ex. 100, Nelson Tr. 227:8-14.

87.   Advance America's internal documents state "No MSB" and "High Risk" as the basis for that termination.  Ex. 23 at AA584123.

88.   Internal Advance America documents and Advance America testimony reflect that Bank of America terminated that relationship because of Advance America's foreign ownership structure.  Ex. 27 at AA268445; Ex. 28 at AA367279; Ex. 29 at AA197600.

89.   Another internal Advance America email attributed the termination to "industry/MSB requirements."  Ex. 30 at AA420472.

90.   Advance America's CEO J. Patrick O'Shaughnessy has attributed this relationship termination to compliance costs arising from Advance America's foreign ownership.  Ex. 96, Calomiris Tr. 172, 182-83, 214-16, 221-23.

91.   The OCC did not direct, encourage, or pressure ████████████ to terminate its customer relationships with Plaintiffs or with any other payday lenders.  Ex. 92, ████████████ Decl. ¶¶ 4-5.

92.     An Excel chart sent to the OCC in December 2013 by a ████████████ employee, entitled "Payday Loans Dec 17 2013.xlsx," listed lines of credit extended by ████████ ████████ to payday lenders, including Advance America.  Ex. 31 at OCC-AA-00003815-3816; Ex. 32 at OCC-00004033-4035.

93.     The OCC's request for the information contained in this was not part of any OCC effort to influence ████████████'s involvement with payday lending businesses.  Ex. 92, ████████████ Decl. at ¶¶4-5; *see also* Ex. 97, ████████████ Tr. 39:17-41:18.

████████████████████

94.     On or about April 22, 2014, ████████████ terminated its relationship with Advance America; although the bank's account termination letter did not include a reason for the termination, a later email from the bank stated that "it was a risk based decision based on MSB status."  Ex. 34 at AA004941; Ex. 35 at AA401203.

95.     Advance America's internal documents state "Closed due to MSB" as the basis for the termination.  Ex. 23 at AA584123.

96.     A 2014 OCC examiner work paper contained a screenshot from ████████████'s internal compliance system indicating that the bank closed Advance America's accounts "due to MSB activity."  Ex. 103, Schwartz Tr. Ex. 16.

97.     The work paper also contained a chart providing the bank's response to an OCC examiner's question about the bank's customer identification processes under the Bank Secrecy Act.  Ex. 36, Schwartz Tr. Ex. 16; *see also* Ex. 103, Schwartz Tr. 79:11-22.

98.     The OCC examiner's question centered on bank processes, not bank customers, because the OCC does not "tell [banks] what customers they should or should not bank."  Ex. 103; Schwartz Tr.77:11-22; 81:15-82:1; 83:21-84:8.

99.     In a post-examination letter, the OCC noted in an MRA that transaction Testing had

"uncovered a licensed MSB, Advance America, which was routinely identified [by the

bank] as having MSB activity during transaction monitoring but was not on the bank's

identified MSB list."  Ex. 38, Schwartz Tr. Ex. 15; *see also* Ex. 36; Schwartz Tr. Ex. 16.

100.    The MRA ultimately became part of an OCC Consent Order, issued in ███████████,

addressing BSA/AML deficiencies at the bank.  Ex. 39, ██████████████████████

██████████████████████████

███████████████████████████.

101.    The Consent Order required the bank, among other actions, to ████████████████

█████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ *Id.* at 6-8.

████████████████████████

102.    On or about April 10, 2014, ██████████ Bank terminated its relationship with Advance

America, stating that it "consistently review[s] business plans and initiatives across the

company to ensure that they are aligned with [its] strategic plans" and that the bank "took

a range of factors into consideration and determined that [payday lending] no longer fit[]

within the Bank's strategic priorities."  Ex. 40 at AA004942-4944.

103.    Advance America's internal documents state "Closed due to MSB" and "No new

accounts due to MSB and Mexican ownership" as the basis for the termination.  Ex. 1 at

AA047327; Ex. 23 at AA584123; Ex. 40, Nelson Tr. Ex. 5; *see also* Ex. 100, Nelson Tr.

150:1-15; Ex. 102, Rudolph Tr. 189:18-190:21.

104.   In conversations with Advance America personnel, a Capital One employee indicated

that the bank ended the relationship because of "regulatory pressure" stemming from an

OCC examination.  Ex. 102, Rudolph Tr. 180:12-181:7; Ex. 100, Nelson Tr. 210:10-

211:17.

███████████

105.   On or about October 21, 2016, ████████ terminated its relationship with Advance

America, stating it had "decided to close your account because the business is in an

industry in which we do not service, such as payday lenders."  Ex. 42 at AA004960-

4963.

106.   ████████ did not provide Advance America with any other reason for its decision.

Ex. 102, Rudolph Tr. 245:18-246:4.

107.   An internal Advance America email indicated that the bank terminated the relationship

because it had been purchased by ████████, a bank with a policy of not servicing

payday lenders.  Ex. 43 at AA210813-14; Ex. 102, Rudolph Tr. 315:13-316:13.

108.   Another internal Advance America email reflected that at least one ████████

branch "has issues with [Advance America's] volume [of transactions] and does not want

to service us."  Ex. 44 at AA262666.

109.   Advance America's internal documents state "Closed due to MSB" as the basis for the

termination.  Ex. 23 at AA584123.

110.   Advance America's representative conceded that ████████'s inability to effectively and

profitably manage a customer's account could induce the bank to terminate its

relationship with the company.  Ex. 102, Rudolph Tr. 243:7-22.

██████████████

111.   ████████████████ maintains an existing business relationship with Advance America. Ex. 100, Nelson Tr. 136:6-8.

112.   Since January 2017, Advance America has opened approximately ███ new accounts with ████████████. Ex. 100, Nelson Tr. 135:16-136:19; Ex. 45 at AA260244.

113.   █████████████████████████████████ ████████████ ██████████ ████████████████████████████████████████████ ████████████████

114.   On or about June 28, 2013, ████████████ terminated its relationship with Advance America.  Advance America's internal documents state "Closed due to MSB" as the basis for that termination.  Ex. 46 at AA004945; Ex. 24 at AA258977; Ex. 100, Nelson Tr. 173:20-174:1; 232:4-17.

115.   Internal Advance America emails and presentations reflect that the termination was caused by Advance America's foreign ownership structure.  Ex. 30 at AA420472; Ex. 100, Nelson Tr. 172:5-17; Ex. 29 at AA197600; Ex. 47, Rudolph Tr. Ex. 22; Ex. 102, Rudolph Tr. 218:7-219:20.

116.   Another internal Advance America email attributed the termination to "industry/MSB requirements."  Ex. 30 at AA420472.

117.   Advance America CEO J. Patrick O'Shaughnessy stated in a March 19, 2015 email that "the major banks which we have lost [relationships with] have claimed it is due to" similar concerns, "not anything to do with . . . Operation Chokepoint."  Ex. 1 at AA047327.

118.   Advance America's CEO believed that to be true, as the same banks that had terminated

relationships with Advance America "continue to bank [its] competitors."  *Id.*

119.   On April 12, 2013, a meeting occurred between former Comptroller of the Currency

Thomas Curry, former OCC Senior Deputy Comptroller Martin Pfinsgraff, and

██████████████████████. Ex. 101, Oldenborg Tr. 46:11-49:13]; *see also* Ex.

48 at OCC-AA-00001378.

120.   After the meeting, ████████ provided the OCC with a chart summarizing the amount of

ACH debits initiated by other banks, acting on behalf of payday lenders, to ████████

accounts that later resulted in overdrafts for ██████ customers.  Ex. 49 at OCC-AA-

00007104-06.

121.   The chart was forwarded to other OCC officials because of concerns that the chart

indicated potential issues in ACH system processes and bank-issued lending products.

These concerns were unrelated to reputation risk and were raised after ██████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████; Ex. 48 at OCC-AA-00001378]; Ex. 49 at OCC-AA-00007104-06; Ex.

51 at OCC-AA00007081-82; Ex. 52 at OCC-AA-00007091-98; Ex. 53 at OCC-AA-

00007120; Ex. 54 at OCC-AA-00007121-25; Ex. 55 OCC-AA-00007131-33; Ex. 100,

Oldenborg Tr. 46:11-49:13.

122.   Several months before the meeting took place, the OCC issued a consent order which

required, among other actions, that ██████ conduct ████████████████████

███████ that would include █████████████████████████████████████

███████ Ex. 56, █████████████████████████████████████

█████████████████████████████████████████████████████

██████

123.   ████████████████████████████████████████████████

       ████████████████████████████████████ *Id.*

124.   Consistent with these terms, the OCC ████████████████████████████

       ████████████████████████████████████████████████

       ██████████████████████████████████. *See* Ex. 52 at OCC-AA-

       00007091-98; Ex. 53 at OCC-AA-00007120; Ex. 54 at OCC-AA-00007121-25; Ex. 55 at

       OCC-AA-00007131-33.

                            ████████████████

125.   On or about August 30, 2014, ████████████████ terminated its relationship with

       Advance America with no explanation.  Ex. 57 at AA004951.  Advance America has

       received no other reason for the termination since that time.  Ex. 102, Rudolph Tr.

       317:15-22.

126.   Advance America's internal documents state "Closed due to MSB" as the basis for the

       termination.  Ex 40, Nelson Tr. Ex. 5.

                            ████████████████

127.   On or about November 1, 2016, ████████████████ terminated its relationship with

       Advance America.  Ex. 58 at AA004994-4996.

128.   In an internal email, Advance America's Chief Financial Officer, Christian Rudolph,

       stated that he "would bet the investigation related to ███████████ relationship with ██████

███████ and its AML controls was the trigger to exit the entire payday lending industry."
Ex. 59 at AA250351.

129.   ███████ had previously disclosed that, following the indictment of ███████, a major
payday lender with an extensive relationship with ███████, it was ████████████████
████████████████. Ex. 60 at 76-77.

130.   ████████████████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
███████.

131.   Specifically, ███████ was fined for the inadequacies of its Bank Secrecy Act/Anti-
Money-Laundering compliance program. *Id.*

132.   ███████ responded to the investigation of its payday lending relationships by exiting
the entire industry. Ex. 59 at AA250351; Ex. 102, Rudolph Tr. at 250-51.

133.   Advance America's internal documents state "Closed due to MSB" and "Reviewed
Account, felt relationship no longer desirable" as the basis for the termination. Ex. 23 at
AA584123.

134.   Advance America represented to the Court shortly after the ███████ account
termination that the "only logical reason" for the termination was regulatory pressure, but
that was not accurate. Ex. 102, Rudolph Tr. 302-14.

135.   On or about October 8, 2014, the OCC issued a supervisory letter to ███████ following
an examination of the bank's payment systems. Ex. 62, ███████ Tr. Ex. 3.

136.   In a section of the letter labeled "New MRAs," the OCC stated that "[m]anagement needs
to enhance monitoring of Automated Clearing House (ACH) returns, and implement

monitoring of Remote Deposit Capture (RDC) and Remotely Created Check (RCC)

returns, to enable accurate risk rating and suspicious activity identification for Payday

Lenders and other high risk customers." *Id.*; *see also* Ex. 97, ███████ Tr. at 44-45,

49-58.

137.   The supervisory letter does not reference reputation risk.  Ex. 62, ███████ Ex. 3.

138.   On or about ███████, ███████ entered into a consent order with the OCC

based on "███████████████████████████████████. Ex.

63, ██████████████████████████████████████

████████████████████████████████.

139.   The Consent Order███████████ requires███████ to ███████

██████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████ *Id.*

140.   The Consent Order does not reference reputation risk.  *Id.*

141.   The OCC's Examiner-in-Charge for ███████, ███████████, stated in a

declaration that ██████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████ ██

███████.

23

142. The OCC ███████████████████████████████████ and █
     █████████████ to ██████████████ into terminating Advance
     America's accounts.  Ex. 97, ███████ Tr. 63-65.

143. Nor did the OCC have any stated concerns with reputation risk associated with the
     services that ██████ was providing to Advance America in years preceding its
     termination of Plaintiff's account.  █████; Ex. 97, ███████ Tr. 23, 62-67.



144. On or about July 20, 2013, ███████████ terminated its relationship with Advance
     America; Advance America's internal documents state "no MSB" and "High Risk" as the
     basis for that termination.  Ex. 23 at AA584123.

145. Internal Advance America emails reflect that ██████████ terminated the relationship
     because of Advance America's foreign ownership structure.  Ex. 1 at AA047327; Ex. 28
     at AA367279; Ex. 29 at AA197600; Ex. 100, Nelson Tr. at 150:16-151:18 and 172; Ex.
     102, Rudolph Tr. at 212:6-21, 215:8-18, and 217:4-14; Ex. 96, Calomiris Tr. 172-182,
     214-16, 221-23.

146. Another internal Advance America email attributed the termination to "industry/MSB
     requirements."  Ex. 30 at AA420472.

147. Advance America's own CEO has attributed this relationship termination to compliance
     costs arising from Advance America's foreign ownership.  Ex. 96, Calomiris Tr. at 172,
     182-83, 214-16, 221-23.

<u>Advance America's Existing Banking Relationships and Access to the Banking System</u>

148.     The OCC incorporates by reference paragraphs 274-82 of the FDIC's Statement of

Undisputed Material Facts, filed October 12, 2018, and the testimony and exhibits cited

in support of those statements of undisputed material fact.

149.     Advance America has expanded its relationship with ███████████, adding

approximately ██ accounts, since early 2017.  Ex. 100, Nelson Tr. at 135:16-136:19]; Ex.

45 at AA260244.

150.     Advance America also maintains relationships with numerous banks for which the OCC

is the primary federal regulator, including: ████████████████████

████████████████████████████

████████████████████████████

██████████████████████████████

████████████████████████████

████████████████████████

████████████████████████

██████████████████████████

████████████████.  Ex. 23 at AA584123;

https://www.ffiec.gov/consumercenter/default.aspx.

**Check Into Cash**

151.     Check Into Cash offers storefront and online payday loans, along with lines of credit,

check cashing, bill-pay, and other services.  Ex. 98, Lane Tr. at 32, 58-59, 67-73.

152.     Check Into Cash has been in business since at least 2002.  Ex. 98, Lane Tr. at 24.

153.     Check Into Cash is registered as an MSB with FinCEN.  Ex. 64 at CIC000694.

Check Into Cash Financials

154. The OCC incorporates by reference paragraphs 286-307 of the FDIC's Statement of

Undisputed Material Facts, filed October 12, 2018, and the testimony and exhibits cited

in support of those statements of undisputed material fact.

Check Into Cash Account Terminations by OCC-Supervised Banks[3]

155. Since 2010, ██ banks have terminated relationships with Check Into Cash.  Ex. 65, Check

Into Cash Responses to First Set of Interrogatories, Ex. A.

156. None of them has attributed the termination decision to the OCC, or to any other

defendants.  Ex. 98, Lane Tr. at 245.

157. None of them has attributed the termination to stigmatizing statements by the OCC.  *See*

*infra* SOF ¶¶ 158-181.

██████████████

158. On or about October 30, 2013, ██████████ terminated its relationship with Check

Into Cash, providing no reason why it chose to end the relationship.  Ex. 66 at

CIC000381-83.

159. A ██████████ representative, ██████████, had told Check Into Cash in

September 2013 that the bank was planning to "exit banking the payday industry" and

would not extend banking services to non-payday-lending subsidiaries of a payday

lender.  Ex. 98, Lane Tr. at 113:4-115:1.

160. (1) Check Into Cash's understanding was that ██████████ was experiencing

"regulatory pressure" in connection with "██████████████████

██████" and that the exit from the payday lending industry was related to that, though

---

[3] *See supra* n.2.

█████████████ did not mention any specific regulators.  *Id.*, Lane Tr. at 114:12-115:11, 132:6-12, 144:6-145:6.

(2) The OCC, however, has stated that it did not direct, encourage, or pressure █████ █████ to terminate its customer relationships with Plaintiffs or with any other payday lenders.  *See* SOF ¶¶ 91-93.

161.   █████████████ had no involvement in the decision, and did not explain how the basis for the decision was conveyed to ████ if at all.  *Id.*, Lane Tr. at 143:14-22, 147:14-148:4.

162.   Check Into Cash's response to █████████ referenced lawsuits against banks arising from the activities of illegal online payday lenders and indicated that those lawsuits "may have contributed" to the termination decision, but did not mention any regulatory pressure or other regulatory acts.  Ex. 67 at CIC000384.

163.   Check Into Cash contacted█████████████ in January 2017, and ████ █████████████ mentioned Operation Choke Point, but did not explain what ████ meant and did not mention any specific regulator.  Ex. 98, Lane Tr. at 135:11-137:14, 146:15-147:13.

████████████████████

164.   On or about March 27, 2014, █████████ terminated its relationship with Check Into Cash, stating that it had "made the decision to exit the business of providing commercial banking services to check cashers and related businesses" because "this business no longer fits within the Bank's strategic priorities."  Ex. 73 at CIC000397.

165.   In a conversation with Check Into Cash, a ███████ representative stated that the bank was "focused on money service business," including check cashing, but did not mention payday lending.  Ex. 98, Lane Tr. at 208-09.

███████████

166.   On or about October 11, 2016, ███████ terminated its relationship with Check Into Cash, stating that "[w]e have decided to close your account because the business is in an industry in which we do not service, such as payday lenders."  Ex. 74 at CIC000448.

167.   Check Into Cash's corporate representative testified that ███████ did not provide the company with a separate reason for the bank's decision.  Ex. 98, Lane Tr. 233:15-22.

168.   ███████'s letter to Check Into Cash indicated that it had been acquired by ███████. *Id.*

███████████

169.   On or about November 12, 2013, ███████ terminated its relationship with Check Into Cash, providing no explanation.  Ex. 75 at CIC000404-06.

170.   In a conversation with Check Into Cash on September 25, 2013, a bank representative, ███████, stated that the bank was "having issues with the regulators . . . related to mortgage lending, and that as part of their resolution of the matter with regulators . . . they were exiting . . . doing business with payday lending" as well as student loan servicing.  Ex. 98, Lane Tr. 153-55]; Ex. 76 at CIC000583.

171.   ███████ did not mention any specific regulator (indeed, he did not even specify whether the regulators were state or federal regulators), and the only description of the regulatory action was that it was "tied to mortgage lending."  Ex. 98, Lane Tr. at 154-55.

172. Check Into Cash's response referenced "negative press" for banks arising from the activities of illegal online payday lenders and indicated that that negative press "may have contributed" to the termination decision, and how "sad" it was that illegal loans made by other payday lenders "may have contributed to ███████'s decision to cease doing business" with it, but did not mention any regulatory pressure or other regulatory acts. Ex. 77 at CIC000407.

173. ███████ subsequently cited Check Into Cash "activities" that were "inconsistent with the Bank's policies" and other "compliance problems" as reasons why it wanted to expedite the closing of Check Into Cash's accounts. Ex. 79 at CIC000411-412; Ex. 80 at CIC000413.

174. Ultimately, the termination date was extended to June 26, 2014. Ex. 98, Lane Tr. at 168.

175. Check Into Cash contacted ███████ again in December 2016 to ask about the reasons for the termination, and ███████ again stated that the termination decision was part of a decision to exit multiple industries, such as firearms and student loans, not just payday lending. Ex. 98, Lane Tr. 172; Ex. 76 at CIC000583.

176. ███████ did not mention Operation Choke Point or any specific regulators. Ex. 98, Lane Tr. 172-73.

███████

177. On or about November 10, 2016, ███████ terminated its relationship with Check Into Cash. Ex. 83 at CIC000515-516.

178. ███████ did not state a basis for the termination. Ex. 98, Lane Tr. 212.

179. The OCC, as ███████ primary regulator, did not direct ███████ to terminate the account. Ex. 94, ███████ Tr. Ex. 8 ¶ 4; Ex. 97, ███████ Tr. 62-67.

29

180. Check Into Cash has no additional information from terminating banks, apart from the statements discussed above, about their decisions to terminate the accounts.  Ex. 98, Lane Tr. 245.

181. No bank representative told Check Into Cash that the banks were closing accounts at the direction of the OCC.  Ex. 98, Lane Tr. 245.

<u>Check Into Cash's Existing Banking Relationships and Access to the Banking System</u>

182. The OCC incorporates by reference paragraphs 357-66 of the FDIC's Statement of Undisputed Material Facts, filed October 12, 2018, and the testimony and exhibits cited in support of those statements of undisputed material fact.

183. Check Into Cash and ████████ have had a business relationship since ███.  Ex. 98, Lane Tr. 249:10-250:18.

184. Check Into Cash's corporate designee testified that ████████ has given no indication that it will close Check Into Cash's accounts in the future.  *Id.* at 263:18-264:7.

185. Check Into Cash expanded its relationship with ████████ in 2017, adding a centralized returns agreement. Ex. 98, Lane Tr. 273-75.

186. Check Into Cash also maintains accounts with ████████████.  Ex. 84 at CIC096259; Ex. 98, Lane Tr. 249:10-250:6, 251:1-7.

187. 

188.

189.   Check Into Cash also maintains relationships with numerous other banks for which the

OCC is the primary federal regulator: ██████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████.

Ex. 84 at CIC096259; https://www.ffiec.gov/consumercenter/default.aspx.

**Northstate Check Exchange**

190.   Northstate Check Exchange offers a variety of services in Shasta County, California,

including payday loans, check cashing, bill pay, auto title loans, prepaid cards, and

various other ancillary services.  Ex. 95, Bassett Tr. 33-45.

191.   The company is registered with the Financial Crimes Enforcement Network as a money

service business.  Ex. 85 at NS000582-583.

<u>Northstate Financials</u>

192.   The OCC incorporates by reference paragraphs 370-82 of the FDIC's Statement of

Undisputed Material Facts, filed October 12, 2018, and the testimony and exhibits cited

in support of those statements of undisputed material fact.

<u>Northstate Account Terminations by OCC-Supervised Banks</u>[4]

██████████████████████████

193.   ██████████████████████  ███████████████  ████████████████████████

██████████████████████████████████████████████████████████

---

[4] *See supra* n.2.

194.    No one at ██████████ ever gave Northstate a different explanation regarding the

termination reason.  Ex. 95, Bassett Tr. 182-83.

195.    Northstate previously asserted that ██████████ closed its account because of "regulatory

pressure," but now claims that ██████████ is only closing accounts for "smaller

companies," though Northstate could not identify the source of that information.  Ex. 95,

Bassett Tr. at 185-86; 274:13-275:11].

196.    

197.    

198.    Northstate had not responded by October 13, 2015.  Ex. 88 at NS000562-564.

199.    Northstate eventually provided some of the information.  Ex. 89 at NS000565-570; Ex.

90 at NS000571-581; Ex. 91 NS000582-608.

200.    Northstate's response referred to Attachments A through N, but only Attachments A

through F were provided; Attachments G through N were not.  Ex. 89 at NS000565-570;

Ex. 90 at NS000571-581; Ex. 91 at NS000582-608.

201.    Northstate's corporate designee acknowledged that ██████████ stood to make less

money from servicing its accounts versus larger payday lenders.  Ex. 95, Bassett Tr. 185-

86, 274:13-275:11.

202.    Northstate's corporate designee acknowledged that ██████████ still does business with

larger payday lenders.  *Id.*

<u>Northstate's Existing Banking Relationships and Access to the Banking System</u>

203.   The OCC incorporates by reference paragraphs 401-08 of the FDIC's Statement of

Undisputed Material Facts, filed October 12, 2018, and the testimony and exhibits cited

in support of those statements of undisputed material fact.


Date:   October 12, 2018                      Respectfully submitted,

                                              BAO NGUYEN
                                              Acting Chief Counsel
                                              CHARLES M. STEELE
                                              Deputy Chief Counsel
                                              GREGORY F. TAYLOR
                                              Director for Litigation
                                              PETER C. KOCH
                                              Assistant Director for Litigation
                                              <u>/s/ Michael K. Morelli</u>
                                              MICHAEL K. MORELLI
                                              Attorney – Litigation Division
                                              Office of the Comptroller of the Currency
                                              400 7th Street SW
                                              Washington DC 20219
                                              Telephone: (202) 649-6209
                                              Facsimile: (202) 649-5709
                                              michael.morelli@occ.treas.gov

                                              *Attorneys for the Office of the Comptroller of the*
                                              *Currency and for Joseph Otting in his official capacity*
                                              *as Comptroller of the Currency*