# EXHIBIT 1



EXHIBIT

21

Rudolph 5-9-18

**Subject:** RE: Great to talk with you yesterday.
**From:** "O'Shaughnessy, Patrick" <MAILER-DAEMON>
**To:** Bill Isaac
**Date:** Thu, 19 Mar 2015 02:38:52 +0000

Bill, thank you for your time at the conference.  As we discussed, the major banks which we have lost have claimed it is due to our parent (Grupo Elektra, a Mexican bank holding company), not anything to do with our compliance management system or Operation Chokepoint.  I believe this to be the truth, as Wells Fargo (and some smaller institutions like IBC in Texas) continues to bank our competitors, including those with much lower compliance ratings from the CFPB.  In order to win them back, I believe we need a different solution than the compliance audit you suggested.  I think we need to know from Wells Fargo exactly what the issue is and if there is a way to resolve it. Please let me know if you think you have any ideas in this regard.

J. Patrick O'Shaughnessy
President and CEO
Advance America
135 N. Church Street
Spartanburg, SC 29306
P: 864-342-5001
F: 864-342-5102

---

**From:** Bill Isaac [mailto:BillIsaac@comcast.net]
**Sent:** Thursday, March 05, 2015 5:03 PM
**To:** O'Shaughnessy, Patrick; Rustin, Jessica
**Cc:** Rosenblum Jeremy
**Subject:** Great to talk with you yesterday.

Patrick & Jessica – We appreciated the opportunity to meet with you yesterday, and we look forward to working with you.  I am confident we can add significant value.

I (and my colleagues at FTI and Ballard) will be pleased to meet with you in Spartanburg or wherever else might work best for you.  Just let me know when and where.

All the best, Bill

William M. Isaac
Senior Managing Director
Global Head of Financial Services
FTI Consulting
1209 Westway Drive
Sarasota, Florida 34236
941-388-0088

We cannot solve our problems with the same thinking we used when we created them -- Albert Einstein

Check out: Senseless Panic: How Washington Failed America by William Isaac, forward by Paul Volcker, and my website at www.williamisaac.com

Protected - Attorneys' Eyes Only

AA047327

# EXHIBIT 2

# Comptroller's Handbook          EP-BSP

# Examination Process (EP)

# Bank Supervision Process

Version 1.0, June 2018



Office of the
Comptroller of the Currency

# Examination Authority and Full-Scope, On-Site Examination Requirement

The OCC examines banks pursuant to the authority conferred by 12 USC 481 (national banks), 12 USC 1463 (FSAs), 12 USC 1464 (FSAs), and the requirements of 12 USC 1820(d).[16] The OCC examines federal branches and agencies pursuant to the authority conferred by 12 USC 3105(c)(1)(C).

Banks must receive a **full-scope, on-site examination** every 12 or 18 months.[17] The required full-scope, on-site examination frequency is known as the **supervisory cycle**. Refer to table 1 for the eligibility requirements for the 18-month supervisory cycle and to the "Full-Scope Examinations" section of this booklet for the OCC's definition of and requirements for the required full-scope, on-site examination.

The statutory and regulatory requirements set the maximum supervisory cycle length and do not limit the OCC's authority to examine a bank as frequently as the OCC deems appropriate.[18] A potential or actual adverse change in the bank's condition or risk profile, a change in bank control, or an OCC scheduling conflict are examples of when the OCC could determine it would be appropriate to examine the bank more frequently. Before increasing the frequency of examinations due to a scheduling conflict, supervisory offices should consider how OCC resources can be used most efficiently and coordinate with the bank to minimize burden.

Table 1 lists the eligibility criteria for the extended, or 18-month, supervisory cycle as of the publication date of this booklet. The Economic Growth, Regulatory Relief, and Consumer Protection Act (Pub. L. 115-174), which was signed into law on May 24, 2018, gave the OCC, the FDIC, and the Federal Reserve the authority to extend the examination cycle for additional banks. As of the publication date of this booklet, the OCC was in the process of amending 12 CFR 4.6 (national banks and FSAs, except federal branches and agencies) and 12 CFR 4.7 (federal branches and agencies) to implement this act. For the most up-to-date information, examiners should refer to 12 USC 1820(d)(4), 12 USC 1820(d)(10), 12 CFR 4.6, and 12 CFR 4.7, and consult the supervisory office.

---

[16] Refer also to 12 USC 1467(h) (FSAs) and 12 USC 1468b (FSAs).

[17] 12 USC 1820(d) requires the OCC to conduct a full-scope, on-site examination of each insured depository institution every 12 or 18 months. The OCC applies this statutory examination requirement to all types of banks (federal branches and agencies excepted), regardless of FDIC-insured status, in 12 CFR 4.6. The frequency of on-site examinations for federal branches and agencies is prescribed by 12 USC 3105(c) and 12 CFR 4.7.

[18] Refer to 12 CFR 4.6(c) (national banks and FSAs, except federal branches and agencies) and 12 CFR 4.7(c) (federal branches and agencies).

Case 1:14-cv-00953-TNM   Document 209-4   Filed 11/09/18   Page 6 of 286

Version 1.0         **Examination Authority and Full-Scope, On-Site Examination Requirement**
                                   > Service Providers and Types of Supervisory Activities

# Service Providers

The OCC has the authority to examine functions or operations performed on behalf of a bank by a third party.[20] Service providers are examined on a 24-, 36-, or 48-month cycle based on the Examination Priority Ranking Program described in the "Supervision of Technology Service Providers" booklet of the *FFIEC Information Technology (IT) Examination Handbook.* Additionally, at least one interim review is required between regularly scheduled examinations. Refer to "Federal Regulatory Agencies' Administrative Guidelines: Implementation of Interagency Programs for the Supervision of Technology Service Providers."[21]

# Types of Supervisory Activities

**Supervisory activities** are the various examination and supervision activities that are conducted throughout a bank's supervisory cycle.

## Full-Scope Examinations

The full-scope, on-site examination requirement may be fulfilled by conducting one examination (most common in community banks) or by aggregating several supervisory activities (most common in midsize and large banks). Even when a bank receives one full-scope examination during its supervisory cycle, examiners conduct ongoing supervision throughout the supervisory cycle. A full-scope, on-site examination must consist of examination activities performed during the supervisory cycle that

- satisfy the core assessment[22] and are sufficient in scope to assign the bank's **regulatory ratings**, except CRA ratings.[23]
- result in conclusions about the bank's risk profile.
- review the bank's BSA compliance program.
- assess the bank's compliance with the national flood insurance program, if the bank is an insured depository institution.[24]

---

[20] Refer to 12 USC 1867(c) (national banks and FSAs) and 12 USC 1464(d)(7) (FSAs).

[21] This publication is available online in the *FFIEC IT Examination Handbook* Infobase.

[22] Refer to the "Core Assessment" section of this booklet for an overview of the core assessment. For specific core assessment guidance, refer to the "Community Bank Supervision," "Large Bank Supervision," and "Federal Branches and Agencies Supervision" booklets of the *Comptroller's Handbook,* and the "Core Examination Overview and Procedures for Assessing the BSA/AML Compliance Program" section of the *FFIEC BSA/AML Examination Manual.*

[23] Refer to the "Regulatory Ratings" section of this booklet for a description of the regulatory rating systems.

[24] Refer to the "National Flood Insurance Program" section of this booklet and 12 USC 1820(i).

- include on-site supervisory activities.[25]
- conclude with the issuance of an ROE.[26]

## Ongoing Supervision

**Ongoing supervision** is the OCC's process for assessing risks and reviewing core knowledge about a bank on an ongoing basis. Ongoing supervision conclusions can result in changes to the OCC's supervisory strategy, regulatory ratings, or risk assessment system (RAS) conclusions for a bank.

## Target Examinations

A **target examination** alone does not fulfill all of the requirements of the statutory full-scope, on-site examination, but may fulfill a portion of the requirements. Target examinations may focus on one particular product (e.g., credit cards), function (e.g., audit), or risk (e.g., operational risk) or may cover specialty areas (e.g., municipal securities dealers). Conclusions from target examinations are generally communicated to the bank in supervisory letters.

Some examinations are conducted as part of the OCC's licensing function. These include charter field investigations, pre-opening examinations, and conversion examinations. Refer to the *Comptroller's Licensing Manual* for more information on examinations conducted as part of the OCC's licensing function.

# Specialty Area Considerations

Specialty areas consist of IT, asset management, BSA/AML, consumer compliance, CRA, and municipal and government securities dealers. Specialty area examinations are integrated within supervisory cycles of all banks. Examination frequencies and scopes of some specialty areas are influenced by statutory mandates, interagency commitments, or OCC policy. Examinations of specialty areas are conducted as part of a full-scope or target examination, depending on the circumstances.

## Information Technology

The level of expertise needed to perform the IT examination typically depends on the bank's complexity and level of risk. The IT review may be performed as multiple target examinations, the results of which are rolled up to form an overall IT assessment for that particular supervisory cycle, or as a singular review. IT examinations of community banks are usually performed by generalist examiners using procedures in the "Community Bank Supervision" booklet of the *Comptroller's Handbook*. More complex midsize and large bank

---

[25] The extent of on-site examination work is flexible.

[26] For more information, refer to the "Report of Examination" section of this booklet.

IT examinations are generally performed by specialists using the procedures in the *FFIEC IT Examination Handbook.*

## Asset Management

**Asset management** is the business of providing financial products and services to a third party for a fee or commission. Asset management activities include trust and fiduciary services, investment management, retirement planning, corporate trust administration, custody, safekeeping, securities lending services, security-holder and transfer agent services, and retail sales of nondeposit investment products. The asset management review may be performed as multiple target examinations, the results of which are rolled up to form an overall asset management assessment for that particular supervisory cycle, or as a singular review. Midsize and large bank asset management examinations are generally performed by specialists.

Refer to the "Community Bank Supervision," "Federal Branches and Agencies Supervision," "Large Bank Supervision," and "Retail Nondeposit Investment Products" booklets and the *Asset Management* series of booklets of the *Comptroller's Handbook* for more guidance on examining asset management activities.

## Bank Secrecy Act/Anti-Money Laundering

The OCC is required to review the BSA compliance program of each bank during every supervisory cycle.[27] The BSA/AML review must include a conclusion about the adequacy of the bank's BSA program. The required BSA/AML review may be performed as multiple target examinations, the results of which are rolled up to form an overall BSA compliance program assessment for that particular supervisory cycle, or as a singular review. Risk-based transaction testing must be performed during each supervisory cycle using the appropriate section(s) of the *FFIEC BSA/AML Examination Manual*. The scope of the BSA/AML review must include the minimum procedures in the "Core Examination Overview and Procedures for Assessing the BSA/AML Compliance Program" section of the *FFIEC BSA/AML Examination Manual*, plus any additional core or expanded procedures as determined during the scoping and planning process. The extent that additional core or expanded procedures are used should be risk-based. Examiners should refer to the "Scoping and Planning" section of the *FFIEC BSA/AML Examination Manual* for guidance when scoping BSA/AML examinations and should particularly emphasize the following when determining the scope:

- The bank's BSA/AML risk profile.
- Quality of the bank's BSA independent testing.
- Previous examination findings.
- Data from the OCC's money laundering risk system, if applicable.

---

[27] 12 USC 1818(s) requires the OCC to review the BSA compliance program of each insured depository institution. For this purpose, "insured depository institution" also includes uninsured federal branches and agencies and uninsured national banks. Refer to 12 USC 1813(c)(3) and 12 USC 1818(b)(5).

While Office of Foreign Assets Control (OFAC) regulations are not part of the BSA, evaluation of OFAC compliance is generally included in BSA/AML examinations. The OFAC review evaluates the sufficiency of a bank's implementation of policies, procedures, and processes regarding compliance with OFAC laws and regulations, using applicable procedures from the OFAC section of the *FFIEC BSA/AML Examination Manual.* OFAC-related matters requiring attention (MRA) and suspected violations regarding OFAC must be reported to the Compliance Risk Policy Division of the OCC's CCA Department for referral to OFAC.

## Consumer Compliance

Consumer compliance encompasses reviews of a bank's compliance with consumer protection-related laws and regulations and the adequacy of a bank's compliance management system (CMS) as it pertains to consumer compliance.[28] The consumer compliance examination should be risk-based, though examination scopes must be consistent with statutory mandates, OCC minimum standards, and interagency commitments regarding examination frequency or minimums. Examiners normally perform consumer compliance examinations as part of a single examination for community banks. In midsize and large banks, the consumer compliance examination is generally conducted as part of one or more target examinations and should be focused on product lines and decision centers that carry the most risk.

Examiners must review the bank's CMS as it pertains to compliance with consumer protection-related laws and regulations at least once per supervisory cycle. This review is a significant consideration when determining a bank's consumer compliance component rating under the Uniform Interagency Consumer Compliance Rating System (CC Rating System). The review of a bank's CMS for assigning the bank's consumer compliance component rating should include a risk-based assessment of the following components:

- Board and management oversight, which includes
  - oversight and commitment, including third-party risk management.
  - change management.
  - comprehension, identification, and management of risk.
  - self-identification and corrective action.
- Consumer compliance program, which includes
  - policies and procedures.
  - training.
  - monitoring and audit.
  - consumer complaint response.

---

[28] A bank's overall CMS should cover all applicable laws and regulations and cover all areas of the bank. Examiners should consider aspects of a bank's CMS that do not pertain to consumer protection-related laws and regulations when assessing the bank's overall risk management program and determining the management component rating.

of credit risk may be increasing if a bank has relaxed underwriting standards during a strong economic cycle, even though the volume of troubled credits and credit losses remains low. Similarly, the direction of liquidity risk may be increasing if a bank has not implemented a well-developed contingency funding plan during a strong economic cycle, even though existing liquidity sources are sufficient for current conditions.

Because an examiner expects aggregate risk to increase or decrease does not necessarily mean that he or she expects the movement to be sufficient to change the aggregate risk level within 12 months. An examiner can expect movement *within* the risk level. For example, aggregate risk can be high and decreasing even though the decline is not anticipated to change the level of aggregate risk to moderate. In such circumstances, examiners should explain in narrative comments why a change in the risk level is not expected. Aggregate risk assessments of high and increasing or low and decreasing are possible.

The presence of risk is not necessarily reason for concern. Examiners determine whether the risks a bank assumes are warranted by assessing whether the risks are effectively managed in a manner consistent with safe and sound banking practices. Generally, a risk is effectively managed when it is identified, measured, monitored, controlled, and reported. Senior management should report to the board on the bank's overall risk profile, including aggregate and emerging risks.[39] A bank should have the capacity to readily withstand the financial distress that a risk, in isolation or in combination with other risks, could cause.

If examiners determine that a risk is unwarranted (e.g., not effectively managed or supported by adequate capital), they must communicate to management and the board the need to mitigate or eliminate the unwarranted risk. Appropriate actions may include reducing exposures, increasing capital, or strengthening risk management practices.

Examiners should discuss RAS conclusions with bank management and the board during each supervisory cycle. If a change to the RAS occurs that warrants altering the bank's supervisory strategy or requires corrective action by bank management, examiners should formally communicate the rationale for the change to the bank and obtain commitments for any corrective actions. These communications help the bank and the OCC reach a common understanding of the bank's risks, focus on the strengths and weaknesses of risk management, and achieve supervisory objectives.

# Categories of Risk

## Credit Risk

Credit risk is the risk to current or projected financial condition and resilience arising from an obligor's failure to meet the terms of any contract with the bank or otherwise perform as agreed. Credit risk is found in all activities in which settlement or repayment depends on counterparty, issuer, or borrower performance. Credit risk exists any time bank funds are

---

[39] Refer to the "Corporate and Risk Governance" booklet of the *Comptroller's Handbook* for more information regarding risk management.

extended, committed, invested, or otherwise exposed through actual or implied contractual agreements, whether reflected on or off the balance sheet.

Credit risk is the most recognizable risk associated with banking. This definition encompasses more than the traditional definition associated with lending activities. Credit risk also arises in conjunction with a broad range of bank activities, including selecting investment portfolio products, derivatives trading partners, or foreign exchange counterparties. Credit risk also arises due to country or sovereign exposure, as well as indirectly through guarantor performance.

## Interest Rate Risk

Interest rate risk is the risk to current or projected financial condition and resilience arising from movements in interest rates. Interest rate risk results from differences between the timing of rate changes and the timing of cash flows (repricing risk); from changing rate relationships among different yield curves affecting bank activities (basis risk); from changing rate relationships across the spectrum of maturities (yield curve risk); and from interest-related options embedded in bank products (options risk).

The assessment of interest rate risk should consider risk from both an accounting perspective (i.e., the effect on the bank's accrual earnings) and an economic perspective (i.e., the effect on the market value of the bank's portfolio equity). In some banks, interest rate risk is included in the broader category of market risk. In contrast with price risk, which focuses on the mark-to-market portfolios (e.g., trading accounts), interest rate risk focuses on the value implications for accrual portfolios (e.g., held-to-maturity and available-for-sale accounts).

## Liquidity Risk

Liquidity risk is the risk to current or projected financial condition and resilience arising from an inability to meet obligations when they come due. Liquidity risk includes the inability to access funding sources or manage fluctuations in funding levels. Liquidity risk also results from a bank's failure to recognize or address changes in market conditions that affect its ability to liquidate assets quickly and with minimal loss in value.

The nature of liquidity risk has changed in recent years. Increased investment alternatives for retail depositors and sophisticated off-balance-sheet products with complicated cash-flow implications are examples of factors that complicate liquidity risk.

## Price Risk

Price risk is the risk to current or projected financial condition and resilience arising from changes in the value of either trading portfolios or other obligations that are entered into as part of distributing risk. These portfolios typically are subject to daily price movements and are accounted for primarily on a mark-to-market basis. This risk occurs most significantly from market-making, dealing, and position-taking in interest rate, foreign exchange, equity, commodities, and credit markets.

Price risk also arises from bank activities whose value changes are reflected in the income statement, such as in lending pipelines, other real estate owned, and mortgage servicing rights. The risk to earnings or capital resulting from the conversion of a bank's financial statements from foreign currency translation also should be assessed under price risk. As with interest rate risk, many banks include price risk in the broader category of market risk.

## Operational Risk

Operational risk is the risk to current or projected financial condition and resilience arising from inadequate or failed internal processes or systems, human errors or misconduct, or adverse external events. Operational losses may result from internal fraud; external fraud; inadequate or inappropriate employment practices and workplace safety; failure to meet professional obligations involving clients, products, and business practices; damage to physical assets; business disruption and systems failures; and failures in execution, delivery, and process management. Operational losses do not include opportunity costs, forgone revenue, or costs related to risk management and control enhancements implemented to prevent future operational losses.

The quantity of operational risk and the quality of operational risk management are heavily influenced by the quality and effectiveness of a bank's system of internal control. The quality of the audit function, although independent of operational risk management, also is a key assessment factor. Audit can affect the operating performance of a bank by helping to identify and validate correction of weaknesses in risk management or controls. The quality of due diligence, risk management of third-party relationships, business continuity planning, and controls protecting the confidentiality, integrity, and availability of bank information are other key assessment factors for mitigating operational risk.

## Compliance Risk

Compliance risk is the risk to current or projected financial condition and resilience arising from violations of laws or regulations, or from nonconformance with prescribed practices, internal bank policies and procedures, or ethical standards. This risk exposes a bank to fines, **civil money penalties (CMP)**, payment of damages, and the voiding of contracts. Compliance risk can result in diminished reputation, harm to bank customers, limited business opportunities, and lessened expansion potential.

Compliance risk is not limited to risk from failure to comply with consumer protection-related laws and regulations; it encompasses the risk of noncompliance with *all* laws and regulations, as well as prudent ethical standards and contractual obligations. It also includes the exposure to litigation (known as legal risk) from all aspects of banking, traditional and nontraditional.

## Strategic Risk

Strategic risk is the risk to current or projected financial condition and resilience arising from adverse business decisions, poor implementation of business decisions, or lack of

responsiveness to changes in the banking industry and operating environment. This risk is a function of a bank's strategic goals, business strategies, resources, and quality of implementation. The resources needed to carry out business strategies are both tangible and intangible. They include communication channels, operating systems, delivery networks, and managerial capacities and capabilities.

The assessment of strategic risk includes more than an analysis of a bank's written strategic plan. It focuses on opportunity costs and how plans, systems, and implementation affect the bank's financial condition and resilience. It also incorporates how management analyzes external factors, such as economic, technological, competitive, regulatory, and other environmental changes, that affect the bank's strategic direction.

## Reputation Risk

Reputation risk is the risk to current or projected financial condition and resilience arising from negative public opinion. This risk may impair a bank's competitiveness by affecting its ability to establish new relationships or services or continue servicing existing relationships. Reputation risk is inherent in all bank activities, and management should deal prudently with stakeholders, such as customers, counterparties, correspondents, investors, regulators, employees, and the community.

A bank that actively associates its name with products and services offered through outsourced arrangements or asset management affiliates is more likely to have higher reputation risk exposure. Significant threats to a bank's reputation also may result from negative publicity regarding matters such as unethical or deceptive business practices, violations of laws or regulations, high-profile litigation, or poor financial performance. The assessment of reputation risk should take into account the bank's culture, the effectiveness of its problem-escalation processes and rapid-response plans, and its engagement with news media.

## Relationship Between RAS and Regulatory Ratings

The RAS is used in conjunction with CAMELS, ROCA, and other regulatory ratings during the supervisory process to evaluate a bank's financial condition and resilience. The RAS provides both a current (aggregate risk) and a prospective (direction of risk) view of the bank's risk profile that examiners incorporate when assigning regulatory ratings. For example, under the RAS, examiners may assess credit risk in a bank with insufficient risk management practices and increasing adverse trends as "moderate and increasing" or "high and increasing." If the component rating for asset quality does not reflect the quality of risk management identified in the credit RAS, examiners should consider whether changing the component rating is warranted. Additionally, examiners consider their assessments of risk management practices for each of the risk categories when assigning management component ratings.

# Risk-Based Supervision Approach

In carrying out its mission, the OCC employs an ongoing risk-based supervision approach focused on evaluating risk, identifying material and emerging concerns, and requiring banks to take timely corrective action before deficiencies compromise their safety and soundness.

The OCC's risk-based supervision approach requires examiners to determine how existing or emerging issues for a bank, its related organizations, or the banking industry as a whole affect the nature and extent of risks in that bank. Examiners evaluate risk using the OCC's RAS and tailor supervisory activities to the risks identified. Examiners must include periodic testing in supervisory activities to validate their risk assessments.

The risk-based supervision approach concentrates on systemic risks and banks that pose the greatest risk to the federal banking system. Under this approach, the OCC allocates greater resources to areas of higher risk by

- identifying risk using common definitions. The categories of risk, as they are defined, are the foundation for supervisory activities.
- measuring risk using common methods of evaluation. Risk cannot always be quantified in dollars. For example, numerous or significant internal control deficiencies may indicate excessive operational risk.
- evaluating risk management to determine whether bank systems adequately identify, measure, monitor, and control risk.
- providing flexibility to modify planned supervisory activities based on changes to a bank's risk profile.
- performing examinations based on the core assessment, expanded procedures, or verification procedures, reaching conclusions on the bank's risk profile and condition, and following up on areas of concern.

While the OCC's supervision focuses on individual banks, the risks to these banks may be mitigated or increased by the activities of affiliates and other related organizations (e.g., financial subsidiaries). Therefore, examiners must determine the risk profile of OCC-supervised banks, regardless of how activities are structured within the bank's overall company. Examiners' assessments should consider the OCC-supervised bank's risks from affiliates and other related organizations, and the effectiveness of the OCC-supervised bank's risk management systems in controlling those risks. To do this, examiners obtain information from the bank, the bank's affiliates, and other regulatory agencies, as necessary. Examiners may also verify transactions between the bank and its affiliates as appropriate.[40] Examiners typically document one consolidated assessment for all OCC-supervised banks within a holding company structure, noting any significant differences for individual OCC-supervised affiliates.

---

[40] For more information, refer to appendix A, "Functional Regulation," of this booklet.

# Supervisory Actions

## Matters Requiring Attention

The OCC uses **MRAs** to communicate concerns about a bank's deficient practices.[61]
Examiners must communicate such concerns to management and the board when the
concerns are discovered and must not defer issuing MRAs pending bank management's
efforts to address the concerns. Examiners must not use a graduated process by first
communicating the OCC's concern with a deficient practice as a recommendation,[62] then, if
the deficient practice is not addressed, using an MRA.

For consistent reporting, the OCC focuses on the concerns within the MRA, tracking them
through their duration. The following Five Cs format is used to communicate an MRA:

- **Concern** describes the deficient bank practice and how it deviates from sound
  governance, internal control, or risk management principles, or results in substantive
  noncompliance with laws or regulations, enforcement actions, or conditions imposed in
  writing. Unsafe or unsound practices should be specifically identified in the concern. A
  single MRA may contain multiple concerns. If the deficient practice has affected the
  bank's condition, this should be described in the concern section.
- **Cause** notes the root cause of the concern when it is evident. When the root cause is not
  evident, the OCC may require bank management to determine the root cause as part of
  the corrective action.
- **Consequence** explains how continuation of the deficient practice could affect the bank's
  condition, including its financial performance or risk profile. Management's inaction
  could, in certain instances, result in violations or additional supervisory actions, such as
  enforcement actions (including CMPs for the bank, the bank's board, or management).
- **Corrective action** includes what management or the board must do to address the
  concern and eliminate the cause. Generally, management is responsible for effectuating
  corrective actions, and the board should oversee management's corrective actions and
  hold management accountable. In certain cases (e.g., concerns with board oversight), the
  board, rather than management, may need to take corrective action.
- **Commitment** relates to the bank's action plan, including specific information regarding
  milestones, the completion date, and staff who are accountable for implementation. If

---

[61] The OCC updated its policies and procedures for examiners regarding MRAs on October 30, 2014. The
updated MRA policies and procedures addressed recommendations in "An International Review of OCC's
Supervision of Large and Midsize Institutions" (International Peer Review report) to support the agency's
mission of ensuring a safe and sound federal banking system by emphasizing timely detection and correction of
deficient bank practices before they affect the bank's condition. The updated policies and procedures also made
MRA terminology, format, follow-up, analysis, and reporting consistent across the agency.

[62] Recommendations must not be included in the ROE or other formal written communication to the bank (e.g.,
supervisory letter). Recommendations can be provided informally to bank management or the board as
suggestions to enhance policies or as best practices. Recommendations do not require specific action by bank
management or follow-up by examiners. Recommendations are not tracked in the OCC's supervisory
information systems.

management is unable to provide an action plan during the examination, the examiner obtains a commitment from bank management to develop a board-approved plan and provide it to the OCC within 30 days of receipt of the formal written communication containing the MRA.

A concern is either "open" or "closed." A concern is closed if the bank implements and the OCC verifies and validates the effectiveness and sustainability of the corrective action, or if the bank's practices are no longer a concern because of a change in the bank's circumstances. In formal written communication, the bank's board may receive a brief listing of closed concerns. Within the meaning of "open," a concern may be categorized several ways in formal written communication to the board and management and for reporting purposes:

- **New:** The concern was not identified previously (i.e., the concern is not "repeat").
- **Repeat:** The same or a substantially similar concern has reoccurred. For a concern to be a repeat concern
  – the OCC must have previously communicated the concern in an MRA or enforcement action during the prior five-year period, and
  – subsequent to the initial communication, the bank corrected the deficient practice and the OCC validated and closed the concern, but the concern has reoccurred.
- **Self-identified:** A significant unresolved concern that the bank initially discovered is labeled as self-identified. A bank's action to self-identify concerns is an important consideration when the OCC assesses the adequacy of the bank's risk management system.
- **Past due:** The corrective action was not implemented within the expected time frame, or during the validation process examiners determine that the corrective action is not effective or sustainable. There may be valid reasons that support failure to meet deadlines. Bankers should communicate these reasons to their primary OCC contact (e.g., supervisory office, EIC, or portfolio manager) promptly, in order to determine a reasonable, modified remediation date.
- **Pending validation:** The OCC verified that the bank implemented the corrective action, but insufficient time has passed for the bank to demonstrate sustained performance under the corrective action, and the OCC has not validated the sustainability of the corrective action.
- **Escalated:** Subsequent to its communication to the bank in an MRA, the OCC addressed the uncorrected concern in an enforcement action. The concern may be past due, or milestones have not been met by management, or inadequate attention given to correcting the deficiency may represent an unsafe or unsound practice.

The OCC expects the bank's board to oversee timely and effective correction of the practices described in an MRA. Those expectations include

- holding management accountable for the deficient practices.
- directing management to develop and implement corrective actions.
- approving the necessary changes to the bank's policies, processes, procedures, and controls.

- establishing processes to monitor progress and verify and validate the effectiveness of management's corrective actions.

When discussing MRAs, examiners must be clear with bank management and the board regarding the OCC's supervisory concerns and expectations. Examiners must impress on the board its responsibility to provide oversight of management's corrective actions. Failure to correct MRAs in a timely manner could provide the basis for enforcement actions. Therefore, banks should have a process for following up on MRAs. Likewise, examiners must include plans to follow up on MRAs in the supervisory strategies for individual banks.

# Violations of Laws and Regulations

A **violation of law or regulation** is an act (or failure to act) that deviates from, or fails to comply with, a statutory or regulatory requirement. Violations are often the result of deficient practices. Frequently, correcting violations alone does not address the deficient practices that may have led to the violations. When examiners identify a violation, they should also identify any deficient practices that contributed to violations. If bank management has not corrected deficient practices that caused or contributed to the violation, examiners must communicate the OCC's concern with these practices in an MRA.[63]

Examiners must cite all OCC-identified violations to facilitate timely and effective corrective action by bank management or the board. Substantive OCC-identified violations must be cited in an ROE or supervisory letter, whereas less substantive violations may be cited in a separate document (e.g., a list provided to management during the exit meeting). Bank-identified violations must be cited in an ROE or supervisory letter in certain circumstances (e.g., the violation requires further investigation or has not been corrected), and examiners have discretion to include substantive bank-identified violations in an ROE or supervisory letter as they determine is warranted. Examiners should use judgment to determine if less substantive bank-identified violations should be cited in writing, and if so, cite them in a separate document provided to bank management or the board.

The OCC expects management, in a timely manner, to effectively correct all violations regardless of how they are communicated. If management fails to correct a violation previously communicated in a separate document by the OCC, the violation should be included in the next ROE or supervisory letter.

The first time the OCC communicates a violation to a bank, the violation must be labeled with one or more of the following attributes:

- **New:** The OCC has not previously cited the same or substantially similar violations in writing during the previous five-year period (i.e., the violation is not "repeat").

---

[63] The OCC updated its policies and procedures for examiners regarding violations on May 23, 2017. The updated violations policies and procedures addressed recommendations in the International Peer Review report to support the agency's mission of ensuring a safe and sound federal banking system by emphasizing timely detection and correction of violations. The updated policies and procedures also made terminology, format, follow-up, analysis, and reporting for violations consistent across the agency.

- **Repeat:** The OCC communicated the violation (even if self-identified) in writing during the previous five-year period and new violations of the same or substantially similar regulation or law occur subsequent to the board or management receiving notification.
- **Self-identified:** The board or management is aware of the violation and documented and disclosed the violation to the OCC before or during the examination. A bank can self-identify a violation from various sources, including customer complaints, risk and control self-assessments, independent risk management reviews, internal audit reviews, or third-party reviews.

Upon completing follow-up, examiners must determine whether to label a violation as past due, pending validation, or closed, as appropriate using the following definitions, and communicate the status of the violation to the bank:

- **Past due:** During verification, examiners determine the bank has not implemented the expected corrective actions for the violation within the required time frame, or, during validation, examiners determine that the corrective action is not effective or sustainable.
- **Pending validation:** The OCC has verified that the bank implemented the corrective actions, but insufficient time has passed for the bank to demonstrate sustained performance under the corrective actions, and the OCC has not validated the sustainability of the corrective actions, or the OCC determines that additional testing is warranted.
- **Closed:** The bank has corrected the violation, and the OCC has verified and validated the bank's corrective actions; a change in the bank's circumstances corrected the violation; or the violation is otherwise deemed uncorrectable. Closed violations should be communicated as closed in a subsequent ROE, supervisory letter, or written list of violations.

# Enforcement Actions

The OCC uses **enforcement actions** to require a bank's board and management to take timely actions to correct a bank's deficiencies. The OCC typically first cites a violation or issues an MRA to address a bank's deficiencies. Violations, concerns in MRAs, or unsafe or unsound practices may serve as the basis for an enforcement action.

Enforcement actions can be either formal or informal. Examiners should consider an informal enforcement action when a bank's condition is sound but deficiencies have not been corrected in a timely manner or escalation beyond the OCC's citation of a violation or documentation of a concern in an MRA is otherwise warranted. The board's agreement or acceptance of an informal enforcement action can be indicative of its commitment to correct identified deficiencies before they adversely affect the bank's condition. When a bank's deficiencies are severe, uncorrected, repeat, or unsafe or unsound, or negatively affect the bank's condition, the OCC may use formal enforcement actions to support the agency's supervisory objectives.

Once an enforcement action is in place, examiners must periodically assess the bank's compliance with the enforcement action. Written feedback must be provided to bank

management and the board, and the assessment should be documented in the OCC's supervisory information systems.

Refer to OCC Bulletin 2017-48, "Bank Enforcement Actions and Related Matters: Updated Guidance," and its attachment, PPM 5310-3, "Bank Enforcement Actions and Related Matters," for more information regarding enforcement actions.

## Civil Money Penalties

CMPs are a type of enforcement action that requires monetary payments to penalize a bank, its directors, or other persons participating in the affairs of the bank for violations,[64] unsafe or unsound practices, or breaches of fiduciary duty. CMPs may be used alone or in combination with other enforcement actions. In addition, the OCC must assess CMPs if it finds that a regulated lending institution engaged in a pattern or practice of violations of certain requirements under the Flood Disaster Protection Act.[65] Examiners should propose CMPs for serious misconduct, including misconduct that is reckless, flagrant, willful, or knowing and that, because of its frequency or recurring nature, shows a general disregard for law or regulation. Added consideration should be given to violations that occurred or continued in direct contravention of the bank's policy guidelines, correspondence from the regulator, or audit reports.

After reviewing the facts and deciding to recommend a CMP, the examiner should immediately contact the appropriate supervisory office and OCC legal counsel for advice on proper documentation and any other assistance. The examiner should submit a CMP referral to the supervisory office within 30 days of the close of the examination. The referral should include a memorandum containing the EIC's recommendations, a completed CMP matrix, and supporting documentation.

When possible, the EIC or appropriate supervisory office representative should notify management or the board at the exit meeting and in the applicable ROE or supervisory letter whenever he or she is recommending CMPs. The discussion should include a description of the CMP process, the criteria the OCC uses to decide whether to assess a CMP and set the amount, and reference to OCC Bulletin 2016-5, "Civil Money Penalties: Revised Civil Money Penalty Policy," and its attachment, PPM 5000-7, "Civil Money Penalties." Examiners should not discuss or speculate on the amount of any penalty but may refer the board or management to the CMP matrix. Examiners must document in the OCC's supervisory information systems any CMP referrals and discussions of referrals with bank management and the board. Examiners should consult with the supervisory office and assigned OCC legal counsel before discussing potential CMPs with the bank.

For more information, refer to OCC Bulletin 2016-5 and its attachment, PPM 5000-7.

---

[64] The term "violation," for the purpose of CMPs under 12 USC 1818(i), is defined by 12 USC 1813(v) to include "any action (alone or with another or others) for or toward causing, bringing about, participating in, counseling, or aiding or abetting a violation."

[65] Refer to 42 USC 4012a(f) and 4003(a)(10).

### Reprimand or Supervisory Letter

In certain cases, the issuance of a reprimand or a supervisory letter may be more appropriate than the assessment of a CMP. A reprimand is a strongly worded document used in lieu of a CMP when, for example, the CMP would be too small to justify spending resources required or when the individual or bank has recognized the supervisory problem and taken steps to correct it. A supervisory letter is generally used to call attention to a supervisory problem that is not severe enough to warrant a CMP. Reprimands and supervisory letters are discussed in more detail in OCC Bulletin 2016-5 and its attachment, PPM 5000-7.

# Conditions Imposed in Writing

The OCC may impose conditions in connection with the approval of an application, a notice, or another request by a bank if it determines that one or more conditions are necessary or appropriate for the approval to be consistent with applicable laws, regulations, or OCC policies. Conditions may be imposed, for example, to protect the safety and soundness of the bank, prevent conflicts of interest, or require the bank to provide for customer protections. Conditions imposed in writing are often used by the OCC in approvals of corporate applications and interpretive letter opinions on banks' requests to engage in permissible activities. These conditions are "conditions imposed in writing" within the meaning of 12 USC 1818 if the OCC's approval explicitly makes the conditions enforceable. These conditions remain in effect until the OCC removes them.

The OCC considers some conditions imposed in writing to be enforcement actions. Generally, the OCC does not consider conditions imposed in writing in connection with the approval of a bank's licensing filing[66] to be enforcement actions, regardless of whether they are conditions imposed in writing within the meaning of 12 USC 1818. Table 2 summarizes when the OCC generally considers conditions imposed in writing to be enforcement actions.

**Table 2: Conditions Imposed in Writing as Enforcement Actions**

| Were the conditions imposed in connection with the approval of a bank's licensing filing? | | Are the conditions "conditions imposed in writing" within the meaning of 12 USC 1818? | | The OCC generally considers the conditions to be an enforcement action |
|---|---|---|---|---|
| Yes | and | Yes | then | No |
| | | No | | |
| No | | Yes | | Yes[a] |
| | | No | | No |

[a] Generally, when the OCC considers a condition imposed in writing within the meaning of 12 USC 1818 to be an enforcement action, the OCC publishes the condition in its monthly enforcement action press release.

Supervisory strategies for banks with outstanding conditions imposed in writing should include periodic assessments of the bank's ongoing compliance with the conditions.

---

[66] A "licensing filing" means an application, notice, or other request submitted to the OCC under 12 CFR 5.

EXHIBIT 3

# Comptroller's Handbook        CC-CMS

# Consumer Compliance (CC)

# Compliance Management Systems

Version 1.0, June 2018



Office of the
Comptroller of the Currency

result when a bank outsources operational functions (e.g., loan origination, account management, collections, payment processing, data input, and legal assistance) to third parties.[10]

## Strategic Risk

Strategic risk is the risk to current or projected financial condition and resilience arising from adverse business decisions, poor implementation of business decisions, or lack of responsiveness to changes in the banking industry and operating environment. Additionally, strategic risk increases when new activities are not compatible with the bank's risk appetite or strategic plan or do not provide an adequate return on investment; the bank engages in new activities without performing adequate due diligence, including upfront expense analysis; or management does not have adequate resources, expertise, and experience to properly implement and oversee the new activities. New activities should be developed and implemented consistently with sound risk management practices and should align with banks' overall business plans and strategies. New activities should encourage fair access to financial services and fair treatment of consumers and should be in compliance with applicable laws and regulations.[11] The board and senior management, collectively, are the key decision makers who drive the strategic direction of the bank and establish governance principles. The failure to integrate the bank's CMS into its decision-making and implementation process can have wide-ranging consequences. The consequences may include missed business opportunities, losses, failure to comply with laws or regulations, or deficient practices (including those that are unsafe or unsound) that could lead to enforcement actions, including CMPs.

## Reputation Risk

Reputation risk is the risk to earnings, capital, or enterprise value arising from negative public opinion. This risk may impair the bank's competitiveness by affecting its ability to establish new relationships or services or continue servicing existing relationships. Inadequate policies and procedures, operational breakdowns, or other weaknesses in the bank's CMS can harm its reputation when these weaknesses result in violations of consumer protection-related laws or regulations, particularly when consumers are harmed. Inappropriate delegation of activities to third parties and wrongful acts by third parties acting on the bank's behalf may also increase a bank's reputation risk exposure. Effective systems and controls to identify, measure, monitor, and control potential issues, such as appropriate oversight of sales, servicing, and collection practices, are important to managing risks, including reputation, compliance, and operational risks.

---

[10] Refer to OCC Bulletin 2013-29, "Third-Party Relationships: Risk Management Guidance," OCC Bulletin 2017-21, "Third-Party Relationships: Frequently Asked Questions to Supplement OCC Bulletin 2013-29," and OCC Bulletin 2017-7, "Third-Party Relationships: Supplemental Examination Procedures," for more information regarding third-party risk management.

[11] Refer to OCC Bulletin 2017-43, "New, Modified, or Expanded Bank Products and Services: Risk Management Principles."

# EXHIBIT 4



# Bank Secrecy Act/ Anti-Money Laundering Examination Manual

## Federal Financial Institutions Examination Council

Board of Governors of the Federal Reserve System, Consumer Financial Protection Bureau, Federal Deposit Insurance Corporation, National Credit Union Administration, Office of the Comptroller of the Currency, State Liaison Committee

2014

# BSA/AML Risk Assessment — Overview

**Objective.** *Assess the BSA/AML risk profile of the bank and evaluate the adequacy of the bank's BSA/AML risk assessment process.*

Evaluating the BSA/AML risk assessment should be part of scoping and planning the examination, and the inclusion of a section on risk assessment in the manual does not mean the two processes are separate.  Rather, risk assessment has been given its own section to emphasize its importance in the examination process and in the bank's design of effective risk-based controls.

The same risk management principles that the bank uses in traditional operational areas should be applied to assessing and managing BSA/AML risk.  A well-developed risk assessment assists in identifying the bank's BSA/AML risk profile.  Understanding the risk profile enables the bank to apply appropriate risk management processes to the BSA/AML compliance program to mitigate risk.  This risk assessment process enables management to better identify and mitigate gaps in the bank's controls.  The risk assessment should provide a comprehensive analysis of the BSA/AML risks in a concise and organized presentation, and should be shared and communicated with all business lines across the bank, board of directors, management, and appropriate staff; as such, it is a sound practice that the risk assessment be reduced to writing.

There are many effective methods and formats used in completing a BSA/AML risk assessment; therefore, examiners should not advocate a particular method or format.  Bank management should decide the appropriate method or format, based on the bank's particular risk profile.  Whatever format management chooses to use for its risk assessment, it should be easily understood by all appropriate parties.

The development of the BSA/AML risk assessment generally involves two steps: first, identify the specific risk categories (i.e., products, services, customers, entities, transactions, and geographic locations) unique to the bank; and second, conduct a more detailed analysis of the data identified to better assess the risk within these categories.  In reviewing the risk assessment during the scoping and planning process, the examiner should determine whether management has considered all products, services, customers, entities, transactions, and geographic locations, and whether management's detailed analysis within these specific risk categories was adequate.  If the bank has not developed a risk assessment, this fact should be discussed with management.  For the purposes of the examination, whenever the bank has not completed a risk assessment, or the risk assessment is inadequate, the examiner must complete a risk assessment based on available information.[17]

## Evaluating the Bank's BSA/AML Risk Assessment

An examiner must review the bank's BSA/AML compliance program with sufficient knowledge of the bank's BSA/AML risks in order to determine whether the BSA/AML compliance program is adequate and provides the controls necessary to mitigate risks.  For example, during the examination scoping and planning process, the examiner may initially

---

[17] Refer to "Examiner Development of a BSA/AML Risk Assessment," page 24, for guidance.

# Automated Clearing House Transactions — Overview

**Objective.**  *Assess the adequacy of the bank's systems to manage the risks associated with automated clearing house (ACH) and international ACH transactions (IAT) and management's ability to implement effective monitoring and reporting systems.*

The use of the ACH has grown markedly over the last several years due to the increased volume of electronic check conversion[206] and one-time ACH debits, reflecting the lower cost of ACH processing relative to check processing.[207] Check conversion transactions, as well as one-time ACH debits, are primarily low-dollar value, consumer transactions for the purchases of goods and services or the payment of consumer bills.  ACH is primarily used for domestic payments, but the Federal Reserve Banks' FedGlobal system[208] can currently accommodate cross-border payments to several countries around the world.

In September 2006, the Office of the Comptroller of the Currency issued guidance titled *Automated Clearinghouse Activities — Risk Management Guidance.*  The document provides guidance on managing the risks of ACH activity.  Banks may be exposed to a variety of risks when originating, receiving, or processing ACH transactions, or outsourcing these activities to a third party.[209]

## ACH Payment Systems

Traditionally, the ACH system has been used for the direct deposit of payroll and government benefit payments and for the direct payment of mortgages and loans.  As noted earlier, the ACH has been expanding to include one-time debits and check conversion.  ACH transactions are payment instructions to either credit or debit a deposit account.  Examples of credit payment transactions include payroll direct deposit, Social Security, dividends, and interest payments.  Examples of debit transactions include mortgage, loan, insurance premium, and a variety of other consumer payments initiated through merchants or businesses.

In general, an ACH transaction is a batch-processed, value-dated, electronic funds transfer between an originating and a receiving bank.  An ACH credit transaction is originated by the accountholder sending funds (payer), while an ACH debit transaction is originated by the

---

[206] In the electronic check conversion process, merchants that receive a check for payment do not collect the check through the check collection system, either electronically or in paper form.  Instead, merchants use the information on the check to initiate a type of electronic funds transfer known as an ACH debit to the check writer's account.  The check is used to obtain the bank routing number, account number, check serial number, and dollar amount for the transaction, and the check itself is not sent through the check collection system in any form as a payment instrument.  Merchants use electronic check conversion because it can be a more efficient way for them to obtain payment than collecting the check.

[207] Refer to the NACHA Web site.

[208] The Federal Reserve Banks operate FedACH, a central clearing facility for transmitting and receiving ACH payments, and FedGlobal, which sends cross-border ACH credits payments to more than 35 countries around the world, plus debit payments to Canada only.

[209] Refer to OCC Bulletin 2006-39, "*Automated Clearing House Activities: Risk Management Guidance*" (September 1, 2006).

# Examination Procedures

## Automated Clearing House Transactions

**Objective.** *Assess the adequacy of the bank's systems to manage the risks associated with automated clearing house (ACH) and international ACH transactions (IAT) and management's ability to implement effective monitoring and reporting systems.*

1.  Review the policies, procedures, and processes related to ACH transactions, including IATs.  Evaluate the adequacy of the policies, procedures, and processes given the bank's ACH transactions, including IATs, and the risks they present.  Assess whether the controls are adequate to reasonably protect the bank from money laundering and terrorist financing.

2.  From review of MIS and internal risk rating factors, determine whether the bank effectively identifies and monitors higher-risk customers using ACH transactions, including IATs.

3.  Evaluate the bank's risks related to ACH transactions, including IATs, by analyzing the frequency and dollar volume and types of ACH transactions in relation to the bank's size, its location, the nature of its customer account relationships, and the location of the origin or destination of IATs relative to the bank's location.

4.  Determine whether the bank's system for monitoring customers, including third-party service providers (TPSP), using ACH transactions and IATs for suspicious activities, and for reporting of suspicious activities, is adequate given the bank's size, complexity, location, and types of customer relationships.  Determine whether internal control systems include:

    -   Identifying customers with frequent and large ACH transactions or IATs.

    -   Monitoring ACH detail activity when the batch-processed transactions are separated for other purposes (e.g., processing errors).

    -   As appropriate, identifying and applying increased due diligence to higher-risk customers who originate or receive IATs, particularly when a party to the transaction is located in a higher-risk geographic location.

    -   Using methods to track, review, and investigate customer complaints or unauthorized returns regarding possible fraudulent or duplicate ACH transactions, including IATs.

5.  If appropriate, refer to the core examination procedures, "Office of Foreign Assets Control," page 152, for guidance.

## Transaction Testing

6.  On the basis of the bank's risk assessment of customers with ACH transactions as well as prior examination and audit reports, select a sample of higher-risk customers, including TPSPs, with ACH transactions or IATs, which may include the following:

# Third-Party Payment Processors — Overview

**Objective.** *Assess the adequacy of the bank's systems to manage the risks associated with its relationships with third-party payment processors, and management's ability to implement effective monitoring and reporting systems.*

Nonbank or third-party payment processors (processors) are bank customers that provide payment-processing services to merchants and other business entities. Traditionally, processors contracted primarily with retailers that had physical locations in order to process the retailers' transactions. These merchant transactions primarily included credit card payments but also covered automated clearing house (ACH) transactions,[221] remotely created checks (RCC),[222] and debit and prepaid cards transactions. With the expansion of the Internet, retail borders have been eliminated. Processors now provide services to a variety of merchant accounts, including conventional retail and Internet-based establishments, prepaid travel, telemarketers, and Internet gaming enterprises.

Third-party payment processors often use their commercial bank accounts to conduct payment processing for their merchant clients. For example, the processor may deposit into its account RCCs generated on behalf of a merchant client, or process ACH transactions on behalf of a merchant client. In either case, the bank does not have a direct relationship with the merchant. The increased use of RCCs by processor customers also raises the risk of fraudulent payments being processed through the processor's bank account. The Federal Deposit Insurance Corporation (FDIC), Office of the Comptroller of the Currency (OCC), and Financial Crimes Enforcement Network (FinCEN) have issued guidance regarding the risks, including the BSA/AML risks, associated with banking third-party processors.[223]

## Risk Factors

Processors generally are not subject to BSA/AML regulatory requirements. As a result, some processors may be vulnerable to money laundering, identity theft, fraud schemes, or other illicit transactions, including those prohibited by OFAC.

The bank's BSA/AML risks when dealing with a processor account are similar to risks from other activities in which the bank's customer conducts transactions through the bank on

---

[221] NACHA – The Electronic Payments Association (NACHA) is the administrator of the Automated Clearing House (ACH) Network. The ACH Network is governed by the NACHA Operating Rules, which provides the legal foundation for the exchange of ACH and IAT payments. The NACHA Web site includes additional information about the ACH payment system.

[222] A remotely created check (sometimes called a "demand draft") is a check that is not created by the paying bank (often created by a payee or its service provider), drawn on a customer's bank account. The check often is authorized by the customer remotely, by telephone or online, and, therefore, does not bear the customer's handwritten signature.

[223] *FDIC Clarifying Supervisory Approach to Institutions Establishing Account Relationships with Third-Party Payment Processors*, FDIC FIL-41-2014, July 28, 2014; *Payment Processor Relationships Revised Guidance*, FDIC FIL-3-2012, January 31, 2012; *Risk Management Guidance: Payment Processors*, OCC Bulletin 2008-12, April 24, 2008; *Risk Management Guidance: Third Party Relationships*, OCC Bulletin 2013-29, October 30, 2013; and *Risk Associated with Third-Party Payment Processors*, FinCEN Advisory FIN-2012-A010, October 22, 2012.

# Examination Procedures

## Third-Party Payment Processors

**Objective.** *Assess the adequacy of the bank's systems to manage the risks associated with its relationships with third-party payment processors, and management's ability to implement effective monitoring and reporting systems.*

1. Review the policies, procedures, and processes related to third-party payment processors (processors). Evaluate the adequacy of the policies, procedures, and processes given the bank's processor activities and the risks they present. Assess whether the controls are adequate to reasonably protect the bank from money laundering and terrorist financing.

2. From a review of MIS and internal risk rating factors, determine whether the bank effectively identifies and monitors processor relationships, particularly those that pose a higher risk for money laundering.

3. Determine whether the bank's system for monitoring processor accounts for suspicious activities, and for reporting suspicious activities, is adequate given the bank's size, complexity, location, and types of customer relationships.

4. If appropriate, refer to the core examination procedures, "Office of Foreign Assets Control," page 152, for guidance.

## Transaction Testing

5. On the basis of the bank's risk assessment of its processor activities, as well as prior examination and audit reports, select a sample of higher-risk processor accounts. From the sample selected:

   - Review account opening documentation and ongoing due diligence information.

   - Review account statements and, as necessary, specific transaction details to determine how expected transactions compare with actual activity.

   - Determine whether actual activity is consistent with the nature of the processor's stated activity.

   - Assess the controls concerning identification of high rates of returns and the process in place to address compliance and fraud risks.

   - Identify any unusual or suspicious activity.

6. On the basis of examination procedures completed, including transaction testing, form a conclusion about the adequacy of policies, procedures, and processes associated with processor accounts.

# Nonbank Financial Institutions — Overview

**Objective.** *Assess the adequacy of the bank's systems to manage the risks associated with accounts of nonbank financial institutions (NBFI), and management's ability to implement effective monitoring and reporting systems.*

NBFIs are broadly defined as institutions other than banks that offer financial services.  The USA PATRIOT Act has defined a variety of entities as financial institutions.[277] Common examples of NBFIs include, but are not limited to:

- Casinos and card clubs.

- Securities and commodities firms (e.g., brokers/dealers, investment advisers, mutual funds, hedge funds, or commodity traders).

- Money services businesses (MSB).[278]

- Insurance companies.

- Loan or finance companies.[279]

- Operators of credit card systems.

- Other financial institutions (e.g., dealers in precious metals, stones, or jewels; pawnbrokers).

Some NBFIs are currently required to develop an AML program, comply with the reporting and recordkeeping requirements of the BSA, and report suspicious activity, as are banks.[280] NBFIs typically need access to banking services in order to operate.  Although NBFIs maintain operating accounts at banks, the BSA does not require, and neither FinCEN nor the federal banking agencies expect, banks to serve as the *de facto* regulator of any NBFI industry or individual NBFI customer.  Furthermore, while banks are expected to manage risk associated with all accounts, including NBFI accounts, banks are not held responsible for their customers' compliance with the BSA and other applicable federal and state laws and regulations.

---

[277] Refer to Appendix D ("Statutory Definition of Financial Institution") for guidance.

[278] MSBs include five distinct types of financial services providers and the U.S. Postal Service: (1) dealers in foreign exchange ; (2) check cashers; (3) issuers or sellers of traveler's checks or money orders, ; (4) providers or sellers of prepaid access; and (5) money transmitters.  FinCEN routinely publishes administrative letter rulings that address inquiries regarding whether persons who engage in certain specific business activities are MSBs.

[279] 77 *Fed. Reg.* 8148 (February 14, 2012)  defines non-bank residential mortgage lenders and originators as loan or finance companies for the purpose of requiring them to establish anti-money laundering programs and report suspicious activity.  FinCEN Guidance FIN-2012-R005, *Compliance obligations of certain loan or finance company subsidiaries of Federally regulated banks and other financial institutions* (August 13, 2012), confirms that when a subsidiary loan or finance company is obligated to comply with the AML and SAR regulations that are applicable to its parent financial institution and is subject to examination by the parent financial institution's Federal functional regulator, the loan or finance company is deemed to comply with FinCEN's regulation.

[280] Refer to 31 CFR Chapter X for specific regulatory requirements.

## Risk Factors

NBFI industries are extremely diverse, ranging from large multi-national corporations to small, independent businesses that offer financial services only as an ancillary component to their primary business (e.g., grocery store that offers check cashing).  The range of products and services offered, and the customer bases served by NBFIs, are equally diverse.  As a result of this diversity, some NBFIs may be lower risk and some may be higher risk for money laundering.

Banks that maintain account relationships with NBFIs may be exposed to a higher risk for potential money laundering activities because many NBFIs:

- Lack ongoing customer relationships and require minimal or no identification from customers.

- Maintain limited or inconsistent record keeping on customers and transactions.

- Engage in frequent currency transactions.

- Are subject to varying levels of regulatory requirements and oversight.

- Can quickly change their product mix or location and quickly enter or exit an operation.

- Sometimes operate without proper registration or licensing.

## Risk Mitigation

Banks that maintain account relationships with NBFIs should develop policies, procedures, and processes to:

- Identify NBFI relationships.

- Assess the potential risks posed by the NBFI relationships.

- Conduct adequate and ongoing due diligence on the NBFI relationships when necessary.

- Ensure NBFI relationships are appropriately considered within the bank's suspicious activity monitoring and reporting systems.

## Risk Assessment Factors

Banks should assess the risks posed by their NBFI customers and direct their resources most appropriately to those accounts that pose a more significant money laundering risk.

The following factors may be used to help identify the relative risks within the NBFI portfolio.  Nevertheless, management should weigh and evaluate each risk assessment factor to arrive at a risk determination for each customer and to prioritize oversight resources.  Relevant risk factors include:

- Types of products and services offered by the NBFI.

- Locations and markets served by the NBFI.

- Anticipated account activity.

- Purpose of the account.

A bank's due diligence should be commensurate with the level of risk of the NBFI customer identified through its risk assessment.  If a bank's risk assessment indicates potential for a heightened risk of money laundering or terrorist financing, the bank is expected to conduct further due diligence in a manner commensurate with the heightened risk.

## Providing Banking Services to Money Services Businesses

FinCEN and the federal banking agencies issued interpretive guidance on April 26, 2005, to clarify the BSA requirements and supervisory expectations as applied to accounts opened or maintained for MSBs.[281] With limited exceptions, many MSBs are subject to the full range of BSA regulatory requirements, including the anti-money laundering program rule, suspicious activity and currency transaction reporting rules, and various other identification and recordkeeping rules.[282] Existing FinCEN regulations require certain MSBs to register with FinCEN.[283] Finally, many states have established supervisory requirements, often including the requirement that an MSB be licensed with the state(s) in which it is incorporated or does business.

FinCEN defines MSBs as doing business in one or more of the following capacities:

- Dealer in foreign exchange

- Check casher

- Issuer or seller of traveler's checks or money orders

- Money transmitter

- Provider of prepaid access

---

[281] Refer to *Interagency Interpretive Guidance on Providing Banking Services to Money Services Businesses Operating in the United States*, April 26, 2005.

[282] Refer to 31 CFR 1022.210 (requirement for MSBs to establish and maintain an anti-money laundering program); 31 CFR 1022.310 (requirement for MSBs to file Currency Transaction Reports); 31 CFR 1022.320 (requirement for MSBs to file Suspicious Activity Reports, other than for check cashing); 31 CFR 1010.415 (requirement for MSBs that sell monetary instruments for currency to verify the identity of the customer and create and maintain a record of each currency purchase between $3,000 and $10,000, inclusive); 31 CFR 1010.410(e) and (f) (rules applicable to certain transmittals of funds); and 1022.410 (additional recordkeeping requirement for dealers in foreign exchange including the requirement to create and maintain a record of each exchange of currency in excess of $1,000);1022.420 (additional recordkeeping requirements for providers or sellers of prepaid access).

[283] Refer to 31 CFR 1022.380.  All MSBs must register with FinCEN (whether or not licensed as an MSB by any state) except: a business that is an MSB solely because it serves as an agent of another MSB; a business that is an MSB solely  as a seller of  prepaid access, ; the U.S. Postal Service; and agencies of the United States, of any state, or of any political subdivision of any state.  A business that acts as an agent for a principal or principals engaged in MSB activities, and that does not on its own behalf  perform any other services of a nature or value that would cause it to qualify as an MSB, is not required to register with FinCEN.  FinCEN has issued guidance on MSB registration and de-registration.  Refer to *Registration and De-Registration of Money Services Businesses*, FIN-2006-G006, February 3, 2006.

- Seller of prepaid access

- U.S. Postal Service

There is a threshold requirement for dealers in foreign exchange, check cashers and issuers or sellers of traveler's checks or money orders.  A business that engages in such transactions is not be considered an MSB if it does not engage in such transactions in an amount greater than $1,000 for any person on any day in one or more transactions (31 CFR 1010.100(ff)).  An entity that engages in money transmission in any amount is considered an MSB.  Thresholds for providers and sellers of prepaid access are discussed below.

## Prepaid Access

FinCEN's regulation for MSBs excluded certain prepaid access arrangements from the definition of prepaid programs.  Providers and sellers of prepaid access are not considered MSBs if they engage in prepaid arrangements excluded from the definition of a prepaid program under 31 CFR 1010.100(ff)(4)(iii).[284]  The exclusions include arrangements that:

- Provide closed loop prepaid access to funds (e.g., such as store gift cards) in amounts not to exceed $2,000 maximum value per device on any day.

- Provide prepaid access solely to funds provided by a government agency.

- Provide prepaid access to funds for pre-tax flexible spending for health and dependent care, or from Health Reimbursement Arrangements for health care expenses.

There are two types of prepaid access arrangements that have a qualified exclusion:

- Open loop prepaid access that does not exceed $1,000 maximum value on any day.

- Prepaid access to employment benefits, incentives, wages or salaries (payroll).

These arrangements are not prepaid programs subject to BSA regulatory requirements unless they can:

- Be used internationally.

- Allow transfers of value from person to person within the arrangement, or

- Be reloaded from a non-depository source.

If any one of these features is part of the arrangement, it is a covered prepaid program under 31 CFR 1010.100.

## Administrators and Exchangers of Virtual Currency

FinCEN's regulations define currency as "the coin and paper money of the United States or of any other country that is designated as legal tender; and that circulates; and is customarily

---

[284] Frequently Asked Questions Final Rule-Definitions and Other Regulations Relating to Prepaid Access (11/2/2011).

used and accepted as a medium of exchange in the country of issuance."  In contrast, "virtual" currency is a medium of exchange that operates like a currency in some environments, but does not have legal tender status in any jurisdiction.  Virtual currency must be converted into U.S. dollars through the services of an administrator or exchanger prior to deposit into the banking system.  An administrator or exchanger of virtual currency is an MSB under FinCEN's regulations, specifically, a money transmitter, unless a limitation to or exemption from the definition applies to the person.[285]  BSA requirements and supervisory expectations for providing banking services to administrators or exchangers of virtual currencies are the same as money transmitters.[286]

## Regulatory Expectations

The following regulatory expectations apply to banks with MSB customers:

- The BSA does not require, and neither FinCEN nor the federal banking agencies expect, banks to serve as the *de facto* regulator of any type of NBFI industry or individual NBFI customer, including MSBs.

- While banks are expected to manage risk associated with all accounts, including MSB accounts, banks are not held responsible for the MSB's BSA/AML program.

- Not all MSBs pose the same level of risk, and not all MSBs require the same level of due diligence.  Accordingly, if a bank's assessment of the risks of a particular MSB relationship indicates a lower risk of money laundering or other illicit activity, a bank is not routinely expected to perform further due diligence (such as reviewing information about an MSB's BSA/AML program) beyond the minimum due diligence expectations. Unless indicated by the risk assessment of the MSB, banks are not expected to routinely review an MSB's BSA/AML program.

## MSB Risk Assessment

An effective risk assessment should be a composite of multiple factors, and depending upon the circumstances, certain factors may be given more weight than others.  The following factors may be used to help identify the level of risk presented by each MSB customer:

- Purpose of the account.

- Anticipated account activity (type and volume).

- Types of products and services offered by the MSB.

- Locations and markets served by the MSB.

Bank management may tailor these factors based on their customer base or the geographic locations in which the bank operates.  Management should weigh and evaluate each risk assessment factor to arrive at a risk determination for each customer.  A bank's due diligence

---

[285] *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies,* FIN-2013-G001, March 18, 2013.

[286] Refer to the Financial Action Task Force *Guidance on Virtual Currencies, Key Definitions and Potential AML/CFT Risks,* June 2014.

# Cash-Intensive Businesses — Overview

**Objective.** *Assess the adequacy of the bank's systems to manage the risks associated with cash-intensive businesses and entities, and management's ability to implement effective due diligence, monitoring, and reporting systems.*

Cash-intensive businesses and entities cover various industry sectors. Most of these businesses are conducting legitimate business; however, some aspects of these businesses may be susceptible to money laundering or terrorist financing. Common examples include, but are not limited to, the following:

- Convenience stores.
- Restaurants.
- Retail stores.
- Liquor stores.
- Cigarette distributors.
- Privately owned automated teller machines (ATM).
- Vending machine operators.
- Parking garages.

## Risk Factors

Some businesses and entities may be misused by money launderers to legitimize their illicit proceeds. For example, a criminal may own a cash-intensive business, such as a restaurant, and use it to launder currency from illicit criminal activities. The restaurant's currency deposits with its bank do not, on the surface, appear unusual because the business is legitimately a cash-generating entity. However, the volume of currency in a restaurant used to launder money is most likely be higher in comparison with similar restaurants in the area. The nature of cash-intensive businesses and the difficulty in identifying unusual activity may cause these businesses to be considered higher risk.

## Risk Mitigation

When establishing and maintaining relationships with cash-intensive businesses, banks should establish policies, procedures, and processes to identify higher-risk relationships; assess AML risks; complete due diligence at account opening and periodically throughout the relationship; and include such relationships in appropriate monitoring for unusual or suspicious activity. At the time of account opening, the bank should have an understanding of the customer's business operations; the intended use of the account; including anticipated transaction volume, products, and services used; and the geographic locations involved in the relationship.

When conducting a risk assessment of cash-intensive businesses, banks should direct their resources to those accounts that pose the greatest risk of money laundering or terrorist financing. The following factors may be used to identify the risks:

# Examination Procedures

## Cash-Intensive Businesses

**Objective.** *Assess the adequacy of the bank's systems to manage the risks associated with cash-intensive businesses and entities, and management's ability to implement effective due diligence, monitoring, and reporting systems.*

1. Review the policies, procedures, and processes related to cash-intensive businesses. Evaluate the adequacy of policies, procedures, and processes given the bank's cash-intensive business activities in relation to the bank's cash-intensive business customers and the risks that they represent.  Assess whether the controls are adequate to reasonably protect the bank from money laundering and terrorist financing.

2. From a review of MIS and internal risk rating factors, determine whether the bank effectively identifies and monitors cash-intensive businesses and entities.

3. Determine whether the bank's system for monitoring cash-intensive businesses for suspicious activities, and for reporting of suspicious activities, is adequate given the bank's size, complexity, location, and types of customer relationships.

4. If appropriate, refer to the core examination procedures, "Office of Foreign Assets Control," page 152, for guidance.

## Transaction Testing

5. On the basis of the bank's risk assessment of its cash-intensive business and entity relationships, as well as prior examination and audit reports, select a sample of cash-intensive businesses.  As an alternative, identify branches in the bank's highest-risk areas or branches that ship/receive the most cash and request the largest sources and users of cash at those locations.  From the sample selected, perform the following examination procedures:

   - Review account opening documentation including CIP information, if applicable, and a sample of transaction activity.

   - Determine whether actual account activity is consistent with anticipated account activity.

   - Look for trends in the nature, size, or scope of the transactions, paying particular attention to currency transactions.

   - Determine whether ongoing monitoring is sufficient to identify potentially suspicious activity.

6. On the basis of examination procedures completed, including transaction testing, form a conclusion about the adequacy of policies, procedures, and processes associated with cash-intensive businesses and entities.

# EXHIBIT 5

# Office of



# Inspector General

Office of Audits and Evaluations
Report No. AUD-15-008

## The FDIC's Role in Operation Choke Point and Supervisory Approach to Institutions that Conducted Business with Merchants Associated with High-Risk Activities

September 2015

PROTECTED

OCC-AA-00001532



**Office of Inspector General**

**Executive Summary**

**The FDIC's Role in Operation Choke Point and Supervisory Approach to Institutions that Conducted Business with Merchants Associated with High-Risk Activities**

Report No. AUD-15-008
September 2015

## Why We Did The Audit

In a letter dated October 23, 2014, thirty-five Members of Congress (referred to hereinafter as Members) requested that the FDIC Office of Inspector General (OIG) investigate the involvement of the FDIC and its staff in the creation and/or execution of the United States Department of Justice (DOJ or Department) initiative known as Operation Choke Point. In the letter, Members expressed concern that the FDIC was working with DOJ in connection with Operation Choke Point to pressure financial institutions to decline banking services to certain categories of lawfully operating merchants that had been associated with high-risk activities. The letter also indicated that it was the Members' belief that FDIC officials had abused their authority by advancing a political or moral agenda to force certain lawful businesses out of the financial services space.

On December 17, 2014, the FDIC Chairman requested that, as part of our planned and ongoing work in this area, we conduct a fact-finding review of the actions of one former and four current senior FDIC officials. The Chairman's request was prompted by concerns raised by a Congressman in a letter dated December 10, 2014 that stated the five officials had allowed their personal and political views to interfere with the important work of the FDIC and that the officials had misled the American people through their emails and in meetings with, and testimony before, the Congress.

The objectives of the audit were to (1) describe the FDIC's role in the DOJ initiative known as Operation Choke Point and (2) assess the FDIC's supervisory approach to financial institutions that conducted business with merchants associated with high-risk activities for consistency with relevant statutes and regulations. As part of the audit, we reviewed a non-statistical sample of 23 FDIC-supervised financial institutions to assess the FDIC's supervisory approach for addressing identified concerns. We also determined the extent to which the five referenced officials were involved with Operation Choke Point and whether their actions involving the institutions we reviewed were based on personal, political, or moral agendas aimed at forcing lawfully operating businesses out of the banking sector. Work on a separate inquiry by the OIG's Office of Investigations into whether one of these five individuals had misled the American people in testimony before the Congress was completed at the close of this audit.

## Background

In November 2012, attorneys within DOJ's Civil Division proposed an internal initiative intended to protect consumers from fraud perpetrated by fraudulent merchants, financial institutions, and financial intermediaries known as third-party payment processors (TPPP). The initiative, which DOJ named Operation Choke Point, focused on the relationship between TPPPs and financial institutions because these relationships were the means by which fraudulent merchants were able to access the banking system to commit consumer fraud. In carrying out its work in connection with Operation Choke Point, DOJ issued 60 administrative subpoenas from February 2013 through August 2013 to entities for which the Department determined it had evidence of potential consumer fraud. According to DOJ employees that we spoke with during the audit, 20 of the subpoenas were issued to FDIC-supervised financial institutions.

In August 2013, Members became concerned that the FDIC and DOJ were pressuring financial institutions and TPPPs to terminate business relationships with lawful lenders that provided short-term credit options to underserved consumers. Since that time, Members have also expressed concern that

i

PROTECTED

| Executive Summary | The FDIC's Role in Operation Choke Point and Supervisory Approach to Institutions that Conducted Business with Merchants Associated with High-Risk Activities |
|---|---|

financial institutions were declining basic banking services, such as deposit accounts and loans, to entire categories of merchants that had been associated with high-risk activities. Members asserted that the FDIC and DOJ were using a "high-risk list" of merchant categories that was published in an informational article contained in the FDIC's summer 2011 edition of the *Supervisory Insights* Journal, together with certain FDIC supervisory guidance, to target institutions for increased scrutiny.

The FDIC has defined higher-risk activities as those that have been understood by industry and financial regulators as being subject to complex or varying legal and regulatory environments (such as activities that may be legal only in certain states); being prohibited for certain consumers (such as minors); being subject to varying state and federal licensing and reporting regimes; or tending to display a higher incidence of consumer complaints, returns, or chargebacks. In the context of this audit, merchants associated with high-risk or higher-risk activities include (among others) payday lenders, pawnbrokers, firearms and ammunition manufacturers and retailers, and tobacco retailers.

The FDIC has broad authority under the Federal Deposit Insurance Act (FDI Act), as amended, and other statutes and regulations to supervise the activities of state-chartered financial institutions that are not members of the Federal Reserve System. The FDIC's *Risk Management Manual of Examination Policies*, *Compliance Examination Manual*, and *Formal and Informal Actions Procedures Manual* describe the FDIC's approach for determining an appropriate supervisory corrective action to address an identified concern. In general, these manuals outline a risk-based, graduated approach for addressing concerns identified through the supervisory process. According to two of the manuals, it is sufficient in many cases for examiners to use moral suasion or make written recommendations in reports of examination to address identified problems or concerns. If such actions would not be sufficient, or if serious concerns exist, stronger actions may be taken in the form of informal or formal corrective actions against an institution or responsible individuals.

## Audit Results

The FDIC's involvement in Operation Choke Point has been limited to a few FDIC staff communicating with DOJ employees regarding aspects of the initiative's implementation. These communications with DOJ generally related to the Corporation's responsibility to understand and consider the implications of potential illegal activity involving FDIC-supervised financial institutions. Overall, we consider the FDIC's involvement in Operation Choke Point to have been inconsequential to the overall direction and outcome of the initiative.

We determined that the FDIC's supervisory approach to financial institutions that conducted business with merchants on the high-risk list was within the Corporation's broad authorities granted under the FDI Act and other relevant statutes and regulations. However, the manner in which the supervisory approach was carried-out was not always consistent with the FDIC's written policy and guidance.

We found no evidence that the FDIC used the high-risk list to target financial institutions. However, references to specific merchant types in the summer 2011 edition of the FDIC's *Supervisory Insights* Journal and in supervisory guidance created a perception among some bank executives that we spoke with that the FDIC discouraged institutions from conducting business with those merchants. This perception was most prevalent with respect to payday lenders.

ii

| Executive Summary | **The FDIC's Role in Operation Choke Point and Supervisory Approach to Institutions that Conducted Business with Merchants Associated with High-Risk Activities** |
|---|---|

Report No. AUD-15-008
September 2015

With the exception of payday lenders, we found no instances among the financial institutions we reviewed where the FDIC pressured an institution to decline banking services to a merchant on the high-risk list. Further, bank executives that we spoke with indicated that, except for payday lenders, they had not experienced regulatory pressure to terminate an existing customer relationship with a merchant on the high-risk list, including a firearms, ammunition, or tobacco retailer. As described below, the FDIC has had concerns regarding payday lending by financial institutions that precede Operation Choke Point by many years. These concerns led to supervisory guidance and actions that caused FDIC-supervised institutions to stop offering payday loans. More recently, FDIC officials became concerned about other types of banking activities that facilitate payday lending.

## Payday Lending and Related Activities

The FDIC's payday lending guidance, which was established in 2003 and updated in 2005, increased expectations and placed heightened scrutiny on institutions that were engaged in payday lending. As a result of the guidance and related supervisory actions, the relatively few FDIC-supervised institutions that were making payday loans stopped doing so in 2006. In the years that followed, the FDIC took steps to encourage institutions to offer affordable, small-dollar loans and researched and communicated concerns about emerging credit products that can have characteristics similar to payday loans, such as deposit advance products.

We found that a number of FDIC officials also had concerns about Automated Clearing House (ACH) payment processing by financial institutions for payday lenders. These concerns were based on the premise that such services facilitate payday lending. The heightened level of concern for payday lending by financial institutions and related ACH processing was reflected in the negative tenor of internal email communications among senior FDIC staff and others that we reviewed. In some cases, these communications involved instances in which FDIC personnel contacted institutions and used moral suasion to discourage them from adopting payday lending products or providing ACH processing for payday lenders. The FDIC does not have a formal definition of moral suasion in its policies. However, examiners commonly use moral suasion in an attempt to influence risk management practices at financial institutions before perceived problems rise to a level that necessitates an informal or formal enforcement action.

We noted two instances in which the FDIC discouraged institutions from providing ACH processing to payday lenders in written communications to the institutions. In both instances, the FDIC's principal stated concern was the reputation risk to the institutions due to their potential or existing relationship with a payday lender. The FDIC does not centrally track its written communications to financial institutions that involve ACH processing concerns. Accordingly, we were unable to determine how often such communications occur. However, our discussions with FDIC executives and our review of regional office status reports identified only three institutions where FDIC officials raised concerns regarding ACH processing practices for payday lenders.

## The FDIC's Actions to Address Concerns Regarding its Supervisory Approach

FDIC officials determined that there were misperceptions regarding the Corporation's supervisory approach to institutions that conduct business with merchants on the high-risk list and, therefore, the FDIC took several actions beginning in September 2013. Specifically, the FDIC withdrew references to

PROTECTED

OCC-AA-00001535

**Executive Summary**

**The FDIC's Role in Operation Choke Point and Supervisory Approach to Institutions that Conducted Business with Merchants Associated with High-Risk Activities**

Report No. AUD-15-008
September 2015

high-risk merchants from the *Supervisory Insights* article and its guidance, clarified its supervisory policy and guidance, and established an internal policy for documenting and reporting instances in which staff recommend or require institutions to terminate deposit account relationships. Among other things, the internal policy does not allow for the termination of deposit account relationships based solely on reputation risk to an institution. These actions were intended to make clear the FDIC's policy that financial institutions that properly manage customer relationships and effectively mitigate risks are neither prohibited nor discouraged from providing financial services to customers, regardless of the customers' business category, provided that the institutions operate in compliance with applicable laws.

We noted that the policy and guidance described above focuses on deposit accounts and does not explicitly address various other types of banking products, such as credit products. In addition, it is too soon, in our view, to determine whether the actions taken by the FDIC will ensure a common understanding and sustained application of the FDIC's supervisory approach to the issues and risks discussed in this report, both within the FDIC and at FDIC-supervised institutions.

## Role of Certain FDIC Officials

We concluded that the five officials referenced above did not play a role in the development or implementation of Operation Choke Point. We also concluded that the individuals did not pursue their own personal, political, or moral agendas aimed at forcing lawfully operating businesses on the high-risk list out of the banking sector. As it pertains to payday lending and related activities, we concluded that the officials acted consistent with a widely-held understanding that the highest levels of the FDIC disfavored these types of banking services. We did, however, identify certain internal email communications and one written communication to an institution involving three of the five individuals that were not consistent with the FDIC's written policy and guidance pertaining to payday lending and related activities.

## Refund Anticipation Loans

Our report includes an observation on the FDIC's supervisory approach to financial institutions that offered a credit product known as a refund anticipation loan (RAL). The FDIC considers RALs to carry a significant degree of risk to financial institutions, including third-party, reputation, compliance, and legal risks. Of particular concern to the FDIC is whether an institution can ensure proper underwriting and compliance with consumer protection requirements, particularly when RALs are brokered by large numbers of third-party tax return preparers (sometimes called electronic refund originators—EROs) in conjunction with the filing of a taxpayer's income tax return. Although RALs were not on the high-risk list, we observed that the FDIC's supervisory approach to institutions that offered this type of credit product involved circumstances that were similar to those that prompted the Congressional request to our office.

We identified three FDIC-supervised institutions that offered RALs. These institutions began offering RALs in 1987, 1988, and 2007, respectively. At various times from 2004 through 2009, FDIC examiners criticized the risk management practices pertaining to RALs at two of these institutions during compliance and risk management examinations. In late 2009 and early 2010, the FDIC sent letters to all three institutions expressing concerns about RALs and requesting that the institutions submit plans for discontinuing this type of lending. In early 2011, after efforts to convince these institutions to discontinue

PROTECTED

| **Executive Summary** | **The FDIC's Role in Operation Choke Point and Supervisory Approach to Institutions that Conducted Business with Merchants Associated with High-Risk Activities** |
|---|---|

Report No. AUD-15-008
September 2015

offering RALs were unsuccessful and supervisory concerns remained, the tenor of the FDIC's supervisory approach became aggressive. In one case, the FDIC took the highly unusual step of conducting a simultaneous, unannounced review of 250 EROs in 36 states involving hundreds of FDIC examiners in order to develop the evidence needed to compel the institution to stop offering RALs. In another case, a former FDIC supervisory attorney used a confrontational approach to pressure an institution's Board to terminate its RAL offerings. By April 2012, all three institutions had stopped offering RALs.

The FDIC drafted a policy statement in 2010 that defined the FDIC's supervisory concerns and expectations for institutions offering RALs. However, the policy statement was never finalized. In our view, establishing such a policy would have been prudent to ensure institutions understood the risks associated with RALs and provide transparent supervisory guidance and expectations for institutions already (or contemplating) offering RALs.

We concluded that the supervisory actions taken with respect to the three institutions that offered RALs fell within the Corporation's broad statutory authorities because the Corporation is permitted to require a financial institution to discontinue a practice if safety and soundness or consumer protection concerns warrant doing so. However, we believe that the execution of these actions by FDIC management and staff warrants further review and the OIG is conducting additional work in this area. Further, in light of the concerns described in this report regarding the use of moral suasion with financial institutions, the FDIC should determine whether moral suasion is adequately defined in FDIC policy and guidance in terms of the types and circumstances under which it is used to address supervisory concerns, whether it is subject to sufficient scrutiny and oversight, and whether meaningful remedies exist should moral suasion be misused.

## Recommendations and Corporation Comments

The report contains three recommendations addressed to the Directors, RMS and DCP, to (1) review and clarify, as appropriate, existing policy and guidance pertaining to the provision and termination of banking services; (2) assess the effectiveness of the FDIC's supervisory policy and approach after a reasonable period of time is allowed for implementation; and (3) coordinate the FDIC's Legal Division to review and clarify, as appropriate, supervisory policy and guidance to ensure that moral suasion is adequately addressed. The Director, RMS, provided a written response on behalf of the FDIC, dated September 10, 2015, to a draft of the report. In the response, the Director concurred with all three of the report's recommendations and described planned and completed corrective actions that were responsive. The FDIC expects to complete all actions to address the recommendations by September 30, 2016.

As noted above, the FDIC has taken and planned corrective actions that are responsive to our recommendations. However, in reiterating our findings and providing perspective surrounding them, management did not discuss the potential impact that statements and actions by FDIC executives can have on those responsible for carrying out the FDIC's supervisory policies and approach. As described in our report, our interviews and review of documents showed that perceptions regarding the views of senior FDIC executives about institutions involved in payday lending and RALs influenced the supervisory approach to handling risks at those institutions. In several instances, the approach was not consistent with written FDIC policy and guidance. Consequently, as it has committed to do, we believe it is prudent for FDIC senior leadership to reiterate its revised policies on a sustained basis to ensure they become

v

PROTECTED

OCC-AA-00001537

| Executive Summary | **The FDIC's Role in Operation Choke Point and Supervisory Approach to Institutions that Conducted Business with Merchants Associated with High-Risk Activities** |
|---|---|

Report No. AUD-15-008
September 2015

engrained in the organization's supervisory culture.  Given the significance of these issues, we will, at an appropriate time, follow up on the FDIC's actions to ensure they address the underlying concerns that support our recommendations.

vi

PROTECTED

OCC-AA-00001538

## Table of Contents

Background                                                                      3

   Congressional Concerns Pertaining to Operation Choke Point              4

   The FDIC's Supervisory Authorities                                      5

   TPPPs and Merchants Associated with High-Risk Activities                6

   Payday Lending                                                          9

Audit Results                                                                   11

   The FDIC's Role in Operation Choke Point                                14

   The FDIC's Supervisory Approach to Institutions that Conducted Business   17
   with Merchants on the High-Risk List

   Role of Certain Former and Current FDIC Officials                       28

   The FDIC's Actions to Address Concerns Regarding Its Supervisory         31
   Approach

   Banker Perspectives                                                     33

   Observation:  Refund Anticipation Loans                                 35

Recommendations                                                                 40

Corporation Comments and OIG Evaluation                                         41

Appendices
   1.  Objectives, Scope, and Methodology                                   43
   2.  Glossary of Terms                                                    50
   3.  Acronyms and Abbreviations                                           56
   4.  Corporation Comments                                                 57
   5.  Summary of the Corporation's Corrective Actions                      65

Table:  Merchants Associated with High-Risk Activities                         7

Figure:  What are Payday Loans?                                                 9

PROTECTED



**Federal Deposit Insurance Corporation**
3501 Fairfax Drive, Arlington, VA 22226

Office of Audits and Evaluations
Office of Inspector General

| | |
|---|---|
| **DATE:** | September 16, 2015 |
| **MEMORANDUM TO:** | Doreen R. Eberley, Director<br>Division of Risk Management Supervision |
| | Mark E. Pearce, Director<br>Division of Depositor and Consumer Protection |
| | Charles Yi<br>General Counsel |
| **FROM:** | **/Signed/**<br>Mark F. Mulholland<br>Assistant Inspector General for Audits |
| **SUBJECT:** | *The FDIC's Role in Operation Choke Point and Supervisory Approach to Institutions that Conducted Business with Merchants Associated with High-Risk Activities* (Report No. AUD-15-008) |

This report presents the results of our audit of the FDIC's role in the United States Department of Justice (DOJ or Department) initiative known as Operation Choke Point and the FDIC's supervisory approach to institutions that conducted business with merchants associated with high-risk activities.[1]  DOJ has described Operation Choke Point as an effort intended to protect consumers from fraud perpetrated by fraudulent merchants, financial institutions, and financial intermediaries known as third-party payment processors (TPPP).[2]  Some Members of Congress, however, have asserted that Operation Choke Point targets certain types of businesses, many of which are licensed and legally-operating, and forces them out of the financial services space and, therefore, out of business.

In a letter dated October 23, 2014, thirty-five Members of Congress (referred to hereinafter as Members) requested that we investigate the involvement of the FDIC and its staff in the creation and/or execution of Operation Choke Point.  In the letter, Members expressed concern that the FDIC was working with DOJ in connection with Operation Choke Point to pressure financial

---

[1] The FDIC has defined higher-risk activities as those that have been understood by industry and financial regulators as being subject to complex or varying legal and regulatory environments (such as activities that may be legal only in certain states); being prohibited for certain consumers (such as minors); being subject to varying state and federal licensing and reporting regimes; or tending to display a higher incidence of consumer complaints, returns, or chargebacks.  In the context of this audit, merchants associated with high-risk or higher-risk activities include (among others) payday lenders, pawnbrokers, firearms and ammunition manufacturers and retailers, and tobacco retailers.  A more detailed discussion of such merchants appears later in this report.

[2] Certain terms that are underlined when first used in this report are defined in Appendix 2, *Glossary of Terms.*

**PROTECTED**

institutions to decline banking services to certain categories of lawfully operating merchants that had been associated with high-risk activities. The letter also suggested that a senior FDIC official had provided false testimony regarding this concern during a July 2014 Congressional hearing. Further, the letter indicated that it was the Members' belief that FDIC officials had abused their authority by advancing a political or moral agenda to force certain lawful businesses out of the financial services space.

Consistent with our established protocols for working within the Congressional committee structure, we sent letters, dated November 7, 2014, to the Chairmen of the Committee on Financial Services and the Committee on Oversight and Government Reform of the United States House of Representatives, stating that we would perform work responsive to the Members' concerns. The letters stated that we would conduct our work in two parts. First, we would investigate the serious allegation that a senior FDIC official had provided false testimony to the Congress. At the close of our audit, the Office of Inspector General's (OIG) Office of Investigations had completed work on a separate inquiry on this matter. Secondly, we would review the FDIC's supervisory activities related to Operation Choke Point and determine if the actions and policies of the FDIC were consistent with applicable law, regulations, and policy, and within the mission of the FDIC.

On December 17, 2014, the FDIC Chairman requested that as part of our planned and ongoing work in this area, we conduct a fact-finding review of the actions of one former and four current senior FDIC officials. The Chairman's request was prompted by concerns raised by a Congressman in a letter dated December 10, 2014 stating the five individuals had allowed their personal and political views to interfere with the important work of the FDIC and that the individuals had misled the American people through their emails and in meetings with, and testimony before, the Congress. The Congressman's concerns were based on information contained in a December 8, 2014 staff report of the House Oversight and Government Reform Committee, entitled *Federal Deposit Insurance Corporation's Involvement in "Operation Choke Point."* On January 20, 2015, we notified the FDIC Chairman that we would address the concerns raised in the Congressman's letter as part of this audit.

The objectives of the audit were to (1) describe the FDIC's role in the DOJ initiative known as Operation Choke Point and (2) assess the FDIC's supervisory approach to financial institutions that conducted business with merchants associated with high-risk activities for consistency with relevant statutes and regulations. To address the objectives, we:

- determined the extent to which the FDIC participated in developing and implementing Operation Choke Point;

- evaluated the FDIC's rationale for identifying certain types of merchants as being associated with high-risk activities;

- analyzed relevant statutes, regulations, policies, procedures, guidance, and training;

2

- reviewed a non-statistical sample[3] of 23 FDIC-supervised financial institutions to assess the FDIC's supervisory approach for addressing identified concerns; and

- conducted interviews of 106 current and former FDIC staff, executives at 19 FDIC-supervised financial institutions, officials in DOJ's Consumer Protection Branch, and officials with selected state banking agencies.

With respect to the five individuals, we determined the extent to which they were involved with Operation Choke Point and whether their actions involving the institutions we reviewed were based on personal, political, or moral agendas aimed at forcing lawful businesses associated with high-risk activities out of the banking sector.

We conducted this performance audit in accordance with generally accepted government auditing standards. Appendix 1 of this report includes additional details on our objectives, scope, and methodology; Appendix 2 contains a glossary of key terms; Appendix 3 contains a list of acronyms and abbreviations; Appendix 4 contains the Corporation's comments on this report; and Appendix 5 contains a summary of the Corporation's corrective actions.

## Background

In November 2012, attorneys within the Consumer Protection Branch of DOJ's Civil Division proposed an internal initiative to investigate financial institutions and TPPPs that were suspected of processing payment transactions on behalf of merchants that engaged in fraudulent activities. At that time, DOJ had reason to believe that some TPPPs were processing payment transactions for their client merchants knowing that the merchants were engaged in fraudulent activities. In addition, DOJ believed that some financial institutions involved with those transactions were either aware of the fraud they were facilitating or ignored warning signs of the fraud. This initiative, which DOJ named Operation Choke Point, focused on the relationship between TPPPs and financial institutions because these relationships were the means by which fraudulent merchants were able to access the banking system to commit consumer fraud.

Using various public and nonpublic sources, DOJ compiled evidence of suspected fraudulent activity involving certain merchants, TPPPs, and financial institutions. Based on this information, DOJ issued 60 administrative subpoenas from February 2013 through August 2013 to entities for which the Department determined it had evidence of potential consumer fraud. According to DOJ employees that we spoke with during the audit, 20 of the subpoenas were issued to FDIC-supervised financial institutions.

According to the results of an inquiry performed by DOJ's Office of Professional Responsibility (OPR), DOJ had filed civil actions against three financial institutions in connection with

---

[3] A non-statistical sample is judgmental and cannot be projected to the population. See Appendix 1 for details regarding our sampling methodology.

PROTECTED                                              OCC-AA-00001542

Operation Choke Point as of July 7, 2015.[4]  The OPR inquiry also found that DOJ had notified the majority of the institutions that received subpoenas that the Department's reviews of their matters had been concluded.  However, at the conclusion of OPR's inquiry, some civil and criminal investigations were still viable and open based on information received in response to some of the subpoenas.  Further, some United States Attorneys' Offices had open investigations based, at least in part, on evidence obtained from the subpoenas.  OPR's inquiry found that although DOJ was focused on completing its investigations, the Department would open and pursue new investigations if it obtained information that institutions, TPPPs, and fraudulent merchants might be continuing to break the law.

In carrying out its work in connection with Operation Choke Point, DOJ employees communicated with regulatory agencies, including the FDIC, the Board of Governors of the Federal Reserve System (FRB), the Office of the Comptroller of the Currency (OCC), and the Consumer Financial Protection Bureau (CFPB).  According to DOJ, such communications were intended to ensure that DOJ understood the industry at issue; that DOJ's investigative activities would not unnecessarily or improperly frustrate regulatory efforts; and that DOJ had all relevant information needed to evaluate its available enforcement options to address violations that the Department's investigations might uncover.

## Congressional Concerns Pertaining to Operation Choke Point

Congressional review of any role that the FDIC may have played in Operation Choke Point began in August 2013.  After an article was published in *The Wall Street Journal* on this subject,[5] 31 Members sent a letter, dated August 22, 2013, to the FDIC Chairman and the United States Attorney General expressing concern that the FDIC and DOJ were pressuring financial institutions and TPPPs to terminate business relationships with lawful lenders that provided short-term credit options to underserved consumers.  Since that time, Members have also expressed concern that financial institutions were declining basic banking services, such as deposit accounts and loans, to entire categories of merchants as a result of regulatory pressure stemming from Operation Choke Point.  Such merchants included (among others) payday lenders, firearms manufacturers and retailers, pawnbrokers, coin dealers, and tobacco retailers. Further, Members have expressed concern that certain senior FDIC staff had allowed their personal views of these merchants to influence their supervisory decision-making.

The concerns described above were based on the results of investigative efforts by the Committee on Financial Services and the Committee on Oversight and Government Reform of the United States House of Representatives.  As part of these efforts, Members have made numerous requests for information to the FDIC and other agencies; exchanged letters and met with agency officials; and held several hearings.  In addition, the Committee on Oversight and

---

[4] On July 7, 2015, OPR issued the results of an inquiry into whether DOJ's Civil Division, acting in concert with federal banking regulators under Operation Choke Point, had abused its authority to conduct civil investigations under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.  The inquiry was conducted in response to a request, dated October 16, 2014, from 32 Members of Congress.

[5] August 8, 2013 article, entitled *Probe Turns Up Heat on Banks---Prosecutors Target Firms That Process Payments for Online Payday Lenders, Others.*

4

PROTECTED

Government Reform has issued two written reports.[6]  At the close of our audit fieldwork, various Members were continuing to investigate Operation Choke Point.

## The FDIC's Supervisory Authorities

The FDIC has broad statutory and regulatory authority to supervise the activities of state-chartered financial institutions that are not members of the Federal Reserve System.[7]  Specifically, Sections 9 and 10(b) of the Federal Deposit Insurance Act (FDI Act), as amended, authorize the FDIC to examine the financial institutions it supervises.  The FDIC conducts examinations pertaining to safety and soundness, consumer compliance, Community Reinvestment Act (CRA), and specialty areas to assess each institution's operating condition, management practices and policies, and compliance with applicable laws and regulations.[8]  Section 8 of the FDI Act authorizes the FDIC to bring enforcement proceedings against any FDIC-supervised institution that, in the opinion of the FDIC, has engaged, is engaging, or is about to engage in an unsafe or unsound practice or has violated, is violating, or is about to violate, a law, rule, or regulation, including consumer protection laws.  The FDIC Chairman, in coordination with the Corporation's Board of Directors (Board), is responsible for setting agency priorities and strategies aimed at addressing risks and concerns at FDIC-supervised financial institutions.

Within the FDIC, the Division of Risk Management Supervision (RMS) has primary responsibility for promoting safe and sound banking practices at FDIC-supervised institutions.  In fulfilling its responsibilities, RMS plans and conducts regular onsite risk management (i.e., safety and soundness) examinations of financial institutions; issues policy and guidance; communicates with industry officials; reviews applications submitted by financial institutions to expand their activities or locations; and monitors institutions to identify emerging safety-and-soundness issues.  RMS also conducts specialty examinations that cover such areas as trust department operations, information technology (IT) controls, and compliance with the Currency and Foreign Transactions Reporting Act—commonly referred to as the Bank Secrecy Act (BSA).

The FDIC's Division of Depositor and Consumer Protection (DCP) has primary responsibility for promoting compliance by FDIC-supervised financial institutions with consumer protection, fair lending, and community reinvestment laws.  DCP fulfills its responsibilities through a variety of activities, including regular onsite compliance and CRA examinations of financial institutions; communications with industry officials; dissemination of information to consumers about their rights and required disclosures; and investigations and resolution of consumer complaints regarding FDIC-supervised institutions.

---

[6] Reports entitled, *The Department of Justice's "Operation Choke Point": Illegally Choking Off Legitimate Businesses?,* dated May 29, 2014, and *Federal Deposit Insurance Corporation's Involvement in "Operation Choke Point,"* dated December 8, 2014.
[7] As of December 31, 2014, the FDIC was the primary federal regulator for 4,138 financial institutions.  The majority of these institutions were small community banks with assets totaling $1 billion or less.
[8] Such laws and regulations include the Fair Debt Collection Practices Act (FDCPA) and its implementing Regulation F, the Equal Credit Opportunity Act (ECOA) and its implementing Regulation B, the Truth in Lending Act (TILA) and its implementing Regulation Z, and the Federal Trade Commission Act (FTC Act).  The FDIC coordinates with other regulatory agencies, such as the CFPB, on relevant consumer protection matters.

PROTECTED     OCC-AA-00001544

The FDIC's Legal Division is responsible for (among other things) providing legal counsel to RMS and DCP on the full range of laws and regulations governing bank supervision and consumer protection. This includes reviewing the legal sufficiency of proposed enforcement proceedings, such as Cease and Desist Orders, Consent Orders, and Civil Money Penalties (CMP), against institutions or responsible individuals, when appropriate.

The FDIC coordinates its supervisory activities with other federal and state banking agencies that have supervisory responsibility for the institutions within their jurisdictions. In addition, the FDIC coordinates with other federal and state organizations, such as the Federal Financial Institutions Examination Council (FFIEC) and Conference of State Bank Supervisors, when developing supervisory policy and guidance to promote a consistent approach to bank supervision.

<u>Supervisory Corrective Actions</u>

The FDIC's *Risk Management Manual of Examination Policies, Compliance Examination Manual,* and *Formal and Informal Actions Procedures Manual* describe the FDIC's approach for determining an appropriate supervisory corrective action to address an identified safety and soundness or consumer protection concern. In general, these manuals outline a risk-based, graduated approach for addressing concerns identified through the supervisory process. According to two of the manuals, it is sufficient in many cases for examiners to use moral suasion or make written recommendations in reports of examination to address identified problems or concerns.[9] The FDIC does not have a formal definition of moral suasion in its policies. However, examiners commonly use moral suasion in an attempt to influence risk management practices at financial institutions before perceived problems rise to a level that necessitates informal or formal action. If moral suasion or recommendations would not be sufficient, or if serious concerns exist, stronger actions may be taken in the form of informal or formal corrective actions against an institution or responsible individuals.

The FDIC generally initiates an informal or formal corrective action when an institution has a safety and soundness or compliance rating of "3," "4," or "5," unless specific circumstances warrant otherwise. Informal actions typically involve the FDIC either recommending that the institution's Board of Directors (Board) adopt a Bank Board Resolution or entering into a Memorandum of Understanding (MOU) with the institution's Board to address specific concerns. Formal actions may involve, for example, a Cease-and-Desist Order or Consent Order; removal, prohibition, or suspension action; or CMP.

**TPPPs and Merchants Associated with High-Risk Activities**

In the summer of 2011, prior to DOJ's initiation of Operation Choke Point, the FDIC published an informational article entitled, *Managing Risks in Third Party Payment Processor Relationships,* in its *Supervisory Insights* Journal. The Journal, which is intended to promote sound principles and practices in bank supervision, does not represent supervisory policy or

---

[9] Moral suasion is not discussed in the Compliance Examination Manual.

6

 OCC-AA-00001545

official guidance.  According to its terms, the views expressed in the Journal are those of its authors and do not necessarily reflect official positions of the FDIC.

The article discussed the role of TPPPs and the risks presented to financial institutions that have deposit account relationships with TPPPs.  According to the article, deposit relationships with payment processors can expose financial institutions to risks not present in typical commercial customer relationships, including greater strategic, credit, compliance, transaction, legal, and reputation risk.  The article also discussed the warning signs that may indicate heightened risk in a TPPP banking relationship, the mitigation controls that institutions should have in place when providing deposit account services to TPPPs, and the supervisory actions that may be taken when risks are not adequately managed.

The article explained that although many TPPPs process legitimate payment transactions for a variety of reputable merchants, an increasing number of TPPPs were initiating payments for abusive telemarketers, deceptive on-line merchants, and organizations engaged in high-risk or illegal activities.  Without adequate monitoring systems and controls, a financial institution in a TPPP relationship could facilitate unauthorized transactions or unfair or deceptive practices, resulting in financial harm to consumers.  The article identified 30 types of TPPP client merchants that were associated with high-risk activities.  The Table below identifies these merchants.  We sometimes refer to these merchants collectively as the "high-risk list."

**Table:  Merchants Associated with High-Risk Activities**

| Merchant Category | |
|---|---|
| Ammunition Sales | Life-Time Memberships |
| Cable Box De-scramblers | Lottery Sales |
| Coin Dealers | Mailing Lists/Personal Information |
| Credit Card Schemes | Money Transfer Networks |
| Credit Repair Services | On-line Gambling |
| Dating Services | PayDay Loans |
| Debt Consolidation Scams | Pharmaceutical Sales |
| Drug Paraphernalia | Ponzi Schemes |
| Escort Services | Pornography |
| Firearms Sales | Pyramid-Type Sales |
| Fireworks Sales | Racist Materials |
| Get Rich Products | Surveillance Equipment |
| Government Grants | Telemarketing |
| Home-Based Charities | Tobacco Sales |
| Life-Time Guarantees | Travel Clubs |

Source:  The FDIC's *Supervisory Insights* Journal, Summer 2011 [original] publication.

Financial institutions that process transactions through a TPPP can be exposed to risks not present in other commercial customer relationships because the institutions typically do not have a direct relationship with the TPPP's client merchants.  Section 326 of the USA PATRIOT Act, which amended the BSA, requires financial institutions to establish and maintain a Customer Identification Program that enables the institution to form a reasonable belief that it knows the true identity of its customers.  Knowing one's customer serves to protect institutions from the potential liability and risk of providing financial services to a customer engaged in fraudulent

PROTECTED                                                            OCC-AA-00001546

and unlawful activity. In addition, the FFIEC's *Bank Secrecy Act Anti-Money Laundering Examination Manual* states that financial institutions should have a Customer Due Diligence (CDD) program that enables the institution to predict with relative certainty the types of transactions in which a customer is likely to engage. The CDD program assists the institution in determining when transactions are potentially suspicious so that the institution may meet its statutory obligations of filing Suspicious Activity Reports (SARs), when appropriate.

Proper monitoring of transactions processed through TPPP bank accounts can be particularly challenging because TPPPs can have hundreds or even thousands of client merchants. In addition, TPPPs are generally not subject to BSA or anti-money laundering (AML) requirements. As a result, some TPPPs may be vulnerable to money laundering, identity theft, fraud schemes, and other illegal transactions.

TPPP Guidance

The FDIC's supervisory approach and expectations for financial institutions that establish relationships with TPPPs are defined in various FDIC and interagency guidance.[10] In general, this guidance states that institutions should establish risk management controls that are appropriate for the risks posed by TPPPs and their client merchants. Such controls include careful due diligence for TPPPs and their client merchants and monitoring of account transactions for indications of suspicious activity, such as elevated levels of unauthorized returns, chargebacks, and/or consumer complaints. These risk management controls are intended to mitigate the increased operational, strategic, credit, compliance, transaction, and other risks associated with TPPP relationships.

According to the guidance, when an institution identifies potentially fraudulent or improper activities involving a TPPP or its client merchants, the institution should take prompt action to minimize possible consumer harm. Such action may include filing a SAR, requiring the payment processor to cease processing for a specific merchant, and/or terminating the institution's relationship with the TPPP. Institutions are also expected to develop processor approval programs that include a background check of payment processors and their merchant clients.

When assessing TPPP-related risks, FDIC examiners focus on whether the institution is adequately overseeing the activities and transactions it is processing and appropriately managing and mitigating the associated risks. According to the FDIC's TPPP guidance, institutions that fail to adequately manage TPPP relationships may be viewed as facilitating the processor's or its client merchant's fraudulent or unlawful activity and, thus, may be liable for such acts or practices. In such cases, financial institutions and responsible individuals have been subject to enforcement, supervisory, and other actions.

Direct Banking Relationships

While the high-risk list was introduced in the context of a financial institution having a deposit account relationship with a TPPP, institutions may also provide banking services directly to a

---

[10] Appendix 1 contains a summary of FDIC and interagency TPPP guidance.

PROTECTED                                                    OCC-AA-00001547

merchant on the high-risk list. Such services include, for example, checking accounts, loans, and the processing of Automated Clearing House (ACH) payment transactions. The FDIC's supervisory approach for assessing banking services offered directly to these (and any other) merchants is reflected in the *Risk Management Manual of Examination Policies, Compliance Examination Manual, Formal and Informal Actions Procedures Manual*, and *Retail Payment Systems IT Examination Handbook*. In addition, the FDIC has issued specific guidance to institutions that offer payday loans—either to their customers using the institution's own employees or through third-party arrangements with a payday lender. A description of the FDIC's payday lending guidance follows.

## Payday Lending

The FDIC initially issued supervisory guidance to address safety and soundness and consumer protection concerns associated with payday lending by FDIC-supervised financial institutions in July 2003.[11] The guidance applied to institutions that were making payday loans both directly to their customers and through third-party payday lenders.[12]

When the guidance was issued, a number of institutions had entered into arrangements whereby third-party payday lenders were making loans on behalf of the institutions. The institutions funded the loans and, therefore, remained responsible for ensuring that the loans were made in a safe and sound manner and in compliance with applicable laws. A key benefit to the payday lenders in these arrangements was that they were permitted to export favorable interest rates in the state where the institution was chartered to

| Figure: What Are Payday Loans? |
| :--- |
| Payday loans are small-dollar, short-term, unsecured loans that borrowers promise to repay out of their next paycheck or regular income payment (such as a social security check). |
| Payday loans are usually priced at a fixed-dollar fee, which represents the finance charge to the borrower. Because the loans have short terms to maturity, the cost of borrowing, expressed as an annual percentage rate, can be very high relative to traditional loans. |

borrowers in other states that had more restrictive usury laws. This in effect allowed the payday lenders to avoid state usury laws, prompting many consumer groups, federal and state regulators (including bank regulatory agencies), and Members, to criticize these arrangements as "rent-a-charters" (implying that the institutions were essentially renting their bank charters out to payday lenders).

The July 2003 guidance stated that payday loans are a high-risk, specialized type of subprime lending not typically found in state nonmember institutions. According to the guidance, such loans are most frequently originated by specialized nonbank firms subject to state regulation. The guidance stated that payday loans have well-defined weaknesses that jeopardize the

---

[11] PR-70-2003: *FDIC Issues Examination Guidance for Payday Lending,* dated July 2, 2003. This guidance supplemented previously issued FDIC and interagency guidance on subprime lending.

[12] The guidance did not apply to financial institutions that (1) made loans to payday lenders; (2) made occasional low-denomination, short-term loans to customers; (3) entered into relationships with TPPPs that processed ACH transactions for payday lenders; or (4) processed ACH transactions directly for payday lenders that had deposit accounts with the institution.

PROTECTED

OCC-AA-00001548

liquidation of the debt, such as limited or no analysis of borrower repayment capacity, the unsecured nature of the credit, and a marked proportion of obligors whose repayment capacity is questionable. Payday lending also raises many consumer protection issues and attracts a great deal of attention from consumer advocates and other regulatory organizations, increasing the potential for litigation.

The July 2003 guidance stated that when institutions facilitate payday lending through third parties, the transaction, legal, and reputation risks to the institutions increase significantly if the third parties are not properly managed. Based on these risks, the FDIC's payday lending guidance imposed significant expectations on institutions engaged in that type of lending. For example, the guidance stated that institutions should hold greater levels of capital against payday loans than for non-subprime assets of a similar nature. In addition, the guidance stated that an institution's CRA rating could be adversely affected if an institution engaged in illegal credit practices.

Due to the heightened safety and soundness and consumer compliance risks posed by payday lending by institutions, the guidance stated that the FDIC would generally perform concurrent risk management and compliance examinations of institutions that engage in payday lending to verify and monitor the institutions' performance relative to the guidance. The guidance also stated that examiners could conduct targeted examinations of the third parties that originated payday loans on behalf of financial institutions under certain circumstances.[13] Further, supervisory corrective actions, including enforcement actions and requirements for institutions to discontinue payday lending, may be pursued when institutions fail to comply with the guidance.

In March 2005, the FDIC revised its July 2003 payday lending guidance due to concerns that FDIC-supervised institutions were offering payday loans in a manner that was inconsistent with the prior guidance, the payday lenders' marketing materials, and industry best practices.[14] The revised guidance reiterated many of the same standards that were contained in the 2003 guidance, but established a new expectation for institutions to ensure that payday loans are not provided to customers who have had such loans outstanding from any lender for a total of 3 months in the previous 12-month period. Additionally, the March 2005 guidance states that providing high-cost, short-term credit on a recurring basis to consumers with long-term credit needs is not responsible lending; increases institutions' credit, legal, reputation, and compliance risks; and can create a serious financial hardship for customers.

Concerns Regarding Payday Lending

As described below, the FDIC, OCC, Congress, and CFPB have raised concerns regarding the risks associated with payday lending by financial institutions. In June 2000, a former FDIC Chairman expressed concern in public remarks that institutions were partnering with payday

---

[13] Authority to conduct examinations of third parties may be established under several circumstances, including through a bank's written agreement with a third party, section 7 of the Bank Service Company Act, or through powers granted under section 10 of the FDI Act.
[14] Financial Institution Letter (FIL)—FIL-14-2005, *Payday Lending Programs, Revised Examination Guidance*, dated March 1, 2005.

10

 OCC-AA-00001549

lenders through so called rent-a-charter arrangements.[15]  Subsequent FDIC Chairmen and certain FDIC Board members also raised concerns about payday lending by FDIC-supervised financial institutions.  In addition, on November 27, 2000, the OCC issued *Advisory Letter on Payday Lending*, (AL 2000-10), which applies to national banks and federal savings associations the agency regulates.  The guidance states that the OCC will closely review the activities of banks engaged or proposing to engage in payday lending by examining the banks and any relevant third parties.  According to the guidance, examinations will focus on safety and soundness risks and compliance with consumer protection and fair lending laws.

In 2007, the Congress enacted legislation aimed at curbing predatory lending practices. Specifically, the Military Lending Act (MLA)—a component of the 2007 National Defense Authorization Act—placed restrictions on credit products offered to active-duty service members and their families by limiting the annual interest rate on such products to 36 percent, including all fees, charges, and premiums.  The associated regulations issued by the Department of Defense that became effective for loans written on or after October 1, 2007, state that payday loans, refund anticipation loans (RAL), and vehicle title loans are subject to the protections of the MLA.  Further, in March 2015, the CFPB announced that it was considering proposed rules pertaining to payday lending.  Such rules would apply to all insured depository institutions and non-depository entities involved in payday lending.  The CFPB raised concerns about practices associated with payday lending and similar products, which can trap consumers in debt and force them to choose between re-borrowing, defaulting, or falling behind on other obligations.  At the time of our audit, the CFPB was contemplating requirements on lenders aimed at ensuring borrowers are not trapped in cycles of debt.

## Audit Results

The FDIC's involvement in Operation Choke Point has been limited to a few FDIC staff communicating with DOJ employees regarding aspects of the initiative's implementation.  These communications with DOJ generally related to the Corporation's responsibility to understand and consider the implications of potential illegal activity involving FDIC-supervised financial institutions.  Overall, we consider the FDIC's involvement in Operation Choke Point to have been inconsequential to the overall direction and outcome of the initiative.

We determined that the FDIC's supervisory approach to financial institutions that conducted business with merchants on the high-risk list was within the Corporation's broad authorities granted under the FDI Act and other relevant statutes and regulations.  However, the manner in which the supervisory approach was carried out was not always consistent with the FDIC's written policy and guidance.

We found no evidence that the FDIC used the high-risk list to target financial institutions. However, references to specific merchant types in the summer 2011 *Supervisory Insights* Journal article and in supervisory guidance created a perception among some bank executives that we

---

[15] Remarks made by the former FDIC Chairman at the *Seventh Annual Greenlining Economic Development Summit*, June 13, 2000.

PROTECTED                    OCC-AA-00001550

spoke with that the FDIC discouraged institutions from conducting business with those merchants. This perception was most prevalent with respect to payday lenders.

The FDIC's payday lending guidance, which was established in 2003 and updated in 2005, increased expectations and placed heightened scrutiny on institutions that were engaged in payday lending. As a result of the guidance and related supervisory actions, the relatively few FDIC-supervised institutions that were making payday loans stopped doing so in 2006. In the years that followed, the FDIC took steps to encourage institutions to offer affordable, small-dollar loans and researched and communicated concerns about emerging credit products that can have characteristics similar to payday loans, such as deposit advance products.

We found that a number of FDIC officials also had concerns about ACH payment processing for payday lenders. These concerns were based on the premise that such services facilitate payday lending. A heightened level of concern for payday lending by financial institutions and related ACH processing was reflected in the negative tenor of internal email communications among senior FDIC staff and others that we reviewed. In some cases, these communications involved instances in which FDIC personnel contacted institutions and used moral suasion to discourage them from adopting payday lending products or providing ACH processing for payday lenders. The FDIC does not have a formal definition of moral suasion in its policies. However, examiners commonly use moral suasion in an attempt to influence risk management practices at financial institutions before perceived problems rise to a level that necessitates an informal or formal enforcement action.

We noted two instances in which the FDIC discouraged institutions from providing ACH processing to payday lenders in written communications to the institutions. In both instances, the FDIC's principal stated concern was the reputation risk to the institutions due to their potential or existing relationship with a payday lender. The FDIC does not centrally track its written communications to financial institutions that involve ACH processing concerns. Accordingly, we were unable to determine how often such communications occur. However, our discussions with FDIC executives and review of regional office status reports identified only three institutions where FDIC officials raised concerns regarding ACH processing practices for payday lenders.

FDIC officials determined that there were misperceptions regarding the Corporation's supervisory approach to institutions that conduct business with merchants on the high-risk list and, therefore, the FDIC took several actions beginning in September 2013. Specifically, the FDIC withdrew references to high-risk merchants from the *Supervisory Insights* article and its guidance, clarified its supervisory policy and guidance, and established an internal policy for documenting and reporting instances in which staff recommend or require institutions to terminate deposit account relationships. Among other things, the internal policy does not allow for the termination of deposit account relationships based solely on reputation risk to an institution. These actions were intended to make clear the FDIC's policy that financial institutions that properly manage customer relationships and effectively mitigate risks are neither prohibited nor discouraged from providing financial services to customers, regardless of the customers' business category, provided that the institutions operate in compliance with

12

OCC-AA-00001551

applicable laws.  However, the policy and guidance focus on deposit accounts and may warrant clarification to address other types of banking products, such as credit products.

With respect to our review of the actions of the five FDIC officials, we concluded that they did not play a role in the development or implementation of Operation Choke Point.  We also concluded that the individuals did not pursue their own personal, political, or moral agendas aimed at forcing lawfully operating businesses on the high-risk list out of the banking sector.  As it pertains to payday lending and related activities, we concluded that the officials acted consistent with a widely-held understanding that the highest levels of the FDIC disfavored these types of banking services.  We did, however, identify certain internal email communications and one written communication to an institution involving three of the five individuals that were not consistent with the FDIC's written guidance pertaining to payday lending and related activities.

Finally, our report includes an observation on the FDIC's supervisory approach to financial institutions that offered a credit product known as a RAL.  The FDIC considers RALs to carry a significant degree of risk to financial institutions, including third-party, reputation, compliance, and legal risks.  Of particular concern to the FDIC is whether an institution can ensure proper underwriting and compliance with consumer protection requirements, particularly when RALs are brokered by large numbers of third-party tax return preparers (sometimes called electronic refund originators—EROs) in conjunction with the filing of a taxpayer's income tax return.  Although RALs were not on the high-risk list, we observed that the FDIC's supervisory approach to institutions that offered this type of credit product involved circumstances that were similar to those that prompted the Congressional request to our office.

We identified three FDIC-supervised institutions that offered RALs.  These institutions began offering RALs in 1987, 1988, and 2007, respectively.  At various times from 2004 through 2009, FDIC examiners criticized the risk management practices pertaining to RALs at two of these institutions during compliance and risk management examinations.  In late 2009 and early 2010, the FDIC sent letters to all three institutions expressing concerns about RALs and requesting that the institutions submit plans for discontinuing this type of lending.  In early 2011, after efforts to convince these institutions to discontinue offering RALs were unsuccessful and supervisory concerns remained, the tenor of the FDIC's supervisory approach became aggressive.  In one case, the FDIC took the highly unusual step of conducting a simultaneous, unannounced review of 250 EROs in 36 states involving hundreds of FDIC examiners in order to develop the evidence needed to compel the institution to stop offering RALs.  In another case, a former FDIC supervisory attorney used a confrontational approach to pressure an institution's Board to terminate its RAL offerings.  By April 2012, all three institutions had stopped offering RALs.

The FDIC drafted a policy statement in 2010 that defined the FDIC's supervisory concerns and expectations for institutions offering RALs.  However, the policy statement was never finalized.  In our view, establishing such a policy would have been prudent to ensure institutions understood the risks associated with RALs and provide transparent supervisory guidance and expectations for institutions already (or contemplating) offering RALs.

We concluded that the supervisory actions taken with respect to the three institutions that offered RALs fell within the Corporation's broad statutory authorities because the Corporation is

13

OCC-AA-00001552

permitted to require a financial institution to discontinue a practice if safety and soundness or consumer protection concerns warrant doing so. However, we found that the FDIC took an aggressive, and at times, confrontational approach to convince the institutions to discontinue their RAL programs. We believe that the execution of these actions by FDIC management and staff warrants further review, and the OIG is conducting additional work in this area.

## The FDIC's Role in Operation Choke Point

The FDIC did not participate in the development of DOJ's internal proposal in November 2012 to investigate financial institutions and TPPPs that were suspected of processing payment transactions on behalf of merchants engaged in fraudulent activities. In addition, the FDIC did not coordinate with DOJ in its efforts to assemble evidence of potential fraudulent activity involving these entities or to identify the financial institutions and other entities that subsequently received subpoenas in connection with Operation Choke Point. Further, DOJ did not notify the FDIC of the financial institutions that received subpoenas. DOJ employees informed us that the Department typically does not notify the primary federal bank regulator when a subpoena is issued to an insured institution. Except as discussed below, RMS and DCP officials that we spoke with were not aware of the specific FDIC-supervised institutions that received a DOJ subpoena. These officials indicated that they may learn of a DOJ subpoena if the institution informs the FDIC, or through standard information requests to an institution prior to a compliance examination.[16]

DOJ employees informed us that many of the subpoenas issued pursuant to Operation Choke Point contained copies of publicly available guidance on payment processors that was issued by the FDIC, the Department of the Treasury's Financial Crimes Enforcement Network (FinCEN), and the OCC.[17] The FDIC guidance contained a footnote listing examples of telemarketing, on-line businesses, and other merchants that may have a higher incidence of consumer fraud or potentially illegal activities or that may otherwise pose elevated risk.[18] Members have raised concern that including the FDIC guidance in the DOJ subpoenas was an attempt by the Corporation and the Department to pressure financial institutions to terminate business relationships with those merchants, regardless of the risks the merchants posed to the institutions.

DOJ employees informed us that the intent of including the regulatory guidance in the subpoenas was to provide the subpoena recipients with information about the risks posed by TPPPs and the responsibilities of financial institutions in managing those risks. Further, DOJ believed that the guidance could help institutions to better identify and provide documents that were responsive to DOJ's subpoenas. DOJ employees stated that they did not have discussions with anyone at the

---

[16] Prior to the start of a compliance examination, DCP submits a document request to the institution that, among other things, requests information about any investigations by other federal agencies.

[17] The guidance consisted of FDIC FIL 3-2012, *Payment Processor Relationships* (Revised Guidance), dated January 31, 2012; FinCEN's Advisory, *Risk Associated with Third Party Payment Processors*, dated October 22, 2012; and OCC Bulletin 2008-12, *Payment Processors*, dated April 24, 2008.

[18] Such entities consisted of credit repair services, debt consolidation and forgiveness programs, on-line gambling-related operations, government grant or will-writing kits, payday or subprime loans, pornography, on-line tobacco or firearms sales, pharmaceutical sales, sweepstakes, and magazine subscriptions. According to the footnote in the guidance, these entities were not all-inclusive.

14

FDIC about whether to include the guidance in the subpoenas, and FDIC officials informed us that they had no knowledge that the guidance would be included in the subpoenas. Further, OPR's review of contemporaneous documents and discussions with DOJ attorneys during its inquiry into Operation Choke Point found that DOJ attorneys did not intend to discourage institutions from conducting business with specific categories of lawful merchants when they included the regulatory guidance in the subpoenas.

We identified a limited number of FDIC staff in the Washington, D.C. office who began communicating with DOJ employees in early 2013 regarding the Department's efforts to investigate certain financial institutions, TPPPs, and merchants. The majority of these communications involved two staff attorneys in the FDIC's Legal Division.[19] In addition, during the period covering March 2013 through April 2015, DOJ formally requested from the FDIC information pertaining to 3 of the 20 FDIC-supervised institutions that DOJ subpoenaed pursuant to Operation Choke Point.[20] The information requested by DOJ included such things as reports of examination, correspondence, memoranda, and examiner working papers related to the institutions' ACH processing activities, remotely-created check businesses, TPPP relationships, and BSA/AML compliance. As of July 15, 2015, the FDIC had provided or was working to provide information responsive to these requests.

FDIC staff informed us that they learned of DOJ's investigative work involving TPPPs, financial institutions, and merchants through informal discussions with a DOJ employee following an inter-agency training conference held in February 2013. In addition, a DOJ employee discussed aspects of the Department's work in this area during a meeting of the *Interagency Bank Fraud Enforcement Working Group* in early 2013.[21] At that time, DCP, RMS, and the Legal Division were—separate from DOJ— researching illegal payday lending activity based on concerns raised by a state regulator to the FDIC in December 2012. That research, which was internal to the FDIC, continued through August 2013.

The FDIC's communications with DOJ consisted of responding to requests from DOJ employees for information about FDIC-supervised institutions that the Department was investigating; responding to DOJ inquiries about remedies that federal regulators could potentially pursue in the event that illegal payday lending was associated with insured-depository institutions; and

---

[19] We identified three other FDIC employees who communicated with DOJ employees regarding their investigative activities pertaining to Operation Choke Point. These individuals consisted of (1) a supervisory attorney in the Legal Division who oversaw the activities of the two staff attorneys referenced above; (2) an RMS employee in the Washington, D.C. office who had informal conversations with DOJ staff during inter-agency meetings and training conferences; and (3) an FDIC OIG criminal investigator assigned to investigate activities at one of the FDIC-supervised institutions that received a subpoena from DOJ. The FDIC OIG notified Members about the communications between the OIG investigator and DOJ and provided relevant documentation to the Members in June and July 2014.

[20] Such requests were processed based on procedures defined in 12 C.F.R. Part 309—*Disclosure of Information*. On June 30, 2015, we provided FDIC officials with the names of the 20 FDIC-supervised institutions that received DOJ subpoenas so that the officials could determine whether the Corporation had received any formal requests for information from the Department. Prior to our providing this information, FDIC officials were not aware of all of the FDIC-supervised institutions that DOJ had subpoenaed in connection with Operation Choke Point.

[21] The working group, which has been in existence for about 30 years, is comprised of individuals from banking, law enforcement, and other federal agencies, including the FDIC.

PROTECTED

OCC-AA-00001554

reviewing documents obtained by DOJ in the course of its investigative activities. We concluded that the FDIC's communications with DOJ employees were based on the FDIC's responsibility to understand and consider potentially illegal activity involving FDIC-supervised institutions, as well as the risks such activities could pose for the institutions.

In April 2013, one of the two FDIC staff attorneys referenced above informed a DOJ employee that both FDIC attorneys were interested in working at the Department on a temporary detail to focus on DOJ's efforts to investigate TPPPs, financial institutions, and merchants. Although the FDIC attorneys had subsequent discussions about a potential detail with DOJ employees, neither FDIC attorney discussed a detail assignment with their supervisor and the FDIC never detailed any of its employees to DOJ to work on matters related to Operation Choke Point.

In June 2013, a DOJ employee assigned to work on Operation Choke Point provided the two FDIC staff attorneys with a hardcopy listing of 15 institutions that had received subpoenas from the Department and that DOJ believed were supervised by the FDIC.[22] At that time, one of the FDIC staff attorneys provided the listing to a DCP employee in the Washington, D.C., office who was working on matters pertaining to fraudulent activities perpetuated by TPPPs. We found no evidence that the listing was provided to RMS or DCP Regional Offices or to field examiners who had direct supervisory responsibility for these institutions.

According to the FDIC's time and attendance records, the two FDIC staff attorneys charged approximately 50 hours (combined) to matters pertaining to Operation Choke Point from February through August 2013. According to these attorneys, a significant portion of the time charges involved gaining remote access to a DOJ system that contained information obtained from the subpoenas that DOJ had issued to FDIC-supervised institutions. Although the attorneys obtained remote access to the system in late August 2013, they informed us that they did not access the information in the system because they were instructed not to do so by an executive in the Legal Division following public reports alleging that the FDIC was working with DOJ to pressure institutions to decline banking services to certain types of merchants.

Senior FDIC executives, including the Chairman, RMS Director, DCP Director, former Acting General Counsel, and all six Regional Directors, informed us that they had never had any discussions with DOJ regarding Operation Choke Point. These statements were consistent with the results of our interviews of officials in the DOJ's Consumer Protection Branch, which had responsibility for planning and executing Operation Choke Point.

The FDIC Chairman informed us that he became aware of Operation Choke Point after receiving the August 22, 2013, letter from Members expressing concern that the FDIC and DOJ were pressuring financial institutions and TPPPs to terminate business relationships with lawful lenders. At that time, the FDIC Chairman requested a briefing from his staff on the matter and asked that he be kept fully informed of any communications between the FDIC and DOJ. The Chairman also requested that any communications between FDIC staff and DOJ be limited to official requests for information from the Department.

---

[22] Fourteen of the 15 institutions were supervised by the FDIC at the time of our audit.

PROTECTED

OCC-AA-00001555

**The FDIC's Supervisory Approach to Institutions that Conducted Business with Merchants on the High-Risk List**

We determined that the FDIC's supervisory approach to financial institutions that conducted business with merchants on the high-risk list was within the Corporation's broad authorities granted under the FDI Act and other relevant statutes and regulations. In addition, we found no evidence that the FDIC used the high-risk list to target financial institutions. Further, both the high-risk list and supervisory guidance containing references to specific merchant categories were developed before the inception of Operation Choke Point and were not a driving factor in the initiative's implementation. However, as described later, references to specific merchant types in the summer 2011 *Supervisory Insights* Journal article and in supervisory guidance created a perception among some bank executives that we spoke with that the FDIC discouraged institutions from conducting business with those merchants. This perception was most prevalent with respect to payday lenders.

With the exception of payday lenders, we found no instances among the 23 financial institutions we reviewed where the FDIC pressured an institution to decline banking services to a merchant on the high-risk list. In addition, bank executives that we spoke with indicated that, except for payday lenders, they had not experienced regulatory pressure to terminate an existing customer relationship with a merchant on the high-risk list, including a firearms, ammunition, or tobacco retailer. Although pawnbrokers were not on the high-risk list, executives from five institutions informed us that they provided banking services to these merchants and had never experienced regulatory pressure to terminate the business relationships.

The FDIC's concerns regarding payday lending by financial institutions precede Operation Choke Point by many years. The FDIC's payday lending guidance, which was established in 2003 and updated in 2005, increased expectations and placed heightened scrutiny on institutions that engage in that type of lending. As a result of this supervisory posture, FDIC-supervised institutions stopped making payday loans in 2006. In the years that followed, the FDIC took steps to encourage financial institutions to offer affordable, small-dollar loans and proactively researched and communicated concerns about emerging credit products that can have characteristics similar to payday loans, such as deposit advance products.

Based on our review of internal FDIC email communications and discussions with FDIC staff, we found that a number of FDIC officials also had concerns regarding financial institutions that provided ACH payment processing for payday lenders. These concerns were based on the premise that the institution was, in effect, facilitating payday lending by processing ACH payments, even though the institution was not engaging in direct payday lending. ACH payment processing activities are covered in the FFIEC's *Bank Secrecy Act Anti-Money Laundering Examination Manual* and *Retail Payment Systems IT Examination Handbook*. We were unable to determine the approximate number of financial institutions that facilitate ACH payment processing activities because that information is not tracked by the FDIC. Based on our review of regional office monthly status reports for the 4-year period ended December 31, 2014, we identified concerns specifically focused on ACH processing for payday lenders at three FDIC-supervised financial institutions.

PROTECTED

OCC-AA-00001556

The heightened level of concern for payday lending by financial institutions and related activities was reflected in the negative tenor of internal email communications among senior FDIC staff and others that we reviewed. We also noted two instances in which the FDIC used moral suasion in its written communications to institutions to discourage them from providing ACH processing to payday lenders. In both instances, the FDIC's principal stated concerns were based primarily on reputation risk to the institutions due to their potential or existing relationship with a payday lender.

The FDIC has taken a number of actions to address concerns raised by Members that the Corporation was pressuring financial institutions to decline banking services to merchants on the high-risk list. These actions were intended to make clear the FDIC's policy that financial institutions that properly manage customer relationships and effectively mitigate risks are neither prohibited nor discouraged from providing financial services to customers, regardless of the customers' business category, provided that the institutions operate in compliance with applicable laws.

<u>The High-Risk List</u>

The FDIC's summer 2011 *Supervisory Insights* Journal and original supervisory guidance on financial institution relationships with TPPPs included examples of merchants associated with high-risk activities.[23] Both the article and guidance were developed prior to the inception of Operation Choke Point and were not a principal factor in the initiative's implementation. RMS, DCP, and Legal Division staff informed us that the references to these merchants were not the primary purpose of the article or guidance. Rather, the references were intended to illustrate the types of merchants that the payments industry had identified as being associated with higher-levels of fraudulent activity. The focus of the article and guidance, according to these FDIC officials, was to describe the risks associated with financial institution relationships with TPPPs and to provide guidance on appropriate risk management controls and practices for these relationships.

We reviewed the policies of six non-statistically sampled companies in the payments industry and confirmed that the policies of one or more of those companies (1) categorized all but two of the merchants on the high-risk list as high-risk and/or (2) prohibited the processing of transactions by those merchants.[24] We also noted that from June 2005 until November 2014, the FFIEC *Bank Secrecy Act Anti-Money Laundering Examination Manual* identified the following types of merchants as being associated with high-risk activities in the context of third-party payment transactions: on-line payday lenders, on-line gambling-related operations, offshore

---

[23] The supervisory guidance consisted of: FIL-127-2008, *Guidance on Payment Processor Relationships*; FIL-3-2012: *Payment Processor Relationships, Revised Guidance; and* FIL-43-2013: *FDIC Supervisory Approach to Payment Processing Relationships With Merchant Customers That Engage in Higher-Risk Activities.*

[24] The exceptions were government grants and coin dealers. The FDIC included government grants on the high-risk list because the Federal Trade Commission had received complaints in connection with disreputable merchants that sold government grant writing kits with public information that consumers could have readily obtained through the Internet. Coin dealers were included because related transactions can be cash-intensive and pose risks associated with money laundering. The policies we reviewed were issued by the following companies: Visa, Inc.; MasterCard, Inc.; PayPal; Amazon, Inc; Ebay, Inc.; and Google, Inc.

PROTECTED                                                        OCC-AA-00001557

companies, mail order and telephone order companies, telemarketing companies, and adult entertainment businesses.[25]  Several of these merchant categories appear on the high-risk list.  In November 2014, the FFIEC updated the *Bank Secrecy Act Anti-Money Laundering Examination Manual* to (among other things) remove references to specific types of merchants associated with high-risk activities in the context of TPPP transactions.

We reviewed examiner training materials pertaining to TPPPs that were prepared by the FDIC and FFIEC and found that although the materials included references to specific types of merchants associated with high-risk activities, the focus of the materials was on TPPP risks and how institutions should manage those risks.[26]  We found no indication in the training materials that examiners were encouraged to pressure financial institutions to decline banking services to merchants based on the category of their business.  Nevertheless, references to specific merchants in the *Supervisory Insights* Journal article and in supervisory guidance, together with a heightened level of scrutiny of TPPPs, led to a perception among executives at some institutions in our sample that providing banking services to merchants on the high-risk list was discouraged by the FDIC.

To clarify its supervisory approach, the FDIC revised its summer 2011 *Supervisory Insights* Journal article and supervisory guidance on financial institution relationships with TPPPs by removing the high-risk list and references to specific types of merchants.  The FDIC also issued FIL-41-2014, *FDIC Clarifying Supervisory Approach to Institutions Establishing Account Relationships with Third-Party Payment Processors,* and revised FIL-43-2013, *FDIC Supervisory Approach to Payment Processing Relationships With Merchant Customers That Engage in Higher-Risk Activities,* in July 2014 to state that financial institutions that properly manage relationships and effectively mitigate risks are neither prohibited nor discouraged from providing payment processing services to customers, regardless of the customers' business, provided that the customers are operating in compliance with applicable federal and state law.

Payday Lending by Financial Institutions

As discussed in the Background section of the report, FIL-14-2005, *Payday Lending Programs, Revised Examination Guidance,* dated March 1, 2005, states that financial institutions that provide high-cost, short-term loans on a recurring basis to customers with long-term credit needs is not responsible lending.  According to the guidance, such loans present increased credit, legal, reputation, and compliance risk to financial institutions and can create a serious financial hardship for consumers.  For these reasons, FIL-14-2005 imposes additional expectations on institutions that engage in payday lending; subjects these institutions to heightened scrutiny; and states that institutions should develop procedures to ensure that payday loans are not provided to customers who had payday loans outstanding from any lender for a total of 3 months during the

---

[25] The November 2014 version continues to include references to certain types of merchants, such as on-line payment processors, credit repair services, on-line gambling, and adult entertainment, in the context of electronic banking products offered by financial institutions to customers.

[26] We reviewed training materials for the FDIC's June 21, 2011 Risk Analysis Center presentation, entitled *Risks Associated with Third Party Payment Processor Relationships,* and the FFIEC's September 17, 2013 IT Conference presentation, entitled *Third Party Payment Processors: Relationships, Guidance, and Case Examples.*

PROTECTED

OCC-AA-00001558

previous 12 months. Failure to meet the standards in the FIL can result in supervisory enforcement actions, which may include requiring institutions to discontinue payday lending.

Of the more than 5,200 financial institutions that the FDIC was supervising when FIL-14-2005 was issued, only 12 institutions had payday lending programs. At that time, all 12 institutions were instructed to submit plans detailing how the institutions would address the expectation to limit payday loans to customers. In addition, an institution's payday lending programs were subject to heightened supervision, which included more frequent examination activities and regular contact with the institution's management. This supervisory strategy was coordinated on a national basis within the FDIC through a payday lending review group, which was led by the former Atlanta Regional Director.

On February 17, 2006, three FDIC Regional Directors sent letters to the Boards of 11 FDIC-supervised institutions that were known to still have payday lending programs at that time. The letters, which were reviewed and sent with the concurrence of the FDIC Chairman and the Legal Division, stated that the FDIC had conducted (or was conducting) onsite examinations or visitations of the institutions and third-party entities and/or had conducted offsite analyses related to the institutions' payday lending activities. The letters referenced ongoing correspondence and discussions with the institutions regarding their payday lending programs and explained that the focus of the FDIC's supervisory efforts in this area was on the credit quality of the institutions' payday lending products, compliance with laws and regulations, and the effectiveness of management and the Board in the oversight of third-party performance.

The letters sent in February 2006 stated that the FDIC had observed a pattern of unsuccessful supervision and management of third-party providers by the institutions and described significant concerns regarding the institutions' ability to administer their payday lending programs. Ten of the 11 letters noted deficiencies in the institutions' payday lending programs, such as:[27]

- not properly managing the performance of third-party payday service providers that facilitate payday lending;

- apparent violations of the Fair and Accurate Credit Transactions Act and Regulation B of the ECOA arising from lending activities pertaining to alternative credit products (ACP) and violations of Regulation Z of the TILA due to inadequate customer disclosures;

- sensitive customer information not being adequately protected; and

- inadequate internal audit procedures pertaining to payday and ACP lending activities.

All 11 letters stated that the safety and soundness risks and compliance concerns associated with the institutions' payday lending activities were unacceptable and that the institutions could not develop the necessary environment to properly administer such a high-risk activity. Eight of the letters stated that the institutions should exit the payday lending business, or notify the FDIC

---

[27] One letter did not identify any deficiencies with the subject institution's payday lending program.

PROTECTED

OCC-AA-00001559

within 15 days of how the institutions expected to correct all identified problems and change their Board and management's oversight to ensure that there would be no problems or issues going forward. The remaining three letters stated that the institutions should consider terminating their payday lending programs and contact the FDIC to schedule a meeting to discuss the matter further. In addition, two of the 11 letters questioned the suitability of any bank to engage in payday lending, particularly through the Internet or third-party marketers. Such statements were inconsistent with the FDIC's written payday lending guidance, which allows institutions to engage in payday lending provided that they have adequate controls. By the end of February 2006, 10 of the 11 institutions indicated that they were planning to stop making payday loans. As of August 2006, all 11 institutions had stopped making payday loans.

Concerns regarding the lack of alternatives in the banking sector to non-bank payday loans prompted the FDIC to issue FIL-50-2007, *Affordable Small-Dollar Loan Products, Final Guidelines*, on June 19, 2007. The FIL encouraged financial institutions to offer and promote affordable, small-dollar credit products to their customers. According to the FIL, these products should have reasonable interest rates with no or low fees and be structured with payments that reduce the principal balance. On the same day the FIL was issued, the FDIC's Board approved the *Affordable and Responsible Consumer Credit* initiative—a 2-year pilot to review affordable and responsible small-dollar loan programs in FDIC-supervised institutions. When announcing the institutions that would participate in the pilot on February 5, 2008, a former FDIC Chairman stated: "Our goal is to identify small-dollar loan programs that are profitable for lenders and affordable alternatives to payday loans and other high-cost loans that are harming consumers and communities across America."

The pilot, which concluded in the fourth quarter of 2009, involved 28 financial institutions with assets ranging from $28 million to nearly $10 billion. The FDIC reported that as a result of the pilot, these institutions made 34,400 small dollar loans totaling approximately $40 million. According to the FDIC, the performance of the loans was in line with the performance of other unsecured consumer credit products and it was determined that it was feasible for institutions to offer such loans in a safe and sound manner. The pilot also resulted in the development of a business template intended for institutions to model safe, affordable, and feasible small-dollar loans.

The FDIC's concerns regarding payday lending by financial institutions continued in the years that followed. For example, in a letter dated May 29, 2012, to the Executive Director of the Americans for Financial Reform, the FDIC Chairman stated that the Corporation was deeply concerned about continued reports of institutions engaging in payday lending and the expansion of payday lending activities under third-party arrangements. The letter added that the Chairman had asked DCP to make it a priority to investigate reports of institutions engaging in payday lending and recommend further steps by the FDIC. The Chairman's letter was in response to concerns raised by the Executive Director in a letter, dated February 22, 2012, that institutions were offering a credit product known as a deposit advance that was structured like a payday loan and that a major software system provider was marketing a bank payday software product.

During 2012 and 2013, DCP's Washington, D.C., office researched deposit advance products, including the product being marketed by the software system provider referenced above.

21

Because the provider serviced a significant number of financial institutions, there was concern that the provider's product could quickly become widespread. In June 2012, DCP officials in the Washington, D.C., office contacted the Regional Offices to determine if any FDIC-supervised institutions were offering the product. The Regional Offices identified two institutions that were considering the product and discouraged both institutions from offering the product. Both institutions subsequently decided not to offer the product.

Based on the results of its research, DCP identified some deposit advance products and practices with characteristics similar to payday loans that appeared to be concentrated in a limited number of FDIC-supervised financial institutions. DCP determined that the FDIC's payday lending guidance did not fully address the risks associated with these emerging products and practices and issued guidance, entitled *Guidance on Supervisory Concerns and Expectations Regarding Deposit Advance Products*, dated November 21, 2013. The OCC issued nearly identical guidance, entitled *Guidance on Supervisory Concerns and Expectations Regarding Deposit Advance Products*, on November 26, 2013.

Internal FDIC Efforts Related to Payday Lending

In March 2013, the Director, DCP, established an internal FDIC working group comprised of RMS, DCP, and Legal Division staff to research and assess risks associated with TPPPs, particularly those that may be involved in illegal on-line payday lending activities. As part of this effort, the working group contacted other federal agencies, including the FRB, CFPB, and DOJ, to learn about any work those agencies might have ongoing to protect consumers from illegal activities facilitated by TPPPs. DCP and Legal Division officials informed us that these internal efforts ended in August 2013, at which point the FDIC's focus shifted to addressing concerns raised by Members. Prior to that time, the FDIC had drafted, but not finalized, the following documents:

- Four memoranda and a whitepaper describing (among other things) consumer protection laws pertaining to payday lending and legal remedies available to the FDIC in the event that illegal payday lending was facilitated through FDIC-supervised institutions.

- A FIL intended to raise awareness of the significant risks associated with institutions that processed and received ACH transactions originated by certain higher-risk merchants (including payday lenders) and TPPPs. The guidance discussed the responsibilities of institutions to identify and mitigate such risks. In lieu of finalizing the guidance, the FDIC issued FIL-43-2013, which is described later in the report.

Concerns Regarding Payday Lending and Related Banking Services

As discussed above, the FDIC's concerns regarding payday lending by financial institutions are longstanding. According to three of the FDIC's six Regional Directors that we spoke with, these concerns extended to ACH payment processing (either through a TPPP or through a deposit account relationship with a payday lender) because such services effectively facilitate payday lending. The heightened level of concern for payday lending by financial institutions and ACH

22

OCC-AA-00001561

processing for payday lenders was reflected in the negative tenor of certain internal email communications among senior FDIC staff and others that we reviewed.[28]  Some of these communications also reflected instances in which moral suasion was used to discourage institutions from providing these types of banking services to, or on behalf of, payday lenders. Examples of such communications follow.

- *Apparently, because of legal considerations, the FDIC has never expressly stated publicly that our supervised institutions are not permitted to do business with payday lenders but the payday lending guidance and our public posture makes clear that we view payday loans as extremely risky.*  (Associate Director, DCP, to the Director, DCP, and other Senior DCP Staff, June 10, 2011).[29]

- *Our [Field Office Supervisors—FOS] canvassed their examination staff and none reported any financial institutions offering "deposit advance products." However, there is one financial institution in [location redacted] that is contemplating offering such a product. The name of that bank is [name redacted]. Of course, we are strongly encouraging them to reconsider the decision.*  (Current Atlanta Regional Director to DCP executives and staff in Atlanta and Washington, D.C., February 29, 2012).

- *By the way...I think you will be pleased....bank with ach is getting out of payday ach and all ach activities...now that is something to celebrate on Thanksgiving!*  (Former Atlanta Regional Director to the Director, DCP, November 21, 2012).

- *I have never said this to you (but I am sincerely passionate about this)...but I literally cannot stand pay day lending. They are abusive, fundamentally wrong, hurt people, and do not deserve to be in any way associated with banking.*  (Former Atlanta Regional Director to the Director, DCP, November 26, 2012).

- *Any banks even remotely involved in payday [sic] should be promptly brought to my attention.*  (Former Atlanta Regional Director to members of his staff, December 5, 2012).

- *Pay day lenders bring reputational risk, compliance risks, legal risk, and risk management concerns.....nothing good for our banks.*  (Former Atlanta Regional Director to his staff, March 22, 2013).

We also noted two instances in which the FDIC used moral suasion in written communications to institutions to discourage them from providing ACH processing services for payday lenders. In one instance, a FOS in the Atlanta Region sent an email to a bank executive on March 6, 2014, in response to a question about payday lending raised by the bank executive.  The email

---

[28] See Appendix 1 for a description of our methodology for selecting email communications for review.
[29] This email communication was sent in response to an inquiry by an FDIC executive regarding whether the FDIC had a policy in place that prohibited financial institutions from allowing payday lenders to hold deposit accounts with financial institutions.  In addition, we confirmed that the author of the email did not consult with an attorney in forming the opinion expressed in the email.

23

PROTECTED                                                                 OCC-AA-00001562

discussed supervisory guidance and expectations pertaining to a prospective relationship with a payday lender that the institution was considering. The relationship involved providing ACH processing services for a Native-American group that was proposing to offer payday loan products on-line. The entire text of the email from the FOS read as follows:

> *To follow-up on our phone call conversation, the following Financial Institution Letters (FILs) should be considered:*
>
> - *FIL-14-2005: Guidelines for Payday Lending*
>
> - *FIL-44-2008: Guidance for Managing Third-Party Risk*
>
> *The FILs can be accessed from our external website www.fdic.gov by selecting the laws and regulations tabs and picking the FILs option. If I understand what is being proposed, a Native-American group is proposing to offer payday loan products online and funds will flow from the bank though [sic] ACH transactions. As I mentioned earlier, while the bank is not expected to directly offer payday loans, it will facilitate such lending and the risks discussed in FIL-14-2005 should be closely considered. I am not sure how the arrangement is expected to work, but if a third-party vendor will be involved ,or any relationship connecting the bank with the depositor group that must be supervised, the concerns raised in FIL-44-2008 must be addressed.*
>
> *As I stated earlier, the arrangement will receive close regulatory scrutiny from the FDIC and State Banking Department. In-depth BSA and IT reviews of this relationship will also take place. Even under the best circumstances, if this venture is undertaken with the proper controls and strategies to try to mitigate risks, since your institution will be linked to an organization providing payday services, your reputation could suffer.*
>
> *If the Board plans to go forward with this venture, please reduce your plans to writing by submitting a letter to the FDIC's Regional Director [name redacted] and [State regulator and name redacted] outlining your proposal.*

The current Atlanta Regional Director became aware of the email in September 2014 after it was identified during a search of email communications in connection with a request for information from the Congress. FDIC officials informed us that the email referenced FDIC guidance that was not relevant to the proposed banking relationship and that communications of that nature should only come from the Regional Office. As a result, the Atlanta Regional Director contacted the bank executive on September 10, 2014, to clarify the FDIC's supervisory approach and expectations for such relationships and to emphasize that the FDIC does not, in any way, prohibit payday lending.

A detailed description of the second instance follows.

PROTECTED

OCC-AA-00001563

Use of Moral Suasion to Discourage ACH Processing for a Payday Lender

In October 2012, an IT examiner in the Chicago Regional Office conducting an offsite review of ACH transaction data provided by the Federal Reserve identified an institution with a significant volume of ACH returns relative to other institutions in the state. The IT examiner provided the information to RMS and DCP examiners who contacted the institution to discuss the return rates. The RMS and DCP examiners learned that substantially all of the ACH returns related to a payment processing relationship the institution had with a payday lender. Although the institution provided an explanation for the large volume of ACH returns, examiners determined that an on-site visitation of the institution to assess the associated risk was appropriate. On November 13, 2012, the Chicago Regional Director sent an email to the FDIC's Chief of Staff; the current and former Director, RMS; the Director and Deputy Director, DCP; and a Legal Division official in the Washington, D.C. Office. The email read, in part:

> *We have recently identified an institution in* [location and institution name redacted] *that is providing ACH processing for a payday lender. As indicated in the commentary immediately below, we are planning a visitation to the bank next month to review the bank's third party activities, including its association with the payday lender. In consideration of this development, the Chicago Region withdraws its recommendation of* [name of individual and institution redacted] *for membership on the* [FDIC Community Bank] *Advisory Committee.*

RMS and DCP, together with the state banking department, conducted a visitation of the institution on December 17-18, 2012.[30] The examiners found that the institution had reasonable controls in place to protect against fraud in the ACH origination service and to prevent undue credit and operational risk. However, the examiners recommended that the institution review and strengthen the terms of its agreement with the payday lender; analyze the level of funds held in the payday lender's deposit account to minimize credit risk to the institution; and develop a strategy to reduce the level of ACH returns. The visitation also identified consumer compliance concerns and recommended that the institution conduct a compliance risk assessment; establish formal monitoring procedures to ensure risks are effectively controlled; and implement a formal process for reporting to the Board.

After FDIC examiners provided preliminary results of the visitation to the Chicago Regional Office, the Chicago Regional Director notified the Director, DCP, that the Office would pursue a strategy to facilitate the institution's exit from the payment processing relationship with the payday lender. The Regional Director notified the Director, DCP, of the strategy via email and during a conference call on January 16, 2013. Additionally, beginning in February 2013 and continuing through August 2013, the Chicago Regional Office's monthly status reports to the Directors, RMS and DCP, referenced concerns related to the institution's involvement with a third party that facilitated payday lending and the FDIC's supervisory expectation for the institution to exit the relationship.

---

[30] Although the visitation focused on the payment processing relationship with the payday lender, a review of the institution's controls over the issuance of multi-purpose gift cards by another company was also performed.

25

 OCC-AA-00001564

On February 8, 2013, FDIC and state examiners held a conference call with the Chief Executive Officer (CEO) and the Chief Financial Officer (CFO) of the institution to reinforce the findings of the visitation and obtain management's commitment to address the recommendations. During the call, an FDIC FOS informed the institution's CEO and the CFO that the payment processing relationship with the payday lender carried a high degree of third-party, reputation, compliance, and legal risks that may not be acceptable. The FOS indicated that the FDIC's primary concern with the relationship was reputation risk. Specifically, the payday lender had an "F" rating with the Better Business Bureau (BBB) that was not consistent with the bank's positive image or the services the institution provided to the community.[31] The FOS informed the institution's CEO that the Board would receive formal correspondence from the Regional Office in the coming weeks urging the Board to terminate the payment processing relationship with the payday lender.

Immediately following the conference call, the FOS sent an email to an Assistant Regional Director in the Chicago Regional Office stating that the BBB rating was the most compelling information the FDIC had to pursue a termination of the relationship because legally the institution was entitled to maintain the relationship and the institution was administering the relationship in a reasonable fashion.[32] On February 15, 2013, the Chicago Regional Office sent a letter to the institution notifying its Board that the FDIC had recently become aware of the bank's involvement in activities related to payday lending—specifically the processing of transactions on behalf of a payday lender. The letter stated, in part:

> *It is our view that payday loans are costly, and offer limited utility for consumers, as compared to traditional loan products. Furthermore, the* [redacted] *relationship carries a high degree of risk to the institution, including third-party, reputational, compliance, and legal risk, which may expose the bank to individual and class actions by borrowers and local regulatory authorities. Consequently, we have generally found that activities related to payday lending are unacceptable for an insured depository institution.*

The letter added that members of the Chicago Regional Office's management team would contact the institution's Board to schedule a meeting to further discuss the FDIC's concerns with the relationship. On April 30, 2013, the FOS and a state examiner met with the institution's CEO and CFO to discuss the status of the payment processing relationship with the payday lender. The meeting took place during a state-led safety and soundness examination. The CEO and CFO informed the examiners that a decision had not yet been made regarding the future of the institution's relationship with the payday lender. The FOS discussed ongoing concerns that the regulators had regarding payday lending programs and encouraged the CEO and CFO to formally notify the Regional Office regarding the institution's planned actions. The CEO and CFO agreed to do so. On May 29, 2013, the state banking agency submitted its report of examination to the institution's Board. The report did not mention the institution's payment processing relationship with the payday lender. We spoke with representatives of the state

---

[31] The BBB rates organizations on a scale of A+ (highest) to F (lowest). The rating represents the BBB's opinion of how the business is likely to interact with its customers.

[32] The FOS and the Chicago Regional Director informed us that they did not request or receive advice from the Legal Division regarding the legal sufficiency of persuading the institution to exit the payment processing relationship with the payday lender.

PROTECTED

OCC-AA-00001565

banking department who informed us that they did not have an objection to the institution's relationship with the payday lender.

In a letter dated June 18, 2013, the institution's CEO notified the Chicago Regional Office that the relationship with the payday lender would be terminated. The letter noted that the institution had not been cited for noncompliance with any laws or regulations in connection with the relationship. In addition, the letter stated that the institution had engaged a consultant to conduct a risk assessment of the relationship and although the assessment identified areas warranting control improvements, it also concluded that the relationship posed no significant risk to the institution, including financial, reputation, or legal risk. The letter also expressed disappointment with the FDIC's supervisory approach, particularly its ability to pressure an institution to terminate a business relationship when there were no safety and soundness considerations other than potential reputation risk. An email dated June 19, 2013, from the FOS to a Chicago Assistant Regional Director, stated: "In the end, we are getting them out of [ACH processing for a payday lender] through moral persuasion and as you know from a legal perspective we don't have much of a position, if any."

The Chicago Regional Director informed us that he pursued a strategy of persuading the institution to terminate its payment processing relationship with the payday lender because it was his perception that senior FDIC management in the Washington, D.C. office, including the current and former Chairmen, did not favor banking services that facilitated payday lending. The Regional Director recalled a meeting held in late 2010 or early 2011 during which the former Senior Deputy Director, Division of Supervision and Consumer Protection (DSC),[33] informed the Regional Directors that if an institution in their region was facilitating payday lending, the Regional Director should require the institution to submit a plan for exiting the business. We contacted the former Senior Deputy Director, DSC, about this matter and he stated that he did not communicate such an expectation to the Regional Directors.

The Director, DCP, was both aware of the Chicago Regional Office's strategy to persuade the institution to exit the relationship with the payday lender through monthly status reports from the Chicago Regional Office as well as conference calls and email communications from the Regional Director. Although the Director, DCP, was aware that the Regional Director had planned to send, and subsequently did send, a letter to the institution requesting a plan to exit the relationship, the Director informed us that he did not receive a copy of the letter or the institution's June 2013 response until early July 2013. The Director, DCP, indicated that his initial reaction/priority at that time was to gain an understanding of the region's perception of the risks in the relationship and the region's plan for following up with the institution to address the issues raised in its June 2013 response letter. No one at the FDIC informed the Chicago Regional Director that the February 2013 letter sent to the institution was inconsistent with FDIC policy or guidance until after Operation Choke Point was publicized in the media.

---

[33] In conjunction with other organizational changes made in response to the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act in 2010, DSC was split into RMS and DCP, effective February 13, 2011.

27

In the fall of 2013, the Chicago Regional Director and the Director, DCP, separately contacted the institution to clarify the FDIC's supervisory policy and guidance for institutions that provide ACH processing for third parties, including payday lenders. FDIC officials informed us that the institution ultimately terminated its payment processing relationship with the payday lender but continued to provide other types of banking services to the merchant.

<u>Regional Director Perspectives</u>

We interviewed all six of the FDIC's Regional Directors to obtain their perspectives on the FDIC's stance towards payday lending by financial institutions and ACH processing for payday lenders. Three of the six Regional Directors informed us that it was their perception that senior FDIC executives in Washington, D.C., up to and including the former and current FDIC Chairmen, had serious concerns regarding the facilitation of payday lending by FDIC-supervised institutions. The three Regional Directors stated that senior FDIC management never made a distinction between payday lending by financial institutions and ACH processing for payday lenders when communicating their concerns. In addition, these three Regional Directors believed that there was a general expectation from executives in Washington, D.C., to discourage institutions from facilitating payday lending. Further, two of these three Regional Directors believed that if an institution was found to be facilitating payday lending, an expectation existed to pursue an exit strategy. The remaining Regional Director believed there was an expectation that examiners should place a heightened level of scrutiny on the associated controls. All three Regional Directors added that they had observed a shift in the supervisory tenor among Washington, D.C., executives towards institutions that facilitate payday lending since the fall of 2013. The current tenor, according to these Regional Directors, is that such activity is acceptable, provided that the institution complies with applicable policy, guidance, and laws.

The remaining three Regional Directors that we spoke with indicated that it was their perception that executives in Washington, D.C., viewed payday lending by financial institutions and ACH processing for payday lenders as acceptable, provided that the institution complies with applicable policy, guidance, and laws.

All six of the Regional Directors informed us that concerns regarding individual FDIC-supervised institutions facilitating payday lending have been relatively infrequent in recent years. These views were consistent with our review of monthly status reports submitted by the Regional Directors to the Directors of RMS and DCP for the 4-year period ended December 31, 2014. These monthly status reports identified concerns specifically pertaining to payday lending activities facilitated through ACH processing at just three financial institutions. All three of the institutions were under the supervision of the Chicago Regional Office.

## Role of Certain Former and Current FDIC Officials

As mentioned earlier in this report, the FDIC Chairman requested that as part of our planned and ongoing work related to Operation Choke Point, we conduct a fact-finding review of the actions of senior FDIC staff, including but not limited to, one former and four current officials. The Chairman's request was prompted by concerns raised by a Congressman in a letter dated December 10, 2014, that identified five individuals that had allegedly allowed their personal and political views to interfere with the important work of the FDIC and that they had misled the

PROTECTED

American people through their emails and in meetings with, and testimony before, the Congress. These five individuals served as the former Acting General Counsel; a Deputy Director, DCP; the former Atlanta Regional Director; the Chicago Regional Director; and the Director, DCP.[34] The Member's concerns were based on information contained in a December 8, 2014 staff report of the House Oversight and Government Reform Committee, entitled *Federal Deposit Insurance Corporation's Involvement in "Operation Choke Point."*

We performed audit procedures to determine the extent to which the individuals serving in the five referenced positions were involved in the development or implementation of Operation Choke Point and whether their actions involving the institutions we reviewed were based on personal, political, or moral agendas aimed at forcing lawful businesses on the high-risk list out of the banking sector. As part of these audit procedures, we interviewed relevant FDIC and DOJ employees, reviewed selected email communications that the five individuals sent and received on the topic of payday lenders, and reviewed supervisory records pertaining to our 23 sampled institutions.[35]

Based on our analysis, we determined that none of the five individuals played a role in the development or implementation of Operation Choke Point. In addition, we concluded that the individuals did not pursue their own personal, political, or moral agendas aimed at forcing lawfully-operating businesses on the high-risk list out of the banking sector. As it pertains to payday lending and related activities, we concluded that the officials acted consistent with a widely-held understanding that the highest levels of the FDIC disfavored these types of banking services. Concerns regarding these types of banking services were rooted in safety and soundness and consumer protection risks. We also noted instances in which internal FDIC email communications and/or a communication to a financial institution involving the former Atlanta Regional Director; the Chicago Regional Director; and the Director, DCP; were not consistent with written FDIC policy or guidance. The exceptions pertained to ACH processing for payday lenders by financial institutions. A brief description of our results by individual follows.

**Former Acting General Counsel.** We did not identify any actions taken by this individual that influenced the FDIC's supervisory approach pertaining to payday lending for the institutions we reviewed. As mentioned earlier, work on a separate inquiry into the allegation that this individual provided false testimony to the Congress was completed by the OIG's Office of Investigations at the close of our audit.

**Deputy Director, DCP.** We did not identify any actions taken by this individual that influenced the FDIC's supervisory approach pertaining to payday lending for the institutions we reviewed. We did, however, note a limited number of internal email communications in which this individual attempted to cast payday lending by financial institutions in a negative light in public communications by the FDIC Chairman. However, we found no evidence that these negative connotations were incorporated into the Chairman's communications.

---

[34] The former Atlanta Regional Director retired from the FDIC on May 3, 2014.
[35] See Appendix 1 for a detailed description of our scope and methodology, including our approach for reviewing email communications for the five individuals.

PROTECTED

OCC-AA-00001568

**Former Atlanta Regional Director.** This individual played a key role in developing the FDIC's payday lending guidance and led an internal FDIC working group in 2005 that helped to establish and implement the Corporation's supervisory strategies pertaining to payday lending. We identified certain email communications authored by this individual, some of which were sent to his supervisor—the Director, DCP—and others of which were sent to his staff that reflected strongly-held, negative views about payday lenders and ACH processing by banks for payday lenders. Some of these communications related to one of the 23 institutions in our sample. The views expressed in these email communications were not consistent with written FDIC policy or guidance, which permits institutions to provide banking services to payday lenders provided that the institutions have adequate risk management controls and comply with applicable laws. In our view, such communications also reflected poor judgment as they had the propensity to influence staff behavior and lead to communications with financial institutions that are inconsistent with written FDIC policy and guidance.

**The Chicago Regional Director.** As discussed earlier, this individual sent a written communication to one of the 23 institutions in our sample discouraging the institution from providing ACH processing services to a payday lender even though material safety and soundness or consumer protection concerns to warrant doing so did not exist. This approach was not consistent with the written FDIC policy or guidance. The individual believed that his communication was consistent with senior FDIC management's expectations to discourage financial institutions from facilitating payday lending. In addition, the individual's supervisor— the Director, DCP—was aware of the Chicago Regional Director's communication and the institution's response, but did not inform the Chicago Regional Director that his communication was inconsistent with FDIC policy or guidance until concerns were raised publicly about the FDIC's approach to financial institutions that facilitate payday lending.

**Director, DCP.** This individual took a lead role in responding to the FDIC Chairman's request to investigate reports of financial institutions engaging in payday lending and recommending further steps that could be taken by the FDIC to address the associated risks. This individual established an interdivisional working group to research the risks to institutions associated with the facilitation of illegal payday lending activities through TPPPs and developed FDIC guidance on deposit advance products.

The Director, DCP, informed us that he did not advise the former Atlanta Regional Director that some of his internal email communications were inconsistent with FDIC policy and guidance because it was the Director's belief that these communications would not be shared with anyone else. However, as described earlier, similar communications were shared with the former Atlanta Regional Director's staff. In addition, it was the Director's belief that the former Atlanta Regional Director's emails were more emotional than substantive and that this individual would not take action to pressure an institution to decline banking services in violation of FDIC policy or guidance.

With respect to the Chicago Regional Director's written communication referenced above, the Director, DCP, informed us that it was his understanding that the institution was being persuaded to terminate its relationship with the payday lender for safety and soundness reasons and not primarily because of reputation risk. Further, the Director did not advise the Chicago Regional

30

PROTECTED

OCC-AA-00001569

Director that his communication with the institution was inconsistent with FDIC policy and guidance until September 2013. The Director stated that after seeing the communication in early July 2013, he attempted to understand the risks associated with the relationship and the region's approach to addressing those risks.

Because the FDIC Chairman has already committed to reviewing the facts and circumstances pertaining to the five individuals, and taking action, as appropriate, we are not making recommendations in this area.

## The FDIC's Actions to Address Concerns Regarding Its Supervisory Approach

FDIC officials determined that there were misperceptions about the FDIC's supervisory approach to institutions that conduct business with merchants associated with high-risk activities. As a result, beginning in September 2013, the FDIC took a number of actions to address these misperceptions. These actions are intended to promote a common understanding and consistent implementation of the FDIC's supervisory approach in this area. These actions are described below:

- On September 27, 2013, the FDIC issued FIL-43-2013, *FDIC Supervisory Approach to Payment Processing Relationships With Merchant Customers That Engage in Higher-Risk Activities*. The FIL clarified the FDIC's policy and supervisory approach related to facilitating payment processing services directly, or indirectly through a third party, for merchant customers engaged in higher-risk activities. According to the FIL, facilitating payment processing for these types of merchant customers can pose risks to financial institutions. However, institutions that properly manage these relationships and risks are neither prohibited nor discouraged from providing payment processing services to customers operating in compliance with applicable law.

  FIL-43-2013 also states that the focus of the FDIC's examination process is on assessing whether institutions are adequately overseeing the activities and transactions they process and appropriately managing and mitigating risks. The FIL adds that institutions with appropriate systems and controls will not be criticized for providing payment processing services to businesses operating in compliance with applicable law.

- On July 28, 2014, the FDIC issued FIL-41-2014, *FDIC Clarifying Supervisory Approach to Institutions Establishing Account Relationships with Third-Party Payment Processors*. The FIL reiterated the FDIC's policy that institutions that properly manage customer relationships are neither prohibited nor discouraged from providing services to any customer operating in compliance with applicable law. The FIL also states that the focus of the FDIC's supervisory approach to institutions with TPPP relationships is to ensure adequate procedures for conducting due diligence, underwriting, and ongoing monitoring of the relationships. According to the FIL, institutions that follow the FDIC's outstanding guidance will not be criticized for establishing and maintaining TPPP relationships.

31

OCC-AA-00001570

Additionally, FIL-41-2014 states that the examples of merchant categories associated with higher-risk activities included in previously-issued FDIC guidance[36] and the informational article in the Summer 2011 *Supervisory Insights* Journal led to misunderstandings regarding the FDIC's supervisory approach to TPPPs and created a misperception that the merchant categories were prohibited or discouraged. As a result, the FDIC removed the lists of examples of merchant categories from previously issued guidance and the informational article.

- On January 28, 2015, the FDIC issued FIL-5-2015, *Statement on Providing Banking Services.* The FIL states that individual customers within broader customer categories present varying degrees of risk. Consequently, institutions should take a risk-based approach in assessing individual customer relationships rather than declining to provide banking services to entire categories of customers. Financial institutions that can properly manage customer relationships and effectively mitigate risks are neither prohibited nor discouraged from providing services to any category of customer accounts or individual customers operating in compliance with applicable state and federal law.

  FIL-5-2015 recognizes that some institutions may hesitate to provide certain types of banking services due to concerns that they will be unable to comply with the associated requirements of the BSA. According to the FIL, the FDIC and the other federal banking agencies recognize that as a practical matter, it is not possible to detect and report all potentially illicit transactions that flow through an institution. Isolated or technical violations, which are limited instances of noncompliance with the BSA that occur within an otherwise adequate system of policies, procedures, and processes, generally do not prompt serious regulatory concern or reflect negatively on management's supervision or commitment to BSA compliance. The FIL adds that when an institution follows existing guidance and maintains an appropriate risk-based program, the institution will be well-positioned to appropriately manage customer accounts, while generally detecting and deterring illicit financial transactions.

  FIL 5-2015 also states that any FDIC-supervised institution concerned that FDIC personnel are not following the policies on providing banking services may contact the FDIC's Office of the Ombudsman (OO) using a dedicated, confidential toll-free number or email address. Individuals or institutions may also contact the FDIC OIG through its Web site, by phone, or by email.

- On January 28, 2015, the FDIC established an internal policy for documenting and reporting instances in which FDIC staff recommend or require institutions to terminate deposit account relationships. According to the policy, recommendations or requirements to terminate a customer deposit account should not be made through informal

---

[36] This guidance consists of FIL-127-2008, *Guidance on Payment Processor Relationships*, originally issued on November 7, 2008, and revised in July 2014; FIL-3-2012, *Payment Processor Relationships, Revised Guidance*, originally issued on January 31, 2012, and revised in July 2014; and FIL-43-2013, *FDIC Supervisory Approach to Payment Processing Relationships With Merchant Customers That Engage in Higher-Risk Activities*, originally issued on September 27, 2013, and revised in July 2014.

PROTECTED                                                                                     OCC-AA-00001571

suggestions. In addition, criticisms of an institution's management or mitigation of risk associated with deposit accounts that do not rise to the level of a recommendation or a requirement to terminate an account should not be made through informal suggestions. Rather, criticisms of an institution's management or mitigation of risk associated with deposit accounts must be made in writing in a report of examination. Further, recommendations or requirements to terminate deposit accounts must be made in writing and must be approved in writing by the Regional Director before being provided to and discussed with the institution's management and Board.

The policy provides that before findings involving customer account terminations are included in a report of examination or supervisory actions are pursued, the findings and supervisory actions must be thoroughly vetted with Regional Office and legal staff. As part of this effort, examiners should include the supervisory basis for recommending or requiring account terminations and address any specific laws or regulations examiners believe are being violated, if applicable. Further, recommendations to terminate deposit account relationships cannot be based solely on reputation risk to the institution. The policy adds that the Regional Directors must report quarterly to the Directors, RMS and DCP, as well as to the FDIC Board regarding requests or requirements for institutions to terminate deposit accounts, along with the basis for such action. The first two of these reports covered the first two quarters of 2015 and identified no requests or requirements for an institution to terminate a deposit account.

Following the issuance of the policy, the FDIC Chairman participated in a national conference call with FDIC supervisory staff to discuss the documentation and reporting requirements described above. The Chairman also met with all six of the FDIC's Regional Directors to emphasize the importance of complying with the policy. In addition, the FDIC plans to emphasize the policy's requirements during upcoming meetings and training sessions with supervisory staff.

We noted that the policy and guidance described above focuses on deposit accounts and does not explicitly address various other types of banking products, such as credit products. The FDIC should consider whether the policy and guidance warrants clarification to address such products.

## Banker Perspectives

We interviewed senior executives at 19 of the 23 financial institutions in our sample to obtain the executives' views on the FDIC's supervisory approach to institutions that provided banking services (either directly or through TPPPs) to merchants on the high-risk list.[37] As part of these interviews, we asked the executives for their thoughts on the FDIC's payday lending and TPPP guidance. We also asked executives at certain institutions about their views on RALs. Although the perspectives provided by the executives varied, several salient views emerged and are described below. We are including these perspectives in our report for the FDIC's consideration in its ongoing outreach to community banks.

---

[37] Executives at 4 of the 23 institutions declined our offer for an interview.

PROTECTED

**The High-Risk List.** Executives at all but one of the 19 institutions were familiar with the Summer 2011 *Supervisory Insights* Journal article that contained the high-risk list. Executives at 14 of the other 18 institutions stated that after reading the article, it was not their impression that the FDIC discouraged institutions from conducting business with merchants on the high-risk list. However, executives at 4 of the 18 institutions believed that the article suggested that the FDIC discouraged institutions from conducting business with merchants on the high-risk list.

**The FDIC's Payday Lending Guidance.** Executives at 11 of the 19 institutions stated that they were not familiar with, or had no perspectives on, the FDIC's payday lending guidance. In several cases, this was because the executives simply had no business interest in offering that type of credit product. Executives at five institutions indicated that the payday lending guidance was generally appropriate, while executives at the remaining three institutions thought the guidance was not appropriate. Executives at one of these three institutions stated that the payday lending model as defined in guidance makes payday lending cost prohibitive for institutions.

**Termination of Business Relationships.** With the exception of payday lenders, none of the executives indicated that they had experienced pressure from the FDIC to terminate a business relationship with a merchant on the high-risk list, including a firearms and ammunition retailer, or tobacco retailer. Although pawnbrokers were not on the high-risk list, executives from five institutions informed us that they provided banking services to these merchants and had never experienced regulatory pressure to terminate the business relationships.

Executives at two institutions stated that they had stopped making payday loans through third-party arrangements with payday lenders in the mid-2000s because the cost of complying with the FDIC's payday lending guidance was too great and the FDIC had exerted pressure on the institutions to stop making payday loans. These executives also expressed concern about the FDIC's heightened scrutiny of payday lending and the risk of potential supervisory actions against institutions that engage in that type of activity. In addition, the executives stated that they have declined to provide banking services to payday lenders because of the associated risks.

Executives at a third institution stated that they terminated a payment processing relationship with a payday lender in 2013 in response to pressure from the FDIC. The executives at this institution stated that the pressure was based primarily on reputation risk to the institution because of its association with a payday lender. The executives added that, in their view, the relationship posed no significant safety and soundness or consumer compliance risk to the institution.

**The FDIC's TPPP Guidance.** Executives at 12 institutions indicated that the risk management concepts and principles defined in the FDIC's TPPP guidance were appropriate. Executives at one of these institutions indicated that they understood the importance of properly managing TPPPs because they can be a source of illegal transactions, while executives at a second institution stated that they would adopt the controls described in the guidance even if the guidance did not exist because doing so was a good business practice. Executives at a third institution indicated that the guidance was clear, contained an appropriate amount of detail, and that the institution was using the guidance to implement related internal controls.

PROTECTED                    OCC-AA-00001573

Executives at seven institutions indicated that the resources required to implement risk management controls as described in the guidance are not practical, particularly for small community banks. Executives at all seven institutions expressed concern about the FDIC's high level of scrutiny of TPPP relationships, and/or the extent to which institutions must go to ensure that the business activities and transactions of TPPP merchant clients comply with applicable federal and state laws. Executives at one of these institutions stated that such monitoring is tantamount to detective work rather than providing banking services. Executives at another institution indicated that they would never conduct business with TPPPs due to regulatory burden and pressure.

**TPPPs.** Executives at three institutions stated that the FDIC pressured their institutions to exit business relationships involving TPPPs. Executives from two of the institutions believed the ultimate direction came from the FDIC's Washington, D.C., office.

**RALs.** Executives from two institutions stated that FDIC officials forced them to stop facilitating RALs and applied increased scrutiny of their institutions' RAL programs. These executives also said that FDIC officials noted the lack of the Internal Revenue Service (IRS) debt indicator[38] as a reason for pressuring the institutions to discontinue facilitating RALs.

**State Banking Agencies.** Executives at six institutions described instances in which the FDIC raised concern about their institutions' payday lending activities, management of TPPP relationships, and/or practices for offering RALs. However, the state regulators for these institutions exhibited a lesser level of concern for these risks. In one instance, a state banking agency and the FDIC issued separate reports of examination for an institution covering the same period. The state banking agency assigned three CAMELS component ratings and a composite rating that were higher than the FDIC's ratings.

**Positive Feedback.** While not specifically asked, executives at six institutions made complimentary remarks about certain FDIC personnel and/or indicated that FDIC officials treated their institutions in a fair, open, and transparent manner. One executive complimented FDIC staff for helping the institution address a consent order, and an executive from another institution stated that the FDIC helped to improve the institution's monitoring and management of BSA risks.

## Observation:  Refund Anticipation Loans

During the course of our audit, we became aware of a credit product known as a RAL. Although RALs were not included on the high-risk list, we observed that the FDIC's supervisory approach to institutions that offered this credit product raised questions similar to those that prompted the Congressional request to our office. Specifically, the FDIC took unusual and aggressive actions to prohibit institutions from offering this credit product. Below is an explanation of RALs and

---

[38] Prior to 2011, tax preparers who electronically submitted a client's tax return received an acknowledgement from the IRS that included (among other things) information about whether the taxpayer would have any portion of their refund offset for delinquent tax or other debts, such as unpaid child support or delinquent federally funded student loans. This information was often referred to as the debt indicator.

PROTECTED

related risks, a description of certain aspects of the FDIC's supervisory approach at the institutions that offered this product, and our preliminary concerns.

<u>What is a RAL?</u>

A RAL is a particular type of loan product typically brokered by a national or local tax preparation company in conjunction with the filing of a taxpayer's income tax return.  As part of the RAL process, the tax preparer works in cooperation with a financial institution to advance the refund as a loan, minus tax preparation costs, other fees, and a finance charge.  The taxpayer in turn provides authorization to the IRS to send the refund directly to the institution to repay the loan.  One benefit of RALs is that they allow taxpayers to receive cash quickly, often on the same day they file their returns.  However, as discussed below, RALs also present safety and soundness and consumer protection concerns.

<u>Concerns with RALs</u>

The Congress, IRS, OCC, and consumer advocacy groups have all raised concerns about RALs.  Specifically, the MLA (discussed earlier) limits annual percentage rates on certain loans offered to military service personnel, including RALs, to 36 percent.  The IRS has expressed concern that RALs may provide tax preparers with financial incentives to take improper tax return positions to inappropriately inflate refund claims.  The OCC's February 2010 *Policy Statement on Tax Refund-Related Products* describes supervisory expectations for national banks that offer RALs and related products, as well as the associated legal, compliance, consumer protection, reputation, and safety and soundness risks.  Because of these risks, the OCC has largely extinguished RALs from the national banking system and indicated that the agency would not accept, license, or charter an institution concentrating in these services today.  Consumer advocacy groups have also criticized RALs as predatory in nature because they are costly and frequently targeted to low-income taxpayers.

The FDIC considers RALs to carry a significant degree of risk to financial institutions, including third-party, reputation, compliance, and legal risks.  Of particular concern to the FDIC is the ability of a financial institution to ensure proper underwriting and compliance with consumer protection requirements when this credit product is offered through hundreds or thousands of EROs.  Contributing to these concerns was the IRS' decision, which became effective with the 2011 tax season, to discontinue providing tax preparers and financial institutions with the "debt indicator" underwriting tool.  In the absence of a debt indicator, and for other reasons, the FDIC concluded that institutions could not facilitate RALs in a safe and sound manner and determined that RALs were unacceptable for FDIC-supervised institutions.

<u>The FDIC's Supervisory Approach to Institutions that Offered RALs</u>

We identified three FDIC-supervised institutions that offered RALs (referred to herein as Institutions A, B, and C).  Institutions A, B, and C began offering RALs in 1987, 1988, and 2007, respectively.  At various times from 2004 through 2009, FDIC examiners criticized the risk management practices pertaining to the RAL programs at Institutions A and B during compliance and risk management examinations.  Among other things, examiners criticized these institutions for apparent violations of consumer protection laws and regulations and insufficient

36

 OCC-AA-00001575

oversight of their EROs.  In addition, Institution A stipulated and consented to a Cease and Desist Order in February 2009 arising from deficiencies in the institution's compliance management system with regard to RALs and the institution's inability to adequately assess, measure, monitor, and control third-party risk.

In late 2009, the FDIC contended that Institution A had expanded its RAL program while operating under the Cease and Desist Order.  This expansion prompted the FDIC to send letters to the institution's Board, dated December 30 and 31, 2009, expressing continued concerns about the institution's RAL products and requesting a plan for discontinuing this type of lending.  In separate letters dated February 3, 2010, the FDIC notified the Boards of the two remaining institutions that RALs were unacceptable for the institutions and that plans should be developed for the expeditious exit of those lines of business.  Notably, the FDIC had not identified any control weaknesses in Institution C's RAL program prior to sending these letters.[39]  The FDIC's letters to all three institutions were coordinated through the Washington, D.C., office.

In early 2011, after prior efforts to convince the three institutions to discontinue offering RALs were unsuccessful, RMS, DCP, and Legal Division executives in the Washington, D.C., office undertook an aggressive, and at times confrontational, approach to compel the institutions to stop offering RALs.  As part of this approach, in January 2011, the Director, DCP, and the former Senior Deputy Director, RMS, proposed, and the former FDIC Chairman approved, plans to commit significant examiner resources to conduct horizontal reviews of the institutions' EROs throughout the United States if the institutions would not voluntarily discontinue their RAL programs.  A brief description of key FDIC supervisory actions to compel the institutions to stop offering RALs beginning in early 2011 follows.

Institution A

In a memorandum dated January 7, 2011, to the Director, DCP, attorneys within the FDIC's Legal Division assessed the litigation risk to the Corporation pertaining to a proposed enforcement action that would require Institution A to terminate its RAL program.  At that time, DCP and RMS were contemplating the issuance of a Notice of Charges and Hearing against the institution because prior efforts to persuade the institution to stipulate to such an order had been unsuccessful.  The Legal Division memorandum noted that although the institution was already operating under a Cease and Desist Order for deficiencies in its RAL program, the most recent compliance examination of the institution found that the deficiencies had been largely corrected.[40]  Without direct criticism of the institution's RALs, or examination staff that could opine as an expert witness that a deficiency in the institution's RAL program rose to an unsafe or

---

[39] After sending the letters, a February 2010 examination issued by the institution's state regulator noted that the FDIC was viewing RALs as "an unacceptable business line."  A September 2010 compliance examination report noted an inadequate bank policy and monitoring practices related to the institution's RAL program.  The report contained numerous recommendations to enhance the institution's internal controls over its RAL program.

[40] The FDIC's January 2011 litigation risk assessment indicated that the FDIC's determination that the institution's RAL deficiencies had apparently been corrected was based, in part, upon the results of preannounced visitations to the institution and the institution's EROs, during which FDIC staff were accompanied by bank personnel.  The FDIC did not select the EROs using statistical techniques.  As a result, FDIC staff believed that deficiencies could be more pronounced if the visitations were conducted on an unannounced basis.

PROTECTED

OCC-AA-00001576

unsound practice or that the institution was faced with an abnormal risk of loss from the program, the memorandum concluded that the litigation risk to the FDIC of pursuing an enforcement action based primarily on safety and soundness arguments was extremely high.

The memorandum noted that DCP and RMS were developing plans to conduct horizontal, unannounced site-visits of the institution's EROs that may identify potential violations of law, rule or regulation, as well as potential unsafe and unsound practices.  The memorandum indicated that such a determination could be used to support a proposed enforcement action.  Accordingly, the memorandum recommended that the FDIC postpone any enforcement action pending the results of the horizontal reviews.

In an e-mail, dated January 28, 2011, and subsequent discussion held on January 31, 2011, an RMS official informed Institution A's CEO that executing a written agreement requiring the institution to discontinue its RAL program was a prerequisite for allowing the institution to bid on failing banks.  At that time, Institution A had an interest in acquiring failing banks.  However, Institution A's CEO did not sign such an agreement.

Notwithstanding the litigation risk, the FDIC issued a Notice of Charges and Hearing on February 9, 2011, charging Institution A with engaging in unsafe or unsound banking practices and violations of laws with respect to the underwriting of RALs.  Specifically, the Notice stated that the institution's underwriting procedures did not mitigate the absence of the IRS debt indicator and did not consider data needed to assess risk in an unsecured consumer loan portfolio.  The institution denied the charges.  On February 15, 2011, DCP and RMS commenced an unannounced visitation of the institution to review and analyze its RAL program and compliance with an outstanding February 2009 Cease and Desist Order.  On the same day, DCP and RMS deployed approximately 400 examiners to conduct a 2-day horizontal review of 250 EROs in 36 states.  The purpose of the review was to determine whether the EROs were complying with federal and state laws and regulations pertaining to the origination of RALs.  RMS and DCP officials informed us that the number of EROs reviewed was large because a statistically valid sample was needed to support any supervisory actions that may have been warranted based on the outcome of the review.

The visitation and horizontal review identified unsafe and unsound practices and violations of laws and regulations at the institution and EROs.  As a result, the FDIC issued an Amended Notice of Charges for an Order to Cease and Desist; Notice of Assessment of Civil Money Penalties, Findings of Fact and Conclusions of Law; Order to Pay; and Notice of Hearing on May 3, 2011, against Institution A.  Following a series of legal actions and discussions, the FDIC and Institution A reached a settlement on December 8, 2011, regarding the Amended Notice of Charges and a lawsuit filed by the institution against the FDIC in March 2011.[41]  As part of the settlement, the institution agreed to discontinue making RALs after the 2012 tax season and

---

[41] On March 1, 2011, Institution A filed a lawsuit against the FDIC stating that the FDIC's action seeking to prohibit the institution from offering RALs constituted a generally applicable change in law that was required to be administered through traditional notice and comment rulemaking required by the Administrative Procedures Act or in another fashion permitted by law.  The Court dismissed the lawsuit in December 2011, based on the institution's filing for a voluntary dismissal.

38

never re-enter that line of business. Such provisions are unusual in FDIC Consent Orders as they typically allow an institution to re-enter lending activity after consulting with, or obtaining a non-objection from the FDIC. Institution A also agreed as part of the settlement to pay a CMP totaling $900,000 and voluntarily dismissed a lawsuit that had been filed against the FDIC on March 11, 2011.

Institution B

On February 3, 2011, the FDIC delivered a proposed consent order to Institution B's Board that would have (among other things) required the institution to stop offering RALs. The proposed order was based on significant weaknesses in the institution's oversight, control, and monitoring of third-party risk, particularly with respect to nontraditional products, and apparent violations of laws and/or regulations detailed in a May 2009 compliance examination report. On February 14, 2011, representatives from RMS, DCP, and the Legal Division participated in a meeting with the institution's Board during which the results of the compliance examination were presented. During the meeting, FDIC officials attempted to persuade the institution's Board to stipulate to a Cease and Desist Order requiring the institution to discontinue offering RALs. The FDIC's approach to doing so was confrontational. An excerpt from a summary of the Board meeting prepared by an RMS employee states, in part:

> [A former FDIC supervisory attorney] *then began by stating that management at the FDIC in Washington would bring the full force of the Corporation to bear against the bank if the Board of Directors did not immediately agree to cease offering RALs at the end of the 2011 tax season.* [The FDIC attorney] *said there would be immediate consequences, beginning the next day, unless the Board agreed to stop offering RALs. When asked,* [the FDIC attorney] *did not answer why the immediate decision was necessary although the FDIC was aware that the bank had been offering RALs since 1988 with no detrimental effect on the bank or any customer.* [The FDIC attorney] *said that "nothing is off the table" pertaining to actions the management of the FDIC would take. When asked by* [the institution's counsel], [the FDIC attorney] *declined to state the actions FDIC management would take if the Board did not get out of the RAL business.*

The institution's Board committed to terminating its RAL program during the meeting. Immediately following the meeting, DCP and RMS executives in Washington, D.C., were notified of the Board's decision and a decision was made to cancel the horizontal review of the institution's EROs that was scheduled to commence the next day. On February 16, 2011, the institution issued a public press release stating that it had decided to exit the RAL business at the conclusion of the 2011 tax season following extensive conversations with its primary regulator, the FDIC, regarding its concerns about RALs.

In October 2011, Institution B stipulated to a consent order, order for restitution, and order to pay CMPs. Among other things, the Consent Order stated that the institution had exited the RAL business and would not resume that type of lending.

PROTECTED

OCC-AA-00001578

Institution C

In a letter dated February 3, 2011, the FDIC notified the institution's Board that supervisory and enforcement actions may be pursued against the institution if the Board failed to submit a plan for promptly discontinuing its RAL program. In a letter dated February 9, 2011, the institution's Board notified the FDIC that a special Board meeting had been held the previous day to discuss the FDIC's February 2011 letter. During that meeting, it was decided that the institution would stop offering RALs after the 2011 tax season, which ended April 21, 2011.

Conclusions

Senior FDIC officials in Washington, D.C., including the former Chairman, considered the safety and soundness and consumer protection risks associated with RALs to be unacceptable and took actions to prohibit this practice at FDIC-supervised institutions.[42] The FDIC drafted a policy statement in 2010 that defined the FDIC's supervisory concerns and expectations for institutions offering RALs. However, the policy statement was never finalized. In our view, establishing such a policy would have been prudent to ensure that institutions understood the risks associated with RALs and provide transparent supervisory guidance and expectations for institutions already (or contemplating) offering RALs.

We concluded that the actions taken with respect to the three institutions that offered RALs fell within the Corporation's broad statutory authorities because the Corporation is permitted to require a financial institution to discontinue a practice if safety and soundness or consumer protection concerns warrant doing so. However, we believe that the execution of these actions and the role of the individuals involved warrants further review, and the OIG is conducting additional work in this area.

# Recommendations

As discussed earlier, the FDIC clarified its supervisory policy and guidance to address misperceptions regarding the Corporation's supervisory approach to institutions that conduct business with merchants on the high-risk list. The policy and guidance, however, focuses on deposit accounts and does not explicitly address various other types of banking products, such as credit products. In addition, it is too soon, in our view, to determine whether the actions taken by the FDIC will ensure a common understanding and sustained application of the FDIC's supervisory approach to the issues and risks discussed in this report, both within the FDIC and at FDIC-supervised institutions. In this regard, an assessment of the implementation of that approach to ensure it is having the intended effect would be prudent. Such an assessment would also be consistent with the internal control and monitoring principles defined in FDIC Circular 4010.3, *FDIC Enterprise Risk Management Program*. This circular provides for continuous monitoring to enhance program performance and operations and a process to identify, analyze, and reduce exposure to risks.

---

[42] Although Institutions A, B, and C stopped offering RALs, FDIC officials informed us that they continued to facilitate other products with EROs, such as tax refund anticipation checks.

PROTECTED　　　　　　　　　　　　　　　　　　　　　OCC-AA-00001579

We recommend that the Directors, RMS and DCP, coordinate to:

1. Review and clarify, as appropriate, existing policy and guidance pertaining to the provision and termination of banking services to ensure it adequately addresses banking products other than deposit accounts, such as credit products.

2. Assess the effectiveness of the FDIC's supervisory policy and approach with respect to the issues and risks discussed in this report after a reasonable period of time is allowed for implementation.

With respect to the use of moral suasion to address supervisory concerns with financial institutions, it would be prudent for the FDIC to review its supervisory policy and guidance to determine whether moral suasion is adequately addressed.

We recommend that the Directors, RMS and DCP, coordinate with the Legal Division to:

3. Review and clarify, as appropriate, existing supervisory policy and guidance to ensure it adequately defines moral suasion in terms of the types and circumstances under which it is used to address supervisory concerns, whether it is subject to sufficient scrutiny and oversight, and whether meaningful remedies exist should moral suasion be misused.

## Corporation Comments and OIG Evaluation

The Director, RMS, provided a written response on behalf of the FDIC, dated September 10, 2015, to a draft of this report. The response is presented in its entirety in Appendix 4. In the response, the Director concurred with all three of the report's recommendations and described planned and completed corrective actions that were responsive. The FDIC expects to complete all actions to address the recommendations by September 30, 2016. A summary of the Corporation's corrective actions is presented in Appendix 5.

In addition to actions already taken, the FDIC's response noted that a sustained effort to communicate with its staff and the industry is important to address what it perceives as potential confusion about appropriate supervisory standards and to ensure a common understanding and sustained application of the FDIC's approach. The FDIC committed to continuing to communicate to its staff and the industry regarding the distinctions between the standards applicable to credit products, including payday loans, offered by banks and those applicable to other banking services. To that end, the FDIC plans to update its guidance on payday lending by banks to clarify that the guidance does not apply to banks offering deposit accounts or extending credit to payday lenders.

The FDIC plans to conduct internal reviews to assess compliance with its actions to address the issues discussed in the report. The FDIC also plans to continue its reporting to the Board on deposit account terminations; highlight supervisory guidance in outreach events; and monitor inquiries and comments from the OO. In addition, the FDIC also plans to revise its written examination guidance by replacing the term moral suasion with a description of the informal

PROTECTED

OCC-AA-00001580

communication that FDIC personnel can use to help mitigate practices that could cause a bank to experience financial or other difficulties.  Further, with respect to our observation on RALs, the response stated that the FDIC would address the OIG's results after the OIG completes additional work in this area.

As noted above, the FDIC has taken and planned corrective actions that are responsive to our recommendations.  However, in reiterating our findings and providing perspective surrounding them, management did not discuss the potential impact that statements and actions by FDIC executives can have on those responsible for carrying out the FDIC's supervisory policies and approach.  As described in our report, our interviews and review of documents showed that perceptions regarding the views of senior FDIC executives about institutions involved in payday lending and RALs influenced the supervisory approach to handling risks at those institutions.  In several instances, the approach was not consistent with written FDIC policy and guidance.  Consequently, as it has committed to do, we believe it is prudent for FDIC senior leadership to reiterate its revised policies on a sustained basis to ensure they become engrained in the organization's supervisory culture.  Given the significance of these issues, we will, at an appropriate time, follow up on the FDIC's actions to ensure they address the underlying concerns that support our recommendations.

PROTECTED

OCC-AA-00001581

## Objectives, Scope, and Methodology

### Objectives

The audit objectives were to (1) describe the FDIC's role in the DOJ initiative known as Operation Choke Point and (2) assess the FDIC's supervisory approach to financial institutions that conducted business with merchants associated with high-risk activities for consistency with relevant statutes and regulations.  To address the audit objectives, we:

- determined the extent to which the FDIC participated in developing and implementing Operation Choke Point;

- evaluated the FDIC's rationale for identifying certain merchants as being associated with high-risk activities;

- reviewed a non-statistical sample[43] of 23 FDIC-supervised financial institutions to assess the FDIC's supervisory approach to address identified concerns;

- analyzed relevant statutes, regulations, policies, procedures, guidance, and training; and

- conducted interviews of 106 current and former FDIC staff, executives at 19 FDIC-supervised financial institutions, officials in DOJ's Consumer Protection Branch, and officials with selected state banking agencies.

Pursuant to a request from the FDIC Chairman, dated December 17, 2014, we also reviewed the actions of one former and four current senior FDIC officials.  The Chairman requested that the OIG perform this work based on concerns raised in a letter from a Congressman to the Chairman, dated December 10, 2014.  Our work pertaining to these individuals focused on determining the extent to which they were involved with Operation Choke Point and whether their actions involving the institutions we reviewed were based on personal, political, or moral agendas aimed at forcing lawful businesses associated with high-risk activities out of the banking sector.  To accomplish this work, we reviewed selected email communications, conducted interviews, and reviewed relevant documentation.

We also reviewed references to the individuals in a December 8, 2014 Congressional report, entitled *Federal Deposit Insurance Corporation's Involvement in "Operation Choke Point"* and assessed whether the information was relevant to our audit objectives.  Work on a separate inquiry by the OIG's Office of Investigations into whether one of these five individuals had misled the American people in testimony before the Congress occurred during the audit.  We coordinated with the Office of Investigations on the inquiry, as appropriate.

The scope of our audit focused on the 5-year period from 2010 through 2014.  However, we also considered certain supervisory activities and information prior to this time period to obtain

---

[43] A non-statistical sample is judgmental and cannot be projected to the population, as explained more fully later in this Appendix.

43

PROTECTED

OCC-AA-00001582

## Objectives, Scope, and Methodology

additional insights into the FDIC's supervisory approach towards institutions that conducted business with high-risk merchants and to provide proper context for issues discussed in the report.

We conducted this performance audit from December 2014 through July 2015 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

### Scope and Methodology

To accomplish our audit objectives, we:

- Reviewed testimony related to Operation Choke Point given by FDIC and DOJ officials to Members.

- Reviewed reports issued by the Congress related to our audit objectives.

- Assessed the FDIC's communication with DOJ personnel and FDIC staff participation in task forces, working groups, meetings, and training events pertaining to Operation Choke Point.

- Determined the extent of the FDIC's involvement in DOJ's issuance of subpoenas to FDIC-supervised institutions.

- Reviewed the merchants on the FDIC's high-risk list and conducted research to identify the extent to which six non-statistically selected, major companies in the financial services industry also categorized such merchants as high-risk and/or restricted the processing of transactions involving certain merchants. We selected the six companies based on their large size and name recognition.

- Reviewed formal FDIC enforcement actions pertaining to FDIC-supervised institutions during the 5-year period 2010 through 2014 to determine the extent to which the actions involved high-risk merchants and TPPPs.

- Reviewed congressional bills and pending lawsuits related to our audit objectives.

- Reviewed training events and speeches by current and former FDIC officials and officials from other federal agencies pertaining to payday lending, TPPPs, ACH activities, and other high-risk activities.

PROTECTED

OCC-AA-00001583

## Objectives, Scope, and Methodology

- Reviewed DCP executive meeting highlights and monthly regional status reports submitted to the Washington, D.C. Office.

- Interviewed current and former FDIC officials from the Washington, D.C., Office, the Regional Offices, and Field Offices, including the internal and external Ombudsmen.  We attempted to interview the FDIC's former RMS Director, but this individual did not respond to multiple requests for an interview.  This individual was the Director, RMS, until February 2013.

- Interviewed DOJ and state financial regulatory officials and executives at a non-statistical sample of 19 financial institutions.

- Reviewed FDIC email communications and related documentation to assess (a) the extent to which FDIC officials communicated with DOJ in connection with Operation Choke Point and (b) the FDIC's supervisory approach for assessing banks that conducted business with certain merchants and TPPPs.  This information can be broken into groups.[44]

  o  We reviewed all 7,640 pages of FDIC staff emails and documentation that FDIC sent to Members of the Committee on Oversight and Government Reform, per their request dated June 9, 2014; and

  o  We reviewed selected emails pertaining to specific FDIC individuals, subject matters, and institutions in connection with our audit objectives.  These emails were generated from January 1, 2011, through December 31, 2014.  In response to our requests for this information, the FDIC provided us with more than 423,000 emails, many of which we found not to be relevant to our objectives (279,526 of these emails were produced as a result of requests pertaining to the five current and former FDIC senior officials mentioned previously).  Due to the large volume of emails provided, we were not able to review all of them and, therefore, we judgmentally selected emails for review.

- Reviewed summaries of communications between financial institutions and the FDIC's OO that were prepared by OO pursuant to FIL-5-2015 (issued in January 2015).  The FIL encouraged institutions to contact OO if they were concerned that FDIC personnel were not following applicable policies.  As of July 27, 2015, OO had received a total of 18 communications pursuant to the FIL.  Two of these communications were relevant to our audit objectives.  In one case, an FDIC-supervised institution alleged that FDIC officials pressured the institution to not conduct business with certain entities, including TPPPs

---

[44] FDIC officials obtained these documents in response to requests from Members and the OIG.  Although the FDIC could not confirm that all relevant documents were identified, we performed procedures to conclude that the documents the FDIC identified responded to the Congressional and OIG information requests and were sufficient for the purposes of our audit.

PROTECTED

OCC-AA-00001584

## Objectives, Scope, and Methodology

and payday lenders.  In the other case, the institution stated that it changed its charter from an FDIC-supervised institution due to alleged pressure from FDIC officials to close accounts with TPPPs.  OO did not provide the OIG with the names of these two financial institutions because that information is confidential.  However, OO provided us with the results of its review of the circumstances pertaining to these communications. In both cases, OO determined that the concerns were unsubstantiated.

- Assessed the risk of fraud and abuse in the context of our audit objectives in the course of evaluating audit evidence.

We identified and became familiar with relevant statutes, laws, rules, regulations, and guidance as follows:

- Safety and soundness and consumer protection statutes and regulations:
  o Sections 8, 10, and 39 of the Federal Deposit Insurance Act;
  o Section 5 of the Federal Trade Commission (FTC) Act;
  o Electronic Fund Transfer Act;
  o Truth in Lending Act (TILA);
  o Fair Debt Collection Practices Act (FDCPA); and
  o Part 364 of the FDIC Rules and Regulations, Appendix A, *Interagency Guidelines Establishing Standards for Safety and Soundness.*

- Statutes, inter-agency policy and guidance, and FDIC policies and procedures pertaining to BSA/AML, ACH processing, and/or TPPPs:
  o Section 8(s), *Compliance with Monetary Transaction Recordkeeping and Report Requirements*, of the FDI Act;
  o Section 326.8, *Bank Secrecy Act Compliance*, of the FDIC Rules and Regulations;
  o *Bank Secrecy Act Anti-Money Laundering Examination Manual* published by the FFIEC (publications dated June 23, 2005 through November 17, 2014); and
  o *Retail Payment Systems IT Examination Handbook* published by the FFIEC (transmitted through FDIC FIL-6-2010, dated February 25, 2010).
  o Relevant portions of the FDIC's:
    o *Formal and Informal Action Procedures Manual* (October 2012),
    o *Risk Management Manual of Examination Policies* (April 2015), and
    o *Compliance Examination Manual* (May 2015).

- FDIC's and Interagency subprime, payday, and small-dollar lending guidance:
  o FIL-44-1997:  *Risks Associated with Subprime Lending* (May 2, 1997);
  o *Interagency Guidance on Subprime Lending* (transmitted through FDIC FIL-20-99, dated March 4, 1999);
  o FIL-9-2001:  *Subprime Lending* (January 31, 2001);
  o PR-70-2003:  *FDIC Issues Examination Guidance for Payday Lending*, (July 2, 2003);
  o FIL-14-2005:  *Payday Lending Programs* (March 1, 2005);

46

PROTECTED

## Objectives, Scope, and Methodology

- o FIL-50-2007: *Affordable Small-Dollar Loan Products, Final Guidelines* (June 19, 2007); and
- o FDIC Guidance 6714-01-P: *Guidance on Supervisory Concerns and Expectations Regarding Deposit Advance Products* (November 21, 2013).

- FDIC's and Interagency TPPP guidance and training materials:
  - o FIL-127-2008: *Guidance on Payment Processor Relationships* (November 7, 2008);
  - o FIL-3-2012: *Payment Processor Relationships, Revised Guidance* (originally issued on January 31, 2012 and revised in July 2014);
  - o FIL-43-2013: *FDIC Supervisory Approach to Payment Processing Relationships with Merchant Customers that Engage in Higher-Risk Activities* (originally issued on September 27, 2013 and revised in July 2014);
  - o FIL-41-2014: *FDIC Clarifying Supervisory Approach to Institutions Establishing Account Relationships with Third-Party Payment Processors* (July 28, 2014);
  - o FDIC and interagency training materials on TPPPs; and
  - o Department of the Treasury Financial Crimes Enforcement Network advisory: *Risk Associated with Third-Party Payment Processors*, FIN-2012-A010 (October 22, 2012).

- Other FDIC guidance:
  - o FIL-44-2008: *Guidance for Managing Third-Party Risk* (June 6, 2008);
  - o FIL-5-2015: *Statement on Providing Banking Services* (January 28, 2015); and
  - o Circular 4010.3: *FDIC Enterprise Risk Management Program* (April 16, 2012).

- FDIC informational publication:
  - o *Supervisory Insights* article: *Managing Risks in Third-Party Payment Processors* (originally issued in the summer of 2011 and revised in July 2014).

We selected a nonstatistical sample of FDIC-supervised financial institutions to assess the FDIC's supervisory approach for addressing identified concerns. To select the institutions, we first asked FDIC officials to inform us of known institutions that conducted business with TPPPs and/or or merchants that were deemed "high-risk." The FDIC does not generally track or identify institutions engaged in these activities, but may learn of this information through its regular oversight and monitoring activities. Through our own research and/or assistance from the FDIC, we also identified institutions that facilitated payday lending either directly or indirectly through third parties, had high ACH returns, were subpoenaed by DOJ in connection with Operation Choke Point, conducted business pertaining to RALs, or terminated business relationships with high-risk merchants, such as payday lenders or customers in the firearms industry.

PROTECTED

OCC-AA-00001586

## Objectives, Scope, and Methodology

Based on our analysis, we identified 130 financial institutions that fit the criteria described above.[45]  We selected 25 of the 130 institutions for a detailed review.  We judgmentally selected the 25 institutions in such a manner as to include representation from each of the FDIC's six Regional Offices and representation of the criteria used to identify the 130 institutions.  Of the 25 institutions, we omitted two institutions because we subsequently learned that they had not conducted business with high-risk merchants.  As a result, we assessed and based our results on a total of 23 institutions.

For our sampled institutions, we:

- Reviewed risk management and compliance reports of examination, visitation reports, formal and informal enforcement actions, correspondence, and consumer complaints in various FDIC systems of record to assess the extent and type of supervisory actions and approach the FDIC took related to the institutions' business relationships with high-risk merchants and TPPPs.  We did not review the FDIC's examination workpapers.

- Interviewed institution executives to obtain their perspectives on the FDIC's supervision, the degree to which the institutions had lending or deposit relationships with high-risk merchants, and their viewpoints on the FDIC's payday lending and TPPP guidance, and in certain instances, supervisory approach to RALs.[46]

- Interviewed, as we deemed appropriate, FDIC officials to obtain their perspectives on the FDIC's supervision of institutions.  We also interviewed officials from two state regulatory agencies covering these same topics.

The Table on the following page presents the merchants that the FDIC identified as having a higher prevalence of being associated with high-risk activities.  The 23 financial institutions in our sample, taken as a whole, conducted business, either directly or indirectly through a third party, with the merchant categories having a "✓."  We based this determination on our review of available documentation and interviews with bank executives and FDIC officials.

---

[45] We considered our universe to be all FDIC-supervised institutions.  As of December 31, 2014, the FDIC supervised a total of 4,138 financial institutions.
[46] Four institutions declined our offer for an interview.

PROTECTED

OCC-AA-00001587

## Objectives, Scope, and Methodology

**Table: Merchants Associated with High-Risk Activities**

| Merchant Category | |
|---|---|
| ✓ Ammunition Sales | Life-Time Memberships |
| Cable Box De-scramblers | ✓ Lottery Sales |
| ✓ Coin Dealers | Mailing Lists/Personal Information |
| Credit Card Schemes | ✓ Money Transfer Networks |
| ✓ Credit Repair Services | ✓ On-line Gambling |
| Dating Services | ✓ PayDay Loans |
| Debt Consolidation Scams | ✓ Pharmaceutical Sales |
| Drug Paraphernalia | Ponzi Schemes |
| ✓ Escort Services | ✓ Pornography |
| ✓ Firearms Sales | ✓ Pyramid-Type Sales |
| ✓ Fireworks Sales | Racist Materials |
| ✓ Get Rich Products | Surveillance Equipment |
| Government Grants | ✓ Telemarketing |
| Home-Based Charities | ✓ Tobacco Sales |
| Life-Time Guarantees | ✓ Travel Clubs |

Source: The FDIC *Supervisory Insights* Journal, Summer 2011 [original] publication.

We performed our audit work at the FDIC's offices in Arlington, Virginia; Atlanta, Georgia; Chicago, Illinois; Dallas, Texas; and Washington, D.C.

PROTECTED

OCC-AA-00001588

# Glossary of Terms

| Term | Definition |
|---|---|
| **Automated Clearing House (ACH)** | The ACH network is a nationwide electronic payment network which enables participating financial institutions to distribute electronic credit and debit entries to bank accounts and settle these entries. Common ACH credit transfers include the direct deposit of payroll and certain benefits payments. Direct debit transfers also may be made through the ACH network and include consumer payments for insurance premiums, mortgage loans, and other types of bills.<br><br>In 2013, there were nearly 22 billion ACH transactions that transferred nearly $39 trillion in the United States. |
| **Bank Board Resolution** | An informal commitment adopted by a financial institution's Board of Directors (often at the request of the FDIC) directing the institution's personnel to take corrective action regarding specific noted deficiencies. A bank board resolution may also be used as a tool to strengthen and monitor the institution's progress with regard to a particular component rating or activity. |
| **Bank Secrecy Act (BSA)** | BSA (formally known as the *Currency and Foreign Transactions Reporting Act of 1970*—31 U.S.C. 5311-5330) was implemented to detect and prevent money laundering. This Act established requirements for record keeping and reporting by private individuals and financial institutions designed to help identify the source, volume, and movement of currency and other monetary instruments transported or transmitted into or out of the United States or deposited in financial institutions. BSA required individuals and financial institutions to file currency reports with the Department of the Treasury, properly identify persons conducting transactions, and keep appropriate records of financial transactions to enable law enforcement and regulatory agencies to pursue investigations of criminal, tax, and regulatory violations. |
| **Cease and Desist Order** | A formal order to stop a violation of law, rule, regulation, or unsafe or unsound practice and require affirmative action to correct any conditions resulting from the violation or practice. Cease and Desist Orders may be issued after notice and hearing or after stipulation by the institution.<br><br>By ordering an institution to cease and desist from violations or practices and/or to take affirmative actions, the FDIC may prevent the institution's problems from reaching such serious proportions as to require more severe corrective measures. Section 8(b) of the FDI Act authorizes the FDIC to issue Cease and Desist Orders. |
| **Chargeback** | The reversal of the dollar value (financial liability), in whole or in part, of a particular transaction by the card issuer to the acquirer, and usually by the merchant bank to the merchant. |
| **Civil Money Penalty (CMP)** | A formal enforcement action that may be assessed for violations of final and temporary orders, written agreements with the FDIC, and laws and regulations; unsafe and unsound practices; and breaches of fiduciary duty. Section 8(i)(2) of the FDI Act authorizes the FDIC to issue CMPs. |

PROTECTED

OCC-AA-00001589

## Glossary of Terms

| Term | Definition |
|---|---|
| **Conference of State Bank Supervisors** | A nationwide organization of banking regulators from all 50 states, the District of Columbia, Guam, Puerto Rico, and the United States Virgin Islands. |
| **Consent Order** | A formal enforcement action issued by a financial institution regulator to a bank or affiliated party to stop an unsafe or unsound practice or violation. All parties agree to the terms of a consent order. A consent order may be terminated by a regulator when it has determined that the bank's condition has significantly improved and the action is no longer needed or the bank has materially complied with its terms. |
| **Debt Indicator** | An acknowledgement that the IRS previously sent to tax preparers who electronically submitted a client's tax return, which shows whether the taxpayer will have any portion of the refund offset for delinquent tax or other debts such as unpaid child support or delinquent federally funded student loans. Tax preparers use the debt indicator as an underwriting tool for RALs. The IRS stopped sending this acknowledgment to tax preparers in 2011. |
| **Deposit Advance Product** | Small-dollar, short-term advances that some institutions offer to customers that maintain a deposit account, reloadable prepaid card, or similar deposit-related vehicle at a bank. After receiving an advance, a customer repays it from the proceeds of his/her next direct deposit. Deposit advance products can have similar characteristics to payday loans, such as high fees, short lump-sum repayment terms, and inadequate attention to the consumer's ability to repay. |
| **Equal Credit Opportunity Act (ECOA)** | ECOA (15 U.S.C. § 1691 et. seq.) prohibits certain discriminatory practices, including creditor practices that discriminate based on race, color, religion, national origin, sex, marital status, or age. |
| **Fair Debt Collection Practices Act (FDCPA)** | FDCPA (15 U.S.C. § 1692-1692p) was enacted in 1977 and was designed to eliminate abusive, deceptive, and unfair debt collection practices. It applies only to the collection of debt incurred by a consumer primarily for personal, family, or household purposes. The FDCPA covers such activities as communication with the debtor, validation of the debt, and application of payments received. |
| **Federal Deposit Insurance (FDI) Act** | A statute enacted on September 21, 1950 that governs the FDIC (12 U.S.C. § 1811 et. seq.). |
| **Federal Financial Institutions Examination Council (FFIEC)** | The FFIEC is a formal interagency body empowered to: (1) prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the FDIC, FRB, CFPB, OCC, and National Credit Union Administration and (2) make recommendations to promote uniformity in the supervision of financial institutions. |
| **Federal Trade Commission Act (FTC Act)** | The FTC Act (15 U.S.C. §§ 41-58, as amended) empowers the Federal Trade Commission to, among other things, prevent unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce. |

51

OCC-AA-00001590

Appendix 2

## Glossary of Terms

| Term | Definition |
|------|-----------|
| **Formal Action** | A Notice or order issued by the FDIC against an insured financial institution and/or individual respondent. The purpose of a formal action is to correct noted safety and soundness deficiencies, ensure compliance with federal and state banking laws, assess civil money penalties, and/or pursue removal or prohibition proceedings. Formal actions are legally enforceable and final orders are available to the public after issuance. |
| **Higher-risk Activities** | The FDIC described these activities as those that have been understood by industry and financial regulators as activities that may be subject to complex or varying legal and regulatory environments, such as activities that may:<br>• be legal only in certain states;<br>• be prohibited for certain consumers, such as minors;<br>• be subject to varying state and federal licensing and reporting regimes; or<br>• tend to display a higher incidence of consumer complaints, returns, or chargebacks.<br><br>Because these risks may be posed directly by bank customers, or indirectly through relationships established by bank customers with other parties (merchants, for example), banks have enhanced their customer due diligence policies and processes to better protect against harm. Harm to a bank can range from operating losses attributable to unanticipated consumer reimbursements that were not properly reserved for, to civil or criminal actions for facilitation of violations of law. |
| **Informal Action** | A voluntary commitment made by an institution's Board of Directors that is designed to correct noted safety and soundness deficiencies or ensure compliance with federal and state laws. Informal actions are neither publicly available nor legally enforceable.<br><br>The FDIC may initiate informal action when a financial institution is found to be in a marginally unsatisfactory condition or to address specific concerns. Although an informal action is not legally enforceable and viewed as a voluntary corrective administrative action, it represents an alternative to formal action when moral suasion will not, by itself, accomplish the FDIC's goal of correcting identified deficiencies in an institution's operations.<br><br>An informal action is particularly appropriate when the FDIC has communicated with bank management regarding deficiencies and determined that the institution's managers and BOD are committed to and capable of effecting correction with some direction, but without initiating a formal action.<br><br>Examples of informal actions include bank board resolutions, memoranda of understanding, and supervisory letters. |
| **Memorandum of Understanding** | A Memorandum of Understanding is an informal agreement between the institution and the FDIC, which is signed by both parties. A State Authority may also be party to the agreement. MOUs are designed to address and correct identified weaknesses in an institution's condition. |

52

PROTECTED

# Glossary of Terms

| Term | Definition |
|---|---|
| **Moral Suasion** | The FDIC does not have a formal definition of moral suasion. Based on FDIC manuals, moral suasion is a process used by FDIC examiners involving reason to persuade financial institution management to correct an identified deficiency in an institution's operations, unacceptable risk level, or unacceptable risk management practice without imposing an informal or formal enforcement action. |
| **Payday Loan** | A small-dollar, short-term, unsecured loan that borrowers promise to repay out of their next paycheck or regular income payment (such as a social security check). Payday loans are usually priced at a fixed dollar fee, which represents the finance charge to the borrower. Because payday loans have short terms to maturity, the cost of borrowing, expressed as an annual percentage rate, can be very high. Most payday loans are from $250 - $700. |
| **Refund Anticipation Check** | An amount of money that is limited to the size of a taxpayer's refund less applicable fees that a financial institution sends to a customer via direct deposit, prepaid card, or bank check. A refund anticipation check allows the consumer to pay for tax preparation fees out of the tax refund and not up front. This product may also be referred to as a refund transfer. |
| **Refund Anticipation Loan (RAL)** | A short-term loan product secured by a consumer's expected income tax refund and offered by financial institutions through third-party tax preparers.<br><br>This product enables consumers to receive their income tax refund the same day they file their return, or shortly thereafter, less the cost of tax preparation and interest and fees for the loan. |
| **Removal, Prohibition, or Suspension Action** | Formal enforcement actions issued by a financial regulator that result in the removal of IAPs from banking and prohibit them from participating in the affairs of any insured depository institution for a period of time that could include a life-time ban. These orders are designed to protect the banking industry and issued pursuant to section 8(e)(1) of the FDI Act. |
| **Rent-a-Charter** | An arrangement that allows a lender in one state to use the authority of an institution in another state to circumvent rate caps in the lender's state, in exchange for a fee. As a result, the lender is permitted to charge its customers higher interest rates permitted in the state where the institution is located. |

53

OCC-AA-00001592

# Glossary of Terms

| Term | Definition |
|------|------------|
| **Reputation Risk** | The risk that potential negative publicity regarding a financial institution's business practices could cause a decline in the customer base, costly litigation, or revenue reductions. Many risks confronting financial institutions carry an inherent element of reputation risk.<br><br>Consistent with the Uniform Financial Institutions Rating System (UFIRS), reputation risk is one of a number of enumerated factors FDIC examiners consider in assessing a financial institution's safety and soundness. The UFIRS explicitly addresses reputation risk in the following two CAMELS component definitions:<br><br>• Asset Quality: The Asset Quality component definition includes consideration of "[a]ll other risks that may affect the value or marketability of an institution's assets, including, but not limited to, operating market, reputation, strategic, or compliance risks..."<br><br>• Management: The component states in part: "[d]epending on the nature and scope of an institution's activities, management practices may need to address some or all of the following risks: credit, market, operating or transaction, reputation, strategic, compliance, legal, liquidity, and other risks." |
| **Return** | A return or ACH return is an ACH entry that has been rejected by a receiving financial institution because it cannot be posted due to things such as non-sufficient funds or an account closure. |
| **Suspicious Activity Report** | A report made by an institution to FinCEN, an agency of the Department of the Treasury, regarding suspicious or potentially suspicious activity. An institution is required to file a suspicious activity report when it detects a known or suspected criminal violation of federal law or a suspicious transaction related to money laundering or a violation of the Bank Secrecy Act. |
| **Third-Party Payment Processor (TPPP)** | Financial institution customers that provide payment processing services to merchant clients and other business entities. TPPPs often use their commercial bank accounts to process these payments. TPPPs may offer merchants a variety of alternatives for accepting payments, including credit and debit card transactions, traditional check acceptance, or ACH debits. |
| **Truth in Lending Act (TILA)** | Contained in Title I of the Consumer Credit Protection Act, the Truth in Lending Act requires meaningful disclosure of credit and leasing terms (15 U.S.C. §§ 1601-1667f). |
| **Uniform Financial Institutions Rating System (UFIRS)** | The FFIEC established the UFIRS in 1979 to evaluate the soundness of financial institutions on a uniform basis and identify those institutions raising concern or requiring special attention. The FFIEC updated the UFIRS to reflect changes in the banking industry, with the most recent version adopted in 1996. The UFIRS defines the six component ratings for Capital, Asset Quality, Management, Earnings, Liquidity, and Sensitivity to Market Risk, referred to as CAMELS. |

PROTECTED

OCC-AA-00001593

## Glossary of Terms

| Term | Definition |
|------|------------|
| **USA PATRIOT Act** | The USA PATRIOT Act (formally known as the *Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001*—Public law 107-56) was signed into law on October 26, 2001, in response to the September 11, 2001, terrorist attacks.<br><br>This Act criminalized the financing of terrorism and augmented the existing BSA framework by strengthening customer identification procedures; prohibiting financial institutions from engaging in business with foreign shell banks; requiring financial institutions to have due diligence procedures and, in some cases, enhanced due diligence procedures for foreign correspondent and private banking accounts; and improving information sharing between financial institutions and the U.S. government.  The Act also increased the civil and criminal penalties for money laundering, facilitated records access by requiring financial institutions to respond to regulatory requests for information within 120 hours, and required regulatory agencies to consider a financial institution's AML record when reviewing applications for business combinations. |

PROTECTED

OCC-AA-00001594

# Acronyms and Abbreviations

| Acronym | Explanation |
| --- | --- |
| ACH | Automated Clearing House |
| ACP | Alternative Credit Product |
| AML | Anti-Money Laundering |
| BBB | Better Business Bureau |
| BSA | Bank Secrecy Act |
| CAMELS | Capital, Asset Quality, Management, Earnings, Liquidity, and Sensitivity to Market Risk |
| CDD | Customer Due Diligence |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| CFPB | Consumer Financial Protection Bureau |
| C.F.R. | Code of Federal Regulations |
| CMP | Civil Money Penalty |
| CRA | Community Reinvestment Act |
| D.C. | District of Columbia |
| DCP | Division of Depositor and Consumer Protection |
| DOJ or Department | United States Department of Justice |
| DSC | Division of Supervision and Consumer Protection |
| ECOA | Equal Credit Opportunity Act |
| ERO | Electronic Refund Originator |
| FDCPA | Fair Debt Collection Practices Act |
| FDI Act | Federal Deposit Insurance Act |
| FDIC | Federal Deposit Insurance Corporation |
| FFIEC | Federal Financial Institutions Examination Council |
| FIL | Financial Institution Letter |
| FinCEN | Financial Crimes Enforcement Network |
| FOS | Field Office Supervisor |
| FRB | Board of Governors of the Federal Reserve System |
| FTC | Federal Trade Commission |
| IRS | Internal Revenue Service |
| IT | Information Technology |
| Members | Members of Congress |
| MOU | Memorandum of Understanding |
| OCC | Office of the Comptroller of the Currency |
| OIG | Office of Inspector General |
| OO | Office of the Ombudsman |
| OPR | Office of Professional Responsibility (a DOJ office) |
| RAL | Refund Anticipation Loan |
| RMS | Division of Risk Management Supervision |
| TILA | Truth in Lending Act |
| TPPP | Third-Party Payment Processor |
| UFIRS | Uniform Financial Institutions Rating System |
| U.S.C. | United States Code |

PROTECTED

OCC-AA-00001595

## Corporation Comments



**Federal Deposit Insurance Corporation**
550 17th Street NW, Washington, D.C. 20429-9990

Division of Risk Management Supervision

DATE:                    September 10, 2015

MEMORANDUM TO:           Mark F. Mulholland
                         Assistant Inspector General for Audits, Office of Inspector General

FROM:                    Doreen R. Eberley
                         Director, Division of Risk Management Supervision

SUBJECT:                 Response to the Draft Audit Report Entitled, *The FDIC's Role in
                         Operation Choke Point and Supervisory Approach to Institutions
                         that Conducted Business with Merchants Associated with High-
                         Risk Activities* (Assignment No. 2015-010)

Thank you for the opportunity to comment on behalf of the FDIC on the Office of Inspector General (OIG) draft report, *The FDIC's Role in Operation Choke Point and Supervisory Approach to Institutions that Conducted Business with Merchants Associated with High-Risk Activities* (Report). We appreciate the extensive work done by the OIG on this matter.

The Federal Deposit Insurance Corporation (FDIC) welcomes confirmation from an independent review that the FDIC did not participate in the development, coordination, or execution of the Department of Justice (DOJ) initiative Operation Choke Point; that the FDIC did not use the so-called high-risk list to target financial institutions; and that the FDIC has acted within its supervisory authorities. As the Report acknowledges, the FDIC has taken a number of steps to reinforce to agency staff, banks, and others that the FDIC neither prohibits nor discourages banks from providing banking services to entire categories of merchants. The FDIC will continue to reinforce this policy going forward.

*Summary of Findings*

The OIG's Report finds the FDIC's involvement with Operation Choke Point "to have been inconsequential to the overall direction and outcome of the initiative." The Report also finds that the limited communications with the DOJ were related to the FDIC's responsibility to understand and consider the implications of potential illegal activity involving FDIC-supervised institutions.

In reaching the determination that the FDIC's involvement with Operation Choke Point was inconsequential, the OIG also found that:

- The FDIC did not participate in the development of Operation Choke Point.
- The FDIC did not coordinate with DOJ to assemble evidence of proof of fraudulent activity by FDIC-supervised institutions.
- The FDIC did not identify institutions to receive subpoenas from DOJ.
- DOJ did not notify the FDIC which financial institutions received subpoenas.

57

PROTECTED

OCC-AA-00001596

## Corporation Comments

Response to Draft Audit Report
Assignment No. 2015-010
September 10, 2015

- DOJ did not discuss with the FDIC the inclusion of supervisory guidance with its subpoenas.
- The FDIC never detailed any employee to DOJ to work on Operation Choke Point.
- Senior FDIC officials had no discussions with DOJ regarding Operation Choke Point.
- The FDIC's approach to financial institutions that conducted business with merchants on the high-risk list was within the FDIC's authorities granted under the Federal Deposit Insurance Act and other relevant statutes and regulations.

As we have previously stated, and as the OIG Report confirms, the FDIC's communications with DOJ consisted of responding to requests from DOJ officials about FDIC-supervised institutions that DOJ was investigating, responding to DOJ inquiries about potential remedies in the event illegal activity was associated with those institutions, and reviewing documents obtained by DOJ in the course of its investigative activities.

Similarly, regarding the development and intent of the list of high-risk activities that had been included in a 2011 article in the FDIC journal *Supervisory Insights* (SIJ) and regulatory guidance, the OIG found:

- No evidence that the FDIC used the high-risk list to target financial institutions.
- Both the SIJ article and the guidance were developed prior to the inception of Operation Choke Point and were not a principal factor in the initiative's implementation.
- The high-risk list was consistent with similar lists maintained by private-sector companies in the payments industry, as well as preexisting interagency guidance.
- The focus of FDIC and Federal Financial Institutions Examination Council training materials was on the risks associated with third-party payment processor deposit accounts and how institutions should manage those risks.
- The training materials contained no indications that examiners were encouraged to pressure financial institutions to decline banking services to merchants based on the category of their business.

Further, among the financial institutions it reviewed, the OIG found:

- No instances in which the FDIC pressured an institution to terminate an existing customer relationship with a firearms or ammunition retailer, pawnbroker, or tobacco retailer.
- No instances, beyond one previously identified instance involving a payday lender, in which the FDIC discouraged an institution from providing banking services to a merchant on the high-risk list.

Finally, we note that the OIG determined that none of the five individuals who were the subject of the requested review played a role in the development or implementation of Operation Choke Point. In addition, the OIG concluded that the supervisory approach of the five

2

PROTECTED   OCC-AA-00001597

# Corporation Comments

Response to Draft Audit Report
Assignment No. 2015-010
September 10, 2015

individuals did not involve personal, political, or moral agendas aimed at forcing lawful businesses on the high-risk list out of the banking sector. The OIG Report did identify instances in which there appeared to us to be some confusion by FDIC employees about which supervisory standards to apply to specific types of activities involving payday lenders and FDIC-supervised financial institutions, and we have taken steps to clarify the standards.

*Banks Making Payday Loans*

As the Report notes, the FDIC and other federal banking agencies have longstanding safety and soundness and consumer protection concerns and guidance for banks making payday or payday-like loans because of the significant risks of payday lending,[1] FDIC guidance for banks making payday loans describes payday lending as being among the highest risk subsets of subprime lending, and expects banks to maintain significantly higher levels of capital to offset the credit risk. Payday loans pose substantial credit risk to a bank because borrowers who obtain payday loans generally have cash flow difficulties, the loans are unsecured, and underwriting analysis of the borrower's ability to repay is generally limited. Consequently, the FDIC issued guidance more than a decade ago establishing the FDIC's expectations for prudent risk-management practices, both safety and soundness and consumer protection, for banks making payday loans, and warning that serious deficiencies in risk-management practices may result in instruction to discontinue payday lending. These supervisory expectations are consistent with longstanding FDIC emphasis on sound risk management of lending activities more generally. Sound management of credit risk by FDIC-insured institutions is of fundamental importance in minimizing costs to the Deposit Insurance Fund and, relatedly, the deposit insurance assessments paid by all insured institutions.

The FDIC has applied this same supervisory approach to banks offering or considering making loans with similar characteristics, such as deposit advance loans or refund anticipation loans. The same supervisory approach has also been applied in instances in which banks facilitate their payday lending activities through third parties that originate loans on behalf of the bank, so-called rent-a-charter arrangements, designed to avoid the application of state usury laws.

The FDIC's guidance on payday lending applies only to banks making payday loans and circumstances in which the activities facilitate payday lending by the bank. It does not apply to banks making loans to non-bank payday lenders or to banks offering deposit account services to non-bank payday lenders, even if these activities facilitate payday lending activities.

---

[1] FDIC Guidelines for Payday Lending, July 2, 2003, https://www.fdic.gov/news/news/press/2003/pr7003.html; FDIC Revised Guidelines for Payday Lending, March 2, 2005, https://www.fdic.gov/news/news/press/2005/pr1905.html; OCC website discussion of payday lending, http://www.occ.gov/topics/consumer-protection/payday-lending/index-payday-lending.html; OCC Advisory Letter on Payday Lending, November 27, 2000, http://occ.gov/static/news-issuances/memos-advisory-letters/2000/advisory-letter-2000-10.pdf; Federal Reserve Board, Proposed revisions to official staff commentary to Regulation Z, November 5, 1999, http://www.federalreserve.gov/boarddocs/press/boardacts/1999/199911033/R-1050.pdf

3

PROTECTED

OCC-AA-00001598

## Corporation Comments

Response to Draft Audit Report
Assignment No. 2015-010
September 10, 2015

*Banks Offering Deposit Accounts to Non-Bank Payday Lenders*

A different set of rules and guidance applies to deposit accounts offered by banks to non-bank payday lenders. Banks offer deposit accounts to non-bank payday lenders directly and indirectly through third-party payment processors (TPPPs) and other third-party arrangements. These deposit accounts are then used to process payday loan proceeds and repayments, typically through automated clearing house (ACH) and privately owned automated teller machine (ATM) transactions. The Federal Financial Institutions Examination Council (FFIEC)[2] Bank Secrecy Act/Anti-Money Laundering (BSA/AML) Manual describes TPPP, ACH, and ATM as higher-risk products and services and provides banks with specific guidelines to mitigate the risk of offering them.[3] Parts 326 and 353 of the FDIC rules and regulations implement the BSA and the suspicious activity reporting statutes.[4] The FDIC and other agencies have also issued additional guidance about how to mitigate the risk of offering deposit accounts to TPPPs.[5]

ACH activity is further governed by the FFIEC Information Technology Handbook, in the Retail Payment Systems Booklet.[6] The Booklet advises banks that ACH operations pose a variety of risks including credit, liquidity, and operational risk. The Booklet also describes the expectations of the National Automated Clearing House Association – NACHA -- (the national association that establishes the rules and procedures governing the exchange of ACH payments) and the national ACH operators (the Federal Reserve banks and the Electronic Payments Network) that banks will manage these risks, particularly when they engage in riskier ACH activities.

---

[2] The FFIEC was established in March 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions. It also conducts schools for examiners employed by the five federal member agencies represented on the FFIEC and makes those schools available to employees of state agencies that supervise financial institutions. The Council consists of the following six voting members: a member of the Board of Governors of the Federal Reserve System; the Chairman of the Federal Deposit Insurance Corporation; the Director of the Consumer Financial Protection Bureau; the Comptroller of the Currency; the Chairman of the National Credit Union Administration; and the Chairman of the State Liaison Committee.
[3] FFIEC BSA/AML Manual, December 2, 2014 (most recent update to original June 30, 2005 and updated April 29, 2010 releases), http://www.ffiec.gov/bsa_aml_infobase/default.htm, see BSA/AML Risk Assessment Overview Section, Subheading Products and Services; Third Party Payment Processors – Overview; Examination Procedures – Third Party Payment Processors; Electronic Banking – Overview; Examination Procedures – Electronic Banking; Automated Clearing House Transactions – Overview; Examination Procedures – Automated Clearing House Transactions; Privately Owned Automated Teller Machines – Overview; and Examination Procedures – Privately Owned Automated Teller Machines.
[4] See FDIC rules and regulations: Bank Secrecy Act Compliance, https://www.fdic.gov/regulations/laws/rules/2000-4900.html#fdic2000part326.8; and Suspicious Activity Reports, https://www.fdic.gov/regulations/laws/rules/2000-7500.html
[5] See Federal Reserve, SR-93-64 (FIS), Interagency Advisory, Credit Card-Related Merchant Activities http://www.federalreserve.gov/boarddocs/srletters/1993/SR9364.HTM, November 18, 1993; FDIC Credit Card Activities Manual, http://www.fdic.gov/regulations/examinations/credit_card/index.html, June 12, 2007; FDIC Financial Institution Letter, FIL-127-2008, *Guidance on Payment Processor Relationships*, issued November 7, 2008, https://www.fdic.gov/news/news/financial/2008/fil08127.html; and OCC Bulletin 2008-12, *Payment Processors - Risk Management Guidance*, issued April 24, 2008, http://www.occ.gov/news-issuances/bulletins/2008/bulletin-2008-12.html; and FDIC Financial Institution Letter, FIL-3-2012, *Payment Processor Relationships, Revised Guidance*, issued January 2012, https://www.fdic.gov/news/news/financial/2012/fil12003.html
[6] FFIEC Information Technology Handbook, http://ithandbook.ffiec.gov/it-booklets.aspx, see Retail Payment Systems Booklet, February 25, 2010, (update to March, 2004 release).

4

PROTECTED

OCC-AA-00001599

## Corporation Comments

Response to Draft Audit Report
Assignment No. 2015-010
September 10, 2015

Since 2008, the FDIC has identified a number of instances of banks offering deposit accounts to TPPPs without adopting the necessary mitigating controls described in the FFIEC BSA/AML Manual and the agency guidance on TPPP relationships. In situations in which the deficiencies were significant, the FDIC issued formal enforcement actions known as Orders to Cease and Desist or Consent Orders, in some cases directing the banks to exit TPPP relationships. Since 2008, the FDIC has issued 12 formal enforcement actions related to poor controls over TPPP relationships, eight of which directed the banks to exit TPPP relationships until such time as they could demonstrate a satisfactory control environment. These orders were not related to the type of merchant being serviced by the third-party payment processor, but rather to the banks' inadequate due diligence, controls, and ongoing monitoring for this higher-risk deposit product. In the case of at least two of the institutions, some of the terminated TPPP relationships included non-bank payday lenders in their merchant base, and as a result, these merchants had to seek alternate deposit account services.

*Misapplication of the Guidance for Banks Making Payday Loans*

We note that the OIG Report describes two instances in which the FDIC's guidance on payday lending by banks was misapplied to banks that were offering or contemplating offering deposit accounts to non-bank payday lenders. Other OIG interviews revealed a belief among some FDIC staff that the FDIC's guidance on payday lending by banks should be applied to a deposit relationship that may facilitate payday lending. It is this apparent misunderstanding – that the FDIC's guidance on payday lending by banks also applied to banks offering deposit accounts to non-bank payday lenders – as well as the potential for confusion about the high-risk list in general, that the FDIC has sought to address in additional guidance and training since September 2013. These actions are intended to promote a common understanding and consistent implementation of the FDIC's supervisory approach and to ensure that the appropriate guidance is applied in the appropriate circumstance.

*FDIC Actions to Clarify Supervisory Guidance*

Toward that end, the FDIC issued guidance in September 2013 that made clear to FDIC staff and the financial industry that although facilitating payment processing for certain customers can pose risks to financial institutions, institutions that properly manage these relationships and risk are neither prohibited nor discouraged from providing payment processing services to customers operating in compliance with applicable law.[7] We also have made clear that institutions that properly manage these relationships will not be criticized for providing payment processing services to customers operating in compliance with applicable law. In July 2014, the FDIC reiterated this policy to its staff and the industry and also sought to address any misperceptions about the high-risk list by removing the lists of merchant categories from previously issued guidance.[8]

---

[7] https://www.fdic.gov/news/news/financial/2013/fil13043.html
[8] https://www.fdic.gov/news/news/financial/2014/fil14041.html

5

PROTECTED                                                              OCC-AA-00001600

## Corporation Comments

Response to Draft Audit Report
Assignment No. 2015-010
September 10, 2015

In January 2015, the FDIC issued guidance encouraging institutions to take a risk-based approach in assessing individual customer relationships, rather than declining to provide banking services to entire categories of customers.[9] The FDIC also made clear that isolated or technical violations, which are limited instances of noncompliance with the BSA that occur within an otherwise adequate system of policies, procedures, and processes, generally do not prompt serious regulatory concern or reflect negatively on management's supervision or commitment to BSA compliance. The guidance also provided notice that any FDIC-supervised institution concerned that FDIC personnel are not following the policies laid out in the statement may contact either the FDIC's Office of the Ombudsman through a dedicated toll-free number or email address or the FDIC OIG through its Web site, telephone number or email address.

*Recommendations*

The OIG Report notes that it is too soon to determine the effectiveness of the FDIC's actions to clarify its supervisory guidance and states that the actions FDIC has taken focus on deposit accounts and do not explicitly address other banking products, such as credit products. The OIG recommends that the FDIC:

1. "Review and clarify, as appropriate, existing policy and guidance pertaining to the provision and termination of banking services to ensure it adequately addresses banking products other than deposit accounts, such as credit products."

The FDIC concurs with this recommendation and agrees that a sustained effort to communicate with its staff and the industry is important to address any potential confusion about appropriate supervisory standards and to ensure a common understanding and sustained application of the FDIC's approach. We are committed to continuing to communicate to staff and the industry on the distinctions between the standards applicable to credit products, including payday loans, offered by banks and those applicable to other banking services. In addition to the actions already implemented, we plan to update our guidance on payday lending by banks before October 31, 2015, to clarify that it does not apply to banks offering deposit accounts or extending credit to payday lenders.

2. "Assess the effectiveness of the FDIC's supervisory policy and approach with respect to the issues and risks discussed in this report after a reasonable period of time is allowed for implementation."

The FDIC concurs with this recommendation. The FDIC reviews the effectiveness and clarity of our policies on an ongoing basis through our regular examination and supervision processes, supervisory personnel meetings and engagement (including periodic "all-hands" meetings with examiners and quarterly Policy Calls), and industry and other stakeholder outreach. Additionally, we have instituted a program of regular reviews of regional office implementation of and adherence to outstanding supervisory policies and guidance.

---

[9] https://www.fdic.gov/news/news/financial/2015/fil15005.html

6

PROTECTED

OCC-AA-00001601

## Corporation Comments

Response to Draft Audit Report
Assignment No. 2015-010
September 10, 2015

To assess the effectiveness of the actions we have taken with respect to the issues and risks discussed in the report, our Internal Control and Review Section will undertake a horizontal review of each region's compliance with the actions, to be completed by the third quarter of 2016, in order to allow sufficient time to elapse for implementation. Additionally, the Internal Control and Review Section will incorporate compliance with our actions in their regularly scheduled regional office reviews. In the interim, each region will continue to provide quarterly reports regarding account terminations pursuant to the internal policy we adopted in January 2015, which is described in more detail below. These reports are shared with the FDIC Board of Directors each quarter, to ensure proper oversight. The FDIC will also continue to highlight the January 2015 guidance in regular outreach events and monitor inquiries and comments received through the FDIC's Office of the Ombudsman and respond as appropriate.

The OIG Report also recommends that the FDIC focus attention on the use of moral suasion in the supervisory process.[10] Specifically, the OIG recommends the FDIC:

3. "Review and clarify, as appropriate, existing supervisory policy and guidance to ensure it adequately defines moral suasion in terms of the types and circumstances under which it is used to address supervisory concerns, whether it is subject to sufficient scrutiny and oversight, and whether meaningful remedies exist should moral suasion be misused."

The FDIC concurs with this recommendation. The FDIC agrees that clarity in its supervisory policies and procedures is essential to consistent understanding and application. Given the questions raised by the OIG about the adequacy of the definition of moral suasion, we intend to reissue the Risk Management Manual of Examination Policies and the Formal and Informal Actions Procedures Manual by December 31, 2015. In the updated Manuals, we will replace the term moral suasion with a description of the informal communication that is intended to help mitigate practices that could cause a bank to experience financial or other difficulties.

The ability for examiners and supervised institutions to engage in informal discussion is a vital and longstanding part of the examination process. Bankers frequently see their examiners as a source of expertise and information, especially with regard to new or developing issues. These informal discussions can provide valuable assistance to banks, especially small community banks that otherwise might need to contract for similar assistance, and identify and address issues before they become a problem for the bank or require a formal enforcement action.

We also recognize that some discussions between examiners and a bank should be more formal. In particular, formal communication should be required in situations in which the FDIC staff recommends or requires a bank to terminate particular relationships. In January 2015, the FDIC established an internal policy for documenting and reporting instances in which FDIC staff

---

[10] The term "moral suasion" has been used in the FDIC's Manual of Examination Policies since 1982. See also, http://www.occ.gov/topics/publications/publications-by-type/other-publications-reports/prblnkgd.pdf, http://www.federalreserve.gov/boardDocs/Speeches/2005/20050106/default.htm; and http://www.oxfordreference.com/view/10.1093/oi/authority.20110810105427712

7

PROTECTED

OCC-AA-00001602

## Corporation Comments

Response to Draft Audit Report
Assignment No. 2015-010
September 10, 2015

recommend or require a bank to terminate customer deposit account relationships and for
documenting criticisms of a bank's management or mitigation of risk associated with deposit
accounts. The policy states that:

- Recommendations or requirements for termination of deposit accounts should not
  be made through informal suggestions.
- Recommendations or requirements for terminating deposit accounts must be made
  in writing and must be approved by regional management before being provided
  to and discussed with the bank's management and board of directors.
- Recommendations may not be based solely on reputation risk.
- Criticisms of a bank's management or mitigation of risk associated with deposit
  accounts that do not rise to a level requiring termination should not be made
  through informal suggestions and must be made in writing in a report of
  examination.
- Before such findings may be included in the report of examination or supervisory
  actions are pursued, the findings must be thoroughly vetted with regional office
  and legal staff.
- In each case, the recommendations of the examiner in charge should include the
  supervisory basis for recommending or requiring account termination, including
  any specific laws or regulations the examiner believes are being violated, if
  applicable.

The policy additionally establishes an FDIC Board-level reporting mechanism to ensure
appropriate oversight. Further, as previously noted, the FDIC has also provided notice that any
FDIC-supervised institution concerned that FDIC personnel are not following the policies laid
out in the January 2015 Statement may contact either the FDIC's Office of the Ombudsman
through a dedicated toll-free number or email address or the FDIC OIG through its Web site,
telephone number or email address.[11]

*Observations*

The Report contains an observation on the FDIC's supervisory approach in early 2011 to
financial institutions that offered a credit product known as a refund anticipation loan (RAL).
The OIG concluded that the supervisory actions taken with respect to institutions that offered
RALs fell within the FDIC's broad statutory authorities. However, the OIG also stated its belief
that the execution of supervisory actions by FDIC management and staff warranted further
review, and advised that the OIG is conducting additional work in this area. We look forward to
receiving the results of that review, and will address the results at that time.

*Closing*

Again, we appreciate the thoroughness of the OIG's review of this matter. We look
forward to addressing any remaining concerns.

---

[11] https://www.fdic.gov/news/news/financial/2015/fil15005.html

8

PROTECTED                                                                    OCC-AA-00001603

## Summary of the Corporation's Corrective Actions

This table presents corrective actions taken or planned by the Corporation in response to the recommendations in the report and the status of the recommendations as of the date of report issuance.

| Rec. No. | Corrective Action: Taken or Planned | Expected Completion Date | Monetary Benefits | Resolved:[a] Yes or No | Open or Closed[b] |
|---|---|---|---|---|---|
| 1 | The FDIC will continue to communicate to its staff and the banking industry the distinctions between the supervisory standards applicable to credit products, including payday loans, offered by banks and those applicable to other banking services. In addition to other actions it has already taken, the FDIC will update its guidance on payday lending by banks to clarify that the guidance does not apply to banks offering deposit accounts or extending credit to payday lenders. | 10/31/15 | $0 | Yes | Open |
| 2 | RMS' Internal Control and Review section will conduct horizontal and regional office reviews to assess compliance with the FDIC's actions to address the issues discussed in the report. The FDIC will also continue to report to the Board on deposit account terminations; highlight supervisory guidance in outreach events; and monitor inquiries and comments from the OO. | 9/30/16 | $0 | Yes | Open |
| 3 | The FDIC will revise its written examination guidance by replacing the term moral suasion with a description of the informal communication that FDIC personnel can use to help mitigate practices that could cause a bank to experience financial or other difficulties. | 12/31/15 | $0 | Yes | Open |

[a] Resolved – (1) Management concurs with the recommendation, and the planned, ongoing, and completed corrective action is consistent with the recommendation.
(2) Management does not concur with the recommendation, but alternative action meets the intent of the recommendation.
(3) Management agrees to the OIG monetary benefits, or a different amount, or no ($0) amount. Monetary benefits are considered resolved as long as management provides an amount.

[b] Recommendations will be closed when (a) Corporate Management Control notifies the OIG that corrective actions are complete or (b) in the case of recommendations that the OIG determines to be significant, when the OIG confirms that corrective actions have been completed and are responsive.

PROTECTED   OCC-AA-00001604

# EXHIBIT 6

 Office of the Comptroller of the Currency

Washington, DC 20219

August 21, 2017

The Honorable Jeb Hensarling
Chairman
Committee on Financial Services
United States House of Representatives
Washington, D.C. 20515

Dear Chairman Hensarling:

Thank you for your letter dated August 10, 2017, requesting that the Office of the Comptroller of the Currency (OCC) issue a formal policy statement repudiating Operation Chokepoint.

The OCC is not now, nor has it ever been part of Operation Chokepoint. That has been, is, and will continue to be the policy of this agency. The agency rejects the targeting of any business operating within state and federal law as well as any intimidation of regulated financial institutions into banking or denying banking services to particular businesses. Agency officials have stated this position in Congressional testimony[1] and on other occasions.[2]

The agency's mission is to ensure that national banks and federal savings associations operate in a safe and sound manner, provide fair access to financial services, treat customers fairly, and comply with applicable laws and regulations. Failures in providing fair access and fair treatment cut off economic opportunity for legitimate bank customers, whether those customers are individual consumers or businesses. If the system fails to provide fairness to all, it cannot be a source of strength to any.

Decisions on whom to bank are business decisions and matters of banker judgment. We expect banks to assess the risks posed by individual customers on a case-by-case basis and to implement appropriate controls to manage their relationships. The agency expects the banks it supervises to maintain banking relationships with any lawful businesses or customers they choose, so long as they effectively manage any risks related to the resulting transactions and comply with applicable laws and regulations.

While the OCC has never issued guidance related to Operation Chokepoint that requires retraction, we have consistently communicated our position on acceptable risk management practices and supervisory expectations to institutions within the federal banking system, OCC examiners, and the public. Most recently, the agency issued a supervision tip to all OCC

---

[1] Oral Statement of Daniel P. Stipano, Deputy Chief Counsel, before the Subcommittee on Oversight and Investigations, House Committee on Financial Services, U.S. House of Representatives, July 15, 2014.
[2] See letters to the Honorable Erik Paulsen (February 24, 2017), the Honorable Blaine Luetkemeyer (January 25, 2017), and the Honorable Alcee L. Hastings (January 25, 2017).

examiners[3] which reiterates our longstanding policy not to direct banks to open, close, or maintain individual accounts, or engage in the termination of entire categories of customer accounts, without regard to the risks presented by individual customers. This internal communication follows previous guidance issued in 2014[4] and 2016,[5] which clearly explain the OCC's position to the industry and examiners, as well as public statements by senior agency officials articulating that position broadly.[6]

We appreciate the opportunity to share information about our ongoing efforts so that the OCC's position regarding risk management is fully and consistently understood. We welcome the recent clarification by the Department of Justice of its position ending Operation Chokepoint. We also welcome the Federal Deposit Insurance Corporation's previous rescission of its list of purportedly "high-risk" industries and clarification of its expectations for insured depository institutions.[7] Please be assured the OCC will continue to articulate our position rejecting the tactics and goals of Operation Chokepoint that were previously pursued by other agencies and departments of the federal government during the prior administration.

I hope this information is helpful. If you have questions or need additional information, please contact Carrie Moore, Director for Congressional Relations, at 202-649-6737.

Sincerely,

Keith A. Noreika
Acting Comptroller of the Currency

---

[3] Supervision Tip 2017-01, "Bank Secrecy Act Risk Management for Customer Accounts."

[4] OCC Bulletin 2014-58, "Banking Money Services Businesses: Statement on Risk Management."

[5] OCC Bulletin 2016-32, "Risk Management Guidance on Periodic Risk Reevaluation of Foreign Correspondent Banking."

[6] Remarks by Comptroller of the Currency Thomas J. Curry before the Association of Anti-Money Laundering Specialists, September 28, 2016.

[7] Statement on Providing Banking Services, Financial Institution Letter (FIL-5-2015). January 28, 2015.

EXHIBIT 7

**Oral Statement of**

**Daniel P. Stipano**

**Deputy Chief Counsel**

**Office of the Comptroller of the Currency**

**July 15, 2014**

Chairman McHenry, Ranking Member Green, and members of the Subcommittee, thank you for the opportunity to appear before you today as the Subcommittee reviews the Department of Justice's Operation Choke Point investigation.

I have spent over 20 years working on Bank Secrecy Act and anti-money laundering issues and have witnessed many cases where banks have been used, wittingly or unwittingly, as vehicles for fraud, money laundering, terrorist financing, and other illicit activities. Ensuring that banks have strong systems and controls in place to deter these abuses is an important objective of the OCC's supervision.

The OCC is not part of Operation Choke Point, so my testimony today will focus on the OCC's supervisory policies and actions. However, it is our policy to cooperate with law enforcement investigations, and the OCC routinely receives and processes requests for information from law enforcement agencies. Some of the official requests for information we received from DOJ during 2013 were related to Operation Chokepoint.

As the Subcommittee is aware, the OCC's primary mission is to charter, regulate, and supervise national banks, federal savings associations, and the federal branches and agencies of foreign banks. In carrying out this mission, the OCC requires banks to appropriately manage their risks, meet the needs of their communities, comply with laws and regulations, and provide

1

fair access to financial services and fair treatment of their customers. The safety and soundness of an institution – indeed its very viability – can be threatened when a bank lacks appropriate risk management systems and controls.

I have seen first-hand the serious consequences for a bank and the public when these controls are missing. A 2008 OCC enforcement action against Wachovia Bank illustrates this point. Wachovia failed to properly oversee activity in its third-party payment processor accounts and ignored significant red flags indicating consumer harm. Telemarketing customers of the payment processors deliberately targeted vulnerable populations, such as the elderly, for the sale of products of dubious or no value. The telemarketers used high-pressure sales calls to convince these consumers to provide their personal checking account information. Payment processors then used consumers' account information to create checks that were deposited into payment processors' accounts at the bank. The bank received hundreds of complaints and hundreds of thousands of the checks created by the payment processors were returned. Despite these red flags, and clear knowledge that consumers were being harmed, the bank failed to properly address the situation.

As a result of these failures, the OCC cited the bank for unsafe or unsound practices and unfair practices in violation of the FTC Act, and required it to pay approximately $144 million in fines, restitution to consumers, and other relief. The OCC did <u>not</u> however, require the bank to cease doing business with any third-party payment processors or telemarketers. Rather, the OCC's action was focused on requiring the bank to remediate specific consumer harm and to establish enhanced risk management policies in order to mitigate the risk of future harm to consumers.

Currently there is great concern that banks are terminating the accounts of entire categories of customers, and some have suggested that regulators are dictating those actions.  As a general matter, the OCC does not direct banks to open, close, or maintain individual accounts, or recommend or encourage banks to engage in the wholesale termination of categories of customer accounts.  In rare cases where the bank cannot properly manage the risk presented by a customer, or a customer has engaged in suspected criminal or other illegal activity, we may order the bank through an enforcement action to terminate the customer's account.

We expect banks to assess the risks posed by individual customers on a case-by-case basis and to implement appropriate controls to manage their relationships.  We recognize that the controls banks put in place to manage their risks are matters of banker and supervisory judgment.  If the bar is set too high, it can cause banks to terminate accounts of legitimate businesses.  However, if the bar is set too low, the consequences can be dire, allowing the bank to be used to facilitate criminal and other forms of misconduct.  At the OCC, we strive to take a supervisory approach that is reasonable, balanced, and fair, and results in systems and controls that are effective in deterring the use of our nation's financial institutions for illicit purposes.

Thank you again for the opportunity to appear before the Subcommittee today.  I will be happy to answer questions.

# EXHIBIT 8

**Office of the Comptroller of the Currency**

Washington, DC 20219

April 17, 2014

The Honorable Blaine Luetkemeyer
United States House of Representatives
Washington, DC 20515

Dear Representative Luetkemeyer:

Thank you for your letter dated March 27, 2014, regarding efforts by the federal banking
agencies and law enforcement to eliminate fraud and illegal transactions from our nation's
payment system. Your letter raises concerns about the unintended impact of these actions on
Money Services Businesses (MSBs) and their legitimate customers and whether the Office of the
Comptroller of the Currency (OCC) is supporting Operation Choke Point.

As you know, the OCC's primary mission is to charter, regulate, and supervise all national
banks, federal savings associations, and the federal branches and agencies of foreign banks. In
our role as a financial regulator, we execute our responsibilities for the banking organizations
that we supervise to ensure the safety and soundness of the U.S. banking system.

The OCC has always taken the position that banks that open or maintain accounts for MSBs
should apply the requirements of the Bank Secrecy Act (BSA) based on their assessment of risk,
as they do for all customers, taking into account the products and services offered as well as any
individual circumstances. As early as 2005, the federal banking agencies and the Financial
Crimes Enforcement Network (FinCEN) issued guidance clarifying our compliance expectations
for banking MSBs. The guidance was provided to banks and set forth our supervisory
expectations so MSBs that comply with the requirements of the BSA and applicable state laws
can remain within the formal financial sector. The OCC does not support any efforts to target
inappropriately any business operating within state and federal law.

With regard to potential fraudulent activity of online payday lenders, the OCC's National Risk
Committee issued a timely reminder to our examination staff last fall. This reminder, issued in
the form of a *National Risk Committee Supervision Tip*, discussed the elevated risk involving
automated clearing house (ACH) transactions and the existing OCC guidance that should be used
by institutions in the detection of unusual activity in the payments system. It also stated that
bankers should be aware of the credit, operational, compliance and reputation risk of processing
ACH transactions.

You specifically asked about the OCC's cooperation with the Department of Justice (DOJ) relative to Operation Choke Point. The OCC is not involved in Operation Choke Point. However, it is the OCC's policy to work cooperatively with other regulatory and law enforcement agencies. Consequently, we will respond to requests from the DOJ for relevant documents and information.

If you have any questions, please do not hesitate to contact me or Carrie Moore, Director, Congressional Liaison, at (202) 649-6737.

Sincerely,

Thomas J. Curry
Comptroller of the Currency

OCC-AA-00001027

# EXHIBIT 9

Remarks

By

Keith A. Noreika
Acting Comptroller of the Currency

Before the Online Lending Policy Summit

Washington, D.C.
September 25, 2017

Greetings. Thank you for that warm introduction. It's a pleasure to be with you today. Events like these play an important role in informing national policymakers of what the industry needs to provide safe and sound products and services to customers across the country and to unleash their potential to promote economic opportunity. Bringing industry together with regulators, academics, and members of Congress creates a special environment where we can have frank discussions informed by diverse perspectives. In the few minutes that I have this morning, I want to focus on economic opportunity—which has been a theme of my time as Acting Comptroller and a big part of Treasury's core financial principles released in June.[1]

Before getting into the topic, I realize that not everyone is familiar with the Office of the Comptroller of the Currency (OCC). The OCC was created by President Lincoln to administer a system of national banks to meet the credit and banking needs of consumers, businesses, and communities across the country. We were born out of necessity at a time when creating national standards and an orderly nationwide system of banks promoted national unity, expansion, and economic opportunity. Over the past 154 years, the mission has evolved. It now includes the chartering, supervision, and regulation of a federal banking system that includes almost 1,400 national banks, federal savings associations, and federal branches of foreign banks operating in

---

[1] *A Financial System That Creates Economic Opportunities Banks and Credit Unions*. U.S. Department of the Treasury. June 2017 (https://www.treasury.gov/press-center/press-releases/Documents/A%20Financial%20System.pdf).

this country. The federal system is mostly made up of small community banks that provide services to consumers and businesses on Main Street, U.S.A., but it also includes the nation's largest, most complex banks operating globally. I would guess that all of you probably have experience with national banks and federal savings associations.

Some pundits see the growth of the online lending industry as a response to the nation's banking industry. And some say that if the industry had been sufficiently agile and fully met the need for lending, alternative lenders would not have grown so rapidly. I do not share that view. I see the growth of online lending and marketplace lenders as the natural evolution of banking itself. Your industry *demonstrates* a certain entrepreneurial spirit to seize economic opportunity that begins with your new *idea.* The *idea* may be leveraging the lending power of groups or using new data to assess creditworthiness. Or, the idea may be a way to make decisions faster or to give consumers more control of their financial lives.

Sweat and talent turn *your* idea into a business—hopefully a sustainable, profitable one. That takes engineering new solutions. Developing repeatable processes. Hiring staff. Marketing. Financing. Paying your debt. And, delivering the products at the core of *your* business.

Too often regulatory burden gets in the way of economic opportunity. That's another reason organizations like this one are important. As entrepreneurs, you become experts in your field, but as an industry, you need forums and advocates to champion your concerns and raise awareness of barriers to your success. Policy institutes, like this one, discuss issues that could shape the next decade for your *idea*—an idea like the one in the U.S. and Europe in 2005 to pioneer online peer-to-peer lending.[2] That is an idea that has come a very long way.

---

[2] Julia Werdigier, "RIT Capital to Take Stake in British Financial Start-Up." *New York Times.* December 10, 2012.

How far? Over the last decade, marketplace lenders have originated about $40 billion in consumer and small business loans in the U.S.[3] Online lending has doubled every year since 2010.[4] Analysts vary on how high the ceiling is. Some suggest that the market will reach nearly $300 billion by 2020, and others suggest as much as $1 trillion by 2025. This volume would be a substantial piece of all outstanding unsecured consumer credit in the United States, which *alone* was $3.7 trillion at the end of 2016.[5]

A *maturing* industry comes with different sorts of issues than a brand new one. Startup funding fades and shareholders begin to demand performance, or at least progress toward profitability. Last month's earnings showed promise and improvement from the previous year, but some of the most widely recognized companies still stretch for profitability. This performance and the progress it shows have occurred under relatively benign credit conditions and a long, albeit slow, economic expansion. We have seen overall delinquency rates in the country decline steadily since 2012, with minor increases in credit card, auto, and student lending delinquencies in the last year.[6] While the consensus expects the economy to expand through 2018,[7] we may be seeing cracks in performance with consumer unsecured charge-offs for marketplace lenders having increased since the fourth quarter of 2015. It remains to be seen how online lending companies and loans originated using new models will perform under stress. That's part of a *maturing* business, and risk is part of economic opportunity. Success requires adapting to new market conditions and effectively managing evolving risks.

---

[3] Stephen Fromhart. *Marketplace lending 2.0: Bringing on the next stage of lending*. Deloitte Center for Financial Services. March 2017.
[4] "Can P2P Lending Reinvent Banking?" Morgan Stanley. June 17, 2015 (https://www.morganstanley.com/ideas/p2p-marketplace-lending).
[5] Fromhart.
[6] Fromhart.
[7] See *Semiannual Risk Perspective*. Office of the Comptroller of the Currency. Spring 2017 (https://www.occ.gov/publications/publications-by-type/other-publications-reports/index-semiannual-risk-perspective.html).

One way a maturing industry adapts to changing market conditions is to diversify its funding sources and expand into other sources that offer greater stability. In the earliest stages of the industry's development, funding primarily came from startup lending and then selling fractional loans to retail investors. As the market has grown, more companies have sold entire loans to institutional investors, including banks, private equity, and hedge funds. As the industry matured, companies have found a balance that includes selling loans to retail and wholesale investors, securitizing loans, and even exploring the potential for deposits.

A more fundamental response to changing market conditions involves adapting new business models and adjusting long-term strategies. Some companies that set out to be "bank killers" a few years ago are discovering the advantages of being part of the banking system.

Some companies now desire to become a bank and a large number of companies are choosing to partner with banks. Other companies are choosing different paths. Some, created by serial entrepreneurs, were never intended to be long-term businesses and may be sold or combined with other companies. Such moves demonstrate that as companies grow, they explore alternatives to meet *their* business goals. Whatever your choice, it should be pursued because it supports *your* business model and fits the economic opportunity in front of you. Too often, regulatory burden and inefficiency limit those decisions, get in your way, and place a drag on your individual and collective economic opportunity.

Let me shift gears and discuss the OCC's work to promote economic opportunity and responsible innovation. I am very optimistic about the power of innovation to improve banking, expand access, and deliver better products and services in more affordable and sustainable ways. While much of the innovation comes from within the banking system itself, other innovations come from outside the system—from companies like yours.

4

The OCC launched its innovation effort in the summer of 2015. Since then, it has published practical guiding principles, held a public forum, and established a framework for supporting responsible innovation. To implement that framework, the agency established an Office of Innovation that has been up and running since January. Its primary purpose is to make certain that institutions with federal charters have a regulatory framework that is receptive to responsible innovation and supervision that supports it. Part of that mission is to assist companies like yours that want to partner with or provide services to banks or even become one.

The office, headed by Chief Innovation Officer Beth Knickerbocker, serves as a clearinghouse for innovation-related matters and a central point of contact for OCC staff, banks, nonbank companies, and other industry stakeholders. Internally, the office has worked to raise awareness and understanding of industry trends and issues among OCC staff. The office has published a number of guides and reference materials for community banks, as well as financial technology companies and nonbank institutions.[8] It collaborates on innovation-related issues with OCC business lines and other regulators, and facilitates related activities. Externally, the office conducts a variety of outreach activities. One involves hosting "Office Hours" in hubs of significant financial innovation. So far, the team has held Office Hours in San Francisco and New York. During those meetings, team members heard from banks exploring potential innovations, companies seeking to work with banks, and more than a few companies interested in becoming national banks. These meetings also allow the agency to share OCC's perspective early in the innovation development process. The office has already become a valuable resource for national banks and thrifts, and its utility will only increase over time.

---

[8] See "Responsible Innovation" on OCC.gov (https://www.occ.gov/topics/responsible-innovation/index-innovation.html).

One aspect of the innovation framework about which many have expressed interest in is the notion of "regulatory sandboxes" and bank pilots. In October 2016, the OCC stated that one of its priorities would be to develop and implement an optional program for banks to conduct pilots with OCC participation to foster responsible innovation by OCC-supervised banks.[9] The idea is to create principles that support the industry's need for a place to experiment while furthering the OCC's understanding of innovative products, services, and technologies. Information gathered in the pilots would also inform OCC policy initiatives.

The OCC generally supports agency participation in bank pilots as a useful way to gain valuable regulatory insight and to provide banks a better means of developing products and services in a controlled environment. However, any program we pursue will be voluntary for banks and cannot provide a safe harbor from many compliance requirements. We are still in the early stages of developing our approach and will share additional details as we make progress.

Another aspect of the agency's support for responsible innovation involves chartering fintech companies that want to become national banks. I detailed my view in July that the health of the federal banking system depends on its ability to adapt to meet the changing needs and preferences of customers and the market.[10] We must avoid defining banking too narrowly or in a stagnant way that prevents the system from evolving or taking proper and responsible advantage of economic opportunities that result from advances in technology and commerce.

Companies that offer banking products and services should be allowed to apply for national bank charters if they choose, and if they meet the standards for doing so. Companies engaged in the business of banking can seek a national bank charter under the agency's existing

[9] See *Recommendations and Decisions for Implementing a Responsible Innovation Framework*. October 2016 (https://www.occ.gov/topics/responsible-innovation/comments/recommendations-decisions-for-implementing-a-responsible-innovation-framework.pdf).
[10] See Keith A. Noreika. "Remarks before the Exchequer Club." July 19, 2017 (https://www.occ.gov/news-issuances/speeches/2017/pub-speech-2017-82.pdf).

authority to charter full-service national banks and federal saving associations, as well as other long-established special purpose national banks, such as trust banks, bankers' banks, and other so-called CEBA banks. Many fintech and online lending business models fit well into these categories of national bank charters. Chartering innovative de novo institutions through these existing authorities enhances the federal banking system, increases choice, promotes economic opportunity, and can improve services to consumers, businesses, and communities.

Interest also remains in the possibility of the OCC offering special purpose national bank charters to nondepository fintech companies engaged in the business of banking. As you know, the Conference of State Bank Supervisors and the New York Department of Financial Services have challenged the OCC's authority in this area.[11] We have filed our responses in both cases and will continue to defend our authority vigorously. We have not, however, decided whether we will exercise that specific authority to issue special purpose national bank charters to nondepository fintech companies. We will keep you posted.

The OCC's initiatives to support innovation are not the only ways we are working to promote economic opportunity. The agency has taken a number of actions to reduce unnecessary burden following its multiyear review of rules and regulations required under the Economic Growth and Regulatory Paperwork Reduction Act.[12] In my Senate testimony in June, I described a number of actions that the agencies and Congress could take to reduce burden and promote

---

[11] Litigation specifically relates to the special purpose charters under 12 CFR 5.20(e)(1).
[12] Joint Report to Congress Economic Growth and Regulatory Paperwork Reduction Act. Board of Governors of the Federal Reserve System, Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, and National Credit Union Administration. March 2017 (https://www.occ.gov/news-issuances/news-releases/2017/nr-ia-2017-33a.pdf).

economic growth.[13] You may have read about work to revise the Volcker Rule[14] and simplify

capital requirements.

One example of action that Congress could take involves clarifying the long-held "valid

when made" doctrine at the heart of the Madden v. Midland Funding, LLC.[15] The Congressional

"fix" supported by the OCC would provide that the rate of interest on a loan made by a bank,

savings association, or credit union that is valid when the loan is made remains valid after

transfer of the loan. This proposal reduces uncertainty by reestablishing well-settled law and

would create a uniform standard eliminating the differences in treatment of loans made in

different judicial circuits. The proposal supports economic opportunity by helping banks, savings

associations, and credit unions to sell their loans, thereby promoting liquid markets.

Another barrier regarding economic opportunity that I have heard from some online

lenders involves difficulty of getting bank accounts and certain banks terminating business

accounts and other banking services of online lenders and fintech companies without providing

sufficient reason. Some companies have even been told that regulators—and specifically the

OCC—are the reason behind terminating the accounts. Little can affect the economic

opportunity of a business more than the inability to obtain banking services. So, let me address

that head on. I added my voice to that chorus in letters to Congress denouncing Operation

Chokepoint last month. Let me repeat those key points here. We, at the OCC, expect banks to

assess the risks posed by individual customers on a case-by-case basis and to implement

appropriate controls to manage their relationships. The controls banks put in place to manage

---

[13] Testimony of Keith A. Noreika, Acting Comptroller of the Currency, Before Committee on Banking, Housing, and Urban Affairs. U.S. Senate. June 22, 2017 (https://www.occ.gov/news-issuances/news-releases/2017/nr-occ-2017-71b.pdf).
[14] "OCC Solicits Public Comments on Revising the Volcker Rule." OCC News Release 2017-89. August 2, 2017. (https://www.occ.gov/news-issuances/news-releases/2017/nr-occ-2017-89.html).
[15] Madden v. Midland Funding, LLC, No. 14-2131 (2d Cir. 2015).

their risks and the decisions about whom to bank are business decisions and matters of banker judgment and should be effective to manage the risks of their activities.

The OCC's policy is not to direct banks to open or close individual accounts, nor to encourage banks to terminate entire categories of accounts without assessing the risks presented by individual customers or the bank's ability to manage the risk. Banks make the decisions to retain or terminate customer relationships, not the regulators, and not the OCC.

When banks fail to provide fair access and fair treatment, they cut off economic opportunity for bank customers, whether those customers are individuals or businesses. If the system fails to provide fairness to all, it cannot be a source of strength to any.

I want to close by sharing my optimism for this industry. Whatever business model and long-term path you choose to achieve your business goals, the future is bright. You are changing how financial services are delivered, and in some ways, you are raising the bar for what consumers of financial services should expect. The market domestically and internationally has plenty of room to grow, and today in Washington there is real energy around reducing unnecessary regulatory burden and promoting economic opportunity. Those are good reasons to be optimistic.

Thank you again for having me and I would be happy to answer any questions as time permits.

# EXHIBIT 10

# FILED UNDER SEAL

# EXHIBIT 11

# FILED UNDER SEAL

# EXHIBIT 12

# FILED UNDER SEAL

EXHIBIT 13

# FILED UNDER SEAL

# EXHIBIT 14

# FILED UNDER SEAL

# EXHIBIT 15

# FILED UNDER SEAL

# EXHIBIT 16

# FILED UNDER SEAL

# EXHIBIT 17

# FILED UNDER SEAL

# EXHIBIT 18

# FILED UNDER SEAL

EXHIBIT 19

# FILED UNDER SEAL

# EXHIBIT 20

# FILED UNDER SEAL

# EXHIBIT 21

# FILED UNDER SEAL

# EXHIBIT 22

# FILED UNDER SEAL

# EXHIBIT 23

| Bank | State | Date | Year | Comment | Notes |
|---|---|---|---|---|---|
| | NAT | 8/15/2012 | 2012 | Closed due to MSB | Asked that we close account b/c MSB |
| | TX | 5/24/2013 | 2013 | No MSB | No MSB |
| | KS | 9/9/2010 | 2010 | Closed due to MSB | MSB |
| | | | | | |
| | WA | 1/8/2013 | 2013 | No Payday | They don't open accounts for Payday Lenders |
| | WI | 12/1/2012 | 2012 | Closed due to MSB | Closed account b/c of MSB |
| | IL | 5/12/2009 | 2009 | No MSB | Closing 2/5/2013 |
| | | | | | |
| | SD | 1/18/2013 | 2013 | Closed due to MSB | Closing 1/21/13 |
| | all | 12/7/2012 | 2012 | No MSB | High Risk |
| | | | | | |
| | VA | 1/18/2013 | 2013 | No MSB | MSB |
| | VA | 1/18/2013 | 2013 | No MSB | MSB |
| | | | | | |
| | | | | | |
| | AL | 1/9/2013 | 2013 | Closed due to MSB | Closed our account due to MSB |
| | | | | | |
| | FL | 5/24/2013 | 2013 | No MSB | No MSB |
| | | | | | |
| | | | | | |
| | FL | 4/22/2014 | 2014 | Closed due to MSB | MSB |
| | NAT | 9/18/2012 | 2012 | Closed due to MSB | Asked that we close account b/c MSB |
| | NAT | 4/10/2014 | 2014 | Closed due to MSB | No new accounts due to MSB and Mexican ownership |
| | VA | 3/29/2013 | 2013 | No Payday | Signers must be present |
| | AL | 8/7/2013 | 2013 | Closed due to MSB | No, b/c we do C2C |
| | OH | 8/30/2014 | 2014 | Closed due to MSB | Closed our account due to MSB |
| | | | | | |
| | MI | 7/31/2014 | 2014 | Closed due to MSB | Closed our account due to MSB |
| | RI | 8/30/2014 | 2014 | Closed due to MSB | Closed our account due to MSB |
| | CA | 2/28/2013 | 2013 | Closed due to MSB | No, needs 3 months worth of activity for credits, debits, and analysis. |
| | TN | 2/5/2013 | 2013 | Closed due to MSB | MSB - Closed our account |
| | OH | 4/14/2014 | 2014 | No MSB | |
| | OH | 4/14/2014 | 2014 | No MSB | MSB |
| | KS | 9/20/2012 | 2012 | No MSB | MSB |
| | KS | 6/10/2010 | 2010 | No MSB | "don't want to deal with the hassels of our account" |
| | | | | | |
| | | | | | |
| | NE | 12/29/2016 | 2016 | No MSB | No MSB |
| | MS | 8/1/2011 | 2011 | No MSB | MSB |
| | SC | 6/3/2016 | 2016 | No MSB | MSB |
| | OH | 10/8/2014 | 2014 | Closed due to MSB | MSB |
| | LA | 7/18/2014 | 2014 | Closed due to MSB | Don't bank with our industry |
| | SC | | | | |
| | MO | 12/29/2016 | 2016 | No MSB | No MSB accounts |
| | SD | 1/28/2016 | 2016 | Closed due to MSB | Closing 2/27/2016 due to MSB registration |
| | AL | 4/1/2012 | 2012 | No MSB | MSB |
| | MO | 4/19/2010 | 2010 | Closed due to MSB | Closed our account due to MSB |
| | MO | 4/19/2010 | 2010 | Closed due to MSB | Don't bank with our industry |

| | | | | |
|---|---|---|---|---|
| MI | 10/21/2016 | 2016 | Closed due to MSB | No Payday Lenders Closing 11/20/2016 |
| MI | 10/21/2016 | 2016 | Closed due to MSB | No Payday Lenders Closing 11/20/2016 |
| MI | 10/21/2016 | 2016 | Closed due to MSB | No Payday Lenders Closing 11/20/2016 |
| IA & KS | 5/10/2010 | 2010 | Closed due to MSB | Closed our account due to MSB |
| SD | 12/8/2016 | 2016 | Closed due to MSB | |
| | | | | |
| | | | | |
| | | | | |
| LA | 5/30/2014 | 2014 | Closed due to MSB | Closed account b/c of MSB |
| | | | | |
| OK | 6/1/2015 | 2015 | Closed due to MSB | Closed our account due to MSB |
| OK | 6/1/2015 | 2015 | Closed due to MSB | Closed our account due to MSB |
| DE | 7/14/2014 | 2014 | No MSB | No longer opening accounts for Payday Companies |
| KY | 11/21/2016 | 2016 | Closed due to MSB | Due to type of business closing on 12/31/2016 |
| KY | 11/21/2016 | 2016 | Closed due to MSB | Due to type of business closing on 12/31/2016 |
| IN | 11/1/2013 | 2013 | Closed due to MSB | Closed our account due to MSB |
| SC | 10/30/2013 | 2013 | Closed due to MSB | Not adding MSB companies |
| | | | | |
| AL | 3/27/2012 | 2012 | Closed due to MSB | Asked that we close account b/c MSB |
| CA | 1/7/2013 | 2013 | No MSB | MSB |
| NAT | 4/17/2012 | 2012 | Closed due to MSB | Closed per Bank's request |
| | | | | |
| MS | 12/10/2010 | 2010 | No MSB | MSB |
| FL | 8/7/2008 | 2008 | Closed due to MSB | Closed account b/c of MSB |
| FL | 8/7/2008 | 2008 | Closed due to MSB | No MSB |
| VA | 10/30/2015 | 2015 | Closed due to MSB | High Risk |
| AL | 10/30/2013 | 2013 | Closed due to MSB | Not accepting anymore MSB/Payday Lenders |
| SC | 10/30/2013 | 2013 | Closed due to MSB | Not accepting anymore MSB/Payday Lenders |
| | | | | |
| FL | 10/1/2012 | 2012 | Closed due to MSB | MSB |
| AL | 1/7/2013 | 2013 | No MSB | MSB |
| AL | 1/7/2013 | 2013 | No MSB | No Payday Lenders |
| AL | 1/7/2013 | 2013 | No MSB | No per Compliance, no reasons given |
| OH | 7/31/2014 | 2014 | Closed due to MSB | Closed our account due to MSB |
| IL | 12/29/2016 | 2016 | No MSB | Doesn't open for MSBs anymore |
| IL | 4/26/2017 | 2017 | No Reason Given | Received letter stating they wished to close account, no reason given. |
| IL | 12/27/2016 | 2016 | No MSB | No more accounts, our acct was grandfathered |
| CA | 5/30/2014 | 2014 | Closed due to MSB | Closed account b/c of MSB |
| CA | 6/28/2010 | 2010 | No MSB | MSB |
| SC | 3/31/2017 | 2017 | Closed due to MSB | Reviewed Account, felt relationship no longer desireable Closing 1/31/2017 |
| all | 7/20/2013 | 2013 | No MSB | High Risk |
| KY | 12/9/2016 | 2016 | Closed due to MSB | Payday Lender |
| AL | 1/15/2013 | 2013 | No Payday | Signers must be present |
| IN | 5/14/2009 | 2009 | No MSB | Won't open accounts over the phone |
| TX | 10/25/2013 | 2013 | No MSB | No MSB/Payday Lenders |
| TX | 6/3/2013 | 2013 | No Payday | They prefer not to open an account like this |
| MO | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| LA | 7/10/2014 | 2014 | No MSB | No more MSB accounts |
| TX | 5/24/2013 | 2013 | No Payday | Local signers |

| | | | | |
|---|---|---|---|---|
| KS | 8/27/2012 | 2012 | No MSB | MSB |
| CA | 11/1/2013 | 2013 | No Payday | Out of their scope |
| AL | 10/21/2013 | 2013 | No MSB | No MSB |
| AL | 10/21/2013 | 2013 | No MSB | No MSB |
| IL | 5/12/2009 | 2009 | No MSB | Bank will no longer open accounts for MSBs |
| IL | 5/12/2009 | 2009 | No MSB | MSB |
| AL | 4/4/2014 | 2014 | No Payday, Maybe MSB | |
| TX | 7/18/2014 | 2014 | No MSB | MSB is too much of a risk |
| TX | 7/18/2014 | 2014 | No MSB | Can't handle any additional volume |
| LA | 7/9/2014 | 2014 | No MSB | No MSB |
| AL | 6/5/2013 | 2013 | No MSB | System can't comply with our needs |
| SC | 12/31/2014 | 2014 | No MSB | They are not interested in banking Payday |
| KY | 12/29/2016 | 2016 | No Payday | Signers Must Be Present |
| LA | 7/9/2014 | 2014 | No MSB | No MSB and signers must always be present to open account |
| AL | 12/29/2016 | 2016 | No MSB | |
| AL | 12/29/2016 | 2016 | No MSB | No new accounts over the phone - 1 center |
| MO | 12/29/2016 | 2016 | No Payday | Signers must be present - 2 centers |
| KS | 8/16/2012 | 2012 | No MSB | MSB |
| KY | 12/29/2016 | 2016 | No Payday | No Payday Lenders |
| LA | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| CA | 8/10/2012 | 2012 | No MSB | MSB |
| IL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| WA | 12/10/2012 | 2012 | No MSB | MSB |
| MO | 12/29/2016 | 2016 | No MSB | |
| MO | 12/29/2016 | 2016 | No MSB | Conflict of interest |
| VA | 10/22/2013 | 2013 | No MSB | No MSB |
| Mo | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| AL | 12/29/2016 | 2016 | No, no Reason | No reason provided |
| LA | 7/7/2014 | 2014 | No MSB | No MSB |
| AL | 3/26/2014 | 2014 | No MSB | No MSB |
| ID | 12/29/2016 | 2016 | No MSB | No MSB accounts |
| KS | 8/11/2010 | 2010 | No MSB | MSB |
| VA | 10/23/2013 | 2013 | No MSB | BSA says no to Payday Lenders |
| KY | 12/29/2016 | 2016 | No Payday | No Payday Lenders |
| IN | 10/8/2014 | 2014 | No MSB | MSB |
| SC | 3/19/2015 | 2015 | No Payday | They do not bank Payday Lenders |
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| WY | 12/29/2016 | 2016 | No Payday | No Payday Lenders |
| KS | 9/18/2012 | 2012 | No Payday | They don't open accounts for Corporations |
| VA | 11/18/2016 | 2016 | No Payday | No payday lenders |
| KS | 10/22/2013 | 2013 | No MSB | No MSB |
| VA | 5/13/2012 | 2012 | No Payday | Payday Lender |
| TN | 12/29/2010 | 2010 | No MSB | No Facsimile Signatures on checks |
| IN | 5/14/2009 | 2009 | No MSB | MSB |
| FL | 4/11/2014 | 2014 | No MSB | Cannot handle our business- small community bank |
| FL | 8/12/2008 | 2008 | No MSB | Type of business |
| IN | 10/22/2014 | 2014 | No Payday | Not interested at all in our business |
| KY | 5/21/2009 | 2009 | No Payday | Too many inquiries |

| | | | |
|---|---|---|---|
| MO | 12/29/2016 | 2016 No Payday | Signers must be present - 1 center |
| CA | 2/4/2013 | 2013 No MSB | MSB |
| VA | 10/22/2013 | 2013 No Payday | No Payday Lenders |
| AL | 1/15/2013 | 2013 No, no Reason | No reason |
| VA | 5/30/2013 | 2013 No Payday | Signers must be present |
| WY | 12/29/2016 | 2016 No Payday | Signers Must Be Present |
| CA | 12/17/2012 | 2012 No Payday | Signers must be present |
| TN | 12/20/2010 | 2010 No MSB | |
| TN | 12/20/2010 | 2010 No MSB | MSB |
| TN | 12/20/2010 | 2010 No MSB | Signers must be present and agents must be signers to cash replenishment checks |
| TN | 12/20/2010 | 2010 No MSB | They don't open accounts for Payday Lenders |
| MS | 8/1/2011 | 2011 No MSB | MSB |
| MO | 12/29/2016 | 2016 No Payday | Don't bank with our industry |
| VA | 5/31/2013 | 2013 No Payday | Financials didn't pass BSA Dept |
| LA | 7/15/2014 | 2014 No MSB | No MSB, bank is too small |
| AL | 2/7/2013 | 2013 No MSB | MSB |
| FL | 5/24/2013 | 2013 No MSB | |
| FL | 5/24/2013 | 2013 No MSB | No MSB |
| FL | 5/24/2013 | 2013 No MSB | No Payday Lenders |
| SC | 10/30/2013 | 2013 No MSB | No Payday Lenders or MSB |
| VA | 6/10/2013 | 2013 No Payday | No Payday Lenders |
| MI | 11/2/2016 | 2016 No MSB | No MSB |
| NAT | 8/12/2012 | 2012 No MSB | MSB |
| NAT | 8/12/2012 | 2012 No MSB | Compliance Officer said no |
| SC | 10/22/2013 | 2013 No MSB | No MSB |
| AL | 10/21/2013 | 2013 No MSB | No MSB - owned by Regions |
| LA | 7/7/2014 | 2014 No MSB | No MSB |
| TN | 9/19/2012 | 2012 No MSB | MSB |
| FL | 1/22/2013 | 2013 No MSB | MSB |
| MO | 9/14/2012 | 2012 No MSB | MSB |
| MO | 12/29/2016 | 2016 No MSB | Don't have enough employees to handle our account |
| CA | 10/22/2013 | 2013 No MSB | No MSB |
| KS | 8/15/2012 | 2012 No MSB | MSB |
| SD | 2/22/2013 | 2013 No MSB | No MSB or Payday Lenders |
| LA | 7/10/2014 | 2014 No MSB | No MSB |
| KS | 10/12/2012 | 2012 No MSB | High Risk |
| KS | 10/12/2012 | 2012 No MSB | No MSB |
| AL | 10/31/2013 | 2013 No MSB | No MSB |
| WY | 12/29/2016 | 2016 No Payday | Signers Must Be Present |
| NV | 12/29/2016 | 2016 No MSB | No MSB |
| AL | 10/22/2013 | 2013 No MSB | No MSB |
| CA | 8/10/2012 | 2012 No MSB | MSB |
| NV | 12/29/2016 | 2016 No MSB | No MSB |
| NV | 12/29/2016 | 2016 No MSB | No MSB |
| TN | 1/7/2011 | 2011 No MSB | "They can't offer help, per president" |
| KS | 9/18/2012 | 2012 No MSB | MSB |
| AL | 10/22/2013 | 2013 No Payday | Signers must be present |
| TX | 3/14/2011 | 2011 No MSB | Can't dep cks not made payable to AA. |
| CA | 8/6/2013 | 2013 No MSB | |

| State | Date | Year | Status | Comment |
|---|---|---|---|---|
| CA | 8/6/2013 | 2013 | No MSB | No MSB |
| SC | 10/14/2009 | 2009 | No MSB | MSB |
| OH | 4/14/2014 | 2014 | No Payday | entails too much work for the bank |
| VA | 6/4/2013 | 2013 | No Payday | Signers must be present |
| AL | 1/4/2013 | 2013 | No MSB | Too small and signers must be present to cash any checks |
| KY | 4/18/2014 | 2014 | No Payday | No Payday Lenders |
| KS | 8/21/2012 | 2012 | No MSB | No b/c signers must be local |
| KS | 8/21/2012 | 2012 | No MSB | |
| VA | 5/29/2013 | 2013 | No MSB | No MSB |
| VA | 5/29/2013 | 2013 | No MSB | Don't bank with our industry |
| TX | 5/24/2013 | 2013 | No MSB | No MSB |
| FL | 1/22/2013 | 2013 | No MSB | MSB |
| FL | 1/22/2013 | 2013 | No MSB | No MSB |
| LA | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| KS | 8/17/2012 | 2012 | No MSB | High Risk |
| LA | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| LA | 7/8/2014 | 2014 | No Payday | Licensed Check Casher |
| KS | 8/21/2012 | 2012 | No MSB | MSB |
| KS | 8/21/2012 | 2012 | No MSB | Signers must be present |
| KS | 8/21/2012 | 2012 | No MSB | No MSB |
| KS | 8/21/2012 | 2012 | No MSB | Don't bank with our industry |
| VA | 5/29/2013 | 2013 | No MSB | High Risk |
| VA | 5/29/2013 | 2013 | No MSB | MSB and Payday |
| VA | 5/29/2013 | 2013 | No MSB | MSB and Payday |
| FL | 10/1/2012 | 2012 | No MSB | |
| FL | 10/1/2012 | 2012 | No MSB | MSB |
| FL | 1/22/2013 | 2013 | No MSB | MSB |
| AL | 2/4/2013 | 2013 | No MSB | MSB |
| AL | 2/4/2013 | 2013 | No MSB | No, since we are considered a MSB |
| AL | 2/4/2013 | 2013 | No MSB | They do not bank MSB |
| TX | 5/24/2013 | 2013 | No Payday | Local signers |
| AL | 5/31/2013 | 2013 | No MSB | No MSB |
| TN | 9/19/2012 | 2012 | No MSB | MSB |
| AL | 10/30/2013 | 2013 | No MSB | No MSB |
| AL | 10/30/2013 | 2013 | No MSB | No, MSB regulations are too strict |
| KY | 6/19/2017 | 2017 | | |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| AL | 10/22/2013 | 2013 | No MSB | No MSB and signers must always be present to cash checks |
| AL | 10/22/2013 | 2013 | No MSB | BSA Dept said no |
| AL | 1/7/2013 | 2013 | No MSB | MSB |
| WY | 12/29/2016 | 2016 | No MSB | MSB |
| AL | 6/10/2013 | 2013 | No MSB | No MSB |
| AL | 6/10/2013 | 2013 | No MSB | Don't bank with our industry |
| IA & KS | 5/19/2010 | 2010 | No MSB | MSB |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| TX | 3/1/2011 | 2011 | No MSB | MSB |
| KS | 8/17/2012 | 2012 | No MSB | High Risk |
| KS | 8/16/2012 | 2012 | No MSB | MSB |
| MO | 8/15/2012 | 2012 | No MSB | MSB and Signers must be present |

| | | | | |
|---|---|---|---|---|
| KS | 8/17/2012 | 2012 | No MSB | High Risk |
| SD | 2/3/2016 | 2016 | No MSB | MSB |
| LA | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| LA | 7/7/2014 | 2014 | No MSB | No MSB |
| LA | 7/8/2014 | 2014 | No MSB | No MSB |
| WY | 12/29/2016 | 2016 | No Payday | Signers Must Be Present |
| AL | 10/22/2013 | 2013 | No MSB | Can't handle MSB accounts |
| KS | 6/10/2010 | 2010 | No MSB | MSB |
| IA | 9/24/2012 | 2012 | No MSB | MSB |
| IA | 9/24/2012 | 2012 | No MSB | Too much that the Fed requires, and they can't do it. |
| TX | 3/1/2011 | 2011 | No MSB | MSB |
| TN | 2/13/2013 | 2013 | No Payday | Payday Lender |
| TN | 9/20/2012 | 2012 | No Payday | Our Operations |
| MI | 4/11/2014 | 2014 | No MSB | No MSB |
| TX | 5/24/2013 | 2013 | No MSB | No MSB |
| MI | 5/18/2009 | 2009 | | |
| MO | 12/30/2016 | 2016 | No, no Reason | told Becky no by email |
| AL | 3/19/2014 | 2014 | No MSB | No MSB |
| AL | 3/19/2014 | 2014 | No MSB | Don't bank with our industry |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| VA | 11/18/2016 | 2016 | No MSB | No MSB |
| KS | 8/27/2012 | 2012 | No MSB | MSB |
| AL | 3/28/2012 | 2012 | No MSB | MSB |
| TX | 7/28/2017 | 2017 | No Payday | No Payday Lenders |
| VA | 11/18/2016 | 2016 | No MSB | No MSB |
| LA | 7/7/2014 | 2014 | No MSB | No MSB |
| LA | 12/10/2015 | 2015 | No MSB | The are too small to bank us |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| MO | 10/30/2013 | 2013 | No MSB | No MSB businesses because too much work |
| VA | 3/29/2013 | 2013 | No MSB | MSB |
| VA | 3/29/2013 | 2013 | No MSB | signers must be present |
| MO | 12/29/2016 | 2016 | No, no Reason | No reason provided |
| TX | 5/24/2013 | 2013 | No MSB | No MSB |
| LA | 12/29/2016 | 2016 | No MSB | Corporate office not in LA, MSB |
| TN | 2/8/2013 | 2013 | No MSB | MSB |
| TN | 2/8/2013 | 2013 | No MSB | Payday Lender |
| OH | 5/19/2009 | 2009 | No MSB | MSB |
| SC | 1/14/2015 | 2015 | No MSB | They cannot monitor our account/MSB |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| MO | 9/14/2012 | 2012 | No MSB | MSB |
| VA | 11/22/2016 | 2016 | No MSB | Signers have to be present/ No MSB |
| LA | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| LA | 7/3/2014 | 2014 | No MSB | No more MSB accounts |
| IL | 12/29/2016 | 2016 | No Payday | Signers must be present - 1 center |
| KS | 10/22/2013 | 2013 | No MSB | No MSB, app wouldn't be approved if we submitted one |
| IL | 12/29/2016 | 2016 | No, no Reason | No reason provided |
| WY | 12/29/2016 | 2016 | No Payday | No Payday Lenders |
| MO | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| MO | 8/15/2012 | 2012 | No Payday | Signers must be present |

| | | | | |
|---|---|---|---|---|
| KY | 1/26/2015 | 2015 | No MSB | too much strain on their individual branches(per a decision made in 2014 by the institution as a whole) |
| IA | 6/2/2010 | 2010 | | |
| KS | 5/14/2010 | 2010 | No MSB | MSB |
| IN | 10/14/2014 | 2014 | No MSB | MSB |
| MO | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| LA | 7/10/2014 | 2014 | No MSB | No MSB |
| OH | 4/14/2014 | 2014 | No MSB | No (they would not specify a reason) |
| KS | 9/10/2012 | 2012 | No MSB | No accepting new MSB's |
| DE | 7/14/2014 | 2014 | No MSB | No longer opening accounts for Payday Companies |
| VA | 6/3/2013 | 2013 | No Payday | Don't open accounts for businesses |
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| OH | 5/28/2013 | 2013 | No MSB | No MSB |
| AL | 10/22/2013 | 2013 | No MSB | No MSB |
| MO | 12/29/2016 | 2016 | No Payday | Signers must be local - 1 center |
| KS | 9/5/2012 | 2012 | No MSB | MSB |
| AL | 10/21/2013 | 2013 | No MSB | No MSB |
| AL | 10/21/2013 | 2013 | No MSB | No Payday Lenders or MSB |
| IL | 12/29/2016 | 2016 | No MSB | Aren't equipped to handle our type of account |
| VA | 6/3/2013 | 2013 | No Payday | No Payday Lenders |
| OH | 4/14/2014 | 2014 | No MSB | CIP procedures is the main reason they cannot open the account |
| CA | 8/10/2012 | 2012 | No MSB | MSB |
| VA | 4/1/2013 | 2013 | No MSB | MSB |
| KY | 6/27/2013 | 2013 | No MSB | No MSB |
| ID | 12/29/2016 | 2016 | No MSB | Stored-Value Cards and can't properly id signers |
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| IL | 5/19/2014 | 2014 | No MSB | MSB |
| VA | 4/10/2013 | 2013 | No MSB | High Risk |
| AL | 1/16/2013 | 2013 | No MSB | MSB |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| IA | 9/24/2012 | 2012 | No MSB | MSB |
| IA | 9/24/2012 | 2012 | No MSB | Aren't equipped to handle our type of account |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| TX | 6/27/2014 | 2014 | No MSB | No MSB |
| MO | 12/29/2016 | 2016 | No Payday | Signers must be  present - 1 center |
| SC | 1/2/2015 | 2015 | No MSB | They are not banking any MSB |
| TN | 2/13/2013 | 2013 | No Payday | Too Large |
| AL | 10/21/2013 | 2013 | No MSB | No MSB |
| FL | 1/22/2013 | 2013 | No MSB | MSB |
| AL | 12/29/2016 | 2016 | No MSB | Can't handle our activity |
| AL | 6/3/2013 | 2013 | No MSB | No MSB |
| AL | 12/29/2016 | 2016 | No MSB | No new accounts over the phone - 1 center |
| KS | 8/16/2012 | 2012 | No MSB | MSB |
| OH | 5/22/2013 | 2013 | No MSB | No MSB |
| AL | 3/13/2014 | 2014 | No MSB | No MSB |
| MO | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| AL | 3/13/2014 | 2014 | No MSB | No accounts for MSB or Payday companies |
| SC | 10/22/2013 | 2013 | No MSB | No MSB |
| WY | 12/29/2016 | 2016 | No MSB | High Risk |
| WY | 12/29/2016 | 2016 | No MSB | No MSB |

| | | | | |
|---|---|---|---|---|
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| VA | 2/20/2013 | 2013 | No MSB | Too Risky |
| AL | 10/22/2013 | 2013 | No Payday | No Payday Lenders |
| FL | 1/22/2013 | 2013 | No MSB | MSB |
| FL | 1/22/2013 | 2013 | No MSB | PNC - no MSB |
| IL | 4/10/2014 | 2014 | No, no Reason | Not at this time |
| IL | 4/10/2014 | 2014 | No, no Reason | No new MSB |
| IL | 4/10/2014 | 2014 | No, no Reason | Don't bank with our industry |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| FL | 1/22/2013 | 2013 | No MSB | TD Bank - no MSB |
| FL | 1/22/2013 | 2013 | No MSB | No MSB |
| MI | 11/22/2016 | 2016 | No MSB | No MSB |
| AL | 2/5/2013 | 2013 | No MSB | MSB |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| IL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| TN | 10/22/2013 | 2013 | No Payday | No Payday Lenders |
| TN | 10/22/2013 | 2013 | No Payday | They do not bank payday lenders, because it's a conflict of interest. Credit counseling |
| AL | 3/26/2014 | 2014 | No MSB | No Payday Lenders or MSB |
| WA | 12/5/2013 | 2013 | No MSB | too Small |
| MO | 8/15/2012 | 2012 | No MSB | MSB |
| AL | 10/30/2013 | 2013 | No MSB | do not presently bank any pay day/cash advance companies |
| AL | 10/30/2013 | 2013 | No MSB | No Payday Lenders or MSB |
| MI | 4/21/2014 | 2014 | No Payday | entails too much work for the bank |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| KS | 8/16/2012 | 2012 | No MSB | High Risk |
| SC | 1/14/2015 | 2015 | No MSB | They do not bank anyone that offers MSB services |
| AL | 10/22/2013 | 2013 | No MSB | No MSB/Payday Lenders |
| AL | 10/22/2013 | 2013 | No MSB | No reason provided |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| RI | 9/1/2012 | 2012 | No MSB | MSB |
| IN | 8/5/2015 | 2015 | No MSB | buisness review board said no to our request to open an account |
| WY | 12/29/2016 | 2016 | No Payday | No Payday Lenders |
| AL | 1/14/2013 | 2013 | No MSB | |
| AL | 1/14/2013 | 2013 | No MSB | MSB |
| AL | 3/20/2014 | 2014 | No Payday | No Payday Lenders |
| AL | 12/29/2016 | 2016 | No Payday | Signers must be present - 1 center |
| FL | 4/14/2014 | 2014 | No Payday | signers must be present, no MSB |
| FL | 10/15/2010 | 2010 | No MSB | MSB |
| IL | 4/10/2014 | 2014 | No Payday | Signers must be present |
| TX | 7/7/2014 | 2014 | No MSB | No MSB |
| IL | 12/29/2016 | 2016 | No MSB | Type of account |
| MO | 12/29/2016 | 2016 | No Payday | Don't like to bank with payday loan companies |
| VA | 5/14/2013 | 2013 | No MSB | Will not open an account for us b/c we are competition |
| AL | 10/22/2013 | 2013 | No MSB | No MSB |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| KS | 8/21/2012 | 2012 | No MSB | Volume is too high |
| OH | 5/6/2013 | 2013 | No MSB | MSB |
| VA | 6/7/2013 | 2013 | No Payday | No Payday Lenders |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |

| | | | | |
|---|---|---|---|---|
| AL | 6/10/2013 | 2013 | No MSB | Bank can't handle the MSB requirements |
| LA | 7/7/2014 | 2014 | No MSB | No MSB |
| KY | 12/29/2016 | 2016 | No MSB | No MSB |
| SC | 12/22/2014 | 2014 | No MSB | They do not bank any Payday Co. |
| OH | 4/11/2014 | 2014 | No MSB | Cannot handle our businesss |
| TN | 2/13/2013 | 2013 | No MSB | MSB |
| MO | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| VA | 7/19/2013 | 2013 | No Payday | No Payday Lenders |
| VA | 3/29/2013 | 2013 | No MSB | MSB |
| KY | 4/4/2014 | 2014 | No Payday | No Payday Lenders |
| CA | 1/9/2013 | 2013 | No MSB | MSB |
| AL | 10/21/2013 | 2013 | No MSB | No MSB |
| AL | 10/21/2013 | 2013 | No MSB | No Payday Lenders or MSB |
| AL | 1/2/2013 | 2013 | No MSB | MSB |
| VA | 10/23/2013 | 2013 | No Payday | Not interested at all in our business |
| KS | 8/27/2012 | 2012 | No MSB | MSB |
| IN | 5/21/2009 | 2009 | No MSB | Can't handle our service req.  I told her we could eliminate any of the services they could not do, but still wouldn't open account |
| LA | 12/29/2016 | 2016 | No Payday | Don't open business accounts |
| AL | 3/15/2012 | 2012 | No MSB | MSB |
| KY | 5/18/2009 | 2009 | No Payday | |
| KY | 5/18/2009 | 2009 | No Payday | Signers must be present |
| KY | 5/18/2009 | 2009 | No Payday | No MSB |
| LA | 12/29/2016 | 2016 | No Payday | Signers must be present - 1 center |
| CA | 4/16/2010 | 2010 | No Payday | Signers must be present |
| CA | 4/16/2010 | 2010 | No Payday | They don't bank Payday Lenders |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| KS | 10/22/2013 | 2013 | No MSB | No MSB |
| VA | 4/18/2013 | 2013 | No MSB | MSB |
| FL | 11/4/2011 | 2011 | No MSB | MSB |
| SC | 1/23/2015 | 2015 | No Payday | They do not bank Payday Lenders |
| ID | 12/29/2016 | 2016 | No Payday | signers must be present |
| WA | 1/3/2013 | 2013 | No MSB | MSB |
| MO | 9/14/2012 | 2012 | No MSB | MSB |
| MO | 9/14/2012 | 2012 | No MSB | Can't open accounts for a corp |
| CA | 8/10/2012 | 2012 | No Payday | They don't bank Payday Lenders |
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| KS | 8/27/2012 | 2012 | No MSB | No accepting new MSB's |
| IL | 11/25/2015 | 2015 | No Payday | They do not bank Payday Lenders |
| KY | 7/6/2009 | 2009 | No MSB | MSB |
| WY | 12/29/2016 | 2016 | No Payday | Signers Must Be Present |
| SC | 10/22/2013 | 2013 | No MSB | No MSB |

| State | Date | Year | Comment | Notes |
|---|---|---|---|---|
| CO | 6/28/2005 | 2005 | | |
| IN | 6/28/2005 | 2005 | | |
| MO | 03/2006 | 2006 | | |
| MO | 03/2006 | 2006 | | |
| NH | 12/26/2006 | 2006 | | |
| AR | 2007 | 2007 | | |
| CO | 1/8/2007 | 2007 | | |
| FL | 2/13/2007 | 2007 | No MSB | Due to being an MSB |
| MO | 5/18/2007 | 2007 | | |
| AR | 5/18/2007 | 2007 | | |
| AL | 5/22/2007 | 2007 | | |
| MO | 5/22/2007 | 2007 | | |
| AL | 5/23/2007 | 2007 | | |
| AR | 5/24/2007 | 2007 | | |
| AR | 5/25/2007 | 2007 | | |
| AL | 5/29/2007 | 2007 | No MSB | MSB |
| MS | 5/29/2007 | 2007 | | |
| MS | 5/30/2007 | 2007 | | |
| MO | 6/5/2007 | 2007 | | |
| AL | 6/5/2007 | 2007 | | |
| AL | 6/6/2007 | 2007 | | |
| AL | 6/6/2007 | 2007 | | |
| AL | 6/6/2007 | 2007 | | |
| AL | 6/6/2007 | 2007 | | |
| OH | 6/15/2007 | 2007 | Closed due to MSB | MSB |
| OH | 6/15/2007 | 2007 | Closed due to MSB | MSB |
| FL | 8/2/2007 | 2007 | No Payday | Signers must be present |
| FL | 8/3/2007 | 2007 | No MSB | Could not give me a reason, sent me an email. |
| FL | 8/14/2007 | 2007 | No Payday | Signers must be present |
| WI | 9/10/2007 | 2007 | No MSB | Due to being an MSB |
| IL | 9/18/2007 | 2007 | No MSB | "high-risk" business |
| KS | 10/16/2007 | 2007 | No MSB | Type of business |
| 0 | 11/7/2007 | 2007 | No MSB | As of 2005, Key Bank will not open any accounts for our type of business |
| 0 | 11/7/2007 | 2007 | No MSB | MSB |
| KY | 11/30/2007 | 2007 | No MSB | Bank will not open accounts for companies that are a "Risk". |
| WI | 12/10/2007 | 2007 | No MSB | Type of business |
| WI | 12/10/2007 | 2007 | No MSB | Just can't work with us. |
| WI | 12/10/2007 | 2007 | No MSB | No MSB, b/c they can't handle the regulations |
| WI | 12/10/2007 | 2007 | No MSB | No MSB |
| FL | 8/7/2008 | 2008 | Closed due to MSB | Closed account b/c of MSB |
| FL | 8/7/2008 | 2008 | Closed due to MSB | No MSB |
| FL | 8/12/2008 | 2008 | No MSB | Type of business |
| IL | 5/12/2009 | 2009 | No MSB | Bank will no longer open accounts for MSBs |
| IL | 5/12/2009 | 2009 | No MSB | Closing 2/5/2013 |
| IL | 5/12/2009 | 2009 | No MSB | MSB |
| IN | 5/14/2009 | 2009 | No MSB | Won't open accounts over the phone |
| IN | 5/14/2009 | 2009 | No MSB | MSB |
| KY | 5/18/2009 | 2009 | No Payday | |
| KY | 5/18/2009 | 2009 | No Payday | Signers must be present |
| KY | 5/18/2009 | 2009 | No Payday | No MSB |

| | | | | |
|---|---|---|---|---|
| MI | 5/18/2009 | 2009 | | |
| OH | 5/19/2009 | 2009 | No MSB | MSB |
| KY | 5/21/2009 | 2009 | No Payday | Too many inquiries |
| IN | 5/21/2009 | 2009 | No MSB | Can't handle our service req.  I told her we could eliminate any of the services they could not do, but still wouldn't open account |
| KY | 7/6/2009 | 2009 | No MSB | MSB |
| SC | 10/14/2009 | 2009 | No MSB | MSB |
| CA | 4/16/2010 | 2010 | No Payday | Signers must be present |
| CA | 4/16/2010 | 2010 | No Payday | They don't bank Payday Lenders |
| MO | 4/19/2010 | 2010 | Closed due to MSB | Closed our account due to MSB |
| MO | 4/19/2010 | 2010 | Closed due to MSB | Don't bank with our industry |
| IA & KS | 5/10/2010 | 2010 | Closed due to MSB | Closed our account due to MSB |
| KS | 5/14/2010 | 2010 | No MSB | MSB |
| IA & KS | 5/19/2010 | 2010 | No MSB | MSB |
| IA | 6/2/2010 | 2010 | | |
| KS | 6/10/2010 | 2010 | No MSB | "don't want to deal with the hassels of our account" |
| KS | 6/10/2010 | 2010 | No MSB | MSB |
| CA | 6/28/2010 | 2010 | No MSB | MSB |
| KS | 8/11/2010 | 2010 | No MSB | MSB |
| KS | 9/9/2010 | 2010 | Closed due to MSB | MSB |
| FL | 10/15/2010 | 2010 | No MSB | MSB |
| MS | 12/10/2010 | 2010 | No MSB | MSB |
| TN | 12/20/2010 | 2010 | No MSB | |
| TN | 12/20/2010 | 2010 | No MSB | MSB |
| TN | 12/20/2010 | 2010 | No MSB | Signers must be present and agents must be signers to cash replenishment checks |
| TN | 12/20/2010 | 2010 | No MSB | They don't open accounts for Payday Lenders |
| TN | 12/29/2010 | 2010 | No MSB | No Facsimile Signatures on checks |
| TN | 1/7/2011 | 2011 | No MSB | "They can't offer help, per president" |
| TX | 3/1/2011 | 2011 | No MSB | MSB |
| TX | 3/1/2011 | 2011 | No MSB | MSB |
| TX | 3/14/2011 | 2011 | No MSB | Can't dep cks not made payable to AA. |
| MS | 8/1/2011 | 2011 | No MSB | MSB |
| MS | 8/1/2011 | 2011 | No MSB | MSB |
| FL | 11/4/2011 | 2011 | No MSB | MSB |
| AL | 3/15/2012 | 2012 | No MSB | MSB |
| AL | 3/27/2012 | 2012 | Closed due to MSB | Asked that we close account b/c MSB |
| AL | 3/28/2012 | 2012 | No MSB | MSB |
| AL | 4/1/2012 | 2012 | No MSB | MSB |
| NAT | 4/17/2012 | 2012 | Closed due to MSB | Closed per Bank's request |
| VA | 5/13/2012 | 2012 | No Payday | Payday Lender |
| CA | 8/10/2012 | 2012 | No MSB | MSB |
| CA | 8/10/2012 | 2012 | No MSB | MSB |
| CA | 8/10/2012 | 2012 | No MSB | MSB |
| CA | 8/10/2012 | 2012 | No Payday | They don't bank Payday Lenders |
| NAT | 8/12/2012 | 2012 | No MSB | MSB |
| NAT | 8/12/2012 | 2012 | No MSB | Compliance Officer said no |
| NAT | 8/15/2012 | 2012 | Closed due to MSB | Asked that we close account b/c MSB |
| KS | 8/15/2012 | 2012 | No MSB | MSB |
| MO | 8/15/2012 | 2012 | No MSB | MSB and Signers must be present |
| MO | 8/15/2012 | 2012 | No Payday | Signers must be present |
| MO | 8/15/2012 | 2012 | No MSB | MSB |
| KS | 8/16/2012 | 2012 | No MSB | MSB |

| KS | 8/16/2012 | 2012 | No MSB | MSB |
|----|-----------|------|--------|-----|
| KS | 8/16/2012 | 2012 | No MSB | MSB |
| KS | 8/16/2012 | 2012 | No MSB | High Risk |
| KS | 8/17/2012 | 2012 | No MSB | High Risk |
| KS | 8/17/2012 | 2012 | No MSB | High Risk |
| KS | 8/17/2012 | 2012 | No MSB | High Risk |
| KS | 8/21/2012 | 2012 | No MSB | No b/c signers must be local |
| KS | 8/21/2012 | 2012 | No MSB | |
| KS | 8/21/2012 | 2012 | No MSB | MSB |
| KS | 8/21/2012 | 2012 | No MSB | Signers must be present |
| KS | 8/21/2012 | 2012 | No MSB | No MSB |
| KS | 8/21/2012 | 2012 | No MSB | Don't bank with our industry |
| KS | 8/21/2012 | 2012 | No MSB | Volume is too high |
| KS | 8/27/2012 | 2012 | No MSB | MSB |
| KS | 8/27/2012 | 2012 | No MSB | MSB |
| KS | 8/27/2012 | 2012 | No MSB | MSB |
| KS | 8/27/2012 | 2012 | No MSB | No accepting new MSB's |
| RI | 9/1/2012 | 2012 | No MSB | MSB |
| KS | 9/5/2012 | 2012 | No MSB | MSB |
| KS | 9/10/2012 | 2012 | No MSB | No accepting new MSB's |
| MO | 9/14/2012 | 2012 | No MSB | MSB |
| MO | 9/14/2012 | 2012 | No MSB | MSB |
| MO | 9/14/2012 | 2012 | No MSB | MSB |
| MO | 9/14/2012 | 2012 | No MSB | Can't open accounts for a corp |
| NAT | 9/18/2012 | 2012 | Closed due to MSB | Asked that we close account b/c MSB |
| KS | 9/18/2012 | 2012 | No Payday | They don't open accounts for Corporations |
| KS | 9/18/2012 | 2012 | No MSB | MSB |
| TN | 9/19/2012 | 2012 | No MSB | MSB |
| TN | 9/19/2012 | 2012 | No MSB | MSB |
| KS | 9/20/2012 | 2012 | No MSB | MSB |
| TN | 9/20/2012 | 2012 | No Payday | Our Operations |
| IA | 9/24/2012 | 2012 | No MSB | MSB |
| IA | 9/24/2012 | 2012 | No MSB | Too much that the Fed requires, and they can't do it. |
| IA | 9/24/2012 | 2012 | No MSB | MSB |
| IA | 9/24/2012 | 2012 | No MSB | Aren't equipped to handle our type of account |
| FL | 10/1/2012 | 2012 | No MSB | |
| FL | 10/1/2012 | 2012 | No MSB | MSB |
| FL | 10/1/2012 | 2012 | Closed due to MSB | MSB |
| KS | 10/12/2012 | 2012 | No MSB | High Risk |
| KS | 10/12/2012 | 2012 | No MSB | No MSB |
| WI | 12/1/2012 | 2012 | Closed due to MSB | Closed account b/c of MSB |
| all | 12/7/2012 | 2012 | No MSB | High Risk |
| WA | 12/10/2012 | 2012 | No MSB | MSB |
| CA | 12/17/2012 | 2012 | No Payday | Signers must be present |
| AL | 1/2/2013 | 2013 | No MSB | MSB |
| WA | 1/3/2013 | 2013 | No MSB | MSB |
| AL | 1/4/2013 | 2013 | No MSB | Too small and signers must be present to cash any checks |
| AL | 1/7/2013 | 2013 | No MSB | MSB |
| CA | 1/7/2013 | 2013 | No MSB | MSB |
| AL | 1/7/2013 | 2013 | No MSB | MSB |
| AL | 1/7/2013 | 2013 | No MSB | No Payday Lenders |

| | | | | |
|---|---|---|---|---|
| AL | 1/7/2013 | 2013 | No MSB | No per Compliance, no reasons given |
| WA | 1/8/2013 | 2013 | No Payday | They don't open accounts for Payday Lenders |
| AL | 1/9/2013 | 2013 | Closed due to MSB | Closed our account due to MSB |
| CA | 1/9/2013 | 2013 | No MSB | MSB |
| AL | 1/14/2013 | 2013 | No MSB | |
| AL | 1/14/2013 | 2013 | No MSB | MSB |
| AL | 1/15/2013 | 2013 | No Payday | Signers must be present |
| AL | 1/15/2013 | 2013 | No, no Reason | No reason |
| AL | 1/16/2013 | 2013 | No MSB | MSB |
| SD | 1/18/2013 | 2013 | Closed due to MSB | Closing 1/21/13 |
| VA | 1/18/2013 | 2013 | No MSB | MSB |
| VA | 1/18/2013 | 2013 | No MSB | MSB |
| FL | 1/22/2013 | 2013 | No MSB | MSB |
| FL | 1/22/2013 | 2013 | No MSB | MSB |
| FL | 1/22/2013 | 2013 | No MSB | No MSB |
| FL | 1/22/2013 | 2013 | No MSB | MSB |
| FL | 1/22/2013 | 2013 | No MSB | MSB |
| FL | 1/22/2013 | 2013 | No MSB | MSB |
| FL | 1/22/2013 | 2013 | No MSB | PNC - no MSB |
| FL | 1/22/2013 | 2013 | No MSB | TD Bank - no MSB |
| FL | 1/22/2013 | 2013 | No MSB | No MSB |
| CA | 2/4/2013 | 2013 | No MSB | MSB |
| AL | 2/4/2013 | 2013 | No MSB | MSB |
| AL | 2/4/2013 | 2013 | No MSB | No, since we are considered a MSB |
| AL | 2/4/2013 | 2013 | No MSB | They do not bank MSB |
| TN | 2/5/2013 | 2013 | Closed due to MSB | MSB - Closed our account |
| AL | 2/5/2013 | 2013 | No MSB | MSB |
| AL | 2/7/2013 | 2013 | No MSB | MSB |
| TN | 2/8/2013 | 2013 | No MSB | MSB |
| TN | 2/8/2013 | 2013 | No MSB | Payday Lender |
| TN | 2/13/2013 | 2013 | No Payday | Payday Lender |
| TN | 2/13/2013 | 2013 | No Payday | Too Large |
| TN | 2/13/2013 | 2013 | No MSB | MSB |
| VA | 2/20/2013 | 2013 | No MSB | Too Risky |
| SD | 2/22/2013 | 2013 | No MSB | No MSB or Payday Lenders |
| CA | 2/28/2013 | 2013 | Closed due to MSB | No, needs 3 months worth of activity for credits, debits, and analysis. |
| VA | 3/29/2013 | 2013 | No Payday | Signers must be present |
| VA | 3/29/2013 | 2013 | No MSB | MSB |
| VA | 3/29/2013 | 2013 | No MSB | signers must be present |
| VA | 3/29/2013 | 2013 | No MSB | MSB |
| VA | 4/1/2013 | 2013 | No MSB | MSB |
| VA | 4/10/2013 | 2013 | No MSB | High Risk |
| VA | 4/18/2013 | 2013 | No MSB | MSB |
| OH | 5/6/2013 | 2013 | No MSB | MSB |
| VA | 5/14/2013 | 2013 | No MSB | Will not open an account for us b/c we are competition |
| OH | 5/22/2013 | 2013 | No MSB | No MSB |
| TX | 5/24/2013 | 2013 | No MSB | No MSB |
| TX | 5/24/2013 | 2013 | No Payday | Local signers |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| FL | 5/24/2013 | 2013 | No MSB | |

| | | | | |
|---|---|---|---|---|
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| FL | 5/24/2013 | 2013 | No MSB | No Payday Lenders |
| TX | 5/24/2013 | 2013 | No MSB | No MSB |
| TX | 5/24/2013 | 2013 | No Payday | Local signers |
| TX | 5/24/2013 | 2013 | No MSB | No MSB |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| TX | 5/24/2013 | 2013 | No MSB | No MSB |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| FL | 5/24/2013 | 2013 | No MSB | No MSB |
| OH | 5/28/2013 | 2013 | No MSB | No MSB |
| VA | 5/29/2013 | 2013 | No MSB | No MSB |
| VA | 5/29/2013 | 2013 | No MSB | Don't bank with our industry |
| VA | 5/29/2013 | 2013 | No MSB | High Risk |
| VA | 5/29/2013 | 2013 | No MSB | MSB and Payday |
| VA | 5/29/2013 | 2013 | No MSB | MSB and Payday |
| VA | 5/30/2013 | 2013 | No Payday | Signers must be present |
| VA | 5/31/2013 | 2013 | No Payday | Financials didn't pass BSA Dept |
| AL | 5/31/2013 | 2013 | No MSB | No MSB |
| TX | 6/3/2013 | 2013 | No Payday | They prefer not to open an account like this |
| VA | 6/3/2013 | 2013 | No Payday | Don't open accounts for businesses |
| VA | 6/3/2013 | 2013 | No Payday | No Payday Lenders |
| AL | 6/3/2013 | 2013 | No MSB | No MSB |
| VA | 6/4/2013 | 2013 | No Payday | Signers must be present |
| AL | 6/5/2013 | 2013 | No MSB | System can't comply with our needs |
| VA | 6/7/2013 | 2013 | No Payday | No Payday Lenders |
| VA | 6/10/2013 | 2013 | No Payday | No Payday Lenders |
| AL | 6/10/2013 | 2013 | No MSB | No MSB |
| AL | 6/10/2013 | 2013 | No MSB | Don't bank with our industry |
| AL | 6/10/2013 | 2013 | No MSB | Bank can't handle the MSB requirements |
| KY | 6/27/2013 | 2013 | No MSB | No MSB |
| VA | 7/19/2013 | 2013 | No Payday | No Payday Lenders |
| all | 7/20/2013 | 2013 | No MSB | High Risk |
| CA | 8/6/2013 | 2013 | No MSB | |
| CA | 8/6/2013 | 2013 | No MSB | No MSB |
| AL | 8/7/2013 | 2013 | Closed due to MSB | No, b/c we do C2C |
| AL | 10/21/2013 | 2013 | No MSB | No MSB |
| AL | 10/21/2013 | 2013 | No MSB | No MSB |
| AL | 10/21/2013 | 2013 | No MSB | No MSB - owned by Regions |
| AL | 10/21/2013 | 2013 | No MSB | No MSB |
| AL | 10/21/2013 | 2013 | No MSB | No Payday Lenders or MSB |
| AL | 10/21/2013 | 2013 | No MSB | No MSB |
| AL | 10/21/2013 | 2013 | No MSB | No MSB |
| AL | 10/21/2013 | 2013 | No MSB | No Payday Lenders or MSB |
| VA | 10/22/2013 | 2013 | No MSB | No MSB |
| KS | 10/22/2013 | 2013 | No MSB | No MSB |
| VA | 10/22/2013 | 2013 | No Payday | No Payday Lenders |
| SC | 10/22/2013 | 2013 | No MSB | No MSB |
| CA | 10/22/2013 | 2013 | No MSB | No MSB |
| AL | 10/22/2013 | 2013 | No MSB | No MSB |

| AL | 10/22/2013 | 2013 | No Payday | Signers must be present |
|---|---|---|---|---|
| AL | 10/22/2013 | 2013 | No MSB | No MSB and signers must always be present to cash checks |
| AL | 10/22/2013 | 2013 | No MSB | BSA Dept said no |
| AL | 10/22/2013 | 2013 | No MSB | Can't handle MSB accounts |
| KS | 10/22/2013 | 2013 | No MSB | No MSB, app wouldn't be approved if we submitted one |
| AL | 10/22/2013 | 2013 | No MSB | No MSB |
| SC | 10/22/2013 | 2013 | No MSB | No MSB |
| AL | 10/22/2013 | 2013 | No Payday | No Payday Lenders |
| TN | 10/22/2013 | 2013 | No Payday | No Payday Lenders |
| TN | 10/22/2013 | 2013 | No Payday | They do not bank payday lenders, because it's a conflict of interest. Credit counseling |
| AL | 10/22/2013 | 2013 | No MSB | No MSB/Payday Lenders |
| AL | 10/22/2013 | 2013 | No MSB | No reason provided |
| AL | 10/22/2013 | 2013 | No MSB | No MSB |
| KS | 10/22/2013 | 2013 | No MSB | No MSB |
| SC | 10/22/2013 | 2013 | No MSB | No MSB |
| VA | 10/23/2013 | 2013 | No MSB | BSA says no to Payday Lenders |
| VA | 10/23/2013 | 2013 | No Payday | Not interested at all in our business |
| TX | 10/25/2013 | 2013 | No MSB | No MSB/Payday Lenders |
| SC | 10/30/2013 | 2013 | No Payday | No Payday Lenders or MSB |
| AL | 10/30/2013 | 2013 | No MSB | No MSB |
| AL | 10/30/2013 | 2013 | No MSB | No, MSB regulations are too strict |
| MO | 10/30/2013 | 2013 | No MSB | No MSB businesses because too much work |
| SC | 10/30/2013 | 2013 | Closed due to MSB | Not adding MSB companies |
| AL | 10/30/2013 | 2013 | No MSB | do not presently bank any pay day/cash advance companies |
| AL | 10/30/2013 | 2013 | No MSB | No Payday Lenders or MSB |
| AL | 10/30/2013 | 2013 | Closed due to MSB | Not accepting anymore MSB/Payday Lenders |
| AL | 10/31/2013 | 2013 | No MSB | No MSB |
| CA | 11/1/2013 | 2013 | No Payday | Out of their scope |
| IN | 11/1/2013 | 2013 | Closed due to MSB | Closed our account due to MSB |
| WA | 12/5/2013 | 2013 | No MSB | too Small |
| AL | 3/13/2014 | 2014 | No MSB | No MSB |
| AL | 3/13/2014 | 2014 | No MSB | No accounts for MSB or Payday companies |
| AL | 3/19/2014 | 2014 | No MSB | No MSB |
| AL | 3/19/2014 | 2014 | No MSB | Don't bank with our industry |
| AL | 3/20/2014 | 2014 | No Payday | No Payday Lenders |
| AL | 3/26/2014 | 2014 | No MSB | No MSB |
| AL | 3/26/2014 | 2014 | No MSB | No Payday Lenders or MSB |
| AL | 4/4/2014 | 2014 | No MSB | No Payday, Maybe MSB |
| KY | 4/4/2014 | 2014 | No Payday | No Payday Lenders |
| NAT | 4/10/2014 | 2014 | Closed due to MSB | No new accounts due to MSB and Mexican ownership |
| IL | 4/10/2014 | 2014 | No, no Reason | Not at this time |
| IL | 4/10/2014 | 2014 | No, no Reason | No new MSB |
| IL | 4/10/2014 | 2014 | No, no Reason | Don't bank with our industry |
| IL | 4/10/2014 | 2014 | No Payday | Signers must be present |
| FL | 4/11/2014 | 2014 | No MSB | Cannot handle our business- small community bank |
| MI | 4/11/2014 | 2014 | No MSB | No MSB |
| OH | 4/11/2014 | 2014 | No MSB | Cannot handle our businesss |
| OH | 4/14/2014 | 2014 | No MSB | |
| OH | 4/14/2014 | 2014 | No MSB | MSB |
| OH | 4/14/2014 | 2014 | No Payday | entails too much work for the bank |
| OH | 4/14/2014 | 2014 | No MSB | No (they would not specify a reason) |

| | | | | |
|---|---|---|---|---|
| OH | 4/14/2014 | 2014 | No MSB | CIP procedures is the main reason they cannot open the account |
| FL | 4/14/2014 | 2014 | No Payday | signers must be present, no MSB |
| KY | 4/18/2014 | 2014 | No Payday | No Payday Lenders |
| MI | 4/21/2014 | 2014 | No Payday | entails too much work for the bank |
| FL | 4/22/2014 | 2014 | Closed due to MSB | MSB |
| IL | 5/19/2014 | 2014 | No MSB | MSB |
| LA | 5/30/2014 | 2014 | Closed due to MSB | Closed account b/c of MSB |
| CA | 5/30/2014 | 2014 | Closed due to MSB | Closed account b/c of MSB |
| TX | 6/27/2014 | 2014 | No MSB | No MSB |
| LA | 7/3/2014 | 2014 | No MSB | No more MSB accounts |
| LA | 7/7/2014 | 2014 | No MSB | No MSB |
| LA | 7/7/2014 | 2014 | No MSB | No MSB |
| LA | 7/7/2014 | 2014 | No MSB | No MSB |
| LA | 7/7/2014 | 2014 | No MSB | No MSB |
| TX | 7/7/2014 | 2014 | No MSB | No MSB |
| LA | 7/7/2014 | 2014 | No MSB | No MSB |
| LA | 7/8/2014 | 2014 | No Payday | Licensed Check Casher |
| LA | 7/8/2014 | 2014 | No MSB | No MSB |
| LA | 7/9/2014 | 2014 | No MSB | No MSB |
| LA | 7/9/2014 | 2014 | No MSB | No MSB and signers must always be present to open account |
| LA | 7/10/2014 | 2014 | No MSB | No more MSB accounts |
| LA | 7/10/2014 | 2014 | No MSB | No MSB |
| LA | 7/10/2014 | 2014 | No MSB | No MSB |
| DE | 7/14/2014 | 2014 | No MSB | No longer opening accounts for Payday Companies |
| DE | 7/14/2014 | 2014 | No MSB | No longer opening accounts for Payday Companies |
| LA | 7/15/2014 | 2014 | No MSB | No MSB, bank is too small |
| TX | 7/18/2014 | 2014 | No MSB | MSB is too much of a risk |
| TX | 7/18/2014 | 2014 | No MSB | Can't handle any additional volume |
| LA | 7/18/2014 | 2014 | Closed due to MSB | Don't bank with our industry |
| MI | 7/31/2014 | 2014 | Closed due to MSB | Closed our account due to MSB |
| OH | 7/31/2014 | 2014 | Closed due to MSB | Closed our account due to MSB |
| OH | 8/30/2014 | 2014 | Closed due to MSB | Closed our account due to MSB |
| RI | 8/30/2014 | 2014 | Closed due to MSB | Closed our account due to MSB |
| IN | 10/8/2014 | 2014 | No MSB | MSB |
| OH | 10/8/2014 | 2014 | Closed due to MSB | MSB |
| IN | 10/14/2014 | 2014 | No MSB | MSB |
| IN | 10/22/2014 | 2014 | No Payday | Not interested at all in our business |
| SC | 12/22/2014 | 2014 | No MSB | They do not bank any Payday Co. |
| SC | 12/31/2014 | 2014 | No MSB | They are not interested in banking Payday |
| SC | 1/2/2015 | 2015 | No MSB | They are not banking any MSB |
| SC | 1/14/2015 | 2015 | No MSB | They cannot monitor our account/MSB |
| SC | 1/14/2015 | 2015 | No MSB | They do not bank anyone that offers MSB services |
| SC | 1/23/2015 | 2015 | No Payday | They do not bank Payday Lenders |
| KY | 1/26/2015 | 2015 | No MSB | too much strain on their individual branches(per a decision made in 2014 by the institution as a whole) |
| SC | 3/19/2015 | 2015 | No Payday | They do not bank Payday Lenders |
| OK | 6/1/2015 | 2015 | Closed due to MSB | Closed our account due to MSB |
| OK | 6/1/2015 | 2015 | Closed due to MSB | Closed our account due to MSB |
| IN | 8/5/2015 | 2015 | No MSB | buisness review board said no to our request to open an account |
| VA | 10/30/2015 | 2015 | Closed due to MSB | High Risk |
| IL | 11/25/2015 | 2015 | No Payday | They do not bank Payday Lenders |
| LA | 12/10/2015 | 2015 | No MSB | The are too small to bank us |

| | | | | |
|---|---|---|---|---|
| SD | 1/28/2016 | 2016 | Closed due to MSB | Closing 2/27/2016 due to MSB registration |
| SD | 2/3/2016 | 2016 | No MSB | MSB |
| SC | 6/3/2016 | 2016 | No MSB | MSB |
| MI | 10/21/2016 | 2016 | Closed due to MSB | No Payday Lenders Closing 11/20/2016 |
| MI | 10/21/2016 | 2016 | Closed due to MSB | No Payday Lenders Closing 11/20/2016 |
| MI | 10/21/2016 | 2016 | Closed due to MSB | No Payday Lenders Closing 11/20/2016 |
| MI | 11/2/2016 | 2016 | No MSB | No MSB |
| VA | 11/18/2016 | 2016 | No Payday | No payday lenders |
| VA | 11/18/2016 | 2016 | No MSB | No MSB |
| VA | 11/18/2016 | 2016 | No MSB | No MSB |
| KY | 11/21/2016 | 2016 | Closed due to MSB | Due to type of business closing on 12/31/2016 |
| KY | 11/21/2016 | 2016 | Closed due to MSB | Due to type of business closing on 12/31/2016 |
| VA | 11/22/2016 | 2016 | No Payday | Signers have to be present/ No MSB |
| MI | 11/22/2016 | 2016 | No MSB | No MSB |
| SD | 12/8/2016 | 2016 | Closed due to MSB | |
| KY | 12/9/2016 | 2016 | Closed due to MSB | Payday Lender |
| IL | 12/27/2016 | 2016 | No MSB | No more accounts, our acct was grandfathered |
| MO | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| KY | 12/29/2016 | 2016 | No Payday | Signers Must Be Present |
| AL | 12/29/2016 | 2016 | No MSB | |
| AL | 12/29/2016 | 2016 | No MSB | No new accounts over the phone - 1 center |
| MO | 12/29/2016 | 2016 | No Payday | Signers must be present - 2 centers |
| KY | 12/29/2016 | 2016 | No Payday | No Payday Lenders |
| LA | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| IL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| MO | 12/29/2016 | 2016 | No MSB | |
| MO | 12/29/2016 | 2016 | No MSB | Conflict of interest |
| Mo | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| AL | 12/29/2016 | 2016 | No, no Reason | No reason provided |
| ID | 12/29/2016 | 2016 | No MSB | No MSB accounts |
| KY | 12/29/2016 | 2016 | No Payday | No Payday Lenders |
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| WY | 12/29/2016 | 2016 | No Payday | No Payday Lenders |
| MO | 12/29/2016 | 2016 | No Payday | Signers must be present - 1 center |
| WY | 12/29/2016 | 2016 | No Payday | Signers Must Be Present |
| MO | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| MO | 12/29/2016 | 2016 | No MSB | Don't have enough employees to handle our account |
| NE | 12/29/2016 | 2016 | No MSB | No MSB |
| WY | 12/29/2016 | 2016 | No Payday | Signers Must Be Present |
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| LA | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| LA | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| MO | 12/29/2016 | 2016 | No MSB | No MSB accounts |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| WY | 12/29/2016 | 2016 | No MSB | MSB |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| LA | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| WY | 12/29/2016 | 2016 | No Payday | Signers Must Be Present |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |

| MO | 12/29/2016 | 2016 | No, no Reason | No reason provided |
|---|---|---|---|---|
| LA | 12/29/2016 | 2016 | No MSB | Corporate office not in LA, MSB |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| LA | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| IL | 12/29/2016 | 2016 | No Payday | Signers must be present - 1 center |
| IL | 12/29/2016 | 2016 | No, no Reason | No reason provided |
| WY | 12/29/2016 | 2016 | No Payday | No Payday Lenders |
| MO | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| MO | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| MO | 12/29/2016 | 2016 | No Payday | Signers must be local - 1 center |
| IL | 12/29/2016 | 2016 | No MSB | Aren't equipped to handle our type of account |
| ID | 12/29/2016 | 2016 | No MSB | Stored-Value Cards and can't properly id signers |
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| MO | 12/29/2016 | 2016 | No Payday | Signers must be  present - 1 center |
| AL | 12/29/2016 | 2016 | No MSB | Can't handle our activity |
| AL | 12/29/2016 | 2016 | No MSB | No new accounts over the phone - 1 center |
| MO | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| WY | 12/29/2016 | 2016 | No MSB | High Risk |
| WY | 12/29/2016 | 2016 | No MSB | No MSB |
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| IL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| WY | 12/29/2016 | 2016 | No Payday | No Payday Lenders |
| AL | 12/29/2016 | 2016 | No Payday | Signers must be present - 1 center |
| IL | 12/29/2016 | 2016 | No MSB | Type of account |
| MO | 12/29/2016 | 2016 | No Payday | Don't like to bank with payday loan companies |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| KY | 12/29/2016 | 2016 | No MSB | No MSB |
| MO | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| IL | 12/29/2016 | 2016 | No MSB | Doesn't open for MSBs anymore |
| LA | 12/29/2016 | 2016 | No MSB | Don't open business accounts |
| LA | 12/29/2016 | 2016 | No Payday | Signers must be present - 1 center |
| AL | 12/29/2016 | 2016 | No Payday | Don't bank with our industry |
| ID | 12/29/2016 | 2016 | No Payday | signers must be present |
| NV | 12/29/2016 | 2016 | No MSB | No MSB |
| WY | 12/29/2016 | 2016 | No Payday | Signers Must Be Present |
| MO | 12/30/2016 | 2016 | No, no Reason | told Becky no by email |
| SC | 3/31/2017 | 2017 | Closed due to MSB | Reviewed Account, felt relationship no longer desireable Closing 1/31/2017 |
| IL | 4/26/2017 | 2017 | No Reason Given | Received letter stating they wished to close account, no reason given. |
| KY | 6/19/2017 | 2017 | | |
| TX | 7/28/2017 | 2017 | No Payday | No Payday Lenders |

| Business Unit | State | Bank | Account | Title | DBA | PeopleSoft GL | SAP GL | Status | Reports | Analysis | Type of Account | Notes | Deposit ABA | Disbursement ABA | Disbursement Serial Digits | Disbursement Fractional ABA | Check MICR Specs | Deposit MICR Specs | Account Digits | Concentration |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 115 | Iowa | | | McKenzie Check Advance of Iowa, LLC | Advance America | 7204 | 1003980051 | Open | | ? | Single | | 073906131 | 073906131 | 10 | 72-613/739 | | | | |
| 46 | Virginia - AA | | | Advance America, Cash Advance Centers of Virginia, Inc. | | 7955 | 1003980089 | Open | | | Single | | 5001-1010 | 051401027 | 8 | 68-102/514 | @@051401027]@XCCCCCCCCC*XXXXX | @@5001-1010@@XCCCCCCCCC*XXXX | 10 | |
| 98N | Virginia - ECA | | | Express Check Advance of Virginia, LLC | | 7076 | 1003980052 | Open | | | Single | | 051401027 | 051401027 | 8 | 68-102/514 | | | | |
| 40 | South Carolina - AA | | | Advance America, Cash Advance Centers of South Carolina, Inc. | | 7943 | 1003980062 | Open | | Statement | Single | | 053201034 | 053201034 | 8 | 67-103/532 | | | | |
| 36 | National | | | Advance America, Cash Advance Centers, Inc. | | 7832 | 1003980071 | Open | | Online | Deposit | | 502900000 | | | | | | | |
| 36 | National | | | Advance America, Cash Advance Centers, Inc. | | 7232 | 1003980091 | Open | | Online | Disbursement | | | 082908816 | 8 | 81-881/829 | | | | |
| 254 | Texas - CSO | | | ACSO of Texas, L.P. | | 7748 | 1003980101 | Open | | Emailed | Mailed | | 113103276 | 113103276 | 8 | 88-327/1131 | | | | |
| 36 | National | | | Advance America, Cash Advance Centers, Inc. | | 7837 | 1003980112 | Open | | Mailed | Deposit | | 103003632 | | | 39-363/1030 | | | | |
| 36 | National | | | Advance America, Cash Advance Centers, Inc. | | 7026 | 1003980111 | Open | | Mailed | Disbursement | | | 103003632 | 8 | 39-363/1030 | | | | |
| 99 | National | | | Advance America, Cash Advance Centers, Nat'l | | 7597 | 1003980121 | Open | | ? | Single | | 5533-0000 | | | | | | | |
| 99 | National | | | Advance America, Cash Advance Centers, Nat'l | | 7100 | 1003981072 | Open | | | Single | | | 065300486 | 9 | 85-127/842 | | | | |
| 99 | National - ECA | | | Express Check Advance LLC | Express Check Advance | 7646 | 1003980122 | Open | | | Single | | 5533-0000 | 084201278 | 9 | 82-127-842 | | | | |
| 42 | Tennessee - AA | | | Advance America, Cash Advance Centers of Tennessee, Inc. | Advance America | 7212 | 1003980131 | Open | | Statement | Single | | 5011-6699 | 101006699 | 9 | 18-669/1010 | | | | |
| 924 | Mississippi - ECA | | | Express Check Advance of Mississippi, LLC | | 7642 | 1003980171 | Open | | Statement | Single | | 065304327 | 065304327 | 9 | 87-677/641 | | | | |
| 17 | Kentucky - AA | | | Advance America, Cash Advance Centers of Kentucky, Inc. | | 7973 | 1003980947 | Open | | | Single | | 042101006 | 042101006 | 9 | 73-100/421 | @@042101006@@XMMMMMXCCC-CCCCC* | @@042101006@@XXXXXXCCC-CCCCC* | 8 | |
| 98 | National - ECA | | | Express Check Advance of Virginia, LLC | Express Check Advan | 7839 | 1003980182 | Open | | 822 | Liquidity | | 103900036 | | | 39-363/1030 | | | | |
| 254 | Texas - CSO | | | ACSO of Texas, L.P. | | 7901 | 1003980191 | Open | | Mailed | Single | | Lockbox for A | 111014225 | 111014225 | 10 | 32-1432/1110 | | | | |
| 224 | Mississippi - CA | | | AAFA of Mississippi, Inc. | Check Advance | 7229 | 1003980195 | Open | | | Single | | 084201524 | 084201524 | 9 | 85-152/842 | | | | |
| 24 | Mississippi - AA | | | Advance America, Cash Advance Centers of Mississippi, LLC | | 7599 | 1003980211 | Open | | Mailed | Single | | 065301948 | 065301948 | 10 | 85-196/653 | | | | |
| 99 | National - ECA | | | Express Check Advance LLC | | 7666 | 1003980231 | Open | | | Single | | 065301948 | 065301948 | 10 | 85-194/653 | | | | |
| 124 | Mississippi - NCA | | | McKenzie Check Advance of Mississippi, LLC | National Cash Advance | 7108 | 1003981273 | Open | | ? | Single | | 065301948 | 065301948 | 10 | 85-194/653 | | | | |
| 924 | Mississippi - ECA | | | Express Check Advance of Mississippi, LLC | | 7663 | 1003980222 | Open | | Statement | Single | | 084201786 | 084201786 | 9 | 85-178/842 | | | | |
| 14 | Indiana - AA | | | Advance America, Cash Advance Centers of Indiana, Inc. | | 7164 | 1003980271 | Open | | | Single | | 5011-0000 | 081304822 | 10 | 71-482/813 | | | | |
| 99 | National - Money Market | | | Advance America, Cash Advance Centers, Inc. | | 8017 | 1003980057 | Open | | | Single | | 053112039 | | | | | | | |
| 49 | Wisconsin - AA | | | Advance America, Cash Advance Centers of Wisconsin, Inc. | Advance America, Ch | 7870 | 1003980911 | Open | | Online | Single | | 091809731 | 096010415 | 9 | 75-1041/960 | | | | |
| 13 | Illinois - AA | | | Advance America, Cash Advance Centers of Illinois, Inc. | | 7166 | 1003980331 | Open | | Mailed | Single | | 071102568 | 071102568 | 9 | 70-256/711 | | | | |
| 25 | Missouri - AA | | | Advance America, Cash Advance Centers of Missouri, Inc. | | 7893 | 1003980331 | Open | | | Single | | 081501696 | 081501696 | 8 | 80-169/815 | | | | |
| 99 | Political Action Committee | | | Advance America, Cash Advance Centers, Inc. | | 7258 | | Open | | | Single | | 067011760 | 067011760 | 8 | 63-1176/670 | | | | |
| 9 | Florida - AA | | | Advance America, Cash Advance Centers of Florida, LLC | | 7378 | 1003980361 | Open | | Mailed | Single | | 063000047 | 063100688 | 9 | 63-68/631 | | | | |
| 40 | South Carolina - AA | | | Advance America, Cash Advance Centers South Carolina, Inc. | | 8008 | 1003980373 | Open | | | Corporate | | 053208202 | 053208202 | 9 | 67-820/532 | | | | |
| 99 | National - CCK | | | Advance America, Cash Advance Centers, Inc. | | 8009 | 1003980374 | Open | | | Corporate | | | 053208202 | 10 | | | | | |
| 40 | South Carolina - AA | | | Advance America, Cash Advance Centers of South Carolina, Inc. | Advance America and | 7931 | 1003980372 | Open | | Statement | Single | | 053207216 | 053207216 | 9 | 67-721/532 | | | | |
| 25 | Missouri - AA | | | Advance America, Cash Advance Centers of Missouri, Inc. | | 7960 | 1003980406 | Open | | | Single | | 081505388 | 081505388 | 9 | 80-538/815 | | | | |
| 50 | Wyoming - AA | | | Advance America, Cash Advance Centers of Wyoming, Inc. | | 7966 | 1003980413 | Open | | | Single | | 102300404 | 102300404 | 9 | 99-40/1023 | | | | |
| 17 | Kentucky - AA | | | Advance America, Cash Advance Centers of Kentucky, Inc. | | 8013 | 1003980414 | Open | | | Single | | 083002533 | 083002533 | 9 | 21-253/830 | | | | |
| 25 | Missouri - AA | | | Advance America, Cash Advance Centers of Missouri, Inc. | | 7965 | 1003980412 | Open | | | Single | | 101902052 | 101902052 | 9 | 80-205/1019 | | | | |
| 16 | Kansas | | | Advance America, Cash Advance Centers of Kansas, Inc. | Advance America | 7284 | 1003980711 | Open | | ? | Single | | 101101293 | 101101293 | 9 | 83-129/1011 | | | | |
| 13 | Illinois - AA | | | Advance America, Cash Advance Centers of Illinois, Inc. | | 7372 | 1003981571 | Open | | | Single | | 071901837 | 071901837 | 9 | 70-183/0719 | | | | |
| 99 | National - AA | | | Advance America, Cash Advance Centers, Inc. | | 7452 | 1003980421 | Open | | Mailed | Single | | 065303328 | 065303328 | 8 | 85-332/653 | | | | |
| 901 | Alabama - ECA | | | Express Check Advance of Alabama, LLC | | 7710 | 1003980423 | Open | | Mailed | Single | | 065303328 | 065303328 | 8 | 85-332/653 | | | | |
| 222 | Michigan - AA | | | ACSO of Michigan, Inc. | | 7162 | 1003980422 | Open | | Mailed | Single | | 072400893 | 072400893 | 9 | 74-488/724 | | | | |
| 99 | National - OH | | | Advance America, Cash Advance Centers, Inc. | | 7091 | 1003980424 | Open | | | Single | | 044101305 | 044101305 | 9 | 56-7209/2441 | | | | |
| 1 | Alabama - AA | | | Advance America, Cash Advance Centers of Alabama, Inc. | | 7967 | 1003980448 | Open | | | Single | | 062206176 | 062206176 | 9 | 61-617/622 | | | | |
| 99 | National | | | Advance America, Cash Advance Centers, Inc. | | 7557 | 1003980467 | Open | | Mailed | Single | | 062201559 | 062201559 | 9 | 61-155/622 | | | | |
| 917 | Kentucky - ECA | | | Express Check Advance of Kentucky, Inc. | Express Check Advan | 7712 | 1003980470 | Open | | Mailed | Single | | 083903195 | 083903195 | 9 | 73-319/839 | | | | |
| 14 | Indiana - AA | | | Advance America, Cash Advance Centers of Indiana, Inc. | | 7135 | 1003980462 | Open | | | Single | | 074905225 | 074905225 | 9 | 71-522/749 | | | | |
| 924 | Mississippi - ECA | | | Express Check Advance of Mississippi, LLC | | 7444 | 1003980466 | Open | | Mailed | Single | | 065304385 | 065304385 | 9 | 85-438/653 | | | | |
| 924 | Mississippi - ECA | | | Express Check Advance of Mississippi, LLC | | 7313 | 1003980471 | Open | | Mailed | Single | | 065304385 | 065304385 | 9 | 85-438/653 | | | | |
| 18 | Louisiana - AA | | | Advance America, Cash Advance Centers of Louisiana, LLC | | 7647 | 1003980473 | Open | | Statement | Single | | 111103524 | 111100921 | 9 | 84-492/1111 | | | | |
| 18 | Louisiana - AA | | | Advance America, Cash Advance Centers of Louisiana, LLC | | 7137 | 1003981141 | Open | | Mailed | Single | | 065401150 | 065401150 | 9 | 84-315/654 | | | | |
| 46 | Virginia - AA | | | Advance America, Cash Advance Centers of Virginia, Inc. | Advance America | 7570 | 1003980469 | Open | | Statement | Single | | 5011-0223 | 051402233 | 9 | 68-223/514 | | | | |
| 46 | Virginia - ECA | | | Express Check Advance of Virginia, LLC | Express Check Advan | 7571 | 1003980461 | Open | | | Single | | 5011-0223 | 051402233 | 9 | 68-223/514 | | | | |
| 222 | Michigan - AA | | | ACSO of Michigan, Inc. | | 7210 | 1003980476 | Open | | Statement | Single | | 072402212 | 072402212 | 8 | 74-221/724 | | | | |
| 924 | Mississippi - ECA | | | Express Check Advance of Mississippi, LLC | | 7716 | 1003980475 | Open | | | Single | | 065300211 | 065300211 | 7 | 85-21/653 | | | | |
| 918 | Louisiana - ECA | | | Express Check Advance of Louisiana LLC | ECA | 7961 | 1003980478 | Open | | | Single | | 265270138 | 265270138 | 9 | 84-7015/2652 | | | | |
| 14 | Indiana - AA | | | Advance America, Cash Advance Centers of Indiana, Inc. | | 7820 | 1003981271 | Open | | | Single | | 074902982 | 074902982 | 10 | 71-208/749 | | | | |
| 42 | Tennessee - AA | | | Advance America, Cash Advance Centers of Tennessee, Inc. | | 8016 | 1003980479 | Open | | | Single | | 064102970 | 064102970 | 9 | 87-297/641 | | | | |
| 99 | National | | | Advance America, Cash Advance Centers, Inc. | | 7086 | 1003980491 | Open | | | Single | | 051904524 | 051904524 | 9 | 69-452/519 | | | | |
| 217 | Kentucky - ECA | | | Express Check Advance of Kentucky, Inc. | Check Advance | 7233 | 1003980492 | Open | | Mailed | Single | | 051904524 | 051904524 | 9 | 69-452/519 | | | | |
| 16 | Kansas | | | Advance America, Cash Advance Centers of Kansas, Inc. | Advance America | 7110 | 1003981331 | Open | | Mailed | Single | | 101100375 | 101100375 | 9 | 83-37/1011 | | | | |
| 1 | Alabama - AA | | | Advance America, Cash Advance Centers of Alabama, LLC | | 7869 | 1003980501 | Open | | | Single | | 062104070 | 062104070 | 9 | 61-407/621 91 | | | | |
| 16 | Kansas | | | Advance America, Cash Advance Centers of Kansas, Inc. | | 7197 | 1003980502 | Open | | | Single | | 101105817 | 101105817 | 10 | 83-58/1011 | | | | |
| 42 | Tennessee - FACA | | | Advance America, Cash Advance Centers of Tennessee, Inc. | First American Cash A | 7230 | 1003980504 | Open | | ? | Single | | 064201120 | 064201120 | 8 | 87-112/642 | | | | |
| 13 | Illinois - AA | | | Advance America, Cash Advance Centers of Illinois, Inc. | | 7383 | 1003980503 | Open | | Statement | Single | | 071124931 | 071124931 | 9 | 70-2493/711 | | | | |
| 17 | Kentucky - AA | | | Advance America, Cash Advance Centers of Kentucky, Inc. | | 7131 | 1003980505 | Open | | Statement | Single | | 5524-0000 | 042102694 | 9 | 73-269/421 | | | | |
| 17 | Kentucky - AA | | | Advance America, Cash Advance Centers of Kentucky, Inc. | | 7234 | 1003980506 | Open | | Mailed | Single | | 5524-0000 | 042102694 | 9 | 73-269/421 | | | | |
| 115 | Iowa | | | Advance America, Cash Advance Centers of Iowa, LLC | | 7395 | 1003980911 | Open | | Mailed | Single | | 073901314 | 073901314 | 9 | 72-131/739 | | | | |
| 16 | Kansas | | | Advance America, Cash Advance Centers of Kansas, Inc. | | 7800 | 1003980571 | Open | | | Single | | 101101109 | 101101109 | | 83-110/1011 | | | | |
| 99 | National | | | Advance America, Cash Advance Centers, Inc. | | 7301 | 1003980114 | Open | | Mailed | Single | | 5501-0114 | 111101144 | 9 | 84-114/1111 | | | | |
| 924 | Mississippi - ECA | | | Express Check Advance of Mississippi, LLC | | 7721 | 1003980572 | Open | | Mailed | Single | | 065306189 | 065306189 | 6 | 85-823/840 | | | | |
| 924 | Mississippi - ECA | | | Express Check Advance of Mississippi, LLC | | 7722 | 1003980561 | Open | | | Single | | 053202871 | 053202871 | 9 | 67-287/532 | | | | |
| 40 | South Carolina - AA | | | Advance America, Cash Advance Centers, Inc. | | 7936 | 1003980571 | Open | | | Single | | 053202871 | 053202871 | 9 | 67-287/532 | | | | |
| 99 | National | | | Advance America, Cash Advance Centers, Inc. | | 7904 | 1003980591 | Open | | Mailed | Single | | 065200531 | 065200531 | 8 | 64-53/652 | | | | |
| 918 | ECA | | | Express Check Advance, LLC | | 7323 | 1003980592 | Open | | | Single | | 065200531 | 065200531 | 8 | 64-53/652 | | | | |
| 46 | Virginia - AA | | | Advance America, Cash Advance Centers of Virginia, Inc. | | 7572 | 1003980593 | Open | | Mailed | Single | | 051404383 | 051404383 | 9 | 68-438/514 | | | | |
| 56 | Oklahoma - AA | | | Advance America, Cash Advance Centers of Oklahoma, Inc. | | 7818 | 1003980601 | Open | | Mailed | Single | | 103101628 | 103101628 | 7 | 86-162/1031 | | | | |
| 25 | Missouri - AA | | | Advance America, Cash Advance Centers of Missouri, Inc. | | 7819 | 1003980608 | Open | | | Single | | 281573013 | 281573013 | 9 | 80-7301/2815 | | | | |
| 49 | Wisconsin - AA | | | Advance America, Cash Advance Centers of Wisconsin, Inc. | | 7954 | 1003980610 | Open | | | Single | | 075907442 | 075907442 | 9 | 70-744/759 | | | | |
| 46 | Virginia - AA | | | Advance America, Cash Advance Centers of Virginia, Inc. | | 7168 | 1003980621 | Open | | Mailed | Single | | 051405670 | 051405670 | 9 | 73-179/421 | @@075907442@@XXX*CCCCCCC*XXXXX | @@075907442@@XXX*CCCCCCC* | 7 | |
| 46 | Virginia - ECA | | | Express Check Advance of Virginia, Inc. | | 7626 | 1003980611 | Open | | Mailed | Single | | 051405670 | 051405670 | 9 | 68-567/514 | | | | |
| 13 | Illinois - AA | | | Advance America, Cash Advance Centers of Illinois, Inc. | | 8018 | 1003980615 | Open | | | Corporate | | 083903041 | 083903041 | 9 | 73-5309/839 | | | | |
| 99 | National | | | Advance America, Cash Advance Centers, Inc. | | 7969 | 1003980699 | Open | | | Single | | 083900525 | 083900525 | 9 | 73-52/839 | | | | |
| 917 | Kentucky - ECA | | | Express Check Advance of Kentucky, LLC | Express Check Advan | 7797 | 1003981181 | Open | | | Single | | 083900525 | 083900525 | 9 | 73-52/839 | | | | |
| 115 | Iowa | | | McKenzie Check Advance of Iowa, LLC | Advance America o | 7285 | 1003981042 | Open | | | Single | | 073900607 | 073900607 | 8 | 72-60/739 | | | | |
| 924 | MS - ECA | | | Express Check Advance of Mississippi, LLC | | 7724 | 1003980661 | Open | | | Single | | 084201058 | 084201058 | 8 | 85-105/842 | | | | |
| 18 | Louisiana - AA | | | Advance America, Cash Advance Centers of Louisiana, Inc. | | 7385 | 1003980673 | Open | | Statement | Single | | 065200531 | 065200531 | 8 | 84-51/652 | | | | |
| 99 | Mississippi | | | Advance America, Cash Advance Centers of South Carolina, Inc. | | 7938 | 1003980672 | Open | | Mailed | Single | | 053104368 | 053104368 | 9 | 67-136/531 | | | | |
| 224 | Mississippi - CA | | | AAFA of Mississippi, Inc. | | 7928 | 1003980681 | Open | | Mailed | Single | | 053104566 | 053104566 | 9 | 85-207/842 | | | | |
| 17 | Kentucky - AA | | | Advance America, Cash Advance Centers of Kentucky, Inc. | | 7899 | 1003980703 | Open | | ? | Single | | 083901100 | 083901100 | 7 | 73-110/839 | @@083901100@@MMMMMXCCCCCCX*X | @@083901100@@XXXXXXCCCCCCX*X | 7 | |
| 917 | Kentucky - ECA | | | Express Check Advance of Kentucky, LLC | Express Check Advan | 7094 | 1003980701 | Open | | ? | Single | | 083901100 | 083901100 | 7 | 73-110/839 | | | | |
| 90 | National | | | Advance America, Cash Advance, Inc. | | 7084 | 1003980704 | Open | | Mailed | Single | | 051503299 | 051503299 | 9 | 69-1297/514 | | | | |
| 115 | Iowa | | | McKenzie Check Advance of Iowa, LLC | | 7923 | 1003980642 | Open | | Mailed | Single | | 073911578 | 073911578 | 9 | 74-1157/739 | | | | |
| 254 | Texas - CSO | | | ACSO of Texas, L.P. | | 7755 | 1003980721 | Open | | | Single | | 263184488 | 263184488 | 11 | 63-6448/2631 | | | | |
| 13 | Illinois - AA | | | Advance America, Cash Advance Centers of Illinois, Inc. | | 7755 | 1003980721 | Open | | | Single | | 111915757 | 111903577 | 9 | 70-3577/1119 | | | | |
| 14 | Indiana - AA | | | Advance America, Cash Advance Centers of Indiana, Inc. | | 7919 | 1003980731 | Open | | Mailed | Single | | 074901664 | 074901664 | 10 | 70-2666/719 | | | | |
| 1 | Alabama - AA | | | Advance America, Cash Advance Centers of Alabama, Inc. | | 7868 | 1003980764 | Open | | Mailed | Single | | 5021-0285 | 062202859 | 9 | 61-285/622 | | | | |
| 115 | Iowa | | | McKenzie Check Advance of Iowa, LLC | Advance America o | 7814 | 1003980764 | Open | | Mailed | Single | | 073900607 | 073900607 | 8 | 72-60/739 | | | | |
| 99 | National | | | Advance America, Cash Advance Centers, Inc. | | 7962 | 1003980766 | Open | | | Single | | 101100846 | 101100846 | 9 | 83-368/1011 | | | | |
| 9 | Florida - AA | | | Advance America, Cash Advance Centers of Florida, LLC | | 7379 | 1003980765 | Open | | | Single | | 063106705 | 063106705 | 9 | 63-670/631 | | | | |
| 16 | Kansas | | | Advance America, Cash Advance Centers of Kansas, Inc. | Advance America | 7425 | 1003980771 | Open | | None | Single | | per email no. at | 101114109 | 101114109 | 10 | 83-1410/1011 | | | Products |

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 224 | Mississippi - CA | [redacted] | AAFA of Mississippi, Inc | Check Advance | 7239 | 1003980781 | Open | | ? | Single | | 084205915 | 084205915 | 8 | 85-591/842 | | | | |
| 924 | Mississippi - ECA | [redacted] | Express Check Advance of Mississippi, LLC | | 7728 | 1003980782 | Open | | | Single | | 084205915 | 084205915 | 8 | 85-591/842 | | | | |
| 46 | Virginia - AA | [redacted] | Advance America, Cash Advance Centers of Virginia, Inc. | | 7573 | 1003980791 | Open | | | Single | | 5502-0401 | 251473512 | 9 | 68-7351/2514 | | | | January |
| 6 | Colorado - AA | [redacted] | Advance America, Cash Advance Centers of Colorado, LLC | | 7545 | 1003980801 | Open | | None | Single | | 102107034 | 102107034 | | 82-703/1021 | | | | |
| 24 | Mississippi - AA | [redacted] | Advance America, Cash Advance Centers of Mississippi, LLC | Advance America | 7829 | 1003980812 | Open | | ? | Single | | 084204628 | 084204628 | 9 | 85-462/842 | | | | |
| 25 | Missouri - AA | [redacted] | Advance America, Cash Advance Centers of Missouri, Inc. | | 7567 | 1003980822 | Open | | Mailed | Single | | 081517907 | 081517907 | 10 | 93-1790/815 | | | | |
| 1 | Alabama - AA | [redacted] | Advance America, Cash Advance Centers of Alabama, LLC | | 7023 | 1003980859 | Open | | | Liquidity | | 084000026 | - | - | 26-2/840 | | | | |
| 8 | Delaware - NCAS | [redacted] | NCAS of Delaware, LLC | | 7019 | 1003980860 | Open | | | Liquidity | | 084000026 | - | - | 26-2/840 | | | | |
| 9 | Florida - AA | [redacted] | Advance America, Cash Advance Centers of Florida, LLC | | 7988 | 1003981696 | Open | | | Deposit | | | | | | | | | |
| 9 | Florida - AA | [redacted] | Advance America, Cash Advance Centers of Florida, LLC | | 7989 | 1003981697 | Open | | | Disbursement | | | | | | | | | |
| 9 | Ohio - AAFA - Alt Dis Acct | [redacted] | AAFA of Ohio, Inc. | | 8004 | 1003981709 | Open | | | Disbursement | | | | | | | | | |
| 12 | Idaho - AA | [redacted] | Advance America, Cash Advance Centers of Idaho, Inc. | | 7024 | 1003980861 | Open | | | Liquidity | | 084000026 | - | - | 26-2/840 | | | | January |
| 13 | Illinois - AA | [redacted] | Advance America, Cash Advance Centers of Illinois, Inc. | | 7990 | 1003981698 | Open | | | Deposit | | | | | | | | | |
| 13 | Illinois - AA | [redacted] | Advance America, Cash Advance Centers of Illinois, Inc. | | 7991 | 1003981699 | Open | | | Disbursement | | | | | | | | | |
| 14 | Indiana - AA | [redacted] | Advance America, Cash Advance Centers of Indiana, Inc. | | 7025 | 1003980862 | Open | | | Liquidity | | 084000026 | - | - | 26-2/840 | | | | |
| 18 | Louisiana - NCA | [redacted] | NCA of Louisiana LLC | | 7022 | 1003980651 | Open | | | Liquidity | | 084000026 | - | - | 26-2/840 | | | | |
| 42 | Tennessee - AA | [redacted] | Advance America, Cash Advance Centers of Tennessee, Inc. | Advance America, Fir | 7865 | 1003980854 | Open | | 822/Statement Online | Deposit | | 064200930 | - | - | - | | | | |
| 42 | Tennessee - AA | [redacted] | Advance America, Cash Advance Centers of Tennessee, Inc. | Advance America, Fir | 7265 | 1003980853 | Open | | 822/Statement Online | Disbursement | | - | 064204347 | 10 | 87-434/642 | | | | |
| 42 | Tennessee - Title | [redacted] | Advance America, Cash Advance Centers of Tennessee, Inc. | | 7925 | 1003980852 | Open | | 822/Statement Online | Disbursement | | - | 064204347 | 10 | 87-434/642 | | | | |
| 46 | Virginia - AA | [redacted] | Advance America, Cash Advance Centers of Virginia, Inc. | | 7021 | 1003980863 | Open | | | Liquidity | | 084000026 | - | - | 26-2/840 | | | | |
| 46 | Virginia - AA | [redacted] | Advance America, Cash Advance Centers of Virginia, Inc. | | 7081 | 1003980851 | Open | | 822/Statement Online | Single | | 084000026 | 084000026 | 10 | 26-2/840 | | | | |
| 99 | AP - ACH | [redacted] | Advance America, Cash Advance Centers, Inc | | 1002 | 1003981598 | Open | | 822/Statement Online | Corporate | | 084000026 | 084000026 | 10 | 26-2/840 | | | | |
| 99 | Image Cash Letter | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7978 | 1003981686 | Open | | | Deposit | | | | | | | | | |
| 99 | ECA State Funds/Repos | [redacted] | Express Financial Services LLC | | 7780 | 1003980857 | Open | | 822/Statement Online | Deposit | | 084000026 | - | - | 26-2/840 | | | | |
| 99 | ECA | [redacted] | Express Check Advance of Mississippi, LLC | | 7729 | 1003980855 | Open | | 822/Statement Online | Single | | 084204657 | 084204657 | 10 | 85-465-842 | | | | |
| 99 | AP Check Account | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7971 | 1003980867 | Open | | | Corporate | | | | | | | | | |
| 99 | Debit Card Settlement | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7976 | 1003981684 | Open | | | Corporate | | | | | | | | | |
| 99 | Lockbox | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7977 | 1003981685 | Open | | | Corporate | | | | | | | | | |
| 99 | Main Cash Account | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7970 | 1003980866 | Open | | | Corporate | | | | | | | | | |
| 99 | MG Express Pay | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7979 | 1003981687 | Open | | | Corporate | | | | | | | | | |
| 99 | National - Checking | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7984 | 1003981692 | Open | | | Corporate | | | | | | | | | |
| 99 | National - Deposit | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7983 | 1003981691 | Open | | | Corporate | | | | | | | | | |
| 99 | National - DMV | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7987 | 1003981695 | Open | | | Corporate | | | | | | | | | |
| 99 | National - Installment | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7986 | 1003981694 | Open | | | Corporate | | | | | | | | | |
| 99 | National - Tile | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7985 | 1003981693 | Open | | | Corporate | | | | | | | | | |
| 99 | Payroll | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7972 | 1003980868 | Open | | | Corporate | | | | | | | | | |
| 99 | RCC Settlement | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7980 | 1003981688 | Open | | | Corporate | | | | | | | | | |
| 99 | Remote Deposit Centers | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7975 | 1003981683 | Open | | | Corporate | | | | | | | | | |
| 99 | Remote Deposit Corporate | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7974 | 1003981682 | Open | | | Corporate | | | | | | | | | |
| 99 | Sellers Agent Collection Account | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7981 | 1003981689 | Open | | | Corporate | | | | | | | | | |
| 99 | YSA | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7982 | 1003981690 | Open | | | Corporate | | | | | | | | | |
| 127 | Nebraska | [redacted] | McKenzie Check Advance of Nebraska, LLC | | 7992 | 1003981700 | Open | | | Deposit | | | | | | | | | |
| 127 | Nebraska | [redacted] | McKenzie Check Advance of Nebraska, LLC | | 7993 | 1003981701 | Open | | | Disbursement | | | | | | | | | |
| 222 | Michigan - AA | [redacted] | ACSO of Michigan, Inc. | | 7995 | 1003981703 | Open | | | Single | | | | | | | | | |
| 254 | Texas - ACSO | [redacted] | ACSO of Texas, L.P | | 8005 | 1003981710 | Open | | | Deposit | | | | | | | | | |
| 254 | Texas - ACSO | [redacted] | ACSO of Texas, L.P | | 8006 | 1003981711 | Open | | | Disbursement | | | | | | | | | |
| 335 | Ohio - AA Small Loan | [redacted] | Advance America Small Loans of Ohio, Inc | | 8002 | 1003981707 | Open | | | Single | | | | | | | | | |
| 335 | Ohio - NCA Small Loan | [redacted] | McKenzie Small Loans of Ohio, Inc. d/b/a National Cash Advance | | 8003 | 1003981708 | Open | | | Single | | | | | | | | | |
| 340 | South Carolina - PM | [redacted] | AAFA of South Carolina, Inc | Purpose Money | 7994 | 1003981702 | Open | | | Single | | | | | | | | | |
| 435 | Ohio - VCSO | [redacted] | VCSO of Ohio, Inc. | | 8001 | 1003981706 | Open | | | Single | | | | | | | | | |
| 535 | Ohio - ACSO | [redacted] | ACSO of Ohio, Inc. | | 7996 | 1003981704 | Open | | | Single | | | | | | | | | |
| 635 | Ohio - MCSO | [redacted] | MCSO of Ohio, Inc. | | 8000 | 1003981705 | Open | | | Single | | | | | | | | | |
| 901 | Alabama - ECA | [redacted] | Express Check Advance of Alabama, LLC | | 7020 | 1003980858 | Open | | | Liquidity | | 084000026 | - | - | 26-2/840 | | | | |
| 254 | Texas - CSO | [redacted] | ACSO of Texas, L.P. | | 7220 | 1003980841 | Open | | Mailed | Single | | 111923937 | 111923937 | 6 | 88-2393/1119 | | | | |
| 36 | Oklahoma - AA | [redacted] | Advance America, Cash Advance Centers, Inc. | Advance America, Nat | 7536 | 1003980873 | Open | | Mailed | Single | | 103100881 | 103100881 | 8 | 86-88/1031 | | | | |
| 1 | Alabama - AA | [redacted] | Advance America, Cash Advance Centers of Alabama, LLC | | 7805 | 1003980872 | Open | | ? | Single | | 062103592 | 062103592 | - | 61-359/621 | | | | |
| 901 | Alabama - ECA | [redacted] | Express Check Advance of Alabama, LLC | | 7781 | 1003980871 | Open | | ? | Single | | 062103592 | 062103592 | - | 61-359/621 | | | | |
| 36 | Oklahoma - AA | [redacted] | Advance America, Cash Advance Centers of Oklahoma, Inc. | | 7246 | 1003980762 | Open | | ? | Single | | 103101262 | 103101262 | 9 | 86-126/1031 | | | | |
| 222 | Michigan - AA | [redacted] | ACSO of Michigan, Inc. | | 7093 | 1003980881 | Open | | Mailed | Single | | 5800-2212 | 272471852 | 10 | 74-7185/2724 | | | | |
| 18 | Louisiana - AA | [redacted] | Advance America, Cash Advance Centers of Louisiana, LLC | | 7520 | 1003980891 | Open | | ? | Single | | 111101319 | 111101319 | 8 | 84-131/1111 | | | | |
| 924 | Mississippi - ECA | [redacted] | Express Check Advance of Mississippi, LLC | | 7783 | 1003980921 | Open | | | Single | | 065303784 | 065303784 | 8 | 85-378/653 | | | | |
| 99 | AANET ACH | [redacted] | Advance America, Cash Advance Centers, Inc | | 1007 | 1003980944 | Open | BAI | Online-Text Statement | Corporate | | 113024164 | 113024164 | 9 | 35-2416/1130 | | | | |
| 99 | National - ACH | [redacted] | Advance America, Cash Advance Centers, Inc. | | 1038 | 1003980947 | Open | | | Corporate | | | 113024164 | | | | | | |
| 99 | National | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7585 | 1003980941 | Open | | Online-Text Statement | Liquidity | | 113024164 | - | - | 35-2416/1130 | | | | |
| 99 | South Carolina - AAFA | [redacted] | AAFA of South Carolina, Inc | Purpose Money | 7584 | 1003980952 | Open | | Online-Text Statement | Liquidity | | 113024164 | - | - | 35-2416/1130 | | | | |
| 99 | National | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7945 | 1003980946 | Open | | Online-Text Statement | Single | | 113024164 | 113024164 | 9 | 35-2416/1130 | | | 10 | |
| 254 | Texas - CSO | [redacted] | ACSO of Texas, L.P. | | 7907 | 1003980942 | Open | BAI | Online-Text Statement | Single | | 113024164 | 113024164 | 9 | 35-2416/1130 | | | | |
| 918 | Louisiana - ECA | [redacted] | Express Check Advance of Louisiana LLC | | 7908 | 1003980943 | Open | | Online-Text Statement | Liquidity | | 113024164 | - | - | 35-2416/1130 | | | | |
| 924 | Mississippi - ECA | [redacted] | Express Check Advance of Mississippi, LLC | | 7785 | 1003980951 | Open | | | Single | | 084202251 | 084202251 | 8 | 85-225/842 | | | | |
| 249 | Wisconsin - PF and CA | [redacted] | Advance America, Cash Advance Centers of Wisconsin, Inc. | Check Advance or Pur | 7227 | 1003981041 | Open | | Online - Rufus | Single | | 071025661 | 071025661 | 10 | 2-2566/710 | | | | |
| 918 | Louisiana - ECA | [redacted] | Express Check Advance of Louisiana LLC | | 7481 | 1003981471 | Open | | Emailed | Single | | 265270413 | 265270413 | 9 | 84-7041/2652 | | | | |
| 36 | Oklahoma - AA | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7539 | 1003980991 | Open | | ? | Single | | 103111744 | 103111744 | 8 | 86-1174/1031 | | | | |
| 36 | Oklahoma - AA | [redacted] | Advance America, Cash Advance Centers of Oklahoma, Inc. | | 7551 | 1003981011 | Open | | ? | Single | | 103000703 | 103000703 | 8 | 39-70/1030 | | | | |
| 249 | Wisconsin - CA | [redacted] | Advance America, Cash Advance Centers of Wisconsin, Inc. | Purpose Finanical | 7228 | 1003981021 | Open | | Mailed | Single | | 075902968 | 075902968 | 7 | 79-296/759 | | | | |
| 14 | Indiana - AA | [redacted] | Advance America, Cash Advance Centers of Indiana, Inc. | | 7851 | 1003981001 | Open | | Mailed | Single | | 074900657 | 074901009 | 10 | 71-100/749 | | | | |
| 14 | Indiana - AA | [redacted] | Advance America, Cash Advance Centers of Indiana, Inc. | | 7161 | 1003981031 | Open | | Online | Single | | 074903719 | 074903719 | 10 | 71-371/749 | | | | |
| 99 | National | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7956 | 1003981033 | Open | | | Single | | 042205708 | 042205709 | 9 | | | | | |
| 108 | Delaware | [redacted] | Advance America, Cash Advance Centers of Delaware, Inc. | | 7556 | 1003981651 | Open | | Mailed | Single | | 999900004 | 031100092 | 9 | 62-9/311 | | | | |
| 18 | Louisiana - AA | [redacted] | Advance America, Cash Advance Centers of Louisiana, LLC | Advance America, Nat | 7518 | 1003981061 | Open | | ? | Single | | 5501-0207 | 111102075 | 9 | 84-207/1111 | | | | |
| 222 | Michigan - AA | [redacted] | ACSO of Michigan, Inc. | | 7963 | 1003981066 | Open | | | Single | | 091102807 | 091102807 | 9 | 74-280/911 | | | | |
| 18 | Louisiana - AA | [redacted] | Advance America, Cash Advance Centers of Louisiana, LLC | | 7400 | 1003981071 | Open | | Faxed | Single | | 065400483 | 065400483 | 9 | 84-48/654 | | | | |
| 94 | Mississippi - ECA | [redacted] | Express Check Advance of Mississippi, LLC | | 7794 | 1003981073 | Open | | | Single | | 084201184 | 084201184 | 8 | 85-118/842 | | | | |
| 24 | Mississippi - AA | [redacted] | Advance America, Cash Advance Centers of Mississippi, LLC | Advance America | 7401 | 1003981075 | Open | | Statement | Single | | 065301362 | 065301362 | 9 | 85-136/653 | | | | |
| 99 | Mississippi | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7451 | 1003981076 | Open | | Statement | Single | | 065301362 | 065301362 | 9 | 85-136/653 | | | | |
| 1 | Alabama - AA | [redacted] | Advance America, Cash Advance Centers of Alabama, LLC | | 7598 | 1003981081 | Open | | ? | Single | | 062204019 | 062204019 | 9 | 61-401/622 | | | | |
| 13 | Illinois - AA | [redacted] | Advance America, Cash Advance Centers of Illinois, Inc. | | 7298 | 1003981091 | Open | | Online | Single | Lockbox for 3 | 071102238 | 071102238 | 6 | 67-448/539 | | | | |
| 36 | Oklahoma - AA | [redacted] | Advance America, Cash Advance Centers of Oklahoma, Inc. | Advance America and | 7543 | 1003981101 | Open | | Mailed | Single | | 303087995 | 303087995 | 8 | 39-8799/3030 | | | | |
| 13 | Illinois - AA - 5830 | [redacted] | Advance America, Cash Advance Centers of Illinois, Inc. | | 7948 | 1003981678 | Open | | | Single | | 081204540 | 081204540 | 9 | 70-454/812 | @081204540@X*CCCCCCCCCC*XXXX | @081204540@X*CCCCCCCCCC*XXX | 10 | |
| 13 | Illinois - AA - 609 | [redacted] | Advance America, Cash Advance Centers of Illinois, Inc. | | 7947 | 1003981677 | Open | | | Single | | 081204540 | 081204540 | 9 | 70-454/812 | @081204540@X*CCCCCCCCCC*XXXX | @081204540@X*CCCCCCCCCC*XXX | 10 | |
| 13 | Illinois - AA - 617 | [redacted] | Advance America, Cash Advance Centers of Illinois, Inc. | | 7949 | 1003981679 | Open | | | Single | | 081204540 | 081204540 | 9 | 70-454/812 | @081204540@X*CCCCCCCCCC*XXXX | @081204540@X*CCCCCCCCCC*XXX | 10 | |
| 25 | Missouri - 671 | [redacted] | Advance America, Cash Advance Centers of Missouri, Inc. | | 7959 | 1003981676 | Open | | | Single | | 081204540 | 081204540 | 9 | 70-454/812 | | | | |
| 18 | Louisiana - AA | [redacted] | Advance America, Cash Advance Centers of Louisiana, LLC | | 7450 | 1003981111 | Open | | Mailed | Single | | 065203431 | 065203431 | 8 | 84-343/652 | | | | |
| 918 | Louisiana - ECA | [redacted] | Express Check Advance of Louisiana LLC | | 7795 | 1003981112 | Open | | Mailed | Single | | 065203431 | 065203431 | 8 | 84-343/652 | | | | |
| 25 | Missouri - AA | [redacted] | Advance America, Cash Advance Centers of Missouri, Inc. | | 8007 | 1003981120 | Open | | | Single | | 101911519 | 101911519 | 9 | 80-1151/1019 | | | | |
| 13 | Illinois - AA | [redacted] | Advance America, Cash Advance Centers of Illinois, Inc. | | 7075 | 1003981131 | Open | | Online | Single | | 071123204 | 071123204 | 9 | 70-2320/711 | | | | |
| 46 | Virginia - AA | [redacted] | Advance America, Cash Advance Centers of Virginia, Inc. | | 7087 | 1003981142 | Open | | | Single | | 051403122 | 051403122 | 9 | 68-312/514 | | | | |
| 946 | Viginia - ECA | [redacted] | Express Check Advance of Virginia, LLC | | 7796 | 1003981143 | Open | | | Single | | 051403122 | 051403122 | 9 | 68-312/514 | | | | |
| 222 | Michigan - AA | [redacted] | ACSO of Michigan, Inc. | | 8012 | 1003981163 | Open | | | Single | | | 075917937 | 8 | | | | | |
| 249 | Wisconsin - | [redacted] | Advance America Cash Advance Centers of Wisconsin, Inc. | Check Advance | 7245 | 1003981121 | Open | | ? | Single | | 075917937 | 075917937 | 8 | 79-297/915 | | | | |
| 46 | Virginia - AA | [redacted] | Advance America, Cash Advance Centers, Inc | Advance America | 7443 | 1003981202 | Open | | Mailed | Single | | 5001-1010 | 051406543 | 8 | 68-654/514 | | | | |
| 946 | Virginia - ECA | [redacted] | Express Check Advance of Virginia, LLC | Express Check Advan | 7077 | 1003981201 | Open | | Mailed | Single | | 5001-1010 | 051406543 | 8 | 68-654/514 | | | | |
| 14 | Indiana - AA | [redacted] | Advance America, Cash Advance Centers of Indiana, Inc. | | 7299 | 1003981211 | Open | | | Single | | 5001-0000 | 074910087 | 10 | 71-1008/749 | | | | |
| 40 | South Carolina - AA | [redacted] | Advance America, Cash Advance Centers of South Carolina, Inc. | | 7505 | 1003981231 | Open | | ? | Single | | 053202596 | 053202596 | 9 | 57-259/532 | | | | |
| 99 | Ohio - AA | [redacted] | Advance America, Cash Advance Centers, Inc. | | 7147 | 1003981241 | Open | | Mailed | Single | | 044202505 | 044202505 | 10 | 56-250/442 006 | | | | |
| 1 | Alabama - AA | [redacted] | Advance America, Cash Advance Centers of Alabama, Inc. | | 7957 | 1003981244 | Open | | | Single | | 062203010 | 062203010 | 9 | 61-301/0622 | | | | |
| 1 | Alabama - AA | [redacted] | Advance America, Cash Advance Centers of Alabama, LLC | | 7453 | 1003981252 | Open | | ? | Single | | 262287386 | 262287386 | 9 | 61-8738/2622 | | | | |
| 127 | Nebraska - AA | [redacted] | McKenzie Check Advance of Nebraska, LLC | | 7506 | 1003981251 | Open | | Mailed | Single | Lockbox for 3 | 5000-1000 | 104913912 | 9 | 76-1391/1049 | | | | |
| 46 | Virginia - AA | [redacted] | Advance America, Cash Advance Centers of Virginia, Inc. | | 7504 | 1003981261 | Open | | ? | Single | | 051404325 | 051404325 | 9 | 68-432/514 | | | | |
| 24 | Mississippi - AA | [redacted] | Advance America, Cash Advance Centers of Mississippi, LLC | | 7408 | 1003981271 | Open | | Mailed | Single | | 5021-0570 | 084205708 | 8 | 85-570/842 | | | | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 94 | Mississippi - ECA | | Express Check Advance of Mississippi, LLC | | 7799 | 1003981272 | Open | | Single | | 5021-0570 | 084205708 | 8 | 85-570/842 | | |
| 934 | Mississippi - ECA | | Express Check Advance of Mississippi, LLC | | 7474 | 1003981291 | Open | | Single | | 065302303 | 065302303 | 8 | 85-230/653 | | |
| 254 | Texas - CSO | | ACSO of Texas, L.P. | | 7089 | 1003981301 | Open | Emailed | Single | | 113122655 | 113122655 | 9 | 88-278/1149 | | |
| 36 | Oklahoma - AA | | Advance America, Cash Advance Centers of Oklahoma, Inc. | | 7540 | 1003981311 | Open | Mailed | Single | Lockbox for S | 5505-0531 | 103112594 | 8 | 86-1259/103 | | |
| 18 | Louisiana - AA | | Advance America, Cash Advance Centers of Louisiana, LLC | | 7548 | 1003981321 | Open | None | Liquidity | | 065205264 | | | | | |
| 99 | Mississippi - ECA | | Express Check Advance of Mississippi, LLC | | 7477 | 1003981332 | Open | Mailed | Single | | 084201294 | 084201294 | 10 | 85-129/842 | | |
| 99 | National | | Advance America, Cash Advance Centers, Inc. | Advance America, Na | 7892 | 1003981074 | Open | Mailed | Single | | 084201621 | 084201621 | 9 | 85-162/842 28 | | |
| 99 | National | | Advance America, Cash Advance Centers, Inc. | | 8015 | 1003981347 | Open | | Corporate | | 83001314 | 83001314 | 9 | 21-131/830 | | |
| 99 | AANET Lending - ACH | | Advance America, Cash Advance Centers, Inc. | | 8014 | 1003981346 | Open | | Single | | 071001180 | 071001180 | 9 | | | |
| 99 | NCP Collateral DACA | | Advance America, Cash Advance Centers, Inc. | | 7916 | 1003981342 | Open | Online | Corporate | | | | | | | |
| 99 | NCP Collateral DACA | | Advance America, Cash Advance Centers, Inc. | | 7914 | 1003981343 | Open | Online | Corporate | | 071001180 | 071001180 | 9 | 2-118/710 | | |
| 99 | Image Cash Letter | | Advance America, Cash Advance Centers, Inc. | | 8019 | 1003981348 | Open | Deposit | Single | | 5209-0600 | 071001180 | 9 | 2-118/710 | | |
| 99 | National | | Advance America, Cash Advance Centers of Virginia, Inc. | | 7917 | 1003981344 | Open | Online | Single | Lockbox for S | 5209-0600 | 071001180 | 9 | 2-118/710 | @071001180@#XCCCCCCCCC*XXXXXXXX | @5209-0600@#XCCCCCCCCC*XXXXXXXX | 10 |
| 940 | Virginia - AA | | Express Check Advance of Virginia, LLC | | 7448 | 1003981352 | Open | Mailed | Single | | 051409074 | 051409074 | 9 | 68-907/514 | | |
| 18 | Louisiana - AA | | Advance America, Cash Advance Centers of Louisiana, LLC | | 7517 | 1003981372 | Open | Statement | Single | | 111102059 | 111102059 | 8 | 84-205/1111 | | |
| 918 | Louisiana - ECA | | Express Check Advance of Louisiana, LLC | | 7478 | 1003981371 | Open | Statement | Single | | 111102059 | 111102059 | 8 | 84-205/1111 | | |
| 42 | Tennessee - AA | | Advance America, Cash Advance Centers of Tennessee, Inc. | | 7083 | 1003980811 | Open | Emailed | Single | | 5001-0129 | 082900432 | 9 | 81-43/829 | | |
| 9 | Florida - AA | | Advance America, Cash Advance Centers of Florida, LLC | | 7183 | 1003981412 | Open | Mailed | Single | | 061205844 | 061205844 | 9 | 64-584/612 | | |
| 25 | Missouri - AA | | Advance America, Cash Advance Centers of Missouri, Inc. | | 7953 | 1003981420 | Open | | Single | | 281573259 | 281573259 | 9 | 80-7325/2615 | @281573259@#XXXXCCCCCCCCC*XXX | @281573259@#XXXXCCCCCCCCC*XX | 9 |
| 1 | Alabama - AA | | Advance America, Cash Advance Centers of Alabama, LLC | | 7576 | 1003981421 | Open | | Single | | 530010007 | 530010007 | 9 | 65-657/621 | | |
| 40 | South Carolina - AA | | Advance America, Cash Advance Centers of South Carolina, Inc. | | 7932 | 1003981431 | Open | ? | Single | | 253272009 | 253272009 | 9 | 67-7200/2532 | | |
| 14 | Indiana - AA | | Advance America, Cash Advance Centers of Indiana, Inc. | | 7013 | 1003981441 | Open | Emailed | Single | | 074901672 | 074901672 | 10 | 71-167/749 | | |
| 1 | Alabama - AA | | Advance America, Cash Advance Centers of Alabama, Inc. | | 7958 | 1003981443 | Open | | Single | | 5011-0141 | 084202219 | 9 | 85-221/842 | | |
| 99 | Kansas | | Advance America, Cash Advance Centers, Inc. | Advance America and | 7021 | 1003981462 | Open | Mailed | Single | | 101100621 | 101100621 | 9 | 38-62/1011 | | |
| 254 | Texas - CSO | | ACSO of Texas, L.P. | | 7756 | 1003980761 | Open | Mailed | Single | | 111923238 | 111923238 | 8 | 88-3571/1119 | | |
| 14 | Indiana - AA | | Advance America, Cash Advance Centers of Indiana, Inc. | | 7169 | 1003981491 | Open | ? | Single | | 074902503 | 074902503 | 9 | 71-250/749 | | |
| 42 | Tennessee - AA | | Advance America, Cash Advance Centers of Tennessee, Inc. | Advance America or C | 7811 | 1003980614 | Open | ? | Single | | 064105336 | 064105336 | 9 | 87-533/641 | | |
| 99 | Louisiana | | Advance America, Cash Advance Centers of Alabama, Inc. | | 7905 | 1003981501 | Open | ? | Single | | 065303360 | 065303360 | 8 | 85-3365/590 | | |
| 94 | Mississippi - ECA | | Express Check Advance of Mississippi, LLC | | 7482 | 1003981242 | Open | Mailed | Single | | 065500752 | 065500752 | 9 | 85-75/655 | | |
| 1 | Alabama - AA | | Advance America, Cash Advance Centers of Alabama, LLC | Advance America, Fir | 7951 | 1003981681 | Open | Emailed | Single | Lockbox for E | 5800-1001 | 063300279 | 9 | 85-27/653 | @062101033@XXCCXCCCC XC*XXXXX | @5022-0103@XXCCXCCCCXC*XXXX | 7 |
| 25 | Missouri - AA | | Advance America, Cash Advance Centers of Missouri, Inc. | | 7098 | 1003981561 | Open | Mailed | Single | | 284174134 | 284174134 | 9 | 81-7413/2841 | | |
| 46 | Virginia - AA | | Advance America, Cash Advance Centers of Virginia, Inc. | | 7745 | 1003981171 | Open | Mailed | Single | | 051403164 | 051403164 | 10 | 68-316/514 | | |
| 940 | Virginia - ECA | | Express Check Advance of Virginia, LLC | | 7483 | 1003981572 | Open | Mailed | Single | | 051404529 | 051404529 | 9 | 68-316/514 | | |
| 940 | Virginia - Title | | Advance America, Cash Advance Centers of Virginia, Inc. | | 7925 | 1003981573 | Open | Mailed | Single | | | | | | | |
| 46 | Virginia - AA | | Advance America, Cash Advance Centers of Virginia, Inc. | Advance America | 7076 | 1003981451 | Open | Mailed | Single | | 051402220 | 051402220 | 9 | 68-222/514 | | |
| 940 | Virginia - ECA | | Express Check Advance of Virginia, LLC | Express Check Advan | 7480 | 1003981452 | Open | Mailed | Single | | 051402220 | 051402220 | 9 | 68-222/514 | | |
| 249 | Wisconsin - ECA | | Advance America, Cash Advance Centers of Wisconsin, Inc. | Check Advance | 7225 | 1003981574 | Open | ? | Single | | 075902120 | 075902120 | 9 | 79-212/759 | | |
| 1 | Alabama - AA | | Advance America, Cash Advance Centers of Alabama, Inc. | | 7079 | 1003981581 | Open | Mailed | Single | | 062102098 | 062102098 | 9 | 61-209/621 | | |
| 901 | Alabama - AA | | Express Check Advance of Alabama, LLC | | 7484 | 1003981582 | Open | | Single | | 062102098 | 062102098 | 9 | 61-209/621 | | |
| 25 | Missouri - AA | | Advance America, Cash Advance Centers of Missouri, Inc. | | 7283 | 1003981601 | Open | Statement | Single | | 101901833 | 101901833 | 9 | 80-183/1019 | | |
| 443 | Utah - AA | | Advance America Cash Advance Center of Utah, Inc. | | 7950 | 1003981680 | Open | | Single | | 124000054 | 981119365 | 9 | | | |











# EXHIBIT 24

# FILED UNDER SEAL

EXHIBIT 25

# FILED UNDER SEAL

# EXHIBIT 26

# FILED UNDER SEAL

# EXHIBIT A

PROTECTED IN FORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**Exhibit A**
**to Plaintiff Advance America's**
**Objections and Responses to Defendants'**
**First Set of Interrogatories**

| Bank | Account Closing Email | Last 4 Digits | Reason |
|------|----------------------|---------------|--------|
| | 2/15/2008 | | |
| | 3/19/2008 | | |
| | 5/2/2008 | | |
| | 8/28/2008 | | |
| | 4/7/2009 | | |
| | 4/10/2009 | | |
| | 5/12/2009 | | |
| | 10/12/2009 | | |
| | 4/5/2010 | | |
| | 6/28/2010 | | |
| | 6/29/2010 | | |
| | 7/5/2010 | | |
| | 7/14/2010 | | |
| | 7/20/2010 | | |
| | 9/14/2010 | | |
| | 2/24/2011 | 7287 | unknown |
| | 5/16/2012 | 6356 | No MSB and/or Payday |
| | 7/24/2012 | 9332 | No MSB and/or Payday |
| | 7/24/2012 | 4115 | No MSB and/or Payday |
| | 8/27/2012 | 4102 | No MSB and/or Payday |
| | 8/29/2012 | 0693 | No MSB and/or Payday |
| | 8/29/2012 | 9002 | No MSB and/or Payday |

1

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| 8/29/2012 | 3950 | No MSB and/or Payday |
| 8/29/2012 | 6339 | No MSB and/or Payday |
| 8/29/2012 | 2356 | No MSB and/or Payday |
| 8/29/2012 | 5428 | No MSB and/or Payday |
| 8/29/2012 | 8878 | No MSB and/or Payday |
| 8/29/2012 | 9096 | No MSB and/or Payday |
| 8/29/2012 | 0000 | No MSB and/or Payday |
| 8/29/2012 | 2692 | No MSB and/or Payday |
| 8/29/2012 | 3181 | No MSB and/or Payday |
| 8/29/2012 | 3507 | No MSB and/or Payday |
| 8/29/2012 | 6483 | No MSB and/or Payday |
| 8/29/2012 | 0495 | No MSB and/or Payday |
| 8/29/2012 | 0398 | No MSB and/or Payday |
| 8/29/2012 | 3178 | No MSB and/or Payday |
| 8/29/2012 | 3316 | No MSB and/or Payday |
| 8/29/2012 | 3194 | No MSB and/or Payday |
| 8/29/2012 | 3523 | No MSB and/or Payday |
| 8/29/2012 | 2020 | No MSB and/or Payday |
| 8/29/2012 | 8628 | No MSB and/or Payday |
| 8/29/2012 | 0602 | No MSB and/or Payday |
| 8/29/2012 | 8146 | No MSB and/or Payday |
| 8/29/2012 | 4522 | No MSB and/or Payday |
| 8/29/2012 | 5972 | No MSB and/or Payday |
| 8/29/2012 | 8493 | No MSB and/or Payday |
| 9/20/2012 | 1917 | No MSB and/or Payday |
| 10/15/2012 | 3001 | No MSB and/or Payday |
| 10/25/2012 | 5206 | No MSB and/or Payday |
| 10/25/2012 | 7006 | No MSB and/or Payday |
| 11/23/2012 | 6371 | unknown |

2

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA



| | | |
|---|---|---|
| 12/4/2012 | 7355 | unknown |
| 12/13/2012 | 2181 | No MSB and/or Payday |
| 1/22/2013 | 5548 | No MSB and/or Payday |
| 2/20/2013 | 8053 | No MSB and/or Payday |
| 2/28/2013 | 4465 | No MSB and/or Payday |
| 3/18/2013 | 1673 | unknown |
| 3/18/2013 | 1908 | unknown |
| 3/18/2013 | 7823 | unknown |
| 3/18/2013 | 7831 | unknown |
| 3/18/2013 | 8913 | unknown |
| 3/18/2013 | 2770 | unknown |
| 3/18/2013 | 1914 | unknown |
| 3/18/2013 | 1250 | unknown |
| 3/18/2013 | 5890 | unknown |
| 3/18/2013 | 9472 | unknown |
| 3/18/2013 | 3381 | unknown |
| 3/25/2013 | 3673 | unknown |
| 3/25/2013 | 7170 | unknown |
| 3/27/2013 | 5143 | unknown |
| 4/1/2013 | 7098 | No MSB and/or Payday |
| 4/1/2013 | 7179 | No MSB and/or Payday |
| 4/1/2013 | 9609 | No MSB and/or Payday |
| 4/1/2013 | 9190 | No MSB and/or Payday |
| 4/1/2013 | 9200 | No MSB and/or Payday |
| 4/1/2013 | 9213 | No MSB and/or Payday |
| 4/1/2013 | 9226 | No MSB and/or Payday |
| 4/1/2013 | 9239 | No MSB and/or Payday |
| 4/1/2013 | 9255 | No MSB and/or Payday |
| 4/1/2013 | 9284 | No MSB and/or Payday |

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| 4/1/2013 | 9297 | No MSB and/or Payday |
| 4/1/2013 | 6075 | No MSB and/or Payday |
| 4/1/2013 | 0534 | No MSB and/or Payday |
| 4/1/2013 | 8052 | unknown |
| 4/2/2013 | 8299 | No MSB and/or Payday |
| 4/2/2013 | 8655 | No MSB and/or Payday |
| 4/2/2013 | 3268 | No MSB and/or Payday |
| 4/2/2013 | 3454 | No MSB and/or Payday |
| 4/2/2013 | 4239 | No MSB and/or Payday |
| 4/2/2013 | 4247 | No MSB and/or Payday |
| 4/2/2013 | 4573 | No MSB and/or Payday |
| 4/2/2013 | 4662 | No MSB and/or Payday |
| 4/2/2013 | 7082 | No MSB and/or Payday |
| 4/2/2013 | 7724 | No MSB and/or Payday |
| 4/2/2013 | 7848 | No MSB and/or Payday |
| 4/2/2013 | 2671 | No MSB and/or Payday |
| 4/2/2013 | 2736 | No MSB and/or Payday |
| 4/2/2013 | 2779 | No MSB and/or Payday |
| 4/2/2013 | 1190 | No MSB and/or Payday |
| 4/2/2013 | 1698 | No MSB and/or Payday |
| 4/2/2013 | 6034 | No MSB and/or Payday |
| 4/2/2013 | 6247 | No MSB and/or Payday |
| 4/2/2013 | 6298 | No MSB and/or Payday |
| 4/9/2013 | 6830 | unknown |
| 4/9/2013 | 8926 | unknown |
| 4/10/2013 | 3316 | No MSB and/or Payday |
| 4/17/2013 | 0087 | unknown |
| 4/24/2013 | 1700 | unknown |
| 4/24/2013 | 6939 | unknown |

4

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA



| Date | Number | Status |
|---|---|---|
| 4/24/2013 | 9736 | unknown |
| 4/30/2013 | 7137 | No MSB and/or Payday |
| 4/30/2013 | 4297 | No MSB and/or Payday |
| 4/30/2013 | 9619 | No MSB and/or Payday |
| 5/7/2013 | 6279 | unknown |
| 5/7/2013 | 6756 | unknown |
| 5/21/2013 | 9447 | No MSB and/or Payday |
| 5/21/2013 | 1337 | No MSB and/or Payday |
| 5/23/2013 | 7785 | unknown |
| 5/23/2013 | 7793 | unknown |
| 5/29/2013 | 3660 | unknown |
| 5/29/2013 | 6798 | unknown |
| 6/10/2013 | 2745 | No MSB and/or Payday |
| 6/10/2013 | 7448 | No MSB and/or Payday |
| 6/25/2013 | 6271 | No MSB and/or Payday |
| 6/25/2013 | 9344 | unknown |
| 6/25/2013 | 9612 | unknown |
| 6/25/2013 | 3890 | unknown |
| 6/26/2013 | 0205 | unknown |
| 6/27/2013 | 1701 | unknown |
| 6/27/2013 | 8284 | unknown |
| 6/27/2013 | 9294 | unknown |
| 6/27/2013 | 8234 | unknown |
| 6/27/2013 | 9216 | unknown |
| 6/27/2013 | 8260 | unknown |
| 7/3/2013 | 5433 | No MSB and/or Payday |
| 7/8/2013 | 9503 | unknown |
| 7/9/2013 | 5835 | unknown |
| 7/9/2013 | 4607 | unknown |

5

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| 7/9/2013 | 0381 | unknown |
| 7/9/2013 | 3816 | unknown |
| 7/9/2013 | 1618 | unknown |
| 7/26/2013 | 1894 | unknown |
| 7/26/2013 | 1886 | unknown |
| 8/15/2013 | 6492 | unknown |
| 8/15/2013 | 3551 | unknown |
| 8/15/2013 | 9487 | unknown |
| 8/15/2013 | 5132 | unknown |
| 8/15/2013 | 6948 | unknown |
| 8/15/2013 | 7619 | unknown |
| 8/15/2013 | 4599 | unknown |
| 8/15/2013 | 4581 | unknown |
| 8/15/2013 | 1880 | unknown |
| 9/16/2013 | 5051 | No MSB and/or Payday |
| 10/3/2013 | 1532 | unknown |
| 10/8/2013 | 7403 | No MSB and/or Payday |
| 10/8/2013 | 7288 | No MSB and/or Payday |
| 10/18/2013 | 4645 | No MSB and/or Payday |
| 10/18/2013 | 4607 | unknown |
| 10/25/2013 | 3866 | No MSB and/or Payday |
| 11/6/2013 | 6041 | No MSB and/or Payday |
| 3/26/2014 | 4068 | No MSB and/or Payday |
| 5/29/2014 | 7997 | No MSB and/or Payday |
| 6/2/2014 | 2142 | No MSB and/or Payday |
| 6/2/2014 | 6417 | No MSB and/or Payday |
| 6/4/2014 | 0775 | No MSB and/or Payday |
| 6/10/2014 | 9034 | No MSB and/or Payday |
| 6/27/2014 | 2685 | No MSB and/or Payday |

6

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| 6/27/2014 | 2693 | No MSB and/or Payday |
| 6/27/2014 | 7206 | No MSB and/or Payday |
| 6/27/2014 | 5028 | No MSB and/or Payday |
| 6/27/2014 | 5044 | No MSB and/or Payday |
| 6/27/2014 | 5010 | No MSB and/or Payday |
| 6/27/2014 | 2733 | No MSB and/or Payday |
| 6/27/2014 | 5143 | No MSB and/or Payday |
| 6/27/2014 | 7110 | No MSB and/or Payday |
| 6/30/2014 | 3604 | No MSB and/or Payday |
| 7/1/2014 | 5036 | No MSB and/or Payday |
| 7/28/2014 | 7318 | No MSB and/or Payday |
| 7/31/2014 | 3074 | unknown |
| 8/4/2014 | 6101 | No MSB and/or Payday |
| 8/4/2014 | 0714 | No MSB and/or Payday |
| 8/4/2014 | 5069 | No MSB and/or Payday |
| 8/4/2014 | 0730 | No MSB and/or Payday |
| 8/4/2014 | 0722 | No MSB and/or Payday |
| 8/4/2014 | 0101 | No MSB and/or Payday |
| 8/4/2014 | 8001 | No MSB and/or Payday |
| 8/7/2014 | 2022 | No MSB and/or Payday |
| 8/8/2014 | 5940 | unknown |
| 9/9/2014 | 1049 | No MSB and/or Payday |
| 10/2/2014 | 7496 | No MSB and/or Payday |
| 10/6/2014 | 4373 | No MSB and/or Payday |
| 10/6/2014 | 2691 | No MSB and/or Payday |
| 10/7/2014 | 0186 | No MSB and/or Payday |
| 10/7/2014 | 7292 | No MSB and/or Payday |
| 10/7/2014 | 6042 | No MSB and/or Payday |
| 10/7/2014 | 9919 | No MSB and/or Payday |

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| 10/7/2014 | 0860 | No MSB and/or Payday |
| 10/7/2014 | 0836 | No MSB and/or Payday |
| 10/7/2014 | 3356 | No MSB and/or Payday |
| 10/7/2014 | 7716 | No MSB and/or Payday |
| 10/7/2014 | 3720 | No MSB and/or Payday |
| 10/7/2014 | 0771 | No MSB and/or Payday |
| 10/8/2014 | 9516 | No MSB and/or Payday |
| 10/8/2014 | 9861 | No MSB and/or Payday |
| 10/8/2014 | 5502 | No MSB and/or Payday |
| 10/8/2014 | 9431 | No MSB and/or Payday |
| 10/8/2014 | 6661 | No MSB and/or Payday |
| 10/8/2014 | 9500 | No MSB and/or Payday |
| 10/8/2014 | 7896 | No MSB and/or Payday |
| 10/8/2014 | 3467 | No MSB and/or Payday |
| 10/8/2014 | 9492 | No MSB and/or Payday |
| 10/8/2014 | 2020 | No MSB and/or Payday |
| 10/8/2014 | 5140 | No MSB and/or Payday |
| 10/8/2014 | 7625 | No MSB and/or Payday |
| 10/8/2014 | 2784 | No MSB and/or Payday |
| 10/8/2014 | 2842 | No MSB and/or Payday |
| 10/8/2014 | 7229 | No MSB and/or Payday |
| 10/8/2014 | 2909 | No MSB and/or Payday |
| 10/8/2014 | 7346 | No MSB and/or Payday |
| 10/8/2014 | 7072 | No MSB and/or Payday |
| 10/8/2014 | 7585 | No MSB and/or Payday |
| 10/8/2014 | 7460 | No MSB and/or Payday |
| 10/8/2014 | 7122 | No MSB and/or Payday |
| 10/8/2014 | 7643 | No MSB and/or Payday |
| 10/8/2014 | 7080 | No MSB and/or Payday |

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| 10/8/2014 | 7098 | No MSB and/or Payday |
| 10/8/2014 | 7130 | No MSB and/or Payday |
| 10/8/2014 | 7114 | No MSB and/or Payday |
| 10/8/2014 | 7064 | No MSB and/or Payday |
| 10/8/2014 | 7106 | No MSB and/or Payday |
| 10/8/2014 | 7528 | No MSB and/or Payday |
| 10/8/2014 | 1026 | No MSB and/or Payday |
| 10/8/2014 | 0010 | No MSB and/or Payday |
| 10/8/2014 | 1083 | No MSB and/or Payday |
| 10/8/2014 | 7521 | No MSB and/or Payday |
| 10/8/2014 | 6671 | No MSB and/or Payday |
| 10/8/2014 | 2211 | No MSB and/or Payday |
| 10/8/2014 | 4554 | No MSB and/or Payday |
| 10/14/2014 | 3047 | unknown |
| 11/3/2014 | 2370 | No MSB and/or Payday |
| 11/21/2014 | 7042 | unknown |
| 11/21/2014 | 9841 | unknown |
| 11/21/2014 | 1338 | unknown |
| 11/21/2014 | 9615 | unknown |
| 5/12/2015 | 4001 | unknown |
| 5/12/2015 | 6601 | unknown |
| 5/12/2015 | 2601 | unknown |
| 5/12/2015 | 7701 | unknown |
| 5/12/2015 | 1201 | unknown |
| 6/10/2015 | 8003 | No MSB and/or Payday |
| 6/10/2015 | 2204 | No MSB and/or Payday |
| 6/10/2015 | 9459 | No MSB and/or Payday |
| 9/1/2015 | 8625 | No MSB and/or Payday |
| 9/1/2015 | 1779 | No MSB and/or Payday |

9

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA



| | | |
|---|---|---|
| 9/1/2015 | 3025 | No MSB and/or Payday |
| 9/1/2015 | 8619 | No MSB and/or Payday |
| 9/1/2015 | 8610 | No MSB and/or Payday |
| 2/1/2016 | 2190 | No MSB and/or Payday |
| 3/24/2016 | 2760 | No MSB and/or Payday |
| 7/15/2016 | 6673 | No MSB and/or Payday |
| 10/14/2016 | 9372 | No MSB and/or Payday |
| 11/29/2016 | 6692 | No MSB and/or Payday |
| 11/29/2016 | 9900 | No MSB and/or Payday |
| 11/29/2016 | 7530 | No MSB and/or Payday |
| 11/29/2016 | 9853 | No MSB and/or Payday |
| 11/29/2016 | 9146 | No MSB and/or Payday |
| 11/29/2016 | 8384 | No MSB and/or Payday |
| 11/29/2016 | 6870 | No MSB and/or Payday |
| 11/29/2016 | 7510 | No MSB and/or Payday |
| 2/7/2017 | 4309 | No MSB and/or Payday |
| 2/10/2017 | 4612 | No MSB and/or Payday |
| 2/10/2017 | 9210 | No MSB and/or Payday |
| 3/1/2017 | 2936 | No MSB and/or Payday |
| 4/12/2017 | 5667 | No MSB and/or Payday |
| 4/12/2017 | 8864 | No MSB and/or Payday |
| 4/12/2017 | 7643 | No MSB and/or Payday |
| 4/12/2017 | 5576 | No MSB and/or Payday |
| 4/12/2017 | 6101 | No MSB and/or Payday |
| 4/12/2017 | 9025 | No MSB and/or Payday |
| 4/12/2017 | 4686 | No MSB and/or Payday |
| 4/12/2017 | 8823 | No MSB and/or Payday |
| 4/12/2017 | 2072 | No MSB and/or Payday |
| 4/12/2017 | 6121 | No MSB and/or Payday |

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| | 4/12/2017 | 2417 | No MSB and/or Payday |
| | 4/12/2017 | 2118 | No MSB and/or Payday |
| | 4/12/2017 | 0925 | No MSB and/or Payday |
| | 4/12/2017 | 1174 | No MSB and/or Payday |
| | 4/12/2017 | 7387 | No MSB and/or Payday |
| | 4/12/2017 | 9417 | No MSB and/or Payday |
| | 4/12/2017 | 5063 | No MSB and/or Payday |
| | 4/12/2017 | 7472 | No MSB and/or Payday |
| | 4/12/2017 | 2779 | No MSB and/or Payday |
| | 4/12/2017 | 3781 | No MSB and/or Payday |
| | 4/12/2017 | 2696 | No MSB and/or Payday |
| | 4/12/2017 | 2589 | No MSB and/or Payday |
| | 4/12/2017 | 4951 | No MSB and/or Payday |
| | 4/12/2017 | 3773 | No MSB and/or Payday |
| | 4/12/2017 | 0761 | No MSB and/or Payday |
| | 4/12/2017 | 4102 | No MSB and/or Payday |
| | 4/12/2017 | 5446 | No MSB and/or Payday |
| | 4/12/2017 | 5784 | No MSB and/or Payday |
| | 4/12/2017 | 5701 | No MSB and/or Payday |
| | 4/12/2017 | 1843 | No MSB and/or Payday |
| | 4/12/2017 | 4700 | No MSB and/or Payday |
| | 4/12/2017 | 0602 | No MSB and/or Payday |
| | 4/12/2017 | 9748 | No MSB and/or Payday |
| | 4/12/2017 | 7124 | No MSB and/or Payday |
| | 4/12/2017 | 9830 | No MSB and/or Payday |
| | 4/12/2017 | 8930 | No MSB and/or Payday |
| | 4/12/2017 | 5461 | No MSB and/or Payday |
| | 4/12/2017 | 6204 | No MSB and/or Payday |
| | 4/12/2017 | 4428 | No MSB and/or Payday |

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA



| | | |
|---|---|---|
| 4/12/2017 | 5793 | No MSB and/or Payday |
| 4/12/2017 | 9516 | No MSB and/or Payday |
| 4/12/2017 | 4095 | No MSB and/or Payday |
| 4/12/2017 | 4053 | No MSB and/or Payday |
| 4/12/2017 | 5961 | No MSB and/or Payday |
| 4/12/2017 | 1050 | No MSB and/or Payday |
| 4/26/2017 | 9138 | No MSB and/or Payday |
| 4/26/2017 | 9154 | No MSB and/or Payday |
| 4/26/2017 | 3202 | unknown |
| 4/26/2017 | 1177 | unknown |
| 6/19/2017 | 7480 | No MSB and/or Payday |
| 6/19/2017 | 2196 | No MSB and/or Payday |
| 6/28/2017 | 9330 | No MSB and/or Payday |
| 2011 - 2016 | 6263 | No MSB and/or Payday |
| 2011 - 2016 | 1810 | No MSB and/or Payday |

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE
PROTECTIVE ORDER OF THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

# EXHIBIT 27

**To:**     Ovenden, James
**From:**  "Fulmer, Jamie" <MAILER-DAEMON>
**Subject:** RE:
**Date:**   Thu, 06 Mar 2014 15:18:43 +0000

O h ok...will add them in then.

*Jamie*

**From:** Ovenden, James
**Sent:** Thursday, March 06, 2014 10:18 AM
**To:** Fulmer, Jamie
**Subject:** RE:

No....they were post Grupo....actually because of Grupo!

**From:** Fulmer, Jamie
**Sent:** Thursday, March 06, 2014 10:17 AM
**To:** Ovenden, James
**Subject:** RE:

We did because we were focusing on from Grupo acquisition forward....they were before that weren't they?

*Jamie*

**From:** Ovenden, James
**Sent:** Thursday, March 06, 2014 10:03 AM
**To:** Fulmer, Jamie
**Subject:** RE:

For some reason we have left off B of A?

**From:** Fulmer, Jamie
**Sent:** Thursday, March 06, 2014 9:01 AM
**To:** Ovenden, James; Rudolph, Christian
**Subject:**

Here is Chokepoint deck I was telling you about.

*Jamie Fulmer*
*Senior Vice President of Public Affairs*
*Advance America, Cash Advance Centers, Inc.*
*135 N. Church Street*
*Spartanburg, SC 29306*
*864-342-5633*
*Email: jfulmer@advanceamerica.net*

Protected - Attorneys' Eyes Only

AA268445

# EXHIBIT 28

**Date:**     Mon, 22 Apr 2013 18:27:57 +0000
**Subject:** RE: Meeting
**From:**     "Nelson, Dale" <MAILER-DAEMON>
**To:**       Spain, Melissa

Below are some of the things I have been hearing and a few thoughts. Let me know if I am way off track here with committee's intent ....

Isite

I have been hearing that the Isite is of poor design and seems unorganized and difficult to locate data. The iSite does not seem to have a professional flow as other company intranet services which make it difficult for internal customers to use.

The Isite has a location for an idea Bank that is listed with outdated information. Asking for employee feedback is very useful only if that feedback is being replied to. We either need to update this section or remove it all together.

There seems to be some general confusion around if people are to utilize the Source or the Ops communication process to find the most recent up to date information.

Office Moving

There is a feeling of nervousness growing around whether or not jobs / office building will be moving. Employees recall that a year agreement was made to stay in Spartanburg, which is near to expire.

Bank Changes

We all work very hard to keep the company brand / product held at a high standard. Over the last six months, we have had four or more major banks close our account due to MSB registration / foreign ownership. Even though Treasury has worked to keep the changes as smooth as possible there seems to be a growing feeling of "banks do not like us". I think we need to somehow ease this feeling and keep trying to promote a sense of pride in our organization. These changes have impacted around 1600 centers, as well as, major corporate accounts.

## Dale Nelson
Treasury Manager
Advance America, Cash Advance Centers, Inc.
135 North Church Street
Spartanburg, SC 29306
Phone (864) 342-5655
Fax (864) 580-5458
EFax (864) 336-7715

 Before printing this e-mail, think if it is necessary. Think Green.

**From:** Spain, Melissa
**Sent:** Monday, April 22, 2013 9:21 AM
**To:** Nelson, Dale
**Subject:** RE: Meeting

Yes, that would be great.

Thank you,
Melissa

**From:** Nelson, Dale
**Sent:** Monday, April 22, 2013 9:00 AM
**To:** Spain, Melissa
**Subject:** Meeting

Melissa:

I just wanted to let you know I will be out of the office half of the day tomorrow and will miss our meeting. Would you like for me to e mail you my thoughts / comments?

## Dale Nelson
Treasury Manager
Advance America, Cash Advance Centers, Inc.
135 North Church Street
Spartanburg, SC 29306
Phone (864) 342-5655
Fax (864) 580-5458
EFax (864) 336-7715

 Before printing this e-mail, think if it is necessary. Think Green.

Protected - Attorneys' Eyes Only                                                                      AA367279

Protected - Attorneys' Eyes Only

# EXHIBIT 29

## Update on relationship exit of banking partners

**Major Relationship Banks:**
- ███████████ notified 06/06/12 – effective 11/30/12
- ███████████ notified 09/11/12 – effective  April 2013
- ███████████ /25/13 – effective 05/31/13
- ███████████ 03/05/13 – effective 05/31/13

**Other Relationship Banks that closed accounts in 2013:**
- 
- 
- 
- 

**Decisions are driven by a number of factors including:**
1. Compliance risk of banking an MSB (Money Service Business)
2. Foreign ownership
3. Adverse publicity and general enterprise risk of banking the payday industry

1

**ADVANCE AMERICA**

Protected - Attorneys' Eyes Only



## Current Bank Relationships

2

ADVANCE AMERICA

Protected - Attorneys' Eyes Only

AA197601



## Alternatives for ██████████

- We are working on establishing bank account relationships with other banks.
- Some of these centers will have to be serviced by Armored Courier.
- VA will likely be the most challenging market given the large footprint of ██████

3

$ ADVANCE AMERICA

Protected - Attorneys' Eyes Only

AA197602

## Strategy for 2013 to reduce reliance on local banks



- **Smart Safe Solution (Cash Recycler) – 53rd Bank**
  - Proof of concept phase – being piloted in three locations
  - Benefits:
    - Servicing of safe is managed by bank
    - Increases employee efficiency
    - Bank provides provisional daily credit while cash is still in the safe
    - Safe allows for deposits & withdrawals
    - Alternative to local banking relationship
- **Remote Deposit**
  - Alternative where banks do not want to service check cashing locations or where a cash recycler is used
- **Debit Card Acceptance**
  - We have met with two vendors to assess technical capabilities and solicit a formal proposal
  - Reduces cash handled at centers and the need to make frequent deposits
- **Purpose Card – Loan 2 Card**
  - Loan 2 Card feature would provide customers with an alternative to a check issued by Advance America that is drawn on a bank which is not conveniently located for the customer

4

ADVANCE AMERICA

AA197603

## Strategy to pro-actively manage bank relationship

- Foster existing banking relationship through meetings with senior management

- Consider hiring a consulting / audit group with strong regulatory background that has credibility in the banking industry

- Periodically engage with senior management of larger financial institutions with a view to re-establishing relationships

- Consider changing the product offering in some markets to avoid FINCEN MSB registration, i.e. limit Check2Card limit to under $1,000 per person per day

5

**$ ADVANCE AMERICA**

# EXHIBIT 30

**To:**       "Nelson, Dale" <DNelson@advanceamerica.net>
**From:**     "Emery, Tim" <temery@advanceamerica.net>
**Subject:** RE: Bank Locations
**Date:**     Mon, 8 Apr 2013 14:36:27 -0400

I will get the DDO to send a couple of suggestions.

Tim Emery

DO R40
Advance America / ECA Centers
(757) 513-1049
Efax 864-336-7072

**From:** Nelson, Dale
**Sent:** Monday, April 08, 2013 2:32 PM
**To:** Emery, Tim
**Subject:** RE: Bank Locations

It is due to industry / MSB requirements.

 will not work with us either. We have some leads for some other VA banks but it is tough as the banks below control most of the market.

## Dale Nelson
Treasury Manager
Advance America, Cash Advance Centers, Inc.
135 North Church Street
Spartanburg, SC  29306
Phone (864) 342-5655
Fax (864) 580-5458
EFax (864) 336-7715

Before printing this e-mail, think if it is necessary. Think Green.

**From:** Emery, Tim
**Sent:** Monday, April 08, 2013 2:29 PM
**To:** Nelson, Dale
**Subject:** RE: Bank Locations

Just curious, is that an industry issue or an AA issue?

What about more local type banks? Branch 2052 has a ████████ closer.

Tim Emery

DO R40
Advance America / ECA Centers
(757) 513-1049
Efax 864-336-7072

**From:** Nelson, Dale
**Sent:** Monday, April 08, 2013 2:16 PM
**To:** Emery, Tim
**Subject:** RE: Bank Locations

Options are very limited. If you send a suggestion, I can see if that bank has already been contacted for an account. ████████████ have all asked that we exit the relationship with their bank. The exit of ████████ is painful especially in VA. In most cases, centers are assigned to banks of further distance as a last resort.

## Dale Nelson
Treasury Manager
Advance America, Cash Advance Centers, Inc.
135 North Church Street
Spartanburg, SC  29306
Phone (864) 342-5655
Fax (864) 580-5458
EFax (864) 336-7715

 Before printing this e-mail, think if it is necessary. Think Green.

**From:** Emery, Tim
**Sent:** Monday, April 08, 2013 2:13 PM

Protected - Attorneys' Eyes Only

AA420472

**To:** Nelson, Dale
**Subject:** Bank Locations

Dale,

Recently we had some branches that had ███ switched to another bank.  In two of these cases the banks are a good distance away and there are much closer options.

Branches 2074 and 2082 both have been switched to ████████ but both have ████████ and other banks much closer, is there an option?

Tim Emery

DO R40
Advance America / ECA Centers
(757) 513-1049
Efax 864-336-7072

Protected - Attorneys' Eyes Only

AA420473

# EXHIBIT 31

# FILED UNDER SEAL

# EXHIBIT 32

# FILED UNDER SEAL

# EXHIBIT 33

# FILED UNDER SEAL

# EXHIBIT 34



**CADENCE**

BANK

April 21, 2014

Advance America Cash Advance, LLC
P.O. Box 3058
Spartanburg, SC 29304

### Re: Advance America Cash Advance, LLC, Account 5000189034

Dear Mr. O'Shaughnessy and Mr. Rudolph,

Cadence Bank is unable to continue servicing your account as referenced above.
Effective **May 30, 2014**, your account will be closed and you will receive a check for any
remaining balance at the address above.

Please discontinue use of the account immediately and destroy unused checks and
deposit tickets. Effective **May 5, 2014**, deposits will no longer be accepted. Please
make sure that any outstanding checks as of May 30, 2014 are re-issued, as they will
be returned by Cadence Bank as "account closed".

Sincerely,

Cadence Bank, NA

VP, Treasury Management Officer

1101 Greensboro Avenue, Tuscaloosa, Alabama 35401

# EXHIBIT 35

**Subject:** FW: Advance America - Letter
**From:** "Blackwell, Jessica" <jessblackwell@advanceamerica.net>
**To:** "Nelson, Dale" <DNelson@advanceamerica.net>
**Date:** Fri, 25 Apr 2014 13:28:41 -0400

FYI -- MSB Status

**From:** Lori Johnson [mailto:Lori.Johnson@cadencebank.com]
**Sent:** Friday, April 25, 2014 11:55 AM
**To:** Blackwell, Jessica
**Subject:** Re: Advance America - Letter

It was a risk based decision based on MSB status. Let me check on these dates but I think we can work with them for sure.

I do greatly apologize!

**From:** Blackwell, Jessica <jessblackwell@advanceamerica.net>
**Sent:** Friday, April 25, 2014 10:46:26 AM
**To:** Lori Johnson
**Subject:** RE: Advance America - Letter

Hey Lori,
Do you happen to know why the account is being closed? We can certainly have the centers stop using the account by May 30th. Can we have until then, and then close the account June 5th?

Thanks!

**From:** Lori Johnson [mailto:Lori.Johnson@cadencebank.com]
**Sent:** Friday, April 25, 2014 11:41 AM
**To:** Blackwell, Jessica
**Subject:** Re: Advance America - Letter

Hi,
I am traveling today but will call you Monday. Tell me what you need and we will certainly work with you. I apologize!

**From:** Blackwell, Jessica <jessblackwell@advanceamerica.net>
**Sent:** Friday, April 25, 2014 10:13:16 AM
**To:** Lori Johnson
**Subject:** Advance America - Letter

Lori,
Can you please call me ASAP? I received the letter you sent, however we need more than 2 weeks to make other arrangements for 20 locations.


Thanks,

*Jessica Blackwell*
**Treasury Analyst**
**Advance America**
**Phone: 864.342.5021**
**eFax: 864.336.7718**
jessblackwell@advanceamerica.net


This email, any attachment thereto, and the information therein may contain privileged or otherwise legally protected confidential or proprietary information and communications of Advance America, Cash Advance Centers, Inc., or its subsidiaries ("Advance America"). If you are not an intended recipient of this email, you are prohibited from using, distributing, or publishing this email, any attachments, or information contained therein. Please report any misdirected emails by calling 864.515.5600 and permanently delete this email and any copies thereof.

# EXHIBIT 36

# FILED UNDER SEAL

EXHIBIT 37

# FILED UNDER SEAL

# EXHIBIT 38

# FILED UNDER SEAL

# EXHIBIT 39

# FILED UNDER SEAL

# EXHIBIT 40



**Capital One, N.A.**
201 St. Charles Avenue
29th Floor
New Orleans, LA 70170



June 18, 2014

### *VIA OVERNIGHT MAIL*

To:     Mr. Christian Rudolph, VP & Treasurer
        Advance America Cash Advance Centers
        135 N. Church Street
        Spartanburg, SC  29306

### Re: Termination of Deposit and Treasury Services Relationship

Dear Mr. Rudolph:

Providing quality service to our clients has been one of the keys to our success at Capital One, National Association ("Capital One").   Toward that end, we are committed to understanding, and satisfying, the needs of our clients.  Unfortunately, difficult decisions are sometimes necessary in order to accomplish these important goals.  Capital One has made the decision to exit the business of providing commercial banking services to payday lenders and related businesses.  We consistently review business plans and initiatives across the company to ensure that they are aligned with our strategic goals and future plans.  We took a range of factors into consideration and determined that this business no longer fits within the Bank's strategic priorities.

Based on the foregoing, please be advised that we are exercising our right, pursuant to our Rules Governing Deposit Accounts, to terminate your account relationship, effective August 15, 2014 (the "Termination Date").

Please make arrangements to close the accounts listed on the attached schedule (the "Accounts"), and have any direct deposits and/or automatic debits re-directed, by the Termination Date.  If the Accounts are not closed by the Termination Date, we will close them and forward bank checks for the balance in each account to you.

Also, in conjunction with the above, we are hereby notifying you, pursuant to the Treasury Management Master Service Agreement ("MSA") between your company and Capital One, that the treasury services associated with the Accounts (as well as any personal accounts that may be linked to these services), each such service represented by a corresponding Addendum to the MSA, shall be terminated as of the Termination Date.

If you have any questions, please feel free to contact the undersigned at ▮▮▮▮▮▮▮▮▮

Respectfully,
CAPITAL ONE, NATIONAL ASSOCIATION

Title: Vice President



**Capital One, N.A.**
201 St. Charles Avenue
29th Floor
New Orleans, LA 70170

504.533.5501
504.533.5344 Fax

**Schedule A**
**Account Listing**

**Advance America Cash Advance Center, Inc.**

**Acso of Texas, L.P.**

**Express Check Advance of LA**

**Express Check Advance of Virginia, LLC**

**US Bank - ACH Accounts**

| Account ending in | Company ID | DBA | Activity |
|---|---|---|---|
|  | 2582332639 - ACH Origination | Advance America | Debits (collections from customer) |
| | 3582332639 - ACH Origination | Kickstand | Debits (collections from customer) |
| | 4582332639 - ACH Origination | Kickstand | Credit (payments to customer) |
| | 5582332639 - ACH Origination | Anytime Wallet | Debits (collections from customer) |
| | 6582332639 - ACH Origination | Anytime Wallet | Credits (payments to customer) |

| Account ending in | Company ID | DBA | Activity |
|---|---|---|---|
|  | 7582332639 - ACH on SinglePoint | Advance America | Debits (collections from customer) |
| | 8582332639 - ACH on SinglePoint | Kickstand | Debits (collections from customer) |
| | 9582332639 - ACH on SinglePoint | Kickstand | Credit (payments to customer) |
| | A582332639 - ACH on SinglePoint | Anytime Wallet | Debits (collections from customer) |
| | B582332639 - ACH on SinglePoint | Anytime Wallet | Credits (payments to customer) |

Protected
AA004944

# EXHIBIT 41

# FILED UNDER SEAL

# EXHIBIT 42



**FIRSTMERIT. BANK**
Now part of The Huntington National Bank

10/21/2016

Advance America Cash Advance
Centers Of Ohio Inc Aka
First American Loans
Po Box 3058
Spartanburg Sc        29304

Regarding
Deposit Account(s) ending in: █████

Dear Advance America Cash Advance
Centers Of Ohio Inc Aka
First American Loans

From time to time, we exit banking relationships with our customers based on select circumstances. We are writing to inform you that we will be closing the above-referenced deposit accounts(s) on 11/20/2016. We have decided to close your account because the business is in an industry in which we do not service, such as payday lenders.

Please note, on 11/14/2016 restrictions will be placed on your account(s) that will block any additional activity on these account(s), including ATM/Debit Card and internet banking transactions. Prior to this date, transaction(s) will be paid against the balance available for withdrawal. Please begin limiting your activity immediately. If you have any automatic payments to or from your account(s), we ask that you make different arrangements and discontinue those payments or if a courier makes deliveries to FirstMerit on your behalf, we ask that you discontinue those shipments.

The remaining balance in the account(s), if any, will be sent in the form of a cashier's check to the account statement address on file at the time of closing. Should your account(s) have a negative balance on the closing date, FirstMerit will pursue collection efforts. Collection attempts may include reporting the account(s) to ChexSystems, retaining a collection agency, or pursuing legal action.

For your benefit, please make the necessary arrangements at another financial institution for your future banking needs. Although this decision is final, you may have additional questions or concerns that you would like to discuss. If so, please feel free to call 866-922-4310.

Sincerely,
FirstMerit Bank
Member FDIC

AA004960



**FIRSTMERIT BANK**

Now part of The Huntington National Bank

10/21/2016

Adv America Cash Adv Ctrs Of Oh Inc Aka
Advance America Cash Advance
135 N Church St
P O Box 3058
Spartanburg Sc      29304

Regarding
Deposit Account(s) ending in: 

Dear Adv America Cash Adv Ctrs Of Oh Inc Aka
Advance America Cash Advance

From time to time, we exit banking relationships with our customers based on select circumstances. We are writing to inform you that we will be closing the above-referenced deposit accounts(s) on 11/20/2016. We have decided to close your account because the business is in an industry in which we do not service, such as payday lenders.

Please note, on 11/14/2016 restrictions will be placed on your account(s) that will block any additional activity on these account(s), including ATM/Debit Card and internet banking transactions. Prior to this date, transaction(s) will be paid against the balance available for withdrawal. Please begin limiting your activity immediately. If you have any automatic payments to or from your account(s), we ask that you make different arrangements and discontinue those payments or if a courier makes deliveries to FirstMerit on your behalf, we ask that you discontinue those shipments.

The remaining balance in the account(s), if any, will be sent in the form of a cashier's check to the account statement address on file at the time of closing. Should your account(s) have a negative balance on the closing date, FirstMerit will pursue collection efforts. Collection attempts may include reporting the account(s) to ChexSystems, retaining a collection agency, or pursuing legal action.

For your benefit, please make the necessary arrangements at another financial institution for your future banking needs. Although this decision is final, you may have additional questions or concerns that you would like to discuss. If so, please feel free to call 866-922-4310.

Sincerely,
FirstMerit Bank
Member FDIC

AA004961



FIRSTMERIT BANK

Now part of The Huntington National Bank

10/21/2016

Aafa Of Ohio Inc Aka
First American Loans
Advance America Attention Reconciliation
P O Box 3058
Spartanbuarg Sc  29304

Regarding
Deposit Account(s) ending in: 

Dear Aafa Of Ohio Inc Aka
First American Loans
Advance America Attention Reconciliation

From time to time, we exit banking relationships with our customers based on select circumstances. We are writing to inform you that we will be closing the above-referenced deposit accounts(s) on 11/20/2016. We have decided to close your account because the business is in an industry in which we do not service, such as payday lenders.

Please note, on 11/14/2016 restrictions will be placed on your account(s) that will block any additional activity on these account(s), including ATM/Debit Card and internet banking transactions. Prior to this date, transaction(s) will be paid against the balance available for withdrawal. Please begin limiting your activity immediately. If you have any automatic payments to or from your account(s), we ask that you make different arrangements and discontinue those payments or if a courier makes deliveries to FirstMerit on your behalf, we ask that you discontinue those shipments.

The remaining balance in the account(s), if any, will be sent in the form of a cashier's check to the account statement address on file at the time of closing. Should your account(s) have a negative balance on the closing date, FirstMerit will pursue collection efforts. Collection attempts may include reporting the account(s) to ChexSystems, retaining a collection agency, or pursuing legal action.

For your benefit, please make the necessary arrangements at another financial institution for your future banking needs. Although this decision is final, you may have additional questions or concerns that you would like to discuss. If so, please feel free to call 866-922-4310.

Sincerely,
FirstMerit Bank
Member FDIC

AA004962



FIRSTMERIT BANK

Now part of The Huntington National Bank

10/21/2016

Advance America Small Loans
Of Ohio, Inc. Aka
Advance America
135 N Church St
Spartanburg Sc        29306

Regarding
Deposit Account(s) ending in: ███

Dear Advance America Small Loans
Of Ohio, Inc. Aka
Advance America

From time to time, we exit banking relationships with our customers based on select circumstances. We are writing to inform you that we will be closing the above-referenced deposit accounts(s) on 11/20/2016. We have decided to close your account because the business is in an industry in which we do not service, such as payday lenders.

Please note, on 11/14/2016 restrictions will be placed on your account(s) that will block any additional activity on these account(s), including ATM/Debit Card and internet banking transactions. Prior to this date, transaction(s) will be paid against the balance available for withdrawal. Please begin limiting your activity immediately. If you have any automatic payments to or from your account(s), we ask that you make different arrangements and discontinue those payments or if a courier makes deliveries to FirstMerit on your behalf, we ask that you discontinue those shipments.

The remaining balance in the account(s), if any, will be sent in the form of a cashier's check to the account statement address on file at the time of closing. Should your account(s) have a negative balance on the closing date, FirstMerit will pursue collection efforts. Collection attempts may include reporting the account(s) to ChexSystems, retaining a collection agency, or pursuing legal action.

For your benefit, please make the necessary arrangements at another financial institution for your future banking needs. Although this decision is final, you may have additional questions or concerns that you would like to discuss. If so, please feel free to call 866-922-4310.

Sincerely,
FirstMerit Bank
Member FDIC

AA004963


FIRSTMERIT BANK
Now part of The Huntington National Bank

10/21/2016

Mckenzie Small Loans Of Ohio, Inc. Aka
National Cash Advance
135 N Church St
Spartanburg Sc        29306

Regarding
Deposit Account(s) ending in: 

Dear Mckenzie Small Loans Of Ohio, Inc. Aka
National Cash Advance

From time to time, we exit banking relationships with our customers based on select circumstances.  We
are writing to inform you that we will be closing the above-referenced deposit accounts(s) on
11/20/2016.  We have decided to close your account because the business is in an industry in which we
do not service, such as payday lenders.

Please note, on 11/14/2016 restrictions will be placed on your account(s) that will block any additional
activity on these account(s), including ATM/Debit Card and internet banking transactions.  Prior to this
date, transaction(s) will be paid against the balance available for withdrawal.  Please begin limiting your
activity immediately.  If you have any automatic payments to or from your account(s), we ask that you
make different arrangements and discontinue those payments or if a courier makes deliveries to
FirstMerit on your behalf, we ask that you discontinue those shipments.

The remaining balance in the account(s), if any, will be sent in the form of a cashier's check to the
account statement address on file at the time of closing.  Should your account(s) have a negative
balance on the closing date, FirstMerit will pursue collection efforts.  Collection attempts may include
reporting the account(s) to ChexSystems, retaining a collection agency, or pursuing legal action.

For your benefit, please make the necessary arrangements at another financial institution for your
future banking needs.  Although this decision is final, you may have additional questions or concerns
that you would like to discuss.  If so, please feel free to call 866-922-4310.

Sincerely,
FirstMerit Bank
Member FDIC

AA004964



**FIRSTMERIT. BANK**

Now part of The Huntington National Bank

10/21/2016

Mckenzie Check Advance Of Ohio, Llc Aka
National Cash Advance
135 N Church St
Spartanburg Sc        29306

Regarding
Deposit Account(s) ending in:  

Dear Mckenzie Check Advance Of Ohio, Llc Aka
National Cash Advance

From time to time, we exit banking relationships with our customers based on select circumstances. We are writing to inform you that we will be closing the above-referenced deposit accounts(s) on 11/20/2016. We have decided to close your account because the business is in an industry in which we do not service, such as payday lenders.

Please note, on 11/14/2016 restrictions will be placed on your account(s) that will block any additional activity on these account(s), including ATM/Debit Card and internet banking transactions. Prior to this date, transaction(s) will be paid against the balance available for withdrawal. Please begin limiting your activity immediately. If you have any automatic payments to or from your account(s), we ask that you make different arrangements and discontinue those payments or if a courier makes deliveries to FirstMerit on your behalf, we ask that you discontinue those shipments.

The remaining balance in the account(s), if any, will be sent in the form of a cashier's check to the account statement address on file at the time of closing. Should your account(s) have a negative balance on the closing date, FirstMerit will pursue collection efforts. Collection attempts may include reporting the account(s) to ChexSystems, retaining a collection agency, or pursuing legal action.

For your benefit, please make the necessary arrangements at another financial institution for your future banking needs. Although this decision is final, you may have additional questions or concerns that you would like to discuss. If so, please feel free to call 866-922-4310.

Sincerely,
FirstMerit Bank
Member FDIC



**FIRSTMERIT BANK**

Now part of The Huntington National Bank

10/21/2016

Advanced America Cash Advance Of Wi
135 N Church St
Spartanburg Sc        29306

Regarding
Deposit Account(s) ending in: 

Dear Advanced America Cash Advance Of Wi

From time to time, we exit banking relationships with our customers based on select circumstances. We are writing to inform you that we will be closing the above-referenced deposit accounts(s) on 11/20/2016. We have decided to close your account because the business is in an industry in which we do not service, such as payday lenders.

Please note, on 11/14/2016 restrictions will be placed on your account(s) that will block any additional activity on these account(s), including ATM/Debit Card and internet banking transactions. Prior to this date, transaction(s) will be paid against the balance available for withdrawal. Please begin limiting your activity immediately. If you have any automatic payments to or from your account(s), we ask that you make different arrangements and discontinue those payments or if a courier makes deliveries to FirstMerit on your behalf, we ask that you discontinue those shipments.

The remaining balance in the account(s), if any, will be sent in the form of a cashier's check to the account statement address on file at the time of closing. Should your account(s) have a negative balance on the closing date, FirstMerit will pursue collection efforts. Collection attempts may include reporting the account(s) to ChexSystems, retaining a collection agency, or pursuing legal action.

For your benefit, please make the necessary arrangements at another financial institution for your future banking needs. Although this decision is final, you may have additional questions or concerns that you would like to discuss. If so, please feel free to call 866-922-4310.

Sincerely,
FirstMerit Bank
Member FDIC



FIRSTMERIT BANK

Now part of The Huntington National Bank

10/21/2016

Acso Of Michigan Inc
135 N Church St
Spartanburg Sc          29306

Regarding
Deposit Account(s) ending in: 

Dear Acso Of Michigan Inc

From time to time, we exit banking relationships with our customers based on select circumstances. We are writing to inform you that we will be closing the above-referenced deposit accounts(s) on 11/20/2016. We have decided to close your account because the business is in an industry in which we do not service, such as payday lenders.

Please note, on 11/14/2016 restrictions will be placed on your account(s) that will block any additional activity on these account(s), including ATM/Debit Card and internet banking transactions. Prior to this date, transaction(s) will be paid against the balance available for withdrawal. Please begin limiting your activity immediately. If you have any automatic payments to or from your account(s), we ask that you make different arrangements and discontinue those payments or if a courier makes deliveries to FirstMerit on your behalf, we ask that you discontinue those shipments.

The remaining balance in the account(s), if any, will be sent in the form of a cashier's check to the account statement address on file at the time of closing. Should your account(s) have a negative balance on the closing date, FirstMerit will pursue collection efforts. Collection attempts may include reporting the account(s) to ChexSystems, retaining a collection agency, or pursuing legal action.

For your benefit, please make the necessary arrangements at another financial institution for your future banking needs. Although this decision is final, you may have additional questions or concerns that you would like to discuss. If so, please feel free to call 866-922-4310.

Sincerely,
FirstMerit Bank
Member FDIC

AA004967



10/21/2016

Advance America Cash Advance Inc
135 N Church St
Spartanburg Sc          29306

Regarding
Deposit Account(s) ending in: 

Dear Advance America Cash Advance Inc

From time to time, we exit banking relationships with our customers based on select circumstances. We are writing to inform you that we will be closing the above-referenced deposit accounts(s) on 11/20/2016. We have decided to close your account because the business is in an industry in which we do not service, such as payday lenders.

Please note, on 11/14/2016 restrictions will be placed on your account(s) that will block any additional activity on these account(s), including ATM/Debit Card and internet banking transactions. Prior to this date, transaction(s) will be paid against the balance available for withdrawal. Please begin limiting your activity immediately. If you have any automatic payments to or from your account(s), we ask that you make different arrangements and discontinue those payments or if a courier makes deliveries to FirstMerit on your behalf, we ask that you discontinue those shipments.

The remaining balance in the account(s), if any, will be sent in the form of a cashier's check to the account statement address on file at the time of closing. Should your account(s) have a negative balance on the closing date, FirstMerit will pursue collection efforts. Collection attempts may include reporting the account(s) to ChexSystems, retaining a collection agency, or pursuing legal action.

For your benefit, please make the necessary arrangements at another financial institution for your future banking needs. Although this decision is final, you may have additional questions or concerns that you would like to discuss. If so, please feel free to call 866-922-4310.

Sincerely,
FirstMerit Bank
Member FDIC

AA004968

# EXHIBIT 43

**From:**     "Blackwell, Jessica" <jessblackwell@advanceamerica.net>
**CC:**       "Brown, Connie" <cobrown@advanceamerica.net>, "White, Rufus" <RWhite@advanceamerica.net>
**Date:**     2016-08-11 16:25:51 -0400
**To:**       "Nelson, Dale" <DNelson@advanceamerica.net>
**Subject:** RE: Question

We have not been notified.. that I know of.  I do recall you talking about this merger months ago.

---

**From:** Nelson, Dale
**Sent:** Thursday, August 11, 2016 4:19 PM
**To:** Blackwell, Jessica; Brown, Connie; White, Rufus
**Subject:** Fwd: Question

Have we been notified?  Will we use the same account. Please investigate.

Sent from my iPhone

Begin forwarded message:

> **From:** "Brown, Rikki" <rbrown@advanceamerica.net>
> **Date:** August 11, 2016 at 3:26:09 PM EDT
> **To:** "Nelson, Dale" <DNelson@advanceamerica.net>
> **Cc:** "Liddell, Scott" <Sliddell@advanceamerica.net>, "Booth, David" <dbooth@advanceamerica.net>
> **Subject:** RE: Question
>
> FYI...Word is Huntington looks to take First Merit by end of month.

---

**From:** Nelson, Dale
**Sent:** Friday, August 05, 2016 4:22 PM
**To:** Liddell, Scott; White, Rufus; Brown, Connie; Blackwell, Jessica
**Cc:** Brown, Rikki; Burnett, Tim; Currie, Richard; Gallegos, Ashley; Hilgendorf, Ty; McLean, Traci; Mestichelli, Adam; Mourguet, Maureen; Peterson, Darrell; VanGorp, Allison
**Subject:** RE: Question

We will keep an eye on it.

# Dale Nelson

Assistant Treasurer
Advance America, Cash Advance Centers, Inc.
135 North Church Street
Spartanburg, SC  29306
Phone (864) 342-5655
EFax (864) 336-7715

---

**From:** Liddell, Scott
**Sent:** Friday, August 05, 2016 4:17 PM
**To:** Nelson, Dale
**Cc:** Brown, Rikki; Burnett, Tim; Currie, Richard; Gallegos, Ashley; Hilgendorf, Ty; Liddell, Scott; McLean, Traci; Mestichelli, Adam; Mourguet, Maureen; Peterson, Darrell; VanGorp, Allison
**Subject:** FW: Question

I spoke with First Merit Bank and it looks like February 2017 is when they are getting sold to Huntington bank, this is what the Bank Manager has seen and heard through her channels, but she said it could possibly be sooner.
If I hear anything else I will pass along the information

---

**From:** Nelson, Dale
**Sent:** Friday, August 05, 2016 4:08 PM
**To:** Liddell, Scott
**Subject:** RE: Question

We are not sure.  Huntington Bank closed our account in other states.  We expect issues but are unsure of the timeline.  Do you know when the change will occur locally?

# Dale Nelson

Assistant Treasurer
Advance America, Cash Advance Centers, Inc.
135 North Church Street
Spartanburg, SC  29306
Phone (864) 342-5655
EFax (864) 336-7715

---

**From:** Liddell, Scott
**Sent:** Friday, August 05, 2016 4:06 PM

Protected - Attorneys' Eyes Only

**To:** Nelson, Dale
**Subject:** Question

Dale,

First Merit Bank is being sold to Huntington Bank. We have several centers in Michigan that deal with First Merit, will we still continue to do business with Huntington Bank

Scott Liddell
Divisional Director of Operations
Region 13 Division 15
Cell: 419-343-0622
Fax:864-336-7236

Protected - Attorneys' Eyes Only

AA210814

# EXHIBIT 44

| | |
|---|---|
| **To:** | Booth, David |
| **From:** | "Nelson, Dale" <MAILER-DAEMON> |
| **Subject:** | RE: First Merit Bank |
| **Date:** | Fri, 21 Oct 2016 13:20:25 +0000 |
| **Inline-Images:** | image001.png |

David:

We called the banking center that the center is assigned to. The manage stated there should not be an issue and was confused by the remark. Turns out, this banking center is 3 miles away and our center has begun using a more convenient location. Apparently this location does not have any of our agreements on hand and has issues with our volume and does not want to service us.

With everything being rocky with First Merit right now, I would suggest going to the banking center that we were originally assigned. I know it is further, however, may save a valuable relationship.

Thanks

## Dale Nelson

Assistant Treasurer
Advance America, Cash Advance Centers, Inc.
135 North Church Street
Spartanburg, SC 29306
Phone (864) 342-5655
EFax (864) 336-7715

**From:** Booth, David
**Sent:** Thursday, October 20, 2016 4:48 PM
**To:** Nelson, Dale
**Subject:** First Merit Bank

Dale,

Center 4148 in Michigan was just told by First Merit that they can no longer do business with us.

Did you know of this, or can we do anything about this?

**Because YOU advance America...Every Center, Every Time!**



*David L. Booth*
Regional Director of Operations
Region 13  Michigan/Delaware
517.414.6527

Protected - Attorneys' Eyes Only

AA262666

# EXHIBIT 45

# FILED UNDER SEAL

# EXHIBIT 46



**Craig B. Laughlin**
Vice President
Chase Middle Market Banking

May 17, 2013

J. Christian Rudolph, Vice President & Treasurer
Advance America, Cash Advance Centers, Inc
135 N. Church Street
Spartanburg, SC  29306

RE:  Termination of Deposit Accounts Referenced Below

Dear Christian:

JPMorgan Chase Bank, N.A. (the "Bank") has decided to close the accounts listed on the attached Exhibit A (the "Accounts").  It is the Bank's understanding that each account owner is an affiliate of Advance America, Cash Advance Centers, Inc.

Please be advised that the Bank shall close the Accounts on June 28, 2013.

Please do not hesitate to call me with any questions regarding the anticipated transition of the Accounts.

Very truly yours,



Vice President

JPMorgan Chase Bank, N.A. • Mailcode OH2-2204, 301 W. Third Street, Dover, OH 44622
Telephone: 330-364-7214 • Facsimile: 330-364-7393
E-mail: craig.b.laughlin@chase.com

Protected

AA004945

# EXHIBIT 47





AA007842

## Treasury Update – Banking Relationships

- ▪ █████████████
  - • These banks continue to be very supportive of the Company and are servicing a large number of centers previously banked by █████████
  - • █████████ are also providing some of the corporate banking services:
    - • █████ is providing NSF Concentration and ACH account services
    - • █████ provide payroll account services
  - • The Company is piloting cash recyclers with █████ in three locations
  - • █████ meeting has been setup for March 8th in Mexico to continue to build a stronger relationship with Advance America and Grupo Elektra
- ▪ █████
  - • Subject to final Board approval, we are ready to close on the $25 million credit facility with █████ on February 18, 2013
  - • The cash concentration business is being handled by █████
  - • █████ is also handling the AP account and electronic vendor payments
- ▪ █████████
  - • The relationship management team of both banks are very supportive of the Company
  - • There is increasing pressure from the compliance areas of these banks to exit the relationship due to industry and foreign ownership concerns
  - • We have met with both banks to address these concerns and a cautiously optimistic that we will be able to maintain the relationships

2

Protected - Attorneys Eyes Only

AA007843

## Banking Relationships — Operating Banks by Center



3

ADVANCE AMERICA

3

Protected - Attorneys Eyes Only

AA007844

## ████████ Cash Recycler Pilot

- Cash is recycled through an onsite smart safe. The Cash Recycler is being piloted in three locations, two centers in FL and one center in OH.

- The service eliminates the need for local bank relationships or reliance on daily armored car services.

- It is an innovative solution that can potentially benefit Operations, Treasury, and Loss prevention.

 Store Operations
- Enhance focus on core business
- Reduce labor/payroll costs through bill reader counting
- Reduce operating costs (Courier pick-up reduced from daily to as needed)
- Enhance productivity and accountability

 Treasury / Accounting
- Improve liquidity
- Provide access to cash as needed allowing for utilization of excess cash on other investments
- Optimize banking relationships
- Improve accountability/control/reconciliation

 Loss Prevention
- Improve employee safety
- Reduce losses
- Reduce investigations



4

ADVANCE AMERICA
the advance America



Protected - Attorneys Eyes Only

AA007845

# EXHIBIT 48

# FILED UNDER SEAL

# EXHIBIT 49

# FILED UNDER SEAL

# EXHIBIT 50

# FILED UNDER SEAL

# EXHIBIT 51

# FILED UNDER SEAL

# EXHIBIT 52

# FILED UNDER SEAL

# EXHIBIT 53

# FILED UNDER SEAL

# EXHIBIT 54

# FILED UNDER SEAL

# EXHIBIT 55

# FILED UNDER SEAL

# EXHIBIT 56

# FILED UNDER SEAL