# EXHIBIT 92

# FILED UNDER SEAL

# EXHIBIT 93

# FILED UNDER SEAL

# EXHIBIT 94

# FILED UNDER SEAL

# EXHIBIT 95



Transcript of **Glenn Bassett**

Tuesday, April 24, 2018

*Advance America, et al. v. Federal Deposit Insurance Corporation, et al.*

Alderson Court Reporting
1-800-FOR-DEPO (367-9976)
Info@AldersonReporting.com
www.AldersonReporting.com

Alderson Reference Number: 78061

```
 1               IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLUMBIA

 3     - - - - - - - - - - - - - - - X

 4     ADVANCE AMERICA, CASH ADVANCE  :

 5     CENTERS, INC., et al.,         :

 6        Plaintiffs,                 :  Civil Action No.

 7            v.                      :  14-953-TNM

 8     FEDERAL DEPOSIT INSURANCE      :

 9     CORPORATION, et al.,           :

10        Defendants.                 :

11     - - - - - - - - - - - - - - - X

12                           Washington, D.C.

13                           Tuesday, April 24, 2018

14              Deposition of GLENN BASSETT, a witness

15     herein, called for examination by counsel for

16     Defendants in the above-entitled matter, pursuant to

17     notice, the witness being duly sworn by MARY GRACE

18     CASTLEBERRY, a Notary Public in and for the District

19     of Columbia, taken at the offices of MoloLamken,

20     600 New Hampshire Avenue, N.W., Washington, D.C., at

21     9:26 a.m., Tuesday, April 24, 2018, and the

22     proceedings being taken down by Stenotype by MARY
```

Page 2

1  GRACE CASTLEBERRY, RPR, and transcribed under her

2  direction.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 4

1  APPEARANCES:  (Continued)

2

3    DUNCAN N. STEVENS, ESQ.

4    Federal Deposit Insurance Corporation

5    3501 Fairfax Drive

6    Room VS-D-7028

7    Arlington, Virginia  22226-3500

8    (703) 562-2545

9

10  On behalf of Defendant Office of the Comptroller

11  of the Currency:

12    CHRISTOPHER A. STERBENZ, ESQ.

13    Office of the Comptroller of the Currency

14    400 Seventh Street, S.W.

15    Washington, D.C.  20219

16    (202) 649-6314

17

18

19

20

21

22

Page 3

1  APPEARANCES:

2

3    On behalf of the Plaintiffs:

4      NICOLE J. MOSS, ESQ.

5      Cooper & Kirk

6      1523 New Hampshire Avenue, N.W.

7      Washington, D.C.  20036

8      (202) 220-9600

9

10   On behalf of Defendant FDIC:

11     SARA E. MARGOLIS, ESQ.

12     MoloLamken

13     430 Park Avenue

14     New York, New York  10022

15     (212) 607-8172

16       and

17     JUSTIN V. SHUR, ESQ.

18     MoloLamken

19     600 New Hampshire Avenue, N.W., Suite 660

20     Washington, D.C.  20037

21     (202) 556-2005

22       and

Page 5

1  APPEARANCES:  (Continued)

2

3    On behalf of the Board of Governors of the

4    Federal Reserve System:

5      YVONNE F. MIZUSAWA, ESQ.

6      Board of Governors of the Federal Reserve

7      System

8      20th and C Streets, N.W.

9      Washington, D.C.  20551

10     (202) 452-3436

11

12

13

14

15

16

17

18

19

20

21

22

## Page 6

C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR |
| --- | --- |
| GLENN BASSETT | DEFENDANT |
| BY MS. MARGOLIS | 10 |
| BY MR. STERBENZ | 270 |

AFTERNOON SESSION - 165

E X H I B I T S

| BASSETT EXHIBIT | PAGE |
| --- | --- |
| NO. 1: Notice of Deposition | 13 |
| NO. 2: Printout from NorthState Check Exchange website | 31 |
| NO. 3: Printout from NorthState Check Exchange website | 39 |
| NO. 4: October 30, 2014 letter To Whom It May Concern ███████ | 52 |
| NO. 5: Declaration of Glenn Bassett | 80 |
| NO. 6: September 8, 2015 letter to Glenn Bassett from Congressman Doug LaMalfa | 111 |

## Page 7

E X H I B I T S (Continued)

| BASSETT EXHIBIT | PAGE |
| --- | --- |
| NO. 7: Plaintiff Northstate Check Exchange's Objections and Responses to Defendants' First Set of Interrogatories | 124 |
| NO. 8: April 22, 2015 letter to NorthState Check Exchange ███████ | 131 |
| NO. 9: July 1, 2015 letter to ███████ from Glenn Bassett | 147 |
| NO. 10: ███████ Disbursement Request and Authorization | 156 |
| NO. 11: Letter to ███████ from Glenn Bassett | 171 |
| ███████████████████████ ███ ███ | |
| NO. 13: Document entitled List of banks that declined to do business with us due to payday loans | 205 |
| NO. 14: NorthState Check Exchange volume of loans for each year | 216 |

## Page 8

E X H I B I T S (Continued)

| BASSETT EXHIBIT | PAGE |
| --- | --- |
| NO. 15: NorthState Check-X-Exchange Financial Statements, December 31, 2012 | 223 |
| NO. 16: NorthState Check-X-Exchange Financial Statements, December 31, 2013 | 223 |
| NO. 17: NorthState Check-X-Exchange Financial Statements, December 31, 2014 | 223 |
| NO. 18: August 23, 2017 letter to Glenn Bassett from ███████ | 223 |
| NO. 19: NorthState Check-X-Exchange Financial Statements, December 31, 2016 | 224 |
| NO. 20: California Deferred Deposit Transaction Activity Report | 244 |
| NO. 21: California Deferred Deposit Transaction Activity Report | 252 |
| NO. 22: California Deferred Deposit Transaction Activity Report | 252 |

## Page 9

E X H I B I T S (Continued)

| BASSETT EXHIBIT | PAGE |
| --- | --- |
| NO. 23: California Deferred Deposit Transaction Activity Report | 252 |

Page 10

08:44:05  1         P R O C E E D I N G S

08:44:05  2     Whereupon,

08:44:05  3         GLENN BASSETT,

08:44:05  4     was called as a witness by counsel for Defendants,

08:44:05  5     and having been duly sworn by the Notary Public, was

08:44:06  6     examined and testified as follows:

08:44:06  7         EXAMINATION BY COUNSEL FOR DEFENDANT FDIC

08:44:07  8     BY MS. MARGOLIS:

08:49:10  9         Q.   Mr. Bassett, my name is Sara Margolis.   We

09:26:42 10     met a few minutes ago, right?

09:26:43 11         A.   Yes.

09:26:44 12         Q.   Could you state your name for the record,

09:26:46 13     please?

09:26:46 14         A.   Glenn Bassett.

09:26:49 15         Q.   How do you spell your last name?

09:26:50 16         A.   B-a-s-s-e-t-t.

09:26:52 17         Q.   Mr. Bassett, where do you currently

09:26:53 18     reside?

09:26:54 19         A.   Redding, California.   Actually, a little

09:26:57 20     town south of Redding, Cottonwood, California.

09:27:00 21         Q.   Have you been deposed before?

09:27:01 22         A.   Yes.

Page 11

09:27:02  1         Q.   And how many times?

09:27:03  2         A.   Once.

09:27:04  3         Q.   What was the case about?

09:27:06  4         A.   It was in regard of a traffic accident.

09:27:10  5         Q.   Were you a party in that case?

09:27:12  6         A.   The company that I worked for was.

09:27:17  7         Q.   Was the company that you worked for the

09:27:21  8     defendant in that case?

09:27:23  9         A.   Yes.

09:27:23 10         Q.   Tell me a little bit more about the facts

09:27:25 11     of the case.

09:27:26 12         A.   This was dating way back, 2003 or '4.   And

09:27:39 13     it was a fatality.   A truck had run over a person.

09:27:44 14         Q.   What did you do for the company?

09:27:46 15         A.   We -- I was a manager of an auto truck

09:27:53 16     plaza and basically had to go there to the deposition

09:27:59 17     and just talk about the -- how we operated the shop.

09:28:05 18         Q.   And I think you mentioned earlier this was

09:28:07 19     in around 2003 or 2004?

09:28:08 20         A.   Yes, going way back.

09:28:11 21         Q.   So you are somewhat familiar with the

09:28:12 22     rules for a deposition but since it's been a while, I

Page 12

09:28:16  1     will restate them.

09:28:17  2         A.   Yes, it has been.

09:28:18  3         Q.   So I'll ask questions and you'll answer

09:28:21  4     them, okay?

09:28:22  5         A.   Uh-huh.

09:28:22  6         Q.   And I need verbal responses so that the

09:28:25  7     court reporter can track what you're saying.   So

09:28:26  8     there is a tendency to nod or say uh-huh, but if you

09:28:31  9     can, please try to say yes or no.

09:28:33 10         A.   Yes.

09:28:33 11         Q.   Great.   And we can't talk over each other

09:28:35 12     for the same reason because otherwise the court

09:28:37 13     reporter can't track what both of us are saying.   So

09:28:39 14     if you'll just wait for me to finish my question

09:28:42 15     before you answer, I will give you the same courtesy.

09:28:44 16     Does that make sense?

09:28:45 17         A.   Yes.

09:28:45 18         Q.   And if you would like to take a break at

09:28:48 19     any point during the deposition, please just let me

09:28:50 20     know.   I would just ask that if I've asked you a

09:28:52 21     question, you answer that question before we move to

09:28:55 22     a break.   Does that make sense?

Page 13

09:28:56  1         A.   Yes.

09:28:56  2         Q.   Great.   Mr. Bassett, you're here to

09:29:01  3     testify as a representative of NorthState Check

09:29:04  4     Exchange, is that right?

09:29:04  5         A.   Yes.

09:29:05  6         Q.   If I refer to that entity as NorthState

09:29:08  7     throughout the deposition, will you understand what

09:29:09  8     I'm referring to?

09:29:10  9         A.   Yes.

09:29:10 10             (Bassett Exhibit No. 1 was

09:29:37 11             marked for identification.)

09:29:37 12     BY MS. MARGOLIS:

09:29:37 13         Q.   Mr. Bassett, the court reporter has handed

09:29:39 14     you Exhibit 1 for your deposition.   Have you seen

09:29:42 15     this document previously?

09:29:43 16         A.   Yes.

09:29:46 17         Q.   What is it?

09:29:46 18         A.   Just a notice of a deposition that goes

09:29:54 19     into the schedule A that defines the deposition

09:29:59 20     topics.

09:30:00 21         Q.   And I notice that you brought with you

09:30:04 22     your own copy of that notice to the deposition, is

## Page 30

09:50:08  1   Service Centers of America.

09:50:08  2       Q.   How did you decide to follow FiSCA?

09:50:10  3       A.   When I came on board, there was -- they

09:50:20  4   had done some business in the past with them and I

09:50:22  5   just continued.

09:50:23  6       Q.   What is FiSCA?

09:50:24  7       A.   An association that represents companies

09:50:25  8   like mine throughout the United States.

09:50:32  9       Q.   Who creates the FiSCA rules?

09:50:33  10      A.   Ed D'Alessio is the director of FiSCA and

09:50:42  11  you would have to ask him that.

09:50:44  12      Q.   Besides these FiSCA rules, are there any

09:50:47  13  other compliance rules that NorthState follows?

09:50:49  14      A.   Yes.  We also are a Western Union agent.

09:51:00  15  They do have their own compliance program that we

09:51:03  16  follow their guidelines also.

09:51:05  17      Q.   Apart from the FiSCA and Western Union

09:51:13  18  programs, are there any other compliance --

09:51:16  19      A.   I am a member of the association, the

09:51:19  20  CFSA, and they have a compliance program but I

09:51:23  21  follow -- they're very similar to FiSCA so I had

09:51:27  22  FiSCA first so I just continued with FiSCA.

## Page 31

09:51:29  1       Q.   In Christina's role as compliance manager,

09:51:54  2   apart from -- how does she implement the two policies

09:52:01  3   that we've discussed, the FiSCA rules and the Western

09:52:03  4   Union programs?

09:52:04  5       A.   There is a training guidelines in regards

09:52:11  6   to how to set up the program, how to administer the

09:52:13  7   program, what forms to use in regards to compliance

09:52:16  8   and she utilizes that.

09:52:18  9       Q.   Who created that?

09:52:19  10      A.   FiSCA.

09:52:20  11      Q.   Is there anything else that she does in

09:52:30  12  her role as compliance manager to ensure that

09:52:32  13  NorthState complies with the FiSCA rules and the

09:52:37  14  Western Union guidelines?

09:52:39  15      A.   She does a lot but in regards to the

09:52:46  16  compliance, I would say I can't think of anything

09:52:49  17  right at the moment.

09:52:49  18          (Bassett Exhibit No. 2 was

09:53:08  19          marked for identification.)

09:53:08  20  BY MS. MARGOLIS:

09:53:23  21      Q.   Mr. Bassett, the court reporter has handed

09:53:25  22  you Exhibit 2 for your deposition.  Do you recognize

## Page 32

09:53:27  1   this document?

09:53:27  2       A.   I recognized the information on the

09:53:36  3   document.

09:53:36  4       Q.   I represent to you that I printed this out

09:53:41  5   from the home page of your website.

09:53:43  6       A.   Okay.

09:53:43  7       Q.   I want to talk to you a little bit about

09:53:45  8   NorthState's business.

09:53:46  9       A.   Okay.

09:53:47  10      Q.   On the second page of this document, it

09:53:57  11  says, "For over 20 years, we have offered a wide

09:54:00  12  range of services to help those who are strapped for

09:54:02  13  cash with honesty and great customer service."

09:54:04  14          Do you see that?

09:54:05  15      A.   Yes.

09:54:05  16      Q.   What does that mean?

09:54:08  17      A.   That we help people in financial need.

09:54:17  18      Q.   And do you see that it lists the services

09:54:19  19  that NorthState provides on the right-hand side of

09:54:22  20  this page?

09:54:23  21      A.   Yes.

09:54:23  22      Q.   I want to talk to you about those

## Page 33

09:54:25  1   services.  The first is check cashing?

09:54:29  2       A.   Yes.

09:54:29  3       Q.   What is that?

09:54:30  4       A.   Check cashing is when a customer comes in

09:54:32  5   that would like to cash a check with us.  We cash

09:54:37  6   that check through reviewing the check to make sure

09:54:43  7   that it is okay to cash, and there is a small

09:54:47  8   fee that we charge them to cash the check.

09:54:50  9       Q.   How do you derive income from check

09:54:52  10  cashing?

09:54:53  11      A.   With a small fee.

09:54:54  12      Q.   What percentage of NorthState's income is

09:54:57  13  derived from this check cashing service?

09:54:59  14      A.   I would say right now, probably around 55

09:55:13  15  to 60 percent.

09:55:17  16      Q.   And the second item on here is payday

09:55:19  17  loans?

09:55:19  18      A.   Uh-huh.

09:55:20  19      Q.   What does that mean?

09:55:20  20      A.   Payday loans are when a customer comes in

09:55:25  21  that needs money, they can write a check to us which

09:55:31  22  we hold on to, basically for 30 days, and then they

## Page 34

09:55:36  1  pay that back and there is a fee that we get for

09:55:40  2  doing that transaction.

09:55:42  3      Q.  How does NorthState derive income from

09:55:45  4  that service?

09:55:45  5      A.  With the fees.

09:55:46  6      Q.  What percentage of income does NorthState

09:55:54  7  derive from that service?

09:55:55  8      A.  Right now, I would say roughly around

09:55:59  9  probably 40, I think probably 30 to 35 percent.

09:56:08  10     Q.  And the next item is Western Union?

09:56:12  11     A.  Yes.

09:56:12  12     Q.  What does that mean?

09:56:13  13     A.  They are a money transmitter and people

09:56:19  14  send and receive money.

09:56:22  15     Q.  And how does NorthState derive income from

09:56:25  16  that service?

09:56:26  17     A.  There is a commission for each

09:56:29  18  transaction.

09:56:30  19     Q.  Is that a percentage of the transaction?

09:56:31  20     A.  Yes.

09:56:35  21     Q.  What percentage of income does NorthState

09:56:37  22  derive from the Western Union service?

## Page 35

09:56:38  1      A.  That would be a minimal amount,

09:56:51  2  probably -- I would say maybe around one and a half,

09:56:55  3  2 percent.

09:56:56  4      Q.  And the next item is PG&E payment center?

09:56:59  5      A.  Yes.

09:57:00  6      Q.  What does that mean?

09:57:01  7      A.  We are an authorized location for PG&E

09:57:04  8  customers to come into our location and pay their

09:57:10  9  bill.

09:57:10  10     Q.  What is PG&E?

09:57:12  11     A.  PG&E is Pacific Gas & Electricity.  They

09:57:19  12  are the utility company for California.

09:57:21  13     Q.  So customers would come to your store and

09:57:24  14  pay their gas and electric bill?

09:57:27  15     A.  Yes.

09:57:30  16     Q.  Why would they need to do that?

09:57:31  17     A.  Convenience.

09:57:32  18     Q.  And how does NorthState derive income from

09:57:35  19  that service?

09:57:36  20     A.  Commission.

09:57:37  21     Q.  And that's a percentage of the bill that

09:57:40  22  the customer is paying?

## Page 36

09:57:41  1      A.  No, it's just a commission for the

09:57:51  2  transaction we receive from PG&E.

09:57:52  3      Q.  Is it a flat commission?

09:57:54  4      A.  Yes.

09:57:54  5      Q.  What percentage of income does NorthState

09:57:56  6  derive from this service?

09:57:57  7      A.  It would be minuscule.

09:57:58  8      Q.  The next item is bill pay, is that right?

09:58:02  9      A.  Yes.

09:58:02  10     Q.  And what does that mean?

09:58:04  11     A.  We provide a computer software so if

09:58:09  12  somebody has a certain bill that they would like paid

09:58:12  13  such as ████████ or any type of billing company

09:58:20  14  that is associated with our bill pay software, they

09:58:24  15  can come in and pay that and we receive a fee for

09:58:31  16  doing that.

09:58:32  17     Q.  Do you receive a flat fee?

09:58:33  18     A.  Yes.

09:58:33  19     Q.  Who do you receive that flat fee from?

09:58:36  20     A.  From a company called CheckFreePay.

09:58:39  21     Q.  And what is CheckFreePay?

09:58:42  22     A.  They are an organization that developed a

## Page 37

09:58:44  1  bill pay program and they're utilized throughout the

09:58:48  2  United States.

09:58:48  3      Q.  What types of companies are associated

09:58:53  4  with the bill pay program?

09:58:54  5      A.  It's diversified.  They have over 500

09:59:00  6  billers.  Like I said, ████████.  You could do,

09:59:09  7  oh, gosh, any type of credit card.  Most credit cards

09:59:21  8  are taken, MasterCard, Visa.

09:59:23  9      Q.  What percentage of income does NorthState

09:59:26  10  derive from this service?

09:59:27  11     A.  Very minuscule.

09:59:28  12     Q.  The last item on there is auto equity

09:59:31  13  loans?

09:59:31  14     A.  Yes.

09:59:31  15     Q.  What does that mean?

09:59:32  16     A.  That means that a person that is in need

09:59:34  17  of money that would like to look into the equity on

09:59:45  18  the auction market value of their vehicle and see if

09:59:48  19  the equity could get them a loan through a company

09:59:50  20  that we deal with called LoanMart.  They're located

09:59:54  21  in California.

09:59:57  22         We're basically the person or the business

Page 38

```
10:00:02   1   that notifies LoanMart that we have a customer for
10:00:05   2   them, and then we process the paperwork and then we
10:00:12   3   get a commission for that.
10:00:13   4       Q.   So a customer who owns a car comes to
10:00:15   5   NorthState and says I would like to take out some of
10:00:17   6   the equity in this car, is that right?
10:00:19   7       A.   That's correct.
10:00:19   8       Q.   And then you contact LoanMart --
10:00:22   9       A.   LoanMart.
10:00:23  10       Q.   -- on their behalf and see if they might
10:00:26  11   qualify to do that?
10:00:27  12       A.   Yes.
10:00:27  13       Q.   Why is it necessary to have an
10:00:32  14   intermediary in the process between the customer and
10:00:35  15   LoanMart?
10:00:35  16       A.   I would say that it gives a stick-built
10:00:44  17   presence to the customer and it's more of a
10:00:49  18   convenience to where they can come in, have their
10:00:54  19   questions answered and then we can get them to fill
10:00:58  20   out paperwork which is a convenience for LoanMart.
10:01:00  21       Q.   What's a stick-built presence?
10:01:02  22       A.   It's basically mortar, a brick and mortar.
```

Page 39

```
10:01:08   1       Q.   How does NorthState derive income from
10:01:11   2   this service?
10:01:12   3       A.   Commission.
10:01:12   4       Q.   Who pays your commission?
10:01:13   5       A.   LoanMart.
10:01:14   6       Q.   Is it a flat fee?
10:01:17   7       A.   It's broke into two.  There is a flat fee
10:01:25   8   for sign-ups and then there is also an interest that
10:01:30   9   we get on some of the loans.
10:01:32  10       Q.   LoanMart pays both of those?
10:01:37  11       A.   Yes.  We get a percentage of the interest.
10:01:40  12       Q.   What percentage of income does NorthState
10:01:46  13   derive from this service?
10:01:47  14       A.   That would be under -- it would probably
10:01:49  15   be about or probably under 1 percent, maybe
10:01:51  16   1 percent.
10:01:53  17       Q.   You can put this document aside.
10:02:01  18       A.   Could be a little higher than that.  I
10:02:03  19   would have to look.
10:02:03  20            (Bassett Exhibit No. 3 was
10:02:13  21            marked for identification.)
10:02:13  22   BY MS. MARGOLIS:
```

Page 40

```
10:02:19   1       Q.   Mr. Bassett, the court reporter has handed
10:02:20   2   you Exhibit 3 for your deposition.  Do you recognize
10:02:22   3   this document?
10:02:23   4       A.   Yes.
10:02:25   5       Q.   And what is it?
10:02:26   6       A.   It looks like photos of information from
10:02:33   7   our website.
10:02:33   8       Q.   I will represent to you that I printed
10:02:35   9   this out from the services page of your website.
10:02:38  10       A.   Uh-huh.
10:02:40  11       Q.   On the second page, there is a list of
10:02:44  12   services.  We've gone through a number of these
10:02:46  13   already but I just wanted to draw your attention to a
10:02:48  14   few more.  The first is cash for gold and silver.
10:02:52  15       A.   Yes.
10:02:52  16       Q.   Do you see that?
10:02:53  17       A.   Uh-huh.
10:02:53  18       Q.   What is that?
10:02:54  19       A.   That is if somebody has scrap gold or
10:03:03  20   jewelry basically and they would like to come in and
10:03:05  21   see if it's worth anything, we'll value what they
10:03:12  22   have and exchange it for dollars.
```

Page 41

```
10:03:15   1       Q.   What does the valuation?
10:03:16   2       A.   Most of the time, it would be either
10:03:22   3   myself or the compliance manager.
10:03:23   4       Q.   What training do you have to value
10:03:26   5   jewelry?
10:03:27   6       A.   The training that we had was through
10:03:32   7   Retail Gold Brokers.  It was just a training program
10:03:36   8   that we went through that they have.
10:03:37   9       Q.   How does NorthState get income from the
10:03:39  10   service?
10:03:40  11       A.   What we do is we have to hold on to the
10:03:49  12   item for at least 30 days and the value of the gold
10:03:59  13   is set up basically on 50/50 analysis so if it's
10:04:06  14   weighed and worth $100, once we send it in, we're
10:04:12  15   hoping to get $50 from that ring.
10:04:14  16       Q.   And you said once we send it in.
10:04:17  17       A.   Yeah, we have to send it in to a refiner
10:04:20  18   and they're the ones that will cut the check to us
10:04:23  19   for the profit for the transaction.
10:04:29  20       Q.   Just to make sure I understand, a customer
10:04:31  21   comes in and gives you gold jewelry, is that right?
10:04:36  22       A.   Yes.
```

## Page 42

10:04:37 1    Q.   And you look at that gold jewelry and you

10:04:38 2    say I think this is worth $100, for example?

10:04:41 3    A.   Yes.

10:04:41 4    Q.   Do you pay the customer then?

10:04:42 5    A.   Yes.

10:04:44 6    Q.   How much do you pay them?

10:04:46 7    A.   We would give them basically $50 and it's

10:04:52 8    depending on the spot price of gold at the time.

10:04:54 9    Q.   And then you hold on to that piece of

10:04:56 10   jewelry within --

10:04:58 11   A.   30 days.

10:04:58 12   Q.   -- your location?

10:05:00 13   A.   Per the state law, yes.

10:05:01 14   Q.   And then you send it in to the refiner?

10:05:09 15   A.   Yes.

10:05:09 16   Q.   And what does the refiner do?

10:05:11 17   A.   They analyze the gold and pay out on the

10:05:18 18   spot price at the time that I sent it in and we hope

10:05:22 19   that it's going to be 50 percent.

10:05:24 20   Q.   Well, you hope that theoretically it would

10:05:30 21   be a little bit more than 50 percent because you were

10:05:32 22   being paid?

## Page 43

10:05:32 1    A.   It could be, yes.

10:05:32 2    Q.   And then how much income does NorthState

10:05:34 3    derive from the cash for gold and silver service?

10:05:38 4    A.   That would be very small too.  Probably

10:05:41 5    under 1 percent.

10:05:44 6    Q.   It also mentions Netspend prepaid cards on

10:05:49 7    here?

10:05:49 8    A.   Yes.

10:05:49 9    Q.   What is that?

10:05:50 10   A.   A prepaid card is a card that customers

10:05:58 11   that -- well, a lot of them are unbanked and they use

10:06:01 12   that as a credit card or a debit card.  And it's

10:06:05 13   preloaded and they can come into our location, we can

10:06:13 14   load the card for a $2 fee and there is a small

10:06:19 15   commission on that side too.

10:06:26 16   Q.   Do you charge a $2 fee every time you sell

10:06:25 17   one of these prepaid cards?

10:06:27 18   A.   When we sell it, we actually make 4.95.

10:06:30 19   To load the card is $2.

10:06:31 20   Q.   So there is two different flat fees

10:06:34 21   associated with these cards?

10:06:35 22   A.   Yes.

## Page 44

10:06:36 1    card that's 4.95?
First is when a customer first buys the

10:06:40 2    card and that's 4.95?

10:06:42 3    A.   Yes.

10:06:42 4    Q.   And then when a customer wants to reload

10:06:44 5    the card --

10:06:44 6    A.   Yes.

10:06:45 7    Q.   -- it costs them $2?

10:06:46 8    A.   Uh-huh.

10:06:47 9    Q.   Yes?

10:06:47 10   A.   Yes.

10:06:47 11   Q.   And on top of that, there is also a

10:06:51 12   commission associated with the card?

10:06:52 13   A.   Yes, we get through the bank statement.

10:06:56 14   Q.   Can you explain that?

10:06:57 15   A.   It's just for the number of transactions

10:07:03 16   that we get, it would be listed as a commission on

10:07:12 17   the bank statement.

10:07:13 18   Q.   And who pays the flat fees?

10:07:15 19   A.   That would be Netspend.

10:07:16 20   Q.   And who pays the commission?

10:07:18 21   A.   Netspend.

10:07:20 22   Q.   Apart from the services listed on both

## Page 45

10:07:23 1    Exhibit 2 and Exhibit 3, are there any other services

10:07:26 2    that NorthState provides?

10:07:29 3    A.   I think you've covered it.

10:07:50 4    Q.   How many storefronts does NorthState

10:07:54 5    currently have?

10:07:54 6    A.   Currently one.

10:07:55 7    Q.   Does NorthState have remote customers that

10:07:57 8    don't use the storefront?

10:07:59 9    A.   No.

10:08:02 10   Q.   We discussed that NorthState has a payday

10:08:11 11   lending line of business, is that right?

10:08:12 12   A.   Yes.

10:08:15 13   Q.   Does NorthState keep its payday lending

10:08:17 14   activities separate from its other lines of

10:08:20 15   businesses?

10:08:21 16   A.   It's a different category but it's

10:08:26 17   involved in the umbrella of our business.

10:08:28 18   Q.   The infrastructure that NorthState uses to

10:08:31 19   service its payday lending business, is that in any

10:08:35 20   way separate from the infrastructure for the other

10:08:37 21   lines of business?

10:08:38 22   A.   No.

Page 182

14:10:26  1    A.  Yes.

14:10:27  2    Q.  And then it says, "After careful review, a

14:10:31  3  business decision has been made to close your

14:10:32  4  accounts referenced above and terminate services

14:10:34  5  associated with the above accounts."

14:10:36  6        Do you see that?

14:10:36  7    A.  Yes, I do.

14:10:37  8    Q.  And they told you it was a business

14:10:39  9  decision to close your account?

14:10:40 10    A.  It doesn't say business decision but --

14:10:49 11  yes, it does.  A business decision, so yeah, that

14:10:51 12  would be it.

14:10:51 13    Q.  Did anyone at ███████████ ever tell you

14:10:54 14  anything different about why they closed your

14:10:56 15  account?

14:10:56 16    A.  I don't recall.

14:11:04 17    Q.  Did anyone at ████████ ever talk to you

14:11:06 18  about regulators?

14:11:12 19    A.  I don't recall.

14:11:15 20    Q.  Sitting here today as NorthState's

14:11:17 21  corporate designee, to the best of your recollection,

14:11:21 22  nobody talked to you about regulators from

Page 183

14:11:24  1  ████

14:11:24  2    A.  You know, I was in a lot of conversations

14:11:37  3  and I just cannot recall if -- I don't remember if

14:11:40  4  there was.  There could have been.  I don't know.

14:11:42  5    Q.  Did anyone at ████ talk to you

14:11:45  6  about an unacceptable risk list?

14:11:47  7    A.  I don't believe so.

14:12:00  8    Q.  Taking back out Exhibit 5, please, I want

14:12:14  9  to refer you to page 2, the last line of paragraph 3.

14:12:16 10  We have discussed this already but it says, "Based on

14:12:18 11  my conversations with various bank managers it is my

14:12:21 12  understanding that both ████ ██ ██

14:12:24 13  closed NorthState's account because of the regulatory

14:12:26 14  pressure placed on them that may be continuing to do

14:12:30 15  business with payday lenders untenable."

14:12:34 16        Do you see that?

14:12:34 17    A.  Yes, I do.

14:12:34 18    Q.  And we've already talked about the

14:12:36 19  TriCounties piece of that statement, right?

14:12:37 20    A.  Yes.

14:12:38 21    Q.  I want to talk to you now about the ████

14:12:40 22  ████ piece of that statement.  Which conversations

Page 184

14:12:44  1  with bank managers caused you to write that about

14:12:46  2  ████████?

14:12:54  3    A.  I can't recall.  I had so many

14:13:02  4  conversations with so many bank representatives and

14:13:05  5  compliance officers through that time period and I

14:13:12  6  don't remember who I spoke with or who made that

14:13:16  7  statement.

14:13:23  8        I know there was a gentleman named ████ at

14:13:29  9  ████ and I spoke to him on occasion and it

14:13:44 10  might have been ████ that told me about that.  I just

14:13:46 11  can't confirm it.

14:13:46 12    Q.  So sitting here today, you don't recall if

14:13:49 13  any bank manager from ████ told you anything

14:13:52 14  about regulatory pressure?

14:13:57 15    A.  Well, I will say somebody told me.  I just

14:13:59 16  can't recall who it was and the time frame that the

14:14:03 17  conversation took place.  I also was speaking with a

14:14:15 18  gentleman named ████ with ████ and he was

14:14:18 19  with the compliance department, but I can't recall if

14:14:24 20  it was him or not.  I don't know.

14:14:26 21    Q.  I don't want you to guess.

14:14:28 22    A.  Yeah.

Page 185

14:14:34  1    Q.  Did ████ ever tell you that it

14:14:36  2  doesn't do business with payday lenders?

14:14:38  3    A.  Not specifically.

14:14:48  4    Q.  When you say not specifically, what are

14:14:51  5  you referring to?

14:14:51  6    A.  In the termination of the account, it was

14:15:03  7  from my understanding that that was one of the main

14:15:09  8  reasons that it was being closed.

14:15:10  9    Q.  It was your understanding that it was

14:15:12 10  being closed because you are a payday lender?

14:15:14 11    A.  Uh-huh.

14:15:14 12    Q.  Are you aware that ████ does in

14:15:16 13  fact do business with other payday lenders?

14:15:18 14    A.  I did hear that.

14:15:22 15    Q.  So how is it your understanding that the

14:15:24 16  reason why they terminated you was because you were a

14:15:26 17  payday lender?

14:15:27 18    A.  Because we fell in -- I heard that the

14:15:31 19  smaller companies said they were basically

14:15:36 20  terminating and kind of the larger ones they were

14:15:38 21  keeping.

14:15:38 22    Q.  Who did you hear that from?

### Page 186

| | | |
|---|---|---|
| 14:15:40 | 1 | A. Like I said, I spoke to so many people at |
| 14:15:50 | 2 | ▮▮▮ at that time. That might have been |
| 14:15:56 | 3 | somebody else other than ▮▮▮. I don't know. |
| 14:16:00 | 4 | Q. Okay. |
| 14:16:01 | 5 | A. Could have been somebody with my |
| 14:16:02 | 6 | association. |
| 14:16:04 | 7 | Q. Going back to Exhibit 11, which is the |
| 14:16:12 | 8 | termination letter from ▮▮▮ on page 195. |
| 14:16:15 | 9 | A. Okay. |
| 14:16:15 | 10 | Q. It says, "We are writing today to let you |
| 14:16:17 | 11 | know that the accounts and agreements will be |
| 14:16:19 | 12 | terminated on December 15th, 2015." It's in the |
| 14:16:23 | 13 | middle of the page. |
| 14:16:24 | 14 | A. Yes. |
| 14:16:24 | 15 | Q. So they were giving you some time to find |
| 14:16:29 | 16 | a new banking relationship, is that right? |
| 14:16:31 | 17 | A. Yes. |
| 14:16:43 | 18 | Q. Apart from this communication that's on |
| 14:16:48 | 19 | page 195 of Exhibit 11, did you receive any other |
| 14:16:51 | 20 | communications in writing from ▮▮▮ about the |
| 14:16:53 | 21 | termination of your account? |
| 14:16:54 | 22 | A. I don't believe so. |

### Page 187

| | | |
|---|---|---|
| 14:17:03 | 1 | Q. Did you have any other conversations about |
| 14:17:08 | 2 | the termination of your account at ▮▮▮? |
| 14:17:13 | 3 | A. No, I don't think so. |
| 14:17:23 | 4 | Q. Did ▮▮▮ ultimately terminate your |
| 14:17:25 | 5 | account? |
| 14:17:25 | 6 | A. Yes. |
| 14:17:29 | 7 | Q. Look at page 197. Do you recognize this |
| 14:17:37 | 8 | document? |
| 14:17:39 | 9 | A. Actually, I don't. |
| 14:18:04 | 10 | Q. Let's see if we can figure out what it is. |
| 14:18:06 | 11 | It's an email from |
| 14:18:12 | 12 | ▮▮▮ to NorthState, is that |
| 14:18:17 | 13 | right? |
| 14:18:17 | 14 | A. Yes. |
| 14:18:17 | 15 | Q. And it's dated June 30th, 2016? |
| 14:18:20 | 16 | A. Yes. |
| 14:18:20 | 17 | Q. And at the very bottom, before it says |
| 14:18:25 | 18 | ▮▮▮ online customer service, it says, "Thank |
| 14:18:28 | 19 | you for being a ▮▮▮ online customer." |
| 14:18:34 | 20 | Do you see that? |
| 14:18:35 | 21 | A. Yes. |
| 14:18:48 | 22 | MS. MOSS: Let me interpose and say I |

### Page 188

| | | |
|---|---|---|
| 14:18:50 | 1 | think you represented that the document is dated |
| 14:18:56 | 2 | 2016. I don't know if your copy is more legible than |
| 14:18:59 | 3 | mine but mine appears to say 2015. But admittedly, |
| 14:19:08 | 4 | it is hard to read. |
| 14:19:11 | 5 | BY MS. MARGOLIS: |
| 14:19:11 | 6 | Q. Putting aside what the date of the |
| 14:19:13 | 7 | document is, does this document appear to suggest |
| 14:19:15 | 8 | that you were a ▮▮▮ online customer as of the |
| 14:19:20 | 9 | date of the document? |
| 14:19:21 | 10 | A. Yes. |
| 14:19:25 | 11 | Q. And this document looks like it's printed |
| 14:19:28 | 12 | out from an email box, right? |
| 14:19:31 | 13 | A. Yes. |
| 14:19:32 | 14 | Q. So you would be able to go back to that |
| 14:19:34 | 15 | email box and determine which date the email came in, |
| 14:19:36 | 16 | right? |
| 14:19:37 | 17 | A. This might be -- I have a home mortgage |
| 14:19:41 | 18 | with ▮▮▮ and this might be my home mortgage. |
| 14:19:44 | 19 | Q. Coming to the NorthState email account? |
| 14:19:47 | 20 | A. Yeah, it shows up on the same bank |
| 14:19:51 | 21 | statement actually. |
| 14:19:52 | 22 | Q. So it's your testimony that you still have |

### Page 189

| | | |
|---|---|---|
| 14:19:58 | 1 | a personal -- |
| 14:20:00 | 2 | A. No, I do not. It's a mortgage statement |
| 14:20:05 | 3 | that is under ▮▮▮. But when I had the bank |
| 14:20:11 | 4 | statement, my mortgage statement showed -- looks |
| 14:20:14 | 5 | like -- it would show the relationship. That might |
| 14:20:18 | 6 | be what this is in regards -- which I still have my |
| 14:20:22 | 7 | mortgage through ▮▮▮ still so I'm still an |
| 14:20:25 | 8 | online customer with them. |
| 14:20:28 | 9 | Q. So if I understand correctly, you have a |
| 14:20:30 | 10 | personal mortgage through ▮▮▮? |
| 14:20:33 | 11 | A. Yes. |
| 14:20:34 | 12 | Q. And when NorthState had a relationship |
| 14:20:39 | 13 | with ▮▮▮, you would receive statements from |
| 14:20:44 | 14 | ▮▮▮ that concerned both NorthState and your |
| 14:20:47 | 15 | personal mortgage? |
| 14:20:50 | 16 | A. Yeah. It would show me the accounts |
| 14:20:52 | 17 | under -- what I had with ▮▮▮ under NorthState |
| 14:20:59 | 18 | and my name. |
| 14:21:03 | 19 | Q. And you think that this document is in |
| 14:21:04 | 20 | regards to your personal mortgage? |
| 14:21:06 | 21 | A. If it's 2016, I believe so. |
| 14:21:11 | 22 | Q. Because your testimony is that ▮▮▮ |

## Page 274

16:28:25  1    A.   Yes.

16:28:26  2    Q.   So who do your colleagues that you meet at

16:28:31  3    the conventions, who do they bank with?  What banks

16:28:33  4    do they bank with?

16:28:34  5    A.   The bigger ones such as I believe Check 'n

16:28:38  6    Go, a couple of the big ones still bank with ███

16:28:42  7    ███.

16:28:43  8    Q.   And why did ███ drop you?

16:28:47  9    A.   They said that the letter stated that -- I

16:28:57 10    would have to read the letter again but just we

16:29:00 11    didn't meet the standards of their compliance

16:29:04 12    program, I believe, in general.

16:29:07 13    Q.   As I recall the correspondence that you

16:29:12 14    testified about earlier today, there was a lot of

16:29:14 15    documentation you had to provide to ███ for

16:29:17 16    their account review?

16:29:18 17    A.   Yes, there was.

16:29:19 18    Q.   But the volume of business you did with

16:29:26 19    ███ would be very small compared to Check 'n

16:29:28 20    Go or some of the larger corporations?

16:29:30 21    A.   Absolutely.

16:29:31 22    Q.   So is it reasonable to assume that ███

## Page 275

16:29:35  1    ███ was not making as much money servicing your

16:29:37  2    account as they could with the other large payday

16:29:42  3    lenders?

16:29:43  4    A.   Probably so, yeah.

16:29:44  5    Q.   But the amount of work that their

16:29:47  6    compliance function does for your one office, mom and

16:29:55  7    pop shop, is almost the same amount as they would do

16:29:58  8    for a larger institution?

16:29:59  9        MS. MOSS:  Objection.

16:30:00 10        THE WITNESS:  Yeah, on a -- numbers would

16:30:05 11    be a smaller degree.

16:30:06 12    BY MR. STERBENZ:

16:30:08 13    Q.   Earlier in your testimony today, you

16:30:10 14    referenced that there is a No-go list or a list of

16:30:13 15    prohibited lines of business that was produced, as

16:30:17 16    you said, by the Office of the Comptroller of the

16:30:20 17    Currency?

16:30:20 18    A.   That is, I believe, what I was told by the

16:30:25 19    credit card processor.

16:30:26 20    Q.   But you also referenced that you had

16:30:29 21    actually a list that you didn't have with you today

16:30:32 22    that was from the OCC of those prohibited businesses?

## Page 276

16:30:35  1    A.   I don't believe it was from the OCC.  It

16:30:37  2    was just a list that was provided to me from PACE.  I

16:30:41  3    believe it was PACE.

16:30:41  4    Q.   Do you know if you produced that in the

16:30:46  5    document discovery?

16:30:47  6    A.   No, I didn't.

16:30:48  7    Q.   Would you mind very much giving a copy of

16:30:52  8    that to your lawyer so she could provide it?

16:30:54  9    A.   If I still have it.  I believe I do.  I

16:30:57 10    kind of keep all that kind of stuff but I'll look for

16:30:59 11    it.

16:31:00 12        MS. MOSS:  And, Chris, as I mentioned to

16:31:03 13    Sara, we'll take it under -- you know, we can discuss

16:31:05 14    supplementation generally and --

16:31:08 15        MR. STERBENZ:  Understood.  I'm not asking

16:31:10 16    that to be disputatious.

16:31:13 17        MS. MOSS:  No, I understand.

16:31:14 18        MR. STERBENZ:  It was something that was

16:31:15 19    interesting to me because --

16:31:16 20        MS. MOSS:  Understood.

16:31:17 21        THE WITNESS:  Honestly, I wish I had it

16:31:19 22    today.

## Page 277

16:31:26  1        MR. STERBENZ:  That's all the questions

16:31:27  2    that I have.  Thank you very much for your time.

16:31:30  3        THE WITNESS:  Yeah, thank you.

16:31:32  4        MS. MIZUSAWA:  No questions.

16:31:48  5        (Whereupon, at 4:31 p.m., the taking of

          6    the instant deposition ceased.)

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

278

1          CERTIFICATE OF REPORTER

2     UNITED STATES OF AMERICA ) ss.:

3     DISTRICT OF COLUMBIA     )

4        I, MARY GRACE CASTLEBERRY, RPR, the officer

5     before whom the foregoing deposition was taken, do

6     hereby certify that the witness whose testimony

7     appears in the foregoing deposition was duly sworn by

8     me; that the testimony of said witness was taken by

9     me to the best of my ability and thereafter reduced

10    to typewriting under my direction; that I am neither

11    counsel for, related to, nor employed by any of the

12    parties for the action in which this deposition was

13    taken, and further that I am not a relative or

14    employee of any attorney or counsel employed by the

15    parties thereto, nor financially or otherwise

16    interested in the outcome of the action.

17

18          ----------------------------

19          Notary Public in and for

20          The District of Columbia

21

22    My commission expires: 07/14/2021

```
        CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.



            _____

            Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

2018, and executed the above certificate in my

presence.



            _____

            NOTARY PUBLIC IN AND FOR



                _____

                County Name

MY COMMISSION EXPIRES:
```

# EXHIBIT 96



Transcript of **Charles W. Calomiris**

Thursday, July 12, 2018

*Advance America, et al. v. Federal Deposit Insurance Corporation, et al.*

Alderson Court Reporting
1-800-FOR-DEPO (367-9976)
Info@AldersonReporting.com
www.AldersonReporting.com

Alderson Reference Number: 79822

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3       - - - - - - - - - - - - - - - X

4       ADVANCE AMERICA, et al.,        :

5            Plaintiffs,               :

6                v.                   :   Civil Action No.

7       FEDERAL DEPOSIT INSURANCE       :   14-cv-00953-TNM

8       CORPORATION, et al.,            :

9            Defendants.               :

10      - - - - - - - - - - - - - - - X

11                          Washington, DC

12                          Thursday, July 12, 2018

13           Videotaped Deposition of CHARLES W. CALOMIRIS, a

14      witness herein, called for examination by counsel for

15      Defendants in the above-entitled matter, pursuant to

16      notice, the witness being duly sworn by Rebecca L.

17      Stonerock, a Notary Public in and for the District

18      of Columbia, taken at the offices of MoloLamken, 600

19      New Hampshire Avenue NW, Washington, DC, at

20      9:00 a.m., Thursday, July 12, 2018, the proceedings

21      being taken down by Stenotype by Rebecca L.

22      Stonerock, RPR, and transcribed under her direction.

```
 1    APPEARANCES:

 2

 3        On behalf of the Plaintiffs:

 4            NICOLE J. MOSS, ESQ.

 5            Cooper & Kirk

 6            1523 New Hampshire Avenue NW

 7            Washington, DC  20036

 8            (202) 220-9600

 9            nmoss@cooperkirk.com

10

11        On behalf of the Office of the

12        Comptroller of the Currency:

13            PETER KOCH, ESQ.

14            MICHAEL MORELLI, ESQ.

15            Office of the Comptroller of the Currency

16            400 Seventh Street SW

17            Washington, DC  20219

18            (202) 649-6313

19            peter.koch@occ.treas.gov

20            michael.morelli@occ.treas.gov

21

22        On behalf of the Federal Deposit
```

```
 1          Insurance Corporation:

 2                  JUSTIN V. SHUR, ESQ.

 3                  MoloLamken

 4                  600 New Hampshire Avenue NW, Suite 660

 5                  Washington, DC  20037

 6                  (202) 556-2005

 7                  jshur@mololamken.com

 8          and

 9                  JESSICA ORTIZ, ESQ.

10                  MoloLamken

11                  430 Park Avenue

12                  New York, New York  10022

13                  (212) 607-8165

14                  jortiz@mololamken.com

15          and

16                  DUNCAN N. STEVENS, ESQ.

17                  Federal Deposit Insurance Corporation

18                  3501 N. Fairfax Drive, Room VS-D-7028

19                  Arlington, Virginia  22226-3500

20                  (703) 562-2402

21                  dstevens@fdic.gov

22
```

```
 1        On behalf of the Board of Governors

 2        of the Federal Reserve System:

 3                KATHERINE H. WHEATLEY, ESQ.

 4                YONATAN GELBLUM, ESQ.

 5                Board of Governors of the

 6                    Federal Reserve System

 7                20th and C Streets NW

 8                Washington, DC  20551

 9                (202) 452-2046

10                kit.wheatley@frb.gov

11                yonatan.gelblum@frb.gov

12

13        Also Present:

14                April Carter, Videographer

15                        -   -   -

16

17

18

19

20

21

22
```

```
 1                    C O N T E N T S

 2   WITNESS                    EXAMINATION BY COUNSEL FOR

 3   CHARLES W. CALOMIRIS       FDIC       OCC         FRB

 4        BY MR. SHUR           8

 5        BY MR. KOCH                      355

 6        BY MR. GELBLUM                               365

 7

 8

 9   Afternoon Session - Page 221

10

11

12                    E X H I B I T S

13   CALOMIRIS EXHIBIT NO.                         PAGE
```



```
15

16    (Exhibits attached to transcript.)

17                           -   -   -

18

19

20

21

22
```

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  We are now on the

3    record in the matter of Advance America versus FDIC.

4    The time is 9:00 a.m.  Today's date is July 12, 2018.

5    This is the video recorded deposition of Charles W.

6    Calomiris being taken at 600 New Hampshire Avenue

7    Northwest, Washington, DC  20027.

8              I'm the camera operator.  My name is April

9    Carter in association in Alderson Reporting located

10   at 2020 K Street Northwest, Washington, DC.  The

11   court reporter is Rebecca Stonerock, also in

12   association with Alderson Reporting.

13             Will all attorneys please identify

14   themselves and the parties they represent beginning

15   with the party noticing this proceeding.

16             MR. SHUR:  Justin Shur from MoloLamken on

17   behalf of the FDIC.

18             MS. ORTIZ:  Jessica Ortiz on behalf of

19   MoloLamken on behalf of the FDIC.

20             MR. STEVENS:  Duncan Stevens from FDIC.

21             MR. KOCH:  Peter Koch, K-O-C-H, for the

22   Office of the Comptroller of the Currency.

1           So, for example, let's take the

2   termination that Mr. O'Shaughnessy references, that

3   occurs, I believe, in 2012, that's coming from -- as

4   I found out in my conversation with him -- he was

5   referring to ████████ and ████████████.  That

6   was a termination that was motivated by the

7   effect the relationship had on the bank from an

8   economic standpoint.  But it wasn't because of the

9   nonviability of the client, it was because of the

10  compliance costs associated with maintaining the

11  client relationship.

12          But as Mr. O'Shaughnessy's declaration

13  makes clear, he understood that, because that was

14  based in a compliance cost that was real, that it was

15  an economic decision made by the bank based on the

16  acquisition by the Mexican parent.  As -- and so

17  let's call that a compliance cost -- but under the

18  current regulations, an understandable and real

19  compliance cost -- motivation, as distinct from what

20  you might call concocted compliance costs that

21  regulators could create, which are really outside of

22  what the regulation requires, but are simply intended

1    defendant in state enforcement actions alleging

2    violations of the law, right?  You understand that

3    generally?

4         A.    You're saying that's true.  I can

5    stipulate that.

6         Q.    Okay.  But you don't think that that fact

7    is relevant to your analysis?

8         A.    Well, Mr. O'Shaughnessy's declaration

9    explains that it wasn't.  So in his declaration he --

10   and this was one of the reasons I wanted to talk to

11   him on the telephone, was to try to understand better

12   what the particulars were.

13             And so as his declaration makes clear --

14   but I wanted just to seek additional clarity on it,

15   and I'm not putting words in his mouth, but this is

16   based on my understanding of his declaration -- that

17   the 2012 terminations were terminations that were

18   particular to Advance America, unlike the 2013

19   terminations which were not particular to Advance

20   America.

21             And so then the question is, well, what

22   was it about Advance America that in particular led

1    to the 2012 terminations.  And my understanding, from

2    his declaration and my corroboration of it in my

3    discussion with him, was it had to do with the -- a

4    couple of different things.  One of them was that

5    ████████████████████████████████████████████████

     ██  ████████████████████████████████████████████

     ██  ███████████████████████████████ And then

8    secondly, the acquisition by a Mexican parent would

9    increase the Know Your Customer costs that the bank

10   would bear, which are real compliance costs.  And

11   that those were the two considerations that

12   explained -- as far as he tells me, both in his

13   declaration and in the telephone call -- that

14   explained the particular terminations that he

15   experienced from ███████████ and ███████████.

16          And it's -- by the way, those are the two,

17   quote, "major banks" that he's referring to, I also

18   wanted to find out who they were -- and so that's

19   what I found out from him in our telephone

20   conversation.

21          And so according to Mr. O'Shaughnessy, the

22   thing that you're raising was not part of the

Charles W. Calomiris
Washington, DC



8     Q.    Okay.  Have you seen this e-mail before?

9     A.    I have.

10    Q.    Did you consider this e-mail in preparing

11    your reports?

12    A.    Yes.  So this e-mail is also referenced in

13    Mr. O'Shaughnessy's declaration.  And then after

14    reading this e-mail and the declaration, this was one

15    of the reasons I wanted to have a telephone

16    conversation with him, to find out a little bit more

17    of the details of what he meant in some of the words

18    in this e-mail, which I've already referenced in my

19    discussion.

20    Q.    What does Mr. O'Shaughnessy say ▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓?

22    A.    Well, I don't have the declaration right

```
 1   here, but, you know, he specifically distinguishes

 2   between the terminations that were the result of

 3   the 2012 acquisition by the Mexican parent, which he

 4   is also referencing here, and the subsequent ones

 5   that were not the result of that fact.

 6            And so what -- what's going on in this

 7   e-mail is that Mr. O'Shaughnessy is saying ████████

██ ███████████████████████████████████████████████ we

 9   don't really need you to try to revisit that

10   termination, because that termination had a cause

11   that we understand, and that we regard as -- as

12   related to those other specific things that were

13   idiosyncratic to that one transaction, ████████

██ ███████████████████████████████████████████████

██ ███████████████████████████████████████ as opposed

16   to some broader kind of judgment applied across the

17   board, which -- and so Mr. O'Shaughnessy in his

18   declaration makes it clear that the reason he's not

19   asking for help ██████████████ on this is because he

20   understands why this happened, as he says, which he

21   believes to be true, that is, that they were

22   motivated by what they told him they were motivated
```

1    by in that 2012 decision to separate.

2           So this was actually very much part of my

3    motivation wanting to talk to Mr. O'Shaughnessy

4    yesterday in light of the declaration to make sure I

5    was connecting the two properly and understood what

6    he meant by this e-mail, and I've already testified

7    about it.  And in particular I've testified and I'll

8    reiterate it just to make it clear that when I asked

9    him who he was referring to when he used the word

10   major banks -- you see it in the first line -- and he

11   said that was two banks.



18

```
 1                    AFTERNOON SESSION

 2                      (2:07 p.m.)

 3      EXAMINATION BY COUNSEL FOR THE FDIC (RESUMED)

 4            THE VIDEOGRAPHER:  Back on the record

 5   at 14:07.

 6   BY MR. SHUR:

 7       Q.    So I believe when we left off one of the

 8   documents you were looking at was an internal Advance

 9   America e-mail that's marked Exhibit 8.  Do you have

10   that in front of you?

11       A.    Yes, I do.

12       Q.    Okay.  And we've read the e-mail into the

13   record, and what the CEO of Advance America is saying

14   is that ██████████ termination wasn't because of

15   Operation Choke Point, correct?

16       A.    I think it's not just a -- I don't think

17   he's just referring to ██████████████████████.

18   I think, as I said, he's referring to ████████████

██   ██████████████ at that particular date.

20       Q.    Well, he refers to major banks which they

21   have lost, right?

22       A.    And I'm telling you based on my discussion
```

1   with him, he meant -- triggered by the 2012

2   acquisition, the major banks ███████████████

██   ████████   That's what I learned from my conversation

4   with him yesterday.

5       Q.    And he says that the terminations,

6   referring to the major banks ██████████████, what he

7   refers to in this e-mail, the termination was because

8   of the company's change in ownership interest, right?

9       A.    Through the two effects that I described

10  in my prior testimony.

11      Q.    What do you mean by two effects?

12      A.    Well, what he told me was, one of them was

13  that because the parent was a Mexican company, that

14  would raise some new costs from a Know Thy Customer

15  standpoints.  And secondly because the parent --

16  ████████████████████████████████████████

██  ██████████████████████████████████████

██  ████████████████████████████████████████

██  ████████████████████████████████

██  ██████████████████████████████████

██  ████████████████████████████████████████

██  ████████████████.  So he mentioned both of those.

1        Q.     Okay.  And you said that in your

2   conversation with Mr. O'Shaughnessy when he says

3   major banks in this e-mail he's referring to who?

4        A.     ███████████████████████████

5        Q.     But you'd agree that foreign ownership

6   interest is an issue for smaller banks, too, correct?

7        A.     It can be.

8        Q.     And it was with respect to the Advance

9   America terminations, right?

10       A.     I haven't studied terminations

11   statistically in order to -- and comprehensively in

12   order to make that kind of statement.

13                ████████████████████████████

█    ██████████████████

█    █████████████

█    ██    ██████   ████████████████████████

█    █████████████████████

█    ████████████████████████

█    ██    ████

█    ████████████████████████

█    ████████████████

█    ██    ████████████

1                    THE VIDEOGRAPHER:  Off the record at --

2                    MS. MOSS:  I have no questions, but I did

3       want to say on the record we'd like him to read and

4       sign.

5                    THE VIDEOGRAPHER:  Off the record

6       at 17:41.

7                    (Whereupon, at 5:41 p.m., the taking of

8       the instant deposition ceased.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
 1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
 2      I, Rebecca L. Stonerock, Registered Professional
 3   Reporter, the officer before whom the foregoing
 4   proceedings were taken, do hereby certify that the
 5   foregoing transcript is a true and correct record of
 6   the proceedings; that said proceedings were taken by
 7   me stenographically and thereafter reduced to
 8   typewriting under my supervision; and that I am
 9   neither counsel for, related to, nor employed by any
10   of the parties to this case and have no interest,
11   financial or otherwise, in its outcome.
12
13   My commission expires:
14   October 14, 2022
15
16
                       NOTARY PUBLIC IN AND FOR
19                     THE DISTRICT OF COLUMBIA
22
```

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.

_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this \_\_\_\_\_ day of _____,

2018, and executed the above certificate in my

presence.

_____

NOTARY PUBLIC IN AND FOR

_____

County Name

MY COMMISSION EXPIRES:

EXHIBIT 97

# FILED UNDER SEAL

# EXHIBIT 98

**Confidential Pursuant to Protective Order**



Transcript of **William S. Lane 30(b)(6)**

Tuesday, May 1, 2018

*Advance America, et al. v. Federal Deposit Insurance Corporation, et al.*

Alderson Court Reporting
1-800-FOR-DEPO (367-9976)
Info@AldersonReporting.com
www.AldersonReporting.com

Alderson Reference Number: 78157

1                  UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLUMBIA

3

4    ADVANCE AMERICA, CASH ADVANCE      )
     CASH ADVANCE CENTERS, INC.;        ) Civil Action No.
5    CHECK INTO CASH, INC.;             ) 1:14-cv-00953-TNM
     NORTHSTATE CHECK EXCHANGE,         )
6                                       )
                         Plaintiffs,    )
7         v.                            )
                                        )
8    FEDERAL DEPOSIT INSURANCE          )
     CORPORATION; BOARD OF GOVERNORS    )
9    OF THE FEDERAL RESERVE SYSTEM;     )
     OFFICE OF THE COMPTROLLER OF       ) CONFIDENTIAL
10   THE CURRENCY,                      )
                                        ) PURSUANT TO
11                       Defendants.    )
     _____) PROTECTIVE ORDER
12

13       30(b)(6) DEPOSITION OF CHECK INTO CASH, INC.

14       by and through its Designated Representative,

15                     WILLIAM S. LANE

16                     Washington, D.C.

17                  Tuesday, May 1, 2018

18                        8:04 a.m.

19

20   Job No. 78157

21   Pages 1 - 315

22   Reported by:  Leslie A. Todd

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 48 of 150
Washington, DC
5/1/2018
Page 2

```
 1      Deposition of WILLIAM S. LANE was held at:

 2

 3                 MoloLamken

 4                 600 New Hampshire Avenue, N.W.

 5                 Suite 500

 6                 Washington, D.C. 20037

 7

 8

 9      Pursuant to agreement, before Leslie Anne Todd,

10   Notary Public of the District of Columbia.

11

12

13

14

15

16

17

18

19

20

21

22
```

William S. Lane 30(b)(6)  Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM  Document 209-6  Filed 11/09/18  Page 49 of 150
Washington, DC
5/1/2018
Page 3

```
 1                 A P P E A R A N C E S

 2

 3    For Plaintiff:

 4              NICOLE J. MOSS, ESQUIRE

 5              COOPER & KIRK, PLLC

 6              1523 New Hampshire Avenue, N.W.

 7              Washington, D.C. 20036

 8              (202) 220-9600

 9    For Defendant Federal Deposit Insurance Corporation

10              JESSICA ORTIZ, ESQUIRE

11              EKTA DHARIA, ESQUIRE

12              MoloLamken

13              430 Park Avenue

14              New York, New York 10022

15              (212) 607-8152

16    For Defendant Board of Governors of the Federal

17    Reserve System

18              YVONNE F. MIZUSAWA, Esquire

19              Board of Governors of the Federal

20               Reserve System

21              Washington, D.C. 20551

22              (202) 452-3436
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 50 of 150
Washington, DC
5/1/2018
Page 4

```
 1    APPEARANCES (Continued)

 2    For Defendant Office of the Comptroller of the

 3    Currency:

 4              ALISSA V. SAGRI, ESQUIRE.

 5              Office of the Comptroller of the Currency

 6              400 7th Street, S.W.

 7              Washington, D.C. 20219

 8              (202) 649-6261

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 51 of 150
Washington, DC
5/1/2018
Page 5

```
 1                    C O N T E N T S

 2

 3   EXAMINATION OF WILLIAM S. LANE              PAGE

 4     By Ms. Ortiz                              11

 5     By Ms. Moss                              312

 6

 7                    E X H I B I T S

 8                 (Exhibits were attached.)

 9   EXHIBIT NO.    DESCRIPTION                  PAGE

10   No. 1:        Notice of Deposition          18

11   No. 2:        Check Into Cash Website information  30

12   No. 3:        Information re Prepaid Cards -

13                 Credit, Debit, Checking, Reloadable

14                 - ████████████               80

15   No. 4:        Plaintiff Check Into Cash's

16                 Objections and Responses to

17                 Defendants' First Set of

18                 Interrogatories               96

19   No. 5:        ████████████ letter to Mr. Lane

20                 Re: Closure of your ██████

21                 ██████ relationship, dated

22                 October 30, 2013             107
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 52 of 150
Washington, DC
5/1/2018
Page 6

```
 1                    E X H I B I T S

 2              (Exhibits were attached.)

 3    EXHIBIT NO.   DESCRIPTION                    PAGE

 4    No. 6:       E-mail re Consumer Finance TM    138

 5    No. 7:       ████   letter to Bill Lane, CFO,

 6                 dated November 12, 2013          150

 7    No. 8:       Memo                             169

 8    No. 9:       █████████████   letter

 9                 to Check Into Cash of Louisiana

10                 Inc. Re Notification of Account

11                 Closure(s) ending in: ███, dated

12                 February 26, 2014                177

13    No. 10:      ██████████   letter to Bill

14                 Lane, dated March 5, 2014        181

15    No. 11:      E-mail string re Fwd: 5/3...     194

16    No. 12:      E-mail string re ██████          203

17    No. 13:      ███████  letter to ████████,

18                 Re: Termination of Deposit and

19                 Treasury Services Relationship,

20                 dated March 27, 2014             207

21

22
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 53 of 150
Washington, DC
5/1/2018
Page 7

```
 1                    E X H I B I T S

 2                (Exhibits were attached.)

 3    EXHIBIT NO.   DESCRIPTION                      PAGE

 4    No. 14:       ██████████  letter to William S. Lane,

 5                  CFO, re Notice of account closure

 6                  and new account management, dated

 7                  November 10, 2016                210

 8    No. 15:       ███████████████ letter to Check

 9                  Into Cash, re: Money Service

10                  Business, dated December 7, 2016   216

11    No. 16:       █████████████ letter to

12                  Check Into Cash                  219

13    No. 17:       E-mail re Accounts ██████████████

14                  █████                            222

15    No. 18:       ███████████████████ letter

16                  to Tim McMahan, dated February 1,

17                  2013                             225

18    No. 19:       ██████████████ letter to Tim

19                  McMahan, dated April 30, 2012    227

20    No. 20:       ████████████████ letter to

21                  Check Into Cash, dated May 10, 2010  229

22
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order     5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 54 of 150
Washington, DC                                        Page 8

```
 1                    E X H I B I T S

 2                 (Exhibits were attached.)

 3     EXHIBIT NO.    DESCRIPTION                      PAGE

 4     No. 21:       E-mail re Account Closure Request -

 5                   Check Into Cash of Missouri Inc

 6                   ██████████████)               231

 7     No. 22:       ████████████ letter to Check

 8                   Into Cash, Regarding Deposit

 9                   Account(s) ending in: ████, dated

10                   10/11/2016                      232

11     No. 23:       ████████████ letter to US Money

12                   Shops of South Carolina, LLC, dated

13                   October 9, 2013                 234

14     No. 24:       ████████████ letter to Tim McMahan

15                   Re: Checking account ██████████,

16                   dated September 1, 2014          237

17     No. 25:       ████████████████ letter to

18                   Check Into Cash of Ohio, LLC, Re:

19                   Your account ending in ████, dated

20                   April 5, 2011                    239

21

22
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 55 of 150
Washington, DC

5/1/2018
Page 9

```
 1                    E X H I B I T S

 2              (Exhibits were attached.)

 3    EXHIBIT NO.   DESCRIPTION                    PAGE

 4    No. 26:       ██████████ letter to Bill Lane,

 5                  Re: ████████ Transactional

 6                  Accounts, dated May 21, 2010      241

 7    No. 27:       ██████████ letter to Check Into

 8                  Cash, dated September 15, 2014    243

 9    No. 28:       E-mail string re ██████████ /

10                  Centralized Returns & ██Direct

11                  Debit Tickets                    272

12    No. 29:       E-mail re Check Into Cash of

13                  Oklahoma ████████               275

14    No. 30:       Creditcorp and Subsidiaries Report

15                  on Consolidated Financial

16                  Statements, December 31, 2015    285

17    No. 31:       E-mail re 2016 Creditcorp audited

18                  consolidated financial statements 290

19    No. 32:       Creditcorp and Subsidiaries, Gross

20                  Revenue, Years ended 2010 - 2016,

21                  three months ended March 31, 2017

22                  and June 30, 2017                299
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order          5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 56 of 150
Washington, DC          Page 10

```
 1                    E X H I B I T S

 2                  (Exhibits were attached.)

 3    EXHIBIT NO.   DESCRIPTION                      PAGE

 4    No. 33:       Document showing Loan Count and

 5                  Principal                        303

 6    No. 34:       Document entitled "Payday

 7                  Originations and Payday Originations

 8                  Loan Amount"                     306

 9    No. 35:       Document entitled "Store Count By

10                  Date," July 26, 2017             309

11

12

13

14

15

16

17

18

19

20

21

22
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order     5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 57 of 150
Washington, DC
Page 11

```
 1                 P R O C E E D I N G S

 2                 -------------------

 3                 WILLIAM SCOTT LANE,

 4        and having been first duly sworn,

 5       was examined and testified as follows:

 6       EXAMINATION BY COUNSEL FOR DEFENDANT

 7       FEDERAL DEPOSIT INSURANCE CORPORATION

 8   BY MS. ORTIZ:

 9        Q    Morning, Mr. Lane.  My name is Jessica

10   Ortiz, and I'm an attorney here at MoloLamken.

11             We just met a few minutes ago, correct?

12        A    Yes.

13        Q    Can you state your name for the record.

14        A    William Scott Lane.

15        Q    Where do you currently live, Mr. Lane?

16        A    Chattanooga, Tennessee.

17        Q    And is this the first time you've sat for

18   a deposition or have you been deposed before?

19        A    I've been deposed before.

20        Q    Approximately how many times?

21        A    Two.

22        Q    When were those two times?
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order     5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 58 of 150
Washington, DC

Page 24

```
 1          A      I was a director of the local chapter of

 2   TSCPA for Chattanooga back in the -- probably 1995 to

 3   1999, somewhere in that time frame.

 4          Q      Okay.  You mentioned that you joined

 5   Check Into Cash in 2002 as chief financial officer,

 6   and you now have these seven groups or six or seven

 7   groups that report to you.

 8               When you first started in 2002, was the

 9   structure the same?

10          A      It was similar.  The collections

11   department did not report to me and human resources

12   did not report to me.  Otherwise, those -- the other

13   departments did.

14          Q      And approximately how many people in

15   total make up these various groups?

16          A      For the departments that report to me?

17          Q      Yes, correct.

18          A      Including the collections group, it's

19   close -- approximately 100.  Prior to collections and

20   human resources reporting to me, closer to 60.

21          Q      So without collections it's about 60 and

22   with collections about a hundred?
```

1   we may be offering title loans in those states.  So

2   it will vary by state based on what products are

3   available under the laws of that state.

4              So we offer financial services.  We make

5   it quick and easy for our consumer -- for our

6   customer because typically our customer is in many

7   cases underbanked, and so they're not able to go to a

8   bank and get a loan if they have a financial need.

9   And so our process is a simpler process.  If they go

10   to a bank and they can get a loan, it may take

11   several days.  In our case for a first-time customer,

12   it may be it takes 15 or 20 minutes, and for a

13   recurring customer it takes less time.

14        Q    You mentioned payday loans as one of the

15   products on Exhibit 2.  At page 2, it says "Payday

16   loans online."

17              You mentioned earlier, you do offer

18   payday loans in some states online; is that correct?

19        A    Yes.

20        Q    And that's if the state allows you to?

21        A    That's correct.

22        Q    And can you walk me through the process

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 60 of 150
Washington, DC
5/1/2018
Page 58

 1   office.

 2           So our point of sale system knows if a

 3   customer is a customer at a location.  So, for

 4   example, if they try to go to another location to

 5   take another loan, our database would know they

 6   already have a loan outstanding in one of our other

 7   stores.

 8       Q    Anywhere across the nation?

 9       A    Yes.  But an employee in one store is not

10   able to go in and look at the information of

11   customers in another store, but our central database

12   has that information so that we have controls in

13   place that would be used as part of the underwriting,

14   but also just to limit whether someone could get an

15   additional loan.

16       Q    If I could turn your attention back to

17   Exhibit 2.  On page 2, under "Payday loans online,"

18   it indicates cash advances.

19           Is that a service that's offered at Check

20   Into Cash?

21       A    A cash advance is typically just going to

22   be the same as a payday loan.

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order   5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 61 of 150
Washington, DC   Page 59

1         Q     Anything different between the two or is

2    it just --

3         A     Well, I believe the payday loans online

4    would be the online.  The cash advance, stop in any

5    of our hundreds of Check Into Cash centers, is just

6    reflective of the store loans, but they're -- again,

7    they follow state law, so that's just a matter of

8    term.

9         Q     Okay.  And the next one listed below that

10   is called "Title Loans."  "A list of our stores now

11   also offer title loans," what does that mean?

12        A     That is a loan that is secured by an

13   individual's title to their car.  We offer those in

14   stores that are in states that have a title loan law

15   where we're licensed to offer title loans.

16        Q     Okay.  And in order to get a title loan,

17   you have to provide a -- you have to bring in the

18   title?

19        A     Yes.  So someone would come in.  If they

20   want to apply for a title loan, then they need to

21   bring their title in, have the car there.  Our

22   employee will look at the car as far as the overall

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 62 of 150
Washington, DC
5/1/2018
Page 67

```
 1          A      It would be the interest on the $200 for

 2     the new loan period.  And then we also limit the

 3     number of times they can do a rollover so that

 4     they -- that's not something that they would

 5     continuously do.  We limit that to four rollovers.

 6          Q      If I could direct your attention to

 7     page 3 of Exhibit 2.  Down at the bottom there is a

 8     list of additional topics, including some products.

 9               The second from the bottom, flex loans.

10     Do you see that?

11          A      Yes.

12          Q      What are flex loans?

13          A      Flex loans are specific to the state of

14     Tennessee.  That's just a term that's used for the

15     state law.  It's basically a line of credit.

16          Q      Okay.  And the next one is check cashing.

17          A      Yes.

18          Q      What is check cashing?

19          A      Check cashing is where someone has a

20     check that's been written to them, and they can bring

21     it into our store, and we'll cash it for a fee.

22          Q      And how is that fee determined?
```

William S. Lane 30(b)(6)  Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM  Document 209-6  Filed 11/09/18  Page 63 of 150
Washington, DC
5/1/2018
Page 68

 1        A     Based on the type of check.  If it's a

 2    payroll check, the fee is different than if it's some

 3    other type of third-party check.

 4        Q     And how do you -- how does Check Into

 5    Cash derive income from cashing checks?

 6        A     Through the fee that's charged in order

 7    to cash that check.

 8        Q     And is there anything done when a check

 9    is brought in to verify the check or verify the

10    availability of funds on that check?

11        A     Yes.  We use a third party that verifies

12    the funds.  So we scan the check, which provides the

13    bank account, routing information, the full face of

14    the check, and input information on the customer into

15    our point of sale system.  It goes to a third party

16    that has algorithms and other data that is used.

17    They provide the service for a number of other

18    companies, and so they gather data as far as checks

19    that have been good or payers that have been good or

20    those that have had bad checks.  And so with all the

21    data that they have, then they send a verification

22    back to us as far as whether we should cash it or not

William S. Lane 30(b)(6)  Confidential Pursuant to Protective Order    5/1/2018
Case 1:14-cv-00953-TNM  Document 209-6  Filed 11/09/18  Page 64 of 150
Washington, DC
Page 69

1    cash it.

2         Q    And that verification is not directly

3    with the bank where the check is drawn on, is it?

4         A    My understanding from the vendor is about

5    80 percent of the transactions are through their

6    algorithms and database and information that they

7    have, and it's automated.  About 20 percent -- if

8    there is some question as to the automated process,

9    if it comes back and isn't complete, then

10   approximately 20 percent of those are done manually

11   where the individual at that vendor that provides the

12   service for us, that those 20 percent that they would

13   either call the bank or they would call the maker of

14   the check to verify the check.  So in some cases the

15   bank is -- contacting the bank may be part of the

16   process.

17        Q    The vendor is contacting the bank as part

18   of the process.

19        A    Yes.

20        Q    But I think you said that's about 20

21   percent of the time possibly --

22        A    Yes.

1          Q      -- or even less?

2          A      I'm not aware of whether their algorithms

3    or analytical automated process verifies anything

4    with the bank.

5          Q      Okay.  And that verification process

6    doesn't guarantee that at the time that Check Into

7    Cash deposits the check that the funds will be

8    available --

9          A      That's correct.

10         Q      -- or that it will be paid.  It's not a

11   guarantee.

12         A      That's correct.

13         Q      And what percentage of Check Into Cash's

14   income is derived from check cashing?

15         A      ███████████████████████████

16         Q      The next item, I guess, listed now on

17   page 4 at the top is Bill Pay.

18         A      Yes.

19         Q      Is that a service offered?

20         A      It is.  We offer that through Western

21   Union.

22         Q      And what is Bill Pay?

William S. Lane 30(b)(6)  Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM  Document 209-6  Filed 11/09/18  Page 66 of 150
Washington, DC
5/1/2018
Page 71

1       A      If people come in and if they have a

2  utility bill to pay, a phone bill to pay, then they

3  often come into our location and pay that through our

4  store.

5              Western Union has a number of companies,

6  vendors that are set up to take payments for that

7  vendor, and customers can come in and conveniently do

8  that in our location.

9       Q      And how does Check Into Cash derive

10  income from Bill Pay?

11      A      That is a service provided through

12  Western Union, and we get a small -- a small fee for

13  doing that.

14      Q      Is that fee based on the amount of the

15  payment?

16      A      I need to go back and look at the

17  agreement with Western Union.

18      Q      And then the next line, speaking of

19  Western Union, is Western Union Near You.  What is

20  that service?

21      A      Okay.  So in our store locations, we

22  offer Western Union services.  So we are -- someone

William S. Lane 30(b)(6)  Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM  Document 209-6  Filed 11/09/18  Page 67 of 150

Washington, DC

5/1/2018
Page 72

1  can come in, they can get a money order, they can do

2  Bill Pay, they can use Western Union to send money to

3  a loved one in another state.  And so the various

4  Western Union services that they offer, we offer

5  through our location.

6       Q    And again, how does Check Into Cash

7  derive income from the Western Union services?

8       A    Western Union charges a fee for those

9  services, and we get -- and then they pay us a small

10  fee for each transaction.

11       Q    And do you know for the non-Bill Pay

12  Western Union services whether it's based on amount?

13  Whether -- what the amount that Western Union pays

14  Check Into Cash.

15       A    Money orders are not.  I know that's just

16  a set fee.  The other transactions, I would need to

17  look at the agreement.

18       Q    ███████████████████████████████████████

██  ███████████████████████████████████████████

██      █   ████████████████████████

██      █   ███████████████████████████████████

██  ████████████████████████████████████████████████

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 68 of 150

Washington, DC

5/1/2018
Page 73

9        Q      Okay.  The next product listed is U.S.

10   Money Card.

11        A      Mm-hmm.

12        Q      What is that?

13        A      It's a prepaid, general purpose,

14   reloadable debit card.  So it's where someone would

15   come in -- it's a Visa-branded card -- and someone

16   can come in and purchase the card, activate the card,

17   and load money on the card.

18             So they can use it at where Visa is

19   accepted anywhere, and purchase goods at a grocery

20   store or any other vendor.  They can use it online

21   just like any other Visa card.  And they can only

22   spend what they've loaded onto the card.

William S. Lane 30(b)(6)  Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 69 of 150
Washington, DC

5/1/2018
Page 113

 1          Q      And approximately how many times did you

 2     talk to ████ between April and September?

 3          A      Probably once, maybe twice a month.

 4          Q      And in September, when you had the

 5     conversation with ████ who initiated that

 6     conversation?

 7          A      He did.

 8          Q      And was that a telephone conversation?

 9          A      Yes.

10          Q      And what did he tell you during that

11     conversation?

12          A      He called to notify me that ████

13     ████ had decided to terminate its banking

14     relationship with the company.  That as part of the

15     conversation as we talked through it, he had

16     indicated, as I had said earlier, that it was nothing

17     that the company had done.  We've had a good

18     relationship.  I think we had banked with them for

19     over 20 years, and they provided various treasury

20     services along with credit to the company.  And that

21     it was a decision that the bank had made to exit

22     banking the payday industry.

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 70 of 150
Washington, DC
5/1/2018
Page 114

```
 1                    I had asked him -- we have -- as we

 2     talked about, we have some subsidiaries that do not

 3     offer payday -- because he had indicated it was

 4     focused around payday, and I had indicated we have

 5     some subsidiaries that do not offer payday and would

 6     they continue to bank those subsidiaries, and he had

 7     indicated that they look at the relationship as a

 8     whole, and that because any of our operations are

 9     payday that that would preclude them from offering

10     those services to any of our other affiliates that

11     did not offer payday.

12          Q    And just so that it's clear, when you

13     were discussing it with him, did he say it was a

14     decision that the bank had made to exit the payday

15     industry?

16          A    He had indicated that they had regulatory

17     pressures.  ████████████████████████████████████████

        ██  ████████████████████████████████████████████████

        ██  ██████████████████████████████████████.  And so it was

20     indicated that in going through that process and as

21     part of their settlement, I suppose, that they had

22     agreed to exit the payday industry, banking the
```

William S. Lane 30(b)(6)  Confidential Pursuant to Protective Order          5/1/2018
Case 1:14-cv-00953-TNM  Document 209-6  Filed 11/09/18  Page 71 of 150 Page 115
Washington, DC

1   payday industry.

2        Q    So I just want to break this down a

3   little bit.

4             He indicated that they had regulatory

5   pressures.  Did he say -- well, what regulators were

6   pressuring them?

7        A    No.  He just indicated -- he mentioned

8   ████████████████████████████████████████████████

9   that, and as part of their agreement and however that

10  was to be settled, I guess, that they agreed to exit

11  servicing the payday industry.

12       Q    And at the time when you spoke to him

13  after 2013, did you take notes at that time?

14       A    Only with regards to a conversation I had

15  with him in January of 2017.

16       Q    So there were -- so you have no notes

17  from any of the conversations with him in 2013?

18       A    No.

19       Q    Did you otherwise memorialize the

20  conversation, send an e-mail after or anything?

21       A    Not that I recall.

22       Q    After that conversation in September of

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order   5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 72 of 150
Washington, DC
Page 132

1 ███████████████████████

2      A    I'm sure we did, and to the extent we

3 did, they were fairly general, just again tied back

4 to the regulatory environment of the banking -- of

5 the banking industry.

6      Q    And during those conversations, do you

7 ever recall him again mentioning the FDIC?

8      A    ████████████████████████████████

9 recall him mentioning regulators.  I don't recall him

10 mentioning a specific regulator.  He referred to

11 Operation Choke Point, but again, I don't recall him

12 mentioning specific regulators.

13      Q    When was the first point that he referred

14 to Operation Choke Point?

15      A    I don't recall it in 2013, so I assume it

16 would have been sometime in 2014 or later.

17      Q    I don't want you to assume, so --

18      A    Okay.  So I know it would -- I don't --

19 it wasn't in 2013.  It would have been after that.

20      Q    And the first time that he made mention

21 of Operation Choke Point -- and again, just to be

22 clear, we're going to talk about the conversation in

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 73 of 150
Washington, DC
5/1/2018
Page 143

```
 1          A     And --

 2          Q     -- with other folks at the bank?

 3          A     Yes.  And then he would also -- if they

 4    had treasury services or other bank services that we

 5    were not utilizing with the bank, then he would meet

 6    with us to tell us about those and see if they were

 7    services that might help our company.  So in some

 8    respects it was sales also.

 9          Q     And did he gain some type of commission

10    or something from the relationship between Check Into

11    █████████████████████?

12          A     I don't know his compensation structure,

13    no.

14          Q     ████████████████████████████████████████

15    he had been involved in the decision to terminate the

16    ████████████████████████████████████

██    ████████████

18          A     He made it clear he was not part of the

19    decision process.  Whether he had communications

20    during that process, I don't know, but he was not

21    part of the process in determining to exit the

22    relationship.
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 74 of 150
Washington, DC
5/1/2018
Page 144

1          Q     And did he tell you who was part of --

2    who, if anyone, was part of the decision process?

3          A     I'm trying to think if he mentioned

4    any -- any particular individuals.  I think it was

5    more just the corporate management of the bank.

6          Q     Okay.  And when you -- when you had the

7    ███████████████████████████████████████████████

8    is 2013 -- the initial conversation where he

9    ███████████████████████████████████████████████

     ███████████████████████████████████████

     █    █     ████████████████████████████

     ███████████████████████████████████████████████

13   who had issues with the way they were conducting

14   business, I guess.  I don't know the details.  And as

15   part of that, I believe, my understanding was that

16   ██████████████████████████████████████████

     ███████████████████████████████   ██████████████

18   being investigated, that -- again, my understanding

19   based on what he had said, was as they were settling

20   that with regulators, that matter, that the bank

21   agreed to exit doing business with the payday

22   industry.  It was related to that extent.

1        Q      And when he said that they were settling

2    with regulators, again did -- he made no reference to

3    a specific regulator --

4        A      No.

5        Q      -- that they were settling with.

6        A      That's correct.

7        Q      ████████████████████████████████████

8    2017 when you made that phone call to him?

9        A      No.

10       Q      After that phone call, at some point did

11   you discuss the -- this lawsuit?

12       A      I don't recall ever mentioning the

13   █████████████████

14       Q      Did you ever forward him an article about

15   it or send him a copy of the complaint or anything of

16   that nature?

17       A      I'm sure I didn't -- I didn't send him a

18   copy of the complaint.

19       Q      Would you have sent him a news article

20   discussing the lawsuit?

21       A      Not that I recall.

22       Q      And when you discussed Operation Choke

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 76 of 150
Washington, DC
5/1/2018
Page 146

1    Point with --

2         A    Can I -- let me just say --

3         Q    Please.

4         A    -- when the lawsuit first started, it may

5    have come up in conversation.  I don't recall

6    mentioning to him that Check Into Cash joined the

7    lawsuit.  So any conversation I think would have been

8    prior to Check Into Cash becoming a plaintiff in

9    that.

10        Q    Okay.  Do you remember what about the

11   lawsuit you would have discussed with him?

12        A    Just that -- that there was litigation

13   out there, but I -- at that point I didn't really

14   know specifics of the lawsuit or the litigation.

15        Q    Okay.  And when you -- when you spoke to

16   ███████████████████████████████████████████████

17   Point" came up, and I'm not -- I'm talking about

18   generally in 2016 and before that when you had

19   conversations with him about Operation Choke Point,

20   did you -- what did you mean by Operation Choke Point

21   when you used that term?

22        A    Well, when I referred to Operation Choke

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order     5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 77 of 150
Washington, DC                                             Page 147

1    Point, what I was referring to in my understanding or

2    my intent when I referred to it was a concerted

3    effort or an effort among various regulators that

4    regulate the banks to put pressure on them to stop

5    banking the payday industry.  And that's what my

6    reference or my intent was when I referred to

7    Operation Choke Point.

8         Q    Did you ever explain that or define that

9    ██████████

10        A    In general conversations about Operation

11   Choke Point, I think we had an understanding that

12   that's what we referred to it as.  As far as any

13   specifics more than that, it would have been general.

14        Q    And in January of 2017, when he made the

15   statement to you, "Well, it was Choke Point for us,"

16   did he tell you what the basis for that statement

17   was?

18        A    No.

19        Q    Did he tell you whether he had had

20   ████████████████████████████████████████████

21   management about that?

22        A    He didn't refer to anything else other

```
 1    than just that statement.

 2         Q    So you have no idea what his basis for

 3    saying, "Well, it was Choke Point for us" is?

 4         A    No.

 5         Q    And Exhibit 6, the August 2017 e-mail,

 6    you testified about a conversation that happened

 7    before this.

 8              Did Check Into Cash have an interest in

 9    ████████████████████████████████████████████████

10         A    Certainly.

11         Q    Why?

12         A    Because for our operations, it's more

13    ideal for us to have bank branches that our stores

14    can use rather than be forced to use armored car

15    ██████████   █████████████████████████████████.

16              When we exited the relationship, while we

17    didn't like the fact that the relationship was being

18    ████████████████████████████████████████████

19    professional way, and that we needed additional time,

20    they gave us additional time.  So while it was an

21    unfortunate situation, from our standpoint in the way

22    ████████████████████████████████████████████████
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order    5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 79 of 150   Page 153
Washington, DC

```
 1         Q     And again, how long had he been

 2    relationship manager?

 3         A     Probably 10 to 15 years.

 4         Q     If I could turn your attention to the

 5    back of the packet, the second to last page, 420.

 6               This is a ████████ business signature

 7    card.  Your name and your signature appear on that.

 8    Do you see that?

 9         A     Yes.

10         Q     And was this the -- the signature card at

11    the time that the bank -- that the account was

12    opened?

13         A     Well, this says ████████.  I would have

14    assumed it would be ██████.

15         Q     Do you remember when you -- when Check

16    Into Cash initially established its relationship with

17    ██████ was it already ██████████ or --

18         A     I -- I don't recall that.

19         Q     Okay.  But during the conversation with

20    ██████████████ on September 25, 2013, did he give

21    you -- did he tell you the reason that █████ was

22    terminating the relationship?
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order   5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 80 of 150
Washington, DC
Page 154

```
 1          A    He had indicated that they were having

 2    issues with the regulators, I believe it was, related

 3    to mortgage lending, and that as part of their

 4    resolution of the matter with regulators, that they

 5    were exiting the payday -- exiting servicing or doing

 6    business with payday lenders, and also I believe he

 7    mentioned student loans with that.

 8          Q    Any other industries that he mentioned?

 9          A    In that conversation I don't recall any

10    others.

11          Q    And when he said that they were having

12    issues with the regulators, did he identify any

13    specific regulator?

14          A    No.

15          Q    Did he say whether they were state

16    regulators or federal regulators?

17          A    No.

18          Q    And did he say -- did he mention at all

19    the Department of Justice or DOJ?

20          A    No.

21          Q    And did he -- did he define the

22    regulatory issues that he -- did he describe those at
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order   5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 81 of 150
Washington, DC   Page 155

```
 1   all, issues --

 2          A     No.  I mean, I think --

 3          Q     -- excuse me, issues with regulators.

 4          A     He just indicated that it was tied to

 5   mortgage lending, as I recall, but not more detail

 6   than that.

 7          Q     Did you -- did you take notes during that

 8   conversation?

 9          A     No.

10          Q     Did you send an e-mail after that

11   conversation to anyone memorializing that

12   conversation?

13          A     No.  I'm sure I would have walked down

14   and talked to Tim.

15          Q     And do you think you talked to anyone

16   else besides Tim?

17          A     Like with the other case, I would have

18   let our CEO and our president be aware of it, and

19   then we would have notified -- after we had put a

20   process or a plan in place, then we would have

21   communicated it to our operations team.

22          Q     Did you say anything to Tom Reinhold on
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 82 of 150
Washington, DC

5/1/2018
Page 168



1          A      That's correct.

2          Q      And then in document 418, they terminate

3     the accounts on June 26, 2014.

4          A      That's correct.

5          Q      And was that the end of the relationship

6     ██████████████████████████████

7          A      Yes.

8          Q      ██████████████████████████████████████████

██  ████████████████████████

██     █      ████████████████████████████████████████████

██     ████

██     █      ██████████████████████████████

██     ██████████████████████████████████

██     █      ██████████████████

15         Q      Any e-mail correspondence?

16         A      Not that I recall.

17         Q      ██████████████████████████████████

██     ████████████████████

██     █      ███

██     █      ██████████████████████

██     █      ████████████████████████████████████████████

██     ████████████████████████    ████████████████

William S. Lane 30(b)(6)  Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM  Document 209-6  Filed 11/09/18  Page 83 of 150
Washington, DC
5/1/2018
Page 172

1    Mr. ████████ did as far as whether there would

2    be an opportunity.  Nothing came about from it.

3            And then he had just reiterated the --

4    that they had to exit the relationship with a couple

5    of other industries other than just payday as they

6    settled their regulatory issues.

7        Q    On Exhibit 8, in the third paragraph, you

8    wrote:  "During the conversation Tom mentioned the

9    decision to exit the relationship was not theirs."

10           When did -- did you ask him a question or

11   what -- what was he saying?

12       A    I believe that -- well, he didn't mention

13   Operation Choke Point in particular.  When I had

14   mentioned Operation Choke Point or sometime during

15   the conversation, he had just made the comment that

16   the bank's decision to exit the relationship wasn't

17   theirs.

18           And having talked about the regulatory

19   pressures and so forth, and the way that

20   conversation -- just -- just the context of the

21   conversation implied that it was regulators' pressure

22   or decision for them to exit banking the industry

William S. Lane 30(b)(6) Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM Document 209-6 Filed 11/09/18 Page 84 of 150
Washington, DC
5/1/2018
Page 173

1    when he said not theirs, meaning not ████████

2         Q    He never said to you -- he never

3    mentioned a specific instance of pressure from a

4    regulator?

5         A    Not a specific instance.

6         Q    He didn't mention any specific regulators

7    during the call at all, did he?

8         A    No.

9         Q    Did he mention Department of Justice,

10   DOJ?

11        A    No.

12        Q    And you didn't mention any specific

13   regulators, did you?

14        A    No.

15        Q    You didn't mention the Department of

16   Justice?

17        A    No.

18        Q    And you believe that you mentioned or

19   used the term "Operation Choke Point"?

20        A    Yes.

21        Q    But you didn't -- but you -- that's not

22   reflected in your notes that you took the day after,

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 85 of 150
Washington, DC
5/1/2018
Page 208

```
 1        A    It went to Tim McMahan.  I didn't receive

 2   it directly.  Tim brought it to my attention when he

 3   received it.

 4        Q    So you saw it around the time it was

 5   sent --

 6        A    Yes.

 7        Q    -- from Tim?

 8             Did you speak to Tim McMahan about this?

 9        A    I did.

10        Q    Did you or Tim have any conversations

11   with anyone about -- with anyone at ███████   about

12   the termination?

13        A    I did not.  Tim did speak to the

14   relationship manager.

15        Q    And did Tim tell you what was discussed

16   during that conversation with the relationship

17   manager?

18        A    Just they -- they just reiterated what

19   they have in the first paragraph there, that they

20   were exiting businesses.  They mention check casher.

21   I don't -- I don't recall that they mentioned payday,

22   but they, I think, focused on money service business
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 86 of 150
Washington, DC
5/1/2018
Page 209

1    and that they were exiting the relationship.

2         Q    And so just to clarify that, in the first

3    paragraph, in the fourth sentence, it reads:

4    "███████████ has made the decision to exit the

5    business of providing commercial banking services to

6    check cashers and related businesses.  We

7    consistently review business plans and initiatives

8    across the company to ensure that they are aligned

9    with our strategic goals and future plans.  We took a

10   range of factors into consideration and determined

11   that this business no longer fits with the bank's

12   strategic priorities."

13              Is that the language you were referring

14   to?

15        A    Yes.

16        Q    And did Check Into Cash respond to

17   ████████████  in writing?

18        A    I don't believe we wrote a letter to

19   them, no.  It was more just in the phone conversation

20   that Tim had with the relationship manager.

21        Q    And it was basically the same substance

22   that was in this letter?

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order   5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 87 of 150
Washington, DC
Page 212

1    Oh, just a second.

2              It was ▮▮▮▮▮▮▮.

3         Q    And when Mr. ▮▮▮▮▮ contacted you to

4    tell you about the termination, did he give you any

5    explanation as to the reason that ▮▮▮▮▮▮ was

6    terminating the relationship?

7         A    No.  It was a very short conversation.

8    He just notified me that the bank was going to

9    terminate the relationship and that I would be

10   hearing from someone within the bank to coordinate

11   the transition.

12        Q    And directing your attention again to

13   515, the letter states in the first paragraph:  "In

14   accordance with your deposit account terms and

15   conditions, and ▮▮▮▮▮▮ services terms and

16   conditions, please be advised that ▮▮▮▮▮▮ has

17   elected to close all accounts with Check Into Cash,

18   Incorporated, as referenced in the attached exhibit."

19             Did anyone ever tell you -- did anyone

20   from ▮▮▮▮▮ ever give you any other reason for

21   terminating the relationship?

22        A    No.

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 88 of 150
Washington, DC
5/1/2018
Page 233

```
 1              MS. MOSS:  448.

 2   BY MS. ORTIZ:

 3        Q    Excuse me.

 4              -- 448, and consecutively numbered

 5   through CIC000454.

 6              This is a letter that Check Into Cash

 7   received from ███████████ regarding the

 8   termination of the relationship?

 9        A    Yes.

10        Q    Did anyone at Check Into Cash have

11   conversations with anyone at ███████████ about

12   the reasons for the termination?

13        A    Tim McMahan talked to them once he

14   received the letter with regards to the termination.

15        Q    And in the letter at the end of the first

16   paragraph, it says:  "We have decided to close your

17   account because the business is in an industry in

18   which we do not service, such as payday lenders."

19              Beyond that, is there any reason given?

20        A    No.  Just that we are -- that we're a

21   payday lender and that they don't do business with

22   payday lenders.
```

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 89 of 150
Washington, DC
5/1/2018
Page 245

1   others?

2        A    Not that come to mind.

3        Q    Are there any conversations that you had

4   with anyone else at a bank, aside from the ones that

5   we've discussed, about a bank's decision to

6   terminate?

7        A    No.

8        Q    Was there ever an employee of a bank

9   who -- well, did anyone at CIC have a conversation

10  with someone at a bank who indicated that they had

11  closed the account at the direction of the FDIC?

12       A    No.

13       Q    Did anyone at a bank ever tell CIC that

14  they closed the account at the direction of the OCC?

15       A    No.

16       Q    Did anyone at a bank ever tell anyone at

17  CIC that they had closed an account at the direction

18  of the Fed?

19       A    No.

20            MS. ORTIZ:  Why don't we take a break

21  here for a few minutes.

22            (Recess.)

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 90 of 150
Washington, DC
5/1/2018
Page 249

1        A      0526 in the middle of the first page is

2   another ███████ account that would have been

3   closed.

4        Q      How many banks does Check Into Cash

5   currently have an existing relationship with?

6        A      Approximately 70.

7        Q      And how many bank accounts with those 70

8   banks does Check Into Cash currently have?

9        A      Several hundred.

10       Q      And of the 70 banks that you currently

11  have a relationship with, what services do those

12  banks offer?

13       A      ███████████ offers bank branch services;

14  also virtual vault where we order cash through ████

15  █████ that's delivered through armored car services.

16  They also do centralized returns.  So if we deposit a

17  check that's returned, it's centrally deposited into

18  one account, rather than going back to the bank where

19  it may have been deposited.

20                ████████████████ also provides ACH

21  services.  And our operating accounts where we do

22  accounts payable and so forth, the checks are written

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order   5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 91 of 150
Washington, DC
Page 250



```
 1
```

```
12        Q    I'm sorry?

13        A    Prior to the time that I joined the

14   company, prior, in 2002.

15        Q
```

```
19        Q    I know you mentioned a few, but can you

20   list all of the banks that you have open accounts at?

21        A    Can I name all of the banks that we have

22   open accounts with?
```

William S. Lane 30(b)(6)  Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM  Document 209-6  Filed 11/09/18  Page 92 of 150
Washington, DC
5/1/2018
Page 251



1          Q     That you can remember.

2          A     It won't be all 70.

3          Q     Okay.

4          A

18    compare the list to the closed list and see if we had

19    any of those that are closed, but...

20          Q

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 93 of 150
Washington, DC
5/1/2018
Page 263



```
 1   seen," what are you referring to?

 2        A    ███████████████████████████

 ▌   ██████████████████████████

 4        Q    All for the -- more recently.  Any

 5   others?

 6        A    Any others haven't had the impact that

 7   those have.  So those are the ones that we certainly

 8   look to because of the longstanding relationship we

 9   had with them.  They were in our credit.  We were

10   expanding our relationship with them at the time that

11   they told us they were terminating the relationship.

12   And so based on our experience with those banks and

13   the growth in business that we were having with those

14   banks, we see the same thing with our two largest

15   banks now in expanding the business with them.  We

16   had no indication they were going to exit, so we have

17   the same concern now.

18        Q    ████████████████████████

 ▌   ██████████████████  ██████████████

 ▌        ▌    █████████████

 ▌        ▌    ██████████████

 ▌             ████████████████████████
```

William S. Lane 30(b)(6)    Confidential Pursuant to Protective Order    5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 94 of 150   Page 264
Washington, DC

1    ████████████████████████████████

     ██  ██████████████████████████

     ██        ██      ██

     ██        ██      ████████████████████

     ██  ████████████████████████████████████

     ██  ████████████████

     ██        ██      ██

8         Q    Could you turn to Exhibit C of Exhibit 4.

9              What's contained in Exhibit C?

10        A    A list of our store locations.

11        Q    As of the time that it was submitted in

12   connection with the interrogatories, so --

13        A    Correct.

14        Q    -- as of August 21st, 2017?

15        A    '17, yes.

16        Q    And I think you said, "A list of our

17   store locations."  Is this all store locations or is

18   this specifically locations that have had to move or

19   that have changed banking relationships after

20   January 1, 2011?

21        A    I believe this is all locations.

22        Q    All locations nationwide of Check Into

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 95 of 150
Washington, DC

5/1/2018
Page 274

1        Q    And this was -- would you classify this

2   as an expansion of ████████     service with Check

3   Into Cash?

4        A    In part.  So the centralized returns was

5   an expansion of our relationship with them because we

6   had to move that away from ████████.  And -- and

7   then the debit tickets was just a process that they

8   wanted to change, which would be an example of -- on

9   this attachment as far as the -- we had a standard

10  debit ticket that we liked to try and use

11  consistently among all banks, and most banks accept

12  that, and ████████ wanted to change the process to

13  use one of their standard debit tickets in the

14  process.  And so it was just working through the

15  details of that.

16       Q    And what are centralized returns?

17       A    So when -- if we -- if any of our centers

18  deposit a check, go to their local bank branch and

19  deposit a check, then if that check is returned,

20  rather than that check come back to the bank that we

21  deposited it in, there's a stamp that's put on the

22  check when we deposit it, and it instructs the

William S. Lane 30(b)(6)   Confidential Pursuant to Protective Order   5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 96 of 150
Washington, DC
Page 313

1   category, I would like to go back and check that.  I

2   think on the payday, I may have been -- may have

3   given a low number, and so I would like to go back

4   and look at that.  But it was revenue, not a profit

5   generated from those products.

6            MS. MOSS:  Okay.  That's all I had.

7            MS. ORTIZ:  Okay.

8            MS. SAGRI:  No questions.

9            MS. MIZUSAWA:  No questions from the

10  Agency.

11           MS. MOSS:  We would like him to read and

12  sign the deposition transcript.

13            (Whereupon, at 4:29 p.m. the

14            deposition of WILLIAM S. LANE

15            was concluded.)

16

17

18

19

20

21

22

1              CERTIFICATE OF NOTARY PUBLIC

2          I, LESLIE A. TODD, the officer before whom

3   the foregoing deposition was taken, do hereby certify

4   that the witness whose testimony appears in the

5   foregoing deposition was duly sworn by me; that the

6   testimony of said witness was taken by me in

7   stenotypy and thereafter reduced to typewriting under

8   my direction; that said deposition is a true record

9   of the testimony given by said witness; that I am

10  neither counsel for, related to, nor employed by any

11  of the parties to the action in which this deposition

12  was taken; and, further, that I am not a relative or

13  employee of any counsel or attorney employed by the

14  parties hereto, nor financially or otherwise

15  interested in the outcome of this action.

16

17  Dated this __9th day of _____May,_____ 2018.

18

19                    _Leslie A Todd_____

20                    LESLIE A. TODD
                      Notary Public in and for the
                      District of Columbia

21

    My commission expires:
22  November 30, 2018

William S. Lane 30(b)(6)    Confidential Pursuant to Protective Order    5/1/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 98 of 150
Washington, DC
Page 316

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.

_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

2018, and executed the above certificate in my

presence.

_____

NOTARY PUBLIC IN AND FOR

_____

County Name

MY COMMISSION EXPIRES:

# EXHIBIT 99

# FILED UNDER SEAL

# EXHIBIT 100

Confidential



Transcript of **Dale Nelson 30(b)(6)**

Thursday, May 3, 2018

*Advance America, et al. v. Federal Deposit Insurance Corporation, et al.*

Alderson Court Reporting
1-800-FOR-DEPO (367-9976)
Info@AldersonReporting.com
www.AldersonReporting.com

Alderson Reference Number: 78158

Dale Nelson 30(b)(6)          Confidential          5/3/2018
Case 1:14-cv-00953-TNM  Document 209-6  Filed 11/09/18  Page 103 of 150
Washington, DC          Page 1 (1)

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4   ADVANCE AMERICA, CASH ADVANCE    )

     CASH ADVANCE CENTERS, INC.;      ) Civil Action No.

 5   CHECK INTO CASH, INC.;           ) 1:14-cv-00953-TNM

     NORTHSTATE CHECK EXCHANGE,       )

 6                                    )

                          Plaintiffs, )

 7        v.                          )

                                      )

 8   FEDERAL DEPOSIT INSURANCE        )

     CORPORATION; BOARD OF GOVERNORS  )

 9   OF THE FEDERAL RESERVE SYSTEM;   )

     OFFICE OF THE COMPTROLLER OF     ) CONFIDENTIAL

10   THE CURRENCY,                    )

                                      ) PURSUANT TO

11                        Defendants. )

     _____ ) PROTECTIVE ORDER

12

13        30(b)(6) DEPOSITION OF ADVANCE AMERICA

14      by and through its Designated Representative,

15                      DALE NELSON

16                   Washington, D.C.

17                Thursday, May 3, 2018

18                      9:04 a.m.

19

20   Job No. 78158

21

22   Reported by:  Leslie A. Todd
```

Page 2

1    Deposition of DALE NELSON was held at:

2

3          MoloLamken

4          600 New Hampshire Avenue, N.W.

5          Suite 500

6          Washington, D.C. 20037

7

8

9     Pursuant to agreement, before Leslie Anne Todd,

10   Notary Public of the District of Columbia.

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

1              A P P E A R A N C E S

2

3    For Plaintiff:

4          NICOLE J. MOSS, ESQUIRE

5          COOPER & KIRK

6          1523 New Hampshire Avenue, N.W.

7          Washington, D.C. 20036

8          (202) 220-9636

9    For Defendant Federal Deposit Insurance Corporation

10         EKTA DHARIA, ESQUIRE

11         JUSTIN V. SHUR, ESQUIRE

12         MoloLamken

13         430 Park Avenue

14         New York, New York 10022

15         (212) 607-8152

16   For Defendant Board of Governors of the Federal

17   Reserve System

18         YVONNE F. MIZUSAWA, Esquire

19         Board of Governors of the Federal

20           Reserve System

21         Washington, D.C. 20551

22         (202) 452-3436

Page 4

1    APPEARANCES (Continued)

2    For Defendant Office of the Comptroller of the

3    Currency:

4          MICHAEL MORELLI, ESQUIRE.

5          Office of the Comptroller of the Currency

6          400 7th Street, S.W.

7          Washington, D.C. 20219

8          (610) 649-6209

9

10   ALSO PRESENT:

11         JESSICA STEADMAN RUSTIN, Chief Legal

12             Counsel, Advance America

13

14

15

16

17

18

19

20

21

22

Page 5

1              C O N T E N T S

2    EXAMINATION OF DALE NELSON              PAGE

3     By Ms. Dharia                9

4

5

6

7

8

9          E X H I B I T S

10         (Exhibits were attached.)

11   EXHIBIT NO.   DESCRIPTION              PAGE

12   No. 1      E-mail re ██████████        41

13   No. 2      E-mail re Copy of Bank List (2).

14             xlsx                75

15   No. 3      Protected Information to be

16             Disclosed only in Accordance with

17             Protective Order of the U.S.

18             District Court for the District of

19             Columbia            90

20   No. 4      E-mail re FW: Scanned Document    120

21   No. 5      E-mail re Bank List       128

22   No. 6      E-mail re working.xlsx       156

Page 6

1       E X H I B I T S  (Continued)

2          (Exhibits were attached.)

3   EXHIBIT NO.   DESCRIPTION              PAGE

4   No. 7      E-mail string re BMO Harris Bank -

5      MSB Questionnaire              159

6   No. 8      E-mail string re Call          162

7   No. 9      E-mail string re ██████        165

8   No. 10     E-mail string re Meeting       170

9   No. 11     E-mail string re ███ Call      179

10  No. 12     E-mail string re vault for ███     183

11  No. 13     E-mail string re ████ and ██████   189

12  No. 14     E-mail string re Upcoming Bank

13     Change - ████                192

14  No. 15     E-mail string re URGENT: Advance

15     America FW: ████████████          196

16  No. 16     E-mail string re Treasury Database

17     v2.xlsx                  201

18  No. 17     E-mail string re Due Diligence

19     Form                   204

20  No. 18     E-mail string re Hello        207

21  No. 19     E-mail string re Bank Terminations  220

22  No. 20     E-mail re Stuff            232

Page 7

1       E X H I B I T S  (Continued)

2          (Exhibits were attached.)

3   EXHIBIT NO.   DESCRIPTION              PAGE

4   No. 21     E_mail string re Banks Closed due

5      to MSB                 239

6   No. 22     E-mail string re (blank)       244

7   No. 23     E-mail string re ████████ -

8      Advance America            246

9   No. 24     Letter to ████████ from ████

10     ████, dated December 2, 2016,

11     Re: ███████████████., successor

12     by merger to ████████████

13     ("the Bank")              247

14  No. 25     Consolidated Financial Statements

15     and Report of Independent Certified

16     Public Accountants, Advance America,

17     Cash Advance Centers, Inc., Period

18     from January 1, 2012 through

19     April 23, 2012 and April 24, 2012

20     through December 31, 2012       252

21  No. 26     E-mail string re bank charges    256

22

Page 8

1       E X H I B I T S  (Continued)

2          (Exhibits were attached.)

3   EXHIBIT NO.   DESCRIPTION              PAGE

4   No. 27     Advance America, Inc., Center

5      Projections by State as of

6      December 31, 2011            262

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 9

1       P R O C E E D I N G S

2       ------------------

3       DALE NELSON,

4      and having been first duly sworn,

5      was examined and testified as follows:

6      EXAMINATION BY COUNSEL FOR DEFENDANT

7      FEDERAL DEPOSIT INSURANCE CORPORATION

8   BY MS. DHARIA:

9   Q   Good morning.

10  A   Good morning.

11  Q   My name is Ekta Dharia.  I'm an attorney

12  with MoloLamken, and I will be taking your deposition

13  today.

14      Please state your name and spell it for

15  the record.

16  A   It's Dale Nelson.

17      D-A-L-E, N-E-L-S-O-N.

18  Q   And, Mr. Nelson, do you feel okay today?

19  A   I do.

20  Q   Is your mind clear?

21  A   It is.

22  Q   Is there any reason why you would be



Page 134

1    Analyst II at the time.

2        Q    Oh, you did not.

3        A    No.

4        Q    Which banks got back to you personally

5    during this process?

12       A    Okay.  Then that would be the two.

13       Q    What about where they initiated contact

14   and you responded?

15       A    There were none that they -- the bank

16   initiated contact.

Page 135

10       Q    How was that communicated to you?

11       A    Through Christian.

12       Q    Christian Rudolph?

13       A    Yes, Christian Rudolph.

Page 136

1    have mercy, why didn't I think of payroll -- to have

2    accounts payable and payroll accounts, and then

3    various other corporate management accounts.

4        Q    Anything else?

5        A    No.

6        Q    Does Advance America have an ongoing

7    relationship with                    today?

8        A    We do.

9        Q    Has Advance America opened new accounts

10   with              since January 2017?

11       A    I'm unsure of the specific date.

12       Q    But they have, correct?

13       A    We have opened accounts with

14                .  I'm unsure of the --

15       Q    Basically in the --

16       A    Well, yes, it would have been after

17   January of 2017, sorry.

18       Q    Approximately how many?

19       A    Approximately 20 accounts.

20       Q    You also mentioned            as a bank

21   that you had contacted.  Who at          did you

22   speak with?

Page 137

1        A    The lady's name is Cindy          .

2        Q    How did you talk to her?  Phone?  E-mail?

3        A    Via phone.

4        Q    In person?

5        A    Just phone.

6        Q    Phone.  And what did you talk to her

7    about?

8        A    The possibility of growing a

9    relationship.

10       Q    And how many times did you speak with

11   her?

12       A    I'm unsure of the exact -- the number of

13   times.

14       Q    Would it be more than a dozen?

15       A    Over the course of what?

16       Q    The time in which you were trying to

17   speak with her about --

18       A    It potentially could have been more than

19   a dozen times, yeah.

20       Q    Okay.  What did you speak about during

21   those calls?

22       A    Expanding volume in an existing account,

Page 150

1    Q   Okay.  Let's go down all the way to row
2    242.  It's ████████.
3        So, first, that column B says "NAT."
4    What does NAT mean?
5    A   That would indicate a -- what we
6    consider -- it's an interdepartment code to let you
7    know kind of the use of the account.  So NAT would be
8    what we -- national.  It would be used for not
9    necessarily a center function, but it could have
10   been -- it's something used at a corporate level.
11   Q   Okay.  And then it says here:  "No new
12   accounts due to MSB and Mexican ownership."
13       What do you think that means?
14   A   I -- I think that it means no new
15   accounts to MSB or Mexican ownership.
16   Q   Have you heard about Mexican ownership
17   before?
18   A   I have.
19   Q   In what context have you heard it?
20   Strike that.
21       What have you heard about it?
22   A   I have heard that ████████

Page 151

1    could've had an issue with us due to our ownership
2    structure.
3    Q   What is the ownership structure that you
4    are referring to?
5    A   I mean, ultimately, we -- it's my
6    understanding we're owned by a Mexican company.
7    Q   And who told you that ████████
8    could've had an issue with that?
9    A   Christian Rudolph.
10   Q   Did you hear it from any other sources?
11   A   Not that I -- I don't believe so.
12   Q   What did Christian Rudolph tell you?
13   A   Just during a conversation of bank exits,
14   that ████████ primarily had an issue with the
15   ownership structure.
16   Q   How did he learn about that?
17   A   I -- I can't speak to that.  I have no
18   idea.
19   Q   Okay.  What is the relationship between
20   this and that exhibit that we looked at earlier?
21   That's Exhibit 3, it was that Exhibit A document, the
22   responses to the interrogatories.

Page 152

1        MS. MOSS:  And by "this," you're
2    referring to the exhibit?
3        MS. DHARIA:  This spreadsheet.
4        MS. MOSS:  This spreadsheet.  Okay.
5        THE WITNESS:  This document (indicating)?
6    BY MS. DHARIA:
7    Q   Yes.  Exhibit 3.
8    A   I'm sorry, can you repeat the question?
9    Q   What relationship does this spreadsheet
10   have with this Exhibit A spreadsheet?
11   A   It would appear that this may have
12   contributed to the creation of this interrogatory
13   response.
14   Q   And by "this," you're referring to --
15   A   Exhibit --
16   Q   -- 5, correct?
17   A   Correct, yes.
18   Q   Was the information in Exhibit 5 used to
19   create Exhibit 3?
20   A   It appears that it could have been, yes.
21   Q   And what is that opinion based on?
22   A   It just appears similar in nature.

Page 153

1    Q   In other words, it seems to contain some
2    of the same information, correct?
3    A   It appears to have similar information,
4    yes.
5    Q   So take a look at Exhibit 3, the
6    Exhibit A attachment.  The last page of it.  That
7    would be page 12.
8        Do you see where it says ████████
9    ████"?
10   A   I do.
11   Q   And that last column says "No MSB and/or
12   payday."  Correct?
13   A   Yeah, that's right.  Yes.
14   Q   That's different from what we just saw in
15   the other spreadsheet, in Exhibit 5, correct, for
16   ████████?
17   A   It appears to be different.  Yes.
18   Q   Why is it different?
19   A   That I am unsure of.
20   Q   Why does ████████ on Exhibit 3
21   say "Payday"?
22   A   I'm unsure.  I didn't create these

Page 170

1  Advance America a reason for why they terminated the
2  account?
3      A   I can't speak if they spoke to someone
4  other than myself.
5      Q   And nobody at ███████ spoke with you
6  about the reasons for terminating the account,
7  correct?
8      A   Not that I can recall.
9          (Nelson Exhibit No. 10 was marked
10         for identification.)
11 BY MS. DHARIA:
12     Q   The court reporter has handed you Exhibit
13 No. 10.  It is a document bearing Bates No. AA367279
14 and runs until AA367280.
15         It is an e-mail that you sent to Melissa
16 Spain on April 22nd, 2013.  Do you see that?
17     A   Mm-hmm.
18     Q   Who is Melissa Spain?
19     A   I believe Melissa is in our marketing
20 group.
21     Q   Was she in the marketing group at the
22 time of this e-mail?

Page 171

1      A   I'm not sure exactly what her job title
2  or function is.
3      Q   Was at the time?
4      A   Was at the time.
5      Q   So in the bottom e-mail, you write to
6  her, and you say:  "You will miss our meeting."
7          What meeting was that?
8      A   I am unsure.  It was a meeting in 2013.
9      Q   Did you have meetings involving Melissa
10 Spain regularly?
11     A   I wouldn't say all too regularly, no.
12     Q   What were the nature of the meetings that
13 you had generally?
14     A   I don't recall.
15     Q   You write in the top e-mail under Bank
16 Changes:  "Over the last six months, we have had four
17 or more major banks close our account due to MSB
18 registration/foreign ownership."
19         What are those four or more banks that
20 you were referring to?
21     A   I'm unsure what four banks this would
22 have been in 2013.

Page 172

1      Q   Is that information stored anywhere?
2      A   I'm unsure specifically without knowing
3  what four banks that those four banks would be
4  stored.
5      Q   It says "major banks."  Were there major
6  banks during that time that were terminating accounts
7  with Advance America, big accounts?
8      A   There may have been larger institutions
9  at that time.  If I can recall.
10     Q   Are you thinking of anything -- like does
11 anything come to mind?
12     A   Around 2013?
13     Q   Mm-hmm.
14     A   Yeah, I'm not sure of the exact time
15 frame, but I feel like that was maybe --███████
16 ███████.  I feel like that was in that time
17 frame.
18     Q   Did ███████ close accounts with
19 Advance America?
20     A   Yeah, they did.
21     Q   Did you speak with anyone at ███████
22 ██ about those terminations?

Page 173

1      A   Not specifically.
2      Q   Did anyone at Advance America speak with
3  anyone at ███████ about the reasons for those
4  terminations?
5      A   That I'm unsure.
6      Q   You also mention ███████.  Did you
7  speak with anyone at ███████ about the
8  termination of accounts?
9      A   Not specifically that I can recall.
10     Q   Did anyone at Advance America speak with
11 anyone at ███████ about the termination of those
12 accounts?
13     A   I can't -- I can't know if somebody else
14 did or not.
15     Q   You also mention ███████  Did you speak
16 with somebody at ███ around that time?
17     A   Regarding them terminating the accounts?
18     Q   Yes.
19     A   No.
20     Q   Did anyone at Advance America speak with
21 anyone at ███████ about the termination of those
22 accounts?

Page 174

1    A   Not that I know of.

2    Q   What about ████, was that a bank that

3  terminated accounts around this time with Advance

4  America?

5    A   ████ did terminate accounts.  I'm unsure

6  if it was -- based on memory, it feels like it was

7  maybe around that time, but again, there were so many

8  once it started, I don't know which one ended and

9  which one started at what particular time.

10   Q   Did you speak with anyone at ████ about

11 the termination of accounts?

12   A   I did not.

13   Q   Did anyone at Advance America speak with

14 anyone at ████ about accounts closing?

15   A   Not that I'm aware of.

16   Q   You also say that the reasons those banks

17 closed was MSB registration/foreign ownership.

18       What is foreign ownership?

19   A   It -- I would assume that would be us

20 ultimately being owned by a Mexican entity.  Or

21 Mexican company.

22   Q   And what is that assumption based on?

Page 175

1    A   Because we are owned by a Mexican

2  company.

3    Q   Did you speak with anyone internally at

4  Advance America about these bank closings?

5    A   Which bank closings?

6    Q   These four that we just discussed: ████

7  ████████████████████████.

8    A   Did I speak to anybody internally?

9    Q   Yeah.  About the reasons for the

10 termination.

11   A   Not about the reasons, no.

12   Q   What about ████████, did you speak

13 with Mr. Rudolph about that?

14   A   In a later conversation, he mentioned

15 that there was a possibility that our account was

16 terminated due to a foreign ownership.

17   Q   And around when was that conversation?

18   A   That I'm unsure of.

19   Q   Do you think it was after 2013?

20   A   I felt like it would have been after

21 2013.

22   Q   But you don't know for sure.

Page 176

1    A   I do not know for sure.

2    Q   You also say in the next sentence:

3  "There seems to be a growing feeling of banks do not

4  like us."

5        What is that growing feeling based on?

6    A   So not only when a bank termination

7  happens does my department feel the pain of moving

8  operations from one bank to another in that whole

9  process that we spoke about, there's operational

10 impact with locations -- when they see their bank

11 change, you know, several times over the course of

12 not even -- as you open an account, and move them to

13 one bank, and that bank then closes, and then you

14 throw it into another bank, and it just adds some

15 uncertainty of what -- or where they're going to be

16 depositing their money.  And that's based on that --

17 just hearsay that you hear, Why are they doing this?

18 Why are we having to go through this constantly?

19 Those types of things.

20   Q   Where do you hear this -- who do you hear

21 this from?

22   A   Hear what?

Page 177

1    Q   This -- these types of comments, these

2  conversations that you just talked about.

3    A   I will hear it from a center manager or

4  I'll hear it from, you know, some associate --

5  associate out in the field.  My team has felt like

6  that, you know, Well, why don't banks like us?  You

7  know, they used to come visit.  They used to do this,

8  and now we're having to scrap and move things, what

9  felt like every other day.

10   Q   When you say your team, you mean the

11 treasury department?

12   A   That's right.

13   Q   And when did you feel like things

14 shifted?

15   A   It's hard to put a time period on it.  I

16 just know what was, and then what -- or, yeah, what

17 was and then what is.  I know that there was just a

18 different feeling of, you know, a bank coming in and

19 courting the department, wanting more business,

20 wanting more accounts, to calling a bank, and them

21 sounding excited that someone is calling to open an

22 account, and, you know, my analysts have the phone

Dale Nelson 30(b)(6)          Confidential          5/3/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 110 of 150
Washington, DC          Page 48 (186 - 189)

Page 186

1  the ideal working solution. And internal vault
2  references a large safe that the location could keep
3  extra cash in. So the combination of those two
4  things is what I would be referring to.
5      Q    What are the two worlds that you're
6  referring to?
7      A    Just a figure of speech. Having a larger
8  safe and a local bank is the best solution for that
9  center.
10      Q    And what was the issue that you were
11  trying to resolve?
12      A    I was try- -- it doesn't look like I was
13  trying to resolve an issue in this e-mail. It looks
14  like I was trying to deter the field from adding an
15  armored car service.
16      Q    So going back down to the last sentence
17  in the next paragraph: "One of the reasons why we
18  are asked to exit many banks is that the cost of
19  doing business does not offset the perceived risk of
20  maintaining an account for our industry."
21          What is the basis for that statement?
22      A    So that goes to what I was stating

Page 187

1  earlier, that sometimes smaller community banks do
2  not charge a lot for a bank account. And that's
3  where when they come in and ask to exit due to
4  non-profitability, Advance America would then
5  extend -- say, Let me cover any costs you are
6  incurring, charge me more money, in order to foster
7  and have those local relationships.
8      Q    Did anyone at ▇▇▇▇▇▇▇▇▇ tell you
9  a reason other than what's listed here about why the
10  account was going to be terminated?
11      MS. MOSS: Objection.
12  BY MS. DHARIA:
13      Q    You can answer.
14      A    I'm not sure this e-mail is in reference
15  to that bank exiting.
16      Q    Did anyone at ▇▇▇▇▇ give you a
17  reason for why, to use your words, that Advance
18  America was being asked to exit, other than what's in
19  this e-mail?
20      MS. MOSS: Objection.
21  BY MS. DHARIA:
22      Q    You can answer.

Page 188

1      A    I don't see where we were asked to exit
2  in this e-mail.
3      Q    Did you speak with anyone at ▇▇▇▇
4  ▇▇▇▇▇?
5      A    I may have in the past.
6      Q    Did you ever speak with them about
7  account closings?
8      A    Not that I'm aware of, nor am I sure if
9  they have closed our account.
10      Q    And you also write in that last sentence,
11  "... that the cost of doing business does not offset
12  the perceived risk of maintaining an account for our
13  industry."
14          What is the perceived risk for
15  maintaining an account for our industry? What does
16  that mean?
17      A    I believe I was trying to convey to the
18  operations that a small community bank that does not
19  have a particular fee may not seem worth us walking
20  in and making deposits. That's what I would mean by
21  that.
22      Q    What do you mean by worth it?

Page 189

1      A    Maybe having a longer line on Fridays
2  because there's business customers in line or some
3  kind of -- I don't know what would make it worth it
4  to the bank or not worth it to the bank. In my mind,
5  a bank making more money on the account would make
6  maintaining the account worth it.
7      Q    And what would the perceived risk be?
8      A    I'm honestly not sure what I was
9  referencing in this e-mail.
10      (Nelson Exhibit No. 13 was marked
11      for identification.)
12  BY MS. DHARIA:
13      Q    The court reporter has handed you Exhibit
14  No. 13, which is a document bearing the Bates No.
15  AA367076 and runs consecutively until AA367078.
16      Do you recognize this as an e-mail that
17  you sent to Raymond Dimeo and Mark Rich on May 15th,
18  2013?
19      A    Based on the e-mail header, yes.
20      Q    Who is Raymond Dimeo?
21      A    I'm honestly not even sure.
22      Q    You write in the e-mail on the bottom of

Page 190

1 the first page to Josh, Joshua Bessette.

2        Who is Joshua Bessette?

3    Q    At the time he was manager in the -- in

4 operations, in field operations.

5    Q    Okay.  And the last sentence there is, in

6 that paragraph:  "Due to the sensitivity surrounding

7 our bank relationships and the limited options in RI,

8 we can not take a chance even if a local bank branch

9 is willing to accept the items."

10       What did you mean by "sensitivity

11 surrounding our bank relationships"?

12   A    The fear of another bank terminating the

13 relationship.

14   Q    What is that fear based on?

15   A    History.

16   Q    What do you mean by that?

17   A    That -- just numerous banks that have

18 exited or closed our accounts.

19   Q    Have banks told you that they're closing

20 accounts because of sensitivity?

21   A    They have not.

22   Q    Have banks told you reasons for closing

Page 191

1 accounts that make you think that it's sensitivity?

2    A    No one has told me anything -- directly

3 anything.  I think "sensitivity" was my word in the

4 feeling of the department of banks exiting.  It's a

5 sensitive subject, a sore subject.  I mean, that type

6 of -- anything that creates more work amongst a team

7 of people.

8    Q    Understood.

9        How long had you believed that Advance

10 America's bank relationships were sensitive?

11   A    Again, I can't put a course of time or a

12 timestamp on it with a start and end date.  I still

13 feel that our accounts are in an unstable

14 environment.  I feel personally that any day there

15 can be some major change or -- or major change to our

16 accounts that accounts -- or account structure or

17 someone could request that they be closed, and we

18 would have the same bucket of work we've done over

19 and over and over again to do again.

20   Q    Did you have this feeling when you

21 started your current position?

22   A    As assistant treasurer?

Page 192

1    Q    Mm-hmm.

2    A    Because I can't fairly say exactly when I

3 started the assistant treasurer position and when I

4 feel this feeling happened, I can't --

5    Q    Just generally, ballpark.

6    A    I don't want to ballpark that.  You know,

7 I can't frame it in a time.

8    Q    Okay.  All right.

9        (Nelson Exhibit No. 14 was marked

10       for identification.)

11 BY MS. DHARIA:

12   Q    The court reporter has handed you

13 Exhibit No. 14.  It is a document bearing the Bates

14 No. AA367470 and runs until AA367471.

15       Do you recognize this as an e-mail that

16 you sent to Jessica Pruitt on April 11, 2013?

17   A    It appears it was started with Jessica

18 Pruitt to me.  Is that correct?

19   Q    Yes, correct.

20       And the top e-mail is a response from you

21 to Jessica Pruitt on April 11, 2013.

22   A    Mm-hmm.

Page 193

1    Q    At the bottom of the first page, in the

2 middle of that paragraph, you write:  "All of our

3 banking relationships are very" -- excuse me,

4 Ms. Pruitt writes:  "All of our banking relationships

5 are very sensitive, and we need to try our best to

6 keep a good relationship with any bank willing to

7 work with us."

8        What is your understanding of what that

9 sentence meant?

10   A    So if I had to assume, it would be based

11 on -- again, we have many center -- centers -- many

12 different center level employees, and you have to --

13 we try to work as liaison between our field and our

14 banks.

15       So we try to make them understand that,

16 you know, when you are visiting a location, a banking

17 location, you need to try to act as professionally as

18 you can.  I mean, we can't control the way every

19 individual in this world acts.

20       So, anyway, we try to make sure that

21 bridge between the bank and the center is there, and

22 if -- if a local bank has an issue, then we relay it

Dale Nelson 30(b)(6)  Confidential  5/3/2018
Case 1:14-cv-00953-TNM Document 209-6 Filed 11/09/18 Page 112 of 150
Washington, DC  Page 54 (210 - 213)

Page 210

1 account with Advance America?

2  A I'm unsure of that date, but I do know it

3 was prior to '16.

4  Q 2016?

5  A 2016.

6  Q Did Ms. ▇ give you a reason for why

7 ▇ terminated its account with Advance

8 America?

9  A She did not.

10  Q Did anyone at ▇ give you a

11 reason for why it terminated the account?

12  A One of the representatives with the bank

13 alluded to verbally in an in-person meeting what I

14 felt would be defined as a reason.

15  Q Who was that person?

16  A ▇ was his name.

17  Q What was his position?

18  A He was ▇ boss.  He was the main

19 treasury representative at the bank.  Maybe account

20 manager was his --

21  Q When was this conversation?

22  A I'm unsure of the exact time and date.

Page 211

1  Q Around when?

2  A During the course of our visits, because

3 they would come often as well to visit and inquire

4 about additional business.

5  Q Did this conversation happen during one

6 of ▇'s visits to Advance America's office?

7  A Yes.

8  Q Was the meeting in person?

9  A It was.

10  Q How long was that meeting?

11  A I'm unsure of the exact time span of the

12 meeting.

13  Q And what was the reason you alluded to

14 that he provided?

15  A He mentioned that they were having to

16 rethink growing business or even staying in the

17 business due to regulatory pressure was his comment.

18  Q What do you mean when you say "the

19 business"?

20  A Maintaining an account with Advance

21 America was my assumption.

22  Q When he said "regulatory pressure," did

Page 212

1 he mention any specific regulator?

2  A He did not.

3  Q Did he distinguish between federal or

4 state regulatory?

5  A He did not.

6  Q Did he explain what kind of regulatory

7 pressure?

8  A He did not.

9  Q Did he say that he was rethinking his

10 business with Advance America in particular or the

11 business industry generally?

12  A He was not specific to Advance America, I

13 do not believe.

14  Q Did you have conversations with anyone

15 else at ▇ about reasons for the

16 termination?

17  A I did not.

18  Q Did you convey this to anyone else within

19 Advance America?

20  A I may have mentioned it to maybe Jessica

21 Blackwell, my supervisor.

22  Q And what did you mention?

Page 213

1  A That how the relationship seems rocky

2 because ▇ made a comment that regulatory pressure is

3 making it difficult for them to keep the accounts.

4  Q What does "rocky" mean?

5  A Could one day have an account and the

6 next day not have an account.

7  Q What was her response?

8  A Probably fear.  I don't know.  She

9 obviously was concerned about the amount of work it

10 would take to accomplish moving and get more centers.

11  Q Did any other banks mention regulatory

12 pressures to you personally?

13  A No, they haven't.

14  Q As a reason for terminating the account.

15  A No, they haven't.

16  Q Did ▇ open an account with

17 Advance America after this e-mail?

18  A They did not.

19  Q Did they give a reason for why they did

20 not?

21  A They did not.

22  Q Did anyone at ▇ tell anyone at

Page 218

1  typically listen to?

2    A   Probably so, yeah.  It probably -- one
3  specific time I recall, and I don't remember
4  specifically when or specifically what, but when I
5  would jump on the internet, my home page is Bing, and
6  Bing are news -- references to news things, and I
7  remember clicking on something and seeing, oh, the
8  word "Choke Point."  And to me like, oh, you know,
9  just associating that word with a feeling is more so
10  my understanding.

11    Q   Had you heard of the word "Choke Point"
12  before you saw that surf result?

13    A   Well, clearly, I've heard of the word or
14  it wouldn't have had any kind of trigger for me,
15  right?

16    Q   And what was that feeling that you had
17  after you saw that?

18    A   I think anything associating with that
19  period of time is -- makes me feel stressed, like I
20  have a little bit of time to do a lot of bit of work.

21    Q   When you say "that period of time," what
22  do you mean?

Page 219

1    A   That's -- again, I can't really frame it.
2  It's just a course of time defined to me by banks
3  wanting business, banks not wanting business.

4    Q   Has any bank ever mentioned Operation
5  Choke Point or Choke Point to you?

6    A   Not to me.

7    Q   Have you heard it outside of the news and
8  your own personal pressures that you're feeling?

9    MS. MOSS:  To the extent that any of your
10  answers would require you to reveal conversations
11  with your counsel, I would instruct you not to, but
12  beyond that, you can answer.

13    THE WITNESS:  Probably not beyond that of
14  -- with my legal team.

15  BY MS. DHARIA:

16    Q   Has your understanding of this word
17  changed since you first heard about it?

18    A   No, it's -- to me it still feels like
19  something negative.

20    Q   Do you discuss Choke Point with other
21  employees at Advance America?

22    A   Not specifically.

Page 220

1    Q   Generally?

2    A   I'm unsure if I personally have ever used
3  the word "Choke Point," to be honest.

4    Q   What word do you usually use for this
5  pressure that you're describing?

6    A   Long nights.

7    Q   Long nights.  Something we can all relate
8  to.

9        Does Advance America keep records of
10  Choke Point?

11    A   Not that I'm -- I don't -- I'm unaware of
12  that.

13        (Nelson Exhibit No. 19 was marked
14        for identification.)

15  BY MS. DHARIA:

16    Q   The court reporter has handed you
17  Exhibit 19, which is an e-mail bearing the Bates
18  stamp AA581988 and it runs consecutively until
19  AA581989.

20        Do you recognize this as an e-mail that
21  you sent to Christian Rudolph and Jessica Rustin on
22  October 26, 2015?

Page 221

1    A   Based on the e-mail header, yes.

2    Q   At the bottom of the e-mail, Ms. Rustin
3  says to Mr. Rudolph:  "Below is a complete list of
4  banks terminating our relationship since Operation
5  Choke Point."

6        And Mr. Rudolph forwards the list to you
7  and asks you to review it for completeness, correct?

8        MS. MOSS:  I'm going to ask for a minute
9  for us to confer to determine if we think that this
10  is privileged or not.

11        We're going off the record for a second.

12        (Pause in the proceedings.)

13        MS. MOSS:  We have no issues with it.  We
14  determined it's not privileged.

15        MS. DHARIA:  Thank you.

16  BY MS. DHARIA:

17    Q   So before the break, I asked:  "At the
18  bottom of the e-mail, Ms. Rustin says to Mr. Rudolph:
19  'Below is a complete list of banks terminating our
20  relationship since Operation Choke Point.'

21        "And Mr. Rudolph then forwards the list
22  to you and asks you to review it for completeness,

Dale Nelson 30(b)(6)      Confidential      5/3/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 114 of 150
Washington, DC      Page 58 (226 - 229)

Page 226

1    Q   And those additional items, where did you
2 get that information from?
3    A   I'm unsure specifically.
4    Q   Generally?
5    A   Conversation.
6    Q   With?
7    A   The Treasury Analysts II and the
8 supervisor.
9    Q   And what did you speak about during those
10 conversations?
11    A   Based on the context of the original
12 e-mail, did any additional banks terminate; and if
13 so, add the names.
14    Q   Did you specify reasons for those
15 terminations?
16    A   It doesn't appear that anybody specified
17 a reason.
18    Q   What do you mean anyone?
19    A   Well, that's included in the e-mail
20 chain.
21    Q   In your e-mail you start off saying,
22 "Since      What does that mean?

Page 227

1    A   I guess starting after      
2 terminated their accounts.
3    Q   Around when was that?
4    A   I -- I don't know of a specific time. I
5 can speak generally.
6    Q   Yeah.
7    A   2012, '13.
8    Q   Did anyone at      tell you
9 why      terminated its account?
10    A   They did not.
11    Q   Did anyone at      tell anyone
12 at Advance America generally about why it terminated
13 its account?
14    A   That I would be unsure of.
15    Q   What happened to this list after you sent
16 it?
17    A   I can't speak to what Christian did with
18 the list after I sent it to him.
19    Q   Was it added to a database?
20    A   That I don't know.
21    Q   Was it sent to others within Advance
22 America?

Page 228

1    A   I can't speak to anybody that's on the
2 e-mail chain.
3    Q   Did you do anything with the list after
4 you sent it to them?
5    A   Not that I recall.
6    Q   So if you look at the list, the first new
7 bank on here is      . Correct?
8    A   That would appear to be correct, yeah.
9    Q   Did anyone at      give you a
10 reason for why      terminated the account?
11    A   They did not.
12    Q   Did anyone at      give anyone at
13 Advance America a reason for why they terminated the
14 account?
15    A   Not that I'm aware of.
16    Q   Did anyone at      give you a reason for
17 why they terminated the account?
18    A   They did not.
19    Q   Did anyone at      tell anyone at Advance
20 America the reason for why they terminated the
21 account?
22    A   Not -- we're speaking verbal

Page 229

1 conversations or reaching out to a specific person.
2 Outside of the termination letters that are on file?
3    Q   It doesn't have to be verbal. It could
4 be an e-mail, it could be text, it could be in
5 person, it could be a nudge, anything. Any type of
6 communication.
7    A   Okay. Not to my knowledge, outside of
8 the termination letters. And that's what I mean by
9 not to my knowledge, outside of that termination
10 letter.
11    Q   With regard to      , did
12 anyone at      give you a reason for why
13 it was terminating the account outside of any
14 termination letter?
15    A   They did not.
16    Q   Did anyone at      give
17 anyone at Advance America a reason for its
18 termination of the account outside of what was in any
19 termination letter?
20    A   Not to my knowledge.
21    Q   With      , did anyone at      
22       give you a reason for why it terminated its

Dale Nelson 30(b)(6)
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 115 of 150
Confidential
Washington, DC
5/3/2018
Page 59 (230 - 233)



Page 230

1  account other than what's in the -- what's in any
2  termination letter?
3      A  They did not.
4      Q  Did anyone at ▇▇▇▇ inform anyone
5  at Advance America about a reason for why it
6  terminated the account?
7      A  Not to my knowledge, no.
8      Q  Did anyone at ▇▇▇▇ give you a
9  reason for why it terminated the account outside of
10  any termination letter?
11     A  No.
12     Q  Did anyone at ▇▇▇▇ give anyone at
13  Advance America a reason for why it terminated the
14  account outside of any termination letter?
15     A  Not that I know of.
16     Q  Did anyone at ▇▇▇▇ give you a
17  reason for why it terminated the account outside of
18  any termination letter?
19     A  They did not.
20     Q  Did anyone at ▇▇▇▇ give anyone
21  at Advance America a reason for terminating the
22  account outside of a termination letter?

Page 231

1      A  Not to my knowledge.
2      Q  Did anyone at ▇▇▇ give you a reason
3  for the termination of the account outside of any
4  termination letter?
5      A  No.
6      Q  Did anyone at ▇▇▇▇ give anyone at
7  Advance America a reason for terminating the account
8  outside of what was in any termination letter?
9      A  Not to my knowledge.
10     Q  Did anyone at ▇▇▇▇ give you a
11  reason for why it terminated its account outside of
12  any termination letter?
13     A  No.
14     Q  Did anyone at ▇▇▇▇ give anyone
15  at Advance America a reason for terminating the
16  account outside of what was in the termination
17  letter?
18     A  Not that I'm aware of.
19     Q  Did anyone at ▇▇▇▇ give you a
20  reason for why it terminated the account?
21     A  I'm sorry, what was the question?  I got
22  distracted.

Page 232

1      Q  We were at ▇▇▇▇  Did anyone give
2  you a reason for why it terminated the account?
3      A  They did not.
4      Q  Great.  Did anyone in the rest -- so the
5  rest of the banks are ▇▇▇▇▇▇▇▇
6  ▇▇▇▇▇▇▇▇▇▇▇▇▇
7  ▇▇▇▇▇▇▇▇▇▇▇▇▇,
8  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇,
9  did anyone from any of those banks give you a reason
10  for why it terminated the account other than what's
11  listed in any termination letter?
12     A  They did not.
13     Q  Did anyone from any of those banks give
14  anyone at Advance America a reason for why it
15  terminated the account outside of what was in the
16  termination letters?
17     A  Not to my knowledge, no.
18         (Nelson Exhibit No. 20 was marked
19          for identification.)
20  BY MS. DHARIA:
21     Q  The court reporter has handed you Exhibit
22  No. 20.  It is a document bearing the Bates stamp

Page 233

1  AA383835.
2         Do you recognize this as an e-mail that
3  you sent to David Hicks on January 13th, 2016?
4      A  Yeah, based on the "to" and "from" lines,
5  yes.
6      Q  Who is David Hicks?
7      A  I'm unsure of David's official title, but
8  he is some form of management within our IT group.
9      Q  Was that his role at the time that you
10  sent this e-mail?
11     A  I'm unsure when his roles have moved and
12  changed, but --
13     Q  He worked in IT at the time?
14     A  That's correct.
15     Q  In your e-mail you write in the third
16  paragraph:  "I will need Becky's computer to stay and
17  will need to be able to access that.  How do I
18  arrange that?  She has been here for 15 years, and
19  there is a good deal of information related to
20  banking and Operation Choke Point that I need to
21  access for a while."
22         Who is Becky?

Dale Nelson 30(b)(6)
Confidential
5/3/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 116 of 150
Washington, DC
Page 68 (266 - 269)

Page 266

1   Q  But assuming that it grows at 3 percent a

2  year, it would have been that in 2011?

3   A  At some point in time there was a

4  promotion involved, so that it may be larger than a

5  3 percent increase.

6   Q  When was that promotion?

7   A  I'm not sure of exactly the time.  I just

8  know -- it feels it should have been somewhere in

9  that time, since I've had multiple positions within

10  the company, or multiple titles, I guess I should

11  say.

12   MS. DHARIA:  We want to state for the

13  record that the monthly reports that Mr. Nelson

14  referred to earlier, the analysis reports, we would

15  request them if they haven't already been produced;

16  and if not, then we would like to be pointed to what

17  the Bates numbers are.

18   MS. MOSS:  Well, he referred to a lot of

19  reports, so you're going to need to be a little more

20  specific with me, and then we will take the request

21  under advisement and see if it's responsive to

22  discovery requests that were served, and consider

Page 267

1  whether we will produce them at that point.

2   MS. DHARIA:  We referred to monthly

3  reports specifically in the context of this document,

4  Exhibit 26, which was about the bank fees, bank

5  charges, and he said that Jessica Blackwell inputted

6  data into these spreadsheets and circulated them

7  monthly, and it included information about bank

8  fees and other --

9   MS. MOSS:  I understood.  So those are

10  the reports you're referring to?  We'll take it under

11  advisement, and determine whether it was responsive

12  to any of the discovery requests.

13   MS. DHARIA:  Okay.  Otherwise, we're set.

14   MS. MOSS:  You're done.  No more

15  questions?

16   MS. DHARIA:  No more questions.

17   MR. MORELLI:  Well, Nicole goes first.

18   MS. MOSS:  I'm sorry?

19   MR. MORELLI:  You go first.

20   MS. MOSS:  Oh, I have no questions.

21   MS. MIZUSAWA:  I have no questions.

22   MR. MORELLI:  No questions.

Page 268

1   MS. MOSS:  We would like him to read and

2  sign, please.

3   (Whereupon, at 4:57 p.m. the

4  deposition of DALE NELSON

5  was concluded.)

Page 269

1   CERTIFICATE OF NOTARY PUBLIC

2

3   I, LESLIE ANNE TODD, the officer before whom the

4  foregoing deposition was taken, do hereby certify

5  that the witness whose testimony appears in the

6  foregoing deposition was duly sworn by me in

7  stenotype and thereafter reduced to typewriting under

8  my direction; that said deposition is a true record of

9  the testimony given by said witness; that I am neither

10  counsel for, related to, nor employed by and the

11  parties to the action in which this deposition was

12  taken; and, further, that I am not a relative or

13  employee of any counsel or attorney employed by the

14  parties hereto, nor financially or otherwise

15  interested in the outcome of this action.

16

17   LESLIE ANNE TODD

18  Notary Public in and for the

19  District of Columbia

20  My commission expires:

21  November 14, 2018

22

　　　CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


　　　　　　　_____

　　　　　　　　Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

2018, and executed the above certificate in my

presence.


　　　　　　　_____

　　　　　　　　NOTARY PUBLIC IN AND FOR


　　　　　　　　_____

　　　　　　　　County Name

MY COMMISSION EXPIRES:

# EXHIBIT 101

# FILED UNDER SEAL

# EXHIBIT 102

Confidential



Transcript of **Joachim Christian Rudolph**

Wednesday, May 9, 2018

*Advance America, et al. v. Federal Deposit Insurance Corporation, et al.*

Alderson Court Reporting
1-800-FOR-DEPO (367-9976)
Info@AldersonReporting.com
www.AldersonReporting.com

Alderson Reference Number: 78159

```
 1                UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLUMBIA

 3

 4    - - - - - - - - - - - - - - +
                                  |
 5    ADVANCE AMERICA, CASH ADVANCE |
                                  |
 6    CENTERS, INC., et al.,       |
                                  |
 7          Plaintiffs,            |
                                  |
 8      vs.                        |   Civil Action
                                  |
 9    FEDERAL DEPOSIT INSURANCE    |   No. 14-953-TNM
                                  |
10    CORPORATION, et al.,         |
                                  |
11          Defendants.            |
                                  |
12    - - - - - - - - - - - - - - +

13        Washington, D.C., Wednesday, May 9, 2018

14

15    CONFIDENTIAL DEPOSITION OF JOACHIM CHRISTIAN RUDOLPH,

16    a witness herein, called for examination by counsel

17    for Defendants in the above-entitled matter, pursuant

18    to notice, the witness being duly sworn by MICHELE E.

19    EDDY, RPR, CRR, a Notary Public in and for the

20    District of Columbia, taken at the offices of

21    MoloLamken, 600 New Hampshire Avenue, Northwest,

22    Washington, D.C., at 8:58 a.m.
```

Page 2

1    A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFFS:

4         NICOLE JO MOSS, ESQUIRE

5         Cooper & Kirk, PLLC

6         1523 New Hampshire Avenue, Northwest

7         Washington, D.C.  20036

8         Telephone: (202) 220-9600

9         Email:  nmoss@cooperkirk.com

10

11   ON BEHALF OF THE DEFENDANT FEDERAL DEPOSIT INSURANCE

12   CORPORATION:

13        JUSTIN V. SHUR, ESQUIRE

14        SARAH NEWMAN, ESQUIRE

15        MoloLamken LLP

16        600 New Hampshire Avenue, Northwest

17        Suite 660

18        Washington, D.C.  20037

19        Telephone: (202) 556-2000

20        Email: jshur@mololamken.com

21             snewman@mololamken.com

22

Page 3

1    ATTENDANCE, Continued

2

3    ON BEHALF OF THE DEFENDANT FEDERAL DEPOSIT INSURANCE

4    CORPORATION:

5         DUNCAN N. STEVENS, ESQUIRE

6         Federal Deposit Insurance Corporation

7         3501 N. Fairfax Drive, D-7028

8         Arlington, Virginia  22226

9         Telephone: (703) 562-2402

10        Email: dstevens@fdic.gov

11

12   ON BEHALF OF THE DEFENDANT BOARD OF GOVERNORS OF THE

13   FEDERAL RESERVE SYSTEM:

14        YVONNE F. MIZUSAWA, ESQUIRE

15        Board of Governors of the Federal Reserve

16        System

17        20th & C Streets, Northwest

18        Washington, D.C. 20551

19        Telephone: (202) 452-3436

20        Email: yvonne.f.mizusawa@frb.gov

21   ALSO PRESENT:

22        Jeffrey W. Newman, Esquire

Page 4

1    ATTENDANCE, Continued

2

3    ON BEHALF OF THE ATTORNEYS FOR THE OFFICE OF THE

4    COMPTROLLER OF THE CURRENCY AND FOR JOSEPH M. OTTING,

5    IN HIS OFFICIAL CAPACITY AS COMPTROLLER OF THE

6    CURRENCY:

7         PETER C. KOCH, ESQUIRE

8         Special Counsel - Litigation Division

9         Office of the Comptroller of the Currency

10        400 7th Street, Southwest

11        Washington, D.C.  20219

12        Telephone:  (202) 649-6313

13        Email: peter.koch@occ.treas.gov

14

15

16

17

18

19

20

21

22

Page 5

1         EXAMINATION INDEX

2                   PAGE

3    EXAMINATION BY MR. SHUR              12

4

5

6

7

8         E X H I B I T S

9    (Attached to the Transcript)

10   DEPOSITION EXHIBIT           PAGE

11   Exhibit 1  Notice of Deposition          19

12   Exhibit 2  Letter dated 2-3-14 from ████      ██

13   ██      █████          Advance America, Cash

14        Advance Centers, Inc., James A.

15        Ovenden; AA004984 - 88

16   Exhibit 3  Email chain; top email dated        108

17        2-18-14 from Christian Rudolph to

18        ██████; AA249016

19   Exhibit 4  Letter dated 4-9-14 from ████      ██

20        ██      █████ to J. Patrick O'Shaughnessy;

21        AA004989

22

Joachim Christian Rudolph
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 124 of 150

Confidential
Washington, DC

5/9/2018
Page 3 (6 - 9)

Page 6

EXHIBIT INDEX CONTINUED

| DEPOSITION EXHIBIT | PAGE |
|---|---|
| Exhibit 5  Declaration of Christian Rudolph dated 10-1-14 | 108 |
| Exhibit 6  Declaration of Christian Rudolph dated 11-23-16 | 108 |
| Exhibit 7  Third Declaration of Christian Rudolph dated 1-23-17 | 108 |
| Exhibit 8  Letter dated 3-3-14 from ██████ ██████; AA4956 | |
| Exhibit 9  Exhibit A to Plaintiff Advance America's Objections and Responses to Defendants' First Set of Interrogatories | 155 |
| Exhibit 10 Email dated 1-23-17 from Dale Nelson to ██████, with attachment; AA258976 | 155 |
| Exhibit 11 Listing of banks | 155 |
| Exhibit 12 Letter dated 2-26-14 from ██████ ██ to McKenzie Check Advance of MS LLC; AA004970 | 170 |

Page 7

EXHIBIT INDEX CONTINUED

| DEPOSITION EXHIBIT | PAGE |
|---|---|
| Exhibit 13  Letter dated 4-10-14 from ██████ to Patrick O'Shaughnessy; AA580885 | 170 |
| Exhibit 14  Letter dated 3-11-14 from ██████ to Cash Advance Centers of California, LLC dba Advance America; AA004993 | 174 |
| Exhibit 15  Letter dated 6-18-14 from ██████; AA004942 - 44 | 178 |
| Exhibit 16  Letter dated 6-26-14 from ██████ to ASCO of Michigan, Inc., DBA Advance America; AA004950 | 198 |
| Exhibit 17  Email chain; top email dated 7-9-14 from ██████ ██████; AA160755 - 56 | 198 |
| Exhibit 18  Email dated 2-5-15 from Dale Nelson to Christian Rudolph, with attachment; AA383153 - 56 | 201 |

Page 8

EXHIBIT INDEX CONTINUED

| DEPOSITION EXHIBIT | PAGE |
|---|---|
| Exhibit 19  Email dated 1-7-15 from Christian Rudolph to ██████, Dale Nelson, and ██████, with attachment; AA000506 - 07 | 201 |
| Exhibit 20  Email dated 12-17-14 from ██████ to Christian Rudolph, with attachment; AA000503 - 05 | 201 |
| Exhibit 21  Email dated 3-19-15 from Patrick O'Shaughnessy ██████; AA047327 | 209 |
| Exhibit 22  PowerPoint titled "Treasury"; AA007842 - 45 | 218 |
| Exhibit 23  Letter dated 10-27-15 from ██████ to Advance America; AA004980 | 231 |
| Exhibit 24  Letter dated 1-14-16 from ██████ to Advance America, Cash Advance Centers; AA000387 | 233 |

Page 9

EXHIBIT INDEX CONTINUED

| DEPOSITION EXHIBIT | PAGE |
|---|---|
| Exhibit 25  Email dated 1-28-16 from Dale Nelson to ██████ ██████ ██████; AA581979 | 233 |
| Exhibit 26  Email dated 10-21-16 from Dale Nelson to ██████, with attachment; AA262666 | 240 |
| Exhibit 27  Letter dated 10-21-16 from ██████ to Advance America Cash Advance; AA004960 | 244 |
| Exhibit 28  Email dated 11-1-16 from ██████ to Christian Rudolph, with attachment; AA036808 | |
| Exhibit 29  Letter dated 11-1-16 from ██████ to Advance America Cash Advance Center, Inc., with attachment; AA004994 - 96 | |

Joachim Christian Rudolph
Confidential
5/9/2018

Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 125 of 150

Washington, DC
Page 4 (10 - 13)

Page 10

EXHIBIT INDEX CONTINUED

DEPOSITION EXHIBIT                                    PAGE

Exhibit 30  Email dated 11-13-16 from Christian   246

      Rudolph to ▮▮▮▮▮; AA250351

Exhibit 31  Letter dated 12-2-16 from ▮▮▮▮▮ ▮▮

▮▮▮▮▮;

      AA004999 - 5000

Exhibit 32  Email dated 12-7-16 from Dale        256

      Nelson to ▮▮▮▮▮; AA260467

Exhibit 33  Letter dated 12-8-16 ▮▮▮▮▮

▮▮    ▮▮▮▮▮l; AA004869

Exhibit 34  Email dated 2-8-17 from ▮▮▮▮▮       256

      to Christian Rudolph, with

      attachment; AA242228

Exhibit 35  PowerPoint titled "Treasury Update   266

      Q1 2017"; AA245198 - 201

Exhibit 36  Consolidated Financial Statements    289

      for Years Ended December 31, 2016

      and 2015; AA000147 - 79

Page 11

EXHIBIT INDEX CONTINUED

DEPOSITION EXHIBIT                                    PAGE

Exhibit 37  Letter dated 4-21-14 from ▮▮▮    ▮▮

▮▮    ▮▮▮▮▮ to Mr. O'Shaughnessy and

      Mr. Rudolph; AA004941

Exhibit 38  Letter dated 10-10-14 from          316

      ▮▮▮▮▮ to Advance America;

      AA004951

Exhibit 39  Letter dated 11-7-16 from ▮▮▮    ▮▮

▮▮    ▮▮▮▮▮ to Express Check Advance

      of Alabama LLC; AA004953

Page 12

        P R O C E E D I N G S

           Washington, D.C.

           May 9, 2018

              - - -

     JOACHIM CHRISTIAN RUDOLPH,

having been duly sworn, testified as follows:

      EXAMINATION BY COUNSEL FOR DEFENDANTS

BY MR. SHUR:

   Q   Good morning.

   A   Good morning.

   Q   My name is Justin Shur.  I'm with a law

firm by the name of MoloLamken, and I'm one of the

lawyers representing the FDIC in connection with

this litigation.

       Could you please state your full name

and spell it for the record.

   A   Full name is Joachim Christian Rudolph,

spelled J-O-A-C-H-I-M, Christian,

C-H-R-I-S-T-I-A-N, Rudolph, R-U-D-O-L-P-H.

   Q   Mr. Rudolph, where do you reside?

   A   I reside in Greer, South Carolina.

   Q   How long have you been there?

Page 13

   A   For approximately 17 years.

   Q   You're here today pursuant to a Notice

of Deposition.  Is that right?

   A   That is correct.

   Q   Have you been deposed before?

   A   I have.

   Q   How many times?

   A   One time.

   Q   What type of case was that?

   A   It was a -- I believe it was a class

action case relating to a California matter that

the Advance America's California subsidiary was

involved in.

   Q   What was the -- or what is the name of

the California subsidiary that was involved?

   A   Advance America, Cash Advance Centers of

California, Inc.  It's Inc. or LLC.  I'm not

100 percent certain.

   Q   Did your deposition involve your work at

Advance America?

   A   Define involve.

   Q   What was the nature of the lawsuit

Joachim Christian Rudolph    Confidential    5/9/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 126 of 150
Washington, DC
Page 14 (50 - 53)

Page 50

1  A  Correct.

2  Q  How long did you hold the position as
3  treasurer?

4  A  I still hold that position.

5  Q  At some point did you take on the
6  additional role of CFO?

7  A  I did.  Before taking that on, I believe
8  in 2014, I was promoted to senior VP of finance
9  and treasurer.  At that time I took on additional
10  responsibilities, which included managing the
11  financial planning process, managing the tax
12  department, and managing the risk department.

13  Q  That was in 2014.

14  A  That's correct.

15  Q  And then when did you become CFO?

16  A  In 2016.

17  Q  That's the position you hold today?

18  A  That's correct.

19  Q  Fair to say you're familiar with the
20  amount of revenue the company earns in a given
21  year?

22  A  Yes.

Page 51

1  Q  And what that revenue is attributable
2  to?

3  A  Yes.

4  Q  So all in all, how long have you been
5  employed at Advance America?

6  A  From August 2001 until today.

Page 52

2  Q  When was Advance America founded?

3  A  1997.

4  Q  Who founded it?

5  A  It was founded by two gentlemen, Billy
6  Webster and George Dean Johnson.

7  Q  Are they still involved in the company?

8  A  They're not.

9  Q  What's the corporate structure of
10  Advance America?

11  A  So the corporate structure obviously
12  changed a little bit over time, given the
13  ownership changes.  The company was acquired in
14  April of 2012 by Grupo Elektra.  Since that
15  acquisition, we are a direct subsidiary of Grupo
16  Elektra B.V., which is a Mexican entity traded on
17  the Mexican stock exchange, and the corporate
18  structure is 100 percent ownership.  Corporate
19  structure under that, there is a holding company,
20  which is -- I believe it's Eagle U.S. Holding,
21  Inc.  Then there's Advance America, Cash Advance
22  Centers, Inc.

Page 53

1  So from there down, nothing has really
2  changed over the years.  And under Advance
3  America, Cash Advance Centers, Inc., you have a
4  number of operating subsidiaries.  And the way
5  that is structured, each state that we operate in
6  has at least one operating subsidiary.  So let me
7  give you an example.  In Florida -- in South
8  Carolina, the entity would be Advance America,
9  Cash Advance Centers, Inc., of South Carolina.  In
10  Florida it would be Advance America, Cash Advance
11  Centers, Inc., of Florida, and so on.

12  Now, there may be some states, due to
13  acquisitions or having different brands, that you
14  would have more than one subsidiary, but in all
15  cases, they all fall under Advance America, Cash
16  Advance Centers, Inc.

17  Q  What's the reason for -- the business
18  reason for the multiple subsidiaries?

19  A  I think there's a number of reasons.
20  The primary reason is we're licensed on a
21  state-by-state basis.  So each entity has to be
22  licensed to do business in a state.  So,

Page 74

1    A   Yes.

2    Q   The company's SEC filings say that the
3 company offers "a variety of consumer lending
4 products and ancillary services."

5        What are the consumer lending products
6 that the company offers?

7    A   I would put those into four broad
8 categories, which are payday loans, also referred
9 to often as cash advances.  The second one is
10 installment loans.  The third one is -- are title
11 loans.  And the fourth one is a line of credit.

12   Q   What are the ancillary services?

13   A   Currently we offer the following
14 ancillary services.  As an agent of MoneyGram, we
15 sell money orders and provide bill payment
16 services and money transfer services.  We sell a
17 prepaid card which is issued by MetaBank.

18   Q   The money transfer service, is that like
19 a Western Union type service?

20   A   Yes.

21   Q   Any other services that the company
22 offers?

Page 75

1    A   No.

2    Q   Is it a redeemer of traveler's checks?

3    A   We don't redeem traveler's checks.  Let
4 me add one other service.  In two -- part of -- so
5 in two states, in Ohio and I believe it's in
6 Wisconsin, we do some check cashing.  And in the
7 other states we load proceeds of a check onto a
8 prepaid card that I previously mentioned.

9    Q   Does it sell traveler's checks?

10   A   We don't sell traveler's checks.

11   Q   So not involved in selling or redeeming
12 traveler's checks.

13   A   That's correct.

14   Q   So if in response to a question from a
15 bank an Advance America employee indicated that
16 the company sells or redeems traveler's checks,
17 that would be incorrect.

18   A   If that was the scope of that question,
19 that would be incorrect.

20   Q   When you say "if that was the scope of
21 that question," if that answer was given in
22 response to that question, is there any scenario

Page 76

1 in which it would be correct?

2    A   No.  I've seen those questions worded in
3 a broader format, like a seller and redeemer of
4 traveler's checks or issuer of money orders, for
5 example.  If it was phrased that way, then the
6 answer would be affirmative.

7    Q   Does Advance America use remotely
8 created checks?

9    A   When you say "use remotely created
10 checks," can you define that.

11   Q   Do you deal in any way, shape, or form
12 with remotely created checks?

13   A   We may.  When I say "may," let me
14 explain that to you.

15        With Check21, any bank can convert a
16 physical paper check to a remotely created check.
17 So a customer may give me a check.  We deposit
18 that check.  It gets returned, and the customer's
19 bank would then create a remotely created check
20 and basically return that IRD to us.

21        So in that sense we would deal with
22 remotely created checks.  Are we creating the

Page 77

1 remotely created check?  No.  But, basically,
2 anybody that accepts checks, I guess, would deal
3 or could potentially deal with remotely created
4 checks.

5    Q   What's a money services business, or
6 MSB?

7    A   There's a FinCEN definition of a money
8 service business.  There's, obviously, a number of
9 requirements to meet that definition.  You know,
10 generally if you cash checks over $1,000, you meet
11 that definition.  If you provide wire transfer
12 services, you may meet that, depending on whether
13 you're an agent of another MSB or if you do it on
14 your own behalf.

15   Q   Is "MSB," or "money services business,"
16 a phrase that's used within the company?

17   A   Yes.

18   Q   So -- how is it defined within Advance
19 America?  So when Advance America employees are
20 using the term "MSB," what does that mean?

21   A   I think it depends on who would use that
22 term.

Page 78

1    Q   Let's say the treasury department.

2    A   So I want to make a distinction.  When

3  our legal counsel would use it, it may be

4  different than what the treasury department uses

5  it.  What we found is, with dealing with banks,

6  they would often use that term interchangeably

7  with "payday lending."

8    Q   So just backing up, you said the legal

9  department within Advance America might use "MSB"

10  or interpret "MSB" differently than the treasury

11  department?

12    A   No.  They may use it differently than

13  banks that we deal with.

14       So let me give you an example.  We may

15  call a bank saying, hey, we want to open up an

16  account.  They may say, oh, we don't open accounts

17  for an MSB.  And the bank then may respond, well,

18  we actually don't open account for MSBs for

19  similar type of businesses, and, therefore, a

20  treasury analyst, who may not be well versed with

21  the official definition, could say, hey, the bank

22  just said they don't bank an MSB even though we're

Page 79

1  not an MSB.

2    Q   You said that the banks use the

3  phrase -- the terms "MSB" and "payday lending"

4  interchangeably.  What makes you say that?

5    A   Because we've asked them.

6    Q   You've asked them what?

7    A   Do you bank -- can you establish a bank

8  account for us.  And when they said -- depending

9  on what the answer is.  So let's assume in the

10  scenario they said no because we don't bank an

11  MSB, and then we explained that we're not an MSB,

12  their response doesn't change.

13    Q   An MSB, though, is -- my understanding

14  is, is a business that transmits or converts

15  money.  Right?

16    A   I don't know if that's a formal FinCEN

17  definition.

18    Q   I'm not asking if it's the formal FinCEN

19  definition.  I'm just saying is that a fair

20  interpretation of what MSB is?

21       MS. MOSS:  Objection to the extent

22  you're asking for a legal conclusion on what the

Page 80

1  FinCEN definition is.

2    Q   I'm not talking about the FinCEN

3  definition.  I'm not talking about a legal

4  conclusion.  I'm asking, within the industry, MSB

5  is a company that transmits or converts money.

6    A   I think it's often referred to a company

7  that is in a cash-intensive business.

8    Q   And is Advance America in a

9  cash-intensive -- incentive -- did you say

10  intensive or incentive?

11    A   Intensive.

12    Q   Okay.  Is Advance America in a

13  cash-intensive business?

14    A   Again, that's a relative term, but,

15  generally, I will say yes, we handle a lot of cash

16  because cash is basically the product we provide

17  to our company -- to our customers.

18    Q   Is Advance America, would you say, a

19  payday lender?

20    A   Yes.

21    Q   Is Advance America, would you say, an

22  MSB?

Page 81

1    A   We're registered as an MSB currently in

2  two states.

3    Q   Which states are those?

4    A   Ohio and Michigan.

5    Q   Why is Advance America registered in

6  those two states but not the other states in which

7  it does business?

8    A   Because in Ohio we provide check-cashing

9  services.

10    Q   And you don't provide check-cashing

11  services in any of the other states?

12    A   We don't with the exception of I think

13  it's Wisconsin, and we have very little maximum

14  amounts that would not require us to register as

15  an MSB.

16    Q   Why are you registered as an MSB in

17  Michigan?

18    A   We provide -- we provide cash advance

19  services in Michigan.  In Michigan, under state

20  law, we can have two loans outstanding with a

21  customer and the customer provides us a collateral

22  check for those loans, and those could be

**Page 154**

1 different lending businesses.

2     Q   Right. But the way you characterize the

3 discussion here in paragraph 8 of your declaration

4 is that he said, "We're dropping the entire money

5 services business" and then gave payday lending as

6 one example, along with others, of lending

7 activities that fall within that umbrella. Right?

8     A   Correct.

9     Q   So he wasn't using MSBs and payday

10 lending interchangeably in that conversation,

11 according to your declaration. Is that fair?

12     A   I don't recall if he was using them

13 interchangeably or not. I do recall a

14 conversation where we talked about the various

15 lending businesses.

16     Q   But you would agree that the way it's

17 described in your declaration, in your declaration

18 those two phrases, "money services businesses" and

19 "payday lending," are not being used

20 interchangeably. Correct?

21     MS. MOSS: Objection.

22     A   Well, I think, you know, the statement

**Page 155**

1 says, "He told us the bank was dropping the entire

2 money service business," and then we tried to

3 define what is money service business. Therefore,

4 we state including these business lines. What we

5 were trying to get at, are you just terminating

6 payday lenders or other lending -- other companies

7 that provide other lending services.

8     Q   And it was the latter.

9     A   Correct.

10     Q   But he didn't say -- when you drilled

11 down on entire money services business industry,

12 he didn't say, well, money services businesses and

13 payday lending are one and the same.

14     A   I don't recall him making that

15 statement.

16     MR. SHUR: If we can mark this as

17 Exhibit 9, please.

18     (Exhibit 9, Exhibit 10, and Exhibit 11

19 were marked for identification and attached to the

20 deposition transcript.)

21 BY MR. SHUR:

22     Q   So there's three exhibits that have been

**Page 156**

1 handed to you, 9, 10, and 11, if we could just

2 take those in turn.

3     Exhibit 9, do you recognize this?

4     A   I do.

5     Q   This is the -- it's titled Exhibit A.

6 Then there's this chart. This was provided or

7 attached to Advance America's responses to

8 defendants' set of interrogatories, the first set

9 of interrogatories in this litigation. Is that

10 right?

11     A   That's correct.

12     Q   What is Exhibit A?

13     A   It was an exhibit that was produced to

14 respond to first set of interrogatories.

15     Q   Right.

16     Do you know what this information

17 reflects? How would you describe it?

18     A   Well, it's got four columns, "Bank,"

19 "Account Closing Email," "Last Four Digit," and

20 "Reason." It's a bank -- list of bank. Then you

21 have a date for the account closing email. "Last

22 Four Digit" would refer to the last four digits of

**Page 157**

1 the bank account number, and the "Reason" would

2 relate to the reason why a bank account may have

3 been closed.

4     Q   Fair to say that this is Advance

5 America's attempt at listing out the banks, when

6 accounts for those banks were terminated, and the

7 reasons the bank provided for a period of time

8 specified in the interrogatories? Is that a fair

9 characterization?

10     A   Yes, that's a good summary.

11     Q   How was this document prepared?

12     A   It was based on internal records that

13 the treasury department maintained.

14     Q   When you say "the treasury department,"

15 this is Advance America's treasury department.

16 Right?

17     A   That's correct, not the U.S. Treasury.

18     Q   What types of records?

19     A   A couple -- obviously, "Account Closing

20 Email," the source document would have been an

21 email relating to the account closing.

22     The actual list was based on a list that

Joachim Christian Rudolph     Confidential     5/9/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 130 of 150
Washington, DC
Page 41 (158 - 161)

Page 158

1 the treasury department maintained, and then that

2 would have augmented that information with the

3 relevant account number.

4     Q   Okay. And who prepared this? Who was

5 involved in preparing this? Do you know?

6     A   My understanding was Dale Nelson was

7 involved based on a request that counsel has made

8 in preparation of the lawsuit or during the

9 proceedings of the lawsuit.

10     Q   Okay. Would you agree this is -- if you

11 were looking to find out what Advance America's

12 best recollection was as to why a particular bank

13 terminated an account, this is the document to

14 look at?

15     A   I think it's one source you would want

16 to look at. It was obviously prepared by Dale and

17 the treasury analyst so it was kind of based on

18 internal working documents, but, obviously,

19 there's other documents, for example, letters from

20 banks, emails that may also be relevant.

21     Q   But those other documents, the letters

22 and emails from banks, those were taken into

Page 159

1 account in preparing Exhibit A -- Exhibit 9?

2     A   Yes.

3     Q   So if you take a look, under the "Bank"

4 column, █████████ appears a number of

5 times.

6     A   Okay.

7     Q   Right?

8     So, for example, on page 6, it appears

9 twice, or three times, rather, and then page 8 it

10 appears a number of different times. Do you see

11 that?

12     A   I do, yes.

13     Q   And under the "Reason" column, for each

14 time █████████ appears, the reason provided

15 is "No MSB and/or payday."

16     Do you see that?

17     A   I do.

18     Q   Were there instructions given to the

19 person that prepared this document as to their

20 options for what they could list under "Reason"?

21     A   Again, it started as kind of an internal

22 working document. So there wasn't a -- strict

Page 160

1 instructions or a dropdown saying, hey, you've got

2 five options, you have to pick one.

3     Now, I think it -- the information

4 started, you probably had some notes somewhere and

5 there was an attempt made to put those in some

6 general categories.

7     Q   You said earlier that Advance America

8 does not use "MSB" and "payday" interchangeably.

9 Correct?

10     A   Advance America's legal department does

11 not.

12     Q   And that's because they're two separate

13 things. Correct?

14     A   Right. Yeah.

15     I think if you're sort of in the shoes

16 of a treasury analyst and they get feedbacks from

17 a bank, those terms are often, in our experience,

18 used interchangeably. So I think they've sort of

19 lumped them into one category, no MSB or payday.

20     Q   So for purposes of Exhibit 9, this

21 Exhibit A that was attached to Plaintiffs'

22 Response to Defendants' Interrogatories, the

Page 161

1 reason that's given here for Fifth Third Bank and

2 some other banks is "No MSB and/or payday," and so

3 here Advance America is using those two terms

4 essentially interchangeably. Right?

5     A   Yes, in this context we are.

6     Q   So if you could set that aside and take

7 a look at Exhibit 10.

8     There's a cover email from Dale Nelson

9 to Jessica Blackwell. It's dated January 23rd,

10 2017. Do you see that?

11     A   I do.

12     Q   Those two individuals work in Advance

13 America's treasury department?

14     A   They do.

15     Q   Then the subject is "Copy of Bank List,"

16 and then in paren it says "to." Right? And

17 there's an attachment, a spreadsheet attached.

18 Correct?

19     A   Yes.

20     Q   The only text in the body of the email,

21 just says -- it just says, "Updated slightly."

22 Right?

Page 162

1    A   Uh-hmm.  Yes.

2    Q   Do you know what this is, this
3  spreadsheet that's attached to it?

4    A   On this first page it looks like there
5  is a summary table.  Then there's somewhat -- the
6  second section looks like there's a somewhat of a
7  summary.  Then there's a lot of detail behind it.
8  Again, I'm not familiar with the particular
9  spreadsheet, but I would imagine there would be
10 probably three different tabs, one detail, one is
11 summarized, and one is fairly summarized.

12   Q   Just to be clear, Exhibit 9, the
13 document we were just looking at, that's something
14 that Advance America prepared for an outside party
15 in connection with this litigation.  Right?  It
16 was prepared for the defendants.  Correct?

17   A   Yes, that is correct.

18   Q   Exhibit 10, the spreadsheet we're now
19 looking at, that's titled "Bank List," at least
20 according to the cover email, this is an internal
21 Advance America document.  Right?

22   A   Yes.

Page 163

1    Q   If you look at the "Comment" column,
2  fair to say that this attempts to list the reason
3  for the bank termination, meaning what's listed
4  under the "Comment" column corresponds with the
5  bank, the date, and the state in that same row?

6    A   What is the question?

7    Q   Sure.  It wasn't a good question.  Let
8  me ask it again.

9    A   Yes.

10   Q   So this is similar to Exhibit 9 in the
11 sense that it shows a list of banks; dates on
12 which accounts at those banks were terminated,
13 right, accounts that Advance America held; and the
14 reason, the stated reason for those terminations.
15 Correct?

16   MS. MOSS:  Objection.

17   A   This list appears to be longer, is
18 longer than the list in Exhibit A, and I believe
19 that it would also include banks that may have
20 been contacted with the goal of establishing a
21 bank account.  So they really serve two different
22 purposes.

Page 164

1    Q   Right.  But what this attempts to
2  summarize is banks that Advance America had
3  relationships with, the dates on which those
4  relationships were terminated, and the reason for
5  the termination.  Is that fair?

6    MS. MOSS:  Objection.

7    A   I don't know what the objective was for
8  creating this list.

9    Q   I'm looking specifically behind the
10 detail slide.  Do you see that, where there's
11 columns for banks, date, date, year, and comments?

12   A   Yes.

13   Q   You don't know the purpose, why this
14 document was created?

15   A   My understanding, it was created just to
16 track internally responses from banks.

17   Q   About bank terminations.

18   A   Or establishing banks.

19   Q   So reasons that banks gave for either
20 terminating existing accounts or declining to open
21 new accounts.  Is that fair?

22   A   Yes.

Page 165

1    Q   If you take a look at the comment
2  column, the "No MSB and/or payday" moniker that we
3  saw in Exhibit 9 is not used in this document,
4  Exhibit 10, is it?

5    A   I don't see that as a moniker.

6    Q   Instead, MSB and payday -- so there's
7  "No MSB."  Right?  You see that moniker?

8    A   Uh-hmm.

9    Q   Then there's "No payday."  Do you see
10 that moniker?

11   A   Uh-hmm.

12   Q   But they're treated separately.  Right?

13   A   They're listed separately, yes.

14   Q   Because they're -- as we discussed,
15 they're two separate things.

16   A   Yes.  Well, they are two separate things
17 from a legal definition perspective.

18   Q   Right.

19   A   This was just an internal list.  A lot
20 of times we don't know the true reason for the
21 termination so that was just a moniker that was
22 given at the time.

Page 166

1    Q   Well, how was it determined whether what
2  would be listed next to any given bank on Exhibit
3  10 would say "No MSB" versus "No payday"?  How
4  would that determination be made?
5    A   Again, it's likely to be somewhat
6  subjective, the reason being it's different
7  individuals completing the form.  But it's based
8  on feedback they had gotten from banks.
9    Q   Based on -- so based on their
10  interactions with the bank.
11   A   That's correct.
12   Q   Presumably what the bank told them about
13  the termination.  Correct?
14   A   Correct.  As I explained earlier, some
15  banks would use those terms interchangeably so it
16  wouldn't balance that.  If it says "No MSB," and
17  there it says "No payday," did the bank really
18  mean no MSB and/or payday, or are they just
19  talking about payday or MSB?  It could be either
20  one or all of those options.
21   Q   Well, in the ████████████ situation
22  that we previously discussed, when the executive

Page 167

1  said "MSB," you sought to clarify that.  Right?
2    A   Because we had a more substantive
3  meeting with ████████.
4    Q   Right.
5       And so in these other interactions with
6  the banks, if the bank says we're not going to
7  bank with MSBs, do the -- whoever it is at the
8  treasury department, are they following up to
9  clarify?
10   A   Sometimes they do.  And the reason they
11  would do that is if they say, hey, we don't bank
12  an MSB, the analyst or whoever is talking to the
13  bank would clarify, we're not an MSB in state X in
14  order to see if that would make a difference to
15  the banks.  Sometimes it does, and sometimes it
16  does not.
17   Q   But is it fair to say that if I am
18  reading Exhibit 10 and I see next to a particular
19  bank it says, "No MSB," that the bank provided no
20  MSB as a reason for the termination?  Is that
21  fair?
22   A   The termination or for not opening up an

Page 168

1  account.
2    Q   Okay.  If I'm reading --
3    A   And a lot of times, that interaction is
4  done at the level that it's done.  So it could be
5  a branch manager.  It could be a teller, whoever
6  it may be.  It could be a corporate account
7  executive.  But there's all different levels, and
8  you may get different responses depending on who
9  you talk to at the bank.
10   Q   If I see in this chart next to a
11  particular bank that it says, "No payday," that's
12  the reason that the bank provided.
13   A   That is correct.
14   Q   If you take a look at the entries for
15  ██████████ -- so I believe that's line 294.
16  Do you see that?
17   A   Uh-hmm.
18   Q   The reason given under the last column
19  there is "Closed due to MSB."  Right?
20   A   That's right.
21   Q   It doesn't say MSB and/or payday, does
22  it?

Page 169

1    A   It does not.  So that was the
2  understanding of whoever updated that spreadsheet
3  at the time.
4    Q   Right.  Is it fair to say, I mean,
5  whoever was preparing this spreadsheet, they were
6  trying to get this right, as accurate as possible.
7  Correct?
8    A   It's an internal working document so,
9  really, our -- we didn't put a lot of focus on
10  having very precise reasons in this document.
11   Q   What about Exhibit A, meaning Exhibit 9
12  for purposes of this deposition?
13   A   The --
14      MS. MOSS:  Let him finish his question.
15   Q   Did you -- was there an effort to make
16  sure that the descriptions here were accurate?
17   A   As accurate as we could be since that
18  was a document we officially submitted to the
19  court.
20   Q   Well, for a lot of the banks in Exhibit
21  10, the reason provided is simply "No MSB."  But
22  in Exhibit A, which is Exhibit 9 for purposes of

Page 174

1    A   They do make a cost-benefit analysis. A
2  lot of times we went out to the bank, saying, can
3  we help you offset some of those compliance costs.
4    Q   Did the bank provide any reason, other
5  than what's stated in Exhibits 12 and 13, for why
6  they terminated the relationship or the accounts?
7    A   Not that I recall.
8        (Exhibit 14 was marked for identification
9  and attached to the deposition transcript.)
10 BY MR. SHUR:
11   Q   So you've just been handed Exhibit 14.
12 This is a March 11th, 2014, letter from -- is it
13 Umpqua?
14   A   I think that's how it's pronounced.
15   Q   -- ███████ to Advance America, and
16 it's addressed to you.  Correct?
17   A   That is correct.
18   Q   It says, ███████ has determined
19 that maintaining your deposit account relationship
20 is no longer mutually beneficial and has decided
21 to exercise our right to terminate your banking
22 relationship."  Right?

Page 175

1    A   Correct.
2    Q   When it says, "no longer mutually
3  beneficial," that's a reference to the fact that
4  it's not just about Advance America, but it also
5  needs to be a beneficial relationship to its
6  counterparty, the bank.  Correct?
7    A   Well, that -- well, let me tell you a
8  little bit about this letter because it was
9  specifically addressed to me so I actually reached
10 out to this bank and asked them, well, what does
11 that mean, and they had a lot of questions on
12 whether we provide just storefront -- this is an
13 account we used in California.  As you can see by
14 the title, our California entity is referenced
15 herein, and their question is do we just provide
16 storefront services or online services.
17       I told them we do provide online lending
18 services and -- but they follow California state
19 law, in strict compliance with federal and state
20 laws.  And they responded that they, given that
21 we're an online lender, could not provide those
22 services to us.

Page 176

1        So in the conversation we had, it was
2  really not around the cost of providing the
3  services.  It was more about the risk of providing
4  services to an online lender.  I think it's well
5  documented in a number of public documents that
6  the federal regulators put additional scrutiny on
7  online lenders.  So, again, I don't know the
8  reason for the termination, but I would presume
9  that would be one of the reasons.
10   Q   So when was this call?
11   A   After I received that letter.
12   Q   Who was the call with?
13   A   Our local relationship person.  I don't
14 recall the name.
15   Q   Was it just you and that other person?
16   A   That's correct.
17   Q   Is there any written record or
18 documentation about that conversation?
19   A   There's not.
20   Q   You said just now that in that call the
21 individual from the bank said that they can't
22 continue the relationship because of the online

Page 177

1  service you provided?
2    A   Correct.
3    Q   Did they say why that was the problem
4  for them?
5    A   As a matter of policy, they're not
6  providing banking services to online lenders.
7    Q   Did they say anything about regulators?
8    A   They did not.
9    Q   But you said that there's certain
10 risks -- additional risks associated with online
11 services.  Is that right?
12   A   No.  There is perceived risk, I guess,
13 communicated by various banking regulators.
14   Q   Fair to say that there's additional
15 compliance costs with the bank associated with
16 having a relationship with an online lender?
17   A   Only if they provide ACH processing
18 services, which this bank did not provide to us.
19 So they were actually in no way involved in online
20 lending at all.  It's just that the entity
21 provided online lending services.
22   Q   Exhibit 14, the letter from ███████,

Joachim Christian Rudolph      Confidential      5/9/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 134 of 150
Washington, DC      Page 46 (178 - 181)

Page 178

1 doesn't say anything about online lending, does

2 it?

3      A   It does not.

4      Q   It says that "relationship is no longer

5 mutually beneficial." Correct?

6      A   That's what it says.

7      Q   Anything -- did the bank, ███████████,

8 tell you or Advance America anything other than

9 what's in Exhibit 14 and the conversation you just

10 described for why they were terminating the

11 relationship?

12      A   No, that was the only communication

13 between us and the bank.

14      MR. SHUR: This is Exhibit 15.

15      (Exhibit 15 was marked for identification

16 and attached to the deposition transcript.)

17 BY MR. SHUR:

18      So this is a letter dated June 18th,

19 2014 -- I'm referring to Exhibit 15 -- from

20 ███████ bank to Advance America, specifically

21 to you, where, in the body of the first paragraph,

22 ███████ writes, "███████ has made the

Page 179

1 decision to exit the business of providing

2 commercial banking services to payday lenders and

3 related businesses."

4      A   Could I just interrupt you for a second?

5      Q   Sure.

6      A   Reviewing this Exhibit 15, I notice

7 there's references in the last page to "██████

8 accounts," which is a different bank.

9      Q   I see.

10      So to be clear, Exhibit 15 has three

11 pages to it, and the third page, which bears Bates

12 number AA004944, contains a list of ██████ ACH

13 accounts, and what you're saying, I believe, is

14 that's a separate document from the first two

15 pages of this exhibit, which is the letter from

16 ██████ Bank I was just referring to.

17      A   Okay. I just wanted to clarify. Thank

18 you.

19      Q   So going back to the first paragraph on

20 the first page of Exhibit 15, it says, "████

21 ██ has made the decision to exit the business of

22 providing commercial banking services to payday

Page 180

1 lenders and related businesses." It goes on to

2 say, "We consistently review business plans and

3 initiatives across the company to ensure that they

4 are aligned with our strategic goals and future

5 plans. We took a range of factors into

6 consideration and determined that this bank no

7 longer fits within the bank's strategic

8 priorities."

9      Did I read that correctly?

10      A   Yes. I don't think you left anything

11 out.

12      Q   The first sentence I read says that

13 "██████ has decided to exit the business of

14 providing commercial banking services to payday

15 lenders and related businesses."

16      Did you have any conversations or other

17 communications with ██████ where they

18 explained what it meant by related businesses?

19      A   Well, we have had a number of

20 conversations with ██████. I specifically

21 had a conversation with ██████ following this

22 letter. He related to me a number of things. One

Page 181

1 is ██████ was a -- obviously had a -- had

2 payday lending relationships as well as

3 relationships with check cashers and at first

4 exited those check cashing relationships, and due

5 to a recent examination by the OCC, they had

6 received pressure to also exit the payday lending

7 industry.

8      Q   So let's back up for one second, and

9 then we'll talk about this conversation you just

10 mentioned.

11      You said that there was a number of

12 conversations you had with ██████ about the

13 termination?

14      A   Well, it's been a long-standing

15 relationship, so we had conversations prior to

16 that, obviously, and post termination. I only

17 recall that one conversation with ██ Dale or

18 other people on the treasury team may have had

19 other conversations, but I think most of those

20 then more resolved -- revolved, my apologies,

21 around the process of closing the accounts out.

22      Q   So the one conversation you remembered

Page 186

1 recollection of a conversation that took place
2 approximately four years ago.  Is that right?
3    A   That's correct.
4    Q   There's no documents, that you're aware
5 of or that you reviewed, that refreshed your
6 recollection about that conversation.  Correct?
7    A   That is correct.
8    Q   Or that documents what was said during
9 the conversation.  Is that right?
10    A   That's right.
11    Q   And the letter that we're looking at,
12 Exhibit 15, says nothing about regulatory
13 pressure.  Right?
14    A   That is correct.
15    Q   It says that ███████ made the
16 decision based on a review of business plans and
17 initiatives across the company.  Correct?
18    A   That's what it says.
19    Q   We discussed that that's something that
20 banks do.  Right?  They do reviews, and they
21 reevaluate their strategic goals and plans.
22 Correct?

Page 187

1    A   Those are the stated reasons in this
2 letter.
3    Q   But in addition to it being the stated
4 reasons in the letter, you're aware, based on your
5 experience, that these are actually things that
6 banks do.
7    A   They do, but not on a mass basis in a
8 short period of time.
9    Q   Well, it doesn't -- is there anything in
10 this letter that states the time period in which
11 they conducted the review?
12    A   No, I don't see any reference to a time
13 period.
14    Q   Right.  So you don't know when the
15 review started or ended.  Correct?
16    A   I don't know that.
17    Q   And then it says -- and you don't
18 know -- it says here -- there's a reference to
19 "business plans, initiatives, strategic goals,
20 future plans."  You don't know what any of those
21 things are.  Correct?
22    A   No, I have no access to that

Page 188

1 information.
2    Q   Right.  The banks didn't share that with
3 you.  Right?
4    A   Yeah, that's not something a bank would
5 typically do.
6    Q   That would be unusual.  Correct?
7    A   Yes.
8    Q   Okay.  Then it says, "We took a range of
9 factors into consideration and determined that
10 this business no longer fits within the bank's
11 strategic priorities."
12        They didn't tell you what factors -- the
13 range of factors that they took into
14 consideration.  Correct?
15    A   I would certainly love to know that
16 information, but they did not share that with us.
17    Q   Did you ask them?
18    A   I asked Al what the reason was for the
19 termination, and, as I just testified, his view
20 was very different from the stated reasons in this
21 letter.
22    Q   Did you say, hey, ███ your letter says

Page 189

1 that you took a range of factors into
2 consideration, what are those factors?  Did you
3 ask him that?
4    A   I didn't ask him that same -- that exact
5 question.
6    Q   It also says in the letter that your
7 business -- "Advance America's business no longer
8 fits within the bank's strategic priorities."
9        Did you say, Al, what strategic
10 priorities are we talking about?  Did you ask him
11 that question?
12    A   I did not.
13    Q   And you don't know what strategic
14 priorities, right, he's talking about?
15    A   Yeah, I don't know.
16    Q   And --
17    A   It's --
18    Q   If you take a look at Exhibit 11, this
19 was the internal spreadsheet or an internal
20 spreadsheet that Advance America created.
21 Correct?
22    A   Yes.

Joachim Christian Rudolph
Confidential
Washington, DC
5/9/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 136 of 150
Page 49 (190 - 193)

Page 190

1   Q   And similar to some of the other lists
2   and spreadsheets we've looked at, this is an
3   attempt by Advance America to document the reasons
4   for bank terminations.  Correct?
5   A   Correct.
6   Q   Take a look at line 295, or row 295, I
7   guess.
8       It's for ██████.  Correct?
9   A   It is.
10  Q   It says -- in terms of reasons for
11  termination, it says, "Closed due to MSB."  Right?
12  A   Uh-hmm.
13  Q   And it says, "No new accounts due to MSB
14  and Mexican ownership."  Right?
15  A   That's what it says, yes.
16  Q   So it says nothing about regulatory
17  pressure.  Correct?
18  A   That's correct.
19  Q   There's no mention of the OCC in there,
20  is there?
21  A   There isn't.
22  Q   Or any other regulator, for that matter.

Page 191

1   Correct?
2   A   That's correct.
3   Q   But it does say, "No new accounts due to
4   MSB and Mexican ownership."  Right?  That's what
5   it says?
6   A   Yes, that's what it says.
7   Q   So fair to say that foreign ownership
8   interests in a company is something that banks are
9   interested in when determining whether or not to
10  engage in a business relationship with them?
11  A   It's fair to say that would be one of
12  the reasons a bank would look at.
13  Q   Especially if that company is involved
14  in transmitting money, right, if they're a money
15  transmitter.  Correct?
16  A   Correct.
17  Q   And one of the reasons is because of the
18  anti-money laundering regulations and compliance
19  obligations that banks have with respect to those
20  activities.  Correct?
21  A   That's correct.
22  Q   Banks have gotten into some trouble with

Page 192

1   respect to some of their banking relationships
2   with companies that transfer money overseas.
3   Isn't that right?
4   A   That is correct.
5   Q   You mentioned earlier, I think, in 2012
6   Advance America was acquired by a Mexican entity.
7   Correct?
8   A   That is correct.
9   Q   And that's Grupo Elektra?  Am I
10  pronouncing that right?
11  A   That's correct.
12  Q   And they purchased Advance America for
13  780 million dollars.  Is that right?
14  A   That is correct.
15  Q   And the owner of Grupo Elektra is a
16  gentleman by the name of Ricardo Salinas Pliego?
17  Am I correctly pronouncing that, or am I
18  butchering that?
19  A   No, that's pretty good.  But he's one of
20  the owner.  Grupo Elektra is actually a publicly
21  traded company in Mexico.
22  Q   Okay.  But he's sort of the face of it.

Page 193

1   Is that fair?
2   A   That's probably a good way to describe
3   it.
4   Q   Okay.
5       Grupo Elektra is based in Mexico City.
6   Right?
7   A   That's correct.
8   Q   They provide banking services and credit
9   and other financial services in Mexico, Brazil,
10  El Salvador, Guatemala, Honduras, Panama, Peru.
11  Is that right?
12  A   It depends on, I think, the date you
13  were looking at.  I think some of those markets,
14  they may have exited since then, but they are
15  active in a number of -- obviously, in Mexico as
16  well as a number of South American markets.
17  Q   Okay.  And Mr. Pliego also opened a
18  bank, Banco Azteca, which provides financial
19  services and loans.  Right?
20  A   Well, Grupo Elektra.  It is a subsidiary
21  of Grupo Elektra.
22  Q   And the loans that they offer carry

---

**Page 210**

1   Q   Why was FTI -- for what purpose was FTI

2   Consulting engaged by Advance America?

3   A   We engaged FTI Consulting in order to

4   help us to either find or reestablish banking

5   relationships.

6   Q   So Mr. O'Shaughnessy says to Mr. Isaac,

7   "Bill, thank you for your time at the conference.

8   As we discussed, the major banks which we have

9   lost have claimed it is due to our parent (Grupo

10  Elektra, a Mexican bank holding company) not

11  anything to do with our compliance management

12  system or Operation Choke Point."

13      Do you see that?

14  A   I do.

15  Q   It then goes on to say --

16  Mr. O'Shaughnessy says, "I believe this to be the

17  truth, as _____ (and some smaller

18  institutions like _____) continues to bank

19  our competitors, including those with much lower

20  compliance ratings from the CFPB."

21      Do you see that?

22  A   I do.

---

**Page 211**

1   Q   Then he goes on to say, "In order to win

2   them back, I believe we need a different solution

3   than the compliance audit you suggested."  Right?

4   A   Right.

5   Q   This -- what Mr. O'Shaughnessy is

6   talking about in this email, as far as the reason

7   for losing the "major banks," is the foreign

8   ownership interest we were talking about earlier

9   today.  Is that right?

10  A   Certainly some of the banks that he

11  references in that email.

12  Q   Well, when Mr. O'Shaughnessy says, "The

13  major banks we have lost claimed it is due to our

14  parent (Grupo Elektra, a Mexican bank holding

15  company)," he's referring to the foreign ownership

16  interest concerns that we discussed earlier.

17  Right?

18  A   Yes.  Then he's referring to specific

19  banks.

20  Q   Right.  But those specific banks, the

21  major banks, their concern is the foreign

22  ownership interest.  Right?

---

**Page 212**

1   A   Certain major banks.

2   Q   Right.  And he's saying that that's the

3   reason that the banks have said they're

4   terminating the relationships.  Right?

5   A   They have -- ask your question again.

6   Q   Sure.  What Mr. O'Shaughnessy is saying

7   is that there are certain banks that he

8   characterizes as the major banks and that the

9   reason those banks provided to Advance America for

10  terminating the accounts is due to the parent

11  company that owns Advance America, this Mexican

12  bank holding company, Grupo Elektra.

13  A   I think that is accurate as it relates

14  to the banks that he then refers to in the

15  following sentence, which is _____ and _____

16  It's unlikely a reason for other banks, such as

17  _____ and _____, who understand the

18  ownership; got comfortable with; visited, in the

19  case of _____, Grupo Elektra; and that

20  termination occurred, you know, in some cases two

21  years later after the acquisition.

22  Q   Let's talk about -- so he says, "the

---

**Page 213**

1   major banks."  That's who he's talking about.

2   Right?  What's your understanding about what he

3   means when he says "the major banks"?

4   A   It certainly is _____.  I'm not

5   sure what other -- obviously he references _____

6   _____

7   Q   Well, he references _____ in the

8   context of saying, "And some smaller institutions

9   like _____."

10      So presumably that is outside of the

11  universe of major banks.  Is that fair?

12  A   That's fair.

13  Q   So major banks, I mean, you've worked at

14  Barclays.  Is Barclays a major bank?

15  A   Not in the U.S., but I would say

16  globally it certainly is.

17  Q   What about _____?  A major

18  bank?

19  A   Yes.

20  Q   _____, is that a major bank?

21  A   Yes.

22  Q   Okay.

---

Joachim Christian Rudolph      Confidential      5/9/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 138 of 150
Washington, DC
Page 55 (214 - 217)

Page 214

1    The banks on Wall Street, those are all
2  major banks.  Right?
3    A   Yes.  I wouldn't disagree with that.
4    Q   So --
5    A   I want to just clarify, you could argue
6  that ████████, as a large regional bank, is a
7  major bank.  And I would tell you that I do not
8  believe that Mexican ownership contributed to the
9  termination of ████████ relationship with
10 Advance America.
11   Q   Okay.  So going back to
12 Mr. O'Shaughnessy's email, he says that "the major
13 banks have claimed it's due to our parent."
14 That's the reason they're terminating these
15 relationships.  Right?
16   A   That's correct.
17   Q   He says they have said it's foreign
18 ownership interest, "not anything to do with our
19 compliance management system or Operation Choke
20 Point."
21      Do you see that?
22   A   I see that.

Page 215

1    Q   And then -- so he's talking about what
2  the banks are claiming.  Correct?
3    A   Certain banks, correct.
4    Q   Right.
5       Then he goes on to say, "I believe this
6  to be the truth."  Right?
7    A   Right.
8    Q   Saying, when the banks say we're
9  terminating this account because of foreign
10 ownership interest, I believe them.  That's the
11 true reason why they're terminating the
12 relationship.  That's what he's saying here.
13 Correct?
14   A   Then he goes on and gives an example of
15 ████████ terminated our relationship but they
16 have not terminated others in the industry.
17   Q   Right.  So ████████ is an example of
18 that.  Correct?
19   A   Yes.
20   Q   Then he also says, "some smaller
21 institutions likes ████████."  Right?
22   A   Uh-hmm.

Page 216

1    Q   What other smaller institutions other
2  than ████████ terminated their relationship
3  with Advance America because of the foreign
4  ownership concerns?
5    A   What other smaller banks have?
6    Q   Yes.
7    A   I don't have any specific examples.
8    Q   Well, Mr. O'Shaughnessy says, "some
9  smaller institutions like ████ suggesting that
10 ████ is one of a larger group.  Right?
11   A   That's what this language would suggest.
12 I don't know if Mr. O'Shaughnessy had other banks
13 in mind or not when he wrote that email.
14   Q   As the head of the treasury department,
15 I'm asking you what other smaller institutions
16 like ████ terminated their relationship with
17 Advance America because of the foreign ownership
18 concerns that we've discussed.
19   A   I'm not aware of smaller banks.  I'm
20 aware of larger regional banks that have mentioned
21 the foreign ownership or foreign MSB.
22   Q   Which banks are those?

Page 217

1    A   The one that comes to mind is BB&T Bank.
2    Q   Any others?
3    A   No.
4    Q   But you lost -- Advance America lost the
5  ████████ accounts because of concerns relating
6  to foreign ownership interests.  Correct?
7    A   Yes.  ████████, you know, obviously
8  merged with ████████, and they've had some
9  money laundering issues with some Mexican
10 businesses, and there's an enforcement action
11 related to that by the OCC.  And I assume that was
12 a big driver of that decision to terminate the
13 relationship based on the Mexican ownership
14 specifically.
15      I'll just grab a water.
16   Q   Sure.
17      Do you recall telling Dale Nelson that
18 ████████ had an issue with Advance America's
19 ownership structure?
20   A   I don't recall specific conversations,
21 but it's very likely that we've talked about that.
22   Q   So going back to Exhibit 21 and

Page 242

1  is he referring to?

2     A  He's referring to one particular

3  location that, according to this email, had issues

4  with the volume.  Because in the second sentence

5  it says -- I think that's supposed to say, "The

6  manager stated that it should not be an issue."

7  It looks like there's a specific bank manager

8  was -- didn't have any issue servicing that

9  account.

10     Q  Right.  But in terms of "issues with our

11  volume," do you know what he's referring to?

12     A  It could be cash volume or -- it

13  probably has to do with volume going through the

14  bank account at that particular banking center.

15     Q  So if there's a high volume of cash

16  going through the bank, that could pose an issue

17  for the bank.  Is that right?

18     A  Well, not necessarily.  You know,

19  generally, banks are -- kind of have two different

20  areas, corporate banking and retail banking.  On a

21  corporate account, corporate banking gets all the

22  revenue.  And if you make a retail deposit, they

Page 243

1  basically have all the work.  Sometimes they don't

2  have the best internal charging structure.  So we

3  have seen a teller or somebody saying, oh, you

4  know, I'm not going to count your money every day,

5  right?  That's what banks do.  So that could

6  easily be the explanation in this case.

7     Q  They don't want to deal with a certain

8  level of volume.  Right?

9     A  It takes money to count money, yes.  It

10  takes time to count money.

11     Q  Right.  As we discussed earlier, if the

12  bank is not able to effectively manage an account,

13  that could be a reason for a termination.

14  Correct?

15     A  It could be.  Normally, banks are in the

16  business of counting money that if they don't want

17  to count money, I guess that could be a reason why

18  they could close an account.

19     Q  If managing an account is too onerous or

20  burdensome for the bank, that could be a reason

21  they would terminate?

22     A  There could be a variety of reasons,

Page 244

1  correct.

2     Q  ███████████ ultimately terminated

3  its relationship with Advance America.  Is that

4  right?

5     A  It did.

6     Q  Other than sort of the issues with

7  volume mentioned in this email, are you aware of

8  any reasons that ███████ provided to

9  Advance America as to why they were terminating

10  their relationship?

11     A  Nothing specifically.  It's noted as "No

12  MSB and no payday" in Exhibit A, but I've not

13  personally have had any conversations with

14  ██████.

15     Q  Okay.  Well, let me show you the

16  termination letter from ██████.  And we

17  can mark that as Exhibit 27.

18       (Exhibit 27 was marked for identification

19  and attached to the deposition transcript.)

20  BY MR. SHUR:

21     Q  Exhibit 27, this is the termination

22  letter from ██████.  Is that right?

Page 245

1     A  That's correct.

2     Q  Is there anything in this letter that

3  says why the bank is terminating the relationship

4  other than it's being terminated?

5     A  It says, "We have decided to close your

6  bank account because the business is an industry

7  which we do not service, such as payday lenders,"

8  even though they have -- now, this is -- I'm

9  adding this, it's not in the letter -- even though

10  they have obviously serviced the industry for many

11  years.

12     Q  Anything in this letter about regulatory

13  pressure?

14     A  I don't see any reference to regulatory

15  pressure.

16     Q  Or Operation Choke Point?

17     A  No reference there.

18     Q  Anything other than what's in Exhibit

19  27, this letter, or referenced in Exhibit 26, the

20  email from Dale Nelson, that the bank --

21  ██████ told Advance America about why

22  they were terminating the relationship?

Joachim Christian Rudolph      Confidential      5/9/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 140 of 150
Washington, DC
Page 63 (246 - 249)



Page 246

1    A   No.  They were very specific that they
2  do not service payday lenders, but they did not
3  give a reason why they do not service payday
4  lenders.
5        (Exhibit 28, Exhibit 29, and Exhibit 30
6  were marked for identification and attached to the
7  deposition transcript.)
8  BY MR. SHUR:
9    Q   So starting with Exhibit 28, this is an
10  email from Roger Gross at ▓▓▓▓ to you dated
11  November 1st, 2016.
12       Who is ▓▓▓▓  Have you dealt with
13  him before?
14    A   We haven't.  He's in the special asset
15  unit of ▓▓▓▓, so they would -- my
16  understanding of a special asset unit is a unit
17  that would normally not manage ongoing
18  relationships.
19    Q   Okay.  And so ▓▓▓▓ writes in this
20  email, "Mr. Rudolph, please see the attached
21  letter and expect to receive the original version
22  via overnight delivery.  I'll call you to discuss

Page 247

1  this in more detail."
2        Do you see that?
3    A   Yes.
4    Q   Okay.  And now turn your attention to
5  Exhibit 29, which is a November 1, 2016, letter
6  from ▓▓▓▓ to Advance America addressed to
7  you.  Is this the attachment to Exhibit 28?
8    A   I would assume so.
9    Q   It essentially says that ▓▓▓▓ has
10  elected to close all accounts with Advance
11  America.  Correct?
12    A   That's correct.
13    Q   Now turn your attention to Exhibit 30,
14  please.
15       This is a November 13, 2016 email from
16  you to Mr. O'Shaughnessy and is it Mr. Rustin?
17    A   Mrs. Rustin, Jessica Rustin.
18    Q   Mrs. Rustin, excuse me, at Advance
19  America.  Right?
20    A   That's correct.
21    Q   And you write, "I would bet the
22  investigation related to ▓▓▓▓ relationship

Page 248

1  with Scott Tucker, and its AML controls was the
2  trigger to exit the entire payday lending
3  industry."  Right?
4    A   Correct.
5    Q   So Exhibit 29, which is the termination
6  letter from ▓▓▓▓, doesn't provide a reason
7  for why they're terminating the account.  Is that
8  right?
9    A   That's correct.
10    Q   And as we discussed, the banks aren't
11  obligated to do so.  Right?
12    A   That's correct.
13    Q   Did you receive a reason from ▓▓▓▓
14  by phone or some other form other than this letter
15  as to why they were terminating the relationship?
16    A   I did not.  I called our treasury sales
17  officer who is in charge of the day-to-day
18  management of the relationship, and he actually
19  called me -- he asked me to call him back on his
20  cell phone and basically communicated that he
21  wasn't allowed to communicate with us and that the
22  communication should go through ▓▓▓▓

Page 249

1    Q   Do you remember who that was, the
2  treasury sales officer at ▓▓▓▓ who you had a
3  relationship with?
4    A   Roger Plott.
5    Q   P-L-O-T?
6    A   P-L-O-T-T.
7    Q   Okay.
8        But you had a theory as to why ▓▓▓▓
9  terminated the relationship, didn't you?
10    A   I had a theory that it was likely to
11  relate to regulatory pressures.
12    Q   Okay.  Well, what type of regulatory
13  pressures?
14    A   Pressures by the -- ▓▓▓▓
15  regulator.
16    Q   Meaning -- who in particular are you
17  thinking of?
18    A   Their primary regulator is the OCC.
19    Q   Okay.  Let's take a look at your email,
20  which says, "I would bet the investigation related
21  to ▓▓▓▓ relationship with Scott Tucker, and
22  its AML controls was the trigger to exit the

Page 250

1    entire payday lending industry." Right? Is that
2    what you say there?
3        A    It is.
4        Q    And Scott Tucker owned and operated a
5    payday lending business. Is that right?
6        A    What we call an illegal payday lending
7    business, not a state-compliant lending business.
8        Q    In January of this year, he was
9    sentenced to 16 years and 8 months in federal
10   prison. Right?
11       A    Yes.
12       Q    He was convicted of collection of
13   unlawful debts, fraud, and money laundering. Is
14   that right?
15       A    If you say so. I have no reason to
16   dispute it.
17       Q    And &#9608;&#9608;&#9608;&#9608; did business with Tucker
18   and his company. Right?
19       A    That's what the article said.
20       Q    And they were fined, &#9608;&#9608;&#9608;&#9608;, that is,
21   approximately 613 million dollars for not having
22   proper risk management protocols in place in

Page 251

1    connection with doing business with Tucker and its
2    company. Isn't that right?
3        A    That's correct.
4        Q    That's what you're referring to here as
5    the reason why &#9608;&#9608;&#9608;&#9608; is exiting the entire
6    payday lending industry. Right?
7        A    That was what I speculated at the time.
8        Q    So what's the basis for your speculation
9    that the OCC or any other regulator impacted
10   &#9608;&#9608;&#9608;&#9608; relationship with Advance America?
11       A    As you just stated, certainly in Scott
12   Tucker's case, they did not have proper email
13   controls in place, and given the fact that he was
14   a payday lender, even though he operates an
15   illegal business model, which is different from
16   what CFSA members generally and Advance America
17   specifically operate under, we just speculated
18   that, as a result of that, we would be kind of
19   thrown into the same mix with Scott Tucker.
20       Q    You understand Scott Tucker was
21   prosecuted by the United States Department of
22   Justice.

Page 252

1        A    Yes.
2        Q    Not the OCC.
3        A    Right. But the OCC had an enforcement
4    action as a result of their lack of AML controls.
5        Q    Let me ask you a question. Do you think
6    that the Justice Department pursuing &#9608;&#9608;&#9608;&#9608; and
7    the fine of over 600 million dollars probably
8    impacted the way &#9608;&#9608;&#9608;&#9608; does business?
9        A    I would hope so.
10       Q    Let me show you what we're marking as
11   Exhibit 31.
12           (Exhibit 31 was marked for identification
13   and attached to the deposition transcript.)
14   BY MR. SHUR:
15       Q    So this is a December 2nd, 2016,
16   letter --
17       A    Does this relate to the topic we just
18   talked about?
19       Q    I don't believe so.
20       A    Okay. I want to make sure we're moving
21   on to the next topic.
22       Q    Okay.

Page 253

1           So this is a letter from what appears to
2    be a law firm, Phillips, Gardill, Kaiser &
3    Altmeyer, which, according to the letter,
4    represents &#9608;&#9608;&#9608;&#9608;
5           Did Advance America have a relationship
6    with &#9608;&#9608;&#9608;&#9608;
7        A    Yes.
8        Q    And it's from &#9608;&#9608;&#9608;&#9608;
9    lawyers to Rufus White at Advance America.
10          Rufus White sits in the treasury
11   department. Is that right?
12       A    He does.
13       Q    In the second paragraph it says, "Just
14   for clarification, the decision to ask Advance
15   America to close its accounts at the bank had
16   nothing to do with the CFPB."
17          Do you see that?
18       A    I see that.
19       Q    Just to be clear, you mentioned earlier
20   that the CFPB is Advance America's regulator.
21   Right?
22       A    Correct.

Page 302

1  to statements made by our attorneys.

2     Q   Well, it's not just statements made by

3  your attorneys.  It's in your declaration you

4  suggest that Advance America is on the verge of

5  going out of business.  Did you tell ████

6  ████ that when you were seeking to finance the

7  purchase of a private jet?

8     A   We did not.

9     Q   We talked a little bit about ████.

10  I just want to go back to that for a moment.

11     If you would take a look at your

12  November 23rd, 2016, declaration, which is

13  Exhibit 6.

14     A   I've got it.

15     Q   Take a look at paragraph 13.

16     Paragraph 13 generally discusses the

17  ████ termination.  Right?

18     A   That's correct.

19     Q   So the last sentence says, "In my

20  experience, the only logical reason a bank would

21  terminate a long-standing, mutually beneficial

22  relationship without warning or explanation is

Page 303

1  regulatory pressure."  Right?

2     A   That's what it reads, yes.

3     Q   When you're talking about a

4  long-standing, mutually beneficial relationship,

5  you're referring to ████ here.  Right?

6     A   That's right.  We had a relationship --

7  I don't know the exact time period, but going back

8  years and years and years.

9     Q   And you're saying that the only logical

10  reason, in your view, based on your experience,

11  for ████ termination is "regulatory

12  pressure."  Right?

13     A   That's correct.

14     Q   When you say "regulatory pressure," I

15  assume you're referring to the defendants in this

16  lawsuit?

17     A   That's correct.

18     Q   So let's take a look now at Exhibit

19  number 30.  We looked at this email earlier.  It's

20  a November 13, 2016, email that you sent to

21  Patrick O'Shaughnessy and another member of

22  Advance America, and just to orient ourselves,

Page 304

1  this email you sent a week or two in advance --

2  before you submitted this November 2016

3  declaration, which is Exhibit 6.  Right?

4     A   What's the date on this?  I know it was

5  filed 1-23.  Oh, that's -- sorry.  Yes, that looks

6  right.

7     Q   In your email you say, "I would bet the

8  investigation related to ████ relationship

9  with Scott Tucker, and its AML controls was the

10  trigger to exit the entire payday lending

11  industry."  Right?

12     A   That's correct.

13     Q   And the investigation you're referring

14  to here is the investigation by the U.S.

15  Attorney's Office for the Southern District of New

16  York in Manhattan, which is the topic of this

17  article that you're forwarding as part of this

18  email.  Is that right?

19     A   That's correct.

20     Q   If you take a look at the article

21  itself, the second paragraph says, "The bank said

22  the Manhattan U.S. Attorney's Office is

Page 305

1  investigating its relationship with Mr. Tucker and

2  has asked for information on aspects of the

3  lender's anti-money laundering controls, which are

4  to spot and prevent nefarious account activity."

5     Do you see that?

6     A   Yes.

7     Q   And that mirrors what you say in your

8  email as far as there being an investigation

9  related to ████ relationship with Scott

10  Tucker and its AML controls.  Right?

11     A   That's right.

12     Q   The U.S. Department of Justice, which --

13  withdrawn.

14     The Manhattan U.S. Attorney's Office is

15  part of the U.S. Department of Justice.  You

16  understand that.  Right?

17     A   I do.

18     Q   They're not one of the regulators that's

19  a defendant in this lawsuit.  Correct?

20     A   That's correct.  The article goes on in

21  saying, "In October it entered into a consent

22  agreement with the Office of the Comptroller of

Page 306

1   the Currency over issues with its controls."

2       Q   I'm sorry, which paragraph are you

3   referring to?

4       A   It starts with, "The disclosure adds to

5   anti-money laundering issues at ███████," and

6   goes on that "In October it entered into a consent

7   order with the OCC," who is a defendant in this

8   case, "over issues with its controls."

9       Q   Okay.  But your email says, "I would bet

10  the investigation," and the only investigation

11  that's discussed in this article that you're

12  forwarding is an investigation by the U.S.

13  Attorney's Office in Manhattan.  Correct?

14      A   The investigation and resulting consent

15  order.

16      Q   Well, no, no, no, it's not a resulting.

17  It says, "In October, the OCC" -- or, rather,

18  "███████ entered into a consent order with the

19  OCC over issues with its controls."  That's

20  separate and apart from the investigation by the

21  Manhattan U.S. Attorney's Office.  It happens to

22  be in the same article because it's relating to

Page 307

1   ███████, but you understand those are two

2   separate things.

3       A   I understand that U.S. Department of

4   Justice and the OCC are separate entities.  I

5   think the way I read this article was that they

6   are tied together.

7       Q   Well, the paragraph you're referring to,

8   it starts with, "The disclosure adds to anti-money

9   laundering issues at ███████."  Right?  This

10  investigation is separate and apart but adds to

11  other issues relating to ███████ and then goes

12  on to discuss this consent order with the OCC.

13  Right?

14      A   Correct.

15      Q   But when you say, "I would bet the

16  investigation related to ███████ relationship

17  with Scott Tucker, and its AML controls was the

18  trigger," you're referring to the U.S. Attorney's

19  Office investigation, again, which is the only

20  investigation discussed in this article.

21          MS. MOSS:  Objection.

22      A   Again, I looked at the whole article.

Page 308

1   It referenced the OCC as well as the U.S.

2   Treasury's investigation, and I concluded from

3   reading it that there was some linkage between the

4   two.

5       Q   You made that conclusion then or now?

6       A   Well, I'm reading it now, and it clearly

7   references the Office of the Comptroller of the

8   Currency.

9       Q   It does.  But your email, sir, tracks

10  the language that's used in the second paragraph

11  of the article that's discussing the investigation

12  by the Manhattan U.S. Attorney's Office.  Do you

13  see that?

14      A   Yes, but a lot of time what I've seen,

15  you know, obviously, what's been in the news with

16  ███████, you know, there may have been an

17  action by the U.S. Attorney's Office or the CFPB,

18  and, as a result, the federal investigator -- I'm

19  sorry -- the primary regulator clearly has an

20  interest and a responsibility to look into those

21  violations and respond to it accordingly through

22  enforcement actions or whatever other mechanism

Page 309

1   they should avail themselves to.

2       Q   With all due respect to the OCC, if

3   you're ███████, right, what's going to be a

4   larger concern for you and that might impact your

5   behavior, is it a cease and desist order, or,

6   rather, a consent order that's already been

7   entered, right, last month by the OCC, or an

8   active criminal investigation by the U.S.

9   Attorney's Office in Manhattan?

10          MS. MOSS:  Objection.

11      A   Yeah, I mean, I'm not in the bank's

12  shoes so I could only speculate.

13      Q   Well, put yourself in your position at

14  Barclays.  You worked at a bank.  Right?

15      A   I did, yes.

16      Q   So as far as ███████ making a decision

17  to exit the entire payday lending industry, don't

18  you think that an active criminal investigation by

19  the U.S. Attorney's Office in Manhattan, which is

20  historically one of the most aggressive offices

21  with the Department of Justice, is going to be on

22  their radar and is going to drive their behavior?

Page 310

1     MS. MOSS:  Objection.

2     A   I mean, it wouldn't surprise me.  But

3 obviously -- first of all, I want to

4 differentiate, obviously, ourselves from Scott

5 Tucker, who you pointed out is a criminal.  But

6 there is concern, obviously, that they're dealing

7 with issues on an illegal payday lender, and those

8 would be, whether it's on their own behalf or

9 their regulators, looking at all payday

10 relationships.

11    Q   Right.  Would you agree, though, the

12 U.S. Attorney's Office's investigation that's

13 referenced here would be a logical reason for ███

14 ███ to exit the industry?

15    A   That certainly is a possible reason.

16    Q   A logical reason.

17    A   I think it's logical.

18    Q   So then why approximately two weeks

19 later do you say in paragraph 13 of your

20 declaration, "The only logical reason a bank would

21 terminate a long-standing, mutually beneficial

22 relationship without warning or explanation" is

Page 311

1 pressure from the defendants in this lawsuit?  How

2 do you square those two things?

3     A   Again, there's maybe a poor choice of

4 words of having to clarify "only," but certainly

5 it is a logical reason, just given the whole kind

6 of history we've had around bank termination, that

7 there was some regulatory pressure.

8     Q   But you understand the significance of

9 the word "only" here, don't you?

10    A   I do.

11    Q   You're ruling out any other possible

12 reason or at least logical reason for a bank

13 termination.  Correct?

14    MS. MOSS:  Objection.

15    Q   Is that right?

16    A   Can you rephrase your question or

17 restate your question?

18    Q   Sure.

19    When you say the only logical reason a

20 bank would terminate is because of pressure by the

21 defendants in this case, that's saying there's no

22 other logical reason because this is the only

Page 312

1 logical reason.  Right?

2     MS. MOSS:  Again, objection.

3     A   You know, given kind of the context of

4 kind of the bank terminations, you know, I felt at

5 the time that it's a logical reason for

6 terminating these relationships.

7     Q   Right.  Mr. Rudolph, you said that, and

8 I understand that.  What I'm saying is, in your

9 declaration it says it is the only logical reason,

10 which means there can be no other logical reason.

11 Would you agree with that?

12    A   At the time that was the only logical

13 reason that came to mind.

14    Q   Well, that's not what it says, though.

15 It doesn't say that's the only logical reason that

16 comes to mind.  It says it is the only logical

17 reason.  It's very definitive.  Right?

18    A   Yes.

19    Q   And when you say it's the only logical

20 reason that came to mind, it was only two weeks

21 earlier that you were emailing your colleagues

22 about there being an investigation by the U.S.

Page 313

1 Attorney's Office, which you just said is a

2 logical reason for ████      to terminate the

3 relationship.

4     MS. MOSS:  Objection.

5     Q   So I want to know, given this email and

6 the close proximity to your declaration, why you

7 chose to use the word "only."

8     A   Again, with kind of looking at this,

9 looking at the email, you know, I felt there was,

10 you know, sufficient linkage between the OCC being

11 involved in the article -- not involved --

12 referenced in the article and, obviously, the

13 termination of our account.

14    Q   But sitting here today, you would agree

15 with me that this statement, "the only logical

16 reason a bank would terminate is regulatory

17 pressure," specifically, as you said, pressure by

18 the defendants in this lawsuit, that's not true.

19    MS. MOSS:  Objection.

20    A   Probably "only" may not have been the

21 best qualifier, but clearly it was a logical

22 reason for it.  I believe it is a logical reason.

Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 145 of 150



**Page 314**

1   Q   I understand that, but it's not the only

2   logical reason, and therefore it's inaccurate.

3   Correct?

4   A   There could be other logical reasons now

5   that I look at it and refresh my memory of looking

6   at this article.

7   Q   So since there could be other logical

8   reasons, the last sentence on paragraph 13 of your

9   November 23rd, 2016 declaration is not accurate.

10  Right?

11  A   It's not entirely accurate given where

12  I'm sitting today.

13  Q   Let me show you what we'll mark as

14  Exhibit 37.

15      (Exhibit 37 was marked for identification

16  and attached to the deposition transcript.)

17  BY MR. SHUR:

18  Q   So this is a letter from ▮▮▮▮▮ to

19  Advance America dated April 21st, 2014.  It reads,

20  "▮▮▮▮▮ is unable to continue servicing your

21  account as referenced above."  It says the account

22  will be closed and that Advance America will

**Page 315**

1   receive a check for any remaining balance.

2       There's no reasons in this letter for

3   why ▮▮▮▮▮ is terminating its relationship

4   with Advance America.  Is that right?

5   A   That's right.  There's no stated reason.

6   Q   Are you aware of -- when I say "you,"

7   Advance America, aware of any reasons provided by

8   ▮▮▮▮▮ as to why they were terminating this

9   relationship?

10  A   I don't recall any specific discussions

11  around ▮▮▮▮▮ or getting specific feedbacks

12  from ▮▮▮▮▮.

13  Q   While we're getting the next exhibit,

14  ▮▮▮▮▮, which is a bank we had previously

15  discussed, you're aware that they were acquired by

16  ▮▮▮▮▮?

17  A   Yes, I think I vaguely remember that.

18  Q   And that ▮▮▮▮▮ didn't do

19  business with payday lending companies?

20  A   They did for a while but then exited the

21  business.

22  Q   And that, in turn, impacted ▮▮▮▮▮

**Page 316**

1   ▮▮▮▮s relationship with payday lending

2   businesses.  Right?

3   A   It sounds like ultimately it impacted

4   it.  I think they continued to do business for a

5   while.  I can't recall when that merger closed,

6   but I think it was sometime before they terminated

7   the account.

8   Q   But after the merger between ▮▮▮▮▮

9   and ▮▮▮▮▮  ▮▮▮▮▮ terminated its

10  relationship with payday lending businesses, and

11  that was a result of a merger?

12  A   I assume that they went by the policy of

13  the acquiring company.

14      (Exhibit 38 was marked for identification

15  and attached to the deposition transcript.)

16  BY MR. SHUR:

17  Q   This is Exhibit 38.  This is an

18  October 10, 2014, letter from ▮▮▮▮▮ to

19  Advance America where ▮▮▮▮▮ informs

20  Advance America that they've concluded they're no

21  longer able to maintain a banking relationship

22  with Advance America.  Is that right?

**Page 317**

1   A   That's what it says after they state

2   that they pride themself with providing legendary

3   service.  It's a little ironic, but ...

4   Q   Why is that ironic?

5   A   Stating that they want to provide

6   legendary service, which I would think it's

7   another term of great service, valuing the

8   customer, and then in the following sentence you

9   say, well, actually, I'm going to terminate your

10  relationship.  It's an unusual way of sending a

11  termination letter.

12  Q   I see.

13  A   The only point I'm trying to make.

14  Q   I see.

15      But the letter itself from ▮▮▮▮▮

16  doesn't specify a reason for the termination.

17  Right?

18  A   The letter does not.

19  Q   And did ▮▮▮▮▮ provide, outside

20  of this letter, any reason to Advance America as

21  to why they were terminating their relationship?

22  A   Not that I recall.

Joachim Christian Rudolph      Confidential      5/9/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 146 of 150
Washington, DC
Page 86 (338 - 341)

**Page 338**

1   Q   Okay. Is that the scope of the
2 injunctive relief that you're requesting? Is that
3 sort of the entirety of it as far as the
4 preliminary injunction is concerned?
5   A   As a businessperson, I want to get my
6 account relationships back. I want to make sure
7 banks know that there is -- again, assuming they
8 do normal customer due diligence, there's no
9 adverse consequence for them to maintaining and
10 opening up account relationships. So if through
11 that injunction, that can be achieved, I think
12 we're getting what we're seeking.
13   Q   You know, you said earlier that you
14 don't have access to, let's say, the
15 communications between regulators, not just the
16 defendants in this case, but other regulators of
17 banks and the banks themselves. Right?
18   A   That's right.
19   Q   You also don't have access to the
20 internal workings of the bank and their
21 decision-making process as to why they might
22 terminate a relationship or decide not to open a

**Page 339**

1 new account. Right?
2   A   That's correct.
3   Q   We've discussed and we've agreed there
4 are many reasons why a bank wouldn't have an
5 account with Advance America. Right? There's not
6 just one reason. There's potentially many
7 reasons. Correct?
8   A   Potentially. But, again, I would look
9 at the totality of the situation, both with
10 Advance America and the rest of the industry, and
11 giving, you know, the history of having those
12 long-standing relationships and then, within a
13 short -- a relatively short period of time, the
14 large number of terminations. Could there be
15 multiple reasons? Certainly. But, clearly, I
16 believe there is -- one reason would be the
17 regulatory pressure.
18   Q   But it's not, as we discussed, the only
19 logical reason. Right?
20   A   Not the only reason.
21   Q   It's not the only logical reason.
22   A   It's not the only logical reason. You

**Page 340**

1 seem to like that term.
2   MR. SHUR: Why don't we take a quick
3 break. I think we're wrapping up here.
4   (A brief recess was taken.)
5 BY MR. SHUR:
6   Q   So just one last question before we wrap
7 up. Advance America has produced to the
8 defendants in connection with this litigation in
9 response to discovery requests various financial
10 statements of Advance America.
11   A   Correct, yes.
12   Q   I just want to confirm that the
13 financial statements that have been produced in
14 discovery are truthful, correct, accurate,
15 complete.
16   A   I believe we provided you with audited
17 financial statements. Therefore, they should be
18 truthful and complete.
19   MR. SHUR: Okay. Understood. Great.
20 Thank you. We're off the record. Thanks.
21   Oh, I apologize. I didn't mean to --
22   MS. MOSS: No, that's fine. I have no

**Page 341**

1 questions, but I do want to say the deposition
2 should be marked as confidential. I think it
3 already is under the protective order, but I want
4 to make it clear that it's on the record that it's
5 confidential until we designate parts of it.
6   MR. KOCH: No questions on behalf of the
7 OCC.
8   MS. MIZUSAWA: No questions on behalf of
9 the Fed.
10   MR. SHUR: Now we're off the record.
11   MS. MOSS: We want to read and sign.
12
13   (Signature having not been waived, the
14 deposition of Joachim Christian Rudolph was concluded
15 at 5:25 p.m.)
16
17
18
19
20
21
22

1          CERTIFICATE OF SHORTHAND REPORTER

2          I, Michele E. Eddy, Registered Professional

3    Reporter and Certified Realtime Reporter, the court

4    reporter before whom the foregoing deposition was

5    taken, do hereby certify that the foregoing transcript

6    is a true and correct record of the testimony given;

7    that said testimony was taken by me stenographically

8    and thereafter reduced to typewriting under my

9    supervision; and that I am neither counsel for,

10   related to, nor employed by any of the parties to this

11   case and have no interest, financial or otherwise, in

12   its outcome.

13         IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 9th day of May,

15   2018.

16

17   My commission expires July 14, 2022

18

19

20   _____

21   MICHELE E. EDDY
     NOTARY PUBLIC IN AND FOR
22   THE DISTRICT OF COLUMBIA

Joachim Christian Rudolph      Confidential      5/9/2018
Case 1:14-cv-00953-TNM   Document 209-6   Filed 11/09/18   Page 148 of 150
Washington, DC
Page 89

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

2018, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

# EXHIBIT 103

# FILED UNDER SEAL