**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

ADVANCE AMERICA, CASH ADVANCE
CENTERS, INC., et al.,

                    Plaintiffs,

     v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, et al.,

                  Defendants.

Civil Action No. 14-953-TNM

---

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

Date:   January 4, 2019

Charles J. Cooper (Bar No. 248070)
ccooper@cooperkirk.com
David H. Thompson (Bar No. 450503)
Peter A. Patterson (Bar No. 998668)
Nicole J. Moss (Bar No. 472424)
Harold S. Reeves (Bar No. 459022)
John D. Ohlendorf (Bar No. 1024544)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................2

I.    All Three Plaintiffs Have Standing. ...........................................................................2

    A.    Northstate Has Suffered Injury-in-Fact. ................................................................2

    B.    Defendants' Campaign Caused Plaintiffs' Injuries ..................................................3

    C.    The Requested Relief Would Redress Plaintiffs' Injuries. ....................................13

II.    Defendants' Continuing Campaign Against Payday Lenders Violates the Due
Process Clause Under the Stigma-Plus Theory. ...............................................13

    A.    Defendants Have Stigmatized Plaintiffs by Tarring Them as "High Risk." ..........14

    B.    Defendants Have Distinctly Altered Plaintiffs' Right to Access the Banking
System in Common with Other Lawful Industries. ...............................................18

III.    Defendants' Continuing Campaign Against Payday Lenders Violates the Due
Process Clause Under the Reputation-Plus Theory. .........................................22

IV.    Plaintiffs' Requested Remedy Is Appropriate. ...................................................23

CONCLUSION ..............................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*America v. Mills*, 654 F. Supp. 2d 28 (D.D.C. 2009) ........................................................4

*American Fed'n of Gov't Emps. v. Vilsack*, 118 F. Supp. 3d 292 (D.D.C. 2015) ........11

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016).................................................................15

*Barry v. Trustees*, 467 F. Supp. 2d 91 (D.D.C. 2006) ....................................................10

*Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441 (1915) ........21

*Blackburn v. City of Marshall*, 42 F.3d 925 (5th Cir. 1995)...........................................15

\* *Board of Regents of State Coll. v. Roth*, 408 U.S. 564 (1972).................................14, 19

*Brady v. Ottaway Newspapers, Inc.*, 84 A.D.2d 226 (N.Y. App. Div. 1981)................16

*Codd v. Velger*, 429 U.S. 624 (1977)..............................................................................15

*Connelly v. Comptroller of the Currency*, 876 F.2d 1209 (5th Cir. 1989) ....................20

*Doe v. Cheney*, 885 F.2d 898 (D.C. Cir. 1989)...............................................................19

*Doe v. Federal Democratic Republic of Ethiopia*, 851 F.3d 7 (D.C. Cir. 2017)...........19

*Doe v. United States Dep't of Justice*, 790 F. Supp. 17 (D.D.C. 1992).........................15

*Flanagan v. Munger*, 890 F.2d 1557 (10th Cir. 1989) ...................................................15

*Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996)................................11

*Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006) ...........................................15

*Hinkle v. White*, 793 F.3d 764 (7th Cir. 2015)...............................................................20

\* *Humphries v. County of Los Angeles*, 554 F.3d 1170 (9th Cir. 2009)..........................20

*Hurst v. Florida*, 136 S. Ct. 616 (2016)..........................................................................19

*Johnson v. DeSoto Cty. Bd. of Comm'rs*, 204 F.3d 1335 (11th Cir. 2000)....................11

*Lyons v. Barrett*, 851 F.2d 406 (D.C. Cir. 1988) ...........................................................19

*Mead v. Independence Ass'n*, 684 F.3d 226 (1st Cir. 2012)...........................................20

*Mideast Sys. & China Civil Constr. Saipan Joint Venture, Inc. v. Hodel*,
   792 F.2d 1172 (D.C. Cir. 1986) ..............................................................................11

*Mosrie v. Barry*, 718 F.2d 1151 (D.C. Cir. 1983)....................................................19, 20

\* *National Council of Resistance of Iran v. Department of State*,
   251 F.3d 192 (D.C. Cir. 2001)................................................................................18

*National Rifle Ass'n v. Cuomo*, 2018 WL 6132464 (N.D.N.Y. Nov. 6, 2018) .............16

\* *O'Donnell v. Barry*, 148 F.3d 1126 (D.C. Cir. 1998)........................................14, 15, 16

*Old Dominion Dairy Prods, Inc. v. Secretary of Def.*, 631 F.2d 953 (D.C. Cir. 1980).................17

\* *Paul v. Davis*, 424 U.S. 693 (1976) .................................................................................1

*Phillips v. Vandygriff*, 724 F.2d 490 (5th Cir. 1984) ....................................................................20

*San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697 (5th Cir. 1991) ................................................15

*Service Emps. Int'l Union Nat'l Pension Fund v. Forest Hill Health Care Ctr., Inc.*, 170 F. Supp. 3d 16 (D.D.C. 2016) ............................................................................................4

*Strasburger v. Board of Educ.*, 143 F.3d 351 (7th Cir. 1998) .....................................................15

*United States v. Safavian*, 435 F. Supp. 2d 36 (D.D.C. 2006).............................................5, 6, 10

\* *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994) ........................................................................20

\* *Wisconsin v. Constantineau*, 400 U.S. 433 (1971) .................................................13, 14, 18, 23, 25

## Rules

FED. R. CIV. P. 65(d)(1) .................................................................................................................24

FED. R. EVID. 801(a) ......................................................................................................................5

FED. R. EVID. 801(d)(2)(D)...........................................................................................................11

FED. R. EVID. 803(3) ..................................................................................................................5, 10

FED. R. EVID. 803(6) ......................................................................................................................4

FED. R. EVID. 803(8) .....................................................................................................................10

## Other

2 MCCORMICK ON EVID. § 250 (7th ed. 2016)..............................................................................5

## INTRODUCTION

Defendants' latest round of briefs claim a breathtaking power, the very pinnacle of an arbitrary government of men rather than laws: the power to *cripple* any line of business in the Nation they choose by stigmatizing it as too risky to bank and deploying an arsenal of bare-knuckle pressure-tactics and heightened regulatory compliance requirements to "encourage" banks to cut it off from the modern economy. According to FDIC and OCC, they are free to tell banks that any member of the industry is an "unacceptable" bank customer, to use all "available means, including verbal recommendations, to strongly encourage [banks] to refrain from any activities that provide assistance" to the industry, and to threaten bank executives with *criminal prosecution* if they don't cut ties with it. SOF ¶¶ 119, 140, 157. And according to Defendants, so long as they couch their pressure tactics as conveying only their "opinion" that the industry is "high risk"—and set their sights on the industry as a whole, rather than each business individually—there is nothing this Court can do about it. Make no mistake: this arbitrary power may be employed against payday lenders today, but that is far from the limit of its logic. No, this power is the new "nuclear option" in the culture wars—the power to bring the NRA or Planned Parenthood to their knees with impunity, all under the guise of preserving the "safety and soundness" of the Nation's banks.

This unbridled power to pick whole industries as "losers" is precisely what the Due Process Clause was enacted to prevent. As the Supreme Court has made clear, "where the State attaches 'a badge of infamy' to the citizen"—in the course of distinctly altering "a right or status previously recognized by state law"—"due process comes into play." *Paul v. Davis*, 424 U.S. 693, 707, 711 (1976) (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). Due process is required here because Defendants have affixed just such a stigma to Plaintiffs: the stigma of being an "unacceptable" "high risk" banking customer—a scarlet letter, if there ever was one, in the modern

financial system. And they have deployed that "high risk" designation to choke off Plaintiffs' right to acquire ordinary banking services in common with any other lawful business. Because they did not provide Plaintiffs with even a scintilla of due process before stigmatizing them in this way, their campaign is unlawful and must be enjoined. Defendants resist this conclusion with a variety of arguments, but none is persuasive, because the upshot of all of them is the same: granting Defendants the power *uninhibited by legal niceties* to tar and feather any lawful industry they please as illegitimate and high risk and drive them out of the economy.

Finally, Defendants' arguments against our standing and the remedy we have proposed are equally unavailing. Defendants' guerilla war against payday lending has caused each of the Plaintiffs to lose bank accounts—and suffer the resulting tangible costs—and putting a stop to the campaign would stem the tide and likely reverse some of the losses. That gives each Plaintiff standing to sue under well-settled principles. And Defendants' arguments against the terms and scope of our proposed injunction all fail because they are all based on a fundamental misconception of what that injunction forbids. By its plain terms, the injunction we have requested would merely prevent Defendants from tarring Plaintiffs as high risk—and pressuring banks to terminate them— *solely because of their status as payday lenders*. Defendants remain free to set regulatory policy and to caution banks about the risks posed by their customers—including their payday lender customers—so long as the risk in question is not *the risk of having a payday lender as a customer*. Defendants' histrionics about our proposed remedy violating the separation of powers and undoing the entirety of banking regulation are thus completely unfounded.

## ARGUMENT

## I.    All Three Plaintiffs Have Standing.

### A.    Northstate Has Suffered Injury-in-Fact.

Defendants do not dispute that Plaintiffs Advance America and Check Into Cash have

suffered cognizable injuries, but FDIC does continue to challenge Northstate's injury-in-fact. FDIC Resp. 12. The challenge continues to be baseless. Both FDIC and OCC admit that Northstate has lost at least one bank account, *compare* SOF ¶ 244, *with* FDIC RSOF ¶ 244, *and* OCC RSOF ¶ 244—itself an injury in fact, as this Court has previously held, *see* Mem. Op. at 5 (July 5, 2017), Doc. 165 ("Mem. Op."). Both FDIC and OCC also admit that under its current banking arrangement it cannot deposit its customers' checks directly, but must instead convert each check into a money order. *Compare* SOF ¶ 247, *with* FDIC RSOF ¶ 247, *and* OCC RSOF ¶ 247. Northstate must pay a fee each time it converts a check into a money order, Basset Dep. 195:7–17, amounting to injury-in-fact by any conceivable standard.[1]

**B.  Defendants' Campaign Caused Plaintiffs' Injuries.**

1.  FDIC contends that "Plaintiffs cite no evidence that any of their banks was coerced into terminating their relationships," FDIC Resp. 8, but that is not so. In several instances, banks that terminated Plaintiffs' accounts expressly pointed the finger at the pressure from their regulators in explaining why they were ending the relationship. *See* SOF ¶¶ 216, 219, 220, 221, 222; *see also id.* ¶¶ 214, 238. Many other banks explained that they were terminating Plaintiffs' accounts because of the "heightened scrutiny required by our regulators," *id.* ¶ 200, and the "resources necessary" to conduct the "due diligence and monitoring program" required by "our primary federal regulatory agency," *id.* ¶ 198; *see also id.* ¶¶ 201, 203, 204, 207, 210. FDIC argues that these statements "represent only a handful of terminations," FDIC Resp. 28, but the silence of most banks can come as no surprise given FDIC's efforts to pressure banks into characterizing terminations as "the bank's decision." SOF ¶ 123; *see also id.* ¶¶ 124–29.

---

[1] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

Defendants attempt to avoid grappling with this evidence that they caused Plaintiffs' terminations by characterizing it all as inadmissible "hearsay," FDIC Resp. 9, 28; OCC Resp. 5, but we have already explained why this evidence is admissible, *see* Pls.' Resp. 15–16. Banks' termination letters to payday lenders are "record[s] . . . kept in the course of a regularly conducted activity of a business"—i.e., account management—that are exempt from the hearsay rule. FED. R. EVID. 803(6). Plaintiffs have laid enough foundation for the Court to consider them at the summary judgment stage. *See America v. Mills*, 654 F. Supp. 2d 28, 36 (D.D.C. 2009) (explaining that, "if it is possible to convert potential evidence into a form that would be admissible at trial . . . the Court may consider it at the summary judgment stage"); *see also Service Emps. Int'l Union Nat'l Pension Fund v. Forest Hill Health Care Ctr., Inc.*, 170 F. Supp. 3d 16, 19 (D.D.C. 2016). Further, oral statements by bankers we have cited would be admissible under the residual exception to the hearsay rule. *See* Pls.' Resp. 16.

FDIC next argues that "no evidence connects [the banks'] statements to enhanced due diligence obligations brought on by a regulatory 'high risk' designation," as opposed to "a variety of [other] legal obligations." FDIC Resp. 9; *see also* OCC Resp. 5–6. For example, FDIC notes that the Bank Secrecy Act/anti-money laundering guidance issued by the Federal Financial Institutions Examination Council ("FFIEC") in some cases requires "enhanced due diligence" of "money service businesses" such as payday lenders. FDIC Resp. 2–4 (brackets omitted). But FDIC itself explains why these background legal requirements cannot have been the cause of Plaintiffs' terminations: the FFIEC's requirements were in place "as long ago as 2006," *id.* at 29, yet Plaintiffs began to experience an unprecedented wave of terminations years later, SOF ¶¶ 225–26. Obviously, something changed at that point in time—and it was not the FFIEC's guidance. The most likely explanation is the simplest one: banks began terminating payday lenders' accounts *en*

*masse* when Defendants began their campaign to "get at" all "banks even remotely involved in payday" and " 'encourage' [them] to sever the relationship." SOF ¶¶ 60, 104, 138.

FDIC disputes this point too, arguing that Plaintiffs' account of the wave of terminations is "inconsistent with Advance America's own documents." FDIC RSOF ¶ 226. But it is FDIC who has misread those documents. At least some of the entries in the document that FDIC characterizes as "Pre-'Campaign' Terminations" were not terminations *at all*, but rather notations that a bank had declined Advance America's service. *See* RSOF FDIC ¶ 152. And many others did not actually occur in the "Pre-'Campaign' " period—since the campaign started no later than late 2010 or early 2011, rather than in 2013, as FDIC's Statement of Facts assumes. *See id.* ¶¶ 158–70. There can be no serious dispute that the scope and severity of the terminations Advance America has suffered since Defendants' campaign against payday lenders began is unprecedented. *See id.* ¶¶ 143–44 & n.4; *see also id.* ¶¶ 150–273 (documenting that of the 75 bank terminations suffered by Advance America since 2007, 63 occurred in the second half or 2010 or later).

Moreover, in addition to the scores of banks that have affirmatively terminated Plaintiffs' accounts during Defendants' campaign, *hundreds more* have refused them service. Advance America alone has been turned away by 275 banks since 2013. SOF ¶ 229. FDIC asserts that all of the evidence of these refusals of service are hearsay, FDIC RSOF ¶¶ 229, 239, 245, but the simple *fact* that scores of banks refused to service Plaintiffs cannot be hearsay. That fact pertains only to business conduct. *See* FED. R. EVID. 801(a); *see also* 2 MCCORMICK ON EVID. § 250 (7th ed. 2016). Moreover, the Court may also consider the reason that banks uniformly gave for refusing to service: that Plaintiffs belonged to a targeted industry. These statements are admissible at least to show whether the refusals were *motivated* by regulatory pressure, rather than business considerations. *See* FED. R. EVID. 803(3); *see also United States v. Safavian*, 435 F. Supp. 2d 36,

45 (D.D.C. 2006) ("[M]any of the e-mails are admissible because they might help to explain [defendant's] motive and intent at the time he undertook certain actions[.]").

OCC is no more successful than FDIC in rebutting the substantial direct evidence that their pressure tactics caused Plaintiffs' terminations:

- In ▮▮▮▮ 2014, OCC sent ▮▮▮▮ a supervisory letter urging it "to enhance monitoring" of "Payday Lenders and other high-risk customers." OCC-AA-00004423– 24 (Appendix to Pls.' Resp. 992 ("R.App.")). OCC says this letter "does not relate to payday lenders' reputations," OCC Resp. 24, but the letter *expressly* tarnishes "payday lenders' reputations," *id.*, by stigmatizing them as "high-risk customers," OCC-AA-00004423–24 (R.App.992). ▮▮▮▮▮▮▮

- A 2014 OCC Supervisory Letter criticized ▮▮▮▮ for failing to adequately monitor and scrutinize its relationship with Advance America. SOF ¶ 195. A 2014 work paper by an OCC examiner also identified Advance America as an "MSB" that had not been included on ▮▮▮▮ "MSB list," noting that "[a]ccount closure was initiated in April." (R.App.928). OCC argues that its supervision of ▮▮▮▮ "focused on problems with the bank's adherence to its own compliance processes," OCC Resp. 25, but it does not explain why the proper remedy for any inconsistent application of ▮▮▮▮ internal compliance processes was *termination of the customer*.

- OCC's internal emails throughout 2013 show that the agency was closely monitoring ▮▮▮▮ "exposures to pay day lenders" and was in communication with the bank concerning its facilitation of payday lending. OCC-00003960 (R.App.887); OCC-00003963 (R.App.890); OCC-00003964 (R.App.891); OCC-00003965 (R.App.892); OCC-00003969 (R.App.896); OCC-AA-00003814 (R.App.931). ▮▮▮▮

- ▮▮▮▮ OCC-AA-00007061 (R.App.935) ▮▮▮▮ OCC-AA-00007061 (R.App.935), which identified several "Example Payday Clients," including Check Into Cash, FDIC0065108 (R.App.983) ▮▮▮▮

- OCC's internal emails emphasize that it used "moral suasion" to "suggest[ ] strongly that [banks] reevaluate payday lending," SOF ¶ 194 (first alteration in original), and OCC repeatedly defends its use of "moral suasion." OCC SOF ¶¶ 51–53; OCC Resp. 27. The record evidence shows that "moral suasion" in reality leaves banks "with no choice but to drop [a payday lender] as a customer and close its accounts." Decl. of Ed Lette ¶ 8 (Nov. 23, 2016), Doc. 87-2. OCC responds that the efforts "proved prescient" because the payday lender that was the subject of OCC's pressure tactics "later pleaded



guilty to criminal violations." OCC Resp. 27. But it is no response to a violation of due process to point out that the person claiming due process is *guilty*, so procedural protections are *unnecessary*.

OCC next maintains that "there are no facts in the record indicating that any of the nine national banks attributed its termination of Plaintiffs' accounts to OCC actions or statements," OCC Resp. 23, but that is also untrue.

- After terminating Check Into Cash's account in █████████, an official at █████ ████ expressly attributed the termination to "Operation Choke Point," RSOF OCC ¶ ██, a term that colloquially includes Defendants' campaign against payday lenders.



- Northstate was told by an employee of █████████ that its termination of Northstate's accounts was due to "regulatory pressure." █████████████████ OCC points out that ████████████████████████████, but that merely reflects the Bank's decision to terminate smaller payday-lender relationships but continue its relationships with larger operations, Bassett Dep. 185:15–21—where the revenue generated by the relationship is large enough to warrant paying the unauthorized surcharge Defendants have imposed on the industry. *See* SOF ¶¶ 77–81.

Finally, OCC trumpets the fact that we "do not cite to any termination letter from any of the [OCC regulated] banks." OCC Resp. 5. But it can come as no surprise that most banks did not send termination letters explicitly fingering *the very regulators that had just coerced them into terminating the accounts*. And some of the termination letters by OCC-regulated banks *are* best read as referring to the heightened monitoring and compliance costs imposed by OCC. *See* █████ ████████████████████████ OCC also complains that we "took no steps during discovery to obtain sworn declarations or deposition testimony" from the banks. OCC Resp. 2. But

discovery focused on the banks would have been unfruitful for multiple reasons: **(1)** As non-parties, the banks would have enjoyed protections from much discovery under FED. R. CIV. P. 45; **(2)** OCC likely would have sought to prevent the discovery of any remotely relevant evidence through assertion of the Bank Examination Privilege, *see, e.g.*, OCC's Objs. & Resp. to First Set of Doc. Reqs. at 1, 5, 6, 8, 9 (claiming bank examination privilege) (attached as Exhibit E); OCC's Objs. & Resp. to First Set of Interrogs. at 7, 8, 10, 11, 12 (same) (attached as Exhibit F); and **(3)** the banks would not likely have been forthcoming anyway, due to the vast, unaccountable power Defendants continue to wield over them, *see* OCC Br. 4; SOF ¶ 80—and Defendants' previous efforts to pressure banks into keeping the regulators' pressure campaign under wraps, SOF ¶¶ 123–27.

2.      Defendants' efforts to rebut the overwhelming indirect evidence of causation are also unavailing. The record leaves no doubt that Defendants led a regulatory guerrilla war against the entire payday lending industry beginning no later than early 2011—when, as one of FDIC's own former Regional Directors testified under oath, senior officials from FDIC's Washington Office threatened each of the Regional Directors that "someone [would] be *fired*" if a bank in any of the regions "was found to be involved in payday lending." SOF ¶ 18 (emphasis added). FDIC does not dispute that after this quarterly meeting, its senior officials: **(1)** told banks that customer relationships with payday lenders were "unacceptable," *compare* SOF ¶ 140, *with* FDIC RSOF ¶ 140; **(2)** instructed their staff to bring to their attention "[a]ny banks even remotely involved in payday," *compare* SOF ¶ 104, *with* FDIC RSOF ¶ 104; **(3)** adopted the "position" of using all "available means, including verbal recommendations, to strongly encourage [banks] to refrain from any activities that provide assistance to the business activities of pd lenders," *compare* SOF ¶ 157, *with* FDIC RSOF ¶ 157; and **(4)** "made . . . clear" to banks, after they terminated their

payday lender customers, that FDIC wanted them to cast the terminations as "a business decision made by bank management"—and then gloated, after the bank complied, about how effectively "we got our message across," *compare* SOF ¶¶ 124, 129, *with* FDIC RSOF ¶¶ 124, 129.

Defendants attempt to chop down a few individual trees in this evidentiary forest, but these efforts are unsuccessful—and they leave untouched the overall conclusion that they led a nationwide campaign to "get at payday lending" SOF ¶ 60. FDIC, for example, disputes the testimony that the Regional Directors were threatened with losing their jobs if they were not sufficiently aggressive in curbing payday lending. FDIC RSOF ¶ 18. But it failed to marshal *any evidence* throwing doubt on Regional Director Lowe's testimony describing the meeting—it did not, for example, elicit testimony from *any* of the other Regional Directors present at the meeting.

FDIC likewise attempts to sweep aside the evidence of the relentless pressure campaign that Director Dujenski conducted against ██████ Bank—as well as Director Lowe's campaign against ██████ Bank—on the basis that the customers both banks ultimately were forced to terminate are not parties to this case. FDIC Resp. 8. As an initial matter, the entity ████ was coerced to terminate was an affiliate of Plaintiff Check Into Cash. RSOF OCC ¶ 125. At any rate, the relevance of this point is unclear. Both incidents remain compelling examples of the tactics Defendants employed on a nationwide basis—*including* against banks that terminated Plaintiffs, who cited the very same regulatory pressure. SOF ¶¶ 213–23. And while FDIC faults Plaintiffs for "never explain[ing] why AA and CIC retained approximately the same number of bank accounts" during the course of the campaign, FDIC Resp. 8, Advance America's representative *did* explain this: the company was able to open enough new accounts to stay afloat only after working for "months around the clock," Rudolph Dep. 280:2–7, reaching out to literally hundreds of banks— and being turned away by about 275 of them, SOF ¶ 229.

Defendants again deploy their hearsay objection, arguing that several pieces of the evidence we have amassed are inadmissible. Defendants were held to account in Congress for their illegal pressure campaign, but now attempt to shield the result—two thorough and well-grounded staff reports released by the U.S. House Committee on Oversight and Government Reform—from the Court's view. The attempt fails. Both reports are records from "a public office," which are presumptively admissible. FED. R. EVID. 803(8); *see Barry v. Trustees*, 467 F. Supp. 2d 91, 94, 101 (D.D.C. 2006) (admitting a report prepared by the majority staff of a Senate committee). And they are definitively admissible where, as here, they offer a purely objective analysis of "voluminous documents," *id.* at 100—in this case, "853 pages of internal memoranda, communications, and presentations." Appendix to SOF 97 ("SOF App.") (House FDIC Report at 2). Defendants seem to suggest that the reports are inadmissible because Republican committee members are listed at the top. But party affiliation is irrelevant where, again as here, the reports themselves are not partisan but objective, "careful," and "methodical." *Barry*, 467 F. Supp. 2d at 100–01.

Defendants similarly fail in their attempt to exclude two other documents. The first is a letter from a bank CEO to FDIC discussing motivations for "the termination of our relationship with [a payday lender.]" FDIC0027054–55 (SOF App.476–77). The second is a note from another bank's Executive Committee explaining that the bank was dropping a rule-abiding payday lender only because of government pressure. FDIC0128625 (SOF App.519). Both are plainly relevant at least to the source of banks' motive to abandon payday lenders—regulatory pressure. Thus, neither is hearsay. *See* FED. R. EVID. 803(3); *Safavian*, 435 F. Supp. 2d at 45.

Defendants also object to a reference in Plaintiffs' initial statement of facts to a banker's deposition, arguing that Plaintiffs' counsel asked leading questions. Counsel was not, however,

putting words in the banker's mouth. He was repeating statements—specifically, that Director Dujenski had called payday lending a "dirty business" and had threatened either to refer the banker to the Department of Justice or to commence a criminal prosecution—from a document the banker had produced (and with which counsel could have impeached him had he denied the statements). *See* ▮▮▮000030 (R.App.299). Our assertions thus rest ultimately on that document, *e.g.*, RSOF OCC ¶¶ 102, 114, 157, 164, 173, 181, which speaks for itself and is not hearsay, since it records the threats of a party opponent. *See* FED. R. EVID. 801(d)(2)(D).

Defendants next argue that even if it is admissible, our indirect evidence of causation should be rejected because "circumstantial evidence" is categorically "insufficient" to show causation for standing purposes. OCC Resp. 6 & n.7; *see also* FDIC Resp. 10. The cases they cite show nothing of the kind. All *Mideast Sys. & China Civil Constr. Saipan Joint Venture, Inc. v. Hodel* holds is that "the mere possibility that causation is present is not enough." 792 F.2d 1172, 1178 (D.C. Cir. 1986). The evidence summarized above shows that causation is far more than "merely possible." Defendants' other cases merely show that standing may not rest on a "protracted chain of causation," *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996), that is based on "wholly unsubstantiated speculation," *American Fed'n of Gov't Emps. v. Vilsack*, 118 F. Supp. 3d 292, 301 (D.D.C. 2015). Here, Plaintiffs have offered a tight causal chain—Defendants caused Plaintiffs' bank terminations by directly pressuring banks and raising the regulatory-cost-of-doing business with payday lenders—and we have amassed substantial direct and indirect evidence establishing that these acts did in fact occur.[2]

FDIC attempts to cast its campaign against the payday lending industry as targeting only

---

[2] Finally, the passage FDIC quotes from *Johnson v. DeSoto Cty. Bd. of Comm'rs*, 204 F.3d 1335, 1344 n.18 (11th Cir. 2000), is not about standing *at all*; it is about the substantive requirements of the Equal Protection Clause. *Id.*

"banks' *direct* involvement in payday lending" (e.g., by offering payday loans themselves), and "banks lacking sufficient controls to detect and prevent their customers' *illegal* payday lending." FDIC Resp. 41–42. But the record contains conclusive evidence that FDIC's campaign was not limited in either of these ways. While FDIC's assault against payday lending may have begun by focusing on banks offering payday loans themselves, there can be no doubt that the campaign went far beyond direct payday lending by banks. *See, e.g.*, SOF ¶¶ 14 (OIG conclusion that concerns extended to "ACH payment processing for payday lenders"); 35 (2012 FIL casting *third-party relationships* with payday lenders as "high-risk"), 60 (FDIC trying to "get at payday lending (either by the bank's direct customer or through a third party payment processor)").[3]

Nor was the campaign limited to banks with lax safeguards facilitating "*illegal* payday lending." FDIC Resp. 42. The evidence of this is overwhelming, but to take just three examples: **(1)** Lowe repeatedly testified that he pressured banks to terminate customers because they were "part of the industry," not because of "anything about the particular payday lender," Lowe Dep. 46:19–471; *see also id.* at 54:17–55:1, 59:8–15, 68:2–5; **(2)** Dujenski told at least one bank that providing ACH access to a payday lender would "receive close regulatory scrutiny from the FDIC" because "[e]ven under the best circumstances, if this venture is undertaken with the proper controls and strategies to try to mitigate risks, since your institution will be linked to an organization providing payday services, your reputation could suffer," SOF ¶ 130 (alteration in original); and

---

[3] *See also id.* ¶¶ 100 (payday lenders "do not deserve to be *in any way* associated with banking" (emphasis added)); 104 ("[A]ny banks *even remotely involved* in payday should be promptly brought to my attention." (emphasis added)), 120–21 (pressuring bank to "sever the entire relationship" with its payday lender customer); 138 (describing "strategy to 'encourage' [a] bank to sever [a payment-processing] relationship" with payday lender); 155–57 (FDIC policy "to use available means . . . to strongly encourage [supervised banks] to refrain from any activities that provide assistance to the business activities of pd lenders," including mere "depository and lending relationship[s]").

(**3**) scores of banks terminated Plaintiffs even though they are scrupulously law-abiding: they conform with a rigorous set of industry best practices, RSOF FDIC ¶ 13, meet the rate-of-return limits set by the National Automated Clearing House Association, *id.* ¶ 80, and are required to comply with all of the applicable laws and regulations of each State in which their customers reside, *id.* ¶ 13. Defendants' repeated discussion of fraudulent or criminal payday lenders, *see, e.g.*, FDIC Resp. 6, 43, 44, 45; OCC Resp. 7, 27, shows nothing—except that Defendants still today lump law-abiding payday lenders like Plaintiffs together with criminals and fraudsters, continuing their effort to stigmatize the entire industry *even in their briefs before this Court*.

### C.   The Requested Relief Would Redress Plaintiffs' Injuries.

Finally, Defendants say nothing to cast doubt on the redressability of Plaintiffs' injuries. FDIC and OCC stake most of their case on redressability on their argument against causation, which all fail. FDIC Resp. 10; *see also* OCC Resp. 8. Defendants also argue that "Plaintiffs do not identify any admissible documents or testimony . . . showing how the[ ] banks would react or respond to the requested injunction," OCC Resp. 8–9; *see also* FDIC Resp. 10–11, but that is false. Plaintiffs submitted evidence that many banks who terminated their accounts expressed regret at doing so, SOF ¶ 223, making clear how they would "react or respond" if the pressure was turned off. Defendants' objections to the admissibility of this evidence are unfounded. *See* Pls.' Resp. 15–16. Finally, FDIC argues that the requested relief cannot redress Plaintiffs' injuries because it is legally inappropriate. FDIC Resp. 11. But as explained below Defendants' objections to our proposed remedy all fail, so this is no barrier to redressability.

## II.   Defendants' Continuing Campaign Against Payday Lenders Violates the Due Process Clause Under the Stigma-Plus Theory.

Under the "stigma-plus" approach established in *Constantineau*, due process is implicated when the government (**A**) stigmatizes a person in connection with (**B**) an alteration of their

background legal rights. 400 U.S. at 437. Here, Defendants stigmatized Plaintiffs by painting their line of work as a "high risk" and "unacceptable" "dirty business" that "bring[s] . . . nothing good" for banks and is akin to peddling "[d]rug [p]araphernalia." SOF ¶¶ 32, 35, 62, 108, 118, 140. And that stigma had real-world consequences for Plaintiffs' background legal right to access the banking system: the categorization of payday lenders as "high risk" exacted a regulatory surcharge from every bank maintaining a relationship with them, *id.* ¶¶ 77–81, leaving many institutions with no financial choice but to cut them off, *id.* ¶¶ 142–46, 179–80, 197–223, just as Defendants had planned, *id.* ¶¶ 16, 18, 60, 73, 91–93, 101, 107, 137, 148, 154, 157, 178.

Defendants offer a grab-bag of responses, but the upshot of all of them is this: on Defendants' theory, they are free to brand any industry in the country as illegitimate and "high risk"—and to impose heightened due diligence and compliance requirements so onerous that banks can no longer afford to serve them—with utter impunity, totally unrestrained by due process. Defendants' attempt to free themselves from the constitutional limits that bind them must fail.

### A.   Defendants Have Stigmatized Plaintiffs by Tarring Them as "High Risk."

1.   Defendants argue that they have not stigmatized anyone because characterizing payday lenders as "high risk" "is a statement of opinion, not fact, and statements of opinion are not stigmatizing" because "they are not capable of being proved false." FDIC Resp. 12, 13; *see also* OCC Resp. 20–21. This contention rests on a misconception about *Constantineau*'s stigma-plus doctrine: the notion that the "stigma" prong is only met if the government's statements are actually "defamatory." FDIC Resp. 13–14; OCC Resp. 20–21.

As the D.C. Circuit has held, while "official defamation" is required for "a 'reputation-plus' claim" under *Board of Regents of State Coll. v. Roth*, 408 U.S. 564 (1972), *Constantineau*'s stigma-plus approach requires no showing of defamation because it "does not depend on official speech, but on a continuing stigma or disability arising from official action." *O'Donnell v. Barry*,

148 F.3d 1126, 1140 (D.C. Cir. 1998). The cases Defendants cite are not to the contrary, because they describe the requirements for a *reputation-plus* claim, not a *stigma-plus* claim. *See Codd v. Velger*, 429 U.S. 624, 627–28 (1977) (challenge to loss of government employment based on *Roth*); *Doe v. United States Dep't of Justice*, 790 F. Supp. 17, 21–22 (D.D.C. 1992) (same); *Hill v. Borough of Kutztown*, 455 F.3d 225, 236–37 (3d Cir. 2006) (same); *Strasburger v. Board of Educ.*, 143 F.3d 351, 355–56 (7th Cir. 1998) (same); *Flanagan v. Munger*, 890 F.2d 1557, 1571 (10th Cir. 1989) (challenge to adverse government employment action).[4] Defendants' efforts to tar payday lending as a "high risk" and "unacceptable" "dirty business," SOF ¶¶ 35, 118, 140, have plainly affixed Plaintiffs with "a continuing stigma or disability," and that is all the reputation-plus doctrine requires, *O'Donnell*, 148 F.3d at 1140.

Moreover, even if the reputation-plus theory *did* require a factual statement "capable of being proved false," FDIC Resp. 13, Defendants' statements satisfy any such test. The stigmatizing proposition that is the fulcrum of Defendants' campaign—that payday lenders are "high risk," "unacceptable" bank-customers *solely because of their status as payday lenders*, SOF ¶¶ 35, 130, 140—is plainly a factual statement capable of being proven false. Indeed, Defendants *admit* it is false. *See* FDIC Br. 7 (". . . a payday lender relationship does not, in itself, pose reputation risk to a bank"); *see also* OCC Resp. 22; FDIC SOF ¶ 487. More generally, the fundamental premise of Defendants' entire regulatory structure is that when a banking regulator concludes a practice is too "risky," that is not a mere "opinion" that banks may ignore without consequence.

---

[4] Although *Aref v. Lynch* does suggest in a footnote that the " 'stigma plus' test" requires a false statement, it is clear from the nature of the case and the court's citation to *Doe* that *Aref* is actually discussing a "reputation plus" claim and thus did not *sub silentio* overrule the court's earlier decision in *O'Donnell*. 833 F.3d 242, 258 n.11 (D.C. Cir. 2016). Defendants also cite *Blackburn v. City of Marshall*, 42 F.3d 925 (5th Cir. 1995), but that decision was based on Fifth Circuit precedent inconsistent with *O'Donnell*'s rule that defamation is not required in the stigma-plus context. *See San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 701 (5th Cir. 1991).

For these reasons, the Northern District of New York's decision in *National Rifle Association v. Cuomo*, 2018 WL 6132464 (N.D.N.Y. Nov. 6, 2018), is unpersuasive. To begin, because the district court there was required by Second Circuit precedent to "look to state substantive law of defamation in analyzing the 'stigma' component of a 'stigma-plus' claim," *id.* at *19, the entirety of its analysis is inconsistent with the D.C. Circuit's binding conclusion in *O'Donnell* that defamation is not required for a stigma-plus claim. And having undertaken the wrong analysis, the court reached the wrong conclusion. It thought that "[w]hether the NRA represents a potential reputational risk to insurance companies and financial institutions is clearly a matter of opinion," *id.* at *20, but for the reasons just discussed that is not so.

2.      FDIC again insists that it has not stigmatized Plaintiffs because it tarred *all* payday lenders as high-risk and unacceptable, not Plaintiffs alone. FDIC Resp. 14–15. This argument fails for three independent reasons. *First*, like the previous one, this argument depends on the erroneous assumption that a stigma-plus claim requires a showing of defamation. *See id.* at 14–15 (citing *Doe v. Casey*, 796 F.2d 1508 (D.C. Cir. 1986) and *AFGE v. Hawley*, 481 F. Supp. 2d 72 (D.D.C. 2006), another reputation-plus case); *id.* at 15 n.14 (citing defamation cases); *but see O'Donnell*, 148 F.3d at 1140. *Second*, even if the requirements of defamation law did apply, Defendants' stigmatization of payday lenders as a group would meet them. To be sure, "an impersonal reproach of an indeterminate class is not actionable" because it is unlikely "that a reader would understand it to refer to a particular individual" in the class. *Brady v. Ottaway Newspapers, Inc.*, 84 A.D.2d 226, 228 (N.Y. App. Div. 1981). But where "a specific charge [is] directed at a circumscribed group of individuals"—even a large group, if it is sufficiently definite—courts have upheld defamation actions, recognizing that "[t]here is no compelling logic in allowing a greater number of wrongs to afford a lesser degree of liability." *Id.* at 232, 234, 236 (quotation marks omitted).

*Third*, Defendants *have* singled out Plaintiffs individually as "high risk" customers. SOF ¶¶ 116–22, 133–34, 195.

3.      OCC maintains that its statements branding payday lenders as too risky to bank cannot have stigmatized Plaintiffs because they were not publicly disclosed. OCC Resp. 18. But the D.C. Circuit has held that general publication is *irrelevant* so long as the stigmatizing statements were communicated to the actors in control of the background legal right, benefit, or status at issue. *Old Dominion Dairy Prods, Inc. v. Secretary of Def.*, 631 F.2d 953, 966 n.24 (D.C. Cir. 1980). Here, Defendants have not only stated publicly that payday lending is a "high risk," disfavored industry, SOF ¶¶ 30–35, 44–45, but also have communicated those stigmatizing statements directly to the banks Plaintiffs depend upon for their survival, *see id.* ¶¶ 90–96, 109–25, 130–31, 135–45, 155–58, 162–64, 165–69, 177, 179–80, 194, 195, 196.

4.      Finally, FDIC argues that even if it did stigmatize payday lenders in the past, there is no "ongoing harm" because the 2012 FIL "was withdrawn in July 2014" and FDIC has "clarified its policy." FDIC Resp. 15, 41. But Defendants' campaign has not ceased: **(1)** the wave of sudden bank terminations continues apace, *see* SOF ¶¶ 204–10; RSOF FDIC ¶ 558; **(2)** banks continue to attribute those terminations to regulatory pressure and the heightened cost of doing business with payday lenders; *see* SOF ¶¶ 104, 207, 209, 210; RSOF ¶ 558 (collecting examples), and **(3)** defendants *themselves* maintain that there has been no change in their substantive policy, SOF ¶ 54. Indeed, Defendants continue to tar payday lending as an industry "in which criminal and fraudulent activity is rife" in their very briefing in this case. FDIC Resp. 30; *see also, e.g.*, *id.* at 6, 43, 44, 45; FDIC Br. 6, 8–10, 39–40; OCC Resp. 7, 27.[5]

---

[5] FDIC insists that "[t]here is *no* dispute about the FDIC's current policy," which "does *not* require banks to conduct enhanced due diligence." FDIC Resp. 28, 41; *see also* FDIC RSOF ¶ 107.

**B.**     **Defendants Have Distinctly Altered Plaintiffs' Right to Access the Banking System in Common with Other Lawful Industries.**

1.     Under *Constantineau*, as reaffirmed in *Paul*, it suffices for Plaintiffs to show that Defendants' have inhibited their right to access the banking system in common with other lawful industries. Defendants dispute this, claiming that *Constantineau* is distinguishable because "[t]here, the plaintiff was *formally* and *completely* barred from purchasing liquor." FDIC Resp. 18; *see also* OCC Resp. 15. But while the restriction in *Constantineau* may have been "formal," it was far from "complete": as the Supreme Court made clear, the restriction prevented Norma Constantineau from purchasing alcohol only "within the city limits." 400 U.S. at 435–36. Contrary to FDIC's assertion, the effect of the law struck down in *Constantineau* was *precisely* to make it "merely somewhat harder for her to find a liquor store." FDIC Resp. 18. "Many people . . . would consider [the right to hold bank accounts] more important than the right to purchase liquor," *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 204 (D.C. Cir. 2001), and the stranglehold Defendants have placed on payday lenders' access to the banking system does far more to inhibit their exercise of that right than Hartford, Wisconsin's requirement that Ms. Constantineau drive a few miles to the liquor store in the next town.

Much of Defendants' briefing on this point labors to refute arguments we do not make. For example, FDIC states that "the loss of a single job"—and, by extension, a single bank account— "does not implicate a liberty interest." FDIC Resp. 17; *see also* OCC Resp. 12. That is simply *irrelevant*, under *Constantineau*'s stigma-plus analysis, because we are not claiming that the loss

---

But its 30(b)(6) representative said precisely the opposite, agreeing without qualification that "the FDIC expects banks facilitating payment processing for merchant customers engaged in payday lending to engage in heightened due diligence and monitoring[.]" Eberley Dep. at 82:16–21 (R.App.381); SOF ¶ 77. FDIC responds that its representative's testimony "identifies an expectation, not . . . a requirement," FDIC RSOF ¶ 77, but that distinction is illusory: if a bank ignores FDIC's "expectations," it risks swiftly facing an enforcement action, SOF ¶ 83.

of a single bank account constitutes a plus for that claim.[6] Rather, the "plus" is the tangible alteration of Plaintiffs' right to access the banking system caused by Defendants' efforts to brand them as "high risk," in conjunction with the supervisory power Defendants hold over every bank in the nation. For the same reasons, FDIC's lengthy argument that there is "no right to hold an account at a particular bank," FDIC Resp. 19–21, is completely immaterial.

FDIC suggests that "[i]t is questionable whether *Constantineau* is still good law." *Id.* at 18 n.16. But the Supreme Court has been quite clear that it alone enjoys "the prerogative of overruling its own decisions." *Hurst v. Florida*, 136 S. Ct. 616, 623 (2016). It has never overruled *Constantineau*.

Both Defendants place great weight on *Mosrie v. Barry*, 718 F.2d 1151 (D.C. Cir. 1983), asserting it shows that a plaintiff only "suffers a change of legal status when the government has 'formally deprived' it of a legal right or 'so severely impaired' it such that the right is 'foreclosed' or 'extinguished,' " OCC Resp. 15; FDIC Resp. 16–17. But *Mosrie* cannot bear the weight Defendants place on it. To begin, the statement Defendants rely upon was pure dicta. The harm Mosrie claimed—the loss of "business interests" and other "financial harm . . . caused by [the alleged] government imposed stigma"—does not implicate due process under a straightforward reading of *Paul*, *see Mosrie*, 718 F.2d at 1158, 1162, so the panel's decision to opine more broadly on the type of depravation necessary to make out a stigma-plus claim was utterly unnecessary to the holding. "[B]inding circuit law comes only from the holdings of a prior panel, not from its dicta." *Doe v. Federal Democratic Republic of Ethiopia*, 851 F.3d 7, 10 (D.C. Cir. 2017).

In any event, the evidence in this case *satisfies Mosrie*'s dicta, because the right in question,

---

[6] And it is simply incorrect, under *Roth*'s reputation-plus analysis, where the loss of a single job plainly *does* implicate due process *See Roth*, 408 U.S. at 573; *Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir. 1989); *Lyons v. Barrett*, 851 F.2d 406, 410 (D.C. Cir. 1988).

properly framed, *has* been extinguished: by exacting an unauthorized regulatory surcharge on any bank doing business with payday lenders, Defendants have extinguished Plaintiffs' right to access the banking system *in common with other law-abiding businesses*. *Mosrie* itself shows that this is the right way of framing the background right in question, noting that some of "the principal recent cases from this court in which a government-imposed stigma was found to have deprived the stigmatized person of a liberty interest involved . . . a right to be considered for government contracts *in common with all other persons*." 718 F.2d at 1161 (emphasis added).

The persuasive authority in *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994), and *Humphries v. County of Los Angeles*, 554 F.3d 1170 (9th Cir. 2009), *rev'd sub nom. Los Angeles Cty. v. Humphries on other grounds*, 562 U.S. 29 (2010), are in accord. There, the courts held due process was required before the government placed an individual's name in a registry of suspected child abusers, reasoning that although inclusion in the registry did not formally or completely cut plaintiffs off from the rights or benefits in question, it "burden[ed]" those rights, causing "a change of that individual's status significant enough to satisfy the 'plus' requirement of the 'stigma plus' test." *Valmonte*, 18 F.3d at 1002; *see also Humphries*, 554 F.3d at 1188. Defendants utterly fail to come to grips with these cases. They argue that "courts have consistently declined to apply" *Valmonte* and *Humphries* "to the sorts of marginal or incremental burdens Plaintiffs allege," FDIC Resp. 22, but the cases they cite either involve no tangible alteration of a background right or status *at all*, *see Mead v. Independence Ass'n*, 684 F.3d 226, 236 (1st Cir. 2012); *Hinkle v. White*, 793 F.3d 764, 768 (7th Cir. 2015), or depend on the wholly different analysis that applies where the background legal right in question is the liberty to pursue one's chosen profession, *see Connelly v. Comptroller of the Currency*, 876 F.2d 1209, 1214 (5th Cir. 1989); *Phillips v. Vandygriff*, 724 F.2d 490, 492 (5th Cir. 1984); *see also* Pls.' Resp. 24–25.

FDIC argues that the imposition of heightened "compliance costs" does not cause any "reputational harm" because it does not convey any "damaging information." FDIC Resp. 30. There is nothing to this. The heightened compliance costs inflicted on banks who have relationships with payday lenders flow *directly* from Defendants' stigmatization of that industry as "high risk" and illegitimate.

2.      Both Defendants attempt to avoid dealing with our stigma-plus claim on the merits by arguing that it is a "new theory," *id.* at 28, that "appears nowhere in the[ ] Third Amended Complaint," OCC Resp. 10. But the complaint unambiguously alleges that each Defendant "deprived Plaintiffs of protected liberty interests without due process of law" by "attacking the reputations of payday lenders" and thereby effectively "depriving [them] of tangible benefits and interests they had previously possessed." Third Am. Compl. ¶¶ 129, 131, 136, 168 (Feb. 7, 2017), Doc. 124. And as *Valmonte* and *Humphries* show, demonstrating that the government has imposed a tangible burden on the exercise of a background right—like the heightened compliance costs that Defendants have imposed on Plaintiffs' right to access the banking system—is one way of making out this type of due process claim. While the precise arguments presented by Plaintiffs in this round of briefing may differ somewhat from those it advanced earlier in the case, it is far from a "new, never-pleaded theory" that effectively "amend[s] [Plaintiffs'] theory of the case." OCC Resp. 11.

3.      FDIC next renews its argument that our due process claims are barred by the line of cases starting with *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445–46 (1915), suggesting that our claims are more properly brought under "the APA." FDIC Resp. 31–32; *see also* OCC Resp. 33–34. We have previously explained why this argument fails: *Bi-Metallic* applies only to formal "legislative-type" rules that apply generically, with the force of

law. *See* Pls.' Resp. 28–29. That said, Plaintiffs certainly agree that the APA is an appropriate "vehicle for challenging" Defendants' campaign. FDIC Resp. 32. For the reasons given in our previous briefing, by expanding the understanding of reputation risk and weaponizing it against the payday lending industry, Defendants violated the APA's notice and comment requirement, exceeded their authority, and acted in an arbitrary and capricious manner. *See* Pls.' Opp'n to Defs.' Mot. to Dismiss (Oct. 2, 2014), Doc. 23. This Court should reconsider its disposition of our APA claims. *See* Pls.' Resp. 33–34.

4.     Defendants also argue that our understanding of *Constantineau*'s stigma-plus doctrine is "unworkable," OCC Resp. 16, and "violates the separation of powers" because it would set up this Court as "the overseer of the banking industry, charged with determining which customers must be accepted and retained by which banks," FDIC Resp. 23. That is not so. Plaintiffs are not seeking to apply "the Equal Protection Clause's differential-treatment concept," *id.* at 24, nor do they claim a right to "identical access to the banking industry across every customer in the United States," OCC Resp. 17; *see also* FDIC Resp. 19. Banks remain free to choose whatever customers they wish, on our theory, and Defendants likewise retain the power to set broad, industry-wide policies on risk management and to criticize individual bank customers as creating unacceptable risks, provided in each case that the requirements of due process are met. What Defendants *may not* do is brand an entire industry as illegitimate and too risky to bank and engage in a pressure campaign designed to force banks to jettison any member of that industry. What Defendants may not do, in other words, is stigmatize Plaintiffs in a way that alters their background legal rights or status—just as *Constantineau* and *Paul* hold.

## III.   Defendants' Continuing Campaign Against Payday Lenders Violates the Due Process Clause Under the Reputation-Plus Theory.

Defendants have also violated Plaintiffs' due process rights under the reputation-plus

doctrine established in *Roth*. Under that approach, due process is required where the Government imposes a stigma in the course of extinguishing a person's or entity's protected rights or benefits. Here, Defendants have done just that: they have disparaged Plaintiffs' line of business as illegitimate and "high risk" in the course of causing banks to terminate their accounts *en masse*.

In response to our reputation-plus claim, Defendants do little more than rehash arguments we have already thoroughly debunked. Both FDIC and OCC insist that the reputation-plus doctrine applies *only* where a plaintiff has "lost a[ ] government position or contract," OCC Resp. 14; *see also* FDIC Resp. 27, but we have previously explained why this is not right. Pls.' Resp. 31–32. And while FDIC insists that the claim fails because "Plaintiffs' causation evidence is . . . insufficient," FDIC Resp. 28, we have already shown in detail why the undisputed record evidence establishes causation, *see supra* Part I.B.

**IV.    Plaintiffs' Requested Remedy Is Appropriate.**

A.     Both Defendants argue that the only appropriate remedy for a stigma-plus or reputation-plus claim "is a hearing to clear [the plaintiff's] name of the stigma." FDIC Resp. 36; *see also* OCC Resp. 32. But this Court has already rejected this argument, concluding that Defendants' cases are limited to "the termination of at-will government employees and thus do not control" in this context, and that it has "other elements in its broad remedial toolkit" beyond ordering a name-clearing hearing. Mem. Op. at 6 n.2; *see also Constantineau*, 400 U.S. at 434 (granting injunctive relief).

B.     Defendants next argue that the proposed injunction would impermissibly create a "judicial exception" to all banking regulation and establish "that payday lenders, across the board, are not high-risk bank customers." FDIC Resp. 38, 39. Defendants' overwrought objections are based on a fundamental misunderstanding of the injunction we requested. Rather than decreeing that payday lenders never pose heightened risk "across the board," *id.* at 39, our proposed relief

would merely clarify that "*the mere status of being a payday lender* does not make an entity a 'high-risk' customer," Proposed Order (Oct. 12, 2018), Doc. 199-5 (emphasis added) ("Proposed Order"). Rather than "disrupt the FDIC's exercise of delegated powers" over supervised institutions by preventing them from ever identifying a payday lender engaged in risky, illegal, or fraudulent conduct, FDIC Resp. 38, the injunction would merely prevent it from using those powers "to deprive Plaintiffs of access to financial services, *on account of Plaintiffs' being members of the payday lending industry*," Proposed Order (emphasis added). This relief does not "declare that payday lenders *never* need special attention," FDIC Resp. 39; it merely bars FDIC from declaring the entire line of business to be categorically high-risk and illegitimate. The entirety of Defendants' arguments on remedy are comprised of setting up and then knocking down an elaborate straw man.

C.     Defendants' objections to the scope of the injunction we request flow from—and fail because of—this same misunderstanding. They argue that our proposed injunction does not "state its terms specifically" in "reasonable detail," FED. R. CIV. P. 65(d)(1), because it does not define what actions count as "informal pressure" that "harm[s] Plaintiffs' reputations," FDIC Resp. 34; *see also* OCC Resp. 29. But their principal argument that these phrases are too vague is based on the assumption that "under Plaintiffs' theory of the case, *any* . . . supervisory statement about payday lenders could constitute 'pressure' and . . . could harm their reputations." OCC Resp. 29. That is incorrect. We have no quarrel with Defendants making supervisory statements about the risks posed by individual payday lender customers; what the Due Process Clause forbids is Defendants' attempt to tar payday lenders as "high risk" *simply because they are payday lenders*. For the very same reasons, the proposed injunction is not overbroad. FDIC complains that it would "prevent the FDIC from making *any* negative statements whatsoever about *any* payday lenders,"

FDIC Resp. 35, but as discussed above that is patently false.[7]

D.      Finally, Defendants' First Amendment arguments merely show the breadth of the power they think they have. FDIC goes so far as to say that "[a]n injunction that prevents the government from speaking . . . would violate the principle of freedom of government speech." FDIC Resp. 36 (quotation marks omitted). But the government does not have a First Amendment right to stigmatize people—which necessarily occurs through speech, *see, e.g.*, *Constantineau*, 400 U.S. at 435 (notice forbidding liquor sales to Ms. Constantineau)—without due process. OCC says somewhat more specifically that the injunction would limit its "ability to offer opinions about . . . certain policy issues." OCC Resp. 34. But all regulatory action is essentially an expression of opinion—e.g., that this person should not be served alcohol, or that these businesses "do not deserve to be in any way associated with banking." SOF ¶ 100. What OCC claims, then, is the right to abuse its power. No one seeks to limit Defendants' right to speak their minds. They simply have no right to do so in a way that violates Plaintiffs' due process rights.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motions for summary judgment.

---

[7] OCC's argument that the injunction would somehow bind non-party state and federal agencies that use the FFIEC's guidance on BSA/AML compliance equally lacks merit. OCC Resp. 31. As discussed earlier, the FFIEC's guidance was in place "as long ago as 2006," FDIC Resp. 29, and Plaintiffs had no difficulty doing business under it until Defendants began to expand the understanding of "reputation risk" and weaponize it against payday lending.

Date:   January 4, 2019                          Respectfully submitted,

                                                 /s/ Charles J. Cooper
                                                 Charles J. Cooper (Bar No. 248070)
                                                 ccooper@cooperkirk.com
                                                 David H. Thompson (Bar No. 450503)
                                                 Peter A. Patterson (Bar No. 998668)
                                                 Nicole J. Moss (Bar No. 472424)
                                                 Harold S. Reeves (Bar No. 459022)
                                                 John D. Ohlendorf (Bar No. 1024544)
                                                 COOPER & KIRK, PLLC
                                                 1523 New Hampshire Avenue, N.W.
                                                 Washington, D.C. 20036
                                                 (202) 220-9600
                                                 (202) 220-9601 (fax)
                                                 *Attorneys for Plaintiffs*