**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ADVANCE AMERICA, CASH ADVANCE CENTERS, INC., et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 14-953-TNM |
| FEDERAL DEPOSIT INSURANCE CORPORATION, et al., | |
| Defendants. | |

**PLAINTIFFS' RESPONSE TO DEFENDANT
FEDERAL DEPOSIT INSURANCE CORPORATION'S
STATEMENT OF ADDITIONAL FACTS**

Pursuant to Local Rule 7(h), Plaintiffs, Advance America, Cash Advance Centers, Inc.,

Check Into Cash, Inc., and Northstate Check Exchange, respectfully submit the following

response to the Defendant Federal Deposit Insurance Corporation's Statement of Additional

Facts.

*FFIEC Manual*

1.     The U.S. Code speaks for itself.

2.     Disputed and immaterial inasmuch as and insofar as Defendant did not follow the FFIEC

manual on BSA/AML examination procedures when it pressured banks to terminate

Plaintiffs and other payday lenders, and/or stigmatized Plaintiffs and other payday

lenders. *See* Plaintiffs' Statement of Undisputed Material Facts ¶¶ 55–185 (Oct. 12,

2018), Doc. 199-2 ("Plaintiffs' SOF"). Plaintiffs further dispute any suggestion that the

FFIEC's BSA/AML requirements could have caused the mass of bank terminations they

have suffered, given that those requirements were in place "as long ago as 2006," FDIC's

1

Mem. in Opp'n to Pls.' Mot. for Summ. J. at 29 (Nov. 27, 2018), Doc. 213 ("FDIC

Resp."), yet Plaintiffs began to experience an unprecedented wave of terminations years

later, Plaintiffs' SOF ¶¶ 225–26; Pls.' Resp. to Def. FDIC's Statement of Undisputed

Facts ¶¶ 143–44 (Nov. 27, 2018), Doc. 220-1 ("RSOF FDIC").

3.  *See* Response to No. 2. Undisputed that the Director of the FDIC's Division of Risk

Management made the statement attributed to her.

4.  *See* Response to No. 2.

5.  *See* Response to No. 2.

6.  *See* Response to No. 2. Further disputed in that, to the extent the U.S. Code requires

FDIC examiners to comply with the FFIEC manual, the FDIC could not lawfully

designate an entire industry "high-risk" without complying with the requirements of the

Administrative Procedure Act.

7.  *See* Response to No. 2.

8.  Undisputed and immaterial, subject to the clarification that the FFIEC manual makes no

reference to payday lending or payday lenders. Subject to the further clarification that the

FFIEC manual specifically states that "[c]ash-intensive businesses and entities cover

various industry sectors. Most of these businesses are conducting legitimate business;

however, some aspects of these businesses may be susceptible to money laundering or

terrorist financing. Common examples include, but are not limited to, the following:

∗ Convenience stores. ∗ Restaurants. ∗ Retail stores. ∗ Liquor stores. ∗ Cigarette

distributors. ∗ Privately owned automated teller machines (ATM). ∗ Vending machine

operators. ∗ Parking garages." FDIC's Statement of Undisputed Material Facts ("FDIC

SOF"), Ex. 58 at 322. Subject to the further clarification the manual also identifies

casinos, card clubs, broker/dealers, investment advisers, mutual funds, hedge funds, commodity traders, dealers in foreign exchange, check cashers, issuers or sellers of traveler's checks or money orders, providers or sellers of prepaid access, money transmitters, insurance companies, operators of credit card systems, dealers in precious metals, pawnbrokers, and other financial institutions as non-bank financial institutions. *Id.* at 299. Immaterial, because there is no evidence that card clubs, broker/dealers, investment advisers, mutual funds, hedge funds, commodity traders, dealers in foreign exchange, check cashers, issuers or sellers of traveler's checks or money orders, providers or sellers of prepaid access, money transmitters, insurance companies, operators of credit card systems, and other financial institutions have been subjected to a campaign of reputational injury carried out by Defendants, nor that they have experienced a rash of terminations like that which the payday lending industry began to experience in or around 2011. The FFIEC manual speaks for itself.

9.      *See* Response to No. 8.

10.     *See* Response to No. 8.

11.     Undisputed and immaterial, subject to the clarification that the FFIEC manual specifically states that: "The ACH system was designed to transfer a high volume of low-dollar domestic transactions, which pose lower BSA/AML risks," FDIC SOF, Ex. 58 at 221. *See* Response to No. 8. Further immaterial in that none of the Plaintiffs in this suit are exclusively online payday lenders who originate ACH transactions without face-to-face contact, and all Plaintiffs are licensed in the states where they operate and comply with all state payday lending requirements. *See* RSOF FDIC ¶ 13.

12.     *See* Responses to Nos. 8 & 11.

13.     Disputed to the extent that the Defendant has pressured banks to terminate relationships

with third-party payment processors (TPPPs) based upon the fact that those TPPPs

facilitated payday lending. *See, e.g.*, FDIC0067441; Plaintiffs' Reply Memorandum in

Support of Their Motion for Summary Judgment and Memorandum of Points and

Authorities in Opposition to Defendants' Motion for Summary Judgment, Appendix at

753 (Dec. 21, 2018), Doc. 220-8 ("RSOF App.") ("Are you buying that we have some

snm [state non-member] banks that are facilitating payday lending thru TPPP? I would be

surprised."); FDIC0068700 (RSOF App.760) ("[A]nd to ensure clarity, no change in our

position: we will continue to review and scrutinize TPPP relationships, direct and indirect

payday lending activities, and other transactions for potential risks, as delineated in

outstanding FILs, or discussed in the various Supervisory Insight Journals."); *see also*

RSOF FDIC ¶¶ 543, 559. The FFIEC manual speaks for itself.

14.     Undisputed.

*Banks' Failure to Manage Payday Lender Relationships Properly*

15.     Undisputed, but immaterial inasmuch as none of the Plaintiffs had account relationships

with ████████████. *See* Pl. Advance America's Objs. & Resp. to Defs.' First

Set of Interrogs., Exhibits A & B (Aug. 21, 2017), FDIC SOF, Exs. 22 & 23; RSOF

App.1-246 ("Advance America Response to Interrogatories"); Pl. Check Into Cash's

Objs. & Resp. to Defs.' First Set of Interrogs., Exhibits A & B (Aug. 21, 2017), FDIC

SOF, Exs. 40 & 41 ("Check Into Cash Response to Interrogatories"); Pl. Northstate

Check Exchange's Objs. & Resp. to Defs.' First Set of Interrogs. at Nos. 2–4 (Aug. 23,

2017), FDIC SOF, Ex. 50 ("Northstate Response to Interrogatories"). Immaterial in that it

would have been unlawful for Defendants to use informal means or pressure to deny

4

access to the financial system to a business without due process of law on the ground that

a financial institution had failed to manage its relationship with another business. And

further immaterial in that requiring a bank to subject payday lenders to heightened risk

assessment and due diligence procedures, solely because they are payday lenders, would

be inconsistent with the FDIC's own claim that it "encourages institutions to take a risk-

based approach in assessing individual customer relationships rather than declining to

provide banking services to entire categories of customers, without regard to the risks

presented by an individual customer or the financial institution's ability to manage the

risk." Defs.' Mot. for Summ. J., Ex. O at 1 (Jan. 9, 2017), Doc. 101-18 (FIL-5-2015 (Jan.

28, 2015)).

16.     Undisputed, but immaterial inasmuch as none of the Plaintiffs had account relationships

with █████████████████. *See* Advance America Response to Interrogatories, Exhibits

A & B; Check Into Cash Response to Interrogatories, Exhibits A & B; Northstate

Response to Interrogatories at Nos. 2–4; *see also* Response to No. 15.

17.     *See* Response to No. 16.

18.     *See* Response to No. 16.

19.     *See* Response to No. 16. Further immaterial because, ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ Further

immaterial because ███████████████████████████████████████

20.   *See* Response to No. 16. Further immaterial because ███████████

███████████ Further immaterial because ███████████

21.     Undisputed, but immaterial inasmuch as none of the Plaintiffs had account relationships
with ███████████████████████. *See* Advance America Response to
Interrogatories, Exhibits A & B; Check Into Cash Response to Interrogatories, Exhibits A
& B; Northstate Response to Interrogatories at Nos. 2–4; *see also* Response to No. 15.

22.     *See* Response to No. 21.

23.     *See* Response to No. 21.

24.     Undisputed in part, but immaterial inasmuch as none of the Plaintiffs had account
relationships with ████████████. *See* Advance America Response to
Interrogatories, Exhibits A & B; Check Into Cash Response to Interrogatories, Exhibits A
& B; Northstate Response to Interrogatories at Nos. 2–4; *see also* Response to No. 15.

25.     Undisputed in part, but immaterial inasmuch as none of the Plaintiffs had account
relationships with████████████. *See* Advance America Response to
Interrogatories, Exhibits A & B; Check Into Cash Response to Interrogatories, Exhibits A
& B; Northstate Response to Interrogatories at Nos. 2–4; *see also* Response to No. 15.

26.     Undisputed in part, but immaterial inasmuch as none of the Plaintiffs had account
relationships with████████████. *See* Advance America Response to Interrogatories,
Exhibits A & B (App.1); Check Into Cash Response to Interrogatories, Exhibits A & B;
Northstate Response to Interrogatories at Nos. 2–4; *see also* Responses to Nos. 15 & 19.

27.     *See* Response to No. 26.

28.     Undisputed in part, but immaterial inasmuch as none of the Plaintiffs had account
relationships with████████████. *See* Advance America Response to
Interrogatories, Exhibits A & B; Check Into Cash Response to Interrogatories, Exhibits A
& B; Northstate Response to Interrogatories at Nos. 2–4; *see also* Response to No. 15.

29.     Undisputed in part, but immaterial inasmuch as none of the Plaintiffs had account

relationships with ████████████ . *See* Advance America Response to Interrogatories,

Exhibits A & B; Check Into Cash Response to Interrogatories, Exhibits A & B;

Northstate Response to Interrogatories at Nos. 2–4. Further disputed and subject to the

clarification that requiring a bank specifically "to manage its relationships with payday

lenders properly" would be inconsistent with the FDIC's own claim that it "encourages

institutions to take a risk-based approach in assessing individual customer relationships

rather than declining to provide banking services to entire categories of customers,

without regard to the risks presented by an individual customer or the financial

institution's ability to manage the risk." Defs.' Mot. for Summ. J., Ex. O at 1 (Jan. 9,

2017), Doc. 101-18 (FIL-5-2015 (Jan. 28, 2015)). The reference to ████████ is

immaterial for the reasons stated in paragraph ██. The reference to ████████ is

immaterial for the reasons stated in Plaintiffs' Response to OCC's Statement of Facts ¶¶

████████ (Nov. 27, 2018), Doc. 220-3 ("RSOF OCC"); *see also* Response to No. 15.

*FDIC Higher Risk Transaction Working Group*

30.     Disputed. Disputed inasmuch as Mr. Pearce testified that only a single state regulator had

identified concerns about illegal payday lending activity in December 2012. Pearce Depo.

at 49:2–8 (FDIC SOF, Ex. 131). Disputed, inasmuch as Defendants' campaign against

payday lenders had begun by no later than late 2010 or early 2011. Transcript of Marvin

Anthony Lowe Deposition at 35:17–37:15 (Apr. 27, 2018) ("Lowe Dep.") (RSOF

App.853–55); Plaintiffs' SOF, Ex. 15 (Office of Inspector General, FDIC, The FDIC's

Role in Operation Choke Point and Supervisory Approach to Institutions that Conducted

Business with Merchants Associates with High-Risk Activities, Report No. AUD-15-008

at 27 (2015) ("FDIC OIG Report")); FDIC0053568 (FDIC official expressed in June 2011 that "I'm being told that banks are being pressured to not serve them [i.e., payday lenders] as customers.") (RSOF App.614). Disputed because the evidence establishes that the FDIC was concerned about banks having customer relationships with payday lenders "a few years" prior to 2011 and may have taken action to discourage banks from maintaining those relationships. *See* FDIC0053566 (2011 email stating that "The issue came up a few years ago. We had two or three FDIC institutions that had deposit accounts with payday lenders and they somehow helped facilitate the transfer of funds between the payday lenders and their customers but I believe there was no direct relationship between the bank and the customer. At the time, the Chairman was unhappy about this arrangement but I don't remember what we did about it.") (RSOF App.612). Disputed, inasmuch as the FDIC's campaign was against both legal and illegal payday lending. FDIC, *Managing Risks in Third-Party Payment Processor Relationships*, SUPERVISORY INSIGHTS, Summer 2011, at 7 (identifying payday lending as a high-risk activity); *see generally* Plaintiffs' SOF ¶¶ 55–185. Disputed, insofar as the FDIC first sought to prevent banks from themselves offering payday loans—a practice that would have raised no risk of third parties offering payday loans in states where those loans are illegal; *see* FDIC OIG Report at 11 ("The FDIC's payday lending guidance, which was established in 2003 and updated in 2005, increased expectations and placed heightened scrutiny on institutions that were engaged in payday lending. As a result of the guidance and related supervisory actions, the relatively few FDIC-supervised institutions that were making payday loans stopped doing so in 2006."). Disputed inasmuch as the FDIC has pressured banks to terminate relationships with payday lenders even when state

regulators had no objection to a bank's relationship with that payday lender. FDIC OIG

Report at 26–27 ("We spoke with representatives of the state banking department who

informed us that they did not have an objection to the institution's relationship with the

payday lender.").

31.     Undisputed in part, immaterial in part, and disputed in part. Undisputed that the FDIC has

taken supervisory action in the case of banks that were found to have facilitated illegal

payday lending. Immaterial and disputed for the reasons set forth in the Responses to

Nos. 15–29. Disputed, for the reasons set forth in the Response to No. 30, that the FDIC's

campaign was limited to illegal activity.

32.     *See* Responses to Nos. 30 & 31.

33.     *See* Responses to Nos. 30 & 31.

34.     *See* Responses to Nos. 30 & 31.

35.     *See* Responses to Nos. 30 & 31.

36.     *See* Responses to Nos. 30 & 31. Disputed, inasmuch as the Defendants have used

reputation risk as a means to seek to exclude payday lenders from the financial system.

*See* FDIC0066955 (RSOF App.978) (letter from supervised bank complaining of the

FDIC's ability "to force an institution to dismiss a relationship when there have been no

safety and soundness considerations identified other than potential reputational risks");

*see also* FDIC0063667 (RSOF App.727) ("Pay day lenders bring reputational risk,

compliance risk, legal risk, and risk management concerns . . . . nothing good for our

banks."); FDIC0079013 (RSOF App.767) ("[The] relationship carries a high degree of

risk to the institution, including third-party, reputational, compliance, and legal risk.");

FDIC0053293 (RSOF App.611) ("Specifically, the FDIC wants to make the Board aware

of the additional legal, reputational, and consumer compliance risks associated with payday lending."); FDIC0052318 (RSOF App.608) ("We should show it to banks to prove the reputat'l risk argmnt."); FDIC0052994 (RSOF App.609) ("We should draft a brief letter to the bank requesting that prior to engaging in any business plan change involving PD lending, they consult with us. Throw in some items about rep, legal, et al risk from that type of program, and underwriting and capital needs."); FDIC OIG Report at 34 ("Executives at a third institution stated that they terminated a payment processing relationship with a payday lender in 2013 in response to pressure from the FDIC. The executives at this institution stated that the pressure was based primarily on reputation risk to the institution."). Immaterial because Plaintiffs are not exclusively online payday lenders and comply with the laws of each state in which they do business, *see* RSOF FDIC ¶ 13.

37.     Undisputed, but immaterial. *See* Responses to Nos. 30 & 31.

38.     Disputed to the extent that the FDIC's campaign against payday lending predates the 2013 articles published in the New York Times. Disputed that the campaign was limited to concerns about online and illegal payday lenders. *See* Responses to Nos. 30 & 31.

39.     Undisputed, but immaterial inasmuch as none of the Plaintiffs had account relationships with either █████████████████████████. *See* Advance America Response to Interrogatories, Exhibits A & B; Check Into Cash Response to Interrogatories, Exhibits A & B; Northstate Response to Interrogatories at Nos. 2–4; *see also* RSOF FDIC ¶¶ ████████████. Immaterial because Plaintiffs are not exclusively online payday lenders and comply with the laws of each state in which they do business, *see* RSOF FDIC ¶ 13; *see also* Responses to Nos. 30 & 31.

40.    Undisputed, but immaterial. *See* Responses to Nos. 30 & 31.

41.    Undisputed, but immaterial. *See* Responses to Nos. 30 & 31.

42.    Immaterial, because Plaintiffs are not exclusively online payday lenders and comply with
       the laws of each state in which they do business, *see* RSOF FDIC ¶ 13; *see also*
       Responses to Nos. 30 & 31.

43.    *See* Responses to Nos. 30, 31, & 42.

44.    *See* Responses to Nos. 30, 31, & 42.

45.    *See* Responses to Nos. 30, 31, & 42.

46.    *See* Responses to Nos. 30 & 31.

47.    *See* Responses to Nos. 30, 31, & 42.

48.    *See* Responses to Nos. 30, 31, & 42.

49.    *See* Responses to Nos. 30, 31, & 42; *see also* RSOF FDIC at ¶¶ 79–83.

*FDIC Activity Outside the Working Group*

50.    Undisputed that FDIC issued the quoted warning in 2011.

51.    Undisputed, but immaterial inasmuch as none of the Plaintiffs had account relationships
       with ██████████████. *See* Advance America Response to Interrogatories, Exhibits
       A & B; Check Into Cash Response to Interrogatories, Exhibits A & B; Northstate
       Response to Interrogatories at Nos. 2–4.

52.    Disputed. Even where it "appear[ed] they would only have a deposit and lending
       relationship," and it "d[idn't] appear they would be involved in any payment processing,"
       the position of the FDIC was "to use available means, including verbal recommendations,
       to strongly encourage [state non-member banks] to refrain from any activities that
       provide assistance to the business activities of payday lenders." FDIC0119433 (RSOF

App.781).

53. Undisputed in part, disputed insofar as the FDIC conducted its campaign against payday

lenders not to prevent payday lending in states where that activity is illegal but to "get at

payday lending." STAFF OF H. COMM. ON OVERSIGHT AND GOV'T REFORM, 113TH CONG.,

REP. FEDERAL DEPOSIT INSURANCE CORPORATION'S INVOLVEMENT IN "OPERATION

CHOKE POINT" at 9 n.35 (Dec. 8, 2014), Doc. 52-1 ("House Report") (citing Email from

Marguerite Sagatelian, Senior Counsel, Consumer Enforcement Unit, Federal Deposit

Insurance Corporation, to two Counsel in Legal Division, Federal Deposit Insurance

Corporation (Mar. 8, 2013 09:32), FDICHOGR00006907). The Regional Directors were

threatened with termination if banks under their supervision were in any way "involved

in payday lending," without regard to the legality of the practice. Plaintiffs' SOF ¶ 18;

*see generally* Plaintiffs' SOF ¶¶ 55–185.

54. The cited presentation speaks for itself.

55. The cited presentation speaks for itself.

56. Undisputed, but immaterial as no bank is reported to have offered potential violations of

the Federal Trade Commission Act, the Bank Secrecy Act, or any other criminal statutes

by any payday lenders, including but not limited to the Plaintiffs, as a reason for

terminating a Plaintiff. *See* RSOF FDIC ¶¶ 150–273, 311–53, 383–99; *see also* FDIC

SOF, Exs. 23, 25, 43.

57. The cited presentation speaks for itself.

58. Undisputed that the FDIC was concerned that the operator of an illegal online poker

game might have been "masking poker transactions as . . . payday lending." FDIC SOF,

Ex. 211. Disputed that the risk that unlawful businesses might masquerade as lawful

13

businesses would warrant using informal pressure tactics to deny lawful businesses access to the banking system.

59.    Undisputed, but immaterial because none of the Plaintiffs in this suit are exclusively online payday lenders. *See* RSOF FDIC ¶ 13.

60.    Undisputed but immaterial. *See* Response to No. 59.

61.    Disputed insofar as, while minimizing the number of fraudulent payday lenders debiting consumer accounts may have been discussed at the meeting, in preparation for the meeting Chairman Gruenberg was briefed on how nationwide banks facilitate payday lending by providing "corporate accounts, including hundreds of millions in lines of credit, to payday lenders," and function "as intermediaries, serving as either payment processors or as the depository institution for Third-Party Payment Processors for both online and storefront payday lenders." FDIC0034227 (RSOF App.517). After the meeting, moreover, Mr. Gruenberg instructed Mark Pearce, the Director of Depositor and Consumer Protection, to "follow up on the discussion of bank services to payday lenders." FDIC0063407 (RSOF App.724). And a ███████████ official described the meeting as a "payday/ACH conversation." FDIC0013220–21 (RSOF App.440–41) ("I wanted to follow up on the payday/ACH conversation. Our internal team would be happy to discuss what we're seeing in our research."); *see also* FDIC0063591 (RSOF App.725); FDIC0034225 (RSOF App.515); FDIC0034226–28 (App.516–18). *See also* Plaintiffs' SOF ¶¶ 88–96.

62.    Disputed to the extent there is any implication that █████████████████████████████ ████████████████████████████████

63.    Disputed to the extent there is any implication that the meeting was limited to discussion

of illegal payday lending. *See* Response to No. 61.

64.   Undisputed.

65.   Undisputed.

66.   Disputed to the extent there is any implication that ████████████████████

████████████████████████████████████████████████████████████

    ████

67.   Undisputed but immaterial. *See* Response to No. 59.

68.   Undisputed, but immaterial.

69.   Undisputed but immaterial. *See* Response to No. 59.

70.   Undisputed but immaterial. *See* Response to No. 59.

71.   Undisputed, but immaterial for the reasons set forth in the Response to No. 59, and

    subject to the clarification that Mr. Pearce specifically requested that someone "review

    this list and: 1. Determine which ones are FDIC-supervised; 2. Determine what we

    know/have done related to these institutions' role as ODFI [Originating Depository

    Financial Institution] (e.g., through exam reports, consult with regions, discussions with

    RMS [the Division of Risk Management Supervision], etc.) 3. Develop options and

    recommendations on whether/how we should follow up." FDI0065167 (FDIC SOF, Ex.

    167).

72.   Undisputed, but immaterial.

73.   Undisputed, but immaterial.

74.   Undisputed but immaterial. *See* Response to No. 59.

75.   Undisputed but immaterial. *See* Response to No. 59.

76.   Undisputed but immaterial. *See* Response to No. 59.

77.     Undisputed but immaterial. *See* Response to No. 59.

78.     Undisputed but immaterial. *See* Response to No. 59.

79.     Undisputed but immaterial. *See* Response to No. 59.

80.     Undisputed, but subject to two clarifications. First, the Examiner reported that the bank
had "been assured that ███████ follows state laws in which they operate and has
controls in place to prevent lending to persons in states where this type of lending is
prohibited. [A bank officer] also knows that they limit rollovers of loans, which can be
another concern." Plaintiffs' Ex. 97 at FDIC0119433. Second, FDIC Regional Director,
M. Anthony Lowe, responded to the examiner that, notwithstanding the payday lender's
compliance with applicable state laws, "our position has been to use available means,
including verbal recommendations, to strongly encourage [state non-member banks] to
refrain from any activities that provide assistance to the business activities of payday
lenders." FDIC0119433 (RSOF App.781).

81.     Undisputed but immaterial. *See* Response to No. 59.

82.     Undisputed but immaterial. *See* Response to No. 59.

83.     Undisputed but immaterial. *See* Response to No. 59.

84.     Undisputed, subject to the clarification that Mr. Pearce also stated that, "during the Q&As
of the Senate Aging testimony," he had "called banks the 'gatekeepers' of the payments
system"), but immaterial. *See* Response to No. 59.

85.     Undisputed but immaterial. *See* Response to No. 59.

86.     Undisputed in part, disputed in part, and subject to the clarifications that the rephrasing
was proposed in response to a request from Representative Blaine Leutkemeyer for
information on actions taken against online payday lenders; that Representative

Luetkemeyer had "proposed legislation to create special purpose banks just for online payday lenders"; that FDIC Deputy Director for Policy and Research in the Division of Depositor and Consumer Protection Jonathan Miller proposed including "other things in addition to payday (gambling, child pornography, others?)." Disputed because Mr. Miller elsewhere communicated to FDIC employees that he wanted to associate payday lending with pornography in order to convey a "good picture regarding the unsavory nature of the businesses at issue":

> Jonathan heard where we were coming from, but nonetheless wants to retain a reference to pornography in our letters / talking points. He thinks it's important for Congress to get a good picture regarding the unsavory nature of the businesses at issue. He repeated that "one is judged by the friends one keeps," and he seems to feel strongly that including payday lenders in the same circle as pornographers and on-line gambling businesses will ultimately help with the messaging on this issue.

FDICHOGR00007424 (Doc. 52-2 at 121).

87.   Undisputed in part, disputed in part, and subject to clarification. *See* Response to No. 86.

88.   Undisputed but immaterial. *See* Response to No. 59. Further immaterial inasmuch as none of the Plaintiffs had account relationships with ███████████████████████. *See* Advance America Response to Interrogatories, Exhibits A & B; Check Into Cash Response to Interrogatories, Exhibits A & B; Northstate Response to Interrogatories at Nos. 2–4.

89.   Undisputed but immaterial. *See* Response to No. 59.

90.   Undisputed, but subject to the clarification that the slide identifies "pay day loans" as a form of "High Risk Payments." Subject to the further clarification that the slide also identifies "pornography," "tobacco sales," and "drug paraphernalia" as forms of "High Risk Payments." FDIC SOF, Ex. 193, at FDIC110580*; see also* Response to No. 86.

91.    Undisputed, but immaterial.

92.    Undisputed that the email includes the quoted statements. Disputed that the FDIC has not

banned banks from involvement with payday lending. Indeed, the Regional Directors

were threatened with termination if banks under their supervision were in any way

"involved in payday lending." Plaintiffs' SOF ¶ 18; *see also* FDIC0069914 (App.504)

(faulting bank for "[l]ack of controls to ensure the Bank does not engage in transactions

with payday lenders . . . ."); FDIC0062667 (App.446) (FDIC will "determine a

supervisory strategy for the bank, including considerations for encouraging a termination

of the relationship with the payday lender"). *See generally* Plaintiffs' SOF ¶¶ 55–185.

93.    Undisputed, but immaterial. *See* Response to No. 59.

94.    Undisputed, but immaterial. *See* Response to No. 59.

95.    Undisputed, but immaterial. *See* Response to No. 59.

96.    Disputed because the FDIC obtained information on banks that were suspected of

facilitating payday lending generally, not merely on banks facilitating illegal payday

lending. Regional Director Dujenski requested that "[a]ny banks even remotely involved

in payday lending should be promptly be brought to my attention," without limiting his

request to banks that facilitate illegal payday lending. FDIC0062140 (App.385).

Furthermore, when Assistant Regional Director Timothy D. Rich replied that "I'm going

to have my [field supervisors] and [case managers] go through their caseloads to confirm

no payday lending and also to identify any finance company subs or affiliates," Mr.

Dujenski did not limit Mr. Rich's search to banks that might be "facilitating illegal

activity," but instructed Mr. Rich "to share [his] approach with other [Assistant Regional

Directors] . . . ." FDIC0062140 (App.385).

97.   Undisputed that the cited statement was part of a letter congressional letter from FDIC's

Chair. Subject to the clarification that the same letter announced that FDIC had engaged

an outside law firm to review actions taken by the FDIC in connection with "Operation

Choke Point." *See* FDIC SOF, Ex. 210, Letter from FDIC Chairman Jelena McWilliams

to Sen. Crapo (Nov. 15, 2018).

*Banks' Direct Involvement in Payday Lending*

98.   Undisputed in part, disputed in part, and immaterial in part. Disputed, insofar as the FDIC

first sought to prohibit banks from directly offering payday loans as early as 2003. *See*

FDIC OIG Report at 11 ("The FDIC's payday lending guidance, which was established

in 2003 and updated in 2005, increased expectations and placed heightened scrutiny on

institutions that were engaged in payday lending. As a result of the guidance and related

supervisory actions, the relatively few FDIC-supervised institutions that were making

payday loans stopped doing so in 2006.").

99.   Undisputed in part, disputed in part, immaterial in part, and subject to clarification. *See*

Response to No. 98. Further disputed, and subject to the clarification that the FDIC's

decision to prohibit banks from offering payday loans purportedly on the ground that

those loans "may not be fair to consumes" was motivated by the same animus and bias

that motivate its unlawful campaign to deny payday lenders access to the banking system

by means of pressure and stigmatization. Payday lending is a lawful business; that FDIC

officials were attacking the practice because they subjectively believed it to be "unfair"

or immoral is evidence of their bias. *See, e.g.*, FDIC0062042 (RSOF FDIC App.685)

(regional director's statement that payday lenders "are abusive, fundamentally wrong,

hurt people, and do not deserve to be in any way associated with banking").

100. *See* Responses to Nos. 98 & 99. Further immaterial because there is no evidence in the record that any of the Plaintiffs have engaged in "churning," "flipping," or any other practice that encourages borrowers to roll over their loans when they have shown an inability to repay previous loans. Advance America and Check Into Cash must comply with the CFSA Best Practices, *see* RSOF FDIC ¶ 13, which require them to "ensure that all credit products offered provide customers with a structure to reduce the principal balance," Best Practices ¶ 9 (App.330), and require members to limit the number of rollovers, *id.* (App.330). "From its inception Northstate has had an excellent compliance record. Northstate has never failed a compliance audit or had any regulatory complaints filed against it." Declaration of Glenn Bassett ¶ 2 (Nov. 11, 2017), Doc. 107-5 ("Bassett Decl.").

101. *See* Responses to Nos. 98 & 99.

102. *See* Responses to Nos. 98 & 99.

103. Undisputed.

### *Deposit Agreements*

104. Undisputed in part; immaterial, subject to clarification, and disputed insofar as the banks that Plaintiffs do business with were instructed by Defendants "to ensure that their contractual agreements with payment processors . . . should also protect financial institutions by providing for immediate account closure, contract termination, or similar action." FIL-3-2012 at 1 (Jan. 31, 2012), Doc. 17-19.

### *Miscellaneous*

105. Disputed. The statement is both inconsistent with the FDIC's claim that it "encourages

institutions to take a risk-based approach in assessing individual customer relationships

rather than declining to provide banking services to entire categories of customers,"

Defs.' Mot. for Summ. J., Ex. O at 1 (Jan. 9, 2017), Doc. 101-18 (FIL-5-2015 (Jan. 28,

2015)), and directly conflicts with the FDIC's de facto zero tolerance policy that the

Washington Office communicated to its Regional Directors in 2010 or 2011 that "if a

bank was found to be involved in payday lending, someone was going to be fired," Lowe

Dep. at 36:16–18 (RSOF App.854), communicated by those Regional Directors to their

examination officers, FDIC0062138 (App.686) (Regional Director ordered subordinates

that "[a]ny banks even remotely involved in payday should be promptly brought to my

attention"), and enforced against banks that have been required to adopt and enforce

"controls to ensure the Bank does not engage in transactions with payday lenders . . . ."

FDIC0035795–96 (RSOF App.523). *See generally* Plaintiffs' SOF ¶¶ 55–185.

106.   Disputed in part, and subject to clarification that the FDIC OIG interviewed and reported

responses for all six of the FDIC's six regional directors in 2015. FDIC OIG Report at 28.

John Vogel became New York Regional Director in 2012, Kristie Elmquist became

Dallas Regional Director in December 2011, and Michael J. Dean became Atlanta

Regional Director in January 2015. Three of those six regional directors in 2015 therefore

would not have attended the meeting that took place in late 2010 or early 2011 at which

the zero-tolerance policy was announced. *See* Plaintiffs' SOF ¶ 18. At least three regional

directors who attended that meeting carried out the policy. FDIC Regional Director

James LaPierre told a bank who was contemplating serving a payday lending client that

"I don't like this product and I don't believe it has any place in our financial system.

Your decision to move forward will result in an immediate unplanned audit of your entire

bank." House Report at 14 & n. 49 (Dec. 8, 2014), Doc. 52-1. FDIC Regional Director

Anthony M. Lowe testified that Washington leadership "informed the regional directors

that if an institution in their region was facilitating payday lending, the regional director

should require the institution to submit a plan for exiting the business." Lowe Dep.

35:19–36:3 (App.197–98). In particular, the regional directors were told that "if a bank

was found to be involved in payday lending, someone was going to be fired." *Id.* at

36:14–18. Regarding the presumption that he had not followed FDIC policy when he

pressured ███████████ to terminate a payday lender, he testified that he "had kept them

[Doreen Eberley and Mark Pearce] both in the loop completely with regard to this

process way back into the fall of the previous year through some monthly reports that

were submitted to the Washington Office, phone calls, meetings that I had with them, and

so I completely disagreed with that presumption." Lowe Dep. at 89:13–19 (attached as

Exhibit D). Indeed, Mr. Lowe testified that he was being scapegoated, with the

Washington Office claiming that he had "committed an error of judgment when [he had

been] just following their policy." Lowe Dep. at 91:9–14 (App.204). Atlanta Regional

Director Thomas J. Dujenski announced that payday lenders are "abusive, fundamentally

wrong, hurt people, and do not deserve to be in any way associated with banking," House

Report at 14 (Dec. 8, 2014), Doc. 52-1, ordered that "[a]ny banks even remotely involved

in payday lending should be promptly be brought to my attention," FDIC0062140

(App.385), ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ FDIC OIG Report at 23–24 (pressuring of unidentified

bank that facilitated payday lending); RSOF Exhibit 4 (chronology of effort to terminate

relationship between ████████████████████ and a Check Into Cash affiliate).

Indeed, because the Office of the Inspector General failed to address the evidence

submitted by ██████████████, RSOF Exhibit 4, attesting to the stigmatizing remarks

made by Mr. Dujenski in the case of a Check Into Cash affiliate, *id.* at RSOF App.399

(attesting that "Director Dujenski stated that the Bank was involved in a 'dirty business',

and that the FDIC would refer any AML issues to the DOJ. He asked if I was aware of

our bank directors could be subject to criminal prosecution."), the completeness of the

report is subject to serious question.

107.   Disputed because the wave of sudden bank terminations continues to this day, *see*

Plaintiffs' SOF ¶¶ 204–10 (detailing several post-July-2014 terminations, including one

in 2018 that referenced the "Compliance requirements" imposed on "non-bank financial

institution businesses"); RSOF FDIC ¶ 558 (describing other recent terminations), and

the banks continue to attribute those terminations to regulatory pressure and the

heightened cost of doing business with payday lenders; *see* Plaintiffs' SOF ¶¶ 104, 207,

209, 210; RSOF FDIC ¶ 558 (collecting examples). Further dispute the effectiveness of

FDIC's response because the Chair of FDIC has engaged an outside law firm to assess

that very issue: "I am troubled that certain FDIC employees acted in a manner

inconsistent with FDIC policies in what has been generically described as "Operation

Choke Point." To ensure that the FDIC's commitment to integrity remains unequivocally

clear, I am asking an outside law firm to review the prior actions taken by the FDIC in

this matter so that I can better ascertain the effectiveness of our response." FDIC SOF,

Ex. 210, Letter from FDIC Chairman Jelena McWilliams to Sen. Crapo (Nov. 15, 2018).

108.   Disputed. *See* RSOF FDIC ¶¶ ███████.

109.   Undisputed, but immaterial because the 2014 class action lawsuit was limited to banks

serving online payday lenders. *See* Response to No. 59. Immaterial because, as the

exhibit submitted by Defendant FDIC makes clear, the lawsuits were brought after banks

had already "started to rid themselves of ties to industries that regulators deem unsavory."

FDIC SOF, Ex. 209, at 1. Furthermore, the cited incidents did not involve Plaintiffs, and

no bank is reported to have offered civil actions brought against any payday lenders,

including but not limited to the Plaintiffs, as a reason for terminating a Plaintiff. *See*

Responses to Nos. 150–273, 311–53, 383–99; *See* Advance America Response to

Interrogatories, Exhibit A; Check Into Cash Response to Interrogatories, Exhibit A;

Northstate Response to Interrogatories at No. 3.


Date: January 4, 2019                             Respectfully submitted,

                                                  s/ Charles J. Cooper
                                                  Charles J. Cooper (Bar No. 248070)
                                                  ccooper@cooperkirk.com
                                                  David H. Thompson (Bar No. 450503)
                                                  Peter A. Patterson (Bar No. 998668)
                                                  Nicole J. Moss (Bar No. 472424)
                                                  Harold S. Reeves (Bar No. 459022)
                                                  John D. Ohlendorf (Bar No. 1024544)
                                                  COOPER & KIRK, PLLC
                                                  1523 New Hampshire Avenue, N.W.
                                                  Washington, D.C. 20036
                                                  (202) 220-9600
                                                  (202) 220-9601 (fax)